UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| V. | ) | 5:09-CR-216-FL |
| | ) | |
| DANIEL PATRICK BOYD, HYSEN | ) | |
| SHERIFI, ANES SUBASIC, | ) | |
| ZAKARIYA BOYD, DYLAN BOYD, | ) | |
| MOHAMMAD OMAR ALY HASSAN, | ) | |
| ZIYAD YAGHI, | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| _____ | ) | |


DETENTION HEARING
AUGUST 4-5, 2009
BEFORE THE HONORABLE WILLIAM A. WEBB
U. S. MAGISTRATE JUDGE




**APPEARANCES:**

**FOR THE GOVERNMENT:**

MS. BARBARA KOCHER          MR. JASON KELLHOFER
MR. JASON COWLEY            DEPT. OF JUSTICE
ASST. U.S. ATTORNEY         950 PENNSYLVANIA AVE. NW
310 NEW BERN AVE.           ROOM 2740
RALEIGH, NC                 WASHINGTON, DC


-------------------------------------------


**FOR THE DEFENDANTS:**

**DANIEL PATRICK BOYD:**          **HYSEN SHERIFI:**

MS. ROSEMARY GODWIN               MR. ROBERT MCAFEE
ASST. FEDERAL PUBLIC DEFENDER     ATTORNEY AT LAW
150 FAYETTEVILLE ST.              P.O. BOX 905
RALEIGH, NC                       NEW BERN, NC

**<u>ANES SUBASIC</u>:**

MS. BRIDGETT AGUIRRE
ATTORNEY AT LAW
P.O. BOX 1167
FUQUAY-VARINA, NC

**<u>ZAKARIYA BOYD</u>:**

MR. MYRON HILL, JR.
ATTORNEY AT LAW
200 E. FOURTH ST.
GREENVILLE, NC

**<u>DYLAN BOYD</u>:**

MR. JOSEPH ZESZOTARSKI
ATTORNEY AT LAW
P.O. BOX 10096
RALEIGH, NC

**<u>ZIYAD YAGHI</u>:**

MR. JOHN D. MCCULLOUGH
ATTORNEY AT LAW
310 CRAVEN ST.
NEW BERN, NC

**<u>MOHAMMAD OMAR ALY HASSAN</u>:**

MR. R. DANIEL BOYCE
ATTORNEY AT LAW
P.O. BOX 1990
RALEIGH, NC

COURT REPORTER:  DONNA J. TOMAWSKI
STENOTYPE WITH COMPUTER AIDED TRANSCRIPTION

INDEX

| WITNESSES FOR THE GOVERNMENT: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MICHAEL SUTTON | 7 | | 127 | |
| (BY MS. GODWIN) | | 77 | | |
| (BY MR. MCAFEE) | | 79 | | |
| (BY MS. AGUIRRE) | | 92 | | |
| (BY MR. HILL) | | 94 | | |
| (BY MR. ZESZOTARSKI) | | 96 | | 134 |
| (BY MR. BOYCE) | | 107 | | 136 |
| (BY MR. MCCULLOUGH) | | 122 | | |
| | | | | |
| MARK UTLEY | 138 | | 162 | |
| (BY MR. MCCULLOUGH) | | 154 | | 163 |
| (BY MR. BOYCE) | | 156 | | |

| WITNESSES FOR: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **HYSEN SHERIFI:** | | | | |
| NASER SADIKU | 164 | 167 | | |
| **ANES SUBASIC:** | | | | |
| DRAGAN SUBASIC | 168 | 170 | | |
| **OMAR HASSAN:** | | | | |
| ALI HASSAN | 175 | 177 | 180 | |

| GOVERNMENT'S EXHIBITS: | IDENTIFIED | IN EVIDENCE |
|---|---|---|
| 1-3 -- PHOTO | 63 | 68 |
| 4-7 -- PHOTO | 64 | 68 |
| 8-10 -- PHOTO | 65 | 68 |
| 11-14 -- PHOTO | 66 | 68 |
| 15-19 -- PHOTO | 67 | 68 |
| 20 -- PHOTO | 8 | 8 |

```
21-23 -- PHOTO                   9            9
24-26 -- PHOTO                  10           10
27 -- SUMMARY                   26           27
28 -- SUMMARY                   41           41
29 -- SUMMARY                   35           36
30 -- SUMMARY                   43           45
32 -- SUMMARY                   21           23
33 -- SUMMARY                   47           48
34 -- PHOTO                     68           72
38 -- PHOTO                     70           72
39 -- PHOTO                     72           72
42 -- REPORT                    70           72
43 -- I.D. CARD                 15           16
44 -- DOCUMENT                  16           17
45 -- PHOTO                     17           18
47 -- DOCUMENT                  18           20
48 -- BALLAST                   48           49
49 -- DISK                     138          138
```

**DEFENDANT'S EXHIBITS:**          **IDENTIFIED**      **IN EVIDENCE**

**FOR OMAR HASSAN:**

```
A -- BIRTH CERTIFICATE          171
B -- SCHOOL TRANSCRIPT          171
C -- NSCU TRANSCRIPT            172
D -- COPY OF PASSPORT           172
E -- AFFIDAVIT                  173
F -- AFFIDAVIT                  173
```

```
1                    TUESDAY, AUGUST 4, 2009

2         THE COURT:  GOOD MORNING.  THIS IS THE TIME FOR

3  THE DETENTION HEARINGS IN THE CASES OF *UNITED STATES OF*

4  *AMERICA VERSUS DANIEL PATRICK BOYD, HYSEN SHERIFI, ANES*

5  *SUBASIC, ZAKARIYA BOYD, DYLAN BOYD, MOHAMMAD OMAR ALY*

6  *HASSAN, ZIYAD YAGHI.*

7         HAVE ALL THE ATTORNEYS HAD A CHANCE TO REVIEW THE

8  PRETRIAL REPORTS OF THEIR CLIENTS?  MR. MCCULLOUGH?

9              MR. MCCULLOUGH:  YES, YOUR HONOR.

10             THE COURT:  MR. BOYCE?

11             MR. BOYCE:  YES, YOUR HONOR.

12             THE COURT:  MR. ZESZOTARSKI?

13             MR. ZESZOTARSKI:  YES, SIR.

14             THE COURT:  MR. HILL?

15             MR. HILL:  YES, YOUR HONOR.

16             THE COURT:  MS. AGUIRRE?

17             MS. AGUIRRE:  YES, SIR.

18             THE COURT:  MR. MCAFEE?

19             MR. MCAFEE:  YES, YOUR HONOR.

20             THE COURT:  MS. GODWIN?

21             MS. GODWIN:  YES, YOUR HONOR.

22             THE COURT:  MADAM CLERK, IF YOU WILL SWEAR IN

23  THE INTERPRETER, PLEASE.

24      (INTERPRETER SWORN.)

25             THE COURT:  MS. KOCHER, IS THIS A CASE IN WHICH
```

1  A REBUTTABLE PRESUMPTION ARISES?

2          **MS. KOCHER:**  IT IS.  THE GOVERNMENT IS WILLING

3  TO GO AND PRESENT ITS EVIDENCE FIRST, IF IT WOULD ASSIST

4  THE COURT IN ITS DECISION.

5          **THE COURT:**  I THINK IT WOULD.  IS THE GOVERNMENT

6  PROCEEDING UNDER BOTH PRONGS UNDER THE DETENTION ACT, THAT

7  IS RISK OF FLIGHT AND DANGER?

8          **MS. KOCHER:**  IT IS, YOUR HONOR.

9          **THE COURT:**  TO THE DEFENDANTS.  CONGRESS, WHEN

10  THEY AMENDED THE BAIL REFORM ACT, INCLUDED CRIMES ALLEGING

11  TERRORISM AMONG THOSE THAT CREATED A REBUTTABLE

12  PRESUMPTION THAT YOU SHOULD BE HELD IN CUSTODY.  IT

13  INSTRUCTS A JUDGE, IN THE FIRST INSTANCE, TO PRESUME THAT

14  YOU SHOULD BE DETAINED.  IT IS REBUTTABLE, THAT IT ALLOWS

15  YOU TO BRING FORTH EVIDENCE TO TILT THE SCALES BACK TO

16  EVEN.  THE BURDEN OF PERSUADING ME THAT YOU SHOULD BE HELD

17  ALWAYS REMAINS WITH THE GOVERNMENT, AND YOU'RE PRESUMED

18  INNOCENT THROUGHOUT THESE PROCEEDINGS.

19      THE NORMAL MANNER OR WAY IN WHICH THESE HEARINGS TAKE

20  PLACE WHEN THERE'S A REBUTTABLE PRESUMPTION IS TO REQUIRE

21  EACH OF YOU TO PRODUCE EVIDENCE TO REBUT THE PRESUMPTION.

22      THE ATTORNEY FOR THE GOVERNMENT HAS STATED THAT THE

23  GOVERNMENT'S PREPARED TO GO FORWARD WITH ITS EVIDENCE IF

24  IT WOULD ASSIST THE COURT.  AND MS. KOCHER, I WOULD BE

25  HAPPY TO HEAR YOUR EVIDENCE.

1    THE MANNER IN WHICH WE ARE GOING TO PROCEED -- MADAM

2  INTERPRETER, WOULD YOU TELL HIM WHAT I'M SAYING?

3           **INTERPRETER:** YES.

4           **THE COURT:** THE MANNER IN WHICH WE'RE GOING TO

5  PROCEED IS THAT I'M GOING TO ASK THE GOVERNMENT TO

6  INTRODUCE ALL OF ITS EVIDENCE. AT THE CLOSE OF THE

7  EVIDENCE OR OF EACH WITNESS OR PROFFER, HOWEVER THE

8  GOVERNMENT PROCEEDS, STARTING WITH MR. MCCULLOUGH, EACH OF

9  YOU LAWYERS WILL HAVE THE OPPORTUNITY TO CROSS-EXAMINE

10  EACH WITNESS. MS. KOCHER.

11           **MS. KOCHER:** THANK YOU, YOUR HONOR. THE

12  GOVERNMENT CALLS SPECIAL AGENT MICHAEL SUTTON.

13  **MICHAEL SUTTON**, BEING FIRST DULY SWORN, TESTIFIED AS

14  FOLLOWS DURING **DIRECT EXAMINATION**:

15  **BY MS. KOCHER:**

16  **Q.**   IF YOU WOULD, SIR, STATE YOUR NAME FOR THE RECORD.

17  **A.**   MICHAEL SUTTON.

18  **Q.**   WHAT DO YOU DO FOR A LIVING?

19  **A.**   SPECIAL AGENT WITH THE FEDERAL BUREAU OF

20  INVESTIGATION.

21  **Q.**   HOW LONG HAVE YOU BEEN A SPECIAL AGENT?

22  **A.**   I HAVE SERVED WITH THE FEDERAL BUREAU OF

23  INVESTIGATION FOR APPROXIMATELY EIGHT YEARS.

24  **Q.**   AND DO YOU HAVE PRIOR LAW ENFORCEMENT EXPERIENCE?

25  **A.**   I DO. PART OF THAT I SERVED FIVE YEARS WITH THE

1  DURHAM COUNTY SHERIFF'S OFFICE AND SIX YEARS WITH THE

2  DURHAM, NORTH CAROLINA, POLICE DEPARTMENT.

3  **Q.**   IF I COULD TURN YOUR ATTENTION TO THE EIGHT YEARS YOU

4  SERVED AS A SPECIAL AGENT WITH THE FBI.  IN WHAT UNITS

5  HAVE YOU BEEN ASSIGNED?

6  **A.**   I HAVE BEEN ASSIGNED TO A VARIETY OF INVESTIGATIVE

7  DUTIES, INCLUDING BANK FRAUD, COUNTER-TERRORISM AND

8  VIOLENT CRIME.

9  **Q.**   ARE YOU ABLE TO QUANTIFY THE NUMBER OF TIMES YOU

10  TESTIFIED IN FEDERAL COURT?

11  **A.**   IT HAS BEEN DOZENS OF TIMES.

12  **Q.**   ARE YOU, IN EXECUTING YOUR DUTIES AS A SPECIAL AGENT

13  WITH THE THE FEDERAL BUREAU OF INVESTIGATION, FAMILIAR

14  WITH THE INVESTIGATION OF THE DEFENDANTS HERE IN THE

15  COURTROOM TODAY?

16  **A.**   YES, I AM.

17  **Q.**   ALL RIGHT, SIR.  LET ME SHOW YOU WHAT'S BEEN MARKED

18  AS GOVERNMENT'S EXHIBIT NO. 20.  DO YOU RECOGNIZE THAT?

19  **A.**   YES, I DO.

20  **Q.**   WHAT IS THAT?

21  **A.**   THAT IS A PHOTOGRAPH OF DANIEL PATRICK BOYD.

22        **MS. KOCHER:**  THE GOVERNMENT MOVES INTO EVIDENCE

23  EXHIBIT 20.

24        **THE COURT:**  WITHOUT OBJECTION, IT WILL BE

25  RECEIVED.

**BY MS. KOCHER:**

**Q.** IF I COULD SHOW YOU GOVERNMENT'S EXHIBIT 21. WHAT IS THAT?

**A.** THAT IS A PHOTOGRAPH OF DYLAN BOYD.

      **MS. KOCHER:** GOVERNMENT MOVES INTO EVIDENCE EXHIBIT 21.

      **THE COURT:** WITHOUT OBJECTION, IT WILL BE RECEIVED.

**Q.** LET ME SHOW YOU GOVERNMENT'S EXHIBIT NO. 22. DO YOU RECOGNIZE THAT?

**A.** THAT IS A PHOTOGRAPH OF ZAKARIYA BOYD.

      **MS. KOCHER:** THE GOVERNMENT MOVES INTO EVIDENCE GOVERNMENT'S EXHIBIT 22.

      **THE COURT:** WITHOUT OBJECTION, IT WILL BE RECEIVED.

**Q.** IF I CAN TURN YOUR ATTENTION TO EXHIBIT 23. DO YOU RECOGNIZE THAT?

**A.** YES, I DO. THAT'S A PHOTOGRAPH OF ZIYAD YAGHI.

      **MS. KOCHER:** THE GOVERNMENT MOVES 23 INTO EVIDENCE.

      **THE COURT:** WITHOUT OBJECTION, IT WILL BE RECEIVED.

**BY MS. KOCHER:**

**Q.** AGENT SUTTON, IF YOU WOULD NOW LOOK AT GOVERNMENT'S EXHIBIT NO. 24. DO YOU RECOGNIZE THAT?

1  **A.**   YES.  THAT IS A PHOTOGRAPH OF HYSEN SHERIFI.

2        **MS. KOCHER:**  THE GOVERNMENT MOVES INTO EVIDENCE

3  GOVERNMENT'S EXHIBIT 24.

4        **THE COURT:**  WITHOUT OBJECTION, IT WILL BE

5  RECEIVED.

6  **Q.**   TURNING YOUR ATTENTION TO GOVERNMENT'S EXHIBIT 25.

7  DO YOU RECOGNIZE THAT?

8  **A.**   YES.  THAT IS A PHOTOGRAPH OF HYSEN SHERIFI.

9        **MS. KOCHER:**  THE GOVERNMENT MOVES INTO EVIDENCE

10  GOVERNMENT'S EXHIBIT 25.

11        **THE COURT:**  WITHOUT OBJECTION, IT WILL BE

12  RECEIVED.

13  **BY MS. KOCHER:**

14  **Q.**   IF I COULD TURN YOUR ATTENTION TO GOVERNMENT'S

15  EXHIBIT 26.  DO YOU RECOGNIZE THAT?

16  **A.**   YES.

17  **Q.**   WHAT IS IT?

18  **A.**   THAT IS A PHOTOGRAPH OF MOHAMMAD OMAR ALY HASSAN.

19        **MS. KOCHER:**  THE GOVERNMENT MOVES INTO EVIDENCE

20  GOVERNMENT'S EXHIBIT 26.

21        **THE COURT:**  WITHOUT OBJECTION, IT WILL BE

22  RECEIVED.

23  **BY MS. KOCHER:**

24  **Q.**   IF I CAN TURN YOUR ATTENTION NOW, AGENT, TO THE

25  INVESTIGATION AT ISSUE.  CAN YOU DESCRIBE FOR THE COURT

1  THE SCOPE OF THAT INVESTIGATION?

2  **A.**    THIS INVESTIGATION WAS INITIATED IN APPROXIMATELY

3  2005, AND IT REVOLVES AROUND REPORTS THROUGH THE COMMUNITY

4  THAT DANIEL PATRICK BOYD, ALONG WITH OTHERS, HAD

5  ESTABLISHED OR WERE WORKING TO ESTABLISH A NETWORK TO

6  ASSIST THOSE TRAVELING OVERSEAS TO FIGHT VIOLENT JIHAD.

7  DURING THE COURSE OF THE CONSPIRACY, THE INDIVIDUALS WERE

8  COLLECTING MONEY TO PAY FOR THESE OVERSEAS TRAVELS, AND

9  DANIEL BOYD USED HIS PREVIOUS EXPERIENCE, PRIMARILY

10  THROUGH HIS TALES OF HIS EARLIER FIGHTING TO ATTRACT

11  MEMBERS IN THE CONSPIRACY.

12  **Q.**    ALL RIGHT.  AND IF YOU WOULD, FOR THE COURT, JUST

13  DETAIL THE TYPES OF INVESTIGATIVE TECHNIQUES USED SINCE

14  2005.

15  **A.**    WITNESS INTERVIEWS WERE UTILIZED.  THERE WAS A

16  COLLECTION OF PHYSICAL EVIDENCE, A REVIEW OF TELEPHONE AND

17  FINANCIAL RECORDS.  THERE WAS INFORMATION RECEIVED FROM

18  CONFIDENTIAL SOURCES.  THERE WERE RECORDINGS THAT WERE

19  ACQUIRED DURING THE COURSE OF THE INVESTIGATION.

20  **Q.**    WERE ANY MANNER OR MEANS OF INVESTIGATION WHICH WERE

21  CLASSIFIED USED DURING THIS INVESTIGATION?

22  **A.**    YES, THERE WERE CLASSIFIED MEANS UTILIZED.

23  **Q.**    ARE YOU AUTHORIZED TODAY TO DISCLOSE EITHER THE

24  MANNER OR MEANS OR THE RESULTS OF SUCH CLASSIFIED

25  INFORMATION?

1   **A.**   I AM NOT AUTHORIZED.

2   **Q.**   IS IT YOUR INTENTION THEN TO TESTIFY TO ANY OF THOSE

3   CLASSIFIED ITEMS?

4   **A.**   NO, IT IS NOT MY INTENTION TO DO THAT.

5   **Q.**   ALL RIGHT.  AGENT SUTTON, THE INDICTMENT ALLEGES THAT

6   IT WAS PART OF THE CHARGED CONSPIRACY TO RADICALIZE

7   OTHERS.  WHAT EVIDENCE DO YOU CALL TO MIND THAT THE

8   INVESTIGATION REVEALED RADICALIZATION?

9   **A.**   DANIEL PATRICK BOYD, IN PARTICULAR, UTILIZED -- WELL,

10  HE PROVIDED MESSAGES TO THESE INDIVIDUALS INVOLVED IN THE

11  CONSPIRACY TO ENCOURAGE AND ENGAGE THESE INDIVIDUALS TO

12  COMMIT VIOLENT ACTS, OFTEN REFERRED TO IN THIS MANNER AS

13  JIHAD.

14  **Q.**   ALL RIGHT.  AND IN WHAT FASHION WOULD HE PROMOTE

15  VIOLENT JIHAD?

16  **A.**   HE WOULD DO THIS THROUGH VERBAL ORATATION (SIC), HE

17  WOULD ALSO PROVIDE WRITTEN MESSAGES AND HAS AT TIMES

18  E-MAILED INFORMATION TO THESE INDIVIDUALS TO REVIEW.

19  **Q.**   AND DO YOU HAVE AN IDEA AS TO WHY ANYONE WOULD LISTEN

20  TO DANIEL BOYD ON THE SUBJECT?

21  **A.**   FROM STATEMENTS TO THE FBI BY DANIEL BOYD, HE

22  INFORMED US THAT IN THE LATE '80S, THAT HE HAD TRAVELED

23  OVERSEAS TO THE PAKISTAN AND AFGHANISTAN REGION AND HAD

24  FOUGHT WITH THE MUJAHIDEEN AGAINST THE SOVIETS.

25  **Q.**   DID HE BETTER EXPLAIN THAT?

1  **A.**  HE DID.  PRIOR TO DEPARTING THE UNITED STATES, HE HAD

2  COME IN CONTACT AND ACTUALLY ATTENDED A TRAINING CAMP IN

3  CONNECTICUT.  IN THIS TRAINING CAMP, THEY TAUGHT HIM

4  BATTLEFIELD TECHNIQUES, BATTLEFIELD RULES, HAND-TO-HAND

5  COMBAT, AND THE USE OF VARIOUS WEAPONS.  WHEN HE

6  ULTIMATELY TRAVELED TO THE PAKISTAN AND AFGHANISTAN

7  REGION, HE TOLD US THAT HE HAD TRAINED AT THREE DIFFERENT

8  TRAINING CAMPS IN THE AREA AND LEARNED SIMILAR-TYPE --

9  PARTICIPATED IN SIMILAR-TYPE ACTIVITIES.

10  **Q.**  ALL RIGHT.  BEFORE WE LEAVE THE MENTION OF

11  CONNECTICUT, DID HE DESCRIBE THE CAMP THAT HE ATTENDED IN

12  CONNECTICUT?

13  **A.**  HE SAID THE CAMP APPEARED TO BE A BOYSCOUT CAMP THAT

14  COULD BE RENTED AND THE INDIVIDUALS WHO WERE RUNNING IT

15  WERE QUITE SECRETIVE AND DIDN'T WANT INDIVIDUALS FROM THE

16  OUTSIDE TO BE AWARE OF WHAT THEY WERE DOING THERE.

17  **Q.**  ALL RIGHT, SIR.  YOU SAID THAT DANIEL BOYD INFORMED

18  THE FBI THAT HE HAD ATTENDED THREE SEPARATE TRAINING CAMPS

19  IN AFGHANISTAN?

20  **A.**  THAT'S CORRECT.

21  **Q.**  DID HE DESCRIBE THOSE WITH ANY PARTICULARITY?

22  **A.**  HE DID.  THE INITIAL TRAINING CAMP HE REFERRED TO AS

23  JAWR.  AND HE SAID THIS WAS AGAIN SIMILAR -- HE RECEIVED

24  SIMILAR TRAINING FROM INDIVIDUALS AS HE HAD RECEIVED IN

25  CONNECTICUT, BATTLEFIELD RULES, ENGAGING IN HAND-TO-HAND

1    COMBAT, AND THE USE OF VARIOUS ASSAULT WEAPONS.

2         HE ALSO REPORTED THAT HE HAD BEEN TO TWO OTHER

3    TRAINING CAMPS, SADR AND KHALDEN, AND ALSO RECEIVED

4    SIMILAR TRAINING.  AT ONE OF THESE, THE SADR TRAINING

5    CAMP, HE REPORTED THAT IT WAS UNDER SEIZE FOR

6    APPROXIMATELY 23 DAYS BY THE RUSSIANS.

7         HE ALSO PROVIDED THIS INFORMATION THROUGH THE COURSE

8    OF THE INVESTIGATION THAT HE HAD BEEN PRESENT DURING SCUD

9    MISSILE ATTACKS AND ACTUALLY HAD BEEN PRESENT WHEN SOVIET

10   LEAGUE FIGHTERS HAD FLOWN OVER, AND THEY WERE SO CLOSE

11   THAT HE COULD ACTUALLY SEE THE PILOT.

12   **Q.**   DID HE DISCUSS ANY PERSONS THAT HE MET WHILE IN

13   AFGHANISTAN IN THAT TIMEFRAME?

14   **A.**   HE DID REPORT THAT HE WAS INFLUENCED AND HAD MET

15   ABDULLAH AZAM.

16   **Q.**   WHO'S ABDULLAH AZAM?

17   **A.**   ABDULLAH AZAM WAS THE IDEOLOGICAL LEADER OF THE

18   MUJAHIDEEN IN THE '80S THAT SUPPORTED THE INDIVIDUALS

19   COMING IN AND FIGHTING AGAINST THE SOVIETS.

20   **Q.**   HAS A SEARCH BEEN EXECUTED ON DANIEL BOYD'S HOME?

21   **A.**   IT HAS.

22   **Q.**   AND WERE THERE THINGS CONSISTENT WITH THE STATEMENTS

23   THAT YOU HAVE DESCRIBED TO THE COURT TODAY DISCOVERED IN

24   THAT SEARCH?

25   **A.**   THERE ARE.

1      **THE COURT:** EXCUSE ME. WOULD THE INTERPRETER

2   AND MS. AGUIRRE, PLEASE APPROACH, AND MS. KOCHER?

3      (THE FOLLOWING BENCH CONFERENCE WAS HELD.)

4      **THE COURT:** IT APPEARS TO ME THERE ARE TIMES

5   WHEN I'M SPEAKING THAT YOU TAKE VERY, VERY LONG PAUSES AND

6   DON'T SAY ANYTHING.

7      **INTERPRETER:** I ASKED MR. SUBASIC WHAT HE

8   WANTED. I CAN ALSO DO IT SIMULTANEOUSLY.

9      **THE COURT:** I DIDN'T REALIZE YOU ASKED ANYBODY.

10  I WANT IT SIMULTANEOUS.

11     **INTERPRETER:** I WAS NOT AWARE OF IT.

12     **THE COURT:** THAT'S ALL RIGHT. NO PROBLEM.

13     (END OF BENCH CONFERENCE.)

14  **BY MS. KOCHER:**

15  **Q.** LET ME SHOW YOU WHAT'S BEEN MARKED AS GOVERNMENT'S

16  EXHIBIT NO. 43. DO YOU RECOGNIZE THAT, AGENT SUTTON?

17  **A.** I DO.

18  **Q.** WHAT IS IT?

19  **A.** THAT'S AN IDENTIFICATION CARD THAT WAS RECOVERED FROM

20  DANIEL BOYD'S RESIDENCE.

21  **Q.** DO YOU KNOW WHOSE PHOTO APPEARS THERE?

22  **A.** IT APPEARS TO BE THE PHOTOGRAPH OF DANIEL BOYD.

23     **MS. KOCHER:** THE GOVERNMENT MOVES INTO EVIDENCE

24  GOVERNMENT'S EXHIBIT 43.

25     **THE COURT:** WITHOUT OBJECTION, IT WILL BE

RECEIVED.

**BY MS. KOCHER:**

**Q.**   I NOTE THE FACE OF EXHIBIT 43 CONTAINS WRITING THAT IS NOT IN ENGLISH; IS THAT ACCURATE?

**A.**   THAT IS ACCURATE.

**Q.**   AND HAS THE FBI HAD THE WORDS ON THAT EXHIBIT 43 TRANSLATED?

**A.**   YES.

**Q.**   BY WHOM?

**A.**   BY ONE OF OUR LINGUISTS.

          **MS. KOCHER:**  IF I MAY APPROACH, YOUR HONOR?

          **THE COURT:**  YOU MAY.

**Q.**   LET ME SHOW YOU WHAT'S MARKED AS GOVERNMENT'S EXHIBIT NO. 44.  WHAT IS THAT, AGENT SUTTON?

**A.**   THERE IS A COPY OF THE IDENTIFICATION CARD ON THIS PAPER ALONG WITH THE TRANSLATION OF THE WRITINGS.

**Q.**   ALL RIGHT.  AND IF YOU WOULD TELL THE COURT THE TRANSLATION PROVIDED FOR THE FACE OF EXHIBIT 43?

**A.**   ON THE FACE, THERE IS THE WORD "MONOTHEISM," "JIHAD," AND "POWER," BUT THERE'S A QUESTION MARK BY THAT.  THE INTERPRETER WAS NOT ABSOLUTELY CERTAIN THAT THAT WAS THE CASE.

          THERE'S ALSO WORDS ON THERE THAT SAYS, "NO GOD BUT GOD."  "MUHAMMED IS HIS MESSENGER."  IT HAS A NUMBER LISTED THERE, 70071.  IT SAYS, "COUNTRY," WHICH SAYS

"AMERICA."  KNOWN BY THE NAME "SAIFULLAH", WHICH IS A NAME

UTILIZED BY DANIEL BOYD, AND DATE SEPTEMBER 24, 1989,

WHICH IS CONSISTENT WITH THE TIMEFRAME THAT DANIEL BOYD

TOLD THE FBI HE HAD TRAVELED TO THE REGION.

**Q.**   LET ME TURN YOU TO THE BACK OF EXHIBIT 43.  THE FBI

INTERPRETER INTERPRETED THE WRITINGS ON THE BACK OF THIS

EXHIBIT AS WELL?

**A.**   THAT IS CORRECT.

**Q.**   IF YOU WOULD LET THE COURT KNOW WHAT --

**A.**   ON THE BACK OF THE CARD IT READS: "CARRIER OF THIS

CARD IS ALLOWED TO GET IN THE ANSAR GUEST HOUSE ALONE.

CARRIER OF THIS CARD MUST ADHERE TO THE REGULATIONS OF

THIS HOSTING HOUSE.  RETURN THIS CARD UPON LEAVING THE

GUEST HOUSE."  AND THEN THERE'S "TYPE OF BLOOD," WHICH IS

BLANK.

          **MS. KOCHER:**  THE GOVERNMENT MOVES INTO EVIDENCE

EXHIBIT 44.

          **THE COURT:**  WITHOUT OBJECTION, IT WILL BE

RECEIVED.

**BY MS. KOCHER:**

**Q.**   IF I CAN TURN YOUR ATTENTION NOW TO EXHIBIT 45.  WHAT

IS THIS?

**A.**   THIS IS A PHOTOGRAPH THAT WAS FOUND IN THE RESIDENCE

OF DANIEL BOYD.

**Q.**   AND WHAT DOES IT PURPORT TO SHOW?

1　**A.**　IT APPEARS TO SHOW DANIEL BOYD IN HIS YOUNGER YEARS

2　WITH ANOTHER INDIVIDUAL.

3　　　　　**MS. KOCHER:**　MOVE EXHIBIT 45 INTO EVIDENCE.

4　　　　　**THE COURT:**　WITHOUT OBJECTION, IT WILL BE

5　RECEIVED.

6　**Q.**　AND IF I CAN TURN YOUR ATTENTION TO GOVERNMENT'S

7　EXHIBIT NO. 46.　DO YOU RECOGNIZE THAT, SIR?

8　**A.**　AGAIN, IT IS A PHOTOGRAPH OF TWO MALES, ONE OF WHICH

9　APPEARS TO BE DANIEL BOYD IN HIS YOUNGER YEARS.　ALSO IN

10　THE PHOTOGRAPH ARE WHAT APPEAR TO BE TWO AK-47'S, OR A

11　LIKE WEAPON.

12　**Q.**　SORRY, I DIDN'T HEAR THAT.

13　**A.**　THERE ARE TWO FIREARMS THAT APPEAR TO BE AK-47'S OR

14　SIMILAR WEAPON.

15　**Q.**　IF I CAN HAVE YOU LOOK AT EXHIBIT 47.　WHAT IS THAT,

16　SIR?

17　**A.**　THIS READS ACROSS THE TOP, "TEXT OF FATWAH URGING

18　JIHAD AGAINST AMERICANS."

19　**Q.**　AND WHAT IS A FATWAH?

20　**A.**　A FATWAH IS AN EDICT TYPICALLY --

21　　　　　**THE COURT:**　MS. KOCHER, ARE YOU CONTROLLING THE

22　EXHIBITS, BECAUSE --

23　　　　　**MS. KOCHER:**　THERE IS NOT AN ELECTRONIC VERSION

24　OF THIS.

25　　　　　**THE COURT:**　THANK YOU.　WHEN THAT OCCURS, IF YOU

1   WILL JUST LET ME KNOW.

2            **MS. KOCHER:**  CERTAINLY.  APOLOGIZE.

3   **Q.**   A FATWAH?

4   **A.**   A FATWAH IS TYPICALLY AN EDICT ISSUED BY AN ISLAMIC

5   CLERIC, IN THIS CASE IT'S URGING JIHAD AGAINST AMERICANS.

6   **Q.**   AND WAS THIS DOCUMENT ALSO FOUND ON THE SEARCH OF THE

7   BOYD HOME?

8   **A.**   YES, IT WAS.

9   **Q.**   IN SUM, WHAT IS THE SIGNIFICANT PORTION OF THIS

10  DOCUMENT?

11  **A.**   THE SECOND PAGE PROVIDES THE MOST TELLING SUMMARY.

12  IT READS, "THE RULING TO KILL AMERICANS AND THEIR ALLIES,

13  CIVILIANS AND MILITARY, IS AN INDIVIDUAL DUTY FOR EVERY

14  AMERICAN WHO CAN DO IT IN ANY COUNTRY IN WHICH IT IS

15  POSSIBLE TO DO IT, IN ORDER TO LIBERATE -- AND I MAY

16  MISPRONOUNCE THIS -- THE AL-AQSA MOSQUE AND THE HOLY

17  MOSQUE FROM THEIR GRIP."

18  **Q.**   IF I CAN REDIRECT YOU, I UNDERSTOOD YOU TO SAY THAT

19  THE RULING TO KILL THE AMERICANS WAS AN INDIVIDUAL DUTY

20  FOR EVERY AMERICAN.  IS THAT WHAT IN FACT IT SAYS?

21  **A.**   I'M SORRY.  "THE RULING TO KILL AMERICANS AND THEIR

22  ALLIES, CIVILIANS AND MILITARY, IS AN INDIVIDUAL DUTY FOR

23  EVERY MUSLIM WHO CAN DO IT IN ANY COUNTRY."

24            **MS. KOCHER:**  THE GOVERNMENT MOVES EXHIBIT 47

25  INTO EVIDENCE.

1    **THE COURT:**  WITHOUT OBJECTION, IT WILL BE

2    RECEIVED.

3    **BY MS. KOCHER:**

4    **Q.**  SO IT'S YOUR TESTIMONY, AGENT SUTTON, THAT BASED ON

5    THE EXPERIENCE AND TRAINING THAT DANIEL BOYD HAD IN

6    AFGHANISTAN, THE PERSONS HERE HAD CAUSE TO LISTEN TO HIM?

7    **A.**  YES.

8    **Q.**  IF I CAN TURN YOU THEN TO STATEMENTS THAT DANIEL BOYD

9    MAY HAVE MADE TO THOSE LISTENING TO HIM HERE.

10       DO YOU HAVE A GENERAL -- SOME EXAMPLES OF THOSE

11   STATEMENTS?

12   **A.**  IN GENERAL, DANIEL BOYD ENCOURAGED THESE INDIVIDUALS

13   TO PARTICIPATE IN VIOLENT JIHAD.  HE ENCOURAGED THEM TO

14   COLLECT THE FINANCIAL MEANS TO BE ABLE TO TRAVEL OVERSEAS

15   TO DO THIS.  HE ENGAGED THEM AND ENCOURAGED THEM TO TRAIN,

16   INCLUDING THE USE OF FIREARMS AND IN THE MILITARY STYLE.

17   **Q.**  WAS DANIEL BOYD EVER HEARD SPECIFICALLY URGING

18   VIOLENT JIHAD?

19   **A.**  HE WAS.  IT WAS TOLD TO THE GROUP, AND THEY ALL

20   APPEARED TO AGREE, THAT KILLING THE KUFFAR IS A

21   RESPONSIBILITY OF INDIVIDUALS DURING THE JIHAD.

22   **Q.**  WHAT IS KUFFAR?

23   **A.**  KUFFAR IS A TERM USED FOR NON-MUSLIMS OR

24   NON-BELIEVERS.

25   **Q.**  ALL RIGHT.  WERE THERE OTHER STATEMENTS THAT YOU

1  RECALL?

2          **MS. KOCHER:**  IF I MAY APPROACH, YOUR HONOR?

3          **THE COURT:**  YOU MAY.

4  **BY MS. KOCHER:**

5  **Q.**  IF YOU WILL ANSWER THE QUESTION FIRST.  WERE THERE

6  ANY OTHER GENERAL STATEMENTS THAT YOU REMEMBER?

7  **A.**  YES.

8  **Q.**  OKAY.

9  **A.**  HE REFERENCED A NUMBER OF THINGS, INCLUDING THE

10  MUJAHIDEEN AND SUPPORT FOR THE MUJAHIDEEN.  HE REFERENCED

11  THAT MUSLIMS SHOULD NOT LEAVE JIHAD AND SHOULD PARTICIPATE

12  IN THE JIHAD.  AND HE ALSO TALKED ABOUT SHAHID.

13  **Q.**  WHAT IS SHAHID?

14  **A.**  SHAHID IS MARTYRDOM.  BY DYING IN THE SERVICE OF

15  JIHAD, THESE INDIVIDUALS, HE INFORMED THEM, WOULD -- HAD

16  THE SHAHEED AND WOULD BE FORGIVEN OF ALL THEIR SINS.

17  **Q.**  I CONFUSED YOU BY APPROACHING YOU WITH THAT DOCUMENT.

18  YOU'RE READING FROM A DOCUMENT MARKED AS GOVERNMENT'S

19  EXHIBIT 32?

20  **A.**  IT IS.

21  **Q.**  WHAT IS EXHIBIT 32?

22  **A.**  THIS IS A GENERAL SUMMARY OF AN AUDIO RECORDING OF

23  DANIEL PATRICK BOYD SPEAKING IN THE PRESENCE OF SABRINA

24  BOYD, NOAH BOYD, ZAKARIYA BOYD, DYLAN BOYD, MARYUM BOYD,

25  AN INDIVIDUAL KNOWN AS ZIZI, WHO IS DYLAN BOYD'S SPOUSE,

1 AND A WITNESS.

2 **Q.** AND THE TOPIC OF THE SPEAKING DONE BY DANIEL BOYD, IS

3 THAT WHAT YOU HAVE JUST STATED?

4 **A.** YES.

5 **Q.** DO YOU KNOW WHERE DANIEL BOYD WAS WHEN THIS STATEMENT

6 WAS MADE?

7 **A.** IN HIS RESIDENCE.

8 **Q.** AND HAVE YOU PREVIOUSLY LISTENED TO THE AUDIO

9 PORTION?

10 **THE COURT:** EXCUSE ME. YES, MA'AM?

11 **INTERPRETER:** I CAN NOT HEAR THE PROSECUTOR.

12 **THE COURT:** MR. MARSHAL, IS IT POSSIBLE TO

13 SUBSTITUTE THE INTERPRETER AND MR. SUBASIC, SWAP PLACES AT

14 THE END WITH MR. DYLAN BOYD?

15 (DEFENDANT, ANES SUBASIC, AND THE INTERPRETER, ARE

16 MOVED CLOSER TO THE PROSECUTION TABLE.)

17 **THE COURT:** THANK YOU. YOU MAY CONTINUE.

18 **BY MS. KOCHER:**

19 **Q.** IS THE SUMMARY THAT YOU ARE LOOKING AT, AGENT SUTTON,

20 EXHIBIT 32, A LINE-BY-LINE TRANSCRIPT OF THE AUDIO

21 RECORDING?

22 **A.** IT IS NOT. IT IS A SUMMARY OF THE RECORDING.

23 **Q.** ALL RIGHT. AND IT WOULD BE -- WOULD IT BE HELPFUL TO

24 THE COURT AS IT REVIEWS THE MATTERS BEFORE IT TODAY?

25 **A.** I THINK IT WOULD.

1        **MS. KOCHER:**  THE GOVERNMENT MOVES INTO EVIDENCE

2   GOVERNMENT'S EXHIBIT 32.

3        **THE COURT:**  HAS IT BEEN PROVIDED TO THE DEFENSE

4   COUNSEL?

5        **MS. KOCHER:**  IT HAS, YOUR HONOR, AT THIS POINT.

6        **THE COURT:**  WITHOUT OBJECTION, IT WILL BE

7   RECEIVED.

8   **BY MS. KOCHER:**

9   **Q.**   AGENT SUTTON, HAVE YOU LISTENED TO THE RECORDING?

10  **A.**   YES, I HAVE.

11  **Q.**   ARE THERE TERMS FOUND IN THE RECORDING THAT MIGHT BE

12  HELPFUL TO GO OVER BEFORE THE RECORDING IS PLAYED?

13  **A.**   YES.

14  **Q.**   WHAT WOULD THOSE TERMS BE?

15  **A.**   ONE OF THE TERMS MAY BE --

16        **INTERPRETER:**  IS IT POSSIBLE TO GET THE

17  MICROPHONE CLOSER?  I CAN NOT HEAR WHAT SHE IS SAYING.

18        **THE COURT:**  IF YOU COULD USE THE MICROPHONE.  WE

19  SHOULD ALL DO THAT.  LET'S TRY AGAIN.

20  **BY MS. KOCHER:**

21  **Q.**   DEFINITIONS OF ANY TERMS THAT THE COURT MIGHT HEAR.

22  **A.**   THE COURT MAY HEAR THE TERM "DEEN," WHICH IS DEFINED

23  AS "A FAITH," OR "THE WAY."

24        THE COURT MAY HEAR THE TERM "KUFFAR" AS I PREVIOUSLY

25  MENTIONED, AS A NON-MUSLIM OR NON-BELIEVER.

1    THE COURT MAY HEAR THE TERM, "FOR THE SAKE OF ALLAH,"

2  WHICH HAS BEEN DEFINED TO US BY WITNESSES AS JIHAD,

3  VIOLENT JIHAD.

4    THE COURT MAY HEAR, AGAIN, THE TERM "SHAHEED", WHICH

5  IS MARTYR.

6  **Q.**  I SEE ALSO THE TERM "HADITH."  ARE YOU ABLE TO TELL

7  THE COURT WHAT A "HADITH" IS?

8  **A.**  I AM NOT FAMILIAR WITH THAT TERM.

9  **Q.**  ALL RIGHT, SIR.  NOW, THE RECORDING THAT HAS BEEN

10  PREPARED FOR THE COURT TODAY, IS IT THE SESSION IN ITS

11  ENTIRETY?

12  **A.**  NO, IT IS A SEGMENT OF THAT SESSION.

13  **Q.**  ALL RIGHT.  IN FACT, THIS SEGMENT THAT MATCHES

14  EXHIBIT 32 IS TWO SEGMENTS OF THE RECORDING MADE THAT DAY;

15  IS THAT CORRECT?

16  **A.**  THAT IS CORRECT.

17    **MS. KOCHER:**  YOUR HONOR, THE RECORDINGS THAT

18  WOULD BE PLAYED TODAY I HAVE COMPILED ON ONE DISK AND

19  MARKED IT WITH ONE EXHIBIT NUMBER.  I WOULD NOTE THE DATE

20  AND TIME OF THE RECORDING FOR THE RECORD.  IT WOULD BE

21  FOUND ON GOVERNMENT'S EXHIBIT 49.

22  **BY MS. KOCHER:**

23  **Q.**  AGENT SUTTON, DID YOU OFFER THE DATE OF THIS

24  RECORDING?

25  **A.**  THE DATE OF THIS RECORDING IS JUNE 26, 2009.

1    **Q.**   AND WHEN DOES THIS RECORDING BEGIN?

2    **A.**   IT BEGINS AT APPROXIMATELY 1:28 P.M.

3    **Q.**   WHICH, IN MILITARY TIME, WOULD BE 13:28?

4    **A.**   THAT'S CORRECT.

5            **MS. KOCHER:**  WITH THE COURT'S PERMISSION, WE

6    WILL PLAY THE RECORDING.

7            **THE COURT:**  YOU MAY PLAY THE RECORDING.

8         (RECORDING PLAYED FOR THE COURT.)

9    **Q.**   I HEARD, AGENT SUTTON, DURING THAT RECORDING THE

10   STATEMENT, "WHY CAN'T WE MEET IN A NORMAL MASJID?"  DID

11   YOU HEAR THAT AS WELL?

12   **A.**   I DID.

13   **Q.**   WHO WAS SPEAKING DURING THAT RECORDING?

14   **A.**   DANIEL BOYD.

15   **Q.**   IN ITS ENTIRETY?

16   **A.**   IN ITS ENTIRETY.

17   **Q.**   HAS DANIEL BOYD MADE OTHER STATEMENTS OR TAKEN OTHER

18   ACTIONS SIMILAR TO HIS STATEMENT IN THIS RECORDING, "WHY

19   CAN'T WE MEET IN A NORMAL MASJID?"

20   **A.**   HE HAS MADE REFERENCE, PARTICULARLY BECAUSE OF HIS

21   VIOLENT RHETORIC, THAT HE WOULD NOT BE ACCEPTED AT THE

22   LOCAL MASJIDS.

23   **Q.**   HAS HE ATTEMPTED TO KEEP HIS NEWER RECRUITS FROM

24   ATTENDING THE MASJIDS?

25   **A.**   HE HAS.  IN ONE CASE, THE DEFENDANT SUBASIC ACTUALLY

WANTED A WITNESS TO TAKE SOME BOOKS AND TRY TO SELL THEM

AT THE MASJID, AND DANIEL BOYD TOLD HIM THAT WE DO NOT

WANT THIS WITNESS, THIS INDIVIDUAL KNOWN TO THE BROTHERS

AT THE MASJID.

**MS. KOCHER:**  IF I MAY APPROACH, YOUR HONOR?

**THE COURT:**  YOU MAY.

**BY MS. KOCHER:**

Q.  LET ME SHOW YOU WHAT'S BEEN MARKED --

**INTERPRETER:**  CAN I HAVE A COPY OF THIS?  I CAN

NOT HEAR ALL OF THIS.

**THE COURT:**  YES.  WOULD YOU EXPLAIN TO HIM THAT

THAT IS A SUMMARY OF THE RECORDING, BUT NOT ITS ENTIRETY.

**BY MS. KOCHER:**

Q.  DID SUBASIC AND DANIEL BOYD, IN THE CONVERSATION THAT

YOU REFERENCE, APPEAR TO BE IN AGREEMENT AS TO THAT COURSE

OF ACTION?

A.  YES.

Q.  LET ME TURN YOUR ATTENTION NOW TO GOVERNMENT'S

EXHIBIT NO. 27.  WHAT IS THAT, SIR?

A.  THIS IS A SUMMARY OF AN AUDIO RECORDING THAT OCCURRED

ON JULY 3, 2009.

Q.  AND, AS WITH THE PRIOR RECORDING, DID YOU LISTEN TO

THIS RECORDING?

A.  I HAVE.

Q.  AND IS THIS SUMMARY AN ACCURATE REPRESENTATION, IN

1  SUMMATION FORM, OF WHAT OCCURS ON THAT AUDIO?

2  **A.**   YES.

3  **Q.**   ALL RIGHT.  NOW, UNLIKE THE LAST ONE, I'M NOT GOING

4  TO ASK TO PLAY THIS RECORDING, BUT INSTEAD WOULD ASK YOU

5  TO REFER THE COURT ON EXHIBIT 27, WHICH I WOULD NOW MOVE

6  INTO EVIDENCE --

7       **THE COURT:**   WITHOUT OBJECTION, IT WILL BE

8  RECEIVED.

9     MS. KOCHER, WOULD YOU PROVIDE THE INTERPRETER WITH A

10  COPY OF THAT?

11       **MS. KOCHER:**   YES, YOUR HONOR, THAT IS WHAT I

12  JUST HANDED HER.

13       **THE COURT:**   OKAY.

14  **BY MS. KOCHER:**

15  **Q.**   -- OF THE PERTINENT PORTIONS OF THAT RECORDING.

16  **A.**   IN ONE REFERENCE HE REFERS THAT THE SCHOLARS ARE ALL

17  MUJAHIDEENS, WHICH IS A PERSON WHO IS ENGAGED OR ENGAGES

18  IN JIHAD.  HE FURTHER REFERENCES THAT THERE COULD ONLY BE

19  DEFENSIVE JIHAD TODAY.  HE GOES ON TO DESCRIBE THAT JIHAD

20  IS FOR GETTING LAND BACK, SUCH AS IN ALGERIA; GETTING

21  STOLEN WEALTH BACK THAT WAS TAKEN FROM MUSLIMS; STOPPING

22  THE KILLING OF WOMEN AND CHILDREN; AND STOPPING THE RAPING

23  OF MUSLIM WOMEN.

24     HE GOES ON TO SAY THAT THIS IS WHY HE DOES NOT GO TO

25  THE LOCAL MASJID BECAUSE HE'S NOT GOING TO GO THERE AND

1  ARGUE WITH THOSE PEOPLE.  HE IS AFRAID HE'S GOING TO PUNCH

2  THEM IN THE NOSE.

3  **Q.**   THANK YOU, SIR.

4      FOLLOWING THE ARREST OF THE DEFENDANTS, HAVE THERE

5  BEEN INDIVIDUALS INTERVIEWED?

6  **A.**   YES.

7  **Q.**   AND DID ANY OF THOSE INDIVIDUALS PROVIDE INFORMATION

8  IN REGARD TO THE RADICALIZATION BY THIS GROUP OF PEOPLE?

9  **A.**   YES.

10 **Q.**   AND WHAT TYPE OF INFORMATION WAS GLEANED IN THOSE

11 INTERVIEWS?

12 **A.**   THE WITNESSES REPORTED THAT ON A REGULAR BASIS DANIEL

13 BOYD, AND TO A SIMILAR EXTENT, ANES SUBASIC, SENT MESSAGES

14 OR ENCOURAGED THE ACTS OF VIOLENT CRIMINAL ACTIVITY, THIS

15 VIOLENT JIHAD, AND THAT IT WAS SHARED AMONGST THE MEMBERS

16 OF THE GROUP.

17 **Q.**   ALL RIGHT, SIR.  IF I CAN TURN YOUR ATTENTION TO

18 ALLEGATIONS IN THE INDICTMENT THAT SOME OF THESE

19 DEFENDANTS TRAVELED WITH THE INTENT TO ENGAGE IN VIOLENT

20 JIHAD.

21     WHAT EVIDENCE, SIR, DID YOUR INVESTIGATION UNCOVER

22 THAT INDICATED SOME OF THESE DEFENDANTS TRAVELED?

23 **A.**   THE INVESTIGATION REVEALED IN OCTOBER OF 2006, THE

24 DEFENDANT ZIYAD YAGHI, AFTER MAKING STATEMENTS IN THE

25 COMMUNITY THAT HE WAS TRAVELING TO COMMIT VIOLENT JIHAD,

1    DID IN FACT TRAVEL TO THE COUNTRY OF JORDAN.  WHEN HE WAS

2    INTERVIEWED IN NEW YORK PRIOR TO HIS DEPARTURE, HIS CLAIM

3    WAS THAT HE WAS MERELY TRAVELING OVERSEAS TO LEARN ARABIC

4    AND TO FIND A SPOUSE.

5        DURING THAT TIME, THROUGH PHONE RECORDS -- ACTUALLY

6    PRIOR TO THAT TRAVEL, PHONE RECORDS SHOWED TELEPHONE

7    CONTACT BETWEEN DANIEL BOYD'S PHONE AND ZIYAD YAGHI'S

8    PHONE, AND ALSO SHOWED TELEPHONE CONTACT WHILE YAGHI WAS

9    OVERSEAS WITH DANIEL BOYD.

10   **Q.**   WAS THERE FURTHER CONTACT UNCOVERED BETWEEN YAGHI AND

11   BOYD WHILE YAGHI WAS OVERSEAS?

12   **A.**   YES.  THERE WAS ACTUALLY AN E-MAIL SENT BY YAGHI TO

13   DANIEL BOYD THAT READ, "IS THE MASJID ALSO KNOWN AS MASJID

14   AL-SHISANI?"

15   **Q.**   YOU SAID THAT TRAVEL OCCURRED IN LATE 2006?

16   **A.**   THAT IS CORRECT.

17   **Q.**   WAS THERE OTHER TRAVEL UNCOVERED AS A RESULT OF THIS

18   CONSPIRACY?

19   **A.**   YES.  THERE WAS TRAVEL THAT OCCURRED IN JUNE OF 2007.

20   **Q.**   WHO TRAVELED IN JUNE OF 2007?

21   **A.**   IN JUNE OF 2007, DANIEL BOYD, ZAKARIYA BOYD, DYLAN

22   BOYD, OMAR HASSAN, AND ZIYAD YAGHI ALL TRAVELED AND

23   ATTEMPTED TO ENTER ISRAEL.

24   **Q.**   IF YOU WOULD, TELL THE COURT FIRST WHEN DANIEL BOYD

25   PURCHASED HIS OWN TICKETS, IF HE DID SO?

1   **A.**   IN FEBRUARY OF 2007, DANIEL BOYD OBTAINED TICKETS FOR

2   HIMSELF AND HIS SON ZAKARIYA BOYD, AND UTILIZED --

3   OBTAINED TICKETS FOR THOSE TWO INDIVIDUALS.

4   **Q.**   WHERE WERE THE TICKETS TO?

5   **A.**   THEY WERE TO ISRAEL.

6   **Q.**   AND DID HE LATER PURCHASE ANOTHER TICKET?

7   **A.**   HE DID.  AT THE END OF MARCH, A TICKET FOR DYLAN BOYD

8   WAS ACQUIRED, ALSO AGAIN FOR TRAVEL TO ISRAEL.

9   **Q.**   SIR, NOW I THINK WHEN YOU SAID -- WHEN YOU LISTED THE

10  PERSONS WHO TRAVELED IN JUNE OF '07, THERE WERE ADDITIONAL

11  NAMES?

12  **A.**   THAT'S CORRECT.  MOHAMMAD OMAR ALY HASSAN AND ZIYAD

13  YAGHI ALSO ACQUIRED TICKETS TO TRAVEL TO ISRAEL AT THE

14  SAME TIME THAT THE BOYDS WOULD BE TRAVELING.

15  **Q.**   WAS THEIR FLIGHT PATH TO BE THE SAME?

16  **A.**   THEY WERE ACTUALLY TRAVELING A DAY LATER.

17  **Q.**   WAS THEIR DESTINATION THE SAME?

18  **A.**   THEIR ULTIMATE DESTINATION WAS THE SAME.

19  **Q.**   AND WHAT WAS THE ULTIMATE DESTINATION?

20  **A.**   TEL AVIV, ISRAEL.

21  **Q.**   DID THE FIVE YOU NAMED ACTUALLY LEAVE THE UNITED

22  STATES AND ACTUALLY TRAVEL TO TEL AVIV?

23  **A.**   THEY DID.

24  **Q.**   WHAT HAPPENED WHEN THEY GOT TO ISRAEL?

25  **A.**   WHEN ZAKARIYA BOYD AND DANIEL BOYD FIRST ARRIVED ON

1    OR ABOUT THE 12TH OF JUNE, THE ISRAELIS DENIED THEM ENTRY.

2    **Q.**    DID THERE COME A TIME WHEN DEFENDANTS YAGHI AND

3    HASSAN ALSO ARRIVED IN ISRAEL?

4    **A.**    THEY ARRIVED THE FOLLOWING DAY AND THEY WERE ALSO

5    DENIED ENTRY INTO ISRAEL.

6    **Q.**    YOU BEGAN THIS WITH THE ALLEGATION THAT THIS TRAVEL

7    WAS SOMEHOW INVOLVED IN THE CONSPIRACY.  WHAT EVIDENCE DO

8    YOU HAVE THAT YAGHI AND HASSAN'S TRAVEL WAS IN FACT

9    RELATED TO THE BOYDS' TRAVEL?

10   **A.**    THE TRAVEL WAS ARRANGED THROUGH THE SAME TRAVEL

11   AGENCY.  IN STATEMENTS MADE BY BOTH YAGHI AND HASSAN, THEY

12   PROVIDED DANIEL BOYD $1,400 IN CASH, AND ON OR ABOUT THE

13   2ND OF APRIL, DANIEL BOYD MADE THE RESERVATIONS AND

14   ACQUIRED TICKETS FOR THEM TO TRAVEL IN CONJUNCTION WITH

15   HIS TRAVEL.

16   **Q.**    WAS THE PLAN, IF YOU KNOW, TO TRAVEL TOGETHER AS A

17   TOURIST GROUP?

18   **A.**    THE PLAN WAS FOR DANIEL BOYD, ACCORDING TO YAGHI AND

19   HASSAN, WAS FOR DANIEL BOYD TO PICK THEM UP AT THE AIRPORT

20   WHEN THEY ARRIVED.

21   **Q.**    WAS DANIEL BOYD ASKED ABOUT THESE THINGS?

22   **A.**    HE WAS.

23   **Q.**    IN 2007?

24   **A.**    THAT IS CORRECT.

25   **Q.**    AND WHAT DID DANIEL BOYD SAY IN REGARD TO THIS

1  TRAVEL?

2  **A.**   IN TWO SEPARATE INTERVIEWS WITH FEDERAL AGENTS, HE

3  DENIED THAT HE MADE ARRANGEMENTS FOR YAGHI AND HASSAN TO

4  TRAVEL AND THERE WAS NO INTENTIONS FOR THEM TO MEET UP AT

5  ALL WHILE IN ISRAEL.

6  **Q.**   WAS THERE OTHER EVIDENCE BESIDES THE DEFENDANTS'

7  YAGHI AND HASSAN STATEMENT THAT THERE HAD BEEN SOME

8  ASSOCIATION WITH BOYD IN REGARD TO THIS TRAVEL?

9  **A.**   THERE WERE TELEPHONE CALLS, APPROXIMATELY 19, THAT

10  OCCURRED BETWEEN YAGHI, DANIEL BOYD, AND THE TRAVEL

11  COMPANY -- DANIEL, YAGHI, AND THE TRAVEL COMPANY.  THERE

12  WAS A COMBINATION OF 19 THROUGHOUT.

13      SHORTLY AFTER THESE SERIES OF PHONE CALLS THAT

14  OCCURRED, GENERALLY ONE RIGHT AFTER THE OTHER, A DIRECT

15  DEPOSIT WAS MADE INTO THE TRAVEL COMPANY'S ACCOUNT FOR

16  TICKETS FOR MOHAMMAD OMAR ALY HASSAN AND ZIYAD YAGHI.

17  **Q.**   WAS THERE ANY COMMUNICATION IN WHICH YOU WERE AWARE

18  FROM BOYD WHILE HE WAS OVERSEAS?

19  **A.**   YES.

20  **Q.**   WHAT IS THAT, SIR?

21  **A.**   THERE WAS A PHONE CALL IN WHICH DANIEL BOYD CALLED

22  HIS HOME AND SPOKE WITH DYLAN AND INFORMED HIM THAT THEY

23  DO NOT HAVE A PROGRAM SET UP BUT WILL FIGURE IT OUT WHEN

24  HE ARRIVES, AND WITH REGARD TO THE FLAT THAT HE AND ZAK

25  ARE IN, "WE STAGE OUT OF HERE."  WAS THERE ANY FURTHER

COMMUNICATIONS FROM DANIEL BOYD WHILE HE WAS IN JORDAN

THAT SUMMER? YES. ON OR ABOUT THE 13TH OF JULY, 2007,

DANIEL BOYD CALLS HIS SPOUSE FROM JORDAN AND GUNFIRE COULD

BE HEARD IN THE BACKGROUND. AND BOYD REMARKED THAT, "THIS

IS SOME GOOD FIRE WORK." THE PHRASE, "ALLAH AKBAR" COULD

BE HEARD AND WHAT WAS AUTOMATIC GUNFIRE COULD BE HEARD,

AND DANIEL BOYD STATED, "THAT WAS SOME FAST FIRE WORK."

**Q.** WERE THERE ANY FURTHER COMMUNICATIONS OF WHICH YOU

ARE AWARE, AGENT SUTTON?

**A.** YES. ON OR ABOUT THE 18TH OF JULY, 2007, DANIEL BOYD

AGAIN CALLS HOME AND INFORMED HIS WIFE THAT IF QUESTIONED,

DYLAN HAS BEEN PREPARED BY BOYD AS TO WHAT TO SAY.

**Q.** AND FINALLY, AGENT SUTTON, ARE YOU AWARE IF THERE WAS

ANY CONTACT BY AND BETWEEN DEFENDANTS YAGHI AND HASSAN AND

ANY OF THE BOYDS WHILE OVERSEAS?

**A.** YES, THERE WAS AN ATTEMPT BY HASSAN. HE SENT AN

E-MAIL TO BOYD PROVIDING HIM WITH A PHONE NUMBER TO TRY TO

ARRANGE CONTACT SINCE THEY WERE DENIED ENTRY INTO ISRAEL

AND WERE IN JORDAN.

**Q.** TURNING YOUR ATTENTION THEN BACK TO THE UNITED

STATES, IS THERE ANY OTHER EVIDENCE THAT THE FBI GATHERED

THAT WOULD INDICATE THAT THE PURPOSE OF THAT TRIP IN JULY

OF 2007 WAS FOR JIHAD?

**A.** YES.

**Q.** WHAT IS THAT, SIR?

1  A.   ON OR ABOUT THE 21ST OF MARCH, 2008, DANIEL BOYD TOLD

2  ANES SUBASIC THAT THE PURPOSE OF THE TRAVEL IN JUNE, 2007,

3  JULY, 2007, WAS TO WAGE JIHAD.

4  Q.   WERE THERE ANY OTHER SIMILAR STATEMENTS?

5  A.   THERE WAS.  ON OR ABOUT THE 1ST OF APRIL, 2008,

6  DANIEL BOYD INFORMED HYSEN SHERIFI THAT HE WENT TO JORDAN

7  LAST SUMMER TO LOOK FOR A WAY.  THIS HAS BEEN DEFINED BY

8  WITNESSES AS A CODE FOR JIHAD.  AND THEN HE COUNSELED

9  SHERIFI ON BEING VERY CAREFUL ABOUT HIS ACTIONS.

10  Q.   FOR WHAT REASON, DID HE SAY?

11  A.   HE WENT ON TO SAY THAT -- HE TOLD A STORY ABOUT A

12  MEMBER OF THE MUJAHIDEEN WHO WAS ARRESTED AND TORTURED IN

13  SYRIA WHILE TRYING TO CROSS THE BORDER INTO IRAQ TO JOIN

14  JIHAD.

15  Q.   AGENT SUTTON, TO YOUR KNOWLEDGE, HAS THERE BEEN ANY

16  OTHER TRAVEL DURING THE TIMEFRAME OF THIS CONSPIRACY?

17  A.   YES, THERE WAS.

18  Q.   WHAT IS THAT?

19  A.   IN OCTOBER OF 2008, JUDE MOHAMMAD, WHO IS INDICTED IN

20  THIS CONSPIRACY AS WELL, LEFT THE UNITED STATES FOR

21  PAKISTAN.

22  Q.   AND DO YOU HAVE REASON TO BELIEVE THAT HIS PURPOSE IN

23  LEAVING FOR PAKISTAN WAS FOR VIOLENT JIHAD?

24  A.   YES.  A WITNESS HAS PROVIDED US INFORMATION THAT

25  MOHAMMAD ATTEMPTED TO RECRUIT HIM TO TRAVEL TO PAKISTAN TO

ENGAGE IN VIOLENT JIHAD; AND SHORTLY AFTER MOHAMMAD'S

ARRIVAL IN PAKISTAN, HE WAS ARRESTED IN THE FEDERALLY

ADMINISTERED TRIBAL AREA, WHICH IS A WELL-KNOWN HOT SPOT

FOR TERRORIST ACTIVITY.

**Q.**   JUST SO THE RECORD IS CLEAR, THE WITNESS OR MOHAMMAD

WAS ARRESTED IN PAKISTAN?

**A.**   MOHAMMAD WAS ARRESTED.  THE WITNESS DID NOT TRAVEL.

          **MS. KOCHER:**  IF I MAY APPROACH, YOUR HONOR?

          **THE COURT:**  YOU MAY.

**BY MS. KOCHER:**

**Q.**   IF I CAN TURN YOUR ATTENTION TO GOVERNMENT'S

EXHIBIT 29.  DO YOU RECOGNIZE THAT?

**A.**   I DO.

**Q.**   AND WHAT IS IT, SIR?

**A.**   IT IS A SUMMARY OF AN AUDIO RECORDING THAT OCCURRED

ON MARCH 5, 2008.

**Q.**   WHAT IS THE SUBJECT MATTER OF THIS RECORDING?

**A.**   THE SUBJECT MATTER OF THIS IS DANIEL BOYD SPEAKING TO

DYLAN BOYD IN PREPARATION FOR HIS FUTURE ACTIONS.

**Q.**   IF YOU COULD, AGAIN STATE THE DATE THIS CONVERSATION

OCCURRED.

**A.**   MARCH 8, 2008.

**Q.**   ALL RIGHT.  AND LIKE THE PREVIOUS SUMMARIES ADMITTED,

THIS IS NOT A COMPLETE TRANSCRIPT BUT MERELY PERTINENT

PORTIONS OF THE CONVERSATION?

1   **A.**   THAT IS CORRECT.

2   **Q.**   HAVE YOU YOURSELF LISTENED TO THIS RECORDING?

3   **A.**   I HAVE.

4   **Q.**   IS THAT SUMMARY AN ACCURATE -- THE SUMMARY OF

5   PERTINENT PORTIONS OF THE CONVERSATION?

6   **A.**   IT IS.

7        **MS. KOCHER:**   THE GOVERNMENT MOVES INTO EVIDENCE

8   GOVERNMENT'S EXHIBIT 29.

9        **THE COURT:**   WITHOUT OBJECTION, IT WILL BE

10  ADMITTED.

11       **MS. KOCHER:**   REQUEST PERMISSION TO PLAY THE

12  ASSOCIATED AUDIO TAPE.

13       **THE COURT:**   YOU MAY.

14       **MS. KOCHER:**   FOR THE RECORD, THIS WILL BE FOUND

15  ON WHAT WOULD BE GOVERNMENT'S EXHIBIT 49 BY THE DATE AND

16  TIME LISTED BY THE WITNESS.

17       (RECORDING PLAYED FOR THE COURT.)

18  **BY MS. KOCHER:**

19  **Q.**   AGENT SUTTON, THE RECORDING WAS A LITTLE BIT

20  DIFFICULT TO HEAR IN THIS SETTING.  YOU LISTENED TO IT

21  MORE THAN ONCE?

22  **A.**   YES.

23  **Q.**   WHICH PORTIONS OF THE RECORDING WOULD YOU CALL TO THE

24  COURT'S ATTENTION?

25  **A.**   IN THE INITIAL PART, HE TALKS ABOUT WHAT PREPARATION

1  THAT YOU HAVE GOING ON.  YOU NEED TO BE DOING WHAT YOU ARE

2  SUPPOSED TO BE DOING, AND HE'S REFERENCING THE COLLECTION

3  OF FINANCIAL FUNDS TO ASSIST IN AIDING THAT TRAVEL.

4      HE IS ENCOURAGING DYLAN TO TRY TO RECEIVE SOME

5  TRAINING, SAY FROM EXECUTIVE PROTECTION AGENCIES, OR TO

6  STUDY OR GO TO RUSSIA AND STUDY TRAINING REGARDING HOW TO

7  BE A BODYGUARD.

8      HE TALKS ABOUT GOING TO GERMANY BECAUSE THERE SEEMS

9  TO BE MONEY THERE.  BUT HE ALSO WARNS HIM THAT THERE MAY

10 BE TRAPS THERE AS WELL.

11     HE TALKS ABOUT FINDING A WAY.  AND AGAIN, WITNESSES

12 HAVE TOLD US THAT WHEN THE PHRASE "FINDING A WAY" IS

13 UTILIZED, THIS IS IN REFERENCE TO FINDING A WAY TO ENTER

14 INTO JIHAD.

15     HE TALKS ABOUT LAUNCHING AND RECOMMENDS THAT DYLAN

16 GET OUT OF SIGHT EARLY IN THE MORNING WHEN HE'S PREPARED

17 TO LAUNCH, AND HE TALKS ABOUT DIFFERENT MAP POINTS ALONG

18 THE WAY.

19 **Q.**   I THOUGHT I HEARD THE WORD "TOURIST."  AGENT SUTTON,

20 IS THERE SOMETHING IN THERE ABOUT BEING A TOURIST?

21 **A.**   THANK YOU.  YES, HE REFERENCED THAT WHILE HE IS

22 THERE, HE SHOULD ACT LIKE A TOURIST.

23 **Q.**   DID I HEAR, "ONCE FREE OF THE CONSTRAINTS OF THE CITY

24 AND VILLAGE?"

25 **A.**   THE TAPE WAS DIFFICULT FOR ME TO HEAR AS WELL.

1     (PAUSE IN THE PROCEEDINGS.)

2  **Q.**   AGENT SUTTON, LET'S MOVE ON TO THE NEXT TOPIC.

3     THE INDICTMENT ALLEGES, AS YOU JUST MENTIONED IN

4  REGARD TO THIS RECORDING, THAT MONEY WAS COLLECTED TO

5  ASSIST THE OVERSEAS TRAVEL.

6  **A.**   THAT IS CORRECT.

7  **Q.**   ALL RIGHT.  YOU JUST REFERENCED IN THIS PARTICULAR

8  RECORDING THAT SOMEONE WAS TELLING DYLAN ABOUT HOW TO

9  COLLECT IT.

10 **A.**   YES.  THAT WAS DANIEL BOYD.

11 **Q.**   DANIEL BOYD?

12 **A.**   YES.

13 **Q.**   AND WHAT EXACTLY WAS THE CONTENT OF THAT PART OF THE

14 CONVERSATION?

15 **A.**   IT WAS A PART OF THE CONVERSATION REGARDING

16 PREPARATION FOR THIS TRAVEL FOR JIHAD.

17 **Q.**   ALL RIGHT.  AND DID EITHER DANIEL OR DYLAN BOYD

18 SPECIFICALLY REFERENCE A SUM OF MONEY IN THAT

19 CONVERSATION?

20 **A.**   YES.  THEY REFERENCED $11,000.

21 **Q.**   THAT WAS TO BE COLLECTED OR HAD BEEN COLLECTED?

22 **A.**   THAT DANIEL BOYD HAD ALREADY COLLECTED.

23 **Q.**   IS THERE A REFERENCE THAT THE PURPOSE OF THAT

24 COLLECTION WAS FOR ANY ILLEGAL PURPOSE?

25 **A.**   YES.  THE COLLECTION, THAT INFORMATION THAT WE HAVE

1   LEARNED THROUGH THE INVESTIGATION, WAS TO FINANCE THE

2   INTERNATIONAL TRAVEL.

3   **Q.**   ALL RIGHT.  NOW, HAVE OTHERS, PERHAPS NOT SO

4   RECORDED, BEEN HEARD TO TALK ABOUT THE GATHERING OF

5   FINANCES FOR THEIR PURPOSE?

6   **A.**   YES.

7   **Q.**   WHO HAS BEEN OVERHEARD TALKING ABOUT THIS?

8   **A.**   IN VARIOUS FORMS OF COMMUNICATION, HYSEN SHERIFI HAS

9   PROVIDED THE WITNESS INFORMATION THAT HE HAD MADE ATTEMPTS

10  TO ACTUALLY GO TO THE BEACH, WHICH WAS TOLD TO US TO MEAN

11  JIHAD, WITH HIS BROTHERS, BUT HAD BEEN UNSUCCESSFUL; AND

12  HE HAD RETURNED TO THE UNITED STATES IN AN ATTEMPT TO

13  GATHER MONEY SO THAT HE COULD RETURN TO THE KOSOVO AREA

14  AND PURCHASE WEAPONS AND ENGAGE IN JIHAD.

15  **Q.**   AND WAS HYSEN SHERIFI HERE IN THE UNITED STATES?

16  **A.**   AT THE TIME OF HIS ARREST, YES.

17  **Q.**   AND DID HE GATHER MONEY, TO YOUR KNOWLEDGE?

18  **A.**   YES.  OUR INFORMATION WAS THAT HE HAD OBTAINED

19  $15,000 TO AID HIM IN HIS EFFORTS TO WAGE JIHAD.  DURING A

20  SEARCH FOLLOWING HIS ARREST, $10,000 IN CASH WAS RECOVERED

21  AND AN ADDITIONAL $5,000 WAS RECOVERED FROM HIS BANK

22  ACCOUNT.

23  **Q.**   OKAY.  ARE THERE OTHER LARGE SUMS OF MONEY WHICH THE

24  FBI BECAME AWARE OF?

25  **A.**   YES.  DURING COURT-ORDERED SEARCH AFTER THE ARREST OF

1  THE SUBJECTS, THERE WAS APPROXIMATELY $13,000 IN CASH THAT

2  WAS LOCATED WITHIN THE BOYD RESIDENCE.

3  **Q.**   AND WAS THERE EVIDENCE OF OTHER LARGE SUMS OF CASH AT

4  THE BOYD RESIDENCE, AGENT SUTTON?

5  **A.**   ALSO DURING THAT POST-ARREST SEARCH, WITHIN DYLAN

6  BOYD'S CAR WAS FOUND A DEPOSIT SLIP INTO HIS BANK ACCOUNT

7  DATED JULY 21, 2009, FOR $16,000.

8  **Q.**   THANK YOU, AGENT SUTTON.

9       IN ADDITION TO THOSE CONVERSATIONS THAT YOU'VE NOTED

10  REGARDING HAVING OBTAINED FINANCING OR EVIDENCE OF MONEYS

11  ITSELF, HAD THERE BEEN OTHER TYPES OF CONVERSATIONS IN

12  WHICH THE MEMBERS OF THE CONSPIRACY TALK ABOUT HOW TO GAIN

13  MONEY FOR THE CONSPIRACY?

14  **A.**   YES, THERE HAVE.

15  **Q.**   IN GENERAL, WHAT TYPES OF THINGS ARE SPOKEN OF?

16  **A.**   IN ONE INSTANCE, DANIEL BOYD IS RECOMMENDING TO A

17  WITNESS THAT HE OBTAIN A CREDIT CARD THROUGH A CREDIT CARD

18  COMPANY.  "THEY'LL SEND YOU CHECKS AND YOU CAN WRITE

19  CHECKS UP TO $6,000, ALL YOU HAVE TO DO IS SIGN THE CHECK

20  AND CASH IT.  YOU NEED NOT WORRY TO HAVE TO PAY FOR IT

21  BECAUSE YOU WILL HAVE LEFT THE COUNTRY AND YOU WILL NO

22  LONGER BE RESPONSIBLE FOR THAT."  AND HE ALSO REFERENCED

23  THAT, "YOU MUST DO THIS FOR ALLAH."

24       **MS. KOCHER:**  IF I MAY APPROACH, YOUR HONOR?

25       **THE COURT:**  YOU MAY.

1    **BY MS. KOCHER:**

2    **Q.**   LET ME SHOW YOU WHAT'S BEEN MARKED AS GOVERNMENT'S

3    EXHIBIT NO. 28.  DO YOU RECOGNIZE THAT?

4    **A.**   I DO.

5    **Q.**   AND WHAT IS IT?

6    **A.**   THIS IS A GENERAL SUMMARY OF AN AUDIO RECORDING THAT

7    OCCURRED ON MAY 20, 2009, THAT INVOLVED DANIEL BOYD.

8    **Q.**   AND THE NATURE OF THE RECORDING?

9    **A.**   IT TALKS, IN PARTICULAR, ON HOW TO GAIN THE FINANCIAL

10   MEANS NECESSARY TO ENGAGE IN THIS JIHAD, INCLUDING THE

11   HITTING OF WELLS FARGO TRUCKS AND BANKS, AND DANIEL BOYD

12   IS ALSO HEARD TALKING ABOUT HOW HE HIT THE BANKS IN

13   PAKISTAN.

14   **Q.**   ALL RIGHT, SIR.  AND WITH THE PREVIOUS RECORDINGS,

15   HAVE YOU YOURSELF LISTENED TO THIS RECORDING?

16   **A.**   I HAVE.

17   **Q.**   IS THAT SUMMARY AN ACCURATE REFLECTION OF THE GENERAL

18   CONTENT THEREIN?

19   **A.**   IT IS.

20          **MS. KOCHER:**  THE GOVERNMENT MOVES INTO EVIDENCE

21   GOVERNMENT'S EXHIBIT NO. 28.

22          **THE COURT:**  WITHOUT OBJECTION, IT WILL BE

23   RECEIVED.

24          **MS. KOCHER:**  I REQUEST PERMISSION TO PLAY THE

25   AUDIO.

1    **THE COURT:** YOU MAY.

2    **MS. KOCHER:** IT WILL BE FOUND UNDER GOVERNMENT'S

3    EXHIBIT 49 BY THE DATE OF MAY 20, 2009.

4    (RECORDING PLAYED FOR THE COURT.)

5    **BY MS. KOCHER:**

6    **Q.** AGENT SUTTON, WHO'S SPEAKING IN THAT RECORDING?

7    **A.** DYLAN BOYD AND A WITNESS.

8    **Q.** DYLAN BOYD?

9    **A.** I'M SORRY, DANIEL BOYD AND A WITNESS.

10   **Q.** HOW DOES DANIEL BOYD END THAT PARTICULAR RECORDING?

11   **THE COURT:** BEFORE YOU GO ON WITH THAT, LET ME

12   SAY: EARLIER SOME OF YOU HAVE TRIED TO LEAVE AND WERE

13   TOLD THAT YOU COULDN'T COME BACK IN IF YOU DO. YOU ARE

14   FREE TO LEAVE AND RE-ENTER, IF YOU WOULD LIKE.

15   **A.** HE ENDS IT BY SAYING, "YOU MUST BE READY FOR THE SAKE

16   OF ALLAH."

17   **Q.** THANK YOU, AGENT SUTTON.

18   I WANT TO TURN YOUR ATTENTION BACK TO THE IDEA THAT

19   WHAT WAS BEING SPOKEN OF COULDN'T BE SPOKEN OF AT THE

20   LOCAL MASJIDS. THE NEED FOR A SECRET LOCATION IS WHAT THE

21   RECORDING SAID; IS THAT ACCURATE?

22   **A.** THAT IS ACCURATE.

23   **Q.** ARE THERE OTHER WAYS IN WHICH THE PERSONS INVOLVED IN

24   THIS CONSPIRACY KEPT SECRET THEIR ACTIONS?

25   **A.** THEY DID. THEY ATTEMPTED TO SPEAK IN CODE AND THEY

1  WERE AVOIDING CERTAIN TYPES OF AREAS OR FORMS OF

2  COMMUNICATION IN AN ATTEMPT TO NOT BE INTERCEPTED.

3  **Q.**  CAN YOU GIVE US A SPECIFIC EXAMPLE?

4  **A.**  THERE IS AN EXAMPLE IN THE CONVERSATION BETWEEN

5  DANIEL BOYD AND DEFENDANT SUBASIC, WHEN THEY ENGAGED IN A

6  GUARDED CONVERSATION WHERE THEY STARTED TALKING ABOUT SOME

7  BROTHERS.  THEN THEY STARTED CHANGING AND REFERRING TO THE

8  BROTHERS AS ACTUALLY CARS.

9  **Q.**  REFERRING TO THE BROTHERS AS CARS?

10  **A.**  THAT'S CORRECT.

11  **Q.**  WHAT WOULD BE THE PURPOSE OF THAT?

12  **A.**  IT WAS CLEAR IN THAT RECORDING THAT THEY BELIEVED

13  THAT THEY WERE BEING MONITORED AND THOUGHT THAT BY

14  REFERRING TO VEHICLES, THEY COULD UTILIZE THIS CODED

15  CONVERSATION AND IT WOULDN'T BE DECIPHERED, AS THEY WERE

16  ACTUALLY REFERRING TO INDIVIDUALS.

17  **MS. KOCHER:**  PERMISSION TO APPROACH, YOUR HONOR?

18  **THE COURT:**  YOU MAY.

19  **BY MS. KOCHER:**

20  **Q.**  IF I CAN ASK YOU, AGENT SUTTON, TO LOOK AT WHAT I

21  HANDED YOU.  IS THAT EXHIBIT 30?

22  **A.**  YES, IT IS.

23  **Q.**  WHAT IS THAT?

24  **A.**  THIS IS A SUMMARY OF AN AUDIO RECORDING THAT OCCURRED

25  ON APRIL 18, 2008, WHICH WAS BETWEEN DANIEL PATRICK BOYD

1   AND ANES SUBASIC.

2   **Q.**    ABOUT WHAT TIME OF DAY, DO YOU KNOW?

3   **A.**    IT WAS ABOUT 3:56 P.M. IN THE AFTERNOON, OR THIS HAS

4   IT IN MILITARY TIME OF 15:56.

5   **Q.**    WHAT'S THE CONTENT OF THIS CONVERSATION BETWEEN

6   DANIEL BOYD AND ANES SUBASIC?

7   **A.**    THERE IS CONVERSATION IN REFERENCE TO BEING CAUTIOUS,

8   BECAUSE THEY BELIEVE THAT A SPEAKER ON A CELL PHONE CAN BE

9   USED AS A LISTENING DEVICE.  THERE IS DISCUSSIONS

10  REGARDING -- IT GOES ON TO DISCUSSIONS WHERE BOYD STATES,

11  "I HAVE TWO BOYS.  THEY ARE LEAVING, AND I NEED TO MAKE A

12  PLAN FOR THEM.  THEY NEED TO GO FOR THE SAKE OF ALLAH."

13  AND THIS IS WHERE THE CONVERSATION CAREENS INTO CONCERN

14  ABOUT THEM BEING MONITORED, AND THEY START CHANGING THE

15  REFERENCE TO THE TWO BOYS AS TO THESE TWO VEHICLES.

16  **Q.**    ALL RIGHT, SIR.  AS WITH THE OTHER RECORDINGS, HAVE

17  YOU LISTENED TO THIS RECORDING?

18  **A.**    I HAVE.

19  **Q.**    IS THIS SUMMARY YOU ARE HOLDING AN ACCURATE SUMMARY

20  OF THE CONTENT OF THE RECORDING?

21  **A.**    IT IS.

22          **MS. KOCHER:**  THE GOVERNMENT MOVES INTO EVIDENCE

23  GOVERNMENT'S EXHIBIT 30.

24          **THE COURT:**  IT WILL BE RECEIVED WITHOUT

25  OBJECTION.

1      **MS. KOCHER:** PERMISSION TO PLAY THE AUDIO, YOUR

2  HONOR?

3      **THE COURT:** YOU MAY.

4      **MS. KOCHER:** IT WOULD BE REFLECTED AND FOUND ON

5  GOVERNMENT'S EXHIBIT 49.

6      (RECORDING PLAYED FOR THE COURT.)

7  **BY MS. KOCHER:**

8  **Q.** AGENT SUTTON, AS THE COURT HAS HEARD SEVERAL OF THESE

9  AUDIO RECORDINGS THIS MORNING, I NOTE THAT NONE HAVE

10 INCLUDED DEFENDANTS HASSAN AND YAGHI; IS THAT TRUE?

11 **A.** THAT IS CORRECT.

12 **Q.** DO YOU KNOW WHY THIS IS?

13 **A.** THE AUDIO RECORDINGS WERE INITIATED AFTER A POINT

14 WHERE THERE WAS SOME ISSUE BETWEEN DANIEL BOYD AND YAGHI

15 AND HASSAN THAT FOLLOWED A RIFT FOLLOWING THEIR RETURN

16 FROM JORDAN IN JUNE, JULY OF 2007.  THAT RIFT WAS BECAUSE

17 THERE WAS A GREAT DEAL OF UPHEAVAL IN THE COMMUNITY AND

18 REPORTS THAT WERE BEING RECEIVED ABOUT THE REASON FOR

19 THEIR TRAVEL WAS ULTIMATELY FOR VIOLENT JIHAD.

20 **Q.** LET ME TURN YOUR ATTENTION NOW, AGENT SUTTON, TO THE

21 ISSUE ALLEGED IN THE INDICTMENT AS TRAINING, PROVIDING

22 THOSE RECRUITED WITH WEAPONS AND TRAINING.

23      WHAT TYPES OF EVIDENCE DOES THE FEDERAL BUREAU OF

24 INVESTIGATION HAVE REGARDING THESE DEFENDANTS ENGAGING IN

25 TRAINING?

**A.**   WE HAVE LEARNED THAT ON OR ABOUT THE 16TH OF

FEBRUARY, 2007, THAT ANES SUBASIC PAID $995 TO ATTEND A

TRAINING SCHOOL IN LAS VEGAS, NEVADA.   THE TRAINING SCHOOL

WAS "SURVIVING EXECUTION, BEHEADING ASSASINATION ATTEMPTS

AND ESCAPING FROM CAPTIVITY."   WE WERE ABLE TO CONFIRM HIS

ACTUAL ATTENDANCE.

     ALSO NOTED THAT ON MARCH 10, 2007, SUBASIC MADE

ONLINE PURCHASES OF BOOKS ENTITLED "SNIPER TRAINING" AND

HE ALSO INQUIRED AS TO THE AVAILABILITY AND PRICING OF A

BOLT ACTION .308 RIFLE AND A REMINGTON TACTICAL LONG RANGE

WEAPON.   HE ALSO ORDERED A SNIPER RIFLE SCOPE, A SNIPER

KILL FLASHLIGHT, AN ANTI-REFLECTION DEVICE, A SNIPER

SHADE, A LENS KIT, AND A MILL DOT MASTER SLIDE RULE, ALL

OF WHICH OCCURRED ONLINE.

     ON MAY 9 OF 2007, HE ORDERED .308 AMMUNITION AND

7.62-MILLIMETER AMMUNITION.

**Q.**   AND IN REGARD TO THE ORDERING OF AMMUNITION OR OTHER

WEAPONS-RELATED ITEMS, THE INDICTMENT ALLEGES A NUMBER OF

PURCHASES BY DANIEL BOYD OF VARYING FIREARMS.   WHAT

EVIDENCE DO YOU HAVE THAT SUPPORTS THOSE PURCHASES?

**A.**   OUR AGENTS REVIEWED INFORMATION FROM THE FEDERAL

FIREARMS LICENSEES WHO SOLD THOSE WEAPONS.

**Q.**   WAS THERE ANY TRAINING AMONG THIS CONSPIRACY IN THE

USE OF THESE WEAPONS?

**A.**   YES, THERE WAS.

1    **MS. KOCHER:**  IF I MAY APPROACH, YOUR HONOR?

2    **THE COURT:**  YOU MAY.

3    **BY MS. KOCHER:**

4    **Q.**    LET ME SHOW YOU WHAT'S MARKED AS GOVERNMENT'S EXHIBIT

5    NO. 33.  DO YOU RECOGNIZE THAT?

6    **A.**    I DO.

7    **Q.**    WHAT IS IT, SIR?

8    **A.**    IT IS A SUMMARY OF AUDIO RECORDINGS THAT OCCURRED ON

9    JUNE 10, 2009.

10    **Q.**    AND HAVE YOU YOURSELF LISTENED TO THE UNDERLYING

11    AUDIO OF THIS SUMMARY?

12    **A.**    I HAVE.

13    **Q.**    AND IS THE SUMMARY AN ACCURATE DEPICTION OF WHAT IS

14    HEARD TO YOU IN THAT AUDIO?

15    **A.**    IT IS.

16    **Q.**    AND IT APPEARS THAT EXHIBIT 33 IS COMPRISED OF A

17    NUMBER OF DIFFERENT PARAGRAPHS; IS THAT CORRECT?

18    **A.**    THAT IS CORRECT.

19    **Q.**    AND IS IT TRUE THAT EACH PARAGRAPH WOULD REPRESENT A

20    PORTION OF THE AUDIO?

21    **A.**    THAT IS CORRECT.

22    **MS. KOCHER:**  THE GOVERNMENT MOVES TO ADMIT

23    EXHIBIT 33.

24    **THE COURT:**  WITHOUT OBJECTION, IT WILL BE

25    ADMITTED.

**BY MS. KOCHER:**

**Q.**   CAN YOU ORIENT THE COURT AS TO WHAT WAS GOING ON

JUNE 10 OF 2009, WHEN THIS AUDIO WAS MADE?

**A.**   ON THAT DATE, DYLAN BOYD, ZAKARIYA BOYD, DANIEL BOYD,

AND HYSEN SHERIFI, ALONG WITH A WITNESS, WERE IN AN AREA

IN CASWELL COUNTY PRACTICING AND TRAINING WITH FIREARMS.

**Q.**   ALL RIGHT.  IF YOU WOULD, AGAIN, JUST ORIENT THE

COURT AS TO THE FIRST SEGMENT OF AUDIO THAT WILL BE HEARD.

WHAT IS THE SUBJECT MATTER?

**A.**   AT THIS POINT, THEY ARE SHOOTING AT AN OLD BALLAST

FROM A LIGHT, AND DANIEL BOYD ACTUALLY REFERENCED THAT

IT'S AN OLD TORN-UP BALLAST AND THAT HE WANTED TO HIT IT

WITH AN ARMOR PIERCING ROUND.  THE WITNESS REFERENCED THAT

THE ITEM WAS SOLID AND HEAVY, BUT BOYD SAID, "WE'LL SEE

WHAT WE CAN DO WITH THAT.  IF IT CAN DO SOMETHING LIKE

THAT, JUST IMAGINE WHAT IT COULD DO IF YOU SHOOT SOMEONE

IN A VEST."

**Q.**   ALL RIGHT, SIR.  LET ME SHOW YOU WHAT'S MARKED AS

GOVERNMENT'S EXHIBIT NO. 48.  DO YOU RECOGNIZE THAT?

**A.**   I DO.

**Q.**   WHAT IS THAT, AGENT SUTTON?

**A.**   THIS IS THE BALLAST THAT WAS RECOVERED FROM THE AREA

IN WHICH THEY WERE TRAINING.  IT CLEARLY HAS BULLET HOLES

THROUGH IT.

**Q.**   NOW, WAS THE FIELD A PROTECTED AREA?

1  **A.**  I DON'T UNDERSTAND WHAT YOU MEAN BY "PROTECTED."

2  **Q.**  HAD AGENTS BEEN TO THE FIELD PRIOR TO THIS TRAINING?

3  **A.**  YES, WE HAD.

4  **Q.**  AND WERE THERE ANY ITEMS FOUND PRIOR TO THIS TRAINING

5  SESSION WHEN THE WITNESS WAS PRESENT?

6  **A.**  NO.

7  **Q.**  WHEN WAS THE BALLAST RETRIEVED?

8  **A.**  I BELIEVE IT WAS RETRIEVED THAT DAY.

9  **Q.**  ALL RIGHT.  IF YOU WOULD HOLD UP THE BALLAST AND SHOW

10  THE JUDGE.

11  **A.**  THIS IS RATHER HEAVY, YOUR HONOR.  YOU CAN SEE WHAT

12  IS A BULLET ENTRY AND A BULLET EXIT.  IT'S REFERENCED AS

13  AN EXIT BECAUSE YOU CAN SEE THE OUTPOUCHING.  THERE'S ALSO

14  A SECOND ROUND THAT ACTUALLY DIDN'T ENTER BUT CAREENED OFF

15  THE CORNER.

16  **Q.**  AGENT SUTTON, WHAT IS THE EXHIBIT NUMBER ON THAT

17  ITEM?

18  **A.**  IT IS EXHIBIT 48.

19      **MS. KOCHER:**  THE GOVERNMENT MOVES INTO EVIDENCE

20  EXHIBIT 48.

21      **THE COURT:**  IT WILL BE ADMITTED WITHOUT

22  OBJECTION.

23  **BY MS. KOCHER:**

24  **Q.**  FOLLOWING DOWN THIS SUMMARY, AGENT SUTTON, WHAT WOULD

25  THEN BE THE NEXT AUDIO REFLECTED IN THE SUMMARY?

1  **A.**  YOU WILL HEAR DANIEL BOYD ASK THE WITNESS IF HE SHOT

2  THE AK YET.  THE WITNESS SAID HE SHOT IT RIGHT AFTER

3  DANIEL BOYD DID.  THEN DANIEL BOYD PICKS UP ANOTHER WEAPON

4  AND ZAKARIYA BOYD SAYS, "THAT ONE IS A .308."  DANIEL BOYD

5  TAKES THE GUN AND A ROUND OF AMMO, SHOWS IT TO THE

6  WITNESS, AND HE SAID, "I WANT TO SHOW YOU THE DIFFERENCE

7  BETWEEN ONE OF THESE BULLETS AND A KALASHNIKOV BULLET."

8  DANIEL BOYD LOADS THE RIFLE AND SAID, "THIS WILL BE A

9  LITTLE STRONGER THAN THE OTHER ONE."  HE BEGINS FIRING AND

10  SAYS, "YOU SEE THIS STUFF FLYING DOWN THERE?  THAT'S A

11  BULLET, MAN."  THEN BOYD BEGINS RAPID FIRING AND YELLS,

12  "ALLAHUA AKBAR."

13         **THE COURT:**  SPECIAL AGENT, HOLD UP UNTIL

14  MR. ZESZOTARSKI --

15         **MR. ZESZOTARSKI:**  I'M OKAY.  THANK YOU.

16         **THE COURT:**  YOU DON'T WANT TO LISTEN TO THE

17  TESTIMONY, I TAKE IT.  GO AHEAD.

18  **A.**  WHEN HE STOPS FIRING, DANIEL BOYD SAYS, "INSHALLAH,

19  ALLAH'S GOING TO PUT ME BACK."  AND THEN BOYD SAID, "I SAW

20  THE DEEN, I SAW THE DEEN.  I LOVE THIS ROUND.  THIS IS THE

21  BEST ROUND IN THE WORLD."  AND THE WITNESS SAYS, "BROTHER,

22  YOU JUST GOT ME EXCITED."  AND BOYD STATES, "YOU JUST

23  DON'T KNOW."

24  **Q.**  ALL RIGHT, SIR.  TURNING YOUR ATTENTION TO THE NEXT

25  SEGMENT OF AUDIO THEN, AS REFLECTED ON THE SUMMARY IN

1   EXHIBIT 33, WHAT OCCURS?

2   **A.**   A YOUNG MALE AND WITNESS ACTUALLY WALK DOWN TO WHERE

3   THE PIECE OF METAL THEY WERE SHOOTING WAS AT.  THE YOUNG

4   MALE YELLS BACK, "HEY DAD, IT CAME BACK BECAUSE WE WEREN'T

5   USING ARMOR-PIERCING ROUNDS.  IT CAME BACK TO US."  DANIEL

6   BOYD SAID, "WHAT CAME BACK?"  THE YOUNG MAN SAYS, "A

7   BULLET, AFTER IT HIT THE METAL."  ZAKARIYA BOYD EXPLAINS

8   TO THE WITNESS THAT THE BULLET DIDN'T GO THROUGH THE MAIN

9   PIECE OF METAL.  HE SAYS, "SEE, THAT'S WHAT WE WANT TO TRY

10  TO SHOOT THROUGH.  IF THE BULLET HITS THROUGH THAT, YOU

11  ARE IN GOOD SHAPE."  AS THEY WALK BACK UP TO DANIEL BOYD,

12  THE YOUNG MALE SAYS, "IT WOULD HAVE GONE RIGHT THROUGH

13  THERE IF IT HAD BEEN A.P. ROUND, RIGHT, DAD?"

14  **Q.**   FINALLY, AGENT SUTTON, THE FOURTH PARAGRAPH OF

15  GOVERNMENT'S EXHIBIT 33.

16  **A.**   DANIEL BOYD IS TALKING ABOUT THE MUJAHIDEEN AND HE

17  SAYS THAT, "IN WAZIRISTAN, THEY DON'T EVEN HAVE A RIFLE,

18  IT'S UNBELIEVABLE.  THE IMAMS ARE APPOINTED BY THE

19  GOVERNMENT.  DURING RAMADAN, THEY HAVE TO GET ON A

20  GOVERNMENT RAFFLE TO BE ALLOWED TO FAST.  THE CHINESE

21  TREAT THEM TERRIBLE."

22      THE WITNESS SAYS, "INSHALLAH, THIS IS THE FIRST PLACE

23  WE NEED TO GO."  BOYD SAYS, "WELL, YOU SEE THAT'S HOW

24  MUJAHIDEEN THINK.  THEY SAY, "WHO WE ARE, WE ARE ALLAH'S

25  ABADEEN, WE DO WHAT HE WANTS.  HE SHOWS US A PLACE AND

ALLOWS US TO ESTABLISH ABADEEN, AND WE DO IT THERE.  WE

WORK OUT.  THAT'S HOW THEY ARE THINKING IN AFGHANISTAN.

YOU SEE, THEY DON'T CARE ABOUT AFGHANISTAN, THEY CARE

ABOUT THE SHARIA OF ALLAH.  THAT'S WHY THEY TOLD THE

KASHMIRIS, JOIN WITH US AND WE'LL TAKE KASHMIR LIKE IT WAS

NOTHING.  KASHMIR IS NOTHING.  IT IS A VALLEY AND THOSE

INDIANS WILL RUN FOR THEIR LIVES WHEN THE REAL MUJAHIDEEN

COME.  YOU CAN'T IMAGINE, MAN, WHEN ONE DAY THE BROTHERS

OF THE SHAHADA ARE COMING AFTER YOU.  IF YOU DO THIS, MAN,

YOU DON'T HAVE A CHANCE.  HE DOESN'T WANT TO HEAR ANYTHING

EXCEPT YOU GOING DOWN ON THE GROUND DEAD.  HE'S HUNGRY FOR

SHAHADA.  THE BEST WAY IS HOW I TOLD THE BROTHERS.  IF

2,000 BROTHERS COME TO THE BORDER TO FIGHT, AFTER YOU GO

FOR TWO MONTHS, THERE WILL ONLY BE 20 OF YOU LEFT THAT ARE

REALLY THERE."

**MS. KOCHER:**  PERMISSION TO PLAY THE AUDIO, YOUR

HONOR?

**THE COURT:**  YOU MAY PLAY IT.

(RECORDING PLAYED FOR THE COURT.)

**THE COURT:**  MS. KOCHER, IS THE VOLUME GOING TO

GET ANY LOUDER?

**MS. KOCHER:**  WE TESTED IT YESTERDAY.  I DON'T

KNOW WHAT THE PROBLEM IS.  IT WAS TESTED YESTERDAY.

**THE COURT:**  IF THAT'S AS LOUD AS IT IS, I CAN'T

HEAR.  I DON'T KNOW HOW THE DEFENDANTS CAN.

1      **MS. KOCHER:**  I'LL ASK THE TECHNICIAN TO MOVE TO

2  THE NEXT PIECE OF THIS AUDIO.

3      **THE COURT:**  OKAY.

4      **MS. KOCHER:**  YOUR HONOR, THE GOVERNMENT WILL

5  MOVE ON.

6      **THE COURT:**  THANK YOU.  MS. KOCHER, IT'S CLEAR

7  THE HEARING IS GOING TO LAST INTO THE AFTERNOON.  OVER THE

8  LUNCHEON RECESS AT 12:30, IF YOU WANT YOUR AUDIO FOLKS TO

9  TAKE A LOOK AT WHATEVER THE PROBLEM IS, YOU ARE WELCOME TO

10 REPLAY IT THEN.

11     **MS. KOCHER:**  THANK YOU, YOUR HONOR.

12 **BY MS. KOCHER:**

13 **Q.**  AGENT SUTTON, WHAT EVIDENCE DOES THE FBI HAVE THAT

14 ANY OF THESE DEFENDANTS IN THE COURTROOM TODAY WOULD BE A

15 DANGER TO THE COMMUNITY IF RELEASED?

16 **A.**  A NUMBER OF THE INDIVIDUALS DO HAVE CRIMINAL

17 HISTORIES INCLUDING, IN THE CASE OF ZIYAD YAGHI, A FELONY

18 CONVICTION AS WELL AS HE HAS AN OUTSTANDING WARRANT IN

19 TEXAS.

20     MOHAMMAD OMAR ALY HASSAN HAS BEEN CONVICTED, ALTHOUGH

21 BE IT A MISDEMEANOR INVOLVED WITH THE FELONY CONVICTION

22 THAT YAGHI HAD RECEIVED, WHICH WAS FOR ROBBERY AND

23 KIDNAPPING OF ANOTHER INDIVIDUAL.

24     OVER THE COURSE OF THE INVESTIGATION, THERE HAVE BEEN

25 A NUMBER OF STATEMENTS BY THE MEMBERS OF THE CONSPIRACY

THAT ARE CONCERNING, SUCH AS ON JUNE 15, 2008, DANIEL BOYD

TOLD HYSEN SHERIFI THAT, "WE HAVE A MISSION AND IT'S GOING

TO HURT SOME PEOPLE."  SHERIFI LATER QUESTIONS HIM

WHETHER, IF HE DID WHAT THE BROTHERS DID IN NEW JERSEY AND

IF HE DIED THERE, WHETHER ALLAH WOULD TAKE HIM AS A

MARTYR, TO WHICH DANIEL BOYD REPLIED, "GOD WILLING, YES,

IF IT IS THE BEST YOU CAN DO."

**Q.**    DO YOU UNDERSTAND THAT REFERENCE TO NEW JERSEY?

**A.**    I BELIEVE IT'S A REFERENCE TO THE ATTEMPT ON FORT

DIX.

**Q.**    ALL RIGHT, SIR.  GO AHEAD.

**A.**    ON JUNE 19, 2008, DANIEL BOYD AND SHERIFI ARE AGAIN

TALKING, AND BOYD REFERENCES THAT WHILE IN AFGHANISTAN, HE

WOULD THINK HOW HE COULD TAKE AMERICA; AND THAT EVEN NOW

WHILE HE'S DRIVING, HE THINKS ABOUT THE STRATEGY REQUIRED

TO TAKE CERTAIN ROADS.  HE STATED THAT HE CAN NOT HELP

THINKING LIKE THAT BECAUSE HE HAS SEEN THE REALITY OF A

FEW VANQUISHING MEN.

THEY MOVE ON TO SHERIFI'S IMMIGRATION ISSUES AND

SHERIFI WAS ASKED BY BOYD IF HE HAD HIS TRAVEL DOCUMENTS.

BOYD (SIC) SAID NO, HE HAD NO PASSPORT, HE HAD A TRAVEL

DOCUMENT.  AND BOYD ASKED IF THIS MEANT THEY ARE NOT

LETTING YOU PRACTICE ISLAM, TO WHICH SHERIFI REPLIED,

"YES."  THEN BOYD DECLARED, "THIS MEANS YOU HAVE TO MAKE

JIHAD ON THEM."

**Q.** WHO WOULD BE "THEM", IN YOUR UNDERSTANDING OF HAVING LISTENED TO THAT RECORDING?

**A.** THE IMMIGRATION OFFICIALS.

**Q.** IN KOSOVO?

**A.** IN THE UNITED STATES.

**Q.** ALL RIGHT, SIR. GO AHEAD.

**A.** ON JUNE 20, 2008, A WITNESS AND SHERIFI AND DANIEL BOYD WERE AT HIS STORE. BOYD PUT HIS FINGERS TO HIS LIPS AND QUIETLY SIGNALED FOR THEM TO BE QUIET AND WROTE ON A PIECE OF PAPER, "DON'T TALK ABOUT ANYTHING YOU DON'T WANT THEM TO HEAR. THEY ARE LISTENING."

ON JULY 30, 2008, BOYD TOLD THE WITNESS ON THE SIDEWALK IN FRONT OF THAT STORE THAT HE THOUGHT -- WHO HE THOUGHT WAS LISTENING IN THE STORE. ACTUALLY, THE WITNESS ASKED WHO HE THOUGHT WAS LISTENING IN THE STORE. BOYD RESPONDED, "THE FBI". BOYD FURTHER THEN CARRIED ON THE STATEMENT THAT HE KEEPS A MINI 14 WITH ARMOR PIERCING ROUNDS IN THE STORE IF THEY WANT TO RUN UP HERE.

IN EARLY AUGUST, 2008, AFTER LEAVING A CONSTRUCTION SITE, BOYD NOTICED A NUMBER OF UNITED STATES MILITARY HUMVEES PARKED AT A NEARBY GAS STATION. HE STATED TO THE WITNESS THAT HE SHOULD TAKE THEM OUT RIGHT NOW, AND THEY ARE OVER THERE KILLING OUR BROTHERS.

ON MARCH 30, 2008, DANIEL BOYD TOLD HIS SON ZAKARIYA, "I HAVE BEEN READING BEAUTIFUL STUFF. ALLAH, IF I DON'T

LEAVE THIS COUNTRY SOON, I'M GOING TO MAKE JIHAD RIGHT

HERE IN AMERICA."

ON JANUARY 10, 2009, DANIEL BOYD, DYLAN BOYD, ZAK

BOYD AND A WITNESS WERE TOGETHER ON A CONSTRUCTION SITE

WHEN A NORTH CAROLINA STATE HIGHWAY PATROL HELICOPTER

OVERFLEW THE AREA.  DANIEL BOYD BECAME SOMEWHAT PARANOID

AND ASKED THE WITNESS IF HE COULD SHOOT.  BOYD TOLD HIM TO

WATCH FOR TRUCKS PILING UP.  LATER AFTER THE HELICOPTER

FLEW OVER, BOYD REMARKED HE HAD SOMETHING FOR THEM, PULLED

A BLACK ASSAULT RIFLE WITH A HOLOGRAPHIC SITE OUT OF HIS

TRUCK AND SAID HE HAD 150 ROUNDS OF A.P. ARMOR PIERCING

AMMUNITION, AND THE WITNESS OBSERVED FIVE 30-ROUND

MAGAZINES IN HIS TRUCK, AND ZAKARIYA BOYD COMMENTED THAT

THEY ALSO HAD A 100 DRUM MAGAZINE FOR ANOTHER WEAPON.

DANIEL BOYD HAS ALSO REFERENCED THAT BOTH OF HIS

SONS, DYLAN AND ZAKARIYA, ARE TRAINED SNIPERS.

Q.   HAVE THERE BEEN WITNESS STATEMENTS, IN ADDITION TO

THOSE YOU MENTIONED, REGARDING THE DEFENDANT'S POSSESSION

OF FIREARMS?

A.   YES.  WE HAVE WITNESS STATEMENTS THAT HE DOES ALWAYS

CARRY A SIDE ARM.

Q.   WHO WOULD "HE" BE, SIR?

A.   I'M SORRY.  DANIEL BOYD ALWAYS CARRIES A SIDE ARM,

AND DYLAN BOYD IS ALSO KNOWN TO CARRY A SIDE ARM.

Q.   LET'S TURN TO DANIEL BOYD AND DYLAN BOYD'S ARREST, IF

1  YOU WOULD.  DID EITHER OF THOSE INDIVIDUALS WEAR A SIDE

2  ARM ON THE DAY OF THEIR ARREST?

3  **A.**   DANIEL BOYD HAD AN FN57 SEMI-AUTOMATIC HANDGUN ON HIS

4  HIP, AND DYLAN BOYD HAD A 9-MILLIMETER PISTOL ON HIS HIP.

5  **Q.**   BOTH OF THEM CARRY CONCEALED PERMITS?

6  **A.**   THEY BOTH DO HAVE CONCEAL CARRY PERMITS.

7  **Q.**   NOTHING ILLEGAL IN ITSELF ABOUT THEM HAVING THOSE

8  FIREARMS?

9  **A.**   NO.

10 **Q.**   IS THERE ANYTHING SPECIAL ABOUT THE FN HANDGUN THAT

11 DANIEL BOYD WAS WEARING, TO YOUR KNOWLEDGE?

12 **A.**   THE FN HANDGUN CARRIES WHAT IS A RIFLE ROUND INTO A

13 PISTOL, AND IT IS CAPABLE OF PIERCING BODY ARMOR TYPICALLY

14 WORN BY LAW ENFORCEMENT.

15 **Q.**   WERE THERE ANY WITNESS STATEMENTS THAT ANES SUBASIC

16 HAD WEAPONS?

17 **A.**   THERE'S WITNESS STATEMENTS THAT SUBASIC HAD SEVERAL

18 WEAPONS.

19 **Q.**   ANY WITNESS STATEMENTS THAT YAGHI HAD WEAPONS, ZIYAD

20 YAGHI HAD WEAPONS?

21 **A.**   I DON'T HAVE ANY INFORMATION TO INDICATE THAT.

22 **Q.**   ALL RIGHT, SIR.  WHEN OMAR, THAT IS MOHAMMAD OMAR ALY

23 HASSAN WAS ARRESTED, A CELL PHONE WAS SEIZED; IS THAT

24 CORRECT?

25 **A.**   IT WAS.

1  **Q.**   WAS THERE ANYTHING RELEVANT TO THE INVESTIGATION

2  WITHIN THAT CELL PHONE?

3  **A.**   THERE WAS AN AUDIO RECORDING OF AN INDIVIDUAL FIRING

4  A HIGH-POWERED RIFLE.

5  **Q.**   AUDIO?

6  **A.**   I'M SORRY, VIDEO AND AUDIO.

7  **Q.**   VERY GOOD.  HAVE YOU WATCHED THAT VIDEO YOURSELF?

8  **A.**   I HAVE.

9  **Q.**   AND HAVE YOU PREPARED IT FOR COURT HERE TODAY?

10  **A.**   I HAVE.

11       **MS. KOCHER:**  YOUR HONOR, THAT VIDEO WOULD BE

12  FOUND ON GOVERNMENT'S EXHIBIT NO. 49, AND I WOULD REQUEST

13  PERMISSION TO PLAY IT.

14       **THE COURT:**  YOU MAY PLAY IT.

15  (EXHIBIT NO. 49 PLAYED FOR THE COURT.)

16  **Q.**   DO YOU KNOW WHAT STYLE OF WEAPON IS BEING FIRED

17  THERE?

18  **A.**   IT APPEARS TO BE AN AK-47, OR SOMETHING SIMILAR.

19  **Q.**   AND WERE YOU ABLE TO TELL FROM REVIEW OF THE PHONE

20  AND ITS FILES APPROXIMATELY WHAT DATE THAT FILE WAS PLACED

21  ON THE PHONE?

22  **A.**   CAN I SEE THE SCREEN AGAIN?  I DON'T HAVE THAT

23  INFORMATION.

24  **Q.**   ALL RIGHT, SIR.  IS IT TRUE THAT IT WAS MAY 2 OF

25  2009?

1 **A.** THAT DOES SOUND CORRECT.

2 **MR. MCCULLOUGH:** YOUR HONOR, COULD WE TAKE A

3 RECESS? WE HAVE BEEN HERE FOR QUITE A WHILE. WE HAVE

4 EXCEEDED THE AMOUNT OF TIME ON MY PARKING METER. I DON'T

5 GET PAID ENOUGH TODAY TO PAY A TICKET FROM THE CITY OF

6 RALEIGH.

7 **THE COURT:** WE'LL TAKE A TEN MINUTE RECESS.

8 (TEN MINUTE RECESS TAKEN.)

9 SPECIAL AGENT SUTTON, I REMIND YOU, YOU ARE STILL

10 UNDER OATH. MS. KOCHER, THE WITNESS IS WITH YOU.

11 **BY MS. KOCHER:**

12 **Q.** ON EXHIBIT 33, DURING THE BREAK DID YOU NOTICE AN

13 ERROR IN THE HEADING OF EXHIBIT 33?

14 **A.** I DID.

15 **Q.** AND WHAT DOES THAT ERROR AMOUNT TO?

16 **A.** EXHIBIT 33 REFERENCES THE TRAINING THAT OCCURRED IN

17 CASWELL COUNTY ON JUNE 10, 2009. IT HAS LISTED HERE THAT

18 DYLAN BOYD PARTICIPATED. DYLAN BOYD DID NOT PARTICIPATE

19 IN THAT TRAINING.

20 **Q.** I BELIEVE YOU HAVE A REDACTING MARKER THERE IN FRONT

21 OF YOU, AGENT. IF I COULD GET YOU TO JUST STRIKE

22 MR. DYLAN BOYD'S NAME FROM THAT EXHIBIT.

23 (WITNESS COMPLIES WITH REQUEST.)

24 IN REGARD TO EXHIBIT 33, THE GOVERNMENT HAD ATTEMPTED

25 TO PLAY CERTAIN PORTIONS OF AUDIO AS A RESULT OR RELATING

1  TO THAT SUMMARY.

2          **MS. KOCHER:**  I BELIEVE, YOUR HONOR, THAT WE WERE

3  ABLE TO GET AT LEAST ONE OF THOSE PIECES OF AUDIO READY TO

4  PLAY.

5          **THE COURT:**  THAT'S FINE.  YOU CAN GO AHEAD AND

6  PLAY IT.

7          **MS. KOCHER:**  THIS WOULD BE FOUND ON GOVERNMENT'S

8  EXHIBIT 49.

9          **THE COURT:**  WHICH PORTION OF THE AUDIO IS THIS

10  GOING TO BE, WHICH SEGMENT?

11          **MS. KOCHER:**  THIS IS THE THIRD SEGMENT.

12          **THE COURT:**  THANK YOU.

13     (EXHIBIT PLAYED FOR THE COURT.)

14  **BY MS. KOCHER:**

15  **Q.**    AGENT SUTTON, DO YOU KNOW WHERE DYLAN, DANIEL AND

16  ZAKARIYA BOYD WERE AT THE TIME OF THEIR ARRESTS?

17  **A.**    THEY WERE IN DURHAM, NORTH CAROLINA.

18  **Q.**    AND DO YOU KNOW WHAT TOOK THEM TO DURHAM, NORTH

19  CAROLINA?

20  **A.**    A PROPOSED CONSTRUCTION SITE FOR THEM TO DO WORK AT.

21  **Q.**    AND WAS DURHAM TO BE THEIR IN-POINT THAT DAY?

22  **A.**    THAT WAS OUR GOAL, YES.

23  **Q.**    THEY WEREN'T HEADING FOR CASWELL COUNTY?

24  **A.**    THEIR PLAN WAS TO HEAD BACK TO THE TRAINING SITE IN

25  CASWELL COUNTY TO CONTINUE FIREARMS TRAINING.

1  **Q.** SO ON THIS OCCASION, DYLAN WAS PRESENT AT LEAST WITH

2  THE INTENT TO GO TRAINING; IS THAT TRUE?

3  **A.** THAT IS CORRECT.

4  **Q.** WHILE WE'RE TALKING ABOUT THE ARRESTS STILL, WAS

5  THERE ACTIVITY BY ANY OF THE THREE BOYDS ARRESTED THAT

6  WOULD INDICATE FOR THE COURT A DANGER TO THE COMMUNITY?

7  **A.** YES. THE AGENTS WHO ARRESTED DANIEL BOYD NOTED THAT

8  WHEN THEY SOUGHT TO TAKE HIM INTO CUSTODY, THAT HE DID

9  ATTEMPT TO ACQUIRE HIS SIDE ARM. THE AGENTS ALSO NOTED

10 THAT WHEN DYLAN BOYD WAS ATTEMPTED TO BE TAKEN INTO

11 CUSTODY, HE FAILED TO COMPLY WITH THEIR INSTRUCTIONS AND

12 HAD TO BE SUBDUED.

13 **Q.** THANK YOU, SIR. IN YOUR REVIEW OF THE INVESTIGATION

14 OF THIS CASE, HAVE YOU HEARD ANY OTHER WORD USED IN

15 REFERENCE TO THE WEAPONS BY THE BOYD FAMILY?

16 **A.** THEY HAVE REFERRED TO THE WEAPONS AS "TOOLS."

17 **Q.** AND WHAT WAS THAT CIRCUMSTANCE?

18 **A.** THERE WAS A DISCUSSION AMONGST THE BOYD FAMILY WITH A

19 WITNESS PRESENT, AND DANIEL BOYD INSTRUCTED ZAKARIYA AND

20 DYLAN TO GET THE TOOLS, AND THEY RETURNED WITH FIREARMS.

21 **Q.** WHAT HAPPENED THEREAFTER?

22 **A.** I DON'T RECALL.

23 **Q.** DID THEY WATCH VIDEOS?

24 **A.** YES, THEY DID WATCH VIDEOS FOR ABOUT THE NEXT TWO

25 HOURS.

1  **Q.**  AND WHAT WAS THE GENERAL CONTENT OF THOSE VIDEOS?

2  **A.**  THE GENERAL CONTENT WAS OF INDIVIDUALS WHO WERE BEING

3  MISTREATED IN OTHER LANDS.

4  **Q.**  ALL RIGHT.  I THINK I EARLIER ASKED YOU IF OTHERS HAD

5  BEEN INTERVIEWED IN THIS CASE, AND YOU RESPONDED

6  AFFIRMATIVELY.

7  **A.**  YES.

8  **Q.**  WERE ANY PERSONS KNOWN TO MR. HASSAN INTERVIEWED?

9  **A.**  YES.

10  **Q.**  WHO WERE THEY?

11          **MS. KOCHER:**  IF I CAN STRIKE THAT QUESTION, YOUR

12  HONOR?

13          **THE COURT:**  YOU MAY.

14  **BY MS. KOCHER:**

15  **Q.**  WHAT WERE THE RESULTS OF THE INTERVIEW SIGNIFICANT TO

16  THE COURT'S HEARING TODAY IN REGARD TO DETENTION?

17  **A.**  THE RESULTS OF THE INTERVIEW RELATED TO MR. HASSAN

18  WAS THAT HE MADE STATEMENTS TO WITNESSES THAT HIS

19  INTERNATIONAL TRAVEL WAS PLANNED TO WAGE VIOLENT JIHAD.

20  **Q.**  DID ANY OF THOSE WITNESSES REPORT YOUR SPECIAL SKILLS

21  OR ITEMS HE HAD?

22  **A.**  NOT THAT I CAN RECALL.

23          **MS. KOCHER:**  IF I MAY APPROACH, YOUR HONOR?

24          **THE COURT:**  YOU MAY.

25  **BY MS. KOCHER:**

**Q.**    AGENT SUTTON, DID YOU APPEAR ON THE SCENE AT THE

SEARCH OF THE BOYD HOUSE?

**A.**    I DID.

**Q.**    WHAT I'M GETTING READY TO HAVE YOU WALK THROUGH WITH

THE COURT ARE PHOTOS; ARE THEY NOT?

**A.**    YES, THEY ARE.

**Q.**    WHAT, IN GENERAL, ARE THEY PHOTOS OF?

**A.**    THEY ARE PHOTOS OF THE RESIDENCE AND SOME ITEMS TAKEN

FROM THE RESIDENCE.

**Q.**    IF I CAN HAVE YOU FIRST LOOK AT GOVERNMENT'S EXHIBIT

NO. 1.  WHAT IS THAT, SIR?

**A.**    THAT IS AN ENTRYWAY/LIVING ROOM AREA IN THE BOYD

HOME.

**Q.**    ALL RIGHT.  IS THERE ANYTHING OF SIGNIFICANCE IN THIS

PHOTO?

**A.**    WELL, THE CABINET THAT IS SHOWN THERE TO THE LEFT ON

THE PHOTO DID HAVE A NUMBER OF WEAPONS INSIDE OF IT.

**Q.**    ALL RIGHT.  IF I CAN TURN YOUR ATTENTION TO

GOVERNMENT'S EXHIBIT NO. 2.  WHAT IS THAT, SIR?

**A.**    THAT IS A PHOTOGRAPH OF THAT CABINET, AND IF YOU LOOK

CLOSELY, YOU CAN SEE A PORTION OF TWO FIREARMS THAT ARE

BACKED BY A WHITE BACKING.

**Q.**    GOVERNMENT'S EXHIBIT NO. 3?

**A.**    THIS IS THE "EMERGENCY RESPONSE TO TERRORISM."  IT'S

A HANDBOOK UTILIZED BY LOCAL FIRE, EMS, LAW ENFORCEMENT

1  AND HAZMAT AGENCIES.  IT IS ESSENTIALLY OUR PLAYBOOK ON

2  HOW WE RESPOND TO ACTS OF TERRORISM.

3  **Q.**    WOULD THERE BE SIGNIFICANCE IN THIS BEING IN THE BOYD

4  HOUSEHOLD?

5  **A.**    IF YOU WANTED TO TRY TO COUNTERACT MEASURES THAT WE

6  MAY INITIATE TO PREVENT OR RESPOND TO TERRORISM, KNOWING

7  THAT PLAYBOOK WOULD BE OF ASSISTANCE.

8  **Q.**    IF I CAN TURN YOUR ATTENTION TO GOVERNMENT'S EXHIBIT

9  NO. 4.

10  **A.**    THIS IS A GAS MASK THAT WAS FOUND WITHIN THE

11  RESIDENCE.

12  **Q.**    AND EXHIBIT 5?

13  **A.**    AN ADDITIONAL GAS MASK THAT WAS FOUND IN THE

14  RESIDENCE.

15  **Q.**    AND EXHIBIT 6, SIR?

16  **A.**    AND TWO ADDITIONAL GAS MASKS FOUND WITHIN THE

17  RESIDENCE.

18  **Q.**    COULD YOU DESCRIBE FOR THE COURT, AGENT SUTTON,

19  WHAT'S FOUND IN THE PHOTO IN EXHIBIT 7?

20  **A.**    EXHIBIT 7 IS A PHOTOGRAPH OF ITEMS THAT WERE WITHIN

21  DANIEL BOYD'S TRUCK AT THE TIME OF HIS ARREST.  IT

22  INCLUDES A BACKPACK AND VEST THAT CONTAIN MULTIPLE

23  MAGAZINES OF AMMUNITION THAT CARRY LARGE QUANTITIES,

24  GENERALLY AROUND 30 OR SO.

25  **Q.**    THIRTY ROUNDS?

1  **A.**   THIRTY ROUNDS FOR EACH MAGAZINE.

2  **Q.**   DO YOU KNOW IN ALL HOW MANY MAGAZINES WERE RECOVERED

3  IN THE SEARCH?

4  **A.**   I DON'T KNOW THAT EXACT NUMBER.

5  **Q.**   IF I CAN TURN YOUR ATTENTION TO EXHIBIT 8.

6  **A.**   WHEN I REFER TO THE RESIDENCE, I REFER TO THE

7  PROPERTY ON THE RESIDENCE, INCLUDING A GARAGE AREA AND

8  VEHICLES.  WHAT YOU SEE THERE ARE BOW AND ARROWS AND ARE

9  FIGHTING SWORDS.

10  **Q.**   WHAT WOULD THE FIGHTING SWORDS BE USED FOR?

11  **A.**   THEY COULD BE USED FOR HAND-TO-HAND COMBAT.

12  **Q.**   FOR THE WRITTEN RECORD, THOSE SWORDS DO NOT HAVE

13  BLADES; IS THAT CORRECT?

14  **A.**   THAT'S CORRECT.  THOSE COULD BE USED FOR TRAINING IN

15  HAND-TO-HAND COMBAT.

16  **Q.**   WHAT IS DEPICTED IN GOVERNMENT'S EXHIBIT 9, SIR?

17  **A.**   THOSE ALSO APPEAR TO BE LARGE-EDGED WEAPONS OR

18  TRAINING DEVICES.

19  **Q.**   AND EXHIBIT 10?

20  **A.**   AGAIN, A LARGE-EDGED WEAPON, BUT I CAN NOT TELL FROM

21  THE PHOTOGRAPH IF THIS IS A TRAINING DEVICE OR AN ACTUAL

22  DEVICE IN LOOKING AT WHAT APPEARS TO BE A BLADE, BUT I

23  DON'T KNOW WHAT THAT SUBSTANCE IS MADE OUT OF.

24  **Q.**   ALL RIGHT, SIR.  LET ME TURN YOUR ATTENTION TO

25  GOVERNMENT'S EXHIBIT 11.  WHAT IS DEPICTED THERE?

1    **A.**    THAT IS A TRENCH OR PIT AREA THAT WAS DUG UNDERNEATH

2    THE DECK AT THE BOYD HOME.

3    **Q.**    DO YOU HAVE ANY INFORMATION AS TO WHAT THIS PIT WOULD

4    BE USED FOR?

5    **A.**    WITNESS INFORMATION TELLS US THE INTENT IN BUILDING

6    THIS BUNKER WAS TO PLACE AND CONCEAL WEAPONS.

7    **Q.**    IF I CAN TURN YOUR ATTENTION TO GOVERNMENT'S

8    EXHIBIT 12.  WHAT IS FOUND THERE?

9    **A.**    WHAT YOU SEE THERE IS THE DECK UNDER WHICH THE PIT OR

10   THE BUNKER IS DUG.  THIS IS A SHOT A LITTLE BIT FURTHER

11   AWAY TO GIVE A BETTER OVERALL VIEW.

12   **Q.**    WHAT'S FOUND, SIR, IN GOVERNMENT'S EXHIBIT 13?

13   **A.**    IF YOU LOOK NEAR THE TOP OF THE PHOTOGRAPH, YOU WILL

14   SEE ON A BRANCH, WHICH IS A PIECE OF PLYWOOD THAT COULD BE

15   USED AS AN AREA TO SIT ON.

16        THE ENTRYWAY TO THE ROAD THAT ENTERS ONTO THE BOYD

17   AREA IS ON A CUL-DE-SAC.  THERE'S ONLY ONE WAY TO ENTER

18   FROM THE ROAD.  AN INDIVIDUAL WHO WOULD BE SITTING IN THAT

19   POSITION COULD SEE ANYONE THAT WOULD BE APPROACHING.

20   **Q.**    IF I COULD NOW TURN YOUR ATTENTION TO GOVERNMENT'S

21   EXHIBIT 14.

22   **A.**    THIS IS A FLYER THAT SAYS, "JOIN THE MUJAHIDEEN.

23   DEFEND THE FRONTIERS OF ISLAM ALLAH AKBAR."  IT WAS FOUND

24   POSTED INSIDE A CABINET IN THE GARAGE AREA.

25   **Q.**    WHAT IS DEPICTED IN GOVERNMENT'S EXHIBIT 15?

1   **A.**   THIS IS A FIREARM THAT IS CONSISTENT WITH AN AK-47 OR

2   SKS-TYPE RIFLE THAT WAS FOUND ON THE BOYD PROPERTY.

3   **Q.**   GOVERNMENT'S EXHIBIT 16, SIR?

4   **A.**   THIS WAS ANOTHER RIFLE/FIREARM THAT WAS FOUND ON THE

5   BOYD PROPERTY.

6   **Q.**   NOW, YOU YOURSELF TRAINED IN FIREARMS SUCH THAT YOU

7   COULD INFORM THE COURT EXACTLY THE MAKE AND MODEL OF THIS

8   FIREARM?

9   **A.**   FROM THIS PHOTOGRAPH, I CAN NOT TELL THIS SPECIFIC

10  MAKE AND MODEL.

11  **Q.**   ALL RIGHT, SIR.  LET ME TURN YOUR ATTENTION TO

12  GOVERNMENT'S EXHIBIT 17.

13  **A.**   AGAIN, ANOTHER FIREARM THAT WAS FOUND ON THE BOYD

14  PROPERTY.

15  **Q.**   NOW THESE FIREARMS, THE PICTURES THAT WE HAVE SEEN TO

16  THIS POINT, ARE ANY OF THEM IN THEMSELVES ILLEGAL?

17  **A.**   HELD BY A MEMBER OF THE GENERAL PUBLIC WITHOUT A

18  CRIMINAL HISTORY WITH NO INTENT TO USE FOR NEFARIOUS

19  MEANS, NO.

20  **Q.**   EXHIBIT 18, SIR?

21  **A.**   EXHIBIT 18 APPEARS TO BE AN M-4 OR M-16-TYPE RIFLE

22  THAT FIRES, GENERALLY FIRES A 5.56 ROUND OR 223 ROUND.

23  **Q.**   WHAT'S EXHIBIT 19, SIR?

24  **A.**   THIS IS A PHOTOGRAPH, AS IT'S READ ACROSS THE TOP,

25  "INTRODUCTION TO BASIC CHEMISTRY" THAT WAS FOUND ON THE

1    BOYD PROPERTY.

2    **Q.**    WHAT IS THE CONTENT OF THIS INTRODUCTION TO BASIC

3    CHEMISTRY, TO YOUR KNOWLEDGE?

4    **A.**    IT CONTAINS INFORMATION REGARDING, AS IT SHOWS HERE,

5    REACTANTS IN PROPELLANTS, SPECIAL AMMUNITION FOR

6    PROJECTILE WEAPONS, ADVANCE USES FOR REACTING, SUCH AS

7    MAKING SHAPE CHARGES AND THOSE SORTS OF THINGS.

8    **Q.**    OTHER THAN THIS BOOK OR PAMPHLET, WAS THERE ANY

9    INDICATION THAT THE MEMBERS OF THIS CONSPIRACY HAD

10    CONSIDERED THE USE OF EXPLOSIVES?

11    **A.**    INFORMATION WAS DERIVED THAT THERE WAS SOME INQUIRY

12    TO THE ACQUISITION OF BLACK POWDER.

13    **Q.**    BUT NO FURTHER INFORMATION OTHER THAN THAT?

14    **A.**    NOT THAT I'M AWARE OF.

15         **MS. KOCHER:**    THE GOVERNMENT MOVES INTO EVIDENCE

16    EXHIBITS 1 THROUGH 19.

17         **THE COURT:**    THEY WILL BE ADMITTED WITHOUT

18    OBJECTION.

19    **Q.**    AGENT SUTTON, EXHIBIT 34 IS THERE ON TOP; IS IT NOT?

20    **A.**    YES, IT IS.

21    **Q.**    WHAT IS THAT A PICTURE OF?

22    **A.**    THAT IS A PICTURE OF ALL OF THE WEAPONS THAT WERE

23    SEIZED DURING THE COURSE OF THE INVESTIGATION OF THIS

24    CONSPIRACY.

25    **Q.**    AND ARE THERE BASICALLY THREE PLACES FROM WHICH

1  WEAPONS WERE SEIZED?

2  **A.**   YES.

3  **Q.**   OKAY.  THE FIRST ONE WOULD BE?

4  **A.**   THERE WAS A PURCHASE MADE BY A WITNESS.  THERE WAS A

5  PURCHASE ACTUALLY MADE BY AN AGENT, AND THEN THESE ITEMS

6  WERE OBTAINED FROM THE TRUCK OF DANIEL BOYD AND FROM THE

7  RESIDENCE.

8  **Q.**   ALL RIGHT.  SO EVERY GUN DEPICTED IN GOVERNMENT'S

9  EXHIBIT 34 DID IN FACT COME FROM DANIEL BOYD, HIS HOME OR

10  THROUGH THE HANDS OF SOMEONE TO WHOM HE SOLD A WEAPON?

11  **A.**   THAT'S CORRECT.

12  **Q.**   NOW, ON THAT NOTE, THE INDICTMENT ALLEGES THAT DYLAN

13  BOYD AT LEAST AIDED AND ABETTED THE SALE OF A FIREARM TO A

14  CONVICTED FELON.

15  **A.**   THAT'S CORRECT.

16  **Q.**   WHAT'S THE GOVERNMENT EVIDENCE SHOW IN THAT REGARD?

17  **A.**   A CONVICTED FELON KNOWINGLY MADE BOTH DANIEL AND

18  DYLAN BOYD AWARE THAT HE HAD BEEN A CONVICTED FELON.

19  THERE WAS ACTUALLY QUESTIONS REGARDING IF THE CONVICTED

20  FELON SAID, "IS THERE ANY RESTRICTION ON MY TRAVEL BECAUSE

21  I'M A CONVICTED FELON?"  HE WAS TOLD BY DANIEL BOYD, "NO,

22  THERE'S NO RESTRICTIONS ON YOUR TRAVEL.  YOU JUST CAN'T

23  POSSESS A FIREARM."

24       THEN A FEW DAYS LATER, DANIEL BOYD INQUIRED TO THE

25  CONVICTED FELON IF HE WANTED TO PURCHASE A WEAPON OR IF HE

1   KNEW SOMEBODY WHO DID.  THE CONVICTED FELON SAID, "WELL

2   I'M INTERESTED."  DANIEL REFERRED HIM TO DYLAN, AND DYLAN

3   SUBSEQUENTLY SOLD HIM THE FIREARM.

4   **Q.**   SO THE EVIDENCE INDICATES THAT DYLAN WAS PRESENT WHEN

5   THE WITNESS INFORMED DANIEL THAT HE WAS A CONVICTED FELON?

6   **A.**   THAT IS CORRECT.

7   **Q.**   LET ME TURN YOUR ATTENTION, SIR, TO GOVERNMENT'S

8   EXHIBIT 38.  WHAT IS THAT A PICTURE OF?

9   **A.**   THIS IS AN OVERALL PICTURE OF ALL OF THE AMMUNITION

10  THAT WAS SEIZED FROM THE DYLAN PROPERTY -- EXCUSE ME --

11  FROM THE BOYD PROPERTY, INCLUDING FROM DANIEL BOYD'S

12  TRUCK.

13  **Q.**   DO YOU KNOW, SIR, WITHOUT REFERRING TO ANY PAPER, THE

14  COUNT FROM THAT SEARCH?

15  **A.**   THERE WAS IN EXCESS OF 27,000 ROUNDS OF AMMUNITION.

16  **Q.**   WAS ANY OF THE AMMO, THAT IS AMMUNITION, RECOVERED IN

17  ITSELF ILLEGAL?

18  **A.**   NO.

19          **MS. KOCHER:**  IF I CAN APPROACH, YOUR HONOR?

20          **THE COURT:**  YOU MAY.

21  **BY MS. KOCHER:**

22  **Q.**   LET ME SHOW YOU, SIR, WHAT'S BEEN MARKED AS

23  GOVERNMENT'S EXHIBIT 42.  WHAT IS THAT?

24  **A.**   THIS IS WHAT'S KNOWN AS AN FD-302 REPORT.  IT'S A

25  REPORT OF INVESTIGATION UTILIZED BY AGENTS OF THE FBI.

1   **Q.**   AND WHAT IS THE CONTENT OF THIS PARTICULAR PAPER?

2   **A.**   THIS IS A BULLET-BY-BULLET COUNT OF AMMUNITION SEIZED

3   DURING THE SEARCH OF THE BOYD RESIDENCE AND THE BOYD

4   VEHICLE.

5   **Q.**   WOULD YOU PLEASE DETAIL THE RESULTS FOR THE COURT?

6   **A.**   THERE WERE 7,640 ROUNDS OF 7.62 AMMO SEIZED, 60 OF

7   WHICH WERE TRACER ROUNDS; THERE WAS 6,178 ROUNDS OF -- HE

8   HAS 233, BUT I BELIEVE IT'S 223 AMMUNITION; THERE WERE

9   3,552 ROUNDS OF 5.56 AMMUNITION, 20 OF WHICH WERE TRACER

10   ROUNDS; THERE WERE 3,093 ROUNDS OF .308 AMMUNITION; 2,720

11   ROUNDS OF 5.45 AMMUNITION; THERE WERE 1,089 ROUNDS OF 5.7

12   X 28 AMMUNITION; 794 ROUNDS OF .357 AMMUNITION; 876 ROUNDS

13   OF 9-MILLIMETER AMMUNITION; 664 ROUNDS OF .45 CALIBER

14   AMMUNITION; 449 ROUNDS OF .22 CALIBER AMMUNITION; 388

15   ROUNDS OF 12-GAUGE SHOTGUN, FIVE OF WHICH WERE SLUG, FOR A

16   TOTAL ROUND COUNT OF 27,443.

17   **Q.**   YOU EARLIER MENTIONED THE SIDE ARM THAT DANIEL BOYD

18   CARRIED AND HAD ON HIM AT THE TIME OF HIS ARREST. CAN YOU

19   SHOW THE COURT WHICH ONE, IF ANY OF THESE ENTRIES, REFLECT

20   THE AMMUNITION FOR THAT FIREARM?

21   **A.**   THE REFERENCE TO 5.7 X 28 WHERE THERE WAS A ROUND

22   COUNT OF 1,089 IS AMMUNITION THAT WOULD BE USED IN THE

23   FN-57 HANDGUN THAT DANIEL BOYD HAD ON HIS POSSESSION AT

24   THE TIME OF HIS ARREST.

25   **Q.**   IF I MAY NOW DIRECT YOUR ATTENTION, AGENT SUTTON, TO

1 GOVERNMENT'S EXHIBIT NO. 39.  WHAT IS THAT?

2 **A.**    THIS IS A BOX THAT WAS FOUND WITHIN THE RESIDENCE

3 PROPERTY.  IT HAS ON IT, "AMMO 223, LAKE CITY, XM-855

4 ARMOR PIERCING."

5 **Q.**    THIS BOX WAS EMPTY AT THE TIME OF THE SEARCH?

6 **A.**    THE BOX WAS EMPTY.

7         **MS. KOCHER:**  YOUR HONOR, AT THIS TIME I MOVE

8 INTO EVIDENCE GOVERNMENT'S EXHIBIT 34, 38, 39 AND 42.

9         **THE COURT:**  THEY WILL BE ADMITTED WITHOUT

10 OBJECTION.

11         **MS. KOCHER:**  IF I COULD HAVE JUST A MOMENT, SIR?

12         **THE COURT:**  YOU MAY.

13     (PAUSE IN THE PROCEEDINGS.)

14 **BY MS. KOCHER:**

15 **Q.**    AGENT SUTTON, DO YOU HAVE ANY INFORMATION RELATIVE TO

16 DANIEL BOYD'S EXPERIENCE IN AFGHANISTAN, THAT IS TO SAY

17 HIS FIGHTING EXPERIENCE IN AFGHANISTAN?

18 **A.**    FROM HIS INTERVIEW WITH US, HE DID TELL US THAT HE,

19 YOU KNOW, HAD BEEN ENGAGED OVER A 23-DAY PERIOD WHEN

20 RUSSIANS ATTACKED THE TRAINING CAMP THAT HE WAS IN.  HE

21 HAD BEEN PRESENT WHEN SCUD MISSILES HAD ATTACKED.  AND HE

22 ALSO CLAIMED THAT ALLAH WAS DOING THE WORK FOR HIM WHILE

23 HE WAS LOOKING DOWN HIS RIFLE AND HE SAW RUSSIANS FALL.

24 **Q.**    DID YOU DRAW AN INFERENCE FROM THAT?

25 **A.**    MY INFERENCE FROM THAT IS THAT HE WAS COMBATING

1    RUSSIANS AND SHOOTING THEM.

2    **Q.**    TURNING TO THE COURT'S INQUIRY AS TO THE RISK OF

3    FLIGHT OF THESE DEFENDANTS, DO YOU HAVE ANY INFORMATION,

4    AGENT SUTTON, THAT ANY OF THESE DEFENDANTS WOULD BE A RISK

5    OF FLIGHT?

6    **A.**    I THINK THAT ALL OF THEM ARE A RISK OF FLIGHT, YOUR

7    HONOR.    THEY ALL HAVE ASSOCIATES AND TIES SOMEHOW

8    OVERSEAS.    THERE WERE SCHEDULED TRIPS BY SOME OF THEM,

9    INCLUDING ZAKARIYA BOYD WHO, WHEN INTERVIEWED, SAID HE WAS

10   TO TRAVEL TO THE BOSNIA AREA IN SEARCH OF A LOCATION WHERE

11   THE FAMILY COULD PERMANENTLY RELOCATE.

12   **Q.**    WERE THERE OTHER DEFENDANTS WHO HAD ACTIVE TRAVEL

13   PLANS AT THE TIME OF THEIR ARREST?

14   **A.**    THE INFORMATION FROM WITNESSES IS THAT HYSEN SHERIFI

15   WAS, ONCE HE COLLECTED THE AMOUNT OF MONEY THAT HE NEEDED,

16   WAS INTENDING TO RETURN TO THE KOSOVO AREA.

17   **Q.**    SIR, ON ARREST, SEVERAL OF THE DEFENDANTS SUBMITTED

18   TO INTERVIEW; IS THAT CORRECT?

19   **A.**    THAT'S CORRECT.

20   **Q.**    LET ME FIRST TURN YOU TO THE INTERVIEW OF DANIEL

21   BOYD.    WHAT INFORMATION, IF ANY, DID DANIEL BOYD PROVIDE

22   FOLLOWING HIS ARREST?

23   **A.**    I'M NOT SURE WHAT YOU ARE ASKING.

24   **Q.**    DO YOU RECALL THE INTERVIEW?

25   **A.**    I DO RECALL IT.

1   **Q.**   IN GENERAL, DID HE DISCUSS HIS VIEWS ON JIHAD?

2   **A.**   I DON'T RECALL SPECIFICALLY WITHOUT THE REPORT.

3   **Q.**   IS THERE A REPORT THAT WOULD ASSIST YOU IN RECALLING

4   THE TEXT OF THAT?

5   **A.**   YES, THERE IS.

6   **Q.**   WOULD THAT BE AN FBI 302?

7   **A.**   THAT WOULD BE CORRECT.

8         **MS. KOCHER:**   YOUR HONOR, MAY THE RECORD REFLECT

9   I PROVIDED THE DOCUMENT TO MR. BOYD'S COUNSEL ITSELF, BUT

10  I DON'T HAVE COPIES FOR ALL COUNSEL.

11        **THE COURT:**   THANK YOU.

12        **THE WITNESS:**   CAN YOU ASK ME THE QUESTION AGAIN?

13  **BY MS. KOCHER:**

14  **Q.**   JUST IN GENERAL, WHAT INFORMATION DID MR. BOYD IMPART

15  FROM HIS INTERVIEW?

16  **A.**   HE AGREED TO BE INTERVIEWED BY THE AGENT, AT WHICH

17  TIME HE SAID HIS TRAVEL TO THE DURHAM AREA WAS RELATED TO

18  A CONSTRUCTION PROJECT, AFTER WHICH THEY INTENDED TO GO

19  TARGET SHOOTING.

20        HE PROVIDED US INFORMATION ABOUT THE WEAPONS THAT HE

21  HAD IN HIS VEHICLE AS WELL AS HE BELIEVED DYLAN BROUGHT A

22  9-MILLIMETER HANDGUN.  HE WAS ASKED WHY HE CARRIED THIS

23  FN-5.7 PISTOL, AND WAS SPECIFICALLY ASKED IF HE CARRIED IT

24  BECAUSE IT WOULD PENETRATE BALLISTIC BODY ARMOR, WHICH HE

25  DENIED THAT'S WHY HE HAD THOSE ITEMS -- THAT ITEM.

1    HIS REPORT TO THE AGENTS WAS THAT WHEN HE WAS

2    ARRESTED THAT HE IMMEDIATELY PLACED HIS HANDS IN THE AIR

3    AND THAT HE COMPLIED.

4    **Q.**    AND IS THAT WHAT THE ARRESTING AGENTS REPORTED?

5    **A.**    NO.  THE AGENTS SAID HE DID NOT COMPLY AND HE DID

6    REACH FOR HIS FIREARM WHILE THEY WERE TRYING TO TAKE HIM

7    INTO CUSTODY.

8        BOYD WAS ASKED TO DESCRIBE WHAT TOOK PLACE DURING THE

9    TARGET PRACTICE, AND HE SAID THEY INTENDED TO SHOOT

10   APPROXIMATELY FIVE TO A THOUSAND ROUNDS.  HE WAS REFERRING

11   TO HIS SONS AND HIS FRIENDS, AND THEY JUST ENJOYED TARGET

12   SHOOTING.  HE SAID THEY DID NOT PRACTICE ANY

13   MILITARY-STYLE TACTICS SUCH AS FIRE AND MOVEMENT, BUT THEY

14   WOULD PRACTICE FIRING FROM DIFFERENT POSITIONS, SUCH AS

15   STANDING, KNEELING AND PRONE.  THEN HE LATER WENT ON TO

16   SAY THEY DID PRACTICE FROM ON-THE-MOVE, BUT HE WAS NOT

17   INSTRUCTING ANYONE IN MILITARY-STYLE TACTICS.

18   **Q.**    DO YOU HAVE INFORMATION TO THE CONTRARY?

19   **A.**    YES.  ONE OF THE WITNESSES REPORTED TO US IN

20   PARTICULAR WHEN FIRING A .308 RIFLE FROM THE PRONE

21   POSITION, DANIEL BOYD NOTED THAT THE TALL GRASS IN THE

22   AREA, BECAUSE OF THE BLAST THAT COMES FROM THE MUZZLE

23   ACTUALLY BLEW BACK THE TALL GRASS AND SAID, "YOU SHOULD

24   CHOOSE A DIFFERENT POSITION BECAUSE THIS BLOW-BACK COULD

25   GIVE AWAY YOUR POSITION, SO TRY A KNEELING POSITION.  IT

1  MAY NOT CREATE THIS CHANGE IN THE ENVIRONMENT OR CHANGE IN

2  THE GRASS STRUCTURE AND GIVE YOUR POSITION AWAY."

3  **Q.**   DID DANIEL BOYD MAKE STATEMENTS AGAINST ANY OF THE

4  CO-DEFENDANTS?

5  **A.**   HE DID SAY THAT HYSEN SHERIFI AT TIMES DID DISPLAY

6  SOME ZEAL TOWARD RADICAL ISLAM AND THAT, YOU KNOW, HE DID

7  SAY THAT ABOUT MR. SHERIFI.

8  **Q.**   AND AGENT SUTTON, DID MR. DANIEL BOYD SPEAK TO HIS

9  PREVIOUS TRAVEL IN 2007 WITH DEFENDANTS YAGHI AND HASSAN?

10 **A.**   HE DID.  THE AGENT INQUIRED -- WELL, ACTUALLY

11 CONFRONTED HIM THAT HE WAS NOT BEING TRUTHFUL IN THE

12 INTERVIEW, AND THAT IN THE PREVIOUS INTERVIEW THAT TOOK

13 PLACE IN AUGUST OF '07, THAT MR. BOYD HAD PROVIDED FALSE

14 STATEMENTS IN WHICH HE SAID THAT HE DID NOT HELP ZIYAD

15 YAGHI TRAVEL OVERSEAS TO ISRAEL.  HE SAID HE HAD BEEN

16 COMPLETELY HONEST.  HE DIDN'T LIE BUT HE WAS JUST NOT

17 TOTALLY FORTHCOMING WITH THE AGENT.  HE SAID THAT ZIYAD

18 YAGHI DID GIVE HIM CASH FOR AN AIRLINE TICKET TO ISRAEL,

19 AND BOYD OBTAINED A CASHIER'S CHECK FROM HIS BANK TO BE

20 DEPOSITED TO THAT TRAVEL AGENCY.  AND BOYD SAID THAT THE

21 TRAVEL AGENCY WOULD NOT ACCEPT CASH.

22 **Q.**   THAT'S THE VERY STATEMENT THAT MR. DANIEL BOYD HAD

23 EARLIER DENIED; IS THAT CORRECT?

24 **A.**   THAT IS CORRECT.

25       **MS. KOCHER:**  NO FURTHER QUESTIONS, YOUR HONOR.

**THE COURT:** THANK YOU. WE'LL START WITH --

ACTUALLY, IT'S 12:25. WE'LL TAKE OUR RECESS NOW AND

RECONVENE AT 2:00 P.M. IF EVERYONE WILL REMAIN SEATED

WHILE THE MARSHALS REMOVE THE PRISONERS. THANK YOU.

(DEFENDANTS LEAVE THE COURTROOM.)

(LUNCH RECESS TAKEN.)

**THE COURT:** SPECIAL AGENT SUTTON, I REMIND YOU

YOU ARE STILL UNDER OATH. WE'LL START THE

CROSS-EXAMINATION WITH MS. GODWIN.

**MS. GODWIN:** THANK YOU, YOUR HONOR.

**CROSS-EXAMINATION**

**BY MS. GODWIN:**

**Q.** SPECIAL AGENT SUTTON, WHEN AGENTS SEARCHED MR. DANIEL

BOYD'S HOME, THEY SEIZED THE PASSPORTS OF MR. BOYD?

**A.** I'M NOT SURE.

**Q.** OKAY. AND WERE YOU THERE WHEN HE WAS ARRESTED?

**A.** I WAS IN THE AREA, BUT I WAS NOT PRESENT AT THE

ACTUAL ARREST.

**Q.** IT'S MY UNDERSTANDING, AND CORRECT ME IF I'M WRONG,

THAT MR. BOYD -- THAT -- YOU ARE AWARE, MR. SUTTON, THAT

LAW ENFORCEMENT AGENTS HAVE MR. BOYD'S PASSPORT IN

CUSTODY?

**A.** I'M NOT AWARE OF THAT, BUT I CAN CHECK AND LET YOU

KNOW THAT.

**Q.** ON THE DAY THAT MR. BOYD WAS ARRESTED, HE WAS

1  CONTACTED BY SOMEONE -- LET ME REPHRASE THAT.  MR. BOYD

2  WAS LURED, IF YOU WILL, TO A PLACE IN DURHAM UNDER THE

3  BELIEF THAT HE WAS GOING THERE TO MAKE A PROPOSAL ON A

4  CONSTRUCTION JOB?

5  **A.**  THAT'S CORRECT.

6  **Q.**  AND HE WAS LURED THERE BY LAW ENFORCEMENT OFFICERS

7  FOR THE PURPOSE OF PLACING HIM UNDER ARREST?

8  **A.**  YES, THAT'S CORRECT.

9  **Q.**  WHEN HE ARRIVED AT THIS LOCATION, THERE WAS A

10  BUILDING THAT HE WENT INTO UNDER THE BELIEF THAT HE WAS

11  THERE TO MAKE A PROPOSAL TO GET A CONSTRUCTION JOB?

12  **A.**  YES.  THAT'S CORRECT.

13  **Q.**  AND HIS TWO SONS WERE IN THE CAR -- HIS TRUCK?

14  **A.**  YES.

15  **Q.**  AND THERE WERE LAW ENFORCEMENT OFFICERS THAT WERE IN

16  SECURE LOCATIONS, SUCH AS IN THE BACK OF A

17  CONSTRUCTION-TYPE VEHICLE, COVERED KIND OF VEHICLE?

18  **A.**  I DON'T KNOW EXACTLY WHERE THE AGENTS WERE PLACED.

19  **Q.**  BUT THEY WERE HIDDEN, IF YOU WILL, FROM THE

20  OBSERVATION OF THESE GENTLEMEN WHEN THEY ARRIVED?

21  **A.**  I WOULD ASSUME SO.

22  **Q.**  AND THE ARREST WAS INTENDED TO BE A SURPRISE?

23  **A.**  YES.

24          **MS. GODWIN:**  THANK YOU.  THAT'S ALL.

25          **THE COURT:**  MR. MCAFEE.

## CROSS-EXAMINATION

**BY MR. MCAFEE:**

**Q.**   SPECIAL AGENT SUTTON, YOU BEGAN YOUR TESTIMONY BY
TALKING ABOUT MR. BOYD'S STATEMENTS THAT HE MADE IN
ATTEMPTS TO RADICALIZE OTHERS.  DO YOU RECALL THAT
TESTIMONY?

**A.**   I DO.

**Q.**   THOSE STATEMENTS WERE MADE UPON HIS RETURN FROM ONE
OF HIS TRIPS OVERSEAS; IS THAT RIGHT?  I'M SORRY, HE WAS
INTERVIEWED BY THE FBI ABOUT THOSE STATEMENTS IN 2007 WHEN
HE HAD RETURNED FROM A TRIP OVERSEAS?

          **MS. KOCHER:**   OBJECTION AS TO WHICH MR. BOYD.

          **MR. MCAFEE:**   DANIEL BOYD.

**A.**   AS I UNDERSTAND THE PRIMARY PURPOSE OF THAT INTERVIEW
WAS TO DETERMINE HIS REASON FOR TRAVELING AND WITH WHOM HE
WAS TRAVELING WITH.

**BY MR. MCAFEE:**

**Q.**   AND THAT'S WHEN HE TOLD YOU OR TOLD THE FBI ABOUT
TRAINING CAMPS IN CONNECTICUT AND AFGHANISTAN?

**A.**   NO.

**Q.**   WHEN WERE THOSE STATEMENTS MADE?

**A.**   THOSE STATEMENTS WERE ORIGINALLY MADE IN
APPROXIMATELY 2004.

**Q.**   THAT'S PRIOR TO THE TIME PERIOD OF THIS CONSPIRACY?

**A.**   YES, SIR.

1   **Q.** DURING YOUR DIRECT TESTIMONY YOU TALKED ABOUT

2   MR. BOYD'S SPEAKING TO THE CO-DEFENDANTS IN THIS CASE AND

3   MAKING STATEMENTS SUCH AS KILLING THE KUFFAR IS THE

4   RESPONSIBILITY OF JIHAD?

5   **A.** THAT'S CORRECT.

6   **Q.** WERE THOSE STATEMENTS MADE DURING THE AUDIO RECORDING

7   THAT WE HEARD OF JUNE, 2009?

8   **A.** I DON'T THINK I HEARD THAT SPECIFIC STATEMENT.

9   **Q.** DO YOU RECALL WHEN THE STATEMENTS WERE MADE TO THE

10   CO-DEFENDANTS ABOUT KILLING THE KUFFAR?

11   **A.** THAT CAME TO US THROUGH INFORMATION PROVIDED BY

12   WITNESSES.

13   **Q.** SPECIAL AGENT, GOVERNMENT'S EXHIBIT 34 IS THE

14   PHOTOGRAPH THAT SHOWS A HALLWAY, APPARENTLY, OF THE GUNS

15   THAT WERE SEIZED IN THIS CASE.  DO YOU RECALL THAT

16   PHOTOGRAPH?

17   **A.** IF YOU ARE REFERRING TO THE APPROXIMATELY 26 WEAPONS

18   THAT WERE ALL TAKEN IN ONE PICTURE, YES, SIR.

19   **Q.** OF THOSE 26 WEAPONS, HOW MANY DID MR. SHERIFI

20   PURCHASE?

21   **A.** I'M NOT AWARE OF ANY.

22   **Q.** HOW MANY WERE RECOVERED FROM MR. SHERIFI?

23   **A.** I'M NOT AWARE OF ANY.

24   **Q.** MR. SHERIFI, YOU TALKED ABOUT THE FACT THAT HE HAD

25   TRAVELED TO KOSOVO IN JULY OF 2008; DO YOU RECALL THAT?

1    **A.**   I DON'T RECALL THE EXACT DATE BUT THERE WAS TRAVEL TO

2    KOSOVO, AND THAT DOES SOUND ABOUT RIGHT.

3    **Q.**   THE INDICTMENT ALLEGES IN PARAGRAPH 32, THAT ON OR

4    ABOUT JULY 30 OF 2008, MR. SHERIFI DEPARTED FROM RALEIGH

5    TO TRAVEL TO PRISTINA, KOSOVO, TO ENGAGE IN VIOLENT JIHAD.

6    ARE YOU FAMILIAR WITH THAT ALLEGATION?

7    **A.**   YES, I AM.

8    **Q.**   MR. SHERIFI WAS A NATIVE OF KOSOVO, AS YOU KNOW.

9    **A.**   I BELIEVE THAT'S CORRECT.

10   **Q.**   AND AS PART OF YOUR INVESTIGATION, DID YOU DETERMINE

11   THAT HE HAD TRAVELED TO KOSOVO PRIOR TO JULY OF 2008?

12   **A.**   I DON'T HAVE INFORMATION REGARDING THAT.

13   **Q.**   WHAT EVIDENCE OR INFORMATION DO YOU HAVE TO SUPPORT

14   THE ALLEGATION THAT MR. SHERIFI WENT TO KOSOVO ON THIS

15   OCCASION IN JULY OF 2008 TO ENGAGE IN VIOLENT JIHAD?

16   **A.**   WITNESS STATEMENTS TO US WERE THAT MR. SHERIFI'S

17   REASON FOR TRAVELING AT THAT TIME WAS TO ENGAGE IN VIOLENT

18   JIHAD.  WHEN HE ARRIVED OVER THERE, HE WAS SEARCHING FOR

19   BROTHERS TO PARTICIPATE WITH HIM IN THAT, WAS UNABLE TO

20   LOCATE THAT AND NEEDED MONEY.  SO HE RETURNED TO THE

21   UNITED STATES TO ACQUIRE FINANCING SO HE THEN COULD RETURN

22   TO KOSOVO AND PURCHASE WEAPONS TO ENGAGE IN VIOLENT JIHAD.

23   **Q.**   IS THAT BASED UPON WHAT THE WITNESSES TOLD YOU OR IS

24   IT BASED UPON SOMETHING THAT MR. SHERIFI SUPPOSEDLY TOLD

25   THEM?

1          **MS. KOCHER:** OBJECTION, YOUR HONOR. IMPROPER

2  MATTERS.

3          **THE COURT:** I'M GOING TO OVERRULE THE OBJECTION.

4  YOU MAY ANSWER THE QUESTION.

5  **A.** COULD YOU ASK IT AGAIN?

6  **Q.** SURE. WAS THAT INFORMATION BASED ON THE WITNESS

7  STATEMENTS FROM THE WITNESSES THEMSELVES OR WAS IT BASED

8  ON SOMETHING MR. SHERIFI TOLD THE WITNESSES?

9          **MS. KOCHER:** OBJECTION, YOUR HONOR. MAY WE

10  APPROACH?

11          **THE COURT:** YES, YOU MAY.

12      (THE FOLLOWING BENCH CONFERENCE WAS HELD.)

13          **MS. KOCHER:** THE QUESTION LIKELY CALLS FOR

14  CLASSIFIED INFORMATION TO RESPOND, YOUR HONOR.

15          **THE COURT:** NOW, YOUR WITNESS HAS TESTIFIED

16  ABOUT INFORMATION COMING FROM WITNESSES.

17          **MS. KOCHER:** THAT'S CORRECT, YOUR HONOR.

18          **THE COURT:** THE QUESTION, AS I UNDERSTAND IT IS,

19  WAS THAT SOMETHING THAT THE WITNESS TOLD HIM, TOLD THE

20  FBI, OR SOMETHING THAT MR. SHERIFI TOLD THE WITNESS?

21          **MS. KOCHER:** I'M SORRY, I MISUNDERSTOOD THE

22  QUESTION. I'M SORRY.

23          **THE COURT:** I THINK IT'S BETTER TO BE PRUDENT.

24          **MS. KOCHER:** THE QUESTION IS WHICH WAY THE

25  INFORMATION FLOWED?

1       **MR. MCAFEE:**  I'M LOOKING FOR THE SOURCE.  I

2   DON'T WANT TO IDENTIFY THE SOURCE, JUST --

3       **THE COURT:**  THAT MAY RUN AFOUL OF MRS. KOCHER'S

4   CONCERN.  AS I UNDERSTOOD IT, YOU WERE ASKING WHETHER IT'S

5   SOMETHING THE WITNESS TOLD THE FBI OR SOMETHING MR.

6   SHERIFI TOLD THE WITNESS.

7       **MR. MCAFEE:**  RIGHT.

8       **MS. KOCHER:**  I DON'T THINK I UNDERSTAND THE

9   QUESTION BECAUSE -- IS THE QUESTION WHETHER THE WITNESS

10  SAW IT?

11      **THE COURT:**  WHY DON'T WE ASK TWO SEPARATE

12  QUESTIONS, OKAY?  WHY DON'T WE PREVIEW IT HERE.

13      **MR. MCAFEE:**  WAS THIS INFORMATION BASED ON A

14  WITNESS REPORT?

15      **MS. KOCHER:**  OKAY.

16      **MR. MCAFEE:**  SECOND, DID THE WITNESS GET THAT

17  INFORMATION DIRECTLY FROM MR. SHERIFI, THE STATEMENTS MR.

18  SHERIFI MADE TO THE WITNESS?  I'M JUST ASKING ABOUT

19  DANGEROUSNESS, IF HE'S MAKING THESE STATEMENTS.

20      **MS. KOCHER:**  I UNDERSTAND.

21      **THE COURT:**  I'M A LITTLE PERPLEXED.  ALSO, IF

22  THE WITNESS IS BEING USED AS A EUPHEMISM OR AS A PLACE

23  HOLDER FOR SOMETHING ELSE AS OPPOSED TO A PERSON, THEN I

24  THINK WE NEED TO --

25      **MS. KOCHER:**  THERE'S NO EUPHEMISM.

1    THE COURT:  SO THERE IS A WITNESS?

2    MS. KOCHER:  YES, SIR.

3    THE COURT:  SO I DON'T UNDERSTAND THE CLASSIFIED

4  NATURE OF THE QUESTION, OR ANY RESPONSE, I MEAN.

5    MS. KOCHER:  I'M UNABLE TO FURTHER EXPLAIN BUT

6  IF WE CAN BREAK IT INTO THOSE TWO QUESTIONS.

7    (END OF BENCH CONFERENCE.)

8    THE COURT:  MR. MCAFEE, IF YOU WOULD RESTATE THE

9  QUESTIONS YOU HAVE.

10 BY MR. MCAFEE:

11 Q.   AGENT SUTTON, THE INFORMATION WE JUST TALKED ABOUT,

12 DID YOU DERIVE THAT INFORMATION FROM A WITNESS?

13 A.   YES.

14 Q.   DID THE WITNESS ACTUALLY HEAR THE STATEMENTS FROM MR.

15 SHERIFI TO THAT EFFECT?

16 A.   WHAT THE WITNESS HAD TOLD US IS THAT MR. SHERIFI

17 REGULARLY -- WELL, HE TALKS ABOUT JIHAD ALL THE TIME,

18 ESPECIALLY SINCE HIS RETURN FROM KOSOVO, AND THAT HE

19 WANTED TO RETURN TO FIGHT AND ASSOCIATE WITH SOME BROTHERS

20 WHO MAYBE HAD A WAY TO FIGHT JIHAD, AND HE WAS HOME TO

21 COLLECT MONEY TO RETURN TO FIGHT THAT JIHAD.

22 Q.   AND MR. SHERIFI WAS IN KOSOVO FROM JULY OF 2008 UNTIL

23 APPROXIMATELY APRIL OF 2009; IS THAT RIGHT?

24 A.   I THINK THAT'S APPROXIMATELY CORRECT.

25 Q.   ABOUT AN EIGHT MONTH PERIOD?

1   **A.**   I DON'T HAVE THOSE EXACT DATES BEFORE ME.

2   **Q.**   DO YOU KNOW WHAT HE DID IN KOSOVO?

3   **A.**   ACCORDING TO THE WITNESS, HE WAS TRYING TO FIND A WAY

4   TO ENGAGE IN VIOLENT JIHAD.

5   **Q.**   I DON'T THINK YOU DEFINED THIS IN YOUR TESTIMONY TO

6   THIS POINT.  WHAT IS YOUR UNDERSTANDING OF VIOLENT JIHAD?

7   **A.**   HE SOUGHT TO WAGE ON THE BATTLEFIELD AND FIGHT

8   OTHERS.  HE SOUGHT TO MAIM AND MURDER OTHERS AS A

9   MUJAHIDEEN WOULD DO.

10   **Q.**   DO YOU HAVE ANY EVIDENCE AS WE SIT HERE TODAY ABOUT

11   ANY SPECIFIC TARGETS OF THIS VIOLENT JIHAD?

12   **A.**   I DON'T HAVE ANY SPECIFIC INFORMATION ABOUT A

13   SPECIFIC TARGET.

14   **Q.**   AS THE INDICTMENT INDICATES, THE ALLEGED CONSPIRACY

15   HAS TO DO WITH ENGAGING IN SOME SORT OF VIOLENT JIHAD

16   OVERSEAS?

17   **A.**   THAT'S CORRECT.

18   **Q.**   SO THERE ARE NOT AMERICAN TARGETS IDENTIFIED AT ANY

19   TIME IN THIS INVESTIGATION?

20       **MS. KOCHER:**   OBJECTION, YOUR HONOR.  IT IS AN

21   ONGOING LAW ENFORCEMENT INVESTIGATION.

22       **THE COURT:**   ALSO, I THINK THE WITNESS HAS

23   TESTIFIED TO CERTAIN THINGS THAT CONCERNED ACTIVITIES THAT

24   COULD HAVE TAKEN PLACE IN THIS COUNTRY.  SO I'M NOT SURE

25   WHAT HIS ANSWER WOULD DO, UNLESS HE WAS DISAVOWING THE

1  ANSWERS HE HAD GIVEN EARLIER.

2  **BY MR. MCAFEE:**

3  **Q.**   AT ANY TIME DURING YOUR INVESTIGATION, DID YOU GET

4  INFORMATION THAT MR. SHERIFI HAD ANY INTENT TO HARM ANYONE

5  IN THE UNITED STATES?

6  **A.**   I DON'T HAVE THAT INFORMATION.

7  **Q.**   WHEN MS. KOCHER WAS ASKING YOU ABOUT RAISING MONEY

8  FOR TRAVEL, YOU MENTIONED THE $11,000 THAT MR. DANIEL BOYD

9  HAD REFERRED TO.  DO YOU KNOW WHERE THAT MONEY CAME FROM?

10  **A.**   I DO NOT.

11  **Q.**   YOU SAID THAT MY CLIENT, MR. SHERIFI, HAD GATHERED

12  APPROXIMATELY $15,000; IS THAT CORRECT?

13  **A.**   THAT IS CORRECT.

14  **Q.**   DO YOU KNOW WHERE HE GOT THAT FROM?

15  **A.**   I DO NOT KNOW THE ORIGIN.

16  **Q.**   AND I BELIEVE IT WAS YOUR TESTIMONY THAT HE WAS GOING

17  TO USE THAT -- I'M SORRY -- IMMEDIATELY AFTER GETTING THAT

18  MONEY, HE MADE TRAVEL PLANS TO GO TO KOSOVO?

19  **A.**   YES.  HE HAD A SCHEDULED FLIGHT TO KOSOVO FOR JULY 29

20  OF THIS YEAR.

21  **Q.**   DO YOU KNOW WHEN HE PURCHASED THAT TICKET?

22  **A.**   I DO NOT.

23  **Q.**   DO YOU KNOW WHETHER HE USED THE SAME TRAVEL AGENT

24  THAT THE BOYDS USED IN 2007?

25  **A.**   I DO NOT.

1   **Q.**   YOU ARE AWARE THAT MR. SHERIFI IS MARRIED?

2   **A.**   I DO BELIEVE HE HAS A WIFE, YES.

3   **Q.**   SHE LIVES IN KOSOVO?

4   **A.**   THAT'S CORRECT.

5   **Q.**   SHE'S EXPECTING A CHILD?

6   **A.**   I DON'T HAVE THAT INFORMATION.

7   **Q.**   IT WOULD NOT BE UNUSUAL FOR A HUSBAND TO TRAVEL

8   OVERSEAS TO SEE HIS WIFE, WOULD IT?

9   **A.**   I CAN'T SPEAK TO THOSE FACTS.

10  **Q.**   DO YOU KNOW WHETHER AT ANY TIME THAT MR. SHERIFI WAS

11  IN KOSOVO IN THE 2008/2009 PERIOD, DID HE ATTEMPT TO

12  PURCHASE ANY FIREARMS?

13  **A.**   I DON'T HAVE ANY PERSONAL INFORMATION REGARDING HIS

14  ACTIVITIES IN KOSOVO.

15  **Q.**   WAS HE UNDER SURVEILLANCE BY KOSOVO POLICE?

16          **MS. KOCHER:**  OBJECTION, IMPROPER MATTERS.

17          **THE COURT:**  I'M GOING TO SUSTAIN THE OBJECTION,

18  BUT I THINK WE NEED TO, AS QUICKLY AS POSSIBLE, WORK

19  THINGS OUT.  THERE'S ALLEGATIONS THROUGHOUT THE INDICTMENT

20  ABOUT SURVEILLANCE AND THE QUESTION IS:  WAS HE UNDER

21  SURVEILLANCE BY POLICE IN A FOREIGN COUNTRY?  I'LL ACCEPT

22  THE GOVERNMENT'S REPRESENTATION THAT GETS INTO IMPROPER

23  MATTERS, BUT IT'S DIFFICULT TO SEE ON THE FACE OF IT THAT

24  IT DOES, BUT I'LL SUSTAIN THE OBJECTION.

25  **BY MR. MCAFEE:**

1 **Q.** SPECIAL AGENT SUTTON, AFTER MY CLIENT RETURNED FROM

2 KOSOVO EARLIER IN 2009, YOU INDICATED THAT HE WAS PRESENT

3 WHEN ONE OF THOSE AUDIO RECORDINGS WERE MADE THAT YOU

4 HEARD APPARENTLY GUNSHOTS ON; IS THAT CORRECT?

5 **A.** ARE YOU REFERRING TO THE AUDIO RECORDING PLAYED FOR

6 JUNE 10, 2009.

7 **Q.** YES, SIR.

8 **A.** YES, HE WAS PRESENT.

9 **Q.** AND THAT TOOK PLACE AT THE PROPERTY IN CASWELL

10 COUNTY; IS THAT RIGHT?

11 **A.** IT DID.

12 **Q.** WHO'S THAT PROPERTY BELONG TO; DO YOU KNOW?

13       **MS. KOCHER:** OBJECTION, YOUR HONOR.

14       **THE COURT:** AND THE NATURE OF THE OBJECTION?

15       **MS. KOCHER:** IT IS AN ONGOING INVESTIGATION, AND

16 IT WOULD ALSO PERHAPS REVEAL COOPERATING SOURCES AT THIS

17 TIME THAT WOULD PUT THEM IN DANGER.

18       **THE COURT:** APPROACH, COUNSEL.

19     (THE FOLLOWING BENCH CONFERENCE WAS HELD.)

20       **THE COURT:** IS THE NATURE OF YOUR OBJECTION THAT

21 THE PROPERTY THAT THE DEFENDANTS WENT TO IS CLASSIFIED?

22       **MS. KOCHER:** NO, YOUR HONOR.

23       **THE COURT:** WHAT'S THE NATURE OF YOUR OBJECTION?

24 IMPROPER MATTERS IS JUST --

25       **MS. KOCHER:** -- I DON'T THINK I SAID IMPROPER

MATTERS.  IF I DID, I APOLOGIZE FOR THAT.  RELEVANCY,

NUMBER ONE.  TWO, IT WOULD BE REVEALING POTENTIALLY A

SOURCE.

       **THE COURT:**  HOW DOES THE OWNERSHIP OF PROPERTY,

WHICH MUST BY LAW BE REGISTERED IN THE COUNTY COURTHOUSE,

IN ANY WAY REVEAL A SOURCE?

       **MS. KOCHER:**  I DON'T BELIEVE THE PLACE, THE

EXACT LOCATION OF THE PROPERTY WAS IDENTIFIED.

       **THE COURT:**  THEY WERE ON THE PROPERTY?

       **MS. KOCHER:**  THEY WERE.

       **THE COURT:**  SO THERE'S NO MYSTERY AS TO THEM

WHERE IT WAS.  AND THERE'S BEEN NO SUGGESTION THAT THE

PROPERTY OWNER IN ANY WAY ASSOCIATED WITH THE PROPERTY IS

IN FACT A SOURCE OF INFORMATION.  I THINK DEFENSE

ATTORNEYS HAVE FAILED TO EXPLORE THE ISSUE OF THE OWNER OF

THE PROPERTY.  IF THE AGENT KNOWS, AND HE MAY NOT KNOW IT,

BECAUSE IF THEY WERE THERE TARGET PRACTICING WITH THE

OWNER'S PERMISSION, THAT MAY BE ONE FACTOR I MIGHT

CONSIDER.  IF THEY WERE THERE TRESPASSING, THAT MIGHT BE

ANOTHER.  I'LL ALLOW THE QUESTION.

    (END OF BENCH CONFERENCE.)

       **THE COURT:**  YOU MAY ANSWER THE QUESTION, IF YOU

KNOW THE ANSWER.

**A.**  I DO NOT KNOW WHO THE OWNER OF THE PROPERTY IS.

**BY MR. MCAFEE:**

1  **Q.**  HOW DID THE BOYDS FIND THE PROPERTY TO GO SHOOT AT?

2  **A.**  A WITNESS PROVIDED THEM INFORMATION ON WHERE IT WAS

3  LOCATED.

4  **Q.**  IS IT FAIR TO SAY THEY WERE INVITED UP TO THE

5  PROPERTY?

6  **A.**  IT'S FAIR TO SAY THAT THEY WERE LOOKING FOR A PLACE

7  TO CONDUCT FIREARMS TRAINING.  THEY HAD ACTUALLY LOOKED TO

8  A PLACE IN SANFORD, BUT ONE OF THE WITNESSES WAS AFRICAN

9  AMERICAN, AND IT WAS REFERENCED TO HIM THAT THE

10 INDIVIDUALS IN THAT AREA MAY NOT LIKE HIM BECAUSE HE'S

11 AFRICAN AMERICAN.  SO THE WITNESS OFFERED AN ALTERNATE

12 LOCATION.

13 **Q.**  ON THAT DAY OF JUNE 10, 2009, MY CLIENT'S VOICE

14 DOESN'T APPEAR IN ANY OF THESE AUDIO RECORDINGS THAT WERE

15 PLAYED TODAY; IS THAT RIGHT?

16 **A.**  NOT THAT I'M AWARE OF.

17 **Q.**  DO YOU HAVE ANY INFORMATION WHETHER HE EVEN FIRED A

18 WEAPON THAT DAY?

19 **A.**  I DON'T HAVE SPECIFIC INFORMATION TO THAT.

20 **Q.**  DO YOU KNOW WHAT MY CLIENT'S IMMIGRATION STATUS IS?

21 **A.**  MY UNDERSTANDING IS THAT HE'S A LEGAL PERMANENT

22 RESIDENT ALIEN.

23 **Q.**  AND HE ACTUALLY CAME HERE ABOUT TEN YEARS AGO, IS

24 THAT RIGHT, WHEN THE WAR IN KOSOVO WAS GOING ON?

25 **A.**  MY UNDERSTANDING, YES.  IT WAS ABOUT 1999.

1  **Q.**  YOU TESTIFIED ABOUT A CONVERSATION THAT MR. DANIEL

2  BOYD HAD WITH MR. SHERIFI ABOUT THE CHARLOTTE OFFICE; DO

3  YOU REMEMBER THAT?

4  **A.**  THE CHARLOTTE --

5  **Q.**  CHARLOTTE.  THAT MR. SHERIFI HAD TO RESUBMIT HIS

6  APPLICATION FOR CITIZENSHIP?

7  **A.**  I REFERENCED THE IMMIGRATION OFFICE.

8  **Q.**  I'M SORRY.  BUT IT WAS THE ONE IN CHARLOTTE; WAS IT

9  NOT?

10  **A.**  I DON'T KNOW THE LOCATION.

11  **Q.**  OKAY.  IN THE JUNE 20, 2008, RECORDING OR INCIDENT

12  YOU DESCRIBED THAT MR. DANIEL BOYD, MR. SHERIFI AND A

13  WITNESS WERE IN THE STORE, MR. BOYD'S STORE, AND MR. BOYD

14  PUT HIS FINGER ACROSS HIS LIPS AS IF TO TELL EVERYONE TO

15  BE QUIET, AND THEN HE WROTE SOMETHING.  THEN SUBSEQUENTLY

16  HE WENT OUTSIDE WITH THE WITNESS; IS THAT RIGHT?

17  **A.**  I BELIEVE I TESTIFIED ON JUNE 20, THEY WERE IN THE

18  STORE AND HE WROTE -- PUT HIS FINGERS TO HIS LIPS

19  SIGNALING TO BE QUIET, AND HE WROTE, "DON'T TALK ABOUT

20  ANYTHING YOU DON'T WANT THEM TO HEAR."

21  THE REFERENCE IN GOING OUTSIDE TO THE SIDEWALK WAS ON

22  ANOTHER DAY.

23  **Q.**  ON JUNE 20, ON THAT OCCASION, DID MY CLIENT, MR.

24  SHERIFI, SAY ANYTHING AT THAT POINT?

25  **A.**  NOT THAT I'M AWARE OF.

1   **Q.**   YOU SAID THAT AFTER MR. DANIEL BOYD WAS ARRESTED, THE

2   ONLY STATEMENT I BELIEVE YOU MADE ABOUT ANY CO-DEFENDANT

3   WAS THAT MR. SHERIFI DISPLAYED SOME ZEAL TOWARD RADICAL

4   ISLAM.

5   **A.**   THAT WAS A STATEMENT MADE BY DANIEL BOYD AFTER HIS

6   ARREST.

7   **Q.**   ANY FURTHER DETAILS AS TO HOW THAT SUPPOSEDLY

8   MANIFESTED ITSELF ABOUT MR. SHERIFI?

9   **A.**   NO.

10  **Q.**   JUST A BALD STATEMENT THAT MR. SHERIFI SEEMED

11  INTERESTED?

12  **A.**   IT WAS A STATEMENT BY DANIEL BOYD THAT HE ESPOUSED

13  RADICAL ISLAMIC VIEWS.

14          **MR. MCAFEE:**  THAT'S ALL, YOUR HONOR.

15          **THE COURT:**  MS. AGUIRRE.

16                        **CROSS-EXAMINATION**

17  **BY MS. AGUIRRE:**

18  **Q.**   AGENT SUTTON, AS TO MR. SUBASIC, WAS THERE ANY

19  EVIDENCE OR ANY INFORMATION THAT YOU HAVE THAT HE WAS

20  PLANNING TO ACTUALLY TRAVEL OUT OF THE UNITED STATES?

21  **A.**   I'M NOT AWARE OF ANY SCHEDULED TRAVEL.

22  **Q.**   AND DO YOU HAVE ANY EVIDENCE THAT HE HAS EVEN

23  TRAVELED OUT OF THE UNITED STATES SINCE HE MOVED HERE WITH

24  HIS FAMILY SINCE 1998?

25  **A.**   I DON'T HAVE THE INFORMATION ONE WAY OR THE OTHER.

1  **Q.**  DO YOU HAVE ANY INFORMATION FROM WITNESSES OR OTHER

2  SOURCES THAT HE HAS ACTUALLY PROVIDED ANY MONEY TO THE

3  BOYDS?

4  **A.**  NO, I DO NOT.

5  **Q.**  WAS THERE ANY INFORMATION THAT HE HAD COLLECTED OR

6  PROVIDED MONEY TO ANYONE ELSE INVOLVED IN AND NAMED IN THE

7  CONSPIRACY AT THIS TIME?

8  **A.**  I DON'T HAVE ANY INFORMATION.

9  **Q.**  IS THERE ANY INFORMATION THAT YOU HAVE THAT INDICATES

10  THAT MR. SUBASIC HAS EVER ATTENDED ANY OF THE SHOOTING

11  RANGE ACTIVITIES IN CASWELL COUNTY OR OTHER PLACES IN

12  NORTH CAROLINA?

13  **A.**  MY UNDERSTANDING IS THAT HE DID NOT ATTEND THE ONE

14  SHOOTING RANGE IN CASWELL COUNTY.

15  **Q.**  DO YOU HAVE INFORMATION THAT HE ATTENDED ANY SHOOTING

16  RANGE IN NORTH CAROLINA WITH THE BOYDS?

17  **A.**  I DO NOT HAVE THAT INFORMATION.

18  **Q.**  HAS HE ATTENDED ANY SHOOTING RANGES OR DISCHARGED

19  FIREARMS WITH ANY OF THE OTHER CO-DEFENDANTS NAMED IN THE

20  INDICTMENT?

21  **A.**  I DO NOT HAVE THAT INFORMATION.

22  **Q.**  WERE YOU PRESENT WHEN HE WAS ARRESTED?

23  **A.**  I WAS NOT.

24  **Q.**  WERE YOU AWARE THAT HE WAS ARRESTED AT HIS HOME

25  WITHOUT ANY INCIDENT?

1   **A.**   I DO NOT KNOW THE SPECIFIC DETAILS, BUT I BELIEVE

2   THAT IS CORRECT.

3   **Q.**   YOU ARE AWARE THAT HE HAS NO CRIMINAL HISTORY OTHER

4   THAN A TRAFFIC VIOLATION?

5   **A.**   YES, MA'AM.  I AM AWARE OF THAT.

6         **MS. AGUIRRE:**  NOTHING FURTHER.

7         **THE COURT:**  MR. HILL.

8                 **CROSS—EXAMINATION**

9   **BY MR. HILL:**

10   **Q.**   AGENT SUTTON, I'M MYRON HILL.  I REPRESENT ZAK BOYD.

11      YOU DESCRIBED THE ARREST OF THE FATHER, DANIEL, AND

12   DYLAN.  CAN YOU DESCRIBE FOR ME THE ARREST OF MY CLIENT,

13   ZAK?

14   **A.**   MY UNDERSTANDING IS WHEN ZAK ENCOUNTERED THE LAW

15   ENFORCEMENT AGENTS, HE DID COMPLY.

16   **Q.**   HE COOPERATE, NO PROBLEM?

17   **A.**   YES, SIR.

18   **Q.**   WAS THERE ANY WEAPON ON HIM AT THAT TIME?

19   **A.**   NO, SIR.

20   **Q.**   DID HE MAKE ANY WRITTEN STATEMENT AS YOU ARE AWARE

21   OF, AS OF UP TO TODAY'S DATE?

22   **A.**   A WRITTEN STATEMENT, NO, SIR.

23   **Q.**   DID HE MAKE AN ORAL STATEMENT?

24   **A.**   HE DID MAKE AN ORAL STATEMENT.

25   **Q.**   CAN YOU TELL ME WHAT THE GIST OF THAT ORAL STATEMENT

1    IS, IF YOU KNOW?

2    **A.**    I DON'T HAVE A STRONG RECOLLECTION OF THAT ORAL

3    STATEMENT.  I WAS NOT PRESENT AT THAT TIME.

4    **Q.**    YOU WERE NOT PRESENT?

5    **A.**    NO.

6    **Q.**    NOW, YOU TESTIFIED THAT I BELIEVE HE WENT OUT OF THE

7    COUNTRY WITH HIS FATHER IN 2007, I BELIEVE IT WAS, AND HE

8    GOT DENIED GOING TO ISRAEL.  BESIDES BEING A LITTLE BOY

9    WHEN HE LIVED IN PAKISTAN WITH HIS FAMILY WHEN HE WAS TWO,

10   IS THAT THE ONLY EVIDENCE YOU HAVE THAT HE WENT OUT OF THE

11   COUNTRY JUST ONE TIME?

12   **A.**    I HAVE NO OTHER EVIDENCE THAN THAT.

13   **Q.**    ARE YOU AWARE THAT HE'S ALWAYS WORKED, ALWAYS HAD

14   EMPLOYMENT EVER SINCE HE WAS OLD ENOUGH TO WORK?

15   **A.**    I'M NOT AWARE OF THAT INFORMATION.

16   **Q.**    ARE YOU AWARE HE WAS A COLLEGE STUDENT FOR A YEAR?

17   **A.**    I'M AWARE HE DID ATTEND UNC PEMBROKE.

18   **Q.**    YOU ARE AWARE HE'S BEEN IN NORTH CAROLINA SINCE HE

19   WAS ABOUT SIX YEARS OLD?

20   **A.**    I DON'T KNOW THE EXACT DATE HE ARRIVED IN THE STATE.

21   **Q.**    BUT HE'S BEEN HERE A LONG TIME?

22   **A.**    I WOULD ASSUME SO.

23   **Q.**    YOU ARE AWARE HE'S 20 YEARS OLD?

24   **A.**    YES, SIR.

25   **Q.**    AND ARE YOU AWARE THAT THE GOVERNMENT SEIZED HIS

1   PASSPORT?

2   **A.**   IN THE SAME RESPONSE TO MS. GODWIN, I WOULD HAVE TO

3   CHECK THE RECEIPT TO VERIFY THAT.

4   **Q.**   DID ZAK EVER PURCHASE OR SELL ANY WEAPONS TO YOUR

5   KNOWLEDGE?

6   **A.**   NOT THAT I'M AWARE OF.

7   **Q.**   AND YOU, DURING YOUR EXAMINATION OF THIS CASE SINCE

8   2005, YOU NEVER SEEN OR HEARD ANY PROBLEMS WITH HIM HAVING

9   ANY SUBSTANCE ABUSE ISSUES, USING DRUGS OR SMOKING OR

10  DRINKING?

11  **A.**   NO, SIR.

12  **Q.**   AND YOU AWARE HE'S A U. S. CITIZEN?

13  **A.**   YES, SIR.

14  **Q.**   ARE YOU AWARE THAT HE'S AN EAGLE SCOUT?

15  **A.**   I'M NOT AWARE OF THAT.

16           **MR. HILL:**  THAT'S ALL, YOUR HONOR.

17           **THE COURT:**  MR. ZESZOTARSKI.

18                 **CROSS-EXAMINATION**

19  **BY MR. ZESZOTARSKI:**

20  **Q.**   AGENT SUTTON, GOOD AFTERNOON.  GOOD TO SEE YOU AGAIN.

21  I REPRESENT DYLAN BOYD IN THIS CASE, AND MY QUESTIONS WILL

22  FOCUS ON HIM.

23       AT THE END OF YOUR TESTIMONY, YOU MENTIONED THAT

24  INTERVIEWS WERE CONDUCTED OF THE BOYDS AT THE TIME OF

25  THEIR ARREST.  WAS DYLAN BOYD INTERVIEWED?

1   **A.**   DYLAN WAS INTERVIEWED.

2   **Q.**   DO YOU KNOW WHO CONDUCTED THAT INTERVIEW?

3   **A.**   I WANT TO BELIEVE IT WAS SPECIAL AGENT MINELLA AND

4   SPECIAL AGENT RICHARDS.

5   **Q.**   BOTH OF THOSE ARE FBI AGENTS?

6   **A.**   YES, SIR.

7   **Q.**   YOU DID NOT PARTICIPATE?

8   **A.**   I DID NOT, SIR.

9   **Q.**   HAVE YOU REVIEWED A COPY OF THE 302 OF HIS INTERVIEW?

10   **A.**   I HAVE LOOKED OVER IT, YES, SIR.

11   **Q.**   OKAY.  DO YOU KNOW HOW LONG HE WAS INTERVIEWED?

12   **A.**   I BELIEVE IT OCCURRED OVER THE COURSE OF AN HOUR,

13   HOUR-AND-A-HALF, AND THAT'S AN APPROXIMATION, SIR.

14   **Q.**   ON THE ISSUE OF RISK OF FLIGHT, AGENT, THE PROSECUTOR

15   ASKED YOU ABOUT THAT ISSUE, AND YOU TESTIFIED TO THE JUDGE

16   THAT THEY -- ALL OF THE DEFENDANTS WERE A RISK OF FLIGHT.

17   I BELIEVE YOU TESTIFIED THAT THEY ALL HAVE TIES OVERSEAS.

18       WHAT TIES DOES DYLAN BOYD HAVE OVERSEAS?

19   **A.**   WELL, HE HAS TRAVELED OVERSEAS, AND THERE IS THE

20   INFERENCE THAT HE HAS CONTACTS OVER THERE THROUGH HIS

21   PREVIOUS TRAVEL, AND SOME OF THE REFERENCES THAT HAVE BEEN

22   MADE; THERE ARE FAMILY FRIENDS.

23   **Q.**   WHAT TRAVEL -- THERE WAS A TRIP IN 2007 WHERE DYLAN

24   BOYD WENT OVERSEAS; IS THAT RIGHT?

25   **A.**   YES, THERE IS TRAVEL BY DYLAN ON THAT DAY.

1   **Q.**  LET'S PUT THAT ONE ASIDE FOR A SECOND.  OTHER THAN

2   GOING OVERSEAS IN 2007, WHAT OTHER TRAVEL INTERNATIONALLY

3   DOES DYLAN BOYD HAVE?

4   **A.**  I'M NOT AWARE OF ANY.

5   **Q.**  SO THERE'S ONE TRIP OVERSEAS IN 2007, CORRECT?

6   **A.**  HE DID TRAVEL OVERSEAS WHEN HE WAS A YOUNG CHILD.

7   **Q.**  PUTTING THAT ASIDE, OTHER THAN THAT, BETWEEN THEN AND

8   NOW WE HAVE ONE TRIP OVERSEAS IN 2007; IS THAT RIGHT?

9   **A.**  TO MY KNOWLEDGE.

10   **Q.**  AND THAT TRIP -- YOU TESTIFIED EARLIER ABOUT THAT

11   TRIP RELATED TO DANIEL AND ZAK ATTEMPTING TO ENTER ISRAEL;

12   IS THAT RIGHT?

13   **A.**  THAT'S CORRECT.

14   **Q.**  NOW, DANIEL AND ZAK, WHEN THEY WENT TO ISRAEL, DYLAN

15   WAS NOT WITH THEM, CORRECT?

16   **A.**  NO, SIR.  HE CAME AT A LATER TIME.

17   **Q.**  DYLAN, IN FACT, FLEW.  THE RECORDS SHOW HE FLEW TO

18   JORDAN; IS THAT CORRECT?

19   **A.**  I BELIEVE THAT'S CORRECT.

20   **Q.**  HE NEVER ATTEMPTED TO ENTER ISRAEL TO YOUR KNOWLEDGE,

21   DID HE?

22   **A.**  NO, BECAUSE THE FAMILY AND OTHER ASSOCIATES HAD BEEN

23   DENIED ENTRY INTO ISRAEL.

24   **Q.**  SO HE NEVER ATTEMPTED TO ENTER ISRAEL?

25   **A.**  THAT'S MY UNDERSTANDING.

**Q.** HOW LONG WAS HE IN JORDAN?

**A.** I DON'T KNOW THE EXACT TIMEFRAME THAT HE WAS OVER THERE.

**Q.** AND I BELIEVE YOU JUST TESTIFIED THAT THE INFERENCE IS THAT HE HAS CONTACTS OVERSEAS FROM THAT TRAVEL. WHAT SPECIFIC INFORMATION DO YOU HAVE TO OFFER THAT HE HAS CONTACTS OVERSEAS?

**A.** WELL, I DO REMEMBER FROM INTERVIEWS WITH DANIEL, ZAK OR DYLAN, I CAN'T REMEMBER THE EXACT ONE, ONE OF THEM SAID THEY HAD GONE OVER THERE TO VISIT FRIENDS IN JORDAN.

**Q.** AGENT SUTTON, I'D LIKE TO ASK YOU, DO YOU HAVE THE PHOTOGRAPHS FROM THE SEARCH OF THE HOME IN FRONT OF YOU, THOSE EXHIBITS?

**A.** NO, SIR. I DO NOT.

**MR. ZESZOTARSKI:** YOUR HONOR, COULD WE MAKE THOSE AVAILABLE TO AGENT SUTTON? IT MIGHT SPEED THINGS UP.

**THE COURT:** MADAM CLERK, IF YOU WOULD PASS UP THE PHOTOGRAPHS.

**BY MR. ZESZOTARSKI:**

**Q.** AGENT SUTTON, WITH RESPECT TO THE ITEMS THAT WERE SEIZED FROM THE BOYD HOME AT THE TIME OF THE SEARCH, I'D LIKE TO ASK YOU ABOUT A COUPLE SPECIFIC ITEMS AND ABOUT WHERE THEY WERE IN THE HOME, IF I COULD.

I'D LIKE TO START WITH EXHIBIT NO. 47, WHICH IS THE

1  FLYER RELATING TO THE FATWAH.  WHERE WAS THAT IN THE BOYD

2  HOME?

3  **A.**   ARE YOU REFERRING TO EXHIBIT 14?

4  **Q.**   FORTY-SEVEN.

5  **A.**   I'M SORRY.  I DO NOT KNOW THE EXACT LOCATION OF WHERE

6  THIS WAS FOUND INSIDE THE RESIDENCE.

7  **Q.**   DO YOU HAVE ANY IDEA GENERALLY WHERE IT WAS FOUND?

8  **A.**   NO, SIR.

9  **Q.**   HOW ABOUT 14, WHICH WAS THE -- I BELIEVE YOU

10  TESTIFIED THAT THAT WAS A CABINET IN THE GARAGE; IS THAT

11  RIGHT?

12  **A.**   I BELIEVE THAT'S CORRECT.  YES, SIR.

13  **Q.**   THE GARAGE AT THE BOYD HOME, IS THAT ATTACHED TO THE

14  HOUSE ITSELF OR IS IT A SEPARATE BUILDING?

15  **A.**   IT'S A DETACHED GARAGE.

16  **Q.**   HOW FAR IS IT FROM THE HOUSE ITSELF?

17  **A.**   THIRTY, 40 FEET, MAYBE.

18  **Q.**   OKAY.  EXHIBIT 3, WHICH I BELIEVE YOU DESCRIBED AS AN

19  FBI PLAYBOOK ON HOW TO RESPOND TO A TERRORIST ATTACK.

20  **A.**   I DIDN'T DESCRIBE IT AS AN FBI PLAYBOOK.  IT DOES

21  GIVE INSTRUCTIONS TO GENERALLY LOCAL LAW ENFORCEMENT,

22  FIRE, EMS AND HAZMAT ENTITIES HOW TO RESPOND TO TERRORIST

23  ACTIVITIES.

24  **Q.**   WHERE WAS THAT FOUND IN THE BOYD HOME?

25  **A.**   THAT WAS FOUND IN THE GARAGE.

1   **Q.**   THE TRENCH THAT IS DEPICTED IN THE PHOTOGRAPH OF

2   GOVERNMENT'S EXHIBIT NO. 11.

3   **A.**   I KNOW WHAT YOU ARE REFERRING TO, SIR.

4   **Q.**   WAS ANYTHING IN THAT TRENCH WHEN THE SEARCH WAS DONE?

5   **A.**   NO, THERE WAS NOTHING IN THERE.

6   **Q.**   WAS IT COVERED IN ANY WAY OR WAS IT IN THE CONDITION

7   THAT IT'S SHOWN IN EXHIBIT 11?

8   **A.**   IT WAS IN THE CONDITION IT WAS SHOWN. IT'S COVERED

9   OBVIOUSLY BY THE DECK.

10   **Q.**   BUT IN TERMS OF IF A PERSON WALKED UP TO THAT DECK,

11   THEY COULD SEE THAT TRENCH AS IT'S SHOWN IN EXHIBIT 11; IS

12   THAT RIGHT?

13   **A.**   I DON'T KNOW THAT YOU CAN SEE IT THROUGH THE DECK.

14   YOU COULD SEE IT IF YOU WERE LOOKING UNDER THE DECK.

15   **Q.**   ARE YOU AWARE THAT DYLAN HAD HIS OWN ROOM WITHIN THE

16   BOYD HOME?

17   **A.**   I DON'T KNOW THAT SPECIFICALLY.

18   **Q.**   IN THE COURSE OF THE INTERVIEW, YOU ARE NOT AWARE OF

19   THAT FROM REVIEWING ANY OF THE REPORTS OF INTERVIEWS IN

20   THIS CASE?

21   **A.**   NO.

22   **Q.**   ARE YOU AWARE THAT DYLAN AND HIS WIFE WERE LIVING

23   TOGETHER IN A ROOM IN THE HOME?

24   **A.**   THAT I'M AWARE OF.

25   **Q.**   YOU ARE AWARE THAT DYLAN'S WIFE IS PREGNANT?

1   **A.**   YES.

2   **Q.**   I BELIEVE YOU TESTIFIED ABOUT THE ARREST OF DYLAN,

3   AND I BELIEVE YOU USED THE TERM THAT DYLAN FAILED TO

4   COMPLY WITH THE ARRESTING AGENTS; IS THAT RIGHT?

5   **A.**   THAT'S WHAT THEY TOLD ME.  YES, SIR.

6   **Q.**   WHAT DID THEY TELL YOU DYLAN DID?

7   **A.**   HE WAS ORDERED INITIALLY TO PUT HIS HANDS UP, WHICH

8   HE DID.  THEN HE WAS ORDERED TO LAY FLAT ON THE GROUND.

9   HE FAILED TO COMPLY WITH THAT.  HE WAS ORDERED TO DO THAT,

10  AND HE DID NOT PROPERLY COMPLY.

11  **Q.**   AND I GATHER FROM YOUR DESCRIPTION YOU WERE NOT

12  PRESENT WHEN ALL OF THIS HAPPENED?

13  **A.**   NO, SIR, I WAS NOT.

14  **Q.**   OTHER THAN FAILING TO LIE ON THE GROUND, WAS THERE

15  ANY OTHER FAILURE TO COMPLY THAT WAS DESCRIBED TO YOU?

16  **A.**   NO, SIR.

17  **Q.**   HE DID PUT HIS HANDS UP WHEN HE WAS TOLD TO DO SO?

18  **A.**   YES, SIR.

19  **Q.**   HE WAS TAKEN INTO CUSTODY AT THAT TIME, CORRECT?

20  **A.**   YES, HE WAS.

21  **Q.**   AND, IN FACT, HE SUFFERED SOME KIND OF INJURY FROM

22  ONE OF THE DOGS PRESENT AT THAT TIME; DID HE NOT?

23  **A.**   THAT IS CORRECT.

24  **Q.**   YOU TESTIFIED ABOUT WHAT YOU DESCRIBED AS TRAINING AT

25  THIS LOCATION IN CASWELL COUNTY.  DO YOU HAVE ANY

1 INFORMATION THAT DYLAN WAS EVER ACTUALLY PRESENT IN

2 CASWELL COUNTY?

3 **A.** AS I STATED EARLIER, DYLAN WAS NOT PRESENT IN THE

4 TRAINING ON JUNE 10, 2009, BUT ON THE DAY OF HIS ARREST HE

5 WAS PLANNING TO TRAVEL AFTER THEY MET FOR THIS

6 CONSTRUCTION SITE REVIEW, TO THAT LOCATION TO TRAIN.

7 **Q.** AGENT, MY QUESTION IS: DO YOU HAVE ANY INFORMATION

8 THAT HE WAS EVER ACTUALLY PRESENT AT THAT LOCATION IN

9 CASWELL COUNTY?

10 **A.** MY INFORMATION IS THAT HE WAS NEVER AT THAT LOCATION.

11 **Q.** YOU DESCRIBED AN INCIDENT, AGENT, ABOUT SOMETHING TO

12 DO WITH THE NORTH CAROLINA STATE HIGHWAY PATROL HELICOPTER

13 FLYING OVERHEAD AND DYLAN'S FATHER, DANIEL, PULLING A GUN

14 OUT AND MAKING STATEMENTS. I BELIEVE YOU TESTIFIED THAT

15 THAT WAS BASED UPON A WITNESS' STATEMENT TO YOU; IS THAT

16 RIGHT?

17 **A.** THAT'S CORRECT.

18 **Q.** SO A WITNESS DESCRIBED THIS INCIDENT TO YOU; IS THAT

19 RIGHT?

20 **A.** HE DESCRIBED IT TO ANOTHER AGENT.

21 **Q.** OKAY. AND I BELIEVE YOU TESTIFIED THAT THE WITNESS

22 TOLD THAT AGENT THAT DYLAN WAS PRESENT WHEN THIS HAPPENED;

23 IS THAT RIGHT? I ASK THAT QUESTION BECAUSE YOU MENTIONED

24 DYLAN DURING YOUR DIRECT TESTIMONY.

25 **A.** ONE MOMENT. THE INFORMATION THAT I RECEIVED FROM THE

1  AGENTS WAS THAT DANIEL BOYD, DYLAN BOYD AND ZAKARIYA BOYD

2  WERE PRESENT ALONG WITH THE WITNESS.

3  **Q.**   IS THERE ANY DESCRIPTION OF WHAT DYLAN BOYD IS

4  ALLEGED TO HAVE DONE DURING THAT INCIDENT?

5  **A.**   THERE IS NO DESCRIPTION.

6  **Q.**   AGENT, I'D LIKE TO, IF YOU COULD, DIRECT YOUR

7  ATTENTION TO GOVERNMENT'S EXHIBITS 29 AND 30, WHICH WERE

8  THE SUMMARIES OF THE RECORDINGS THAT WERE PLAYED.

9  **A.**   I HAVE THEM, SIR.

10  **Q.**   EXHIBIT 30.  I BELIEVE THAT'S A CONVERSATION THAT WAS

11  RECORDED IN APRIL OF 2008; IS THAT RIGHT?

12  **A.**   YES, APRIL 18, 2008.

13  **Q.**   AND DYLAN IS NOT A PARTY TO THE CONVERSATION THAT WAS

14  RECORDED, CORRECT?

15  **A.**   I BELIEVE THAT IS CORRECT.

16  **Q.**   PAGE TWO, THERE'S A REFERENCE THAT DYLAN'S FATHER,

17  DANIEL, STATES, "I HAVE TWO BOYS.  THEY ARE LEAVING, GOD

18  WILLING, OKAY.  AND I NEED HELP TO MAKE A PLAN FOR THEM."

19      IS THAT ACCURATE AS TO WHAT'S ON THAT RECORDING AS TO

20  DANIEL BOYD'S STATEMENT?

21  **A.**   YES.

22  **Q.**   SO DANIEL BOYD, IN APRIL OF '08, IS STATING THAT HE

23  NEEDS TO MAKE A PLAN FOR HIS TWO BOYS; IS THAT RIGHT?

24  **A.**   WELL, HE SAYS HE NEEDS TO MAKE A PLAN FOR TWO BOYS.

25  **Q.**   OKAY.  EXHIBIT 29 IS A RECORDING MADE IN MARCH OF

1  '08, A MONTH EARLIER, CORRECT?

2  **A.**   YES, MARCH 5, 2008.

3  **Q.**   AND THAT IS A RECORDING OF DANIEL AND DYLAN; IS THAT

4  RIGHT?

5  **A.**   YES, SIR.

6  **Q.**   AND YOU TESTIFIED ABOUT THAT RECORDING.  I'D ASK YOU,

7  AGENT, IN MARCH OF '08, THIS CONVERSATION BETWEEN DANIEL

8  AND DYLAN, WHERE WAS DYLAN GOING?

9  **A.**   I CAN NOT SPECIFICALLY SAY.

10  **Q.**   DO YOU HAVE ANY INFORMATION THAT IN MARCH OF 2008

11  RELATING TO THIS CONVERSATION, THAT THERE WAS A SPECIFIC

12  PLACE THAT DYLAN WAS TO GO, THAT THEY ARE REFERRING TO

13  HERE?

14  **A.**   NO, SIR.

15  **Q.**   AND, OF COURSE, FROM MARCH 2008 TO PRESENT, DYLAN HAS

16  NOT TRAVELED OVERSEAS?

17  **A.**   NOT TO MY KNOWLEDGE.

18  **Q.**   THE REFERENCE ON THE FIRST PAGE OF GOVERNMENT'S

19  EXHIBIT 29 WHERE DANIEL BOYD REFERS TO $11,000 SAVED FROM

20  PEOPLE.  I BELIEVE YOU TESTIFIED THAT THE INFORMATION FROM

21  THE INVESTIGATION WAS THAT THIS MONEY WAS FOR JIHAD?

22  **A.**   THAT'S CORRECT.

23  **Q.**   IS THAT INFORMATION THAT COMES SIMPLY FROM WITNESSES?

24  **A.**   I DO NOT KNOW THE DIRECT ORIGIN.  IT COULD BE FROM

25  WITNESSES OR IT COULD BE FROM RECORDINGS.

1  **Q.**  ARE YOU THE LEAD CASE AGENT ON THIS CASE, AGENT

2  SUTTON?

3  **A.**  NO, SIR.  I'M NOT.  THERE ARE MULTIPLE CASE AGENTS

4  ASSIGNED TO THIS PARTICULAR MATTER.

5  **Q.**  IS THERE ONE AGENT WHO WOULD BE THE LEAD AGENT?

6  **A.**  NOT FOR THIS ENTIRE CASE.  NO, SIR.

7  **Q.**  WOULD YOU CHARACTERIZE YOURSELF AS ONE OF THE LEAD

8  AGENTS?

9  **A.**  I AM NOT DIRECTLY ASSIGNED AS A LEAD CASE AGENT IN

10  THIS MATTER.

11  **Q.**  WHO WOULD BE?  WHO WOULD BE -- WHO WOULD YOU

12  CHARACTERIZE AS THE AGENT WHO'S AT THE TOP IN CHARGE?

13  **A.**  THAT WOULD BE DIFFICULT FOR ME TO SAY.  IT'S A VERY

14  LARGE AND COMPLEX CASE THAT INVOLVED MULTIPLE, MULTIPLE

15  AGENTS.  IF YOU ARE LOOKING FOR ONE SPECIFIC AGENT, I

16  WOULD HAVE TO REFER YOU TO SPECIAL AGENT MANILLA.

17  **Q.**  WITH THE FBI?

18  **A.**  THAT'S CORRECT, SIR.

19  **Q.**  THANK YOU.  AGENT, YOU TESTIFIED, JUMPING BACK TO THE

20  DATE OF THE SEARCH OF THE HOUSE ABOUT A DEPOSIT TICKET

21  THAT WAS FOUND IN DYLAN'S VEHICLE?

22  **A.**  YES, SIR.

23  **Q.**  WHAT EXACTLY WAS THAT DEPOSIT TICKET -- I BELIEVE YOU

24  MENTIONED $16,000; IS THAT CORRECT?

25  **A.**  YES, SIR.

1  **Q.**  AND I GATHER THE GOVERNMENT HAS THAT DEPOSIT TICKET?

2  **A.**  YES.

3  **Q.**  AND DO YOU HAVE INFORMATION ABOUT THE SPECIFIC DATE

4  AND THE ACCOUNT FOR THAT DEPOSIT TICKET?

5  **A.**  I HAVE INFORMATION ABOUT THE SPECIFIC DATE.  THERE

6  WAS A DEPOSIT SLIP FOR $16,000 FOUND IN DYLAN'S CAR, AND

7  THE DEPOSIT WAS DATED 7/21/2009.

8  **Q.**  7/29/09.  DO YOU KNOW WHAT ACCOUNT THAT MONEY WAS

9  DEPOSITED INTO?

10  **A.**  I DO NOT.

11  **Q.**  AGENT, YOU TESTIFIED ABOUT A FIREARM BEING PRESENT ON

12  DYLAN AT THE TIME OF HIS ARREST, CORRECT?

13  **A.**  YES, SIR.

14  **Q.**  AND YOU WERE NOT PRESENT AT THE TIME OF HIS ARREST?

15  **A.**  NO, SIR.

16  **Q.**  YOU TESTIFIED THAT DYLAN DOES HAVE A VALID CARRY

17  CONCEALED WEAPON PERMIT; IS THAT RIGHT?

18  **A.**  YES, HE DOES.

19  **Q.**  ALL OF THE EXHIBITS RELATING TO THE ITEMS SEIZED FROM

20  THE BOYD HOME AND ALL OF THOSE PHOTOGRAPHS, DO YOU KNOW IF

21  ANY OF THOSE ITEMS WERE FOUND IN THE ROOM THAT DYLAN LIVED

22  IN WITH HIS WIFE?

23  **A.**  I DO NOT KNOW THE ANSWER TO THAT QUESTION.

24       **MR. ZESZOTARSKI:**  THANK YOU.  THAT'S ALL I HAVE.

25       **THE COURT:**  MR. BOYCE.

### CROSS-EXAMINATION

**BY MR. BOYCE:**

**Q.** GOOD AFTERNOON, AGENT SUTTON. MY NAME IS DAN BOYCE,
AND I REPRESENT MOHAMMAD OMAR ALY HASSAN. I WILL BE
REFERRING TO HIM AS OMAR HASSAN FOR SHORT.

YOU INDICATED THAT YOUR INVESTIGATION STARTED IN
2005. OMAR HASSAN WAS NOT BEING INVESTIGATED THAT FAR
BACK, WAS HE?

**A.** NO. I'M NOT EXACTLY SURE WHEN MR. HASSAN CAME INTO
THE INVESTIGATION.

**Q.** DO YOU KNOW IF IT WAS 2006?

**A.** I DON'T KNOW THE EXACT DATE.

**Q.** DURING THE COURSE OF YOUR INVESTIGATION OF OMAR
HASSAN, AS PART OF THAT OVERALL INVESTIGATION, DID YOU
HAVE ANY TAPE RECORDINGS OR CONVERSATIONS BETWEEN OMAR
HASSAN AND DANIEL BOYD?

**A.** I'M NOT AWARE OF ANY.

**Q.** ARE YOU AWARE OF ANY RECORDINGS BETWEEN OMAR HASSAN
AND ANY OF THE BOYD BOYS, DANIEL BOYD'S SONS?

**A.** NO, SIR, I'M NOT AWARE OF ANY.

**Q.** ARE YOU AWARE OF ANY RECORDINGS BETWEEN MR. HASSAN
AND OTHER CO-DEFENDANTS?

**A.** NO, SIR.

**Q.** SO THERE ARE NO RECORDINGS OF OMAR HASSAN THAT ARE
PART OF THIS INVESTIGATION?

1  **A.** NOT THAT I'M AWARE OF.

2  **Q.** YOU INDICATED THAT AS PART OF THE INVESTIGATION YOU

3  FOUND OUT THAT MR. BOYD HAD EXPERIENCE FIGHTING.  DID YOU

4  UNCOVER ANYTHING AS PART OF YOUR INVESTIGATION THAT OMAR

5  HASSAN HAD EXPERIENCE IN FIGHTING?

6  **A.** YES.

7  **Q.** OKAY.  IN MILITARY-TYPE TACTICS?

8  **A.** MORE ALONG THE LINES OF HAND-TO-HAND-TYPE TACTICS.

9  **Q.** TRAINING IN MILITARY HAND-TO-HAND TACTICS?

10 **A.** ACCORDING TO WITNESSES, TRAINING AND FIGHTING IN SOME

11 TYPE OF HAND-TO-HAND-TYPE TACTICS.

12 **Q.** HOW ABOUT WITH WEAPONS?

13 **A.** I DON'T KNOW THE ANSWER TO THAT QUESTION.

14 **Q.** SO YOU HAVE NO EVIDENCE TODAY OF ANY TRAINING OR

15 MILITARY-TYPE TACTICAL TRAINING IN WEAPONS?

16 **A.** I'M NOT AWARE OF THAT.

17 **Q.** DURING THE COURSE OF YOUR INVESTIGATION, YOU

18 MENTIONED THAT THERE WERE A NUMBER OF DOCUMENTS RELATING

19 TO JIHAD, INCLUDING SOME TEXT FROM FATWAH URGING JIHAD

20 AGAINST AMERICANS, EXHIBIT 47.

21 **A.** THAT'S CORRECT.

22 **Q.** I BELIEVE YOU SAID YOU FOUND EXHIBIT 47 IN THE BOYD

23 HOME; IS THAT CORRECT?

24 **A.** IF THAT IS THE FATWAH EXHIBIT, THEN YES.

25 **Q.** IS THERE ANY INDICATION OMAR HASSAN HAD ADOPTED OR

1   SIGNED ON IN ANY WAY OR HAD IN HIS POSSESSION THIS TEXT OR

2   ANYTHING SIMILAR TO IT?

3   **A.**   I HAVE NO SPECIFIC INFORMATION REGARDING THIS TEXT.

4   **Q.**   TO YOUR KNOWLEDGE, DID MR. HASSAN AT ANY TIME ADOPT

5   THE TEXT OF FATWAH AS FOUND IN EXHIBIT 47 IN THIS DOCUMENT

6   PER SE?

7   **A.**   I DON'T HAVE ANY INFORMATION REGARDING THAT.

8   **Q.**   IF YOU WILL LOOK AT GOVERNMENT'S EXHIBIT NO. 44.  I

9   BELIEVE YOU IDENTIFIED THIS AS A PICTURE OF DANIEL BOYD

10  AND IT WAS SOME TYPE OF IDENTIFICATION CARD.

11  **A.**   ARE YOU REFERRING TO THE ONE THAT HAS THE TRANSLATION

12  ON IT?

13  **Q.**   EXHIBIT 44, YES, SIR.  IT DOES HAVE SOME WRITTEN

14  TRANSLATION, STARTS WITH "MONOTHEISM" AT THE TOP RIGHT

15  HAND.

16  **A.**   YES, SIR.

17  **Q.**   DURING THE COURSE OF YOUR INVESTIGATION, DID YOU FIND

18  ANY SIMILAR TYPE OF CARD FOR OMAR HASSAN?

19  **A.**   NO, SIR.

20  **Q.**   DURING HIS ARREST, WHEN MR. OMAR HASSAN WAS ARRESTED,

21  DID YOU FIND ANY DOCUMENTATION THAT REFERRED TO JIHAD OR

22  ANY TYPE OF DOCUMENTATION SIMILAR TO EXHIBIT 44?

23  **A.**   NOT THAT I'M AWARE OF.

24  **Q.**   YOU'VE PLAYED AND GONE THROUGH A SERIES OF

25  RECORDINGS, INCLUDING GOVERNMENT'S EXHIBITS 32, 33, 27,

1    28, 29 AND 30, AS WELL AS EXHIBIT 31.  I BELIEVE YOU HAVE

2    ALREADY TESTIFIED THERE ARE NO RECORDINGS OF OMAR HASSAN,

3    BUT WAS OMAR HASSAN ALLEGED TO HAVE BEEN PRESENT DURING

4    THE RECORDINGS THAT YOU PLAYED TODAY IN THE COURTROOM?

5    **A.**   NOT THAT I'M AWARE OF.

6    **Q.**   ARE THERE ANY MENTION OR ANY -- DOES ANYONE MENTION

7    OMAR HASSAN IN ANY OF THOSE RECORDINGS?

8    **A.**   NO, SIR.

9    **Q.**   DURING THE SEARCH OF THE BOYD RESIDENCE, YOU HAVE

10   IDENTIFIED A NUMBER OF WEAPONS, INCLUDING GUNS AND I

11   BELIEVE SWORDS AND BULLETS; IS THAT CORRECT?

12   **A.**   YES.

13   **Q.**   DURING THE COURSE OF YOUR INVESTIGATION THUS FAR,

14   HAVE ANY OF THE WEAPONS, GUNS, OR BULLETS BEEN DIRECTLY

15   ASSOCIATED WITH OMAR HASSAN?

16   **A.**   NO, SIR.

17   **Q.**   WHEN YOU EXECUTED THE ARREST WARRANT ON OMAR HASSAN,

18   WAS HE CARRYING ANY TYPE OF WEAPON?

19   **A.**   NOT THAT I'M AWARE OF.

20   **Q.**   DID YOU CONDUCT A SEARCH OF HIS RESIDENCE OR HIS

21   PARENT'S RESIDENCE?

22   **A.**   I BELIEVE THERE WAS A SEARCH.

23   **Q.**   DURING THE CONDUCTING OF THAT SEARCH, DID YOU FIND

24   ANY WEAPONS THAT COULD BE ATTRIBUTED TO OMAR HASSAN?

25   **A.**   NOT THAT I'M AWARE OF.

1  **Q.**  DURING THE COURSE OF YOUR INVESTIGATION -- LET ME

2  BACK UP.

3     IN THE INDICTMENT -- YOU'VE READ THE INDICTMENT,

4  CORRECT?

5  **A.**  YES, SIR.

6  **Q.**  AND YOU PARTICIPATED IN THE PREPARATION OF THE

7  INDICTMENT, CORRECT?

8  **A.**  I HAVE REVIEWED THE INDICTMENT.

9  **Q.**  OKAY.  DID YOU PARTICIPATE IN THE PREPARATION OF IT?

10  **A.**  NO, SIR.

11  **Q.**  DID YOU CONFIRM THE ACCURACY OF IT WHEN YOU REVIEWED

12  IT?

13  **A.**  WITH OTHER AGENTS, YES, SIR.

14  **Q.**  OKAY.  DURING THE COURSE OF YOUR INVESTIGATION, DID

15  YOU FIND ANY BANK DEPOSITS OR TRACE ANY OTHER FUNDS OR

16  CURRENCY DIRECTLY ATTRIBUTABLE TO OMAR HASSAN THAT WAS

17  USED TO PROVIDE MATERIAL SUPPORT AND RESOURCES THAT

18  RELATED TO THE CONSPIRACY TO MURDER, KIDNAP, MAIM OR

19  INJURE PERSONS?

20  **A.**  AS I RECALL, THERE WERE BANK RECORDS THAT CONFIRMED

21  THE STATEMENTS IN WHICH $1,400 WAS PROVIDED BY HASSAN TO

22  DANIEL BOYD, WHICH WAS ULTIMATELY DEPOSITED DIRECTLY INTO

23  THE ACCOUNT OF HOLLYWOOD TRAVEL, WHICH PAID FOR THAT TRIP

24  IN JUNE OF 2007, WITH THEIR INTENDED DESTINATION OF ISRAEL

25  AND WITH THE REPORTS OF THE WITNESSES THAT THEY WERE

1  TRAVELING FOR VIOLENT JIHAD.

2  **Q.**   WHAT OTHER MONEY OR CURRENCY DID YOU FIND THAT YOU

3  CONTEND MOHAMMAD OMAR ALY HASSAN USED IN PREPARATION FOR

4  THE CONSPIRACY TO MURDER, KIDNAP, MAIM OR INJURE PERSONS

5  IN A FOREIGN COUNTRY?

6  **A.**   I DON'T HAVE ANY OTHER INFORMATION.

7  **Q.**   YOU'VE INDICATED THAT YOU ARE AWARE OF ONE TRIP THAT

8  WAS MADE ROUGHLY IN JUNE OR JULY OF 2007; IS THAT CORRECT?

9  **A.**   YES, SIR.

10  **Q.**   ALL RIGHT.  ARE YOU AWARE OF ANY TRIPS BY OMAR HASSAN

11  OVERSEAS PRIOR TO THE PERIOD OF JUNE OR JULY OF 2007?

12  **A.**   NO, SIR.

13  **Q.**   ARE YOU AWARE OF ANY TRIPS BY OMAR HASSAN AFTER THE

14  PERIOD OF JUNE THROUGH JULY OF 2007?

15  **A.**   NO, SIR.

16  **Q.**   DID YOU INTERVIEW FAMILY MEMBERS OF OMAR HASSAN ABOUT

17  HIS TRIP OVERSEAS?

18  **A.**   OTHER AGENTS DID INTERVIEW HIS FATHER.

19  **Q.**   AND DID HE GIVE YOU A REASON FOR THE TRIP?

20  **A.**   NOT THAT I CAN RECALL?

21  **Q.**   DO YOU NEED TO LOOK AT YOUR NOTES OR ANYTHING TO

22  REFRESH YOUR RECOLLECTION?

23  **A.**   NO.  MY RECOLLECTION OF THE INTERVIEW THAT WAS

24  PROVIDED BY HIS FATHER IS THAT HIS SON LEFT WITHOUT

25  PERMISSION, WITHOUT NOTICE TO HIS FATHER, WITHOUT NOTICE

1  TO HIS EMPLOYER, AND HE ONLY LATER LEARNED THAT HE HAD

2  TRAVELED OVERSEAS.

3  **Q.**   AND DID YOU FIND OUT THE PURPOSE OF THE TRIP?

4  **A.**   I DON'T RECALL THE SPECIFIC PURPOSE.

5  **Q.**   DO YOU KNOW IF THE PURPOSE OF HIS TRIP WAS AT ALL

6  CONNECTED TO HIS FIANCEE?

7  **A.**   I DON'T KNOW THE ANSWER TO THAT QUESTION, SIR.

8  **Q.**   DID YOU KNOW THAT HE HAD PURCHASED A ROUND TRIP

9  TICKET?

10  **A.**   I AM NOT AWARE OF THAT.

11  **Q.**   DID YOU KNOW HE VISITED OTHER COUNTRIES, INCLUDING

12  FRIENDS OR FAMILY MEMBERS IN OTHER COUNTRIES?

13  **A.**   YES.

14  **Q.**   AND IS THAT FOR VACATION?

15  **A.**   WELL, I'M NOT EXACTLY SURE WHY HE ENDED UP THERE WHEN

16  THEY WERE TURNED AWAY FROM ISRAEL, BUT I'M AWARE HE DID

17  END UP WITH FAMILY MEMBERS IN EGYPT.

18  **Q.**   DO YOU HAVE ANY EVIDENCE THAT HE ACTUALLY MET WITH

19  DANIEL BOYD WHILE HE WAS ON THAT TRIP?

20  **A.**   THE EVIDENCE IS HE DID NOT MEET WITH DANIEL BOYD, BUT

21  THERE WERE ATTEMPTS TO MAKE CONTACT TO SCHEDULE A MEETING.

22  **Q.**   BUT TO YOUR KNOWLEDGE, THERE WAS NO ACTUAL MEETING

23  BETWEEN OMAR HASSAN AND DANIEL BOYD ONCE THEY WERE

24  OVERSEAS?

25  **A.**   THAT'S CORRECT.

1  **Q.**  ARE THERE ANY RECORDINGS INVOLVING OMAR HASSAN DURING

2  THAT TRIP IN THE JUNE TO JULY 2007 PERIOD RELATED TO THAT

3  TRIP?

4  **A.**  NOT THAT I'M AWARE OF.

5  **Q.**  DURING THE TRIP, YOU SAID THERE WERE 19 TELEPHONE

6  CALLS BETWEEN DANIEL BOYD AND THE OTHER CO-DEFENDANT,

7  YAGHI; IS THAT RIGHT?

8  **A.**  THERE WAS A SUM OF 19 PHONE CALLS THAT WOULD BE

9  BETWEEN BOYD AND YAGHI AND ALSO CONTACT WITH DANIEL BOYD

10  TO THE TRAVEL COMPANY OVER THE COURSE OF -- THEY APPEARED

11  TO BE CONSECUTIVE-TYPE CALLS.

12  **Q.**  HOW MANY TELEPHONE CALLS WERE THERE BETWEEN DANIEL

13  BOYD AND OMAR HASSAN DURING THAT PERIOD OF TIME?

14  **A.**  DURING THAT PERIOD OF TIME, I'M NOT AWARE OF ANY.

15  **Q.**  HOW MANY?

16  **A.**  I'M NOT AWARE OF ANY.

17  **Q.**  DURING THAT PERIOD OF TIME, DID YOU LOOK AT OMAR

18  HASSAN'S TELEPHONE RECORDS FOR THAT PERIOD OF TIME?

19  **A.**  I DID NOT.

20  **Q.**  DO YOU KNOW WHY OMAR HASSAN WAS DENIED ENTRY TO

21  ISRAEL?

22  **A.**  NO, SIR.  I DO NOT.

23  **Q.**  DURING YOUR INVESTIGATION, YOU INDICATED THAT YOU

24  OBTAINED INFORMATION RELATING TO FINANCING AND THAT YOU

25  FOUND LARGE SUMS OF MONEY WITH SOME OF THE BOYDS.  AT ANY

1  POINT IN TIME, DID YOU EVER FIND LARGE SUMS OF MONEY THAT

2  WERE DIRECTLY ATTRIBUTABLE TO OMAR HASSAN?

3  **A.**  NOT THAT I'M AWARE OF.

4  **Q.**  DURING YOUR INVESTIGATION, YOU ALSO INDICATED THAT

5  PEOPLE WERE HAVING DISCUSSIONS OF HOW TO GET MONEY, AND

6  MR. BOYD RECOMMENDED USING CREDIT CARDS TO WRITE CHECKS.

7  DID YOU FIND AT ANY TIME THAT OMAR HASSAN WAS USING HIS

8  CREDIT CARD TO OBTAIN LARGE AMOUNTS OF CASH?

9  **A.**  I'M NOT AWARE OF THAT.

10  **Q.**  DURING THE INVESTIGATION, YOU SAID MR. BOYD HAD MADE

11  STATEMENTS ABOUT HITTING BANKS IN PAKISTAN.  DID YOU FIND

12  ANY EVIDENCE THAT OMAR HASSAN, AT ANY TIME, HAD HIT BANKS

13  OR ROBBED BANKS IN PAKISTAN OR THE UNITED STATES OR FOR

14  THAT MATTER ANY OTHER COUNTRY?

15  **A.**  I KNOW HE WAS PARTY TO AN EVENT HERE IN THE UNITED

16  STATES IN WHICH THEY FORCED AN INDIVIDUAL TO GO TO A BANK

17  ATM AND WITHDRAW MONEY.

18  **Q.**  DO YOU KNOW HOW MUCH MONEY THAT WAS?

19  **A.**  NO, SIR.

20  **Q.**  DO YOU KNOW IT WAS $70.

21  **A.**  NO, SIR.

22  **Q.**  DO YOU KNOW IT WAS A DISPUTE AND ONE OF HIS FRIENDS

23  WAS OWED $70.

24  **A.**  WHAT I KNOW, THEY FORCIBLY TOOK AN INDIVIDUAL TO AN

25  ATM AND FORCED THEM TO WITHDRAW MONEY.

1   **Q.**   DO YOU KNOW WITNESSES SAID OMAR HASSAN HAD NOTHING TO

2   DO WITH FORCIBLY TAKING OF THE MAN, HE WAS MERELY PRESENT?

3   **A.**   NO, SIR.

4   **Q.**   SO YOU DIDN'T FULLY INVESTIGATE THAT MATTER?

5   **A.**   I BELIEVE THERE WILL BE ANOTHER WITNESS THAT CAN

6   TESTIFY TO THAT.

7   **Q.**   YOU TESTIFIED EARLIER THAT THERE WAS A RIFT UPON THE

8   RETURN FROM JORDAN IN JUNE OR JULY OF 2007, AND THAT THE

9   RIFT WAS AN UPHEAVAL IN THE COMMUNITY BECAUSE THE REASON

10   OF THE TRIP WAS SAID TO HAVE BEEN FOR JIHAD.  DID I SAY

11   THAT RIGHT?

12   **A.**   YES, SIR.

13   **Q.**   OKAY.  WHAT WAS THAT RIFT ABOUT?

14   **A.**   THERE WAS A LOT OF TALK IN THE COMMUNITY BECAUSE

15   INDIVIDUALS WHO MADE THAT TRIP HAD TALKED IN ADVANCE,

16   INCLUDING YOUR CLIENT, ABOUT GOING OVERSEAS TO ENGAGE IN

17   VIOLENT JIHAD, AND THAT BROUGHT A LOT OF ATTENTION TO THE

18   GROUP.

19   **Q.**   AND WHEN MR. HASSAN GOT BACK, DID HE DISASSOCIATE

20   HIMSELF FROM DANIEL BOYD?

21   **A.**   I AM NOT SURE HOW THE DISTANCE OF THAT OCCURRED OR

22   WHO DISTANCED THEMSELVES FROM WHOM.

23   **Q.**   DID YOU KNOW THAT OMAR HASSAN HAD DENIED THE PURPOSE

24   OF HIS TRIP ABROAD WAS FOR JIHAD?

25   **A.**   I AM AWARE HE DENIED THAT, YES.

1   **Q.** HE DENIED THAT UPON HIS RETURN TO THE UNITED STATES?

2   **A.** THAT'S CORRECT.

3   **Q.** AND HE REPEATED THAT THROUGHOUT THE MUSLIM COMMUNITY

4   HERE IN RALEIGH, NORTH CAROLINA?

5   **A.** I DON'T KNOW WHAT HE REPEATED THROUGH THE COMMUNITY.

6   **Q.** BUT YOU KNOW HE DENIED HE WENT THERE FOR JIHAD.

7   **A.** HE DENIED THAT TO AGENTS WHEN THEY INTERVIEWED HIM

8   UPON HIS RETURN.

9   **Q.** HE DENIED HAVING MET WITH DANIEL BOYD WHEN HE WENT

10  ABROAD, CORRECT?

11  **A.** THAT'S CORRECT.

12  **Q.** IN FACT, HE DIDN'T HAVE ANY PART OF THE CONSPIRACY

13  INVOLVING DANIEL BOYD IN ANY ATTEMPT TO PREPARE OR CARRY

14  OUT THE CONSPIRACY TO MURDER, KIDNAP, MAIM OR INJURE

15  PERSONS IN A FOREIGN COUNTRY?

16  **A.** HE DENIED THAT.

17  **Q.** HAVE YOU SEEN HASSAN'S PASSPORT?

18  **A.** I HAVE NOT.

19  **Q.** DO YOU KNOW OMAR HASSAN'S PASSPORT HAS BEEN PLACED IN

20  THE FILES OF WAKE COUNTY SUPERIOR COURT?

21  **A.** I'M NOT AWARE OF THAT.

22  **Q.** DID YOU INTERVIEW ANY OF HIS FAMILY MEMBERS?

23  **A.** I DID NOT PERSONALLY INTERVIEW HIS FAMILY MEMBERS,

24  NO.

25  **Q.** DO YOU KNOW IF HIS FATHER WAS INTERVIEWED?

1   **A.**   I BELIEVE HIS FATHER WAS INTERVIEWED, YES.

2   **Q.**   DID HIS FATHER ACKNOWLEDGE THAT HIS SON WAS IN ANY

3   WAY INVOLVED IN VIOLENT JIHAD?

4   **A.**   I DON'T BELIEVE THAT WAS IN THE STATEMENT.

5   **Q.**   HOW ABOUT THE SISTERS?

6   **A.**   I'M NOT AWARE OF ANY INTERVIEW OF HIS SISTERS.

7   **Q.**   DID YOU KNOW HE HAS A FIANCEE OR WOMAN HE PLANS TO

8   MARRY?

9   **A.**   I'M NOT AWARE OF THAT.

10  **Q.**   YOU LISTED A NUMBER OF -- WHEN YOU WERE TALKING ABOUT

11  DANGER TO THE COMMUNITY, YOU LISTED A NUMBER OF

12  CONVERSATIONS BETWEEN MR. BOYD AND MR. SHERIFI FROM 2008

13  THROUGH 2009.  ARE YOU WITH ME?

14  **A.**   YES, SIR.  I BELIEVE THOSE WERE IN 2008.

15  **Q.**   IN 2008 AND 2009, DO YOU HAVE ANY STATEMENTS OF

16  CO-CONSPIRATORS THAT OMAR HASSAN WAS PRESENT IN WHICH HE

17  TALKED OF CARRYING OUT VIOLENT JIHAD?

18  **A.**   NO.

19  **Q.**   IN 2008 OR 2009?

20  **A.**   NO.

21  **Q.**   DURING THE ARREST OF OMAR HASSAN, DID HE IN ANY WAY

22  RESIST THE ARREST?

23  **A.**   NOT THAT I'M AWARE OF.

24  **Q.**   DID HE HAVE ANY TYPE OF -- I BELIEVE YOU TESTIFIED HE

25  DIDN'T HAVE ANY FIREARMS OR ANY WEAPONS ON HIM?

1    **A.**   NOT THAT I'M AWARE OF.

2    **Q.**   IS THERE ANY EVIDENCE THAT OMAR HASSAN HAD BEEN AT

3    THIS TRAINING CAMP IN CASWELL COUNTY?

4    **A.**   NO.

5    **Q.**   I BELIEVE YOU INDICATED YOU HAVE NO EVIDENCE THAT

6    MR. HASSAN HAD ANY SPECIAL SKILLS THAT MAY HAVE SUPPORTED

7    VIOLENT JIHAD?

8    **A.**   SPECIAL SKILLS?

9    **Q.**   YOU TESTIFIED, I BELIEVE ON DIRECT, YOU SAID YOU WERE

10   NOT AWARE THAT HE HAD ANY SPECIAL SKILLS?

11   **A.**   NOT THAT I'M AWARE OF.

12   **Q.**   WERE YOU AWARE HE WAS A STUDENT AT N. C. STATE

13   UNIVERSITY?

14   **A.**   I HAD HEARD THAT.  YES, SIR.

15   **Q.**   THE THREE PLACES WHERE YOU INDICATED WEAPONS WERE

16   SEIZED, I BELIEVE THERE WAS A PURCHASE BY A WITNESS.  DID

17   THAT INVOLVE OMAR HASSAN IN ANY WAY?

18   **A.**   I'M NOT AWARE THAT IT DID.

19   **Q.**   AND THEN YOU SAID THERE WAS A PURCHASE OF A WEAPON BY

20   AN AGENT.  DID THAT INVOLVE OMAR HASSAN IN ANY WAY?

21   **A.**   I'M NOT AWARE THAT IT DID.

22   **Q.**   THEN YOU GAVE THE REMAINING LOCATIONS OF FIREARMS OR

23   WEAPONS BEING FOUND IN THE TRUCK OF MR. BOYD AND IN HIS

24   RESIDENCE.  WERE ANY OF THOSE GUNS ASSOCIATED WITH OMAR

25   HASSAN IN ANY WAY?

1  **A.**   NOT THAT I'M AWARE OF, SIR.

2  **Q.**   AS FAR AS RISK OF FLIGHT, YOU INDICATED THAT SOME OF

3  THE CO-DEFENDANTS WERE ACTIVELY PLANNING OR SCHEDULING

4  TRIPS OVERSEAS.  DO YOU HAVE ANY EVIDENCE THAT OMAR HASSAN

5  HAD ANY ACTIVE TRAVEL PLANS?

6  **A.**   NO, SIR.

7  **Q.**   DURING YOUR INTERVIEWS, YOU INDICATED THAT MR.

8  BOYCE -- EXCUSE ME -- MR. BOYD, MADE REFERENCE TO ONE OF

9  THE CO-DEFENDANTS, MR. SHERIFI.  DURING THE INTERVIEW OF

10  DANIEL PATRICK BOYD, DID HE MAKE ANY REFERENCES TO OMAR

11  HASSAN?

12  **A.**   NOT THAT I CAN RECALL.

13  **Q.**   DURING THE COURSE OF YOUR INVESTIGATION, HAVE YOU OR

14  OTHER INVESTIGATIONS (SIC) INVOLVED IN THIS INVESTIGATION

15  BEEN COORDINATING EFFORTS WITH THE WAKE COUNTY DISTRICT

16  ATTORNEY'S OFFICE?

17  **A.**   I DON'T HAVE ANY INFORMATION REGARDING THAT.

18  **Q.**   DURING THE COURSE OF YOUR INVESTIGATION, DID YOU

19  GATHER ANY INFORMATION THAT MR. OMAR HASSAN HAD A SPECIFIC

20  TARGET IN MIND TO CREATE VIOLENT OR COMMIT VIOLENT JIHAD

21  AND ANY SPECIFIC TARGET?

22  **A.**   OTHER THAN TRAVELING INTO ISRAEL, NO.

23  **Q.**   ANY SPECIFIC AMERICAN TARGETS HERE IN THE UNITED

24  STATES?

25  **A.**   NOT THAT I'M AWARE OF.

1    **MR. BOYCE:** THANK YOU. NO OTHER QUESTIONS, YOUR

2    HONOR.

3              **THE COURT:** MR. MCCULLOUGH.

4                        **CROSS-EXAMINATION**

5    **BY MR. MCCULLOUGH:**

6    **Q.** AGENT SUTTON, CAN YOU SEE ME?

7    **A.** YES, SIR.

8    **Q.** I'M REPRESENTING, LAST BUT NOT LEAST, MR. YAGHI, I

9    GUESS KNOWN TO YOU FROM YOUR INVESTIGATION.

10         ARE YOU AWARE THAT MR. YAGHI WAS ARRESTED AT HIS

11   APARTMENT POOL WITHOUT INCIDENT?

12   **A.** YES, SIR.

13   **Q.** SO HE WAS IN A SWIMSUIT?

14   **A.** YES, SIR. HE WAS.

15   **Q.** HE DIDN'T HAVE ANY WEAPONS, I GUESS THEN?

16   **A.** NO, SIR.

17   **Q.** DID HE MAKE ANY POST-ARREST INTERVIEW STATEMENTS?

18   **A.** NOT THAT I'M AWARE OF, SIR.

19   **Q.** HAS HE EVER BEEN UP TO CASWELL COUNTY TO ENGAGE IN

20   FIREARMS TRAINING?

21   **A.** NOT THAT I'M AWARE OF, SIR.

22   **Q.** HAVE YOU DONE SURVEILLANCE AT MR. BOYD'S RESIDENCE AS

23   PART OF THIS INVESTIGATION FROM TIME TO TIME?

24   **A.** I AM NOT FAMILIAR WITH SPECIFIC SURVEILLANCE

25   LOCATIONS.

1   **Q.**   WELL, HAS ANYBODY EVER SEEN MR. YAGHI VISIT MR. BOYD?

2   ANY OF THE INVESTIGATORS EVER SEEN MR. YAGHI VISITING

3   MR. BOYD AT MR. BOYD'S RESIDENCE, TO YOUR KNOWLEDGE?

4   **A.**   I DON'T KNOW THE ANSWER TO THAT QUESTION, SIR.

5   **Q.**   YOU DON'T HAVE ANY KNOWLEDGE?

6   **A.**   I DON'T HAVE ANY KNOWLEDGE.  NO, SIR.

7   **Q.**   NOW, GOING TO THESE TRIPS.  WERE THERE TWO TRIPS BY

8   MR. YAGHI?  DID I HEAR YOU CORRECTLY, YOU SAID THERE WAS A

9   TRIP IN THE FALL OF '06 SOMETIME AND THEN ONE IN '07?

10  **A.**   YES, SIR.  THERE WAS A TRIP IN OCTOBER OF 2006

11  FOLLOWED BY A TRIP IN JUNE OF 2007.

12  **Q.**   AND WHO WENT ON THE TRIP IN OCTOBER OF '06?

13  **A.**   MR. YAGHI, AS I UNDERSTAND, TRAVELED OUT OF THE

14  COUNTRY BY HIMSELF.

15  **Q.**   BY HIMSELF?

16  **A.**   YES, SIR.

17  **Q.**   WHERE WAS HIS DESTINATION?

18  **A.**   JORDAN, I BELIEVE.

19  **Q.**   AND ARE YOU AWARE THAT HE HAS SOME FAMILY MEMBERS

20  LIVING IN JORDAN?

21  **A.**   I'M NOT SPECIFICALLY AWARE OF THAT.  NO, SIR.

22  **Q.**   WHEN HE WAS DENIED ENTRY INTO TEL AVIV, ISRAEL, DID

23  HE NOT GO TO JORDAN FOLLOWING THAT?

24  **A.**   THAT'S MY UNDERSTANDING.

25  **Q.**   AND IN YOUR BACKGROUND INVESTIGATION OF HIM, DID YOU

1   NOT UNCOVER THE FACT THAT YOU THINK HE MIGHT HAVE BEEN

2   BORN IN JORDAN AND CAME HERE IN THE EARLY '80S?

3   **A.**   I AM AWARE THAT HE WAS BORN OUTSIDE OF THE UNITED

4   STATES AND HE HAS BECOME A NATURALIZED CITIZEN.  NOW THAT

5   I REFRESH MY MEMORY, I DO KNOW HE HAS FAMILY THAT RESIDES

6   IN JORDAN.

7   **Q.**   THANK YOU VERY MUCH.  YOU SAY THAT ON OCTOBER OF '06,

8   THERE WAS AN ATTEMPT TO COMMUNICATE WITH MR. BOYD BY MY

9   CLIENT BY E-MAIL?

10  **A.**   YES, SIR.

11  **Q.**   AND DID I HEAR IT CORRECTLY, HIS REQUEST WAS A

12  QUESTION ABOUT THE NAME OF A MOSQUE?

13  **A.**   THE EXCERPT I HAVE FROM THE E-MAIL COMMUNICATION IS,

14  "IS THE MASJID ALSO KNOWN AS MASJID AL-SHISANI?"

15  **Q.**   I AM NOT FAMILIAR WITH THE MOSQUE OVER THERE.  IS

16  THAT A WELL-KNOWN MOSQUE?

17  **A.**   I'M NOT FAMILIAR WITH IT.

18  **Q.**   DO YOU KNOW WHERE THAT MOSQUE IS LOCATED?

19  **A.**   NO, SIR.

20  **Q.**   SOMEWHERE IN ISRAEL?

21  **A.**   I DON'T KNOW.

22  **Q.**   SO IT MIGHT NOT EVEN BE A MOSQUE IN ISRAEL AS FAR AS

23  YOU KNOW?

24  **A.**   I HAVE NO IDEA WHERE IT IS.

25  **Q.**   NOW THEN, YOU SAID THERE WAS A SECOND TRIP IN JUNE OF

1    '07 IN WHICH ENTRY WAS DENIED?

2    **A.**    WHERE ENTRY WAS DENIED TO ISRAEL, YES, SIR.

3    **Q.**    BUT IN THE FIRST ONE, THE TRIP WAS TO JORDAN?

4    **A.**    THAT IS MY UNDERSTANDING.

5    **Q.**    DURING THE TIME HE WAS IN JORDAN, HE WAS NOT LINKED

6    TO ANY VIOLENT ACTS?

7    **A.**    I'M NOT AWARE OF ANY.

8    **Q.**    AND WHEN ENTRY WAS DENIED TO TEL AVIV, WAS IT TEL

9    AVIV WHERE THE PLANE LANDED?

10    **A.**    I BELIEVE THAT'S CORRECT.

11    **Q.**    HE THEN DIVERTED HIMSELF TO JORDAN.  HE COULD EITHER

12    GO BACK OR GO TO ANOTHER COUNTRY, AND HE WENT ON TO

13    JORDAN?

14    **A.**    I'M NOT EXACTLY SURE WHERE THE ISRAELIS HAD DIVERTED

15    HIM TO.

16    **Q.**    IS THERE A FAMOUS MOSQUE IN ISRAEL?

17    **A.**    ARE YOU REFERRING TO THE GOLDEN DOME?

18    **Q.**    YES.

19    **A.**    YES.

20    **Q.**    SO IT IS A PLACE THAT RELIGIOUS PEOPLE OF ARABIC

21    FAITH WOULD GO TO VISIT, CORRECT?

22    **A.**    YES.

23    **Q.**    AND YOU HAVE NO KNOWLEDGE AS TO WHY HE WAS DENIED

24    ACCESS TO ISRAEL?

25    **A.**    NO, SIR.  I DO NOT.

1  **Q.**  AND THEN I THINK IN YOUR TESTIMONY, YOU SAID IN YOUR

2  VIEW THE FACT THAT HE HAD BEEN CONVICTED IN THIS INCIDENT

3  AT THE ATM MACHINE MADE HIM DANGEROUS?

4  **A.**  YES, SIR.

5  **Q.**  BUT IT HAD NOTHING TO DO WITH VIOLENT JIHAD, DID IT?

6  **A.**  NO, SIR.

7  **Q.**  IT HAD TO DO WITH A $40 DEBT BETWEEN KIDS?

8  **A.**  I DON'T KNOW WHAT THE DEBT WAS.

9  **Q.**  AND YOU SAID HE WAS A FLIGHT RISK BECAUSE HE HAD SOME

10  WARRANTS FROM TEXAS?

11  **A.**  THAT'S CORRECT.

12  **Q.**  HE'S ON BOND FOR THOSE; IS THAT CORRECT?

13  **A.**  I DON'T KNOW WHAT HIS -- WHETHER HE'S ON BOND OR NOT.

14  **Q.**  WELL, IF I TOLD YOU PRETRIAL SERVICES SAID HE WAS ON

15  BOND, WOULD YOU DISAGREE WITH THAT?

16  **A.**  NO, BUT IN THE STATEMENT THAT HE MADE TO US, HE SAID

17  HE WAS AWARE OF THE WARRANTS IN TEXAS, HE HAD NO

18  INTENTIONS OF RESOLVING THEM, AND HE WASN'T GOING TO JAIL.

19  **Q.**  HAD HE ABSCONDED FROM THOSE?

20  **A.**  THAT'S MY UNDERSTANDING.

21  **Q.**  BUT HE WAS ON PROBATION HERE IN NORTH CAROLINA FROM

22  THE PREVIOUS OFFENSE?

23  **A.**  I'M NOT AWARE OF THAT.

24  **Q.**  IF PRETRIAL SERVICES SAID THAT, YOU WOULDN'T DISAGREE

25  WITH IT, WOULD YOU?

1    **A.**   NO.

2           **MR. MCCULLOUGH:**  NOTHING FURTHER, YOUR HONOR.

3           **THE COURT:**  ANY REDIRECT?

4           **MS. KOCHER:**  THANK YOU, YOUR HONOR.

5                    <u>**REDIRECT EXAMINATION**</u>

6    **BY MS. KOCHER:**

7    **Q.**   AGENT SUTTON, YOU WERE ASKED ON CROSS-EXAMINATION IF

8    YOU KNEW WHETHER ZAK OR DYLAN BOYD HAD FRIENDS OUTSIDE OF

9    THE UNITED STATES.  DO YOU RECALL THAT QUESTION?

10   **A.**   YES.

11   **Q.**   DO YOU KNOW IF THEY WERE FRIENDS WITH DEFENDANT JUDE

12   MOHAMMAD?

13   **A.**   IT IS MY UNDERSTANDING THEY ARE FRIENDS.

14   **Q.**   AND TO YOUR KNOWLEDGE, IS JUDE MOHAMMAD THIS DAY

15   OUTSIDE OF THE UNITED STATES?

16   **A.**   YES.

17   **Q.**   YOU WERE ASKED IF THERE WERE ANY RECORDINGS IN THIS

18   CASE OF OMAR HASSAN, THE DEFENDANT HASSAN, AND YOU

19   ANSWERED THERE WERE NOT; IS THAT CORRECT?

20   **A.**   YES.

21   **Q.**   IS THERE NOT, IN FACT, A RECORDING --

22           **THE COURT:**  MS. KOCHER, IF YOU COULD ARRANGE THE

23   MICROPHONE SO THE INTERPRETER CAN HEAR YOU.

24   **BY MS. KOCHER:**

25   **Q.**   -- RECORDING OF DEFENDANT HASSAN PLAYED IN COURT

1 TODAY THAT WAS TAKEN OFF OF HIS CELL PHONE?

2 **A.** YES. I'M SORRY, I WAS THINKING AN AUDIO RECORDING.

3 THERE WAS A VIDEO RECORDING TAKEN OFF OF HIS CELL PHONE.

4 **Q.** AND IN SIMILAR NATURE, YOU WERE ASKED IF THERE WAS

5 ANY EVIDENCE THAT DEFENDANT HASSAN EVER TRAINED WITH

6 WEAPONS. NOW RECALLING PLAYING THAT VIDEO --

7 **A.** YES. THE INDIVIDUAL IN THAT VIDEO IS FIRING WHAT

8 APPEARS TO BE AN SKS OR AK-47 TYPE RIFLE.

9 **Q.** AGENT SUTTON, CAN YOU EXPLAIN TO SOME EXTENT WHY

10 THERE MIGHT NOT BE AUDIO RECORDINGS OF EITHER DEFENDANT

11 YAGHI OR DEFENDANT HASSAN IN THIS INVESTIGATION?

12 **A.** I BELIEVE THAT THE RECORDINGS TO THIS POINT OCCURRED

13 AT A TIME IN WHICH THERE WAS SOME SEPARATION BETWEEN

14 DANIEL BOYD AND YAGHI AND HASSAN.

15 **Q.** YOU WERE ASKED, AGENT SUTTON, ON CROSS-EXAMINATION

16 ABOUT PHONE CALLS PERHAPS BY AND BETWEEN DEFENDANT YAGHI

17 AND DANIEL BOYD WHILE YAGHI IS OVERSEAS. YOU RESPONDED IN

18 REFERENCE TO THE 19 CALLS THAT SHOW ON THE TOLL RECORDS.

19 JUST TO CLARIFY, WERE THOSE 19 CALLS TO WHICH YOU

20 REFERENCE PLACED BY AND BETWEEN YAGHI AND BOYD WHILE ONE

21 OR THE OTHER WAS OUTSIDE THE UNITED STATES?

22 **A.** NOW, THOSE 19 CALLS WERE PLACED HERE, AS WE BELIEVE,

23 INSIDE THE UNITED STATES AND WERE COMMUNICATIONS BASED ON

24 WHAT IMMEDIATELY FOLLOWED WAS TO ARRANGE FOR THE TRAVEL OF

25 YAGHI AND HASSAN TO ACTUALLY EXIT THE UNITED STATES.

1   **Q.** AND DO YOU KNOW THE TIME SPAN OF THOSE 19 CALLS?

2   **A.** I DO NOT KNOW THE EXACT TIME SPAN, BUT IT WAS A VERY

3   SHORT TIME SPAN WITHIN THE SAME DAY.

4   **Q.** DO I RECALL YOU SAID ON CROSS THEY WERE SEQUENTIAL IN

5   NATURE?

6   **A.** THEY APPEARED TO BE SEQUENTIAL, YES.

7   **Q.** WHAT DO YOU MEAN BY THAT?

8   **A.** BY THE LENGTH OF TIME WHEN THE CALL OCCURRED AND THE

9   NEXT CALL STARTED, WHEN ONE CALL ENDED, THE NEXT ONE

10  BEGAN.

11  **Q.** SIR, YOU WERE ASKED BY SEVERAL COUNSEL FOR THE

12  DEFENDANTS IF YOU WERE AWARE OF SPECIFIC TARGETS OF THE

13  CONSPIRACY TO MURDER AS CHARGED IN THIS INDICTMENT.

14  **A.** YES, I RECALL THAT.

15  **Q.** NOW, HAVING LISTENED TO THE MESSAGES BY DANIEL BOYD

16  AND READ SOME OF THE LITERATURE, CAN YOU STATE IN FACT WHO

17  THE TARGETS OF THE CONSPIRACY WERE?

18  **A.** THE TARGETS WOULD BE THE NON-MUSLIMS, THE

19  NON-BELIEVERS, OR INDIVIDUALS HE REFERS TO AS KUFFARS.

20  **Q.** YOU WERE ASKED, SIR, IF SURVEILLANCE OR ANY OTHER

21  MEANS WOULD HAVE PLACED DEFENDANT YAGHI AT THE BOYD HOME.

22  I BELIEVE YOU RESPONDED THAT YOU WERE UNAWARE OF THAT

23  INFORMATION?

24  **A.** THAT'S CORRECT.

25  **Q.** DO YOU HAVE ANY KNOWLEDGE, SIR, AS TO WHETHER

1  SURVEILLANCE WATCHED DEFENDANT YAGHI MEET WITH DANIEL BOYD

2  ELSEWHERE?

3  **A.**   I CAN'T RECALL THE SPECIFIC INFORMATION RELATED TO

4  THAT.

5  **Q.**   ALL RIGHT, SIR.  YOU WERE ASKED BY COUNSEL FOR ZAK

6  BOYD, I BELIEVE, AS TO WHETHER AN INTERVIEW WAS TAKEN OF

7  HIS CLIENT?

8  **A.**   YES.

9  **Q.**   AND YOU WERE UNABLE TO RECALL ANY SPECIFICS OF THAT

10  INTERVIEW; IS THAT TRUE?

11  **A.**   THAT'S CORRECT.

12  **Q.**   IS THERE A DOCUMENT THAT EXISTS THAT WOULD ASSIST YOU

13  IN RECALLING THE CONTENT OF THAT INTERVIEW?

14  **A.**   THERE WOULD BE AN FD 302 WHICH WOULD DOCUMENT THAT

15  INTERVIEW CONDUCTED BY AGENTS.

16          **MS. KOCHER:**  YOUR HONOR, MAY I APPROACH?

17          **THE COURT:**  YOU MAY.  IS THAT MARKED AS AN

18  EXHIBIT?

19          **MS. KOCHER:**  IT IS NOT, YOUR HONOR.  I HAD NOT

20  SUBMITTED THESE.

21  **BY MS. KOCHER:**

22  **Q.**   WHAT IS THAT DOCUMENT, AGENT SUTTON?

23  **A.**   THIS IS A COPY OF THE FD 302 WHICH IS THE INTERVIEW

24  REPORT OF ZAKARIYA BOYD.

25  **Q.**   IF YOU WOULD TURN TO PAGE THREE OF THAT INTERVIEW.

1  JUST REVIEW, IF YOU WOULD, IN CONTEXT THE QUESTION TO YOU

2  WHETHER EITHER ZAK OR DYLAN HAD ADMITTED TO HAVING FRIENDS

3  OR FAMILY WHICH THEY VISITED IN THEIR OVERSEAS TRIP IN

4  JUNE OF 2007.

5  **A.**  ZAK HAD RELATED THAT IN THE TRAVEL THAT OCCURRED IN

6  2007, THE PURPOSE WAS TO VISIT FRIENDS, AND HE REPORTED OF

7  A MEETING WITH A RETIRED JORDANIAN GENERAL ABDUL LATIF.

8  **Q.**  JUST A LITTLE FURTHER IN THAT INTERVIEW, DID ZAK BOYD

9  RELATE THE PURPOSE OF THAT TRIP?

10  **A.**  IN HIS STATEMENT, THE PURPOSE OF THE TRIP WAS TO SEE

11  HOW THEY WERE RECEIVED.

12  **Q.**  DO YOU HAVE A BETTER UNDERSTANDING OF WHAT HE MEANT?

13  **A.**  HE GOES ON TO EXPLAIN THAT IN HIS WORDS, WHITE PEOPLE

14  ARE NOT WELL RECEIVED IN CERTAIN PARTS OF THE WORLD.

15  **Q.**  ALL RIGHT, SIR.  SIMILARLY, YOU WERE ASKED IF DYLAN

16  BOYD HAD BEEN INTERVIEWED.

17  **A.**  YES.

18  **Q.**  YOU RESPONDED, I BELIEVE, YOU COULD NOT RECALL THE

19  TERMS OF THAT INTERVIEW?

20  **A.**  THAT'S CORRECT.

21  **Q.**  IS THERE A DOCUMENT THAT WOULD ASSIST YOU IN

22  RECALLING THE ITEMS MENTIONED IN THAT INTERVIEW?

23  **A.**  YES.

24          **THE COURT:**  EXCUSE ME.  MS. GODWIN, MAY I SEE

25  YOU AND MS. KOCHER?

1    (THE FOLLOWING BENCH CONFERENCE WAS HELD.)

2        **THE COURT:**  WOULD YOU TELL YOUR CLIENT THAT THE

3    PURPOSE OF THE INTERPRETER IS TO TRANSLATE AND INTERPRET

4    WHAT'S SAID BY THE PEOPLE IN THE COURT.  SHE IS NOT A

5    PERSON WITH WHOM HE CAN HAVE CONVERSATIONS.  WOULD YOU

6    TELL HER THE -- I'M SORRY, WRONG LAWYER.

7        **MS. KOCHER:**  I WAS GOING TO SAY THAT.

8        **THE COURT:**  MS. AGUIRRE, CAN I SEE YOU UP HERE?

9    (ATTORNEY, BRIDGETT AGUIRRE, APPROACHES THE BENCH.)

10       **THE COURT:**  YOUR CLIENT APPEARS TO BE CARRYING

11   ON FULLY ANIMATED CONVERSATIONS WITH THE INTERPRETER.

12   WOULD YOU TELL HIM THE INTERPRETER IS THERE TO SAY WHAT'S

13   SAID IN COURT AND TELL HER THAT SHE IS NOT TO CONVERSE

14   WITH HIM BUT ONLY TO SAY WHAT'S SAID IN COURT.  IF HE

15   WANTS TO TALK TO SOMEBODY, HE SHOULD RAISE HIS HAND AND

16   YOU'LL TALK TO HIM.  I HAVE NO IDEA WHAT SHE IS SAYING.

17       **MS. AGUIRRE:**  YES, YOUR HONOR.

18   (END OF BENCH CONFERENCE.)

19       **THE COURT:**  YOU MAY RESUME YOUR QUESTIONING.

20   **BY MS. KOCHER:**

21   **Q.**  WOULD THAT DOCUMENT REFRESH YOUR RECOLLECTION, THE

22   302?

23   **A.**  THAT WOULD BE CORRECT.

24       **MS. KOCHER:**  PERMISSION TO APPROACH?

25       **THE COURT:**  YOU MAY.

**BY MS. KOCHER:**

Q.   IF I CAN DIRECT YOUR ATTENTION, AGENT SUTTON, TO PAGE TWO.  IT APPEARS DYLAN BOYD WAS ASKED QUESTIONS ABOUT HIS RELATIONSHIP WITH THOSE ARRESTED WITH HIM; IS THAT CORRECT?

A.   YES, THAT'S CORRECT.

Q.   AND IN REGARD TO HIS FATHER, DANIEL BOYD, WHAT DID DYLAN BOYD HAVE TO SAY?

A.   DYLAN SAID HE HAD COMPLETE TRUST AND CONFIDENCE IN HIS FATHER ABOUT EVERYTHING AND ANYTHING.  HE REPORTED THAT HE HAD A DISOBEDIENCE PROBLEM WITH HIS FATHER.  HE ALSO DESCRIBED HIS FATHER AS THE MORALLY STRAIGHT ONE IN THE FAMILY.

Q.   ALL RIGHT, SIR.  IF I CAN TURN YOUR ATTENTION TO PAGE FOUR.  WAS DYLAN BOYD ASKED WHAT JIHAD MEANT FOR HIM?

A.   YES, HE WAS.

Q.   AND WHAT WAS HIS RESPONSE?

A.   HIS REPLY MEANT THAT IT WAS FIGHTING FOR THE SAKE OF GOD.  HE GOES ON TO FURTHER EXPLAIN THAT HE BELIEVED THAT MUSLIMS HAVE TO BE READY IN CASE THEY ARE ATTACKED AND STATED THAT THE AMERICAN ARMY, WHICH WAS NOW OVERSEAS, WAS RAPING AND KILLING THEIR SISTERS.  JIHAD IS RIGHT TO PROTECT YOUR MUSLIM SISTERS.  HE COMMENTED THAT ALL ARMIES DO IT, AND IT HAPPENS EVERYWHERE, AND FOR EXAMPLE, HE SAID, IN VIET NAM IT HAPPENED AND THE PUBLIC SAW IT IN

MOVIES AND HE BELIEVED IT WOULD NOT BE PUT INTO A MOVIE IF

IT WAS NOT TRUE.

**Q.**   AND AT PAGE SEVEN, AGENT SUTTON, DID DYLAN BOYD

EXPLAIN ONE OF THE TERMS THAT YOU PREVIOUSLY EXPLAINED TO

THE COURT, THAT IS DEEN?

**A.**   YES, HE DID.

**Q.**   AND WHAT WAS THE EXPLANATION HE GAVE?

**A.**   HE EXPLAINED THAT THE DEEN IS SOMETHING THAT YOU JUST

FOLLOW.  YOU FOLLOW IT EVEN IF YOU DO NOT UNDERSTAND IT,

AND YOU FOLLOW IT 100 PERCENT.

      **MS. KOCHER:**  NO FURTHER QUESTIONS, YOUR HONOR.

      **THE COURT:**  RECROSS?

      **MS. GODWIN:**  NO, YOUR HONOR.

      **THE COURT:**  MR. MCAFEE?

      **MR. MCAFEE:**  NO, YOUR HONOR.

      **THE COURT:**  MS. AGUIRRE?

      **MS. AGUIRRE:**  NO, YOUR HONOR.

      **THE COURT:**  MR. HILL.

      **MR. HILL:**  NO, YOUR HONOR.

      **THE COURT:**  MR. ZESZOTARSKI.

      **MR. ZESZOTARSKI:**  YES, YOUR HONOR.

<u>**RECROSS-EXAMINATION**</u>

**BY MR. ZESZOTARSKI:**

**Q.**   AGENT SUTTON, ON CROSS YOU WERE ASKED ABOUT MY

CLIENT, DYLAN, BEING FRIENDS WITH JUDE MOHAMMAD; IS THAT

1  RIGHT?

2  **A.**  YES, SIR.

3  **Q.**  WHO IS THAT PERSON?

4  **A.**  JUDE MOHAMMAD IS AN INDICTED MEMBER OF THE CONSPIRACY

5  WHO IS NOW A FUGITIVE OVERSEAS.

6  **Q.**  HE'S A FUGITIVE OVERSEAS.  DO YOU KNOW EXACTLY WHERE

7  OVERSEAS HE IS?

8  **A.**  LAST INFORMATION WE HAD WAS HE WAS IN PAKISTAN.

9  **Q.**  PAKISTAN.  WHAT'S THE LAST INFORMATION THAT YOU HAVE

10  ABOUT ANY CONTACT BETWEEN DYLAN AND JUDE MOHAMMAD?

11  **A.**  I DON'T HAVE ANY INFORMATION SPECIFIC TO THAT.

12  **Q.**  WHEN WOULD THE INVESTIGATION SHOW THE LAST CONTACT

13  BETWEEN DYLAN AND JUDE MOHAMMAD TO BE?

14  **A.**  I DON'T HAVE THAT INFORMATION.

15  **Q.**  A WEEK AGO, A YEAR AGO, FIVE YEARS AGO, ANY IDEA?

16  **A.**  NO, SIR.

17  **Q.**  DO YOU HAVE ANY IDEA WHETHER THEY'VE HAD ANY CONTACT?

18  **A.**  MY UNDERSTANDING IS THAT THEY WERE FRIENDS.

19  **Q.**  WHEN DID THAT FRIENDSHIP END?

20  **A.**  I DON'T KNOW IT HAS ENDED.

21  **Q.**  YOU DON'T HAVE ANY INFORMATION BEYOND THE FACT THEY

22  WERE FRIENDS AT SOME TIME?

23  **A.**  YES, SIR.

24  **Q.**  AGENT SUTTON, THE 302 OF THE INTERVIEW OF DYLAN THAT

25  WAS HANDED TO YOU, IS THAT THE REPORT THAT YOU REFERENCED

1    WHEN WE WERE TALKING EARLIER THAT YOU HAD REVIEWED BRIEFLY

2    ABOUT DYLAN'S INTERVIEW?

3    **A.**    YES, SIR.

4    **Q.**    THAT'S THE SAME REPORT?

5    **A.**    YES, SIR.

6          **MR. ZESZOTARSKI:**  THAT'S ALL, YOUR HONOR.

7          **THE COURT:**  MR. BOYCE?

8          **MR. BOYCE:**  THANK YOU, YOUR HONOR.

9                    **<u>RECROSS-EXAMINATION</u>**

10   **BY MR. BOYCE:**

11   **Q.**    AGENT SUTTON, YOU WERE HANDED THESE TWO INTERVIEWS OF

12   THE TWO BOYD BOYS, ONE FOR ZAK BOYD.  IF YOU WILL TURN TO

13   PAGE THREE AND TELL ME, ON PAGE THREE ZAK BOYD IS TALKING

14   ABOUT PREVIOUSLY TRAVELED TO JORDAN IN 2007; IS THAT

15   CORRECT?

16   **A.**    YES, SIR, HE IS.

17   **Q.**    IS THAT THE TRIP SET FORTH IN THE INDICTMENT?

18   **A.**    I BELIEVE IT IS, SIR.

19   **Q.**    AND THAT'S THE TRIP, THE ONLY TRIP ALLEGEDLY MADE BY

20   OMAR HASSAN IN SUPPORT OF THIS CONSPIRACY, CORRECT?

21   **A.**    HE ALSO MADE A TRIP IN OCTOBER OF 2006.

22   **Q.**    OMAR HASSAN?

23   **A.**    I'M SORRY, MY APOLOGIES.  YES, SIR.  YOU ARE CORRECT.

24   **Q.**    NOW, GOING BACK TO THE ONLY TRIP MADE BY OMAR HASSAN

25   IN 2007, ZAK BOYD WAS ASKED ABOUT THAT TRIP AND HE NEVER

1  MENTIONED MEETING WITH OMAR HASSAN, CORRECT?

2  **A.**  THAT'S CORRECT, SIR.

3  **Q.**  AND HE NEVER MENTIONED TRAVELING WITH OMAR HASSAN,

4  CORRECT?

5  **A.**  THAT'S CORRECT, SIR.

6  **Q.**  HE NEVER MENTIONED ANY PLANS THAT MIGHT HAVE INVOLVED

7  OMAR HASSAN, CORRECT?

8  **A.**  THAT'S CORRECT, SIR.

9  **Q.**  AND THEN DYLAN BOYD WAS ALSO INTERVIEWED.  IF YOU

10  WILL FLIP TO PAGE FIVE.  HE WAS ALSO ASKED ABOUT THE TRIP

11  OVERSEAS, CORRECT?

12  **A.**  YES, SIR.

13  **Q.**  ALL RIGHT.  AND WHEN DYLAN BOYD WAS ASKED IF ZIYAD

14  YAGHI AND OMAR HASSAN WERE SUPPOSED TO MEET THEM WHILE

15  THEY WERE OVERSEAS, DYLAN BOYD STATED THAT YAGHI AND

16  HASSAN WERE NEVER PLANNING OR GOING TO MEET THEM AT ALL

17  OVERSEAS; IS THAT CORRECT?

18  **A.**  THAT'S WHAT DYLAN SAID, YES.

19  **Q.**  AND BOYD ACKNOWLEDGED HIS FATHER KNEW BOTH OF THEM

20  PRIOR TO THE TRIP, CORRECT?

21  **A.**  YES, SIR.

22  **Q.**  HE DIDN'T SAY ANYTHING OTHER THAN HAVING -- THEM

23  KNOWING EACH OTHER, RIGHT?

24  **A.**  WELL, HE SAID THAT BOTH HASSAN AND YAGHI CAME TO

25  THEIR HOUSE TO HANG OUT.

1  **Q.**   OKAY.  AND OTHER THAN THAT, DID HE INDICATE THAT

2  THERE WAS ANY REASON FOR THE TRIP OVERSEAS?  DID DYLAN

3  BOYD SAY THERE WAS ANY PURPOSE OF OMAR HASSAN'S TRIP

4  OVERSEAS THAT CORRELATED WITH THE TRIP THE BOYDS WERE

5  TAKING?

6  **A.**   NOT ACCORDING TO DYLAN.

7            **MR. BOYCE:**  THANK YOU, SIR.

8            **THE COURT:**  MR. MCCULLOUGH.

9            **MR. MCCULLOUGH:**  NO QUESTIONS, YOUR HONOR.

10           **THE COURT:**  SPECIAL AGENT SUTTON, I'M GOING TO

11  ASK YOU TO REMAIN AT THE END OF THE PROCEDURE AND GO OVER

12  WITH THE COURT REPORTER ANY NAMES THAT MIGHT BE ELUSIVE.

13  THANK YOU.

14           **MS. KOCHER:**  THE GOVERNMENT WOULD AT THIS TIME

15  MOVE INTO EVIDENCE GOVERNMENT'S EXHIBIT 49, WHICH IS THE

16  DISKS OF RECORDINGS.

17           **THE COURT:**  IT WILL BE ADMITTED.  THANK YOU.

18           **MS. KOCHER:**  THIS DOES INCLUDE THE AUDIO FOR THE

19  SUMMARIES MOVED INTO EVIDENCE BUT NOT PLAYED IN COURT.

20           **MR. COWLEY:**  YOUR HONOR, THE GOVERNMENT CALLS

21  DETECTIVE MARK UTLEY TO THE STAND.

22  **MARK UTLEY**, BEING FIRST DULY SWORN, TESTIFIED AS FOLLOWS

23  DURING **DIRECT EXAMINATION:**

24  **BY MR. COWLEY:**

25  **Q.**   GOOD AFTERNOON, DETECTIVE UTLEY.

1  **A.**   GOOD AFTERNOON.

2  **Q.**   WOULD YOU EXPLAIN TO THE COURT HOW YOU ARE EMPLOYED?

3  **A.**   I'M EMPLOYED AS A DETECTIVE WITH THE RALEIGH POLICE

4  DEPARTMENT.

5  **Q.**   HOW LONG HAVE YOU SERVED AS A DETECTIVE WITH RPD?

6  **A.**   TWELVE YEARS.

7  **Q.**   PRIOR TO THAT, HAD YOU ALSO BEEN EMPLOYED BY THE RPD

8  IN ANOTHER CAPACITY?

9  **A.**   YES.  I SPENT TEN YEARS ON PATROL.

10  **Q.**   SO YOU HAVE BEEN WITH RPD FOR 22 YEARS; IS THAT

11  RIGHT?

12  **A.**   YES, SIR.

13  **Q.**   HAVE YOU HAD OCCASION TO BE INVOLVED IN AN

14  INVESTIGATION INVOLVING TWO OF THE DEFENDANTS IN THIS

15  MATTER, MR. ZIYAD YAGHI AND MR. MOHAMMAD OMAR ALY HASSAN?

16  **A.**   YES.

17  **Q.**   AND WE HEARD REFERENCE TO A KIDNAPPING INCIDENT THAT

18  TOOK PLACE IN 2008.  ARE YOU FAMILIAR WITH THE INCIDENT

19  THAT THEY ARE REFERRING TO?

20  **A.**   YES, I AM.

21  **Q.**   AND IN FACT, THIS INCIDENT TOOK PLACE ON DECEMBER 28,

22  2008; IS THAT CORRECT?

23  **A.**   THAT IS CORRECT.

24  **Q.**   COULD YOU RELAY TO THE COURT THE FACTS OF THIS

25  INCIDENT, PLEASE?

1    **A.**   RALEIGH POLICE RECEIVED A 911 CALL FROM THE VICTIM

2    STATING THAT HE WAS ROBBED AND KIDNAPPED FROM FOUR

3    ACQUAINTANCES.  HE SAID HE WAS AT HIS APARTMENT AND THAT

4    HE WAS LURED OUT INTO THE PARKING LOT UNDER THE PRETENSE

5    THAT HE WAS MEETING A YOUNG LADY.  ONCE HE WENT OUTSIDE,

6    HE WAS MET BY THE FOUR ACQUAINTANCES, TWO OF THEM BEING

7    MR. YAGHI AND MR. HASSAN.

8    **Q.**   UPON ARRIVING IN THE PARKING LOT AND ENCOUNTERING

9    THESE INDIVIDUALS, DID ANY SORT OF CONFLICT ENSUE?

10   **A.**   YES.  IT WAS A VERBAL CONFRONTATION AT FIRST OVER $70

11   THAT THE VICTIM OWED TO MR. YAGHI.  MR. YAGHI (SIC) FELT

12   THREATENED.  HE TRIED TO CALL 911.

13   **Q.**   WAS IT MR. YAGHI THAT FELT THREATENED?

14   **A.**   I'M SORRY.  LET ME BACK UP.  IT WAS THE VICTIM THAT

15   FELT THREATENED.

16         ONCE HE FELT THREATENED, HE CALLED 911 ON HIS CELL

17   PHONE.  THAT IS WHEN THE SITUATION ESCALATED TO PHYSICAL

18   VIOLENCE.  THE VICTIM WAS KICKED AND PUNCHED IN THE FACE

19   BY THE SUSPECTS.  DURING THE STRUGGLE, A HANDGUN FELL FROM

20   ONE OF THE SUSPECTS.  THE SUSPECT THAT DROPPED IT ACTUALLY

21   PICKED IT BACK UP, PUT IT BACK ON HIS PERSON.

22   **Q.**   DID THE SUSPECT THAT HAD THE FIREARM -- JUST TO

23   CLARIFY, THAT WAS NOT MR. YAGHI OR MR. HASSAN; IS THAT

24   CORRECT?

25   **A.**   THAT'S CORRECT.

1    **Q.**   BUT AFTER THE FIREARM BECAME APPARENT, THEY CONTINUED

2    THEIR PARTICIPATION?

3    **A.**   YES, THEY DID.

4    **Q.**   AND WHAT HAPPENED AT THIS POINT IN THE ALTERCATION,

5    SIR?

6    **A.**   AFTER THE PHYSICAL ASSAULT, THE VICTIM WAS ESCORTED

7    TO THE SUSPECT'S VEHICLE.  HE WAS DRIVEN TO AN ATM.  HE

8    WAS TAKEN OUT OF THE CAR.  THREE OF THE FOUR GUYS GOT OUT

9    OF THE CAR WITH HIM AT THE ATM.

10   **Q.**   LET ME STOP YOU THERE.  THOSE THREE OUT OF THE FOUR

11   GENTLEMEN THAT GOT OUT OF THE CAR AND TOOK THE VICTIM TO

12   THE ATM, DID THEY INCLUDE THE TWO DEFENDANTS IN THIS CASE,

13   MR. YAGHI AND MR. HASSAN?

14   **A.**   YES.

15   **Q.**   UPON ARRIVING AT THE ATM, WHAT HAPPENED THEN?

16   **A.**   THE VICTIM WAS UNSUCCESSFUL IN GETTING MONEY OUT OF

17   THE ATM.  HE WAS TOLD TO GET BACK INTO THE CAR.  ONE OF

18   THE GUYS THAT HAD THE GUN MADE REFERENCE, "DON'T MAKE ME

19   PULL IT BACK OUT."  HE GOT BACK INTO THE VEHICLE.  AS THEY

20   WERE LEAVING THE SHOPPING CENTER, THEY APPROACHED A STOP

21   SIGN.  AT THAT POINT, THE VICTIM JUMPED OUT OF THE CAR AND

22   RAN TO A NEARBY BURGER KING.

23   **Q.**   WERE ANY EMPLOYEES OF THE BURGER KING INTERVIEWED

24   REGARDING THIS INCIDENT?

25   **A.**   YES.

1   **Q.** WHAT, IF ANY, INFORMATION DID THEY PROVIDE REGARDING

2   INJURIES THE VICTIM SUSTAINED AS A RESULT OF THIS

3   INCIDENT?

4   **A.** THE VICTIM HAD A BLOODY NOSE, BLOODY LIP AND BLACK

5   EYE.

6   **Q.** DID YOUR INVESTIGATION REVEAL WHETHER OR NOT

7   MR. YAGHI SPECIFICALLY ASSAULTED THE VICTIM DURING THIS

8   INCIDENT?

9   **A.** YES, HE DID. HE PUNCHED THE VICTIM IN THE FACE.

10   **Q.** DID YOUR INVESTIGATION REVEAL THAT THE VICTIM AND MR.

11   YAGHI PREVIOUSLY LIVED TOGETHER?

12   **A.** YES.

13   **Q.** AND WHEN DID THEY LIVE TOGETHER?

14   **A.** IN NOVEMBER OF 2008.

15   **Q.** WHAT, IF ANY, INFORMATION DID THE VICTIM PROVIDE

16   REGARDING MR. YAGHI'S POSSESSION OF FIREARMS AT THAT TIME?

17   AND TO CLARIFY, THE TIME WE ARE TALKING ABOUT IS THE TIME

18   THEY WERE LIVING TOGETHER.

19   **A.** CORRECT. THE VICTIM REPORTED THAT MR. YAGHI HAD

20   SHOWED HIM TWO RIFLES AND A HANDGUN.

21   **Q.** AND GOING BACK TO THE INCIDENT ON DECEMBER 28, 2008,

22   WHEN WAS AN ARREST WARRANT ISSUED FOR MR. ZIYAD YAGHI?

23   **A.** IT WAS ISSUED THE SAME MORNING OF THE 28TH.

24   **Q.** WHEN WAS AN ARREST WARRANT ISSUED FOR MR. HASSAN?

25   **A.** JANUARY 7.

1   **Q.**   AND WHEN WERE THESE INDIVIDUALS ARRESTED?

2   **A.**   MR. HASSAN WAS ARRESTED ON JANUARY 7.  MR. YAGHI WAS

3   ARRESTED ON JANUARY 8.

4   **Q.**   WAS THERE A PARTICULAR UNIT OF THE RALEIGH POLICE

5   DEPARTMENT THAT APPREHENDED THESE TWO INDIVIDUALS?

6   **A.**   YES, OUR FUGITIVE TASK FORCE.

7   **Q.**   NOW, IF I UNDERSTAND YOU CORRECTLY REGARDING MR.

8   YAGHI, THE ARREST WARRANT WAS ISSUED ON THE 28TH OF

9   DECEMBER OF 2008, BUT HE WASN'T ARRESTED UNTIL JANUARY 8,

10  2009; IS THAT CORRECT?

11  **A.**   YES, SIR.

12  **Q.**   DID YOUR INVESTIGATION REVEAL WHETHER OR NOT

13  MR. YAGHI WAS AWARE THERE WAS AN OUTSTANDING WARRANT FOR

14  HIS ARREST?

15  **A.**   YES.

16  **Q.**   AND HOW AND WHAT INDICATION DID YOU HAVE THAT HE IN

17  FACT WAS AWARE THAT HE WAS WANTED ON AN ARREST WARRANT?

18  **A.**   ON JANUARY 1 OF '09 AT 9:33 P.M., MR. YAGHI HAD HIS

19  STATUS AS "ON THE RUN."

20  **Q.**   STATUS WHERE?

21  **A.**   ON FACEBOOK.

22  **Q.**   SO ON THE EVENING OF JANUARY 1, THAT'S HOW HE

23  CLASSIFIED WHAT HE WAS DOING AT THE TIME?

24  **A.**   YES.

25  **Q.**   AND EVENTUALLY BOTH MR. YAGHI AND MR. HASSAN PLEADED

1 GUILTY TO CRIMINAL CHARGES RELATING TO THEIR INVOLVEMENT

2 IN THIS INCIDENT; IS THAT CORRECT?

3 **A.** THAT'S CORRECT.

4 **Q.** IN FACT, MR. YAGHI PLED GUILTY TO FELONIOUS

5 RESTRAINT; IS THAT CORRECT?

6 **A.** YES, SIR.

7 **Q.** AND MR. HASSAN PLED GUILTY TO MISDEMEANOR FALSE

8 IMPRISONMENT; IS THAT CORRECT?

9 **A.** YES, SIR.

10 **Q.** DURING THE TIME BETWEEN MR. YAGHI'S ARREST AND THE

11 RESOLUTION OF THESE CHARGES IN MAY, WAS HE INCARCERATED

12 FOR A TIME?

13 **A.** HE WAS.

14 **Q.** ARE YOU AWARE, SIR, IF ANOTHER ONE OF THE DEFENDANTS

15 IN THIS CASE, THIS FEDERAL CASE, HAD OCCASION TO VISIT MR.

16 YAGHI WHILE HE WAS IN JAIL?

17 **A.** YES. DANIEL BOYD.

18 **Q.** AND WAS THAT CONVERSATION RECORDED, SIR?

19 **A.** YES, IT WAS.

20 **Q.** AND COULD YOU DESCRIBE FOR THE COURT THE ESSENCE OF

21 WHAT MR. BOYD AND MR. YAGHI DISCUSSED DURING MR. BOYD'S

22 VISIT TO MR. YAGHI?

23 **A.** MR. BOYD WAS ASKING IF LAW ENFORCEMENT HAD BEEN

24 ASKING ABOUT HIM. MR. YAGHI TOLD HIM THAT LAW ENFORCEMENT

25 HAD NOT INQUIRED ABOUT HIM, TOLD HIM NOT TO WORRY AND THAT

1   IT HAD NOTHING TO DO WITH HIS TRIP TO PALESTINE.

2   **Q.**   REFERRING TO MR. YAGHI'S TRIP TO PALESTINE?

3   **A.**   YES.

4   **Q.**   WERE YOU AWARE OF OTHER VIOLENT INCIDENTS INVOLVING

5   MR. YAGHI, MR. HASSAN THAT THE RPD HAS HAD TO DEAL WITH?

6   **A.**   YES, SIR.

7   **Q.**   LET ME TAKE YOU BACK TO NOVEMBER 27, 2007.  ARE YOU

8   AWARE OF AN INCIDENT THAT TOOK PLACE THAT DAY, SIR?

9   **A.**   YES.

10  **Q.**   CAN YOU DESCRIBE THAT INCIDENT TO THE COURT, PLEASE?

11  **A.**   RALEIGH POLICE RECEIVED A 911 CALL TO THE TEXACO

12  LOCATED AT 1321 SOUTH BLOUNT STREET IN REFERENCE TO AN

13  ASSAULT.  ONCE OFFICERS GOT THERE, THEY DETERMINED THAT A

14  15-YEAR OLD CARY HIGH SCHOOL STUDENT HAD BEEN THE TARGET

15  OF AN ASSAULT.

16  **Q.**   AND WHO WERE THE SUSPECTS THAT WERE IDENTIFIED AS THE

17  ASSAILANTS, THE PEOPLE THAT COMMITTED THE ASSAULT IN THIS

18  CASE?

19  **A.**   MR. YAGHI AND MR. HASSAN AND APPROXIMATELY FOUR OTHER

20  PEOPLE.

21  **Q.**   AND WHAT AGES WERE MR. HASSAN AND MR. YAGHI AT THIS

22  TIME?

23  **A.**   NINETEEN AND 20.

24  **Q.**   THEY WERE LEGALLY CONSIDERED ADULTS; IS THAT CORRECT?

25  **A.**   YES, SIR.

1  **Q.**  AND OF THE OTHER MEMBERS OF THE GROUP THAT WERE WITH

2  THEM, HOW MANY OF THEM WERE ALSO ADULTS?

3  **A.**  ALL EXCEPT ONE, WHO WAS 15.

4  **Q.**  AND CAN YOU PROVIDE TO THE COURT A LITTLE BACKGROUND

5  ABOUT THE EVENTS LEADING UP TO THIS INCIDENT?

6  **A.**  YES, SIR.  THE PERSON THEY WENT TO SEE, THE 15-YEAR

7  OLD THAT LIVES OFF SOUTH BLOUNT STREET, GOES TO CARY HIGH

8  SCHOOL.  MR. YAGHI AND MR. HASSAN HAS A FRIEND WHO IS 15

9  THAT ALSO GOES TO CARY HIGH SCHOOL AND APPARENTLY THE TWO

10  15-YEAR OLDS HAD ISSUES WITH EACH OTHER.

11  **Q.**  AND ONE OF THE 15-YEAR OLDS, I GUESS, INFORMED MR.

12  YAGHI AND MR. HASSAN OF THIS CONFLICT?

13  **A.**  YES.

14  **Q.**  AND WHAT WAS THE PURPOSE OF THEIR TRAVEL OVER TO

15  BLOUNT STREET ON THAT DAY, SIR?

16  **A.**  TO FIND THE 15-YEAR OLD AND BEAT HIM UP.

17  **Q.**  WHEN THEY ARRIVED IN THE AREA, WHAT DID THIS GROUP

18  DO?

19  **A.**  THEY WERE SEEN OUTSIDE OF THE VICTIM'S HOME.

20  WITNESSES NOTICED THAT THE GROUP WAS POINTING AT THE

21  15-YEAR OLD'S HOUSE.  LAW ENFORCEMENT ACTUALLY CAME BY AND

22  SPOKE WITH THE GROUP AND QUESTIONED WHY THEY WERE IN THE

23  AREA AND ASKED THEM TO LEAVE THE AREA.

24  **Q.**  DID THEY IN FACT LEAVE, SIR?

25  **A.**  NO.

1    **Q.**   WHAT HAPPENED AFTER THIS?

2    **A.**   MINUTES LATER, THE VICTIM AND A 16-YEAR OLD FRIEND

3    WALKED OVER TO THE TEXACO. WHILE THEY WERE IN ROUTE, THE

4    GROUP OF FIVE OR SIX ACTUALLY JUMPED ON THEM, AND THERE

5    WAS A FIGHT THAT ENSUED. THE FIGHT STOPPED FOR A FEW

6    MINUTES, AND AFTER IT HAD STOPPED, IT RESTARTED INSIDE THE

7    TEXACO.

8    **Q.**   AND AS A RESULT OF THIS FIGHT INSIDE THE TEXACO,

9    WHAT, IF ANY, PROPERTY DAMAGE WAS SUSTAINED?

10    **A.**   THE STORE OWNER REPORTED $400 WORTH OF DAMAGE.

11    **Q.**   ARE YOU AWARE, SIR, THAT CHARGES WERE ORIGINALLY

12    BROUGHT AGAINST THE ASSAILANTS IN THIS CASE?

13    **A.**   YES.

14    **Q.**   BUT THEY WERE ULTIMATELY DROPPED; IS THAT CORRECT?

15    **A.**   THAT'S CORRECT.

16    **Q.**   DO YOU HAVE ANY UNDERSTANDING AS TO WHY THE CHARGES

17    WERE DROPPED REGARDING THIS INCIDENT?

18    **A.**   ONE WAS THE 15-YEAR OLD AND THE OTHER GUY, THE

19    16-YEAR OLD, DID NOT WANT TO PURSUE CHARGES, AND ALSO THE

20    STORE OWNER OF THE TEXACO SETTLED CIVILLY WITH THE FATHER

21    OF THE 15-YEAR OLD THAT CAME FROM CARY.

22    **Q.**   ARE YOU AWARE OF ANY OTHER ENCOUNTERS THAT MR. HASSAN

23    SPECIFICALLY HAS HAD WITH LOCAL LAW ENFORCEMENT THAT

24    INVOLVE VIOLENCE?

25    **A.**   YES, SIR.

1   **Q.**   LET ME TAKE YOU BACK TO OCTOBER 3, 2007.  ARE YOU

2   AWARE OF AN INCIDENT TAKEN PLACE THAT DAY, SIR?

3   **A.**   YES, SIR.

4   **Q.**   COULD YOU RELATE TO THE COURT THE FACTS OF THAT

5   INCIDENT, PLEASE?

6   **A.**   CARY POLICE DEPARTMENT RECEIVED A 911 CALL FROM A

7   MOTORIST THAT SAID THAT HE SAW A MALE IN ANOTHER VEHICLE

8   STRIKE A FEMALE PASSENGER.  HE GAVE THAT INFORMATION TO

9   CARY POLICE DEPARTMENT, AND HE PROVIDED A LICENSE TAG

10  NUMBER, THE MAKE OF THE VEHICLE, THE COLOR AND THE

11  DIRECTION OF TRAVEL THAT VEHICLE WAS HEADING.

12  **Q.**   SO THE WITNESS ALERTED LAW ENFORCEMENT THAT HE

13  OBSERVED THE MALE DRIVER HITTING THE FEMALE PASSENGER?

14  **A.**   YES.

15  **Q.**   AS A RESULT OF THAT CALL, WHAT WAS CARY POLICE

16  DEPARTMENT ABLE TO DO?

17  **A.**   CARY POLICE DEPARTMENT WAS ABLE TO FIND THE CAR AND

18  MADE A TRAFFIC STOP ON THE CAR.

19  **Q.**   AND WHO WAS IDENTIFIED AS THE DRIVER OF THAT CAR

20  DURING THAT STOP, SIR?

21  **A.**   OMAR HASSAN.

22  **Q.**   AND WHO WAS IDENTIFIED AS THE FEMALE PASSENGER?

23  **A.**   HIS GIRLFRIEND.

24  **Q.**   AND WERE THESE TWO INDIVIDUALS INTERVIEWED ABOUT THIS

25  ISSUE?

1   **A.**   YES, THEY WERE.

2   **Q.**   WHAT HAPPENED DURING THOSE INTERVIEWS?

3   **A.**   MR. HASSAN DENIED THE ASSAULT, AND THE YOUNG LADY

4   ALSO DENIED THE ASSAULT.

5   **Q.**   WAS THERE ANY PHYSICAL EVIDENCE THAT WAS CONSISTENT

6   WITH THE FACT THAT HITTING OR STRIKING OF A FEMALE HAD

7   TAKEN PLACE?

8   **A.**   YES.  SHE HAD RED BLEMISHES ABOUT HER FACE CONSISTENT

9   WITH THOSE OF BEING STRUCK.

10   **Q.**   WAS ANYTHING DONE IN REGARD TO THOSE RED BLEMISHES

11   DURING THE INTERVIEW THAT WAS UNUSUAL?

12   **A.**   YES.  AS THE OFFICER WAS TALKING TO THE YOUNG LADY,

13   SHE WAS APPLYING MAKE-UP TO THE BLEMISHES.

14   **Q.**   IN FACT, ARE YOU AWARE THAT MR. HASSAN ULTIMATELY WAS

15   FOUND GUILTY OF ASSAULT ON A FEMALE FOR THIS INCIDENT?

16   **A.**   YES.

17   **Q.**   DETECTIVE UTLEY, ARE YOU AWARE OF OUTSTANDING ARREST

18   WARRANTS FOR MR. YAGHI THAT HAVE EMANATED FROM THE STATE

19   OF TEXAS?

20   **A.**   YES, I AM.

21   **Q.**   ARE YOU FAMILIAR WITH THE CHARGES THAT THOSE ARREST

22   WARRANTS ARE RELATED TO?

23   **A.**   YES, SIR.

24   **Q.**   WHEN DID THE ALLEGED CRIMES THAT MR. YAGHI COMMITTED

25   IN TEXAS TAKE PLACE?

1    **A.**    JUNE OF 2006.

2    **Q.**    AND ARE YOU FAMILIAR WITH WHAT EXACTLY HE WAS CHARGED

3    WITH?

4    **A.**    YES.  HE WAS CHARGED WITH BURGLARY, CRIMINAL MISCHIEF

5    AND ENGAGING IN ORGANIZED CRIME.

6    **Q.**    ALL OF THESE RELATE TO ONE PARTICULAR INCIDENT IN

7    TEXAS; IS THAT RIGHT?

8              **THE COURT:**  HOLD ON ONE MINUTE.  MR. MCCULLOUGH?

9              **MR. MCCULLOUGH:**  I JUST GOT A MESSAGE MY CLIENT

10   WANTS TO TALK TO ME.  IF YOU WOULDN'T MIND BEFORE I

11   CROSS-EXAMINE, I COULD HAVE A MOMENT?

12             **THE COURT:**  YES.  WOULD YOU RE-ASK THE QUESTION?

13             **MR. COWLEY:**  YES, YOUR HONOR.

14   **BY MR. COWLEY:**

15   **Q.**    THESE CHARGES FROM TEXAS, THEY ALL RELATE TO ONE

16   PARTICULAR INCIDENT?

17   **A.**    YES.

18   **Q.**    AND DO YOU HAVE ANY DETAILS AS TO WHAT THAT INCIDENT

19   WAS?

20   **A.**    YES, SIR.  IN AUSTIN, TEXAS, A TRAVIS COUNTY DEPUTY

21   MADE A TRAFFIC STOP ON A VEHICLE OWNED AND OCCUPIED BY MR.

22   YAGHI.  WHEN HE MADE THE STOP, HE NOTICED MARIJUANA IN

23   PLAIN VIEW OF THE VEHICLE.  THE VEHICLE WAS OCCUPIED BY

24   THREE PEOPLE.  THE DEPUTY OBTAINED CONSENT FOR THE

25   VEHICLE.  HE SEARCHED THE VEHICLE.  IN THE TRUNK OF THE

1  VEHICLE, HE FOUND A LARGE AMOUNT OF COPPER PIPING AND ALSO

2  NEW WINDOWS.

3  THE THREE WERE ARRESTED. ONE CONFESSED TO

4  BURGLARIZING A 24-HOUR FITNESS CENTER THAT WAS UNDER

5  CONSTRUCTION. SEARCH WARRANT WAS OBTAINED FOR MR. YAGHI'S

6  APARTMENT, AND INSIDE THE APARTMENT WAS SIMILAR COPPER

7  PIPING THAT APPEARS TO HAVE COME FROM THE SAME LOCATION.

8  **Q.** AND, IN FACT, HE WAS ARRESTED ON THESE CHARGES; IS

9  THAT CORRECT?

10 **A.** YES.

11 **Q.** AND ARE YOU AWARE OF WHETHER OR NOT HE WAS -- WHETHER

12 HE WAS DETAINED PRIOR TO HIS TRIAL FOR THESE CHARGES OR

13 WHETHER OR NOT HE WAS RELEASED ON CONDITIONS?

14 **A.** HE WAS RELEASED ON CONDITIONS.

15 **Q.** WHAT SPECIFIC PROVISIONS WERE INCLUDED IN THOSE

16 CONDITIONS TO YOUR KNOWLEDGE, SIR?

17 **A.** HE HAD A BOND, AND HE ALSO HAD ELECTRONIC MONITORING.

18 **Q.** AND WHAT PLEDGE OR OBLIGATION TO APPEAR DID MR. YAGHI

19 MAKE AS PART OF THAT BOND?

20 **A.** THAT HE WOULD APPEAR IN COURT.

21 **Q.** WAS A SPECIFIC COURT DATE REFERENCED IN THE BOND

22 AGREEMENT, TO YOUR KNOWLEDGE?

23 **A.** AUGUST 7 OF THAT YEAR.

24 **Q.** AND ARE YOU AWARE OF WHETHER OR NOT MR. YAGHI

25 APPEARED FOR COURT ON THAT DATE?

1  **A.**   HE DID NOT.

2  **Q.**   AND, IN FACT, ARREST WARRANTS WERE ISSUED AFTER HE

3  FAILED TO APPEAR; IS THAT CORRECT?

4  **A.**   YES.

5  **Q.**   AND TO YOUR KNOWLEDGE, WHERE DID MR. YAGHI TRAVEL TO

6  IN JULY OF 2006?

7  **A.**   RALEIGH-DURHAM AREA.

8  **Q.**   AND TO YOUR KNOWLEDGE, THOSE ARREST WARRANTS ARE

9  STILL OUTSTANDING?

10  **A.**   YES, SIR.

11       **MR. COWLEY:**  IF I COULD HAVE A MOMENT, YOUR

12  HONOR?

13       **THE COURT:**  YOU MAY.

14       **MR. COWLEY:**  NO FURTHER QUESTIONS.

15       **THE COURT:**  MR. MCCULLOUGH, WHY DON'T YOU

16  CONSULT WITH YOUR CLIENT NOW.  WE'LL TAKE A TEN MINUTE

17  RECESS.

18       (RECESS TAKEN).

19       **THE COURT:**  FOR HOUSEKEEPING PURPOSES, WE'RE

20  GOING TO GO UNTIL 4:30 P.M. TODAY, AT WHICH TIME SPECIAL

21  AGENT SUTTON WILL MEET WITH THE COURT REPORTER AND LAWYERS

22  WILL MEET WITH MRS. CAMPBELL TO IRON OUT WHATEVER YOU CAN

23  TODAY AND THEN REPORT TO ME FIRST THING TOMORROW MORNING

24  ABOUT A DATE FOR THE OR SOME DATES SO I CAN GIVE TO JUDGE

25  FLANAGAN FOR THE STATUS CONFERENCE.

1    YOU HAD FINISHED DIRECT, MR. COWLEY?

2           **MR. COWLEY:** YOUR HONOR, ACTUALLY THERE'S ONE

3    OTHER ISSUE I WOULD LIKE TO DISCUSS.

4    **BY MR. COWLEY:**

5    **Q.** DETECTIVE UTLEY, AGAIN SPEAKING ABOUT MR. HASSAN, ARE

6    YOU AWARE OF A 2003 INCIDENT INVOLVING THE CLAIM OF

7    FIREARM THAT MR. HASSAN WAS INVOLVED IN?

8    **A.** YES.

9    **Q.** AND, IN FACT, THAT TOOK PLACE ON DECEMBER 2, 2003; IS

10   THAT CORRECT?

11   **A.** YES, SIR.

12   **Q.** CAN YOU RELATE THE FACTS OF THAT INVESTIGATION TO THE

13   COURT PLEASE?

14   **A.** CARY POLICE DEPARTMENT RECEIVED A 911 CALL IN

15   REFERENCE TO A GENTLEMAN WHO WAS WALKING DOWN THE STREET.

16   HE SAID HE WAS APPROACHED BY TWO MALES IN A VEHICLE.  THEY

17   PULLED UP NEXT TO HIM AND ASKED HIM IF HE WOULD LIKE TO

18   PURCHASE MARIJUANA.  HE SAID NO.  ONCE HE SAID NO, THE

19   PASSENGER HELD UP A HANDGUN AND POINTED IT AT HIM, SAID

20   "JUST KIDDING," AND DROVE OFF.

21   **Q.** AND WAS THE VICTIM IN THAT CASE ABLE TO PROVIDE ANY

22   INFORMATION ABOUT THE CAR TO LAW ENFORCEMENT AUTHORITIES?

23   **A.** YES, HE WAS.  I BELIEVE HE WAS ABLE TO PROVIDE A

24   VEHICLE REGISTRATION.

25   **Q.** THROUGH INVESTIGATION OF -- DID A SUSPECT ARISE THAT

1  WAS AFFILIATED WITH THAT CAR?

2  **A.**  YES.

3  **Q.**  WHO WAS THAT SUSPECT?

4  **A.**  OMAR HASSAN.

5  **Q.**  AND WAS MR. HASSAN QUESTIONED ABOUT THIS INCIDENT?

6  **A.**  HE WAS.

7  **Q.**  AND WHAT DID HE SAY ABOUT THIS INCIDENT?

8  **A.**  HE ACKNOWLEDGED THE FACT THAT HE WAS THERE AND THAT

9  HE HAD A CONVERSATION WITH THE VICTIM.  HE SAID THAT THE

10  GUN THAT HE HAD WAS A BB GUN, AND HE CLAIMED THAT HE DID

11  NOT ACTUALLY POINT IT AT THE VICTIM BUT JUST HELD IT UP.

12  **Q.**  AND WAS LAW ENFORCEMENT EVER ABLE TO CONFIRM

13  MR. HASSAN'S STATEMENT THAT THIS GUN WAS ONLY A BB GUN?

14  **A.**  NO.

15  **Q.**  AND THE KNOWLEDGE OF THE VICTIM WHO SAW THE WEAPON IN

16  QUESTION THAT DAY, HE WAS LED TO BELIEVE IT WAS AN ACTUAL

17  FIREARM; IS THAT CORRECT?

18  **A.**  YES.

19  **Q.**  IN OTHER WORDS, THEY GAVE THE VICTIM NO INDICATION IT

20  WAS A BB GUN?

21  **A.**  CORRECT.

22  **Q.**  ADDITIONALLY, ARE YOU AWARE THAT MR. HASSAN ACTUALLY

23  PLED GUILTY TO ASSAULT BY POINTING A GUN FOR THIS INCIDENT

24  IN 2004?

25  **A.**  YES.

1    **MR. COWLEY:** NOTHING FURTHER, YOUR HONOR.

2    **THE COURT:** MR. MCCULLOUGH?

3    **CROSS-EXAMINATION**

4    **BY MR. MCCULLOUGH:**

5    **Q.** NEITHER OF THE INCIDENTS INVOLVING MY CLIENT HAD

6    ANYTHING TO DO WITH VIOLENT JIHAD, DID THEY?

7    **A.** NO, SIR.

8    **Q.** AND CONCERNING THIS INCIDENT FOR WHICH NO CHARGES --

9    THE ONE IN CARY, I GUESS THE CARY YOUTH WAS INVOLVED IN,

10   THE 15-YEAR OLD YOUTH?

11   **A.** YES, SIR.

12   **Q.** THAT PERSON IS ALLEGED TO HAVE GANG TIES; IS HE NOT?

13   **A.** YES, SIR.

14   **Q.** WASN'T HE AND OTHER GANG MEMBERS BULLYING ONE OF MR.

15   YAGHI'S FRIENDS ALLEGELY, AND THAT'S WHAT TRIGGERED THIS

16   WHOLE FIGHT? THEY FELT LIKE IF THEY DIDN'T FIGHT BACK

17   AGAINST A GANG BULLY, THEY WOULD ALWAYS BE TERRORIZED AT

18   SCHOOL?

19   **A.** I DON'T KNOW WHAT THEY FELT. I JUST KNOW THERE WERE

20   ISSUES BETWEEN THE TWO GROUPS.

21   **Q.** AND THE SO-CALLED VICTIM WAS A GROUP WITH A GANG?

22   **A.** YES, SIR.

23   **Q.** ONE THAT'S RECOGNIZED, AND SCHOOL RESOURCE OFFICERS

24   NOTE THOSE KINDS OF THINGS, DON'T THEY?

25   **A.** I IMAGINE SO.

1  **Q.**   SO THE POLICE WERE WELL AWARE OF THAT AT THE TIME YOU

2  CONDUCTED THE INVESTIGATION?

3  **A.**   I DON'T KNOW.

4  **Q.**   BUT YOU ARE AWARE OF IT, AREN'T YOU?

5  **A.**   I'M AWARE OF THE REPORT, YES, SIR.

6       **MR. MCCULLOUGH:**  NOTHING FURTHER.

7       **THE COURT:**  MR. BOYCE?

8                    **CROSS-EXAMINATION**

9  **BY MR. BOYCE:**

10  **Q.**   DETECTIVE, I HAVE SOME QUESTIONS ABOUT THE INCIDENTS.

11  I'LL START FIRST WITH THE FIRST ALLEGATION OR ACCUSATIONS

12  OF ROBBERY WITH A DANGEROUS WEAPON AND FIRST DEGREE

13  KIDNAPPING.  THAT INVOLVED THREE FRIENDS WHO WERE TRYING

14  TO OBTAIN REPAYMENT OF A LOAN OF $70, CORRECT?

15  **A.**   THEY WERE TRYING TO GET MONEY THAT WAS OWED.  YES,

16  SIR.

17  **Q.**   SEVENTY DOLLARS?

18  **A.**   YES, SIR.

19  **Q.**   ARE YOU AWARE OF ANY INFORMATION THAT LINKED THAT

20  PARTICULAR INCIDENT IN TRYING TO RECOVER A DEBT OF $70

21  WITH VIOLENT JIHAD?

22  **A.**   NO, SIR.

23  **Q.**   NOW, MR. HASSAN WAS CONFINED IN THE WAKE COUNTY JAIL

24  UNDER A $200,000 SECURED BOND FOR 41 DAYS, CORRECT?

25  **A.**   I'M NOT SURE.

1 **Q.** DID YOU KNOW THE BOND WAS REDUCED TO $10,000 SECURED

2 WITH A CONSENT OF BOTH THE STATE AND THE ALLEGED VICTIM?

3 **A.** NO, SIR.

4 **Q.** DID YOU KNOW THAT BY THE TIME OF REDUCTION OF THE

5 BOND, MR. SALAM, THE ALLEGED VICTIM, HAD TOLD MR. KNUDSEN,

6 WHO IS MR. HASSAN'S ATTORNEY, AND A NUMBER OF OTHER

7 INDIVIDUALS, THAT MR. HASSAN WAS MERELY PRESENT?

8 **A.** NO, SIR.  I DIDN'T KNOW HE TOLD HIM THAT.

9 **Q.** WERE YOU AWARE THAT MR. SALAM, THE ALLEGED VICTIM,

10 CONFIRMED MR. HASSAN DID NOT PERSONALLY PARTICIPATE IN OR

11 ENCOURAGE ANY ACT OF VIOLENCE AGAINST MR. SALAM?

12 **A.** NO, I DIDN'T KNOW THEY HAD THAT CONVERSATION.

13 **Q.** THE CHARGES AGAINST MR. HASSAN WERE DISPOSED OF ON

14 MAY 18, 2009, CORRECT?

15 **A.** THAT SOUNDS CORRECT.

16 **Q.** THEY DISMISSED THE ROBBERY CHARGE?

17 **A.** YES, SIR.

18 **Q.** AND MR. HASSAN PLED TO ONE MISDEMEANOR COUNT OF FALSE

19 IMPRISONMENT?

20 **A.** YES, SIR.

21 **Q.** FALSE IMPRISONMENT COULD OCCUR WITH ONE HIGH SCHOOL

22 STUDENT LOCKING ANOTHER HIGH SCHOOL STUDENT IN A LOCKER

23 FOR MORE THAN FIVE MINUTES, RIGHT?

24 **A.** YES, SIR.

25 **Q.** THE CHARGES AGAINST THE OTHER THREE DEFENDANTS WERE

1  REDUCED ALSO, CORRECT?

2  **A.**   YES, SIR.

3  **Q.**   THE MAXIMUM EXPOSURE FOR MR. HASSAN WAS ONLY 45 DAYS,

4  AND HE ALREADY SERVED 41 DAYS, CORRECT?

5  **A.**   YES, SIR.

6  **Q.**   AFTER THAT, HE PLED GUILTY, HE GOT A 45-DAY SENTENCE,

7  41-DAYS CREDIT, AND THEN HE OPTED TO SERVE THE ADDITIONAL

8  FOUR DAYS SO HE WOULDN'T HAVE TO BE UNDER PROBATIONARY

9  PERIOD FOR SEVEN YEARS, CORRECT?

10  **A.**   YES, SIR.

11  **Q.**   THAT'S AN OPTION THE DEFENDANT HAS IN STATE COURT,

12  CORRECT?

13  **A.**   YES, SIR.

14  **Q.**   WHILE HE WAS -- ALL OF THIS OCCURRED IN 2009?

15  **A.**   NO.  IT HAPPENED DECEMBER 28 OF '08.

16  **Q.**   ALL RIGHT.  THE COURT PROCEEDINGS --

17  **A.**   HAPPENED IN '09.

18  **Q.**   THE COURT PROCEEDINGS WERE IN 2009, CORRECT?

19  **A.**   YES, SIR.

20  **Q.**   THE OTHER INCIDENT YOU WERE TALKING ABOUT, SOME

21  MISDEMEANOR ASSAULT CHARGES, THAT INCIDENT ACTUALLY

22  OCCURRED IN NOVEMBER OF 2007, CORRECT?

23  **A.**   WITH THE MUGGERS AND THE FEMALE PASSENGER?

24  **Q.**   NO, THE ASSAULT CHARGES.

25  **A.**   I'M SORRY.  ABOUT THE TEXACO?

1 **Q.** YES, SIR.

2 **A.** YES, SIR.

3 **Q.** ALL RIGHT. SO THE OFFENSES WERE ALLEGED TO HAVE

4 OCCURRED IN THE TEXACO INCIDENT, NOVEMBER 27, 2007, BUT

5 THE WARRANTS WERE NOT ISSUED UNTIL JANUARY OF 2009?

6 **A.** THAT'S CORRECT.

7 **Q.** SO 14 MONTHS LATER THAN THE INCIDENT WAS WHEN

8 MR. HASSAN WAS SERVED WITH THE ASSAULT WARRANTS FOR

9 ARREST?

10 **A.** YES, SIR.

11 **Q.** AND THOSE CHARGES WERE LATER DROPPED?

12 **A.** YES, SIR.

13 **Q.** ARE YOU AWARE OF ANY ALLEGATION THAT THAT PARTICULAR

14 INCIDENT AMONG THESE YOUNG PEOPLE IN ANY WAY RELATED TO

15 VIOLENT JIHAD?

16 **A.** NO, SIR.

17 **Q.** DID YOU HAVE ANY CONVERSATIONS WITH MR. KNUDSEN,

18 MR. HASSAN'S ATTORNEY, IN THAT MATTER?

19 **A.** NO, SIR. I DID NOT.

20 **Q.** DID YOU KNOW THE ONLY NON-LAW ENFORCEMENT WITNESS WHO

21 APPEARED IN COURT TOLD MR. KNUDSEN THAT MR. HASSAN WAS NOT

22 IN ANY WAY AT FAULT IN THE MATTER AND HE DID NOT

23 UNDERSTAND WHY HE WAS EVEN CALLED TO COURT?

24 **A.** NO, SIR, NOT AWARE OF THAT.

25 **Q.** OKAY. NOW THE OTHER INCIDENT YOU MENTIONED, THE

1 POINTING OF THE BB GUN, MR. HASSAN WAS 16-YEARS OLD; IS

2 THAT CORRECT?

3 **A.**   YES, SIR.

4 **Q.**   AND PRAYER FOR JUDGMENT CONTINUED WAS ENTERED IN THAT

5 CASE?

6 **A.**   I'M UNAWARE OF THAT.

7 **Q.**   IF PRETRIAL SERVICES REPORT SAYS PJC WAS ENTERED, YOU

8 WOULDN'T DISPUTE THAT, WOULD YOU?

9 **A.**   NO, SIR.

10 **Q.**   SO MR. HASSAN IN THAT MATTER PAID NO FINE THAT YOU

11 ARE AWARE OF?

12 **A.**   NO.

13 **Q.**   HE WAS NOT PLACED ON PROBATION?

14 **A.**   NOT THAT I'M AWARE OF.

15 **Q.**   AND HE DID NOT RECEIVE ANY TYPE OF SENTENCE THAT THE

16 COURT SUSPENDED?

17 **A.**   CORRECT.

18 **Q.**   ALSO, YOU MENTIONED MR. HASSAN ALLEGEDLY HAVING

19 ASSAULTED THE GIRLFRIEND?

20 **A.**   YES.

21 **Q.**   AND THAT OCCURRED SOME TIME AGO ALSO?

22 **A.**   YES, SIR.

23 **Q.**   ARE YOU AWARE IF THAT PARTICULAR INCIDENT HAD ANY

24 RELATION TO ALLEGATIONS OF BEING CONNECTED TO VIOLENT

25 JIHAD?

1   **A.**   NOT THAT I'M AWARE OF.

2   **Q.**   IN THAT PARTICULAR CASE, MR. HASSAN'S GIRLFRIEND

3   DENIED SHE HAD BEEN ASSAULTED?

4   **A.**   THAT'S CORRECT.

5   **Q.**   DID YOU KNOW THEY ARE STILL DATING?

6   **A.**   NO, SIR.

7   **Q.**   DID YOU KNOW THEY WERE ENGAGED TO BE MARRIED?

8   **A.**   NO, SIR.

9   **Q.**   DID YOU KNOW THEY ACTUALLY ENTERED INTO A RELIGIOUS

10   CEREMONY IN FURTHERANCE OF MARRIAGE?

11   **A.**   NO, I DID NOT.

12   **Q.**   MR. HASSAN WAS UNREPRESENTED BY COUNSEL AT THAT

13   PARTICULAR PROCEEDING, CORRECT?

14   **A.**   I DON'T KNOW.

15   **Q.**   DID YOU KNOW HE WAS OFFERED A DIVERSION PROGRAM?

16   **A.**   NO, SIR.

17   **Q.**   DID YOU KNOW HE SUCCESSFULLY COMPLETED THE DIVERSION

18   PROGRAM?

19   **A.**   NO, SIR.

20   **Q.**   DID YOU KNOW A PRAYER FOR JUDGMENT CONTINUED WAS

21   GRANTED ON FEBRUARY 11, 2009, IN THAT CASE?

22   **A.**   NO, SIR.

23   **Q.**   DO YOU HAVE ANY EVIDENCE THAT THE GUN ALLEGEDLY USED

24   WAS ANYTHING OTHER THAN A BB GUN?

25   **A.**   I HAVE NO EVIDENCE THAT IT WAS A BB GUN OR A REAL

1   GUN.

2   **Q.**   SO YOU HAVE NO EVIDENCE EITHER WAY?

3   **A.**   CORRECT.

4   **Q.**   BUT THE CHARGING DOCUMENT MENTIONS, TO WIT: A BB GUN,

5   CORRECT?

6   **A.**   YES.

7   **Q.**   AND HE WAS HOW OLD AT THE TIME?

8   **A.**   I BELIEVE HE WAS 16.

9           **MR. BOYCE:**  NO OTHER QUESTIONS.

10          **THE COURT:**  MR. ZESZOTARSKI?

11          **MR. ZESZOTARSKI:**  NO, YOUR HONOR.  THANK YOU.

12          **THE COURT:**  MR. HILL?

13          **MR. HILL:**  NO, SIR.

14          **THE COURT:**  MS. AGUIRRE?

15          **MS. AGUIRRE:**  NO, YOUR HONOR.

16          **THE COURT:**  MR. MCAFEE?

17          **MR. MCAFEE:**  NO, YOUR HONOR.

18          **THE COURT:**  AND MS. GODWIN?

19          **MS. GODWIN:**  NO, YOUR HONOR.

20          **THE COURT:**  REDIRECT?

21                    **<u>REDIRECT EXAMINATION</u>**

22   **BY MR. COWLEY:**

23   **Q.**   IN REGARD TO THE 2007 INCIDENT, THE GANG MEMBER --

24   THE ALLEGED GANG MEMBER THAT DEFENSE COUNSEL REFERRED TO,

25   WAS HE AN ADULT OR A MINOR?

1  **A.**  HE WAS A MINOR.

2  **Q.**  AT THE TIME, WERE MR. YAGHI AND MR. HASSAN MINORS?

3  **A.**  NO.

4  **Q.**  THEY WERE ADULTS?

5  **A.**  YES.

6  **Q.**  AND TURNING TO THE 2008 INCIDENT, THE KIDNAPPING

7  INCIDENT AS IT'S BEEN REFERRED TO, DURING THE EVENTS OF

8  THAT EVENING, MR. HASSAN WAS PRESENT THE ENTIRE TIME; IS

9  THAT CORRECT?

10  **A.**  YES, HE WAS.

11  **Q.**  TO YOUR KNOWLEDGE, DID HE EVER ATTEMPT TO WITHDRAW

12  FROM THE ACTIVITIES OF THAT EVENING?

13  **A.**  NO.

14  **Q.**  DID HE ATTEMPT TO WITHDRAW FROM THEM AFTER ASSAULTIVE

15  BEHAVIOR TOOK PLACE?

16  **A.**  NO.

17  **Q.**  DID HE ATTEMPT TO WITHDRAW FROM THEM AFTER A FIREARM

18  WAS USED TO FORCE THIS VICTIM TO TRAVEL WITH HIM TO AN ATM

19  MACHINE?

20  **A.**  NO.

21       **MR. COWLEY:**  NOTHING FURTHER.

22       **THE COURT:**  YOU MAY STEP DOWN.  MR. MCCULLOUGH?

23       **MR. MCCULLOUGH:**  I JUST HAVE ONE QUESTION.

24       **THE COURT:**  GO AHEAD.

25                  **RECROSS-EXAMINATION**

**BY MR. MCCULLOUGH:**

**Q.** DURING ANY OF THAT INVESTIGATION CONCERNING THE ATM MACHINE, WAS ANY FIREARM EVER RECOVERED?

**A.** NO, SIR.

**Q.** AND I THINK YOU SAID THAT THE VICTIM OF THAT SAID THAT HE HAD SEEN FIREARMS AT THE APARTMENT THAT THEY HAD LIVED IN, IN POSSESSION OF MR. YAGHI?

**A.** YES, SIR.

**Q.** DID LAW ENFORCEMENT EVER GO TO THE APARTMENT AND ATTEMPT TO SEE IF MR. YAGHI HAD ANY FIREARMS?

**A.** I DON'T KNOW IF WE DID OR NOT. I DIDN'T.

**Q.** BUT NONE WERE RECOVERED DURING THAT INVESTIGATION?

**A.** CORRECT.

     **MR. MCCULLOUGH:** NO FURTHER QUESTIONS.

     **THE COURT:** YOU MAY STEP DOWN. CALL YOUR NEXT WITNESS.

     **MS. KOCHER:** NO FURTHER EVIDENCE FOR THE GOVERNMENT.

     **THE COURT:** THANK YOU. MS. GODWIN, ANY EVIDENCE FOR MR. BOYD?

     **MS. GODWIN:** NO, YOUR HONOR.

     **THE COURT:** MR. MCAFEE?

     **MR. MCAFEE:** I'M GOING TO OFFER BRIEF TESTIMONY OF A PROPOSED THIRD PARTY CUSTODIAN. WE WOULD CALL NASER SADIKU.

1  **NASER SADIKU**, BEING FIRST DULY AFFIRMED, TESTIFIED AS

2  FOLLOWS DURING **DIRECT EXAMINATION**:

3  **BY MR. MCAFEE:**

4  Q.   MR. SADIKU, DO YOU KNOW HYSEN SHERIFI?

5  A.   YES.

6  Q.   HOW DO YOU KNOW HIM?

7  A.   HIS MOTHER IS MY COUSIN.

8  Q.   YOU ARE HIS SECOND COUSIN?

9  A.   YES.

10  Q.   DO YOU LIVE HERE IN RALEIGH, SIR?

11  A.   YES, SIR.

12  Q.   YOU LIVE ON TWICKENHAM COURT; IS THAT CORRECT?

13  A.   YES.

14  Q.   ARE YOU MARRIED?

15  A.   YES.

16  Q.   WHAT IS YOUR WIFE'S NAME?

17  A.   ZYMRIJE.

18  Q.   DO YOU HAVE ANY CHILDREN?

19  A.   I HAVE TWO KIDS, 16 AND 13.

20  Q.   AND YOU-ALL LIVE AT THAT APARTMENT?

21  A.   YES.

22  Q.   MR. SADIKU, ARE YOU HERE TODAY TO OFFER YOURSELF AS A

23  THIRD PARTY CUSTODIAN?

24  A.   YES.

25  Q.   DO YOU UNDERSTAND THAT IF THE COURT WERE TO RELEASE

1  MR. SHERIFI TO YOUR CUSTODY, THAT HE WOULD HAVE TO RESIDE

2  IN YOUR HOME?

3  **A.**  YES.

4  **Q.**  ARE YOU PREPARED TO TAKE HIM IN AT THIS TIME?

5  **A.**  YES.

6  **Q.**  DO YOU HAVE SUFFICIENT ROOM TO TAKE HIM IN?

7  **A.**  I HAVE TWO ROOMS NOW.  I DON'T KNOW HOW DO YOU --

8  **Q.**  DO YOU HAVE ENOUGH ROOM FOR A BED FOR HIM AND A PLACE

9  FOR HIM TO STAY?

10  **A.**  YES.

11  **Q.**  DO YOU HAVE A LAND-LINE TELEPHONE IN YOUR HOME?

12  **A.**  I HAVE ONLY TELEPHONE -- HOME TELEPHONE.

13  **Q.**  YOU HAVE A PHONE THAT PLUGS INTO THE WALL?

14  **A.**  YEAH.

15  **Q.**  MR. SADIKU, ARE YOU A UNITED STATES CITIZEN?

16  **A.**  YES.

17  **Q.**  WHAT IS YOUR NATIVE COUNTRY?

18  **A.**  KOSOVO.

19  **Q.**  AND YOU COME FROM THE SAME TOWN, GJILIAN, THAT MR.

20  SHERIFI COMES FROM?

21  **A.**  YES.

22  **Q.**  HOW LONG HAVE YOU BEEN IN THE UNITED STATES?

23  **A.**  TEN YEARS, SINCE 1999.

24  **Q.**  YOU CAME DURING THE WAR AS WELL?

25  **A.**  YES.

1 **Q.** IS YOUR WIFE A U. S. CITIZEN AS WELL?

2 **A.** YES.

3 **Q.** DO EITHER YOU OR YOUR WIFE HAVE ANY KIND OF CRIMINAL

4 RECORD, EITHER HERE OR IN KOSOVO?

5 **A.** NO.

6 **Q.** WOULD YOU BE WILLING TO HAVE ELECTRONIC EQUIPMENT

7 INSTALLED AND ATTACHED TO YOUR TELEPHONE THAT WOULD

8 MONITOR MR. SHERIFI'S WHEREABOUTS?

9 **A.** YES.

10 **Q.** WOULD YOU BE WILLING TO, IF MR. SHERIFI VIOLATED ANY

11 CONDITION THAT THE JUDGE MIGHT SET, WOULD YOU BE WILLING

12 TO CALL THE COURT AND REPORT HIM?

13 **A.** YES.

14 **Q.** DO YOU UNDERSTAND HOW SERIOUS THE CHARGES ARE AGAINST

15 HIM?

16 **A.** YES.

17 **Q.** YOU HAVE BEEN IN COURT TODAY TO HEAR THE TESTIMONY;

18 IS THAT RIGHT?

19 **A.** YES.

20 **Q.** DESPITE ALL OF THAT, YOU ARE STILL WILLING TO HAVE

21 HIM RESIDE WITH YOU?

22 **A.** YES.

23   **MR. MCAFEE:** THAT'S ALL.

24   **THE COURT:** MS. KOCHER OR MR. COWLEY?

25     **<u>CROSS-EXAMINATION</u>**

1  **BY MS. KOCHER:**

2  **Q.**  SIR, IF YOU WOULD SPELL YOUR LAST NAME FOR ME?

3  **A.**  S-A-D-I-K-U.

4  **Q.**  THANK YOU, SIR.  WHAT HAS YOUR RELATIONSHIP BEEN WITH

5  MR. SHERIFI IN THE PAST SEVERAL YEARS?

6  **A.**  HE IS MY COUSIN -- HIS MOTHER.  WE SEE EACH OTHER.  I

7  DIDN'T ACTUALLY SEE HIM FOR ONE YEAR, SINCE LAST YEAR, I

8  THINK.  AND SINCE HIS FATHER AND MOTHER ARE NOT HERE AND

9  HE DOESN'T HAVE NOBODY CLOSER TO HIM AT THIS MOMENT, I

10  THOUGHT THAT I NEED TO COME AND TAKE CARE ABOUT HIM.

11  **Q.**  I SEE.

12  **MS. KOCHER:**  NO FURTHER QUESTIONS, YOUR HONOR.

13  **THE COURT:**  THANK YOU, SIR.  YOU MAY STEP DOWN.

14  I FIND MR. SADIKU TO BE A SUITABLE THIRD PARTY CUSTODIAN.

15  MS. AGUIRRE.

16  **MS. AGUIRRE:**  I WOULD LIKE TO CALL DRAGAN

17  SUBASIC.  YOUR HONOR, IF THE INTERPRETER MAY GO WITH MR.

18  SUBASIC?

19  **THE COURT:**  SHE MAY.

20  **DRAGAN SUBASIC**, BEING FIRST DULY AFFIRMED, TESTIFIED AS

21  FOLLOWS DURING **DIRECT EXAMINATION:**

22  **BY MS. AGUIRRE:**

23  **Q.**  MR. SUBASIC, YOU ARE THE FATHER OF ANES SUBASIC; IS

24  THAT CORRECT?

25  **A.**  YES.

1  **Q.**  AND YOU CURRENTLY LIVE AT 248 ATTERFIELD LANE IN

2  HOLLY SPRINGS, HERE IN WAKE COUNTY?

3  **A.**  YES.

4  **Q.**  PRIOR TO YOUR SON'S ARREST, WAS HE RESIDING AT THAT

5  RESIDENCE WITH YOU?

6  **A.**  YES.

7  **Q.**  HOW LONG HAVE YOU LIVED AT THAT RESIDENCE?

8  **A.**  SIX YEARS.

9  **Q.**  AND HAS YOUR SON LIVED THERE SINCE YOUR WIFE PASSED

10  AWAY?

11  **A.**  YES.

12  **Q.**  AND HOW LONG HAS THAT BEEN, APPROXIMATELY?

13  **A.**  BETWEEN THREE AND FOUR YEARS.

14  **Q.**  ARE YOU EMPLOYED AT THIS TIME, SIR?

15  **A.**  I DO NOT BECAUSE I'M SICK.

16  **Q.**  AND WHEN DID YOU COME TO THE UNITED STATES?

17  **A.**  ELEVEN YEARS AGO.

18  **Q.**  AND AFTER YOUR ARRIVAL HERE, DID YOU WORK?

19  **A.**  I STARTED TO WORK IMMEDIATELY.

20  **Q.**  AND WHERE WERE YOU EMPLOYED?

21  **A.**  CARDINAL HEALTH.

22  **Q.**  WHAT DID YOU DO?

23  **A.**  FOR MEDICINE.  IT'S A MEDICAL COMPANY.

24  **Q.**  WHAT WAS YOUR JOB THERE, SIR?

25  **A.**  PROCESSING ORDERS.

1   **Q.**   AND DID YOU WORK UNTIL YOU BECAME ILL?

2   **A.**   I WORKED UNTIL THE LAST DAY THAT I WAS HEALTHY.

3   **Q.**   NOW, AT THIS TIME ARE YOU AT HOME ALL OF THE TIME?

4   **A.**   YES, I'M AT HOME ALL THE TIME.

5   **Q.**   AND ARE YOU WILLING TO SUPERVISE YOUR SON SHOULD HE

6   BE ALLOWED TO COME HOME?

7   **A.**   YES, AND I WILL NOT LET HIM GO ANYWHERE.

8   **Q.**   AND IF HE WERE TO LEAVE WITHOUT YOUR PERMISSION OR

9   NOT TO FOLLOW THE GUIDELINES OF THE COURT, WOULD YOU CALL

10  THE PROBATION OFFICE OR THE U. S. MARSHALS?

11  **A.**   YES, DEFINITELY.

12  **Q.**   HAVE YOU EVER BEEN CONVICTED OF ANY CRIMES SINCE YOU

13  HAVE LIVED HERE OR BEFORE YOU ENTERED INTO THIS COUNTRY?

14  **A.**   NO.

15          **MS. AGUIRRE:**  NOTHING FURTHER, JUDGE.

16          **THE COURT:**  YOU MAY CROSS-EXAMINE.

17                  **CROSS-EXAMINATION**

18  **BY MR. KELLHOFER:**

19  **Q.**   SIR, WOULD YOU AGREE THAT IN ORDER TO BE A CUSTODIAN

20  AS YOU UNDERSTAND IT, YOU WOULD BE REQUIRED TO FOLLOW THE

21  LAW?

22  **A.**   YES.

23  **Q.**   WOULD YOU AGREE THAT SOMEONE WHO STEALS FROM A

24  GROCERY STORE IS NOT FOLLOWING THE LAW?

25  **A.**   I WOULD REPORT THAT PERSON.

1  **Q.**   ISN'T IT A FACT THAT YOU ASSISTED YOUR SON IN

2  SHOPLIFTING FROM A LOCAL GROCERY STORE?

3  **A.**   NO, THAT IS NOT TRUE.

4        **MR. KELLHOFER:**  NO FURTHER QUESTIONS.

5        **THE COURT:**  THANK YOU, SIR.  YOU MAY STEP DOWN.

6  DOES THE GOVERNMENT HAVE ANY EVIDENCE IT INTENDS TO OFFER

7  IN LIGHT OF ITS LINE OF QUESTIONING?

8        **MR. KELLHOFER:**  YES, SIR, WE WOULD CALL --

9        **THE COURT:**  HOLD UP.  I'LL DEFER RULING ON HIS

10 SUITABILITY UNTIL THAT TIME.  MR. HILL?

11       **MR. HILL:**  NO, YOUR HONOR.

12       **THE COURT:**  MR. ZESZOTARSKI?

13       **MR. ZESZOTARSKI:**  NOTHING BEYOND WHAT'S IN THE

14 REPORT, YOUR HONOR.

15       **THE COURT:**  MR. BOYCE?

16       **MR. BOYCE:**  YES, YOUR HONOR.  QUITE A BIT OF IT

17 IS IN WRITTEN MATERIALS.

18       **THE COURT:**  I'M TALKING ABOUT EVIDENCE.

19       **MR. BOYCE:**  WRITTEN EVIDENCE.

20       **THE COURT:**  OKAY.

21       **MR. BOYCE:**  RATHER THAN TESTIMONY.

22       **THE COURT:**  THAT'S FINE.

23       **MR. BOYCE:**  YOUR HONOR, WE WILL BE TENDERING TO

24 THE COURT EXHIBIT A, WHICH IS THE BIRTH CERTIFICATE OF

25 MR. OMAR HASSAN, WHICH SHOWS HIS DATE OF BIRTH AS MAY 15,

1  1987, HIS PLACE OF BIRTH IN NEW JERSEY.

2     WE WILL BE TENDERING TO THE COURT CARY HIGH SCHOOL

3  TRANSCRIPTS, INCLUDING OTHER DOCUMENTS FROM ELEMENTARY

4  SCHOOL CALLED AL-IMAN SCHOOL AS EXHIBIT B, WHICH SHOWS HE

5  ATTENDED SCHOOL FOR YEARS AND YEARS HERE IN WAKE COUNTY,

6  BOTH THIS ELEMENTARY SCHOOL AND CARY HIGH SCHOOL.

7     WE TENDER TO THE COURT EXHIBIT C, WHICH IS NORTH

8  CAROLINA STATE UNIVERSITY TRANSCRIPTS.  YOUR HONOR, IT

9  SHOWS HIS ATTENDANCE AT CLASSES, AND HE HAD ALMOST A 3.0

10  BEFORE HIS ARREST ON SOME OF THE OTHER MATTERS, WHICH I

11  BELIEVE THE PRETRIAL SERVICES REPORT INDICATES HE WAS HELD

12  IN CUSTODY FOR SOME 41 DAYS AND HE HAD FAILING MARKS

13  DURING THAT PERIOD OF TIME.

14     WE ALSO HAVE DEFENDANT'S D, WHICH IS A COPY OF HIS

15  PASSPORT.  WHEN HIS TROUBLES IN WAKE COUNTY SUPERIOR COURT

16  OCCURRED, HIS ATTORNEY VOLUNTARILY OFFERED THE PASSPORT TO

17  THE COURT, AND IT WAS KEPT IN THE COURT RECORDS THROUGHOUT

18  THOSE PROCEEDINGS.  IT'S MY UNDERSTANDING THROUGH

19  MR. KNUDSEN THAT ALL CASES THAT WERE PENDING AGAINST

20  MR. HASSAN HAVE BEEN RESOLVED.  HE'S NOT ON ANY TYPE OF

21  PROBATION OR PAROLE NOW.

22     WHEN WE SAW THAT THE MEDIA HAD OPENED THE SEALED

23  DOCUMENT THAT MR. KNUDSEN HAD PLACED IN THE COURT RECORD

24  AND IT APPEARED ON TV, WE BECAME CONCERNED ABOUT THE

25  SECURITY OF THAT DOCUMENT.  SO MR. KNUDSEN HAS SECURED

CUSTODY OF THAT DOCUMENT. WE'RE PREPARED TO TENDER THAT
TO THIS COURT DURING ANY PERIOD IF HE IS ALLOWED TO BE
RELEASED.

IN ADDITION TO THAT, WE HAVE EXHIBIT E, WHICH IS AN
AFFIDAVIT OF CARL KNUDSEN, AND IN THIS AFFIDAVIT, IT
TRACES THE NUMEROUS CASES THAT WERE TESTIFIED TO TODAY,
BASICALLY THREE INCIDENTS. YOUR HONOR, THE FIRST INCIDENT
REGARDING THE THREE FRIENDS AND THE $70, AND WHAT
MR. KNUDSEN'S INVESTIGATION REVEALED AS TO MR. HASSAN'S
LACK OF INVOLVEMENT IN THAT INCIDENT.

**THE COURT:** MR. BOYCE, NOT TO CUT YOU OFF, BUT
IN LIGHT OF THE FACT OF YOUR CLIENT'S GUILTY PLEAS, I'M
NOT -- I'LL TAKE WHATEVER EVIDENCE YOU WANT TO OFFER, BUT
IT WILL HAVE ABSOLUTELY NO WEIGHT.

**MR. BOYCE:** I UNDERSTAND THAT. THIS OUTLINES
THE MINIMAL ROLE OF PARTICIPATION HE HAD IN THAT INCIDENT.

**THE COURT:** THAT'S FINE.

**MR. BOYCE:** SECONDLY, THE SAME ON THE OTHER
INCIDENT. IT OUTLINES AGAIN HIS MINIMAL ROLE AND NO
PARTICIPATION IN THE CHARGES THAT WERE DISMISSED.

AND THIRDLY, IT RELATES TO -- IT GOES THROUGH THE
VARIOUS COURT RECORDS RELATING TO THE BB GUN INCIDENT. HE
WAS NOT REPRESENTING HIM AT THAT POINT IN TIME.

FINALLY, WE HAVE AN AFFIDAVIT, EXHIBIT F, OF SONYA
YUZMAN ZAGU. SHE IS THE, FOR LACK OF BETTER WORDS, THE

1  FIANCEE OF MR. HASSAN WHO WAS THE ALLEGED VICTIM OF THE

2  PRIOR INCIDENT WHERE SHE STILL MAINTAINS THAT HE DID NOT

3  ASSAULT HER.  HE DID ENTER A DIVERSION PROGRAM.  HE DID

4  SUCCESSFULLY COMPLETE IT, AND THAT'S OUTLINED IN

5  MR. KNUDSEN'S AFFIDAVIT, AND THEY ARE STILL PLANNING TO BE

6  MARRIED ONCE THIS MATTER IS RESOLVED.

7      MAY I TENDER THESE TO THE COURT?

8          **THE COURT:**  IF THEY ARE MARKED AS EXHIBITS, YOU

9  CERTAINLY MAY.

10         **MR. COWLEY:**  WE HAVE NO OBJECTION TO THEIR

11  ADMISSION, BUT WE WOULD REQUEST COPIES BE PROVIDED TO THE

12  UNITED STATES.

13         **MR. BOYCE:**  WE'RE PREPARED TO DO THAT, YOUR

14  HONOR.  MAY I APPROACH?

15         **THE COURT:**  YOU MAY.

16         **MR. BOYCE:**  THANK YOU, YOUR HONOR.

17         **THE COURT:**  THANK YOU.  EVEN THOUGH EACH OF THE

18  DEFENSE ATTORNEYS HAS APPEARED BEFORE ME BEFORE, LET ME

19  MAKE SURE AND MAKE MY POLICY CRYSTAL CLEAR.  IN ORDER FOR

20  A PERSON TO BE CONSIDERED AS A THIRD PARTY CUSTODIAN, THEY

21  HAVE TO PERSONALLY APPEAR, TESTIFY, AND BE SUBJECT TO

22  CROSS-EXAMINATION.  IT MAY BE THAT NONE OF YOU INTEND TO

23  OFFER, OTHER THAN THE ONES WHO HAVE, THIRD PARTY

24  CUSTODIANS.  I JUST WANT TO MAKE SURE EVERYBODY

25  UNDERSTANDS THAT.  MR. MCCULLOUGH.

1  **MR. MCCULLOUGH:**  NO, YOUR HONOR, OTHER THAN

2  WHAT'S IN THE REPORT AND THE TESTIMONY HEARD TODAY.

3  **MR. BOYCE:**  I'M SORRY, YOUR HONOR.  I WAS NOT

4  AWARE OF THAT RULE.  I HAVE ALI HASSAN.  HE'S IN THE

5  COURTROOM AND PREPARED TO TESTIFY.

6  **THE COURT:**  OKAY.

7  **ALI HASSAN**, BEING FIRST DULY AFFIRMED, TESTIFIED AS

8  FOLLOWS DURING **DIRECT EXAMINATION**:

9  **BY MR. BOYCE:**

10  **Q.**   MR. HASSAN, ARE YOU THE FATHER OF OMAR HASSAN, ONE OF

11  THE DEFENDANTS IN THIS CASE?

12  **A.**   YES, SIR.

13  **Q.**   HAVE YOU LIVED IN THE UNITED STATES FOR OVER 26

14  YEARS?

15  **A.**   YES, SIR.

16  **Q.**   ARE YOU LAWFULLY IN THE UNITED STATES?

17  **A.**   YES, SIR.

18  **Q.**   WHAT TYPE OF BUSINESS ARE YOU INVOLVED IN?

19  **A.**   I'M IN THE USED CAR BUSINESS.

20  **Q.**   HAS YOUR SON BEEN LIVING WITH YOU SINCE YOU AND YOUR

21  FAMILY ARRIVED IN THE UNITED STATES?

22  **A.**   SINCE HE WAS BORN, YES.

23  **Q.**   AND DOES THE FAMILY UNIT COMPRISE OF YOU, YOUR WIFE,

24  AND OMAR AND HIS TWO YOUNGER SISTERS?

25  **A.**   YES, SIR.

1  **Q.**  NOW, HAVE YOU OFFERED -- TOLD PRETRIAL SERVICES THAT

2  YOU WOULD BE WILLING TO SERVE AS A THIRD PARTY CUSTODIAN?

3  **A.**  YES, SIR.

4  **Q.**  DO YOU KEEP ANY WEAPONS IN THE HOUSE?

5  **A.**  NO, I DON'T.

6  **Q.**  DO YOU HAVE ANY TYPE OF CRIMINAL RECORD OTHER THAN

7  SOME MINOR TRAFFIC VIOLATIONS?

8  **A.**  NOT EVEN.

9  **Q.**  DO YOU ALLOW ANY DRUGS IN YOUR HOME?

10  **A.**  NO, SIR.

11  **Q.**  WOULD YOU AGREE TO ALLOW THE GOVERNMENT TO HOOK UP

12  ELECTRONIC MONITORING EQUIPMENT IN YOUR RESIDENCE SHOULD

13  THE COURT DECIDE TO RELEASE YOUR SON INTO YOUR THIRD PARTY

14  CUSTODY?

15  **A.**  SURE.

16  **Q.**  DO YOU REALIZE THE SERIOUSNESS INVOLVED IN SERVING AS

17  A THIRD PARTY CUSTODIAN, AND IT WOULD REQUIRE YOU TO

18  REPORT ANY VIOLATIONS OF PRETRIAL RELEASE?

19  **A.**  ABSOLUTELY.

20  **Q.**  ARE YOU WILLING TO DO THAT?

21  **A.**  YES, SIR.

22  **Q.**  DO YOU HAVE ANY HESITATION WHATSOEVER KNOWING THAT IT

23  IS YOUR SON WHO WOULD BE IN YOUR CUSTODY AND REPORTING TO

24  THE COURT IF HE VIOLATES ANY CONDITIONS OF RELEASE?

25  **A.**  NO HESITATION.

1  **Q.**  MR. HASSAN, YOU ARE MUSLIM; IS THAT CORRECT?

2  **A.**  YES, SIR.

3  **Q.**  AS YOU UNDERSTAND THE MUSLIM FAITH, IS IT YOUR BELIEF

4  THAT YOUR RELIGION CARRIES WITH IT ANY BASIC TENET ABOUT

5  THE KILLING OF MUSLIMS?

6  **A.**  NO.

7  **MS. KOCHER:**  OBJECTION, YOUR HONOR.

8  **MR. BOYCE:**  IF THERE'S ANY CONCERN THAT THIS

9  PARTICULAR PERSON SERVING AS THIRD PARTY CUSTODIAN

10  SUPPORTS VIOLENT JIHAD, I WANT TO CLEAR THAT UP.

11  **THE COURT:**  YOU CAN ASK HIM THAT DIRECTLY, BUT

12  I'M NOT SURE HE'S QUALIFIED BY VIRTUE OF THE QUESTIONS

13  YOU'VE ASKED TO EXPLAIN WHAT HIS RELIGION IS ABOUT.  I

14  DON'T DOUBT HE'S A RELIGIOUS MAN, BUT YOU WILL NEED TO LAY

15  A GREATER FOUNDATION THAN YOU HAVE TO ASK HIM QUESTIONS

16  ABOUT THE FAITH GENERALLY.

17  **MR. BOYCE:**  I'LL REPHRASE THE QUESTION.

18  **BY MR. BOYCE:**

19  **Q.**  DO YOU IN ANY WAY SUPPORT VIOLENT JIHAD?

20  **A.**  NO, I DON'T.

21  **MR. BOYCE:**  THANK YOU.  NO OTHER QUESTIONS.

22  **THE COURT:**  YOU MAY CROSS-EXAMINE.

23  **<u>CROSS-EXAMINATION</u>**

24  **BY MR. COWLEY:**

25  **Q.**  NOW, IT IS YOUR TESTIMONY JUST NOW THAT YOUR SON,

1  MR. HASSAN, HAS BEEN LIVING WITH YOU SINCE THE TIME HE WAS

2  BORN; IS THAT CORRECT?

3  **A.**   YES, SIR.

4  **Q.**   WAS HE LIVING WITH YOU IN DECEMBER OF 2008?

5  **A.**   DECEMBER OF 2008?

6  **Q.**   YES, SIR.

7  **A.**   IF HE'S OUT A COUPLE DAYS, THERE'S NO DIFFERENCE,

8  BECAUSE I WAS OUT IN DECEMBER MYSELF.  I WAS COMMITTING

9  ACTUALLY WHAT YOU CALL IT, PILIGRAM (SIC).  YOU HAVE TO GO

10 TO SAUDI ARABIA.  I WASN'T HERE MYSELF.

11         **THE COURT:**  WOULD YOU SPELL THE NAME YOU JUST

12 USED?

13         **THE WITNESS:**  IT'S A PILIGRAM, WHICH IS THE

14 MUSLIMS WHEN YOU GO TO MECCA.

15         **THE COURT:**  IT'S A PILGRIMAGE?

16         **THE WITNESS:**  YES, SIR.

17         **THE COURT:**  THANK YOU.

18 **BY MR. COWLEY:**

19 **Q.**   ARE YOU AWARE IT WAS ON DECEMBER 28, 2008, THAT THE

20 INCIDENT THAT YOUR SON TOOK PLACE IN TOOK PLACE -- THAT

21 INVOLVED THE POSSIBLE KIDNAPPING OF AN INDIVIDUAL AND THE

22 TAKING OF HIM BY FORCE TO AN ATM MACHINE?

23 **A.**   I HEARD AFTER HE GOT ARRESTED.

24 **Q.**   AND DID HE LIVE WITH YOU IN NOVEMBER OF 2007, SIR?

25 **A.**   NOVEMBER OF 2007, YES, HE WAS.

**Q.** AND WERE YOU AWARE AT THE TIME THAT ON NOVEMBER 27, 2007, THAT MR. HASSAN TOOK PART IN A FIGHT ON BLOUNT STREET HERE IN RALEIGH, NORTH CAROLINA?

**A.** WELL, I HAD A POLICE OFFICER CAME TO MY HOUSE, AND HE TOLD ME THE STORY.

**Q.** AND WAS HE LIVING WITH YOU IN OCTOBER OF 2007?

**A.** HE WAS WITH ME, YES.

**Q.** AND THAT WAS THE TIME PERIOD IN WHICH THE INCIDENT TOOK PLACE INVOLVING THE ASSAULT ON A FEMALE THAT HE PLED GUILTY TO?

**A.** WELL, THIS ACTUALLY A BIG ALLEGATION. IF YOU WANT ME TO TALK ABOUT THIS, I HAVE TO TALK ABOUT THE WHOLE STORY.

**Q.** MY QUESTION WAS JUST WAS HE LIVING IN YOUR HOUSE?

**A.** HE WAS LIVING WITH ME, YES.

**Q.** AND HE WAS LIVING IN YOUR HOUSE IN DECEMBER OF 2003?

**A.** YES.

**Q.** AND THAT WAS WHEN THE INCIDENT INVOLVING ASSAULT BY POINTING A GUN TOOK PLACE?

**A.** YES.

**Q.** AND HE WAS LIVING WITH YOU IN JUNE OF 2007; IS THAT CORRECT?

**A.** HE WAS LIVING WITH ME SINCE HE WAS BORN.

**Q.** AND THAT'S WHEN -- IT WAS AROUND THAT TIME THAT HE TOOK A TRIP TO THE MIDDLE EAST; ARE YOU AWARE OF THAT?

**A.** YES.

1 **Q.** AND ISN'T IT TRUE HE LEFT WITHOUT TELLING YOU?

2 **A.** WELL, ACTUALLY HE LEFT, BUT HE LEFT ME A MESSAGE.

3 **Q.** DID YOU RECEIVE THAT MESSAGE BEFORE HE LEFT?

4 **A.** NO, AFTER HE LEFT.

5 **Q.** AND IS IT -- TO YOUR KNOWLEDGE, DID HE INFORM HIS

6 EMPLOYER AT THE TIME THAT HE WAS GOING?

7 **A.** I'M NOT AWARE OF THAT. I HAVE NO IDEA.

8 **Q.** WERE YOU AWARE AS TO THE FACT THAT HE WAS INFORMING

9 OTHER PEOPLE THAT HIS INTENT TO GO ON THIS TRIP WAS TO

10 PARTICIPATE IN JIHAD?

11 **A.** THERE'S NO SUCH A THING.

12 **Q.** BUT YOU CERTAINLY NEVER -- HE NEVER TOLD YOU THAT IN

13 TIME; IS THAT CORRECT?

14 **A.** HE NEVER TOLD ME IN TIME OR EVEN AFTER THE TIME.

15 **Q.** WHEN DID YOU FIND OUT THAT HE LEFT THE UNITED STATES?

16 **A.** THE SAME DAY.

17        **MR. COWLEY:** NOTHING FURTHER, YOUR HONOR.

18        **THE COURT:** ANY REDIRECT?

19               **<u>REDIRECT EXAMINATION</u>**

20 **BY MR. BOYCE:**

21 **Q.** DID YOUR SON EXPLAIN TO YOU WHY HE WENT OVERSEAS?

22 **A.** SORRY?

23 **Q.** DID YOUR SON EXPLAIN TO YOU WHY HE WAS GOING

24 OVERSEAS?

25 **A.** BEFORE OR AFTER?

1 **Q.** EITHER.

2 **A.** WELL, ACTUALLY IT'S A LONG STORY. I WILL MAKE IT AS

3 SHORT AS POSSIBLE. MY SON, BECAUSE WE'RE MUSLIM, WE HAVE

4 BEEN RAISED IT'S AGAINST OUR RELIGION TO HAVE A GIRLFRIEND

5 OR BOYFRIEND, BUT IT'S NORMAL BECAUSE WE ARE LIVING IN THE

6 UNITED STATES. IT HAPPENED THAT HE WENT TO SCHOOL WITH

7 HIS FIANCEE RIGHT NOW. SO HE FELL IN LOVE WITH HER. WE

8 ACTUALLY DISAGREE ABOUT THIS.

9 SHE WAS PUTTING PRESSURE ON HIM, NOT ACTUALLY

10 DIRECTLY, TO HAVE US GO AHEAD AND ENGAGE -- HAVE

11 ENGAGEMENT PARTY WITH HER FAMILY. WE HAD A DISAGREEMENT,

12 SAID IT'S TOO EARLY FOR THE ENGAGEMENT. THAT WAS LIKE

13 FIRST TIME FOR TEENAGER TO BE IN LOVE. SHE WAS TRAVELING,

14 GOING TO EGYPT. SHE TOLD HIM, "I'M GOING TO EGYPT. I'M

15 AFRAID IF I GO THERE, I MIGHT GET ENGAGEMENT TO SOMEBODY

16 ELSE." I'M NOT SURE IF SHE WAS PRESSURING HIM TO TALK TO

17 US OR SOMETHING. THAT'S WHAT HAPPENED. SO HE WAS IN BAD

18 FEELING. HE HAD A BAD FEELING ABOUT THE WHOLE SITUATION.

19 SO HE DECIDED -- HE SOLD HIS CAR BECAUSE HE WANTED TO

20 GO AFTER HER TO EGYPT. AT THIS TIME HE HAD A STORY -- I

21 MEAN HIS FRIEND, BEST FRIEND, ZIYAD YAGHI, HE WAS GOING TO

22 HAVE AN ENGAGEMENT ALSO IN ISRAEL, TO SEE ONE OF THE

23 GIRLS. HE TOLD HIM TO COME WITH HIM. SO THEY WENT

24 TOGETHER. THEY WERE DENIED THE VISA. THEN HE CALLED ME

25 BECAUSE THEY SENT HIM BACK TO GERMANY. HE SAID, "I'M

1    GOING TO SPEND A FEW DAYS IN JORDAN WITH ZIYAD."  I TOLD

2    HIM, "I'M GOING TO EGYPT, WHY DON'T YOU GO TO EGYPT AND

3    I'LL MEET YOU THERE."

4    **Q.**   DID YOU MEET YOUR SON THERE?

5    **A.**   YES.  I HAD A PLAN TO GO.  MY SISTER WAS SICK.  I

6    SPENT THE WHOLE TIME WITH BOTH OF THEM.  I HAD OTHER

7    FRIENDS FROM THE UNITED STATES.  THEY CAME -- WE LIVE IN

8    ALEXANDRIA, WHICH IS LIKE A BEACH AREA.  SO WE HAD A LOT

9    OF PEOPLE WENT THERE IN EGYPT AT THIS TIME.  WE MET ALL OF

10   THEM, HAD A GOOD TIME.  WE HAD A GOOD TIME, NOTHING BUT

11   HAVING FUN, AND THEN WE CAME BACK.

12   **Q.**   DID YOU AND YOUR SON COME BACK TO THE UNITED STATES?

13   **A.**   YES, AFTER THE VACATION, WE CAME RIGHT STRAIGHT TO

14   THE UNITED STATES.

15   **Q.**   THAT WAS IMMEDIATELY AFTER THE VACATION?

16   **A.**   YES.

17   **Q.**   DID YOUR SON GO ANYWHERE ELSE AFTER VACATION?

18   **A.**   NO.

19   **Q.**   AT ANY POINT IN TIME DURING THAT TRIP -- THIS WAS IN

20   JUNE OR JULY OF 2007?

21   **A.**   YES.

22   **Q.**   AT ANY TIME DURING THE TRIP, DID YOUR SON MENTION

23   DOING ANYTHING RELATED TO VIOLENT JIHAD?

24   **A.**   NO.  NO.  NO.

25   **Q.**   DID HE MENTION MEETING WITH A DANIEL BOYD FOR ANY

1  PURPOSE WHILE HE WAS THERE?

2  **A.**   NO, SIR.  HE KNOWS MY IDEA ABOUT JIHAD, WHAT IT IS.

3  THE PROBLEM IS, THE COURT OR THE GOVERNMENT USING ONE

4  DEFINITION FOR --

5          **MR. COWLEY:**  I OBJECT AS NON-RESPONSIVE, GETTING

6  INTO THEORETICAL CONVERSATIONS.

7          **THE COURT:**  I'LL LET HIM ANSWER THE QUESTION.

8          **THE WITNESS:**  YES, YOUR HONOR.

9          **THE COURT:**  GO AHEAD, ANSWER IT.

10         **THE WITNESS:**  YOUR HONOR, THE GOVERNMENT USE

11  ONLY ONE DEFINITION FOR THE WORD "JIHAD".  JIHAD MEANS SO

12  MANY DIFFERENT THINGS, ACTUALLY TWO DIFFERENT THINGS.

13      JIHAD IN ITSELF MEANS TROUBLE, BUT IN ISLAMIC

14  PERSPECTIVE, IT MEANS THE STRUGGLE FOR THE GOD SAKE, IN

15  TWO CONDITIONS.  NUMBER ONE, IT'S TO DO THINGS THAT

16  PLEASES THE LORD.  I'M GOING TO GIVE YOU AN EXAMPLE FOR

17  THAT.

18         **THE COURT:**  NO, YOU'RE JUST GOING TO DEFINE THE

19  OTHER ONE.

20         **THE WITNESS:**  BECAUSE THE GOVERNMENT MIGHT TAKE

21  IT A DIFFERENT WAY ALSO, YOUR HONOR.  THEY MIGHT THINK --

22         **THE COURT:**  YOU ARE THE ONE THAT OPENED THIS UP.

23  YOU WILL RUN THE RISK OF WHATEVER IT IS, BUT YOUR

24  DEFINITION HASN'T VARIED TOO MUCH FROM WHAT THE GOVERNMENT

25  HAS SAID ON THAT.

1           **THE WITNESS:** OKAY.

2           **THE COURT:** SO GO AHEAD, YOU CAN SAY THE SECOND

3 THING IT MEANS.

4           **THE WITNESS:** THE SECOND PART OF THE DEFINITION

5 MEANS REFRAIN YOURSELF FROM DOING THINGS THAT DISPLEASES

6 THE LORD. AND THAT'S ACTUALLY IN THE DAILY BASIS OF LIFE.

7 I DON'T KNOW IF I COULD GIVE EXAMPLE, YOUR HONOR, OR NOT.

8           **THE COURT:** I DON'T THINK THAT WOULD BE

9 RESPONSIVE.

10           **THE WITNESS:** THAT'S THE FIRST PART OF THE

11 MEANING. THE SECOND PART OF THE MEANING, WHAT IT TAKES

12 ACTUALLY -- WHAT THEY CALL THE MILITARY PART, THAT MEANS

13 THREE THINGS: TO DEFEND OURSELF AGAINST INVASION, AND

14 THAT ACTUALLY, BECAUSE SINCE WE CAME HERE IN AMERICA, IT'S

15 OUR COUNTRY. IT IS THE SAME THING. IF THERE'S ANOTHER

16 COUNTRY INVADING THE UNITED STATES, IT'S PART OF OUR

17 RELIGION AS MUSLIM TO GO AHEAD AND DEFEND JIHAD TO DEFEND

18 THE UNITED STATES.

19    THE WORD TAKES DIFFERENT PERSPECTIVE WHEN THE

20 GOVERNMENT USE IT. AND HONESTLY I'M ASKING YOUR HONOR,

21 PLEASE HAVE SOME DISCOLORS (SIC) FROM THE MESSAGE OR FROM

22 THE RALEIGH ISLAMIC ASSOCIATION TO GIVE THE DEFINITION OF

23 JIHAD, BECAUSE I DON'T WANT THE WORD TO BE USED IN A BAD

24 POSITION.

25           **THE COURT:** THANK YOU. ANYMORE QUESTIONS?

1  **BY MR. BOYCE:**

2  **Q.**   ONE FINAL QUESTION:  DO YOU AGREE TO ABIDE BY ANY

3  TERMS AS THIRD PARTY CUSTODIAN AND MAKE SURE YOUR SON DOES

4  NOT ENGAGE IN ANY ASPECTS OF VIOLENT JIHAD?

5  **A.**   NEVER.

6  **Q.**   NEVER -- WILL YOU MAKE SURE HE DOES NOT?

7  **A.**   ABSOLUTELY, A HUNDRED PERCENT.

8         **MR. BOYCE:**  NO FURTHER QUESTIONS.

9         **THE COURT:**  YOU MAY STEP DOWN.  I FIND

10  MR. HASSAN TO BE SUITABLE AS A THIRD PARTY CUSTODIAN.

11     MAY I SEE MS. AGUIRRE AND SOMEONE FROM THE

12  PROSECUTION HERE?

13     (THE FOLLOWING BENCH CONFERENCE WAS HELD.)

14         **THE COURT:**  I DON'T KNOW WHAT THE GOVERNMENT'S

15  INFORMATION ABOUT MR. SUBASIC IS, AND I'M NOT ASKING HIM

16  TO DISCLOSE IT NOW, BUT I THINK THE PRUDENT THING WOULD

17  DICTATE THAT YOU SPEAK TO YOUR WITNESS, BECAUSE IF IT

18  TURNS OUT THAT THEY HAVE SOMETHING THAT SERIOUSLY CALLS

19  INTO QUESTION HIS VERACITY, I'LL REFER THE MATTER TO THEM

20  FOR EVALUATION FOR PROSECUTION.  HE TESTIFIED

21  UNEQUIVOCALLY HE'S DONE NOTHING.  I'M JUST SAYING --

22         **MS. AGUIRRE:**  I KNOW.

23         **THE COURT:**  -- YOU HAVE AN OPPORTUNITY TOMORROW

24  TO, IF IN FACT HE REMEMBERS SOMETHING, TO PURGE HIMSELF OF

25  WHATEVER MISSTATEMENT HE MADE, BUT I'M GOING TO LET THE

1   GOVERNMENT PUT ON WHATEVER IT WANTS.

2         **MS. AGUIRRE:**  I WILL FIND OUT WHAT IT IS THEY

3   HAVE.

4         (END OF BENCH CONFERENCE.)

5         **THE COURT:**  WE'RE GOING TO STAND IN RECESS UNTIL

6   9 O'CLOCK TOMORROW MORNING.

7         BEFORE THE ATTORNEYS MEET WITH MS. CAMPBELL, I WANT

8   TO SEE MS. AGUIRRE, AS MANY OF THE GOVERNMENT LAWYERS AS

9   WANT TO COME, AND THE COURT REPORTER IN CHAMBERS.

10

11  (REPORTER'S NOTE:  WHEREUPON, FURTHER PROCEEDINGS WERE

12  HELD IN CHAMBERS UNDER SEAL.)

13

14  (WHEREUPON, THE DAY'S PROCEEDINGS WERE CONCLUDED, AND AN

15  OVERNIGHT RECESS WAS TAKEN.)

16

17

18

19

20

21

22

23

24

25

1          WEDNESDAY, AUGUST 5, 2009

2          **THE COURT:**  GOOD MORNING.  THIS IS THE TIME SET

3   FOR THE RESUMPTION OF THE DETENTION HEARING IN THE CASES

4   OF *UNITED STATES OF AMERICA V. DANIEL PATRICK BOYD, ET AL.*

5          YESTERDAY THREE MOTIONS WERE FILED ON BEHALF OF MR.

6   SUBASIC.  THOSE MOTIONS ARE GRANTED.  MS. AGUIRRE, THANK

7   YOU FOR YOUR SERVICE.  I ALREADY EXCUSED THE INTERPRETER,

8   WHO WILL BE REPLACED BY ANOTHER INTERPRETER.  MR.

9   SUBASIC'S CASE IS CONTINUED UNTIL A LATER DATE.

10         MR. MARSHAL, YOU MAY REMOVE HIM FROM THE COURTROOM.

11         (DEFENDANT, ANES SUBASIC, IS REMOVED FROM THE

12   COURTROOM.)

13         THE PUBLIC DEFENDER HAS APPOINTED KEAT WILES.  MR.

14   WILES, YOU ARE WELCOME TO SIT HERE AND LISTEN TO AND

15   MONITOR THE REMAINING PORTION OF THE HEARING, IT MAY HELP

16   YOU GET ACCLIMATED TO THE CASE.  ARGUMENTS ARE ABOUT TO

17   TAKE PLACE.

18         IN ADDITION, THERE WILL BE A MEETING OF ALL THE

19   ATTORNEYS AT THE END OF TODAY'S PROCEEDINGS WITH, AMONG

20   OTHERS, MRS. CAMPBELL FROM THE DEPARTMENT OF JUSTICE TO

21   WORK OUT SOME OF THE DETAILS OF CLEARANCES AND THE LIKE.

22   YOU'LL HAVE PLENTY OF TIME TO TALK TO YOUR CLIENT, IF YOU

23   WISH LATER.

24         **MR. WILES:**  THANK YOU, YOUR HONOR.

25         **THE COURT:**  MY RECOLLECTION IS THAT WE HAVE

COMPLETED ALL OF THE EVIDENCE IN THE CASE.  AS TO THE

REMAINING DEFENDANTS, THE GOVERNMENT HAS PRESENTED ITS

EVIDENCE ALTHOUGH THEY HAD RESERVED THE RIGHT TO A

REBUTTAL WITNESS IN THE *SUBASIC* CASE.  SINCE THAT CASE HAS

BEEN CONTINUED, THE GOVERNMENT'S REBUTTAL WILL BE

CONTINUED.

IS THERE ANYTHING FOR EITHER SIDE IN THE WAY OF

EVIDENCE THAT NEEDS TO BE PRESENTED?  HEARING NOTHING FROM

ANY OF THE LAWYERS, THE EVIDENCE IS CLOSED.

WHILE THE GOVERNMENT ELECTED TO PRESENT EVIDENCE

INITIALLY, THE BAIL REFORM ACT CONTEMPLATES A DIFFERENT

SCHEME.  THAT IS, IT REQUIRES THE DEFENDANTS TO REBUT THE

PRESUMPTION THAT THEY SHOULD BE HELD.

AT THIS TIME WE'LL START WITH MR. MCCULLOUGH AND

ALLOW YOU TO ARGUE ON BEHALF OF YOUR CLIENT IN AN ATTEMPT

TO REBUT THE PRESUMPTION, RECOGNIZING THAT EVEN IF THE

PRESUMPTION IS REBUTTED, THAT IS A FACTOR BY LAW I MUST

CONSIDER IN MAKING MY DETERMINATION.  SO MR. MCCULLOUGH.

**MR. MCCULLOUGH:**  YOUR HONOR, I WOULD BE LESS

THAN CANDID WITH THE COURT TO SAY THAT THE EVIDENTIARY

RECORD OF MY CLIENT AS BROUGHT OUT BY THE PRETRIAL

SERVICES REPORT COULD REBUT THE PRESUMPTION.

I HAVE TALKED TO HIM AND HE UNDERSTANDS IT WAS A

STUPID THING TO NOT GO TO TEXAS AND DEAL WITH CHARGES THAT

WERE PENDING THERE.  BUT WITH THE TESTIMONY THAT HE HAS

OUTSTANDING CHARGES, WHICH WE DON'T DISPUTE, THAT HE HAD

NOT SETTLED WITH, WE REALIZE THAT DESPITE LONG TIES IN THE

UNITED STATES, A MINOR TRANSGRESSION WHICH I THINK

ESCALATED INTO A FELONY CONVICTION, BUT I DON'T BELIEVE

WOULD BE DISQUALIFIED OTHERWISE.  IT WASN'T EXACTLY LIKE

FRANK SEDONE, THE MAFIA WAS COLLECTING LOAN SHARK MONEY.

IN THE WAY THEY WERE DOING THINGS, YOU COULD TELL IT WAS

KIDS, AND IT WAS WRONG.  BUT MY CLIENT REALIZES THAT WITH

THOSE OUTSTANDING CHARGES, HE PROBABLY WOULD NOT BE

RELEASED NO MATTER WHAT ARGUMENT WE COULD ADVANCE.  THAT'S

WHY WE DON'T TENDER HIS MOTHER, WHO WOULD BE MORE THAN

HAPPY AND WOULD BE WILLING TO BE A THIRD PARTY CUSTODIAN.

**THE COURT:**  MR. BOYCE, ON BEHALF OF MR. HASSAN.

**MR. BOYCE:**  YOUR HONOR, I'M GOING TO TAKE A

LITTLE MORE TIME IN ARGUMENT AND I URGE THE COURT TO

CONSIDER PRETRIAL RELEASE, WHICH WOULD INCLUDE RELEASE

INTO THE CUSTODY OF HIS FAMILY AS WELL AS HOUSE ARREST AND

ANY OTHER CONDITIONS, INCLUDING SURRENDER OF THE PASSPORT,

AND ANY OTHER CONDITIONS THE COURT MAY FEEL ARE

APPROPRIATE.

YOUR HONOR, I WOULD LIKE TO GO THROUGH A NUMBER OF

FACTORS STARTING WITH THE NATURE AND SERIOUSNESS OF THE

OFFENSE.  CERTAINLY PROBABLE CAUSE HAS BEEN FOUND BY A

GRAND JURY.  CERTAINLY THIS IS A VERY SERIOUS CASE.  BUT

THE EVIDENCE THAT YOU HEARD YESTERDAY WHEN YOU FOCUS

SOLELY ON OMAR HASSAN, WHAT WE HAVE IS A SERIOUS DISPUTE
ABOUT A SINGULAR TRIP IN JUNE OR JULY OF 2007.

THE GOVERNMENT CONTENDS THAT HE WAS GOING OVER THERE
TO COMMIT VIOLENT JIHAD.  HE DENIES THAT, HE HAS PRESENTED
EVIDENCE TO THE COURT THAT THE PURPOSE OF THAT TRIP WAS
VERY DIFFERENT FROM THAT AS ALLEGED BY THE GOVERNMENT.

ADDITIONALLY, IT CAME OUT ON CROSS-EXAMINATION THAT
THERE WAS NO MEETING BETWEEN MR. HASSAN AND THE BOYDS, AND
THAT THE BOYDS THEMSELVES HAVE CONFIRMED THERE WAS NO SUCH
MEETING OVERSEAS DURING THAT TRIP.  IT WAS A LEGAL TRIP,
AND AGAIN THERE'S GOING TO BE A SERIOUS DISPUTE AT TRIAL
ABOUT THE PURPOSE OF THAT TRIP.

THE AGENT ON CROSS-EXAMINATION ACKNOWLEDGED THERE
WERE NO RECORDINGS PRIOR TO THAT TRIP INDICATING HIS
INVOLVEMENT WITH MR. BOYD OR IN A CONSPIRACY TO COMMIT
VIOLENT JIHAD.  IF THERE IS ANYTHING, IF THERE'S SOME
DISCOURSE, CERTAINLY HE HAS A FIRST AMENDMENT RIGHT TO
EXPRESS RELIGIOUS VIEWS ON JIHAD VERSUS VIOLENT JIHAD.

CERTAINLY HE HAS -- I THINK THEY HAVE A SINGLE
ISOLATED INCIDENT INVOLVING A GUN, WHICH IS ON HIS CELL
PHONE SHOWING HIM SHOOTING A GUN.  THERE'S NO DATE ON IT,
THERE'S NO INDICATION THAT IT WAS POINTING IN THE
DIRECTION OF AN INDIVIDUAL.  THEY DO NOT CONTEND THAT ON
ANY AUDIO HE WAS SCREAMING ANYTHING IN SUPPORT OF VIOLENT
JIHAD WHEN SHOOTING THE GUN.  IT MIGHT BE JUST LIKE ANY

1 TARGET PRACTICE ANY PERSON MIGHT DO.  I DON'T THINK

2 THERE'S ANY INDICATION THAT THE GUN INVOLVED IN THAT SHORT

3 VIDEO CLIP WAS ILLEGAL IN ANY WAY OR HE SOMEHOW ILLEGALLY

4 WAS POSSESSING THE GUN AT THAT TIME.

5     WITH RESPECT TO THE FACTORS THAT THE STATUTE SAYS THE

6 COURT MUST CONSIDER, I WOULD POINT OUT A NUMBER OF THINGS

7 THAT RELATE SPECIFICALLY AND ONLY TO OMAR HASSAN.  HE IS A

8 UNITED STATES CITIZEN, HE WAS BORN HERE IN THE UNITED

9 STATES AND HIS LIVED IN THIS COMMUNITY SINCE 1997.

10     HE HAS ATTENDED LOCAL SCHOOLS, INCLUDING CARY HIGH

11 SCHOOL, AND WAS MOST RECENTLY ATTENDING N. C. STATE

12 UNIVERSITY.  AS WE POINTED OUT YESTERDAY, HE HAD ALMOST A

13 3.0 UNTIL HE RAN INTO A SERIES OF SKIRMISHES, AND AS A

14 RESULT HAS SOME MISDEMEANOR CONVICTIONS.

15     THERE IS ONE ERROR IN THE PRESENTENCE REPORT, YOUR

16 HONOR.  IT INDICATED THAT HE WAS FOUND GUILTY OF ASSAULT

17 ON A FEMALE, AND THAT IS A FELONY.

18         **THE COURT:**  IT'S A MISDEMEANOR.

19         **MR. BOYCE:**  THAT IS CORRECT.  THANK YOU, JUDGE.

20     ALSO, ONE OF THE FACTORS THAT THE COURT CAN CONSIDER

21 IS FAMILY AND COMMUNITY TIES.  WITH THE COURT'S

22 PERMISSION, I WOULD ASK THE FAMILY TO STAND.  THE FAMILY,

23 MR. HASSAN, THE MOTHER, THE TWO SISTERS AND HIS FIANCEE

24 ARE ALL HERE TODAY.

25     WITH THEM ARE A NUMBER OF SUPPORTERS.  MAY I ASK THE

1   COURT'S PERMISSION FOR THEM TO STAND?  THOSE HERE IN

2   SUPPORT OF OMAR HASSAN, WOULD YOU PLEASE STAND?  YOUR

3   HONOR, IF THE RECORD COULD REFLECT AT LEAST I WOULD SAY 30

4   OR 40 PEOPLE ARE IN THE COURTROOM TODAY IN SUPPORT OF OMAR

5   HASSAN.  PLEASE BE SEATED.

6       ADDITIONALLY, YOUR HONOR, WE HAVE A GENTLEMAN,

7   MR. HASSAN, WHO IS WILLING TO SERVE AS THIRD PARTY

8   CUSTODIAN.  I KNOW THE GOVERNMENT WENT AT GREAT LENGTHS TO

9   PRESENT EVIDENCE AS TO THE CRIMINAL HISTORY OF MR. HASSAN,

10   BUT THE BOTTOM LINE IS THOSE WERE ALL MISDEMEANORS.

11   DURING THE TIME OF THE ALLEGED OFFENSE HE WAS NOT ON

12   PROBATION OR PAROLE, AND TODAY HE IS NOT ON PROBATION OR

13   PAROLE.

14       HIS FATHER COULD ALLOW HIM TO WORK IF HE WERE NOT

15   ALLOWED BACK INTO STATE UNIVERSITY.  I THINK GIVEN THE --

16   EVERYTHING GOING ON OUTSIDE THIS COURTROOM RELATED TO THIS

17   CASE, THE STATE MIGHT BE RELUCTANT TO TAKE HIM BACK AS A

18   STUDENT, BUT CERTAINLY HE COULD WORK WITH HIS FATHER OR

19   JUST STAY AT HOME UNDER 24-HOUR HOUSE ARREST.

20       THE OTHER FACTORS TO CONSIDER, HIS PHYSICAL

21   CONDITION.  HE IS IN GOOD PHYSICAL HEALTH.  HIS MENTAL AND

22   EMOTIONAL HEALTH, THERE'S NO INDICATION OF ANYTHING WRONG

23   WITH HIM.

24       I ASKED MR. HASSAN THIS MORNING IF AS PART OF ANY

25   CONDITIONS OF RELEASE, IF UNDER OATH HE WOULD AGREE TO

1  PUBLICLY AFFIRM THAT HE DOES NOT ENDORSE VIOLENT JIHAD, HE

2  DOES NOT ENDORSE THE KILLING OF OTHER PEOPLE EXCEPT, FOR

3  INSTANCE, IN SELF-DEFENSE, BUT HE WOULD PUBLICLY REPUDIATE

4  ANY SUGGESTION THAT HE MAY SUPPORT SUCH VIOLENCE, THE

5  UNNECESSARY KILLING OF OTHER HUMAN BEINGS.

6       ALSO ON THE CRIMINAL HISTORY, THE COURT IS AWARE THAT

7  HE HAD THESE MISDEMEANOR CONVICTIONS.  I WOULD POINT OUT

8  THERE IS NO INDICATION DURING ANY PERIOD OF TIME ON ANY OF

9  THESE WHAT I WOULD SUGGEST ARE RELATIVELY MINOR SKIRMISHES

10  WITH THE LAW, DID HE EVER FAIL TO APPEAR FOR COURT.

11       ALSO, AGAIN, MR. KNUDSEN SUBMITTED AN AFFIDAVIT

12  REGARDING SOME OF THE BACKGROUND.  WE'RE NOT SAYING HE WAS

13  NOT FOUND GUILTY OF CERTAIN CRIMES.  AGAIN WHAT WE'RE

14  TRYING TO SHOW TO THE COURT WAS HIS MINOR OR MINIMAL ROLE

15  IN SOME OF THOSE SKIRMISHES.  I THINK THERE'S AMPLE

16  EVIDENCE OUT THERE OF THAT MINOR AND MINIMAL ROLE IN THAT.

17       YOUR HONOR, I DON'T BELIEVE THERE ARE ANY OTHER

18  PENDING CHARGES, ANY CASES OUT THERE THAT COULD BE A

19  PROBLEM WITH ANY WARRANT FOR ARREST OR ANYTHING LIKE THAT.

20  CERTAINLY THE PRETRIAL SERVICES REPORT DOES NOT INDICATE

21  THAT.

22       FOR ALL OF THOSE REASONS, I THINK MR. HASSAN IS IN A

23  UNIQUE SITUATION IN THIS PARTICULAR COURTROOM AND THERE

24  ARE CONDITIONS THAT COULD BE APPLIED TO HIM TO ASSURE BOTH

25  THE SAFETY OF THE COMMUNITY AND HIS APPEARANCE IN ALL

1 FUTURE PROCEEDINGS.  THANK YOU, YOUR HONOR.

2        **THE COURT:**  MR. BOYCE, BEFORE YOU SIT DOWN,

3 WOULD YOU NOT AGREE THAT THERE ARE TWO DIFFERENT

4 EVIDENTIARY STANDARDS THAT COME INTO PLAY?  I AM REQUIRED

5 TO MAKE A FINDING AS TO THE STRENGTH OF THE GOVERNMENT'S

6 EVIDENCE ON THE UNDERLYING CHARGES, BUT THEN IN A SEPARATE

7 FINDING I MAKE A DETERMINATION WHETHER BY CLEAR AND

8 CONVINCING EVIDENCE YOUR CLIENT CONSTITUTES A RISK OF

9 FLIGHT -- I MEAN DANGER TO THE COMMUNITY, AND BY A

10 PREPONDERANCE OF THE EVIDENCE THAT HE CONSTITUTES A FLIGHT

11 RISK.

12      THOSE ARE TWO DIFFERENT THINGS.  YOU WOULD AGREE

13 THAT'S THE WAY THE SCHEME IS SET OUT.

14        **MR. BOYCE:**  I DO AGREE WITH THAT, YOUR HONOR.

15        **THE COURT:**  YOU HAD MENTIONED EARLIER THAT YOUR

16 CLIENT WAS NOT ON PROBATION WHEN ANY OF THESE OCCURRED.

17 THE RECORD BEFORE ME SHOWS THAT ON MAY 18, 2009, HE PLED

18 GUILTY TO FALSE IMPRISONMENT, WAS PLACED ON 12-MONTHS

19 PROBATION AND THE INDICTMENT BY ITS TERMS SAYS THAT THIS

20 CONTINUED UP THROUGH JULY OF 2009.  IN FACT, THE EVIDENCE

21 THAT WAS PRESENTED YESTERDAY HAD A GREAT NUMBER OF THINGS

22 TAKING PLACE AFTER THE DATE OF HIS GUILTY PLEA.

23        **MR. BOYCE:**  YOUR HONOR, MY RECOLLECTION OF THE

24 EVIDENCE WAS THERE WAS A SINGLE ISOLATED TRIP IN 2007 THAT

25 RELATES SPECIFICALLY TO OMAR HASSAN, AND I BELIEVE THE

AGENT ALSO TESTIFIED THAT HE APPARENTLY WITHDREW FROM THE

CONSPIRACY AT THAT POINT FORWARD BECAUSE OF A RIFT OR SOME

DISPUTE THAT MAY HAVE OCCURRED AS A RESULT OF THAT TRIP.

**THE COURT:** MY UNDERSTANDING OF THE EVIDENCE WAS

THAT THERE WAS AN ESTRANGEMENT BUT NOT A WITHDRAWAL, BUT

THAT'S SOMETHING I WILL BE SURE TO LOOK AT AFTER YOU

FOCUSED ME ON THAT.

THE LAST THING IS, WITH REGARD TO THE CONVICTION OF

ASSAULT BY POINTING A GUN AND ASSAULT ON A FEMALE, WOULD I

BE UNFAIR TO CHARACTERIZE THOSE AS ASSAULTIVE OR VIOLENT

CONDUCT?

**MR. BOYCE:** I BELIEVE BY THE TITLE, NO. BUT

AGAIN, WHEN YOU LOOK BEHIND THE CURTAIN -- WHEN YOU LOOK

AND FIND OUT THE FACTS OF THE CASE, THEY ARE NOT NEARLY AS

SERIOUS AS THE ORIGINAL ALLEGATIONS WERE. AGAIN, I

BELIEVE THE BB GUN INCIDENT WAS WHEN HE WAS, I WANT TO

SAY, 16 YEARS OLD.

**THE COURT:** I UNDERSTAND HIS AGE AND I

UNDERSTAND THE FACTS OF THE CASE, BUT ISN'T THAT A

DETERMINATION FOR THE LEGISLATURE OF NORTH CAROLINA HOW

THEY CLASSIFY AN OFFENSE RATHER THAN A JUDGE IN FEDERAL

COURT DECIDING THAT, FOR INSTANCE, AFTER THE LEGISLATURE

DETERMINED THAT ASSAULT WAS NOT SUFFICIENT, THAT WOMEN

DESERVE A GREATER PROTECTION AND AN ACT OF THE STATUTE

MAKING ASSAULT ON A FEMALE A SEPARATE CRIME, THAT I SHOULD

1    NOT DISREGARD THAT?

2         **MR. BOYCE:**  NO DOUBT THAT THE LEGISLATURE HAS

3    THE POWER TO DECIDE HOW SERIOUS THEY ARE.  IT IS A

4    MISDEMEANOR.  THE FACTUAL BACKGROUND ON THIS PARTICULAR

5    ALLEGATION OF ASSAULT IS HIS FIANCEE DENIED THE

6    ALLEGATIONS.  THE EVIDENCE THAT CAME IN YESTERDAY WAS SHE

7    WAS COVERING UP SOME TYPE OF RED MARK, SO IT'S NOT LIKE HE

8    BRUTALLY ASSAULTED HER.  THERE WAS SOME ALLEGATION OF

9    ALTERCATION, SOME MINIMAL EVIDENCE OF A RED MARK ON HER

10   FACE, AND THAT'S IT.  PLUS, HE ENTERED THE DIVERSION

11   PROGRAM, COMPLETED IT SUCCESSFULLY, AND HE IS STILL WITH

12   THIS SAME WOMAN.

13        **THE COURT:**  ISN'T THE GREATEST EVIDENCE --

14   STRONGEST EVIDENCE THE FACT THAT HE PLED GUILTY?

15        **MR. BOYCE:**  THEY'RE THE ONES THAT PUT ON

16   EVIDENCE RELATING TO THE CONVICTION.  THEY PUT EVIDENCE AS

17   TO WHY HE WAS CONVICTED.

18        **THE COURT:**  I UNDERSTAND.

19        **MR. BOYCE:**  WE REBUTTED THAT.

20        **THE COURT:**  I UNDERSTAND, BUT THERE'S NO WAY I

21   CAN OBVIATE THE CONVICTION OR MAKE IT GO AWAY.

22        **MR. BOYCE:**  NO WAY YOU CAN OBVIATE THE

23   MISDEMEANOR CONVICTION, I AGREE WITH THE COURT ON THAT.

24        **THE COURT:**  THANK YOU.  MR. ZESZOTARSKI.

25        **MR. ZESZOTARSKI:**  YOUR HONOR, MAY I SPEAK WITH

1   MY CLIENT FOR ONE SECOND?

2   **THE COURT:** ABSOLUTELY.

3   (PAUSE IN THE PROCEEDINGS.)

4   **MR. ZESZOTARSKI:** THANK YOU, YOUR HONOR. YOUR

5   HONOR, ON BEHALF OF DYLAN BOYD, WE WOULD SUBMIT TO THE

6   COURT THAT THE EVIDENCE THROUGH THE GOVERNMENT'S OWN

7   EVIDENCE AND THROUGH WHAT'S PRESENTED IN THE REPORT, WOULD

8   REBUT THE PRESUMPTION IN THIS CASE.

9   DYLAN BOYD IS 22 YEARS OLD. HE HAS ABSOLUTELY NO

10  PRIOR CRIMINAL RECORD OTHER THAN A SPEEDING TICKET. YOUR

11  HONOR HEARD THAT HE WAS LIVING AT THE BOYD HOME WITH HIS

12  PARENTS AND WITH HIS PREGNANT WIFE AT THE TIME THAT HE WAS

13  ARRESTED IN THIS CASE AND CHARGED IN THIS CASE.

14  YOUR HONOR, IT'S INTERESTING IN THE REPORT IN DYLAN'S

15  CASE, WHEN WE LOOK AT THE FACTORS THE COURT HAS TO

16  CONSIDER UNDER THE STATUTE, PROBATION AGREES THAT DYLAN IS

17  NOT A RISK OF FLIGHT. THE EVIDENCE YOU HEARD FROM THE

18  GOVERNMENT, THROUGH AGENT SUTTON WAS THAT IN HIS OPINION

19  ALL OF THESE DEFENDANTS ARE RISKS OF FLIGHT BECAUSE OF

20  SOME SORT OF TIES OVERSEAS. WE HAD A BACK AND FORTH ABOUT

21  THAT ISSUE. AND, YOUR HONOR, THE EVIDENCE IS THAT DYLAN

22  WAS AT SOME POINT FRIENDS OR ACQUAINTANCES WITH THIS OTHER

23  PERSON WHO IS CHARGED, WHO APPARENTLY NOW IS IN PAKISTAN.

24  NO EVIDENCE OF ANY CONTACT, NO EVIDENCE OF WHEN THERE WAS

25  ANY CONTACT BETWEEN DYLAN AND THIS PERSON.

1    I WOULD SUBMIT, YOUR HONOR, AS IS SHOWN IN THE

2  PROBATION REPORT, THAT ALL THE EVIDENCE IN THIS CASE SHOWS

3  THAT DYLAN IS NOT A RISK OF FLIGHT.

4    WHEN WE LOOK AT THE REPORT AS TO THE OTHER FACTOR

5  WHICH IS DANGEROUSNESS, THERE'S ONE ISSUE LISTED IN THE

6  REPORT, WHICH IS THE OFFENSE CHARGED.  CERTAINLY A SERIOUS

7  OFFENSE THAT'S CHARGED IN THIS CASE, YOUR HONOR.  I ASK

8  THE COURT TO CONSIDER THE EVIDENCE THAT'S BEEN PRESENTED

9  AS TO HOW THAT TIES DYLAN TO WHAT IS ACTUALLY CHARGED IN

10  THE INDICTMENT.

11    COUNT ONE CHARGES AN AGREEMENT TO PROVIDE MATERIAL

12  SUPPORT TO TERRORISM.  COUNT TWO CHARGES AN AGREEMENT TO

13  COMMIT MURDER OVERSEAS.

14    THE EVIDENCE YOU HEARD CONSISTS OF A COUPLE DIFFERENT

15  CLASSIFICATIONS, THE FIRST OF WHICH WAS THESE RECORDINGS

16  AND THEY'RE IN EVIDENCE, YOUR HONOR.  EXHIBIT 27, WHAT

17  STRUCK ME ABOUT THESE IS WHEN YOU LISTEN TO THESE

18  RECORDINGS, PROBABLY 95 PERCENT OF THE WORDS ARE FROM

19  DYLAN'S FATHER.  EXHIBIT 27 IS DANIEL BOYD SPEAKING TO THE

20  GOVERNMENT WITNESS ABOUT SOME ISSUES.  LIKEWISE,

21  EXHIBIT 28.  EXHIBIT 31 IS DANIEL BOYD AND MR. SHERIFI.

22  EXHIBIT 32 IS THE ENTIRE BOYD FAMILY WHERE DANIEL BOYD IS

23  THE ONE SPEAKING.  FROM THE SUMMARY AND FROM WHAT I RECALL

24  HEARING THE TAPE IN COURT AS TO EXHIBIT 32, IT'S ALL

25  DANIEL BOYD SPEAKING.

1    LIKEWISE, EXHIBIT 33, YOUR HONOR, YOU WILL RECALL

2    THIS IS THE CONVERSATION THAT TOOK PLACE OUT AT CASWELL

3    COUNTY.  WHEN THE EXHIBIT WAS FIRST PRESENTED TO THE

4    COURT, DYLAN BOYD WAS LISTED AS SOMEBODY WHO WAS THERE.

5    AGENT SUTTON CORRECTLY CORRECTED THAT, AND HE NOTED THAT

6    DYLAN BOYD WAS NOT THERE.  IN FACT, DYLAN BOYD -- THE

7    EVIDENCE IN THIS CASE IS THAT DYLAN BOYD HAS NEVER BEEN TO

8    THE CASWELL COUNTY AREA FOR DEALING WITH THAT SHOOTING

9    RANGE UP THERE, OR WHATEVER IT WAS.

10    THE LAST TWO EXHIBITS, YOUR HONOR, ARE THE ONES THAT

11    TOUCH, TO THE ESSENCE OF WHAT WE'RE DEALING WITH HERE,

12    WHICH IS EXHIBIT 30 AND EXHIBIT 29.

13    EXHIBIT 30 IS THE CONVERSATION BETWEEN DANIEL BOYD,

14    DYLAN'S FATHER, AND MR. SUBASIC, WHERE WE HAD THIS

15    MENTIONED BY DANIEL BOYD ABOUT, "I HAVE TWO BOYS."  I

16    WOULD ASSUME THAT THE GOVERNMENT IN THIS CASE IS GOING TO

17    ARGUE THAT DANIEL BOYD IS TALKING ABOUT HIS SONS.  I THINK

18    IT'S VERY TELLING WHAT DANIEL BOYD SAYS THERE, YOUR HONOR,

19    IF YOU VIEW THE EVIDENCE FROM THE GOVERNMENT'S SIDE, WHICH

20    IS, "AND I NEED HELP TO MAKE A PLAN FOR THEM."  THIS, YOUR

21    HONOR, IS IN APRIL OF 2008.  "I NEED HELP TO MAKE A PLAN."

22    THAT STATEMENT, READ LITERALLY, MEANS THAT THERE IS NOT

23    YET A PLAN.

24    LIKEWISE, YOUR HONOR, EXHIBIT 29, WHICH IS THE

25    CONVERSATION THAT WAS RECORDED APPARENTLY, ACCORDING TO

THE EXHIBIT, AT BLACKSTONE MARKET IN GARNER IN MARCH OF
2008, DANIEL BOYD AND DYLAN BOYD.  AGAIN, THE VAST
MAJORITY OF IT IS DYLAN'S FATHER, DANIEL, SPEAKING.
AGAIN, WE GET INTO THIS CONVERSATION WHICH THE GOVERNMENT
IS GOING TO PORTRAY AS AN INCRIMINATING CONVERSATION.

WHEN WE ASKED AGENT SUTTON, WELL WHERE ARE THEY
TALKING ABOUT GOING, WHAT ARE THEY TALKING ABOUT DOING?
VERY TELLING, YOUR HONOR, THAT AGENT SUTTON'S RESPONSE IS,
"WE HAVE NO INFORMATION ABOUT ANYTHING SPECIFIC," WHICH
GETS REALLY TO, YOUR HONOR, WHAT I WOULD ASK THE COURT TO
FOCUS ON FROM DYLAN'S PERSPECTIVE, WHICH IS, WHAT IS THE
EVIDENCE THAT HE ENTERED EITHER OF THESE AGREEMENTS
CHARGED IN COUNT ONE OR COUNT TWO?

I'D SUBMIT, YOUR HONOR, THAT THE EVIDENCE BEFORE THE
COURT IS VERY TENUOUS TO LINK HIM TO EITHER OF THOSE
CONSPIRACIES.  WE HAVE NO STATEMENTS FROM HIM, FROM HIS
MOUTH.  WE HAVE NO EVIDENCE OF ANY SPECIFIC ACTION THAT
WAS GOING TO BE TAKEN IN ANY SPECIFIC PLACE THAT DYLAN
BOYD WAS SUPPOSED TO BE INVOLVED IN.

WE'VE HAD THIS EVIDENCE ABOUT THE SHOOTING RANGE IN
CASWELL COUNTY, AND THE EVIDENCE IS DYLAN BOYD DIDN'T TAKE
PART IN THAT.

IT WAS ALSO INTERESTING, YOUR HONOR, THE GOVERNMENT
BROUGHT OUT DYLAN'S STATEMENT AT THE TIME OF HIS ARREST,
AND THE GOVERNMENT POINTED OUT TO THE COURT THAT DYLAN

1  TOLD THE AGENTS THAT HE HAD COMPLETE FAITH AND TRUST IN

2  HIS FATHER, BUT I STRESS THE SECOND PART, YOUR HONOR, BUT

3  HE HAD A DISOBEDIENCE PROBLEM.  THAT'S INCONSISTENT, I

4  WOULD SUBMIT, WITH HIS BEING INCLUDED IN THE CONSPIRACY

5  CHARGED IN THE INDICTMENT.

6       LIKEWISE, YOUR HONOR, THE GOVERNMENT BROUGHT OUT THAT

7  DYLAN DESCRIBED JIHAD AS, "MUSLIMS HAVE TO BE READY IN

8  CASE THEY ARE ATTACKED."  AGAIN, A DEFENSIVE POSITION, ALL

9  OF WHICH, YOUR HONOR, IS INCONSISTENT WITH HIM BEING PART

10  OF THE CONSPIRACY CHARGED IN THE INDICTMENT.

11       YOUR HONOR, THE OTHER PORTION OF THE EVIDENCE THAT WE

12  SPENT A LOT OF TIME ON WAS THIS TRIP IN 2007, THAT MR.

13  BOYCE MENTIONED ALREADY.  WHAT WE KNOW FROM THE EVIDENCE

14  BEFORE YOU IS THAT DYLAN'S FATHER AND BROTHER WENT TO

15  ISRAEL, NOT DYLAN.  HE NEVER WENT TO ISRAEL.  CAME OUT

16  THROUGH AGENT SUTTON THAT DYLAN AT SOME LATER POINT FLEW

17  TO JORDAN.  THAT'S THE EVIDENCE BEFORE THE COURT.  HE

18  DIDN'T TRAVEL WITH HIS FATHER AND HE NEVER TRIED TO ENTER

19  ISRAEL.

20       AGAIN, WE HAVE NO SPECIFIC INFORMATION ABOUT WHAT

21  ROLE DYLAN WAS ALLEGED TO HAVE IN THE COURSE OF WHATEVER

22  WAS SUPPOSED TO HAPPEN OVER THERE ON THIS TRIP, ACCORDING

23  TO THE GOVERNMENT'S CASE.  YOU'VE HEARD EVIDENCE FROM SOME

24  OF THE OTHER DEFENDANTS ABOUT THEIR POSITION ABOUT WHAT

25  THAT TRIP WAS, AND IT CERTAINLY WASN'T ANYTHING RELATED TO

1  WHAT'S CHARGED IN THE INDICTMENT.  SO THERE'S CERTAINLY

2  SOME CONFLICTING EVIDENCE ON THAT.

3      YOUR HONOR, ALL OF THIS GOES, I WOULD SUBMIT, TO WE

4  HAVE VERY OBVIOUSLY IMPORTANT AND VOLATILE CHARGES IN THIS

5  CASE.  THIS IS AN ISSUE WHICH TOUCHES ALL OF US IN A VERY

6  SPECIAL WAY.  GIVEN THAT, YOUR HONOR, I WOULD ASK THE

7  COURT TO CONSIDER AS TO EACH INDIVIDUAL DEFENDANT, AND

8  ESPECIALLY IN THE CASE OF MY CLIENT, DYLAN, WHAT EXACTLY

9  TIES HIM TO THESE VERY, VERY SERIOUS CHARGES IN THE

10  INDICTMENT.

11      LASTLY, YOUR HONOR, I UNDERSTAND THE EVIDENCE

12  CERTAINLY ABOUT WHAT WAS AT THE HOUSE WHERE DYLAN WAS

13  LIVING WITH HIS PREGNANT WIFE, ALL OF THOSE FIREARMS.

14  THAT CERTAINLY IS UNDERSTANDABLE WHY THE GOVERNMENT

15  PRESENTS THAT TO THE COURT, CERTAINLY.  THE GOVERNMENT HAS

16  ALL OF THOSE FIREARMS.  THEY'RE GONE.

17      YOUR HONOR, IF DYLAN IS RELEASED IN THIS CASE, I

18  WOULD SUBMIT ANY ISSUE OF DANGEROUSNESS CAN BE ADDRESSED

19  BY ONE VERY SIMPLE AND VERY POWERFUL CONDITION, WHICH IS

20  HOUSE ARREST.  HE'S GOT A PREGNANT WIFE, HE NEEDS TO BE

21  WITH HIS PREGNANT WIFE.  HE'S 22 YEARS OLD.  HE HAS NO

22  PRIOR CRIMINAL RECORD.  I WOULD ASK THE COURT TO CONSIDER

23  RELEASING HIM ON HOUSE ARREST.  THANK YOU.

24      **THE COURT:**  THANK YOU.  MR. HILL.

25      **MR. HILL:**  YOUR HONOR, MY CLIENT IS 20 YEARS

OLD.  HE'S A U. S. CITIZEN.  HE'S BEEN IN NORTH CAROLINA

FOR THE LAST 14 YEARS.  HE'S BEEN OUT OF THE COUNTRY ONE

TIME, IN JUNE OF 2007, SINCE HE WAS TWO YEARS OLD WHEN HE

LIVED IN PAKISTAN AND CAME TO WASHINGTON, D. C. IN 1991

WHEN HE WAS TWO, SO HE'S BEEN OUT OF THE COUNTRY ONE TIME.

HE HAS NO CRIMINAL RECORD.

HE'S ALWAYS DONE WELL IN SCHOOL.  HE WAS IN THE

NATIONAL HONOR SOCIETY, DID WELL AT HIS HIGH SCHOOL.  HE

WENT TO UNC PEMBROKE, MADE GOOD GRADES FOR A YEAR AND HE

WITHDREW BECAUSE HE DIDN'T SMOKE, DRINK, AND DIDN'T LIKE

THE PARTY ATMOSPHERE THERE.  HE MADE A PERSONAL CHOICE TO

COME BACK HOME.

HE ALWAYS WORKED, YOUR HONOR.  SINCE 2004, AS THE

REPORT INDICATES, HE WORKED AT CVS PHARMACY, HE'S WORKED

AT CRACKER BARREL, HE'S WORKED AT RUBY TUESDAY, AND HE

WORKED WITH A FRAMER WITH HIS DAD'S COMPANY.  SO HE ALWAYS

WORKED AND ALWAYS LEAD A CLEAN LIFE.

THE GOVERNMENT HAS HIS PASSPORT.  HE ATTAINED EAGLE

SCOUT STATUS BEFORE 18, WHICH SPEAKS A LOT ABOUT HIS

DETERMINATION AND SETTING A GOAL AND PUBLISHING THAT GOAL.

THE AGENT TESTIFIED ON THE STAND THERE'S NO EVIDENCE

THAT HE EVER PURCHASED OR SOLD A WEAPON.  AT THE TIME OF

HIS ARREST THERE WAS NO WEAPON ON HIS PERSON.  HE

COOPERATED AT THE TIME OF HIS ARREST, AND THERE IS NO

SUBSTANCE ABUSE ISSUES.  HE DOESN'T SMOKE, DRINK, OR

1   OBVIOUSLY TAKE DRUGS.

2       YOUR HONOR, ON PAGE THREE OF THE PRETRIAL REPORT, I

3   WOULD DISAGREE WITH ONE ITEM.  IT SAYS, "ASSESSMENT OF

4   NON-APPEARANCE."  THERE'S TWO:  U. S. PASSPORT AND

5   FREQUENT TRAVELS ABROAD.  THE ONLY EVIDENCE I SEE IS HE'S

6   GONE ONE TIME SINCE HE WAS TWO YOURS OLD.  SO I CERTAINLY

7   WOULDN'T SAY FREQUENT.

8       **THE COURT:**  MR. HILL, I GENERALLY TAKE JUDICIAL

9   NOTICE OF THE FACTUAL INFORMATION IN THE PRETRIAL REPORT,

10  BUT STATEMENTS LIKE FREQUENT TRAVELS ABROAD AND THINGS ARE

11  MORE CONCLUSIONS THAT I MAKE AN INDEPENDENT JUDGMENT ON.

12  AND WITH REGARD TO MR. ZESZOTARSKI'S COMMENT, I WEIGH EACH

13  INDIVIDUAL SEPARATELY.  EVEN THOUGH THEY ARE LINKED IN THE

14  CONSPIRACY CHARGED, THEY ARE SEPARATE DETERMINATIONS.

15      WE HAVE TAKEN EVIDENCE COLLECTIVELY SIMPLY FOR

16  EXPEDIENT SAKE, FOR JUDICIAL ECONOMY.  THE DETERMINATIONS

17  AS TO EACH DEFENDANT ARE INDIVIDUAL DETERMINATIONS.

18      **MR. HILL:**  SO WITH REGARD TO THE ASSESSMENT OF

19  NON-APPEARANCE, YOUR HONOR, THE GOVERNMENT HAS HIS

20  PASSPORT AND I WOULD ALLEGE THERE'S NO FREQUENT TRAVELS

21  ABROAD, SO I SAY THERE'S NO PROBLEM WITH HIM BEING A

22  FLIGHT RISK.

23      WITH REGARD TO ASSESSMENT OF DANGER, USUALLY I GET

24  THESE REPORTS AND I HAVE NINE DIFFERENT ITEMS OR NUMEROUS

25  ITEMS.  I HAVE ONE INSTANT OFFENSE, JUST THE CHARGES

1  THEMSELVES. I KNOW THEY ARE SERIOUS AND I DON'T ECHO WHAT

2  JOE SAID, BUT BASICALLY I THINK ZAK AND DYLAN ARE PRETTY

3  MUCH IN THE SAME BOAT AS FAR AS THEIR INVOLVEMENT AND WHAT

4  JOE SAID ABOUT THE EVIDENCE. BUT I THINK THERE ARE

5  CONDITIONS WHERE MY CLIENT CAN BE RELEASED BASED ON HIS

6  AGE AND PAST HISTORY, AND WE WOULD ASK YOU TO IMPART A

7  COMBINATION OF CONDITIONS WHERE HE CAN BE RELEASED ON

8  ELECTRONIC HOUSE ARREST, TAKE HIS PASSPORT AND LET HIM GO

9  BACK HOME AND CONTINUE TO WORK AND HELP SUPPORT HIS

10 FAMILY. THANK YOU, YOUR HONOR.

11        **THE COURT:** THANK YOU, MR. HILL. MR. MCAFEE.

12        **MR. MCAFEE:** GOOD MORNING, YOUR HONOR. JUDGE,

13 PRELIMINARY MATTER, I WOULD CONTEND THAT MY CLIENT HAS

14 OVERCOME THE PRESUMPTION BY OFFERING A SUITABLE THIRD

15 PARTY CUSTODIAN, WHICH THE COURT FOUND YESTERDAY.

16        MR. SADIKU IS PREPARED TO TAKE HYSEN INTO HIS HOME.

17 HE'S A FAMILY MEMBER, A SECOND COUSIN AND A COUSIN TO MY

18 CLIENT'S MOTHER. HE IS SUITABLE SUPERVISION FOR HIM AND

19 HE IS PREPARED TO DO SO TODAY.

20        JUDGE, THAT LEAVES THE QUESTION ESSENTIALLY OF TWO

21 ELEMENTS THE COURT ALWAYS LOOKS AT. I HAVE DONE A NUMBER

22 OF THESE HEARINGS IN FRONT OF YOUR HONOR I KNOW WE CUT TO

23 THE CHASE PRETTY EARLY. RISK OF DANGER TO THE COMMUNITY

24 AND RISK OF FLIGHT.

25        I WOULD CONTEND TO YOU THE GOVERNMENT'S EVIDENCE

1    SHOWS THAT MY CLIENT IS NOT SUCH A DANGER TO THE COMMUNITY

2    NOR A RISK OF FLIGHT THAT THE COURT CANNOT FASHION SOME

3    SET OF CONDITIONS TO FASHION HIS RELEASE.

4        FIRST, YOUR HONOR, AS TO DANGEROUSNESS.  AS I WOULD

5    ASK THE COURT TO VIEW THE EVIDENCE, MR. SHERIFI'S

6    DANGEROUSNESS SEEMS INEXTRICABLY TIED TO WHETHER OR NOT

7    HE'S IN A CONVERSATION OR THE RECIPIENT OF OR THE SUBJECT

8    OF STATEMENTS BY DANIEL BOYD.  MY CLIENT'S NAME CAME UP

9    MORE IN CONVERSATIONS WITH MR. BOYD THAN IN ANY OTHER

10   CONTEXT.  HE WAS IDENTIFIED AS EITHER BEING PRESENT WHEN

11   MR. BOYD WAS SPEAKING OR WAS, IN ONE INSTANCE, SPEAKING TO

12   HIM AT THE BLACKSTONE MARKET, I UNDERSTAND.

13       IN MR. BOYD'S POST-ARREST STATEMENTS, HE ONLY TALKS

14   ABOUT -- MY CLIENT IS THE ONLY CO-DEFENDANT HE EVEN SPEAKS

15   ABOUT WHEN HE STATES THAT MR. SHERIFI SHOWS SOME ZEAL FOR

16   RADICAL ISLAM, BUT THEN WHEN I ASKED AGENT SUTTON HOW THAT

17   MANIFESTED ITSELF, WHETHER MR. BOYD DISCUSSED THAT, NO, WE

18   HAVE NO FURTHER EVIDENCE THAN THAT.  IT'S SIMPLY A BALD

19   STATEMENT OF WHAT SOME PERSON THINKS OR HAS AN OPINION OF

20   ANOTHER PERSON IN THIS MATTER.

21       WITH ONE EXCEPTION, JUDGE, THERE ARE NO STATEMENTS

22   ABOUT OR BY MY CLIENT CONCERNING THESE CHARGES OR WHICH

23   TOUCH UPON THE HEART OF THESE CHARGES WHICH, AS WE HEARD

24   AGAIN AND AGAIN, VIOLENT JIHAD.  THAT ONE EXCEPTION, YOUR

25   HONOR, CAME AFTER MY CLIENT'S RETURN FROM HIS TRIP TO

KOSOVO.  HE LEFT IN JULY OF 2008, AND RETURNED IN APRIL OF

2009.  WE HEAR -- IN THE INDICTMENT THERE'S NOTHING

ALLEGED EXCEPT THE TWO INCIDENTS IN CASWELL COUNTY.  WE

ONLY HEARD ABOUT ONE IN THIS DETENTION HEARING.  WE DIDN'T

HEAR ABOUT THE SECOND ALLEGATION OF GOING TO CASWELL

COUNTY, WHICH IS A JULY DATE.  SO I POINT THAT OUT TO YOUR

HONOR, WE ONLY HEARD ABOUT ONE INCIDENT.

     WHILE I'M TALKING ABOUT THAT, DURING THAT INCIDENT

THE AGENT WAS UNABLE TO SAY WHETHER MY CLIENT EVEN TOUCHED

A WEAPON.  HE IS ALLEGED IN THE INDICTMENT TO HAVE ENGAGED

IN MILITARY TACTICS AND THE USE OF WEAPONS, BUT THE AGENT

CAN'T SAY WHETHER MY CLIENT EVEN FIRED A WEAPON, MUCH LESS

TOUCHED A WEAPON, MUCH LESS ENGAGED IN MILITARY TACTICS.

THE ONLY MILITARY TACTICS WE HEARD ABOUT WERE, "DON'T

SHOOT IN TALL GRASS BECAUSE THE BLOW-BACK WILL GIVE AWAY

YOUR POSITION."  WHO SAID THAT STATEMENT?  MR. DANIEL

BOYD, NOT MY CLIENT.

     THERE'S NO INDICATION, JUDGE, THAT MY CLIENT, IN

DEALING WITH MR. BOYD, EITHER ACCEPTED OR MANIFESTED SOME

SORT OF APPROVAL OF MR. BOYD'S EXHORTATIONS, MR. BOYD'S

PREACHINGS, IF YOU WILL.  EVEN WHEN MR. BOYD IS SPEAKING

TO OTHERS AND, AS I UNDERSTAND IT, RECITING FROM THE

HADITHA AND IS GIVING HIS INTERPRETATION OF ONE OF THE

HADITHS, MY CLIENT, IN GOVERNMENT'S EXHIBIT 32, WASN'T

EVEN PRESENT DURING THAT TIME.

AT OTHER TIMES WHEN MR. BOYD IS SPEAKING, MY CLIENT
ASKS QUESTIONS BUT DOES NOT SAY SOMETHING LIKE, "WHAT A
GREAT IDEA." "YES, I BELIEVE IN THAT." "YES, LET'S DO
THAT." THERE'S NOTHING TO SHOW THAT MY CLIENT IS, BY HIS
OWN WORDS, A DANGER.

NOW, BACK TO ONE EXCEPTION. WHEN MY CLIENT RETURNED
FROM KOSOVO WE HEAR, AND IT'S NOT IN THE INDICTMENT BUT WE
HEARD FROM AGENT SUTTON, HE SUPPOSEDLY MADE A STATEMENT TO
THE WITNESS WHEN THE WITNESS SAID ESSENTIALLY, "WHERE HAVE
YOU BEEN FOR THE LAST EIGHT MONTHS?" MY CLIENT SAID, "I
WAS IN KOSOVO. I WAS TRYING TO GET BROTHERS INVOLVED AND
I WAS TRYING TO GO TO THE BEACH." "GO TO THE BEACH." WE
HEAR THAT THAT IS CODE FOR TRYING TO WAGE VIOLENT JIHAD.
NOW THAT IS NOT CORROBORATED ANYWHERE, EITHER IN THE
INDICTMENT OR ANY OTHER EVIDENCE PRESENTED HERE.

YOU HEARD THE AGENT TESTIFY THERE WERE CODE WORDS
USED ALL OVER THE PLACE. CARS, MEANING BROTHERS, MEANING
SOMETHING, BUT WE DON'T KNOW WHAT THE CONTEXT WAS.

MY CLIENT RETURNED TO THE UNITED STATES. SUPPOSEDLY
THE WITNESS SAID MY CLIENT RETURNED TO RAISE MONEY.
THAT'S WHAT THE INDICTMENT SAYS, MY CLIENT SUPPOSEDLY
RETURNED TO RAISE MONEY TO SUPPORT THE MUJAHIDEEN. AGAIN,
NO CORROBORATION, NO CONTEXT FOR THAT STATEMENT AS TO
WHETHER OR NOT MY CLIENT CARRIED ANY OF THAT OUT.

AS AN ASIDE, YOUR HONOR, THE CHARGES IN THIS CASE ARE

TWO CONSPIRACIES AND OF COURSE MY CLIENT HAS A 924(C)

COUNT, BUT THE CONSPIRACIES APPEAR TO BE SOMEWHAT THE

OPPOSITE OF THE REGULAR CONSPIRACIES WE SEE IN THIS COURT.

NORMALLY WE HAVE A GOOD DEAL OF EVIDENCE OF OVERT ACTS.

IN A DRUG CONSPIRACY YOU HAVE DRUG TRANSACTIONS.  IN

A STRAW PURCHASE OF A FIREARM, WE HAVE FALSE STATEMENTS ON

DOCUMENTS, AND WE HAVE VERY LITTLE EXPRESSION OF INTENT.

IT APPEARS IN THIS CASE WE HAVE A LOT OF EXPRESSION

OF INTENT BUT NOT VERY MUCH BY THE WAY OF ACTIONS, BY THE

WAY OF ACTUAL ACTIONS TO FURTHER WHATEVER THE AIMS OF

THESE CONSPIRACIES ARE, CERTAINLY NOT BY MR. SHERIFI.

AFTER MY CLIENT GATHERED, AS THE AGENT SAID, $15,000,

WE DON'T KNOW WHAT THE SOURCE IS OF THAT.  I ASKED THE

AGENT THAT SPECIFIC QUESTION.  WE DON'T KNOW WHERE THAT

MONEY CAME FROM.  MY CLIENT HAD A PLANE TICKET TO GO TO

KOSOVO JULY 30, A FEW DAYS AGO.

AS NOTED IN THE PRESENTENCE REPORT, YOUR HONOR, MY

CLIENT'S PARENTS WERE ALREADY IN KOSOVO.  I WILL LET THE

COURT KNOW TWO OF MY CLIENT'S SISTER AND HIS BROTHER WERE

ALSO IN KOSOVO; IT WAS A FAMILY VACATION.  MY CLIENT WAS

PLANNING TO GO TO KOSOVO IN JULY.  THERE'S NO INDICATION

OF WHETHER IT WAS A ROUND TRIP TICKET OR A ONE WAY TICKET.

NO OTHER INDICATION EXCEPT THAT MY CLIENT HAD GONE TO

KOSOVO THE YEAR BEFORE AND STAYED SEVEN MONTHS, WHEN HE

GOT MARRIED, AND HE WENT BACK IN 2008 THROUGH 2009.  HE

1    HAS A WIFE IN KOSOVO.  HE HAS AN EXPECTANT WIFE IN KOSOVO,

2    DUE IN OCTOBER.  WHY WOULD YOU NOT GO SEE HER?

3         THE GOVERNMENT HAS NOW SEIZED HIS PASSPORT.  THE ONLY

4    PASSPORT HE HAS IS A KOSOVO PASSPORT, YOUR HONOR, AND HE

5    HAS NO OTHER WAY TO LAWFULLY LEAVE THE COUNTRY.

6         WE HAVE A THIRD PARTY CUSTODIAN HERE.  AS TO THE RISK

7    OF FLIGHT, IF THE COURT WERE TO FASHION HOUSE ARREST WITH

8    ELECTRONIC MONITOR, AS MR. SUDIKU AGREED COULD BE DONE,

9    THE COURT COULD CONFINE MY CLIENT NOT ONLY TO THE EASTERN

10   DISTRICT BUT TO WAKE COUNTY OR TO THAT VERY HOUSE, IF THE

11   COURT SO CHOSE.  BUT IN ANY EVENT MY CLIENT, IF HE'S

12   RELEASED, WOULD BE TO SOME EXTENT PUNISHED BECAUSE HE'S

13   NOT GOING TO BE PRESENT AT THE BIRTH OF HIS CHILD.  IF HE

14   WERE DETAINED, HE WOULD BE PUNISHED BECAUSE HE WILL NOT BE

15   PRESENT FOR THE BIRTH OF HIS CHILD.  ALL I CAN TELL YOU IS

16   THAT IN MY CONVERSATIONS WITH HIM, OBVIOUSLY THAT'S A

17   GREAT PRESSING CONCERN OF HIS AND IS A QUITE OVERWHELMING

18   SITUATION THAT HE FINDS HIMSELF IN.

19        WE WOULD CONTEND, YOUR HONOR, WE OVERCAME THE

20   PRESUMPTION IN THIS CASE.  WHEN THE COURT LOOKS AT WHETHER

21   OR NOT THERE'S CLEAR AND CONVINCING EVIDENCE OF DANGER TO

22   THE COMMUNITY, THE GOVERNMENT HAS NOT REACHED THAT BURDEN.

23   WE WOULD CONTEND BY THE PREPONDERANCE OF THE EVIDENCE THE

24   COURT CANNOT FIND MY CLIENT'S A RISK OF FLIGHT BECAUSE THE

25   CONDITIONS THE COURT CAN FASHION WILL ADDRESS BOTH OF

1   THOSE FACTORS ADEQUATELY.  THANK YOU.

2         **THE COURT:**  MS. GODWIN.

3         **MS. GODWIN:**  THANK YOU, YOUR HONOR.  YOUR HONOR,

4   REGARDING MR. BOYD, ONE POINT I WOULD ECHO THAT MY

5   COLLEAGUES HAVE MADE ON BEHALF OF THEIR CLIENTS IS EVEN

6   TAKING THE EVIDENCE IN THE LIGHT MOST FAVORABLE TO THE

7   GOVERNMENT, THERE IS A LACK OF SPECIFICITY IN THIS ALLEGED

8   CONSPIRACY THAT WE DON'T OFTEN SEE.

9         REGARDING MR. BOYD, WE HEARD EVIDENCE AND SAW PHOTOS

10  OF HIM FROM 20 YEARS AGO WHEN HE WAS A MUCH YOUNGER MAN.

11  HE RESIDES NOW IN WILLOW SPRINGS.  HE HAS A FAMILY HERE

12  THAT ARE IN SUPPORT OF HIM.  OBVIOUSLY HIS TWO SONS ARE

13  ALSO CHARGED IN THIS CASE.  HE HAS A WIFE, ANOTHER SON IN

14  COURT HERE AS WELL.

15        HE'S RUN A CONSTRUCTION BUSINESS FOR SEVERAL YEARS,

16  AND PRIOR TO THAT HE WAS IN A PARTNERSHIP WITH ANOTHER

17  GROUP OF INDIVIDUALS THAT ARE ALSO IN THE CONSTRUCTION

18  BUSINESS.  THE PROBATION REPORT OR THE BAIL REPORT SPEAKS

19  TO RISK OF FLIGHT AND REFERENCES HIS TRAVEL HISTORY, AND

20  NOTHING ELSE.  THE GOVERNMENT -- WELL, LAW ENFORCEMENT

21  OFFICERS, IT IS OUR BELIEF, HAVE SEIZED HIS PASSPORTS WHEN

22  THEY SEARCHED THE HOME.  THAT'S WHERE THEY WERE; THEY ARE

23  NO LONGER THERE.  I BELIEVE THAT THE GOVERNMENT COULD

24  CONFIRM THAT BY DISCUSSING THAT WITH THE AGENTS THAT

25  SEARCHED THE HOME.  IN THIS DAY AND AGE, THE IDEA THAT

1   SOMEBODY COULD TRAVEL WITHOUT A PASSPORT I THINK IS NOT

2   REALLY A CREDIBLE CONCERN.

3        **THE COURT:** MS. GODWIN, DOES THAT MEAN YOU

4   BELIEVE IT IS EASIER TO ENTER THIS COUNTRY THAN EXIT IT,

5   BECAUSE EVERYDAY ALMOST THERE IS A CRIMINAL COMPLAINT

6   ISSUED OR AN INITIAL APPEARANCE FOR SOMEONE WHO IS

7   ILLEGALLY ENTERED THIS COUNTRY WITHOUT A PASSPORT.

8        **MS. GODWIN:** I UNDERSTAND THAT, YOUR HONOR.

9        **THE COURT:** SO SHOULD I TAKE IT THAT YOU BELIEVE

10   IT IS MORE DIFFICULT TO EXIT THIS COUNTRY THAN TO ENTER

11   IT?

12        **MS. GODWIN:** I BELIEVE THAT IF MR. BOYD,

13   PARTICULARLY IN LIGHT OF THE CHARGES AGAINST HIM, DID NOT

14   HAVE A PASSPORT, I DON'T BELIEVE HE COULD TRAVEL FREELY

15   THROUGHOUT THE COUNTRIES AS STATED IN THIS PRETRIAL REPORT

16   OR BAIL REPORT.

17     THE ASSESSMENT OF DANGER AGAIN IS THE OFFENSE

18   CHARGED, WHICH IS CONSPIRACY. MR. BOYD HAS NO CRIMINAL

19   HISTORY THAT IS SIGNIFICANT. HE HAS AN INTOXICATED AND

20   DISRUPTIVE CONVICTION FROM TEN YEARS AGO. HE'S NEVER BEEN

21   CONVICTED OF A CRIME OF VIOLENCE. THERE'S NEVER BEEN ANY

22   ALLEGATION THAT HE HAS PERPETRATED ANY CRIMES OF VIOLENCE

23   IN THIS COMMUNITY, AND I WOULD ASK THE COURT TO CONSIDER

24   WITHIN YOUR DISCRETION FASHIONING CONDITIONS OF RELEASE

25   THAT WOULD, IN THE COURT'S OPINION, INSURE HIS APPEARANCE

IN COURT.

        **THE COURT:**  THANK YOU.  WHO WILL ARGUE ON BEHALF OF THE GOVERNMENT?

        **MR. KELLHOFER:**  I WILL BE, SIR.

    SIR, I WILL BEGIN WITH WHERE WE LEFT OFF WITH DANIEL BOYD, IF THAT'S APPROPRIATE.

        **THE COURT:**  IT'S YOUR ARGUMENT, YOU CAN START WHEREVER YOU WANT.

        **MR. KELLHOFER:**  THANK YOU, SIR.  FIRST, I WOULD LIKE TO REITERATE, AS YOU STATED, THAT THIS IS A PRESUMPTION CASE, WHILE REBUTTABLE.  ADDITIONALLY, IT IS EXTREMELY IMPORTANT IN THIS CASE TO LOOK AT THE NATURE OF THE CRIME HERE.  WE DO HAVE A TERRORIST OFFENSE AND NOT ONLY A TERRORIST OFFENSE, BUT ONE THAT INCLUDES EXTREME VIOLENCE, THAT IS INTENT TO TRAVEL OVERSEAS IN ORDER TO MURDER INDIVIDUALS.

    THE WEIGHT OF THE EVIDENCE, WHILE OBVIOUSLY THIS IS NOT A TRIAL, THIS IS A DETENTION HEARING, IS A FACTOR TO CONSIDER.  I WOULD LIKE TO HIGHLIGHT SOME OF THE EVIDENCE THAT WAS PRESENTED WITH REGARD TO THE WEIGHT OF THE EVIDENCE AND SPECIFICALLY HERE WITH REGARD TO MR. DANIEL BOYD.

    FIRST OF ALL, WE HEARD A SPEECH BY MR. BOYD THAT WAS MADE ON THE 26TH OF JUNE OF 2009.  IN THAT HE STATED THAT IT WAS ABSOLUTELY NECESSARY TO, AS HE PUT IT, "PROTECT BY

ANY MEANS." HE GOES ON TO STATE, "THAT THAT PROTECTION IS
NECESSARY BECAUSE THERE ARE AMERICAN TROOPS WHO ARE IN
PLACES THEY SHOULD NOT BE," ACCORDING TO HIM, "OVERSEAS."
HE STATES THAT, "BY VIRTUE OF THOSE INDIVIDUALS BEING
THERE, IT IS INCUMBENT UPON," AS HE PUTS IT, "MUSLIMS TO
RID THOSE PLACES OF SUCH PEOPLE." HE GOES ON TO DEFINE
SUCH PEOPLE AS THE KUFFAR. KUFFAR BEING NON-MUSLIMS. HE
STATES THAT THIS IS THEIR "DEEN," WHICH AS YOU HEARD FROM
AGENT SUTTON, IS ESSENTIALLY THEIR PURPOSE.

HE STATES THAT OF THE INDIVIDUALS, OF THE MUSLIMS HE
IS SPEAKING ABOUT, THAT INCLUDES ONE ONE-THOUSANDTH OF ONE
PERCENT. HE HAS PUT HIMSELF AS AN EXTREMIST. HE IS
STATING, "WE ARE NOT OF THE GENERAL MUSLIM POPULATION, WE
ARE DIFFERENT." AND HERE'S WHY WE ARE DIFFERENT, BECAUSE
IT IS INCUMBENT UPON US, IT IS OBLIGATORY TO COMMIT
VIOLENT JIHAD. HE DOES NOT USE THE TERM VIOLENT JIHAD.
HOWEVER, THAT IS CLEAR FROM THE STATEMENTS HE IS MAKING BY
VIRTUE OF PLACING HIMSELF WITHIN THAT ONE ONE-THOUSANDTH
OF ONE PERCENT, BY STATING WITHIN THAT RECORDING THAT, "IT
IS NECESSARY TO MEET AT A SECRET LOCATION." THAT HE
COULDN'T ATTEND THE MASJIDS HERE IN RALEIGH AND PROCLAIM
WHAT HE WOULD LIKE TO, AND THAT THIS SHOULD INSTILL FURY
WITHIN HIMSELF AND ALL OF THE INDIVIDUALS THAT WERE
PRESENT THERE.

HE STATES SPECIFICALLY THAT, "IT IS OUR DEEN TO

COMMIT JIHAD."  HE STATES, "I LOVE JIHAD", AND THAT "THIS
IS NECESSARY TO PUNISH THE KUFFAR."

    IN JUNE OF 2007, HE TRAVELED OVERSEAS IN AN ATTEMPT
TO ENTER ISRAEL.  HE DID SO WITH HIS SONS ZAK, DYLAN --
ZAK BOYD AND DYLAN BOYD.  THE EVIDENCE HAS SHOWN THAT AT
THAT TIME HE INTENDED TO MEET UP WITH OMAR HASSAN AND
ZIYAD YAGHI.  WHEN QUESTIONED ABOUT WHETHER HIS INTENT WAS
TO MEET UP WITH THOSE TWO OTHER INDIVIDUALS, HE DENIES IT.
WHY WOULD YOU DENY A SIMPLE TOURIST TRAVEL TO ISRAEL?  THE
REASON HERE IS OBVIOUS.  HE HAD, AS AGENT SUTTON STATED, A
NEFARIOUS INTENT.

    **THE COURT:**  DID THE GOVERNMENT OFFER ANY
EVIDENCE AS TO THE INTENTIONS OF ANY OF THE BOYDS ON THEIR
TRIP TO ISRAEL?

    **MR. KELLHOFER:**  YOUR HONOR, WHAT WE HAVE
PRESENTED IS THAT IN REGARD TO THAT TRIP -- FIRST OF ALL,
YOU HAVE THE LIES BY DANIEL BOYD.

    **THE COURT:**  I UNDERSTAND THAT.  I'M ASKING THE
EVIDENCE OF THEIR INTENTION, WHAT WAS THAT, IF YOU COULD
DIRECT ME TO THAT?

    **MR. KELLHOFER:**  I WOULD TURN TO THE PHONE CALL
THAT WAS BROUGHT OUT BY AGENT SUTTON THAT DANIEL BOYD
STATED TO HIS WIFE THAT "DYLAN HAS BEEN PREPPED IF HE'S
QUESTIONED ABOUT THEIR TRAVELS."

    ADDITIONALLY, THERE'S ANOTHER PHONE CALL IN WHICH HE

STATES TO DYLAN THAT, "WE'RE OPERATING OUT OF A FLAT.
WE'RE STAGING OUT OF THERE."  WHEN YOU PUT THOSE IN
CONTEXT WITH THE FACT THAT HE LATER TELLS ANES SUBASIC
THAT HE WAS THERE "LOOKING FOR A WAY."  THEN WHEN YOU LINK
THAT WITH THE FACT THAT A WITNESS HAS TESTIFIED OR HAS
STATED TO THE FBI THAT LOOKING "FOR A WAY" THAT "FINDING A
WAY," MEANS ATTEMPTING TO ENGAGE IN VIOLENT JIHAD
OVERSEAS.

WHEN YOU PUT THOSE PIECES TOGETHER, IT DISPLAYS THAT
BOTH ZAKARIYA BOYD AND DYLAN BOYD WERE THERE FOR THE SAME
INTENDED PURPOSE AS THEIR FATHER.

ADDITIONALLY, DYLAN BOYD HAS BEEN COUNSELED BY HIS
FATHER, AS WAS DISPLAYED THROUGH THE AUDIO, ON HOW TO
CONDUCT HIMSELF WHEN TRAVELING OVERSEAS.  AS WE HEARD FROM
THAT, IT'S EXTREMELY SUSPICIOUS BEHAVIOR.  HE'S TOLD TO
"ACT LIKE A TOURIST."

YOU ADDITIONALLY HAVE DANIEL BOYD ENGAGING IN CODED
CONVERSATION WITH ANES SUBASIC ABOUT HOW TO GET -- I
BELIEVE HE STATES, "HOW TO GET TWO BOYS OVER THERE."  THE
CONVERSATION BETWEEN ANES SUBASIC AND DANIEL BOYD CLEARLY
IS AN INFERENCE TO INDIVIDUALS.

THEY ASK ABOUT THE HEART OF THESE VEHICLES.  DANIEL
BOYD HAS PROVEN HIMSELF, THROUGH THE EVIDENCE PRESENTED,
TO BE A DANGEROUS INDIVIDUAL.  I WOULD SUBMIT AN EXTREMELY
IMPORTANT FACTOR, HE HAS ENCOURAGED OTHERS THROUGH THESE

1 SPEECHES TO ENGAGE IN OVERSEAS TRAVEL, TO ENGAGE IN MURDER

2 OF OTHER INDIVIDUALS.  HE HAS TRAINED OR HAS TRAINING,

3 THROUGH HIS OWN WORDS, AT AL QAEDA CAMPS.  THAT TRAINING

4 INCLUDES WEAPONS, HAND-TO-HAND COMBAT.  HE, ACCORDING TO

5 HIMSELF, HAS FOUGHT IN AFGHANISTAN.

6   DURING THE SEARCH OF HIS HOME THERE WAS LITERATURE

7 LOCATED, SPECIFICALLY A FATWAH TO KILL AMERICANS ANYWHERE.

8 HE HAS DISPLAYED A WILLINGNESS TO ENGAGE IN DANGEROUS

9 CONDUCT, AS WE HEARD, IN ORDER TO FUND TRAVEL OVERSEAS TO

10 ENGAGE IN ROBBING BANKS, KNOCKING OVER WELLS FARGO TRUCKS

11 I BELIEVE.

12   IS THERE ANY BELIEF THAT HE WOULD OR COULD DO SUCH A

13 THING?  HE ADDITIONALLY STATED THAT HE HAS CONDUCTED -- HE

14 HAS ROBBED BANKS IN THE PAST, AT LEAST ACCORDING TO HIM,

15 IN PAKISTAN.  ACCORDING TO THE TESTIMONY WE HEARD, HE SOLD

16 A FIREARM TO A KNOWN FELON, AND HE'S UTILIZED HIS

17 FAMILIARITY WITH WEAPONS AND WEAPONS TRAINING TO TRAIN

18 OTHERS, AND HE'S ENGAGED IN THAT RECENTLY, AS WE HEARD IN

19 JUNE OF THIS YEAR.

20   SOME OF THE SPECIFIC STATEMENTS THAT WERE MADE BY

21 DANIEL BOYD INCLUDE A STATEMENT TO SHERIFI THAT, "WE HAVE

22 A MISSION AND IT'S GOING TO HURT SOME PEOPLE."  THAT HE

23 OFTEN THINKS ABOUT HOW TO TAKE AMERICA AND THAT WHEN HE'S

24 DRIVING ON ROADS, HE CAN'T HELP BUT THINK ABOUT HOW TO

25 TAKE THAT ROAD, CLEAR INDICATION OF HIS MILITARY THOUGHT

PROCESS. HE INFORMS SHERIFI THAT, IF IMMIGRATION OFFICE

IS GOING TO CONTINUE TO CAUSE HIM PROBLEMS WITH REGARD TO

HIS STATUS, THEN JIHAD MAY BE NECESSARY HERE. CLEARLY

THESE ARE INFERENCES AND STATEMENTS TOWARDS VIOLENT JIHAD.

HE INFORMS A WITNESS THAT HE HAS A MINI 14 IN HIS STORE IF

THE FBI SHOW UP.

AT ONE POINT WHILE OBSERVING SOME MILITARY

INDIVIDUALS HERE IN RALEIGH GETTING INTO A HUMVEE, HE

STATES, "WE SHOULD TAKE THEM OUT. THEY'RE OVERSEAS

FIGHTING OUR BROTHERS." HE INFORMS HIS SON, ZAKARIYA

BOYD, "IF I DON'T LEAVE SOON, THEN JIHAD WILL BE HERE IN

THE UNITED STATES."

ALONG WITH ANOTHER WITNESS AND HIS SON ZAK AND DYLAN

PRESENT, HE SEES A HELICOPTER FLY OVERHEAD THAT APPEARS TO

BE LAW ENFORCEMENT RELATED. HE PULLS OUT AN ASSAULT RIFLE

FROM HIS TRUCK, STATES THAT HE HAS 150 ARMOR PIERCING

ROUNDS. ZAK NOTES, "WE HAVE MORE AS WELL." HE ALWAYS

CARRIES A SIDE ARM.

I BELIEVE IT WAS MENTIONED THAT THESE WEAPONS HAVE

BEEN OBTAINED AT PRESENT AND THEY'RE NOT A THREAT. THIS

IS AN INDIVIDUAL WHO HAS MULTIPLE WEAPONS LOCATED IN

MULTIPLE LOCATIONS AND WAS, ACCORDING TO THE TESTIMONY OF

AGENT SUTTON, DIGGING A HOLE IN ORDER TO HIDE MORE

WEAPONS.

HE ADDITIONALLY IS A FLIGHT RISK. I UNDERSTAND THE

FACT THAT HIS PASSPORT HAS LIKELY BEEN TAKEN, ALTHOUGH IT

WASN'T CONFIRMED BY AGENT SUTTON, BUT WAS AS HE SUSPECTED.

THIS IS AN INDIVIDUAL WITH CONTACTS, WITH CONTACTS

OVERSEAS, AND WITH A STRONG DESIRE TO TRAVEL OVERSEAS.

AS TO MR. DANIEL BOYD, THERE'S A REBUTTABLE

PRESUMPTION, ALTHOUGH THAT PRESUMPTION IS IN FAVOR OF

DETENTION.  THIS IS AN EXTREMELY SERIOUS CRIME.  THE

WEIGHT OF THE EVIDENCE, PARTICULARLY INSOFAR AS IT

DISPLAYS THE LIKELIHOOD THAT HE WILL POSE A THREAT AND

THAT THREAT AND THAT DANGEROUSNESS ALL WEIGH HEAVILY IN

FAVOR OF DETENTION.

SIR, I'LL TURN TO MR. HYSEN SHERIFI AND HIGHLIGHT

SOME SPECIFICS.  AGAIN, OBVIOUSLY THE PRESUMPTION AND THE

NATURE OF THE CRIME APPLY.  SPECIFICALLY HERE, HE WAS TOLD

BY DANIEL BOYD THAT THE JUNE, 2007 TRAVEL WAS, AS I

EARLIER STATED, FOR JIHAD.  IN THAT CONVERSATION, HE

COUNSELS SHERIFI ABOUT BEING CAREFUL ON HIS OWN TRAVEL.

COUNSEL FOR MR. SHERIFI STATED THAT WHILE DANIEL BOYD

STATED THAT HYSEN SHERIFI HAS DISPLAYED TENDENCIES OF

RADICAL ISLAM, DANIEL BOYD DID NOT GO ON TO DEFINE THOSE

TENDENCIES.  HOWEVER, AGENT SUTTON DID.

HYSEN SHERIFI STATED TO AN INDIVIDUAL THAT HE WAS

ATTEMPTING TO GET TO THE BEACH.  THE BEACH, AS WE HEARD,

WAS CODE FOR ATTEMPTING TO ENGAGE IN VIOLENT JIHAD

OVERSEAS AND GET TO A LOCATION, NOT ACCORDING TO AGENT

1  SUTTON BUT ACCORDING TO THE WITNESS WHO INFORMED THE FBI

2  THAT THAT IS WHAT IT MEANT.

3       **THE COURT:**  COUNSEL, WOULD IT HAVE BEEN A LOT

4  MORE PERSUASIVE TO HAVE THE WITNESS DESCRIBE IN SOME

5  GENERAL WAY, SOME GENERIC WAY THAT WOULD ALLOW ME TO

6  CONCLUDE THAT HE KNEW WHAT JIHAD IS, HE KNEW -- HOW HE

7  KNEW THIS WAS CODE, ANYTHING?  ALL I KNOW IS THERE'S A

8  WITNESS OR WITNESSES AND THAT AT SOME POINT THAT WITNESS

9  OR A WITNESS SAID, YOU KNOW, BECAUSE HE WAS AFRICAN

10  AMERICAN SANFORD MAY NOT BE THE PLACE HE WANTED TO GO OR

11  THAT THEY SHOULD GO.  WHY IS IT YOU BELIEVE I SHOULD

12  CREDIT THIS UNNAMED, UNIDENTIFIED, UNCHARACTERIZED PERSON

13  AS BEING CREDIBLE?

14       **MR. KELLHOFER:**  I WOULD ASSERT THAT THERE'S NO

15  REASON TO BELIEVE THAT THIS INDIVIDUAL IS NOT CREDIBLE AND

16  THAT THE ADDITIONAL EVIDENCE CORROBORATES WHAT THAT

17  INDIVIDUAL HAS --

18       **THE COURT:**  -- IT MAY WELL AS TO OTHER ASPECTS,

19  BUT WE'RE TALKING NOW ABOUT CODE.  YOU ARE ASKING ME TO

20  CREDIT "BEACH" AS BEING THE FUNCTIONAL EQUIVALENT OF JIHAD

21  OR VIOLENT JIHAD BASED ON THE TESTIMONY OF A WITNESS ABOUT

22  WHOM I KNOW NOTHING, AND THAT YOU SAY BECAUSE THERE'S NO

23  REASON TO DISBELIEVE HIM OR TO FIND HIM NOT CREDIBLE I

24  MUST, ALMOST, FIND HIM CREDIBLE.  I'M ASKING YOU WHY.

25       **MR. KELLHOFER:**  WELL, SIR, I THINK THE

1    ADDITIONAL INFORMATION FROM THAT WITNESS AS WELL, HYSEN

2    SHERIFI HAD INFORMED HIM THAT HE RETURNED TO THE UNITED

3    STATES IN ORDER TO OBTAIN MONEY SO THAT HE COULD GO BACK

4    AND ENGAGE IN JIHAD.  IN ADDITION TO THAT, HYSEN SHERIFI

5    CAME INTO $15,000 JUST DAYS BEFORE RETURNING OR SCHEDULED

6    RETURN TO KOSOVO.

7        ADDITIONALLY, AND I UNDERSTAND THAT THIS IS

8    ADDITIONAL CORROBORATION, BUT THE CONVERSATION BETWEEN

9    HYSEN SHERIFI AND DANIEL BOYD IN WHICH DANIEL BOYD STATES

10   THAT PART OF THE REASON TO BE CAREFUL IS BECAUSE

11   ANOTHER -- I SHOULDN'T SAY ANOTHER, THAT'S NOT ACCURATE, A

12   MUJAHIDEEN, MEANING A FIGHTER IN THE NAME OF JIHAD, WAS

13   CAPTURED ATTEMPTING TO ENTER INTO IRAQ AND WAS, I BELIEVE

14   ACCORDING TO DANIEL BOYD, TORTURED IN SYRIA.  NOW, THAT'S

15   IN CONTEXT OF THE CONVERSATION OF TELLING HYSEN SHERIFI,

16   "BE CAREFUL IN YOUR TRAVEL."

17       ADDITIONALLY, COUNSEL HAS STATED THAT THIS IS ONLY IN

18   CONTEXT OF MY CLIENT HYSEN SHERIFI ASKING QUESTIONS.  WHAT

19   WAS THE QUESTION ASKED?  THE QUESTION WAS, "IF I CAN ONLY

20   DO AS THE BROTHERS IN NEW JERSEY DID, WILL I DIE SHAHEED,"

21   WILL I BE A MARTYR.  ACCORDING TO AGENT SUTTON, THAT

22   REFERENCE TO THE BROTHERS IN NEW JERSEY LIKELY REFERENCED

23   THE FORT DIX PLOT IN WHICH THEY WERE ATTEMPTING TO BLOW

24   UP, PLANT BOMBS AT FORT DIX TO KILL INDIVIDUALS.  THAT'S

25   THE QUESTION THAT'S ASKED, "IF I CAN ONLY DO AS THE

1　BROTHERS DID IN NEW JERSEY, WOULD I DIE SHAHEED?"  SO I

2　THINK THE QUESTION ITSELF IS RATHER TELLING AND THE

3　ANSWER, OF COURSE, FROM MR. DANIEL BOYD, IS, "IF THAT'S

4　THE BEST YOU CAN DO, THEN YES."

5　　　ADDITIONALLY, THOSE STATEMENTS THAT WERE MADE BY

6　DANIEL BOYD TO SHERIFI ABOUT THE MISSION IS GOING TO HURT

7　SOME PEOPLE, ABOUT THE FACT THAT IF YOU HAVE IMMIGRATION

8　ISSUES THEN JIHAD WOULD BE APPROPRIATE HERE, AND THE FACT

9　THAT HE DID TRAVEL TO CASWELL COUNTY WHERE AS WE HEARD,

10　DANIEL BOYD WAS GIVING INSTRUCTION ON SOME MILITARY

11　TACTICS AND THERE WAS FIRING ENGAGED AT THAT TIME.

12　　　AS WE HEARD AS WELL, MR. SHERIFI HAS FAMILY OVERSEAS

13　AND HAD PLANNED TO TRAVEL, AND WE WOULD SUBMIT THEREFORE

14　DOES POSE A FLIGHT RISK.

15　　　TURNING TO MR. DYLAN BOYD.  AGAIN, THE PRESUMPTION

16　AND THE NATURE OF THE CRIME APPLY.  WITH REGARD TO THE

17　WEIGHT OF THE EVIDENCE, I BELIEVE A PORTION OF THIS I'VE

18　ANSWERED IN RESPONSE TO YOUR QUESTION, SIR.

19　　　IN JUNE OF 2007, THERE WAS TRAVEL IN WHICH, ACCORDING

20　TO DYLAN'S FATHER, THEY HAD A LOCATION TO STAGE OUT OF.

21　DYLAN HAD BEEN PREPPED ON WHAT TO SAY WHEN QUESTIONED BY

22　AUTHORITIES ON HIS RETURN.  THAT DANIEL BOYD LATER TOLD

23　ANOTHER INDIVIDUAL THAT THIS WAS TO "FIND A WAY."  THAT

24　"FINDING A WAY" HAS BEEN DEFINED AS LOCATING A PLACE TO

25　ENGAGE IN VIOLENT JIHAD.  THAT HE RECEIVED ADVICE FROM

1    DANIEL BOYD ABOUT FINDING A WAY, ABOUT WHERE TO LAUNCH OUT

2    OF, HOW TO ACT LIKE A TOURIST.  THAT HE'S QUESTIONED ABOUT

3    HIS FATHER, "WHAT HAVE YOU DONE?"  AND THAT HIS FATHER

4    THEN STATES HE HIMSELF HAS GATHERED 11,000 IN THE EFFORT

5    AND THEN LATER, POST-ARREST, THERE'S A RECEIPT THAT

6    DISPLAYED A DEPOSIT TO DYLAN BOYD'S ACCOUNT OF $16,000.

7         THERE'S TESTIMONY THAT DYLAN ENGAGED IN THE SALE OF A

8    FIREARM TO A KNOWN FELON.  WHILE HE WASN'T PRESENT FOR THE

9    TRAINING WE HEARD ABOUT IN JUNE IN CASWELL COUNTY, ON THE

10   DAY HE WAS ARRESTED HE WAS TRAVELING TO DO SO.  ON THE DAY

11   HE WAS ARRESTED HE WAS NON-COMPLIANT.

12        THERE WAS TESTIMONY THAT HE SEIZED WEAPONS, FIREARMS

13   AS TOOLS.  HE'S TOLD BY HIS FATHER TO RETRIEVE THE TOOLS.

14   HE AND ZAK GO TO THE HOUSE AND RETURN WITH FIREARMS.

15   ACCORDING TO HIS FATHER, HE'S A TRAINED SNIPER.

16        PRESENT ON THE DAY OF THE INCIDENT THAT I DESCRIBED

17   WITH THE HELICOPTER AND PULLING OUT AN ASSAULT RIFLE AND

18   150 ROUNDS OF ARMOR PIERCING ROUNDS.  PERHAPS ALMOST

19   WHAT'S MOST TELLING IS WHILE COUNSEL HAS STATED -- WITH

20   REGARD TO DYLAN, IT SEEMS 90 PERCENT OF THE WORDS ARE FROM

21   HIS FATHER, THE FACT OF THE MATTER IS, AS WAS HEARD FROM

22   THE TESTIMONY, DYLAN STATED AFTER HIS ARREST AND WHEN

23   QUESTIONED THAT HE HAS COMPLETE TRUST IN ANYTHING HIS

24   FATHER SAYS.

25             **THE COURT:**  I'M SORRY, COUNSEL, WAS THAT -- IF I

1    GO THROUGH THE TRANSCRIPT WILL I FIND THAT HE SAYS HE HAS

2    COMPLETE TRUST IN ANYTHING HIS FATHER SAYS, OR COMPLETE

3    TRUST IN HIS FATHER?

4        **MR. KELLHOFER:**  I BELIEVE -- IT IS MY

5    RECOLLECTION AND I HAVE WRITTEN, YOUR HONOR, THAT IT WILL

6    BE COMPLETE TRUST IN ANYTHING --

7        **THE COURT:**  IT MAY BE, I'M JUST ASKING.

8        **MR. KELLHOFER:**  I BELIEVE THE STATEMENT WILL

9    ACTUALLY BE THAT HE HAS COMPLETE TRUST AND CONFIDENCE IN

10   HIS FATHER ABOUT EVERYTHING AND ANYTHING.

11       **THE COURT:**  YEAH, I DIDN'T REMEMBER THE "SAYS"

12   PART IN THERE.

13       **MR. KELLHOFER:**  I THINK YOU ARE CORRECT ON THAT.

14       **THE COURT:**  OKAY.

15       **MR. KELLHOFER:**  I WILL ASSERT THAT WITH REGARD

16   TO EVERYTHING AND ANYTHING, THAT IT WOULD BE THE

17   STATEMENTS MADE BY HIS FATHER AND THAT SPECIFICALLY WHEN

18   ASKED ABOUT WHAT HIS DEFINITION OF JIHAD IS, IT IS

19   FIGHTING FOR THE SAKE OF GOD.  IN THAT CONTEXT HE STATES,

20   THERE ARE AMERICANS -- THE AMERICAN ARMY IS RAPING AND

21   KILLING MUSLIMS, AND THEREFORE IT'S APPROPRIATE.

22       HE STATES THAT DEEN, HIS DEFINITION OF DEEN, IS

23   SOMETHING YOU DO EVEN IF YOU DON'T UNDERSTAND, AND YOU

24   FOLLOW IT 100 PERCENT.

25       SO WHILE PERHAPS, AND I'M NOT CONCEDING, BUT PERHAPS

1 EVEN IF 90 PERCENT OF THE WORDS WITH REGARD TO DYLAN BOYD,

2 AS DISPLAYED THROUGH THE TESTIMONY OF AGENT SUTTON, WERE

3 IN FACT FROM HIS FATHER, I THINK IT MOST IMPORTANT TO

4 IMPUTE THOSE UPON DYLAN BOYD, GIVEN HIS OWN CONCESSION

5 THAT HE HAS COMPLETE TRUST IN ANYTHING AND EVERYTHING FROM

6 HIS FATHER.

7     ADDITIONALLY, DYLAN HAS TRAVELED OVERSEAS AND DOES

8 KNOW INDIVIDUALS OVER THERE.  IN THAT REGARD, WE BELIEVE

9 HE IS ALSO A FLIGHT RISK.

10     I WOULD ALSO NOTE THAT, AND I FAILED TO NOTE THIS FOR

11 DANIEL BOYD AS WELL, THAT NO THIRD PARTY CUSTODIAN WAS

12 PRESENTED AND ESSENTIALLY THE REQUEST IS THAT THEY BE

13 RELEASED ON THEIR OWN RECOGNIZANCE, WHICH WE WOULD ASSERT

14 IS INAPPROPRIATE.

15     WITH REGARD TO ZAKARIYA BOYD.  AGAIN, MOST OF THESE

16 MATTERS ARE OVERLAPPING.  THE PRESUMPTION, THE NATURE, AND

17 MUCH OF THE WEIGHT HERE OF THE EVIDENCE IS WITH REGARD TO

18 THE JUNE, 2007, TRIP THAT I HAVE JUST DESCRIBED BOTH FOR

19 DANIEL BOYD AND DYLAN BOYD.  THIS TRIP ZAKARIYA BOYD WAS

20 PRESENT FOR.

21     ADDITIONALLY, WITH REGARD TO ZAKARIYA BOYD

22 SPECIFICALLY, HE WAS PRESENT FOR THE JUNE, 2009, TRAINING

23 OF FIREARMS AND MILITARY TACTICS IN CASWELL COUNTY.

24     **THE COURT:**  EXCUSE ME.  MA'AM, WOULD YOU SIT

25 DOWN, PLEASE?

1      **MR. KELLHOFER:**  WITH REGARD TO ZAKARIYA BOYD,

2  HIS STATEMENTS BY DANIEL BOYD THAT HIS SON IS A TRAINED

3  SNIPER ALSO APPLY.  HE ALSO SEIZED FIREARMS AS TOOLS.

4      HE AGAIN WAS PRESENT DURING THE HELICOPTER INCIDENT I

5  DESCRIBED.  IT WAS TO ZAKARIYA BOYD THAT HIS FATHER

6  STATED, "IF I DON'T LEAVE THEN JIHAD WILL BE HERE IN THE

7  UNITED STATES."

8      IT WAS ZAKARIYA BOYD DURING THAT HELICOPTER INCIDENT

9  WHO ALSO STATED, WHEN HIS FATHER PULLED OUT THE ASSAULT

10  RIFLE WITH THE HOLOGRAPHIC SCOPE AND STATES "WE HAVE 150

11  ARMOR PIERCING ROUNDS," IT'S ZAKARIYA WHO STATES, "YEAH,

12  WE HAVE MORE AS WELL."

13      DURING HIS QUESTIONING HE INFORMED THE FBI THAT HE

14  HAD PLANNED TRAVEL, AND THAT HE WAS LOOKING TO -- HIS

15  STATED PURPOSE WAS TO LOOK FOR A HOME FOR THE FAMILY

16  OVERSEAS.  HE ADDITIONALLY HAS TRAVELED, ACCORDING TO HIS

17  STATEMENT, HAS FRIENDS THERE AS WELL.

18      LASTLY, NO THIRD PARTY CUSTODIAN HAS BEEN PROFFERED

19  FOR ZAKARIYA BOYD.  IT APPEARS HE THEN HAS TO BE RELEASED

20  ON HIS OWN RECOGNIZANCE.

21      YOUR HONOR, I WOULD ASK FOR PERMISSION FOR MY

22  CO-COUNSEL TO PRESENT OR HIGHLIGHT TO YOU THE ISSUES WITH

23  REGARD TO MR. OMAR HASSAN AND ZIYAD YAGHI.

24      **THE COURT:**  THAT WILL BE FINE.

25      **MR. COWLEY:**  THANK YOU, YOUR HONOR.  I WILL

BEGIN WITH MR. HASSAN.

FIRST OF ALL WITH REGARDS TO THE EVIDENCE OR THE CHARGES AGAINST MR. HASSAN, I THINK IT IS IMPORTANT TO GO OVER SOME DETAILS REGARDING THIS JUNE, 2000, TRIP AND THE ATTEMPTED ENTRANCE INTO ISRAEL.

FIRST, WE HAVE TESTIMONY FROM AGENT SUTTON THAT MR. HASSAN HIMSELF INFORMS WITNESSES THAT HIS PURPOSE IN GOING OVER THERE IS TO COMMIT JIHAD.  THIS PURPOSE IS ALSO EVIDENCE FROM SOME OF THE ARGUMENT YOU'VE HEARD FROM MY CO-COUNSEL, THAT WHEN BOYD IS DISCUSSING THIS TRIP WITH CO-DEFENDANTS MR. SHERIFI AND MR. SUBASIC, HE REFERENCES THE FACT THAT THIS TRIP IS TO "FIND A WAY," AND IN DOING SO MR. SHERIFI, HE SAYS THIS IN CONTEXT OF REFERENCING OF A MEMBER OF THE MUJAHIDEEN WHO IS CAPTURED TRYING TO ENTER IRAQ AND ALLEGEDLY TORTURED BY THE FOREIGN GOVERNMENT.

ADDITIONALLY, YOU HAVE DEFENDANT DANIEL BOYD'S ORIGINAL ADMISSION AFTER ORIGINALLY DENYING IT, THAT THE INTENTION WAS TO MEET UP WITH MR. YAGHI AND MR. HASSAN DURING THIS TRIP.  THIS IS EVIDENCED, YOUR HONOR, BY THE FACT THAT MR. HASSAN SENDS AN E-MAIL TO DANIEL BOYD FROM JORDAN IN AN ATTEMPT TO MEET UP DURING THIS TRIP.

I THINK IT'S ALSO HIGHLY RELEVANT TO THE CHARGES THAT IT IS DANIEL BOYD THAT ACTUALLY PURCHASED THE TICKET FOR THAT TRIP FOR MR. HASSAN, AND THAT THE MULTIPLE DISCUSSIONS INVOLVING THE PLANNING OF THIS TRIP AND THE

1    EVENTUAL PURCHASE OF THESE TICKETS BY DANIEL BOYD TOOK

2    PLACE IN APRIL.  ALSO, TO CLEAR UP, YOUR HONOR, AN ISSUE

3    THAT WAS RAISED DURING MR. BOYCE'S ARGUMENT, THERE HAS

4    BEEN NO TESTIMONY OR EVIDENCE THAT MR. HASSAN WITHDREW

5    FROM THIS CONSPIRACY.

6        IN THE REVIEW OF THE TESTIMONY THAT WAS --

7        **THE COURT:**  MR. COWLEY, THE CASE LAW IN THIS

8    CIRCUIT IS FAIRLY CLEAR AS TO WHAT'S REQUIRED TO WITHDRAW

9    FROM THE CONSPIRACY.  I THINK MR. BOYCE WAS TALKING MORE

10   ABOUT THE ESTRANGEMENT, WHICH IS HOW HE CHARACTERIZED IT.

11       **MR. COWLEY:**  AND WE REFERENCE THAT ESTRANGEMENT

12   WAS DUE TO STATEMENTS WITHIN THE COMMUNITY THAT THEY WERE

13   FEARING THAT MR. HASSAN AND MR. YAGHI, THEIR INTENTION WAS

14   TO TRAVEL ABROAD TO COMMIT JIHAD.

15       NOW IN ADDITION TO THE EVIDENCE RELATING TO THE

16   CHARGES, YOUR HONOR, AS YOU POINTED OUT DURING MR. BOYCE'S

17   ARGUMENT, THAT'S ONE INQUIRY YOU HAVE TO MAKE.  AN

18   ADDITIONAL INQUIRY IS LOOKING AT THE DANGEROUSNESS AND THE

19   FLIGHT RISK OF THIS INDIVIDUAL.  WE WOULD SUBMIT THERE IS

20   SUBSTANTIAL EVIDENCE POINTING TO THE DANGEROUSNESS OF THIS

21   INDIVIDUAL.

22       YOU'VE HEARD THE EVIDENCE RELATING TO FOUR INCIDENTS

23   OF ASSAULTIVE CONDUCT INVOLVING MR. HASSAN.  FIRST, WE

24   HAVE THE 2008 INCIDENT THAT WAS DUBBED DURING OUR ARGUMENT

25   AND TESTIMONY AS THE KIDNAPPING ISSUE.  THIS IS AN

INCIDENT WHERE OVER A MERE $70, MR. HASSAN AND OTHERS
PARTICIPATED IN TAKING A VICTIM, FORCING HIM, WITH A
FIREARM PRESENT, TO GO TO AN ATM AND ATTEMPT TO WITHDRAW
MONEY, AND ALSO ASSAULTIVE BEHAVIOR AGAINST THAT VICTIM
THAT LED TO INJURIES.  IT'S TRUE THERE'S BEEN NO EVIDENCE
MR. HASSAN PERSONALLY PUNCHED THE VICTIM OR PERSONALLY
HELD THE FIREARM, BUT IT'S NONETHELESS CLEAR THAT HE
PARTICIPATED IN THAT EVENT AND INDEED PLEADED GUILTY TO A
CRIMINAL CONVICTION BASED ON HIS ROLE IN THAT INCIDENT.

YOU HAVE EVIDENCE FROM THE 2007 FIGHT THAT TOOK PLACE
IN THE BLOUNT STREET AREA HERE IN RALEIGH WHERE
MR. HASSAN, AS AN ADULT, GOES WITH ANOTHER GROUP OF ADULTS
AND ONE MINOR TO GO CONFRONT A 15-YEAR OLD, AND THAT THIS
CONFRONTATION LED TO A VIOLENT INCIDENT THAT ALSO RESULTED
IN PROPERTY DAMAGE, AND THAT THE REASON WHY THESE CHARGES
WERE NOT PURSUED TOWARDS CONVICTION IS ONLY BECAUSE THE
VICTIMS IN THAT CASE WERE NOT INTERESTED IN PRESSING
CHARGES.

IN 2007, YOUR HONOR, YOU HAVE AN ASSAULT ON A FEMALE
INCIDENT WHERE TESTIMONY IS REVEALED THAT AN EYE WITNESS
SAW THE DEFENDANT, MR. HASSAN, HITTING A FEMALE IN THAT
CAR, AND THAT EVENTUALLY MR. HASSAN WAS FOUND GUILTY OF
THAT OFFENSE.

YOU ALSO HAVE A 2003 INCIDENT OF THE ASSAULT BY
POINTING A GUN TO WHICH MR. HASSAN PLEADED GUILTY, IN

WHICH AN INDIVIDUAL WALKING DOWN THE STREET WAS STOPPED BY
MR. HASSAN AND ANOTHER INDIVIDUAL IN A CAR AFTER SAYING HE
DIDN'T WANT TO PURCHASE MARIJUANA, SOMETHING THAT THE
VICTIM THOUGHT WAS A FIREARM, A REAL GUN, WAS POINTED AT
HIM.  AND IT IS STILL UNCLEAR AS TO THIS DAY AS TO WHETHER
OR NOT THAT WAS AN ACTUAL FIREARM OR A BB GUN.  THE ONLY
REFERENCE WE HAVE THAT IT WAS A BB GUN IS FROM
MR. HASSAN'S OWN STATEMENTS TO THE POLICE.  THE VICTIM
CERTAINLY HAD NO REASON THAT DAY TO SUSPECT IT WAS A BB
GUN.

ALL OF THESE INCIDENTS DEMONSTRATE A PATTERN BY
MR. HASSAN, WHO'S COMFORTABLE WITH BREAKING THE LAW.

ADDITIONALLY, YOUR HONOR, THERE'S EVIDENCE IN THE
RECORD THAT HE'S TRAINED IN HAND-TO-HAND FIGHTING.  WE
ALSO REFERENCE HE HAS ACCESS TO FIREARMS, WE SUBMIT, AS
EVIDENCED BY THE VIDEO FOUND ON HIS PHONE OF HIM SHOOTING
WHAT APPEARS TO BE AN ASSAULT RIFLE.  THE EVIDENCE FROM
MR. SUTTON INDICATED THAT IT APPEARS THIS VIDEO WAS SHOT
IN MAY OF 2009, ONLY A FEW MONTHS AGO.

IN ADDITION TO THIS, YOUR HONOR, WE THINK IN ADDITION
TO DANGEROUSNESS HE'S ALSO A FLIGHT RISK.  THE EVIDENCE
SUBMITTED IS WHEN HE TOOK THIS TRIP IN JUNE OF 2007, THAT
WAS PAID FOR BY ANOTHER INDIVIDUAL, HE TOOK THIS TRIP AND
HE LEFT WITHOUT GIVING ANY PRIOR NOTICE TO HIS FAMILY OR
HIS EMPLOYER.  WE SUBMIT HE WAS ABLE TO FIND THE RESOURCES

1    TO TAKE THIS TRIP AND HE WAS ABLE AND WILLING TO LEAVE

2    WITHOUT ANY PRIOR NOTICE TO ANYONE, WITH ONLY A NOTE

3    APPARENTLY LEFT FOR THE PARENTS, BUT AFTER HE LEFT.  SO WE

4    WOULD ALSO POINT TO HIS RISK OF FLIGHT.

5       YOUR HONOR, IN ADDITION, AS MY CO-COUNSEL NOTED,

6    THERE'S A PRESUMPTION HERE.  THERE ARE VERY SERIOUS

7    CHARGES HERE.  EVEN IF YOU FOUND THAT THAT PRESUMPTION IS

8    REBUTTED BY A SUITABLE THIRD PARTY CUSTODIAN, THE

9    SERIOUSNESS OF THAT OFFENSE, AS DESIGNATED BY CONGRESS, IS

10   SOMETHING YOU SHOULD TAKE INTO ACCOUNT IN CONSIDERING

11   WHETHER OR NOT MR. HASSAN SHOULD BE DETAINED.

12      IN TURNING TO MR. YAGHI, SIR, MR. MCCULLOUGH

13   CERTAINLY WAS VERY CANDID WITH THE COURT, AND I WON'T TAKE

14   UP MUCH OF THE COURT'S TIME.  I ONLY NOTE THAT THE

15   EVIDENCE IS CLEAR THAT MR. YAGHI HAS FLED FROM OUTSTANDING

16   CHARGES IN TEXAS, HE FLED WHEN HE WAS ON ELECTRONIC

17   MONITORING, AND ALSO IT IS CRYSTAL CLEAR FROM HIS FACEBOOK

18   POSTING THAT HE WAS ON THE RUN AFTER THIS 2008 KIDNAPPING

19   INCIDENT THAT HE EVENTUALLY PLED GUILTY TO.  I THINK HIS

20   FLIGHT RISK AND HIS ABILITY TO COMPLETELY DISREGARD COURT

21   ORDERS IS EVIDENCED BY THOSE INCIDENTS.

22      IN ADDITION TO THE ASSAULTIVE CONDUCT THAT HE

23   PARTICIPATED IN IN THE 2008 KIDNAPPING ISSUE, THE 2007

24   FIGHT IN THE BLOUNT STREET AREA, AND THE STRENGTH OF THE

25   EVIDENCE WE FEEL IS ALSO GOOD IN REGARD TO MR. YAGHI.

1    THAT FOR HIS 2006 TRIP TO JORDAN, HE TELLS WITNESSES THAT

2    HE WAS GOING THERE TO WAGE JIHAD.  THAT HE WAS ALSO

3    TRAVELING TO ISRAEL WITH MR. YAGHI IN 2007.  THAT ISSUE

4    HAS ALREADY BEEN DISCUSSED.  AND ALSO TELLING IS

5    MR. DANIEL BOYD'S VISIT TO MR. YAGHI WHILE MR. YAGHI IS IN

6    JAIL FOR THIS KIDNAPPING OFFENSE, WHERE DANIEL BOYD IS

7    CONCERNED THAT MR. YAGHI -- THAT, YOU KNOW, WANTS TO KNOW

8    IF THEY ARE DISCUSSING HIM, WANTS TO KNOW WHAT THEY ARE

9    ASKING ABOUT, AND MR. YAGHI SAYS, YOU KNOW, "DON'T WORRY,

10   THEY'RE NOT ASKING ME ABOUT THE TRIP TO PALESTINE."  I

11   THINK THAT'S ALSO EVIDENCE THAT HAS A BEARING ON THE

12   DECISIONS THE COURT HAS TO RENDER TODAY.

13        SO, YOUR HONOR, WE THINK DETENTION IS APPROPRIATE FOR

14   THESE TWO INDIVIDUALS.

15        **THE COURT:**  THANK YOU.  ANYBODY HAVE ANYTHING

16   ELSE THEY WANT TO SAY?  IF NOT, WE'LL RECESS UNTIL 2

17   O'CLOCK, AT WHICH TIME I'LL ANNOUNCE MY DECISION AS TO

18   EACH OF THE DEFENDANTS.  MR. MCCULLOUGH?

19        **MR. MCCULLOUGH:**  YOUR HONOR, I HAVE A MEDIATION

20   IN WILMINGTON AT 2 O'CLOCK THIS AFTERNOON.  IN LIGHT OF MY

21   STATEMENT TO THE COURT --

22        **THE COURT:**  I'LL ISSUE A WRITTEN ORDER.  YOU AND

23   YOUR CLIENT -- IT'S JUST GOING TO TAKE ME THAT LONG TO

24   SORT THROUGH THIS AND TO HAVE THINGS I WANT TO PUT ON THE

25   RECORD IN A FORM THAT'S UNDERSTANDABLE, IN CASE EITHER

SIDE SHOULD APPEAL WHATEVER I DO TO THE DISTRICT JUDGE

WHO'S PRESIDING.  EVEN THOUGH THE HEARING'S DE NOVO, I

WANT HER TO HAVE THE BENEFIT OF MY ANALYSIS AND RECITATION

OF THE EVIDENCE.

YOU ARE ALMOST GOING TO HAVE TO LEAVE FOR WILMINGTON

IMMEDIATELY.  I KNOW MR. BOYCE HAS A SIMILAR --

**MR. MCCULLOUGH:**  I HAD THIS MEDIATION SCHEDULED

FOR TODAY.  THE PARTIES HAVE TRAVELED --

**THE COURT:**  LET'S DO THIS THEN.  I'M GOING TO

ASK THE LAWYERS TO MEET WITH MS. CAMPBELL TO FINISH THE

DISCUSSIONS THAT STARTED YESTERDAY ABOUT SOME OF THE CIPA

MATERIAL, AND ALSO TO MEET WITH THE ASSISTANT UNITED

STATES ATTORNEY OR ATTORNEYS TO SET A DATE, OR TO NARROW A

RANGE OF DATES FOR THE CIPA STATUS CONFERENCE.

WE'LL RECONVENE HERE AT 11:45 A.M., WHICH WILL GIVE

ME ENOUGH TIME TO AT LEAST MUDDLE MY THOUGHTS THROUGH AND

TO ALLOW YOU TO MAKE THE NECESSARY TRAVEL DOWN TO

WILMINGTON.

ANYTHING ELSE TO COME BEFORE THE COURT BEFORE THE

RECESS?

**MS. KOCHER:**  NOT FOR THE GOVERNMENT, YOUR HONOR.

(RECESS TAKEN.)

**THE COURT:**  THIS WILL BE A RESUMPTION OF THE

DETENTION HEAR IN THE CASE OF *UNITED STATES OF AMERICA V.*

*DANIEL PATRICK BOYD, ET AL.*  I HAD HOPED TO HAVE -- WE'LL

1    STAND AT EASE UNTIL THE DEFENDANTS COME IN.

2        (DEFENDANTS ENTER INTO THE COURTROOM.)

3        THIS IS A RESUMPTION OF THE DETENTION HEARING IN THE

4    CASES OF THE *UNITED STATES OF AMERICA VS. DANIEL PATRICK*

5    *BOYD, HYSEN SHERIFI, ZAKARIYA BOYD, DYLAN BOYD, MOHAMMAD*

6    *OMAR ALY HASSAN, AND ZIYAD YAGHI.*  I HAVE CAREFULLY

7    CONSIDERED THE RECORD MADE IN THIS COURT, AS WELL AS THE

8    EVIDENCE OFFERED BY THE GOVERNMENT AND BY THE DEFENDANT

9    HASSAN, AND REACHED THE FOLLOWING CONCLUSIONS.

10        THE DEFENDANTS ARE ALL CHARGED IN COUNTS ONE AND TWO

11    WITH CRIMES THAT TRIGGER A REBUTTABLE PRESUMPTION THAT

12    THEY SHOULD BE HELD.  THEY WERE INDICTED BY A GRAND JURY

13    IN COUNT ONE CHARGED WITH PROVIDING MATERIAL -- CONSPIRACY

14    TO PROVIDE MATERIAL SUPPORT TO TERRORISTS, IN VIOLATION OF

15    TITLE 18, UNITED STATES CODE, SECTION 2339(A); AND IN

16    COUNT TWO WITH CONSPIRACY TO MURDER, KIDNAP, MAIM AND

17    INJURE PERSONS OR DAMAGE PROPERTY IN A FOREIGN COUNTRY, IN

18    VIOLATION OF TITLE 18, UNITED STATES CODE, SECTION 956(A).

19        COUNT ONE OF THE INDICTMENT AUTHORIZES A MAXIMUM TERM

20    OF IMPRISONMENT UPON CONVICTION OF NOT MORE THAN 15 YEARS,

21    WHILE COUNT TWO WOULD SUBJECT THE DEFENDANTS TO ANY TERM

22    OF YEARS, OR LIFE.

23        THE DEFENDANT'S RIGHT TO BAIL IS CONTROLLED BY THE

24    BAIL REFORM ACT OF 1984.  IN GENERAL, A DEFENDANT MUST BE

25    RELEASED ON LEAST RESTRICTIVE CONDITIONS OF A COMBINATION

OF CONDITIONS THAT WILL REASONABLY ASSURE THE DEFENDANT'S

APPEARANCE AND THE SAFETY OF THE COMMUNITY.  PURSUANT TO

THAT ACT, HOWEVER, IF AFTER A DETENTION HEARING A COURT

DETERMINES THAT NO CONDITION OR COMBINATION OF CONDITIONS

WILL REASONABLY ASSURE THE APPEARANCE OF THE PERSON AS

REQUIRED AND THE SAFETY OF ANY OTHER PERSON AND THE

COMMUNITY, THE COURT MUST ORDER THE DETENTION OF THE

PERSON BEFORE TRIAL.

THE GOVERNMENT IS REQUIRED TO PROVE THAT A PERSON IS

A RISK OF FLIGHT BY A PREPONDERANCE OF THE EVIDENCE, AND

THAT THAT PERSON CONSTITUTES A DANGER TO THE COMMUNITY BY

CLEAR AND CONVINCING EVIDENCE.

THE STATUTE SETS OUT THE FACTORS WHICH A COURT MUST

CONSIDER.  THEY INCLUDE THE NATURE AND CIRCUMSTANCES OF

THE OFFENSE CHARGED, INCLUDING WHETHER IT WAS A CRIME OF

VIOLENCE OR A FEDERAL CRIME OF TERRORISM; THE WEIGHT OF

THE EVIDENCE AGAINST THE DEFENDANT; THE HISTORY AND

CHARACTERISTICS OF THE DEFENDANT; AND THE NATURE AND

SERIOUSNESS OF THE DANGER TO ANY PERSON OR THE COMMUNITY

THAT WOULD BE POSED IF THE DEFENDANT WERE RELEASED.

WITH REGARD TO RISK OF FLIGHT, WHILE THE GOVERNMENT

DID NOT ARGUE THAT THE POTENTIAL LIFE SENTENCE IN AND OF

ITSELF MIGHT CONSTITUTE A RISK OF FLIGHT, BOTH LOGIC AND

EXPERIENCE COUNSEL THAT THAT'S TRUE.  IT IS FURTHER

REFLECTED IN THE CONGRESSIONAL DETERMINATION THAT CRIMES

1  CHARGED UNDER 18, UNITED STATES CODE, SECTION 956(A)

2  CREATE A REBUTTABLE PRESUMPTION AS TO BOTH.

3      THE DEFENDANTS ALL HAVE CONTACTS IN FOREIGN

4  COUNTRIES.  EACH DEFENDANT, AS PART OF THE CONSPIRACY, AND

5  THE GRAND JURY HAS ESTABLISHED THROUGH ITS INDICTMENT THAT

6  THERE'S PROBABLE CAUSE TO BELIEVE THAT THOSE CRIMES WERE

7  COMMITTED AND THAT EACH OF THESE DEFENDANTS PARTICIPATED

8  IN THAT CONSPIRACY, HAD ACCESS TO OR WERE ABLE TO RAISE

9  SIGNIFICANT AMOUNTS OF MONEY, THEREBY PROVIDING THEM WITH

10  THE MEANS AND MANNER WHICH THEY COULD FLEE IF THEY CHOSE

11  TO DO SO.

12      ONE OF THE HARDEST THINGS FOR A JUDGE TO DO IS TO

13  PREDICT FUTURE BEHAVIOR.  WE, MUCH LIKE THE REST OF YOU,

14  DO NOT HAVE A CRYSTAL BALL IN WHICH WE CAN LOOK INTO THE

15  FUTURE OR SOMEONE'S HEART AND DECIDE WHAT A PERSON WILL DO

16  OR WILL NOT DO.  BASED ON THOSE FACTORS AND OTHERS,

17  PARTICULARLY IN THE CASE OF THE DEFENDANT WHO HAS THE

18  WARRANTS OUT OF TEXAS, I FIND BY CLEAR AND CONVINCING

19  EVIDENCE THAT EACH OF THE DEFENDANTS CONSTITUTES A RISK OF

20  FLIGHT.

21      THE CALCULUS ONE EMPLOYS WITH DANGER TO THE COMMUNITY

22  MUST BEGIN WITH THE CONGRESSIONAL DETERMINATION THAT

23  CONGRESS, IN AMENDING THE BAIL REFORM ACT, ADDED TERRORISM

24  AND CRIMES ASSOCIATED WITH TERRORISM AS A PREDICATE FOR A

25  REBUTTABLE PRESUMPTION.  AS I SAID, EVEN IF THE

1 PRESUMPTION HAD BEEN REBUTTED BY EVIDENCE OFFERED BY THE

2 DEFENDANTS, AND I NOTE THAT ONLY MR. HASSAN PRESENTED

3 EVIDENCE TO REBUT THE PRESUMPTION, AND THAT WAS THE

4 TESTIMONY OF HIS FATHER AS A POTENTIAL THIRD PARTY

5 CUSTODIAN.  I MAKE NO FINDING AS TO WHETHER HE IS SUITABLE

6 AS A THIRD PARTY CUSTODIAN BECAUSE EVEN IF HE WERE, THAT

7 WOULD NOT TAKE AWAY THE RISK OF FLIGHT AND IT CERTAINLY

8 WOULD DO NOTHING WHATSOEVER TO AMELIORATE THE DANGER POSED

9 BY THE DEFENDANTS IN THIS CASE.

10   THE EVIDENCE IS THAT WEAPONS WERE STOCKPILED, SOME

11 27,000 ROUNDS OF AMMUNITION INCLUDING TRACER ROUNDS, EMPTY

12 CARTONS THAT PRESUMABLY, AS THEIR LABEL STATES, BORE ARMOR

13 PIERCING AMMUNITION.  AND WHILE THERE'S BEEN A LOT OF

14 EVIDENCE AND ARGUMENT ABOUT JIHAD AND VIOLENT JIHAD, THIS

15 CASE IS A CASE ABOUT PROVIDING SUPPORT TO TERRORISM AND A

16 CONSPIRACY TO MURDER, KIDNAP, AND MAIM.

17   THE EVIDENCE OR THE DISCUSSION ABOUT JIHAD OR VIOLENT

18 JIHAD IS RELEVANT ONLY TO THE EXTENT THAT IT BEARS ON

19 EITHER THAT ISSUE OR THE ISSUE OF WHETHER OR NOT THE

20 DEFENDANTS ARE DANGEROUS.  THE CONVERSATIONS THAT OCCURRED

21 AND ARE A MATTER OF RECORD AND HAVE BEEN WITNESSED,

22 CONSIST OF STATEMENTS ABOUT THE OVERFLIGHT OF THE LAW

23 ENFORCEMENT HELICOPTER, WHERE THE DEFENDANT DANIEL BOYD

24 TOOK OUT AN ASSAULT RIFLE AND TALKED ABOUT 150 ROUNDS OF

25 ARMOR PIERCING BULLETS AND HIS SON, ZAKARIYA BOYD, SAID

THAT "WE HAVE MORE."  THERE WAS A CONVERSATION ABOUT

HUMVEES AND THAT BEING THE VEHICLE USED BY AMERICAN TROOPS

IN MUSLIM COUNTRIES.  THERE WAS A DISCUSSION ABOUT, IF

THINGS DID NOT GO WELL OR DANIEL BOYD COULD NOT LEAVE THE

COUNTRY AS HE WISHED, THAT MAYBE JIHAD WOULD START HERE.

HAD THOSE CONVERSATIONS OCCURRED IN ISOLATION, THEY COULD

BE TAKEN PERHAPS AS BRAVADO OR BRAGGADOCIO, BUT IN THE

CONTEXT OF PERSONS ENGAGING IN MILITARY-TYPE TRAINING WITH

ASSAULT-TYPE WEAPONS, WITH LARGE AMOUNTS OF AMMUNITION,

SOME OF WHICH IS NOT GENERALLY ASSOCIATED WITH HUNTING, I

THINK IT IS EVIDENCE OF MORE.

THERE WAS THE CONVERSATION WITH DANIEL BOYD RECORDED

BY THE WITNESS WITH HIS DISCUSSING, AND I QUOTE, "HITTING

THE WELLS FARGO TRUCKS AND BANKS.  THAT MONEY IS INSURED.

THEY HAVE TO PAY THE PEOPLE WHO HAD THAT MONEY.  THOSE

PEOPLE DON'T GET HURT.  THE BANKS GET HURT AND THE BANKING

SYSTEM IS THE MAIN AMMUNITION FOR KUFFAR."  DANIEL BOYD

THEN RECOUNTED HIS EXPERIENCE IN PAKISTAN IN WHICH HE

CLAIMED TO HAVE ROBBED BANKS.  WHETHER HE DID OR NOT I

HAVE NO WAY OF KNOWING, BUT THAT IS THE EVIDENCE BEFORE

ME.

THAT IS SUFFICIENT FOR ME TO CONCLUDE ALSO BY CLEAR

AND CONVINCING EVIDENCE THAT EACH OF THESE DEFENDANTS

CONSTITUTES A DANGER TO THE COMMUNITY.

THERE WILL BE ADDITIONAL FINDINGS OF FACT AND THOSE

1  FACTS WILL BE SPELLED OUT IN WRITTEN ORDER.  RATHER THAN

2  WAIT AND HAVE THE MARSHALS HAVE TO BRING THE DEFENDANTS

3  BACK INTO COURT YET AGAIN, I HAVE CHOSEN TO PUT ON THE

4  RECORD THESE ORAL FINDINGS IN ABBREVIATED FORM.

5      MR. MARSHAL, THEY WILL EACH BE IN YOUR CUSTODY.

6  THANK YOU.  WE'LL STAND IN RECESS.

7

8  (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

9

10

11

12

13

14

15                    END OF TRANSCRIPT

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE

2       THIS IS TO CERTIFY THAT THE FOREGOING TRANSCRIPT OF

3   PROCEEDINGS TAKEN AT THE CRIMINAL SESSION OF UNITED STATES

4   DISTRICT COURT IS A TRUE AND ACCURATE TRANSCRIPTION OF THE

5   PROCEEDINGS TAKEN BY ME IN MACHINE SHORTHAND AND

6   TRANSCRIBED BY COMPUTER UNDER MY SUPERVISION.

7       THIS THE 8TH DAY OF AUGUST, 2009.

8

9                          /S/ DONNA J. TOMAWSKI

10                         DONNA J. TOMAWSKI
                           OFFICIAL COURT REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25