UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO: 5:09-CR-00216-FL

UNITED STATES OF AMERICA  )
  )
  )   ORDER
  )
  )
DANIEL PATRICK BOYD, *et al.*,  )
  )
  Defendants  )

   This matter is before the court on the Government's motion to detain Defendants
DANIEL PATRICK BOYD, a/k/a "Saifullah," HYSEN SHERIFI, ANES SUBASIC,
ZAKARIYA BOYD, a/k/a "Zak", DYLAN BOYD, a/k/a "Mohammed", MOHAMMAD
OMAR ALY HASSAN, and ZIYAD YAGHI as flight risks and dangers to the community.
Hearings were conducted on August 4, 5, and 10, 2009. Accordingly, the matter is now ripe
for adjudication. The Court has carefully considered the record before it and, for the reasons
discussed below, grants the Government's motion to detain.

**Background**

   The indictment charges Defendants with, *inter alia*: 1) conspiracy to provide material
support to terrorists in violation of 18 U.S.C. § 2339A and; 2) conspiracy to murder, kidnap,
maim and injure persons or damage property in a foreign country in violation of 18 U.S.C.
§ 956(a). The indictment (DE-3) establishes probable cause to believe that each of the crimes
charged therein were committed and that they were committed by Defendants. *See* Gernstein

v. Pugh, 420 U.S. 103, 114 (1975)("[A]n indictment ...conclusively determines the existence of probable cause....").  The Government augmented the indictment with the testimony of Special Agent ("SA") Michael Sutton of the Federal Bureau of Investigation ("FBI") and the exhibits introduced through him.

As an initial matter, the undersigned notes that while much of the evidence and arguments by both sides focused on whether Defendants engaged in "jihad" or "violent jihad", that term is relevant only to the extent that it is evidence of the crimes charged.  Neither the term "jihad" nor the term "violent jihad" appears in the relevant statutes.

SA Sutton testified as a summary witness and provided a glimpse of the government's evidence against the defendants.  He began his testimony by noting that:

> This investigation was initiated in approximately 2005 and it revolves around reports through the community that Daniel Patrick Boyd, along with others, had established or were working to establish a network to assist those traveling overseas to fight violent jihad.  During the course of the conspiracy, the individuals were collecting money to pay for these overseas travels and Daniel Boyd used his previous experience, primarily through his tales of his earlier fighting to attract members in the conspiracy.
> (Tr. 11).

Continuing, Sutton testified that Daniel Boyd "encouraged . . . individuals to participate in violent jihad . . .[h]e encouraged them to collect the financial means to be able to travel overseas to do this. . . . [and] to train, including the use of firearms and in the military style. (Tr. 20).

Through SA Sutton's testimony, the Government introduced exhibit 49.  (Tr. 24).

This exhibit is a compact disc which contains excerpts of tape recordings[1] of conversations among various individuals–including the defendants–occurring on March 5, 2008, April 18, 2008, May 20, 2009, June 10, 2009, June 26, 2009, and July 3, 2009. The recordings were made by a person or persons identified only as "a witness." Summaries of these conversations[2] were introduced as government exhibits 27, 28, 29,30,32, and 33. Each of these exhibits mixed language from the recordings with a narrative prepared by the Government in which it seeks to provide context for the statements.

Before these summaries are examined, the undersigned notes that the person or persons to whom the Government applies the appellation "witness" played two distinct roles in this case. The first, that of the recorder of conversations and a reporter of events is straightforward. The other role, that of interpreter or translator of words used in some of the tapes is more problematic. Neither the identity of "the witness" nor other identifying factors from which an assessment of this person's ability to fulfill this second role are provided. Through the evidence, the only fact we learn about the witness is that he or she is African-American. (Tr. 90). Accordingly, the Court will parse the recordings and summaries in an attempt to discern whether conversations about "vehicles" (Tr. 43, Ex. 30); "going to the beach" (Tr. 39); "the way"; or "finding a way" (Tr. 23, 33-34, Ex. 28) are discussions about vehicles, beaches, and religion or are evidence of terrorism. After a careful review of these

---

[1]The recordings varied widely in audio quality. Some of the recordings or portions of them were unintelligible.

[2]Special agent Sutton testified that the summaries are accurate representations in summary form of what occurs on that audio. (Tr. 26-27, 41, 104)

summaries, the undersigned finds the context in which these words and phrases occur leaves no doubt as to their meaning.

In Government exhibit 27, a July 3, 2009 conversation is summarized. During this conversation Daniel Boyd states that: 1) "those who make Jihad in the name of Allah we will guide them to our path and there is Allah with the majahideen"; 2) "Muslims that think it is all right to just sit here, chill in America, make some money, and work for the day when they have enough knowledge to make jihad . . . .have left Islam; 3) "if you live amongst the Kufar[3] and they are comfortable with you, you have left Islam"; and 4) "after Iman (faith) there is no duty but Jihad, defending the Muslim land." (Ex. 27).

Daniel Boyd also discusses how to obtain money to finance their plan. Government exhibit 28 recounts a May 20, 2009 conversation between Daniel Boyd and "a witness." Daniel Boyd talks about "dope boys" and how "they . . .carry[] . . . a lot of money." He goes on to say that "they should "snatch it from them and use it for the sake of Allah." In addition, Daniel Boyd stated that "he doesn't want . . .[a] chump" but that "he wants ten grand and up." Later, Daniel Boyd argues:

> "[h]itting the Wells Fargo trucks and banks, that money is insured. They have to pay the people who had that money. Those people don't get hurt. The banks get hurt and the banking system is the main ammunition for the Kuffar."
>
> (Ex. 28).

---

[3]"non-muslims. [or].. non-believers" (TR. 129)

The summary states that Daniel Boyd goes on to recount his experience "hitting the banks in Pakistan." Likewise, SA Sutton testified that Daniel Boyd recommended to a witness that:

> he obtain a credit card through a credit card company, they'll send you checks and you can write checks up to $6,000, all you have to do is sign the check and cash it. You need not worry to have to pay for it because you will have left the country and you will no longer be responsible for that.
> (Tr. 40).

A search of the Boyd residence revealed $13,000.00 in cash, and a deposit slip for $16,000.00 was found in Dylan Boyd's car. (Tr. 40).

A March 5, 2008 conversation between Daniel Boyd and Dylan Boyd is summarized by Government exhibit 29. During this conversation, Daniel Boyd talks with his son Dylan about how to conduct himself abroad. The exhibit begins with Daniel Boyd stating that he wants to talk to Dylan about "preparations." Specifically, Daniel Boyd says that he has "11 grand saved from people, and a couple others who have committed." Dylan Boyd is then admonished to be careful. In response, Dylan Boyd answers that he investigated some executive protection agencies. He asserts that these agencies will "send you to Russia to study intelligence and be trained one-on-one to be a body guard to a top government official- or to know out someone else's top government official." [Ex. 29, pg. 1]. Daniel Boyd agrees that these agencies are interesting, but also warns that they might be traps. Ultimately, Daniel Boyd believes the best plan is to "use your brain the best we can and put it together with others who are with you on this and trust in Allah." [Ex. 28, pg. 2]. Furthermore, Daniel Boyd counsels Dylan Boyd to stay "in that village" for no more than a couple of days, and

that "we've got to be tourists." [Ex. 28, pg. 2]. Specifically Daniel Boyd says that Dylan Boyd "may have to buy a couple of stupid things to play the part, all the while looking for 'where is the way?'" (Ex. 28, pg. 2). Likewise, Daniel Boyd notes that Dylan Boyd will be able to locate a "launching point", because Dylan Boyd "will already know ahead of time where the places are from 2.1 to 2.2." (Ex. 28, pg. 2). Once Dylan Boyd is away from the constraints of the city or village, Daniel Boyd adds that "the role of tourist is off and the role of what you really are is on." [Ex. 28, pg. 2]. Daniel Boyd also tells Dylan Boyd to get up and out of sight before early morning prayer when Dylan Boyd decides to "launch." Dylan Boyd then asks if he will be captured, to which Daniel Boyd replies, "definitely, and when they do, you kiss the ground . . . and say 'Thanks be to God'" [Ex. 28, pg. 2].

Government exhibit 30 summarizes an April 18, 2008 conversation between Daniel Boyd and Anes Subasic. They first discuss what it means to be a good citizen and how it conflicts with being a good Muslim. During this discussion, Daniel Boyd asks Subasic if he has his phone on. When Subasic answers yes, Boyd tell him not to bring it inside. Boyd then explains various ways in which he believes a mobile phone can be used for surveillance. He tells Subasic "you have to be smart." [Ex. 30, pg. 1]. Daniel Boyd also explained that he opened a store so that his wife and children would have a way to make a living on their own–as opposed to running a construction company which they could not do on their own. "This way, if [Daniel] gets an order from Allah here or in Bosnia or Sudan or Alaska, he can obey it." [Ex. 30, pg. 1]. He then adds that he has two boys and needs help "to make a plan

for them." He adds "I'm being very specific and very frank with you."Subasic asks and Boyd answers that "they are two Muslim boys" who are 'to go for the sake of Allah." Boyd asks Subasic's' help to make a plan "to put these two people somewhere good." [Ex. 30, pg. 2]. Subasic is reluctant because he does not know Daniel Boyd's "background or his status with the FBI and things like that." [Ex. 30, pg. 2]. They then resume their discussion regarding the danger that their conversations could be recorded. Also, Subasic adds " . . .if he helps me with whatever, that I will help somebody, if it's safer, and I can do with the other brothers that I know for fifteen, twenty years, and deal with them hundreds of times, a thousand times, say, okay should I take that risk to open up a new front here, a new front here." [Ex. 30, pg. 3]. They both agree that Daniel Boyd's store is not a safe place for them to discuss such matters, because Daniel Boyd believe the FBI was monitoring him. (Ex. 30, pg. 2-3). Accordingly, Boyd suggests that they "should stick with what is sure and open now . . ." (Ex. 30, pg. 3). Thereafter, they discuss the difficulties of recruiting "brother(s) who look[] like [they] want to be good Muslim[s]" in this area. (Ex. 30, pg. 3). When viewed in light of Subasic's' preceding comments, it is clearer that the following portions of this conversation are, as the government contends, "in code." Specifically, the Government argues that "vehicles" is a reference to Dylan and Zakariya Boyd. Subasic begins with a question: "Since I don't know...how good you know these individual cars." Daniel Boyd responds noting that he has been "driving them for 20 years." Subasic asks "[s]o they are in good shape?" Boyd answers "Like a Porsche." (Ex. 30, pg. 4). When Subasic asks if "they are able", Daniel Boyd responds "[o]ne of them I will say I am, I, I am sure . . . [t]he other

one I am   95 percent sure." (Ex. 30, pg. 4).   The undersigned finds that this is a conversation regarding Dylan and Zakariya Boyd.

A June 26, 2009 conversation between Daniel Boyd and several others (including Zakariya Boyd and Dylan Boyd) is summarized by exhibit 32.  During this conversation, Daniel Boyd states "[e]verything with the Muslims has become intellectual and metaphorical while the Kuffar are taking the real world right from out from under our feet." [Ex. 32, pg. 1].  Likewise, he says "Fight them so Allah will punish them through your hands . . . Allah knows, I love Jihad.  I love to stand and fight for the sake of Allah . . . in front of me, the battlefield and the Kuffar." [Ex. 32, pg. 2-3].  Finally, Daniel Boyd indicates that they are required to meet secretly because of these beliefs.

Government exhibit 33, summarizes a conversation between Daniel Boyd, Zakariya Boyd, Hysen Serifi and a witness on June 10, 2009.  During this conversation they discuss armor piercing rounds.  Daniel Boyd states that he wants to shoot "an old ballast from a light fixture" with an armor piercing round. [Ex. 33, pg. 1].  Specifically, he notes that "[i]f it can do something with that, just imagine what it could do if you shoot one in a vest." [Ex. 33, pg. 1].  Daniel Boyd begins rapid firing and yells "Allahua Akbar." [Ex. 33, pg. 1].  When he stops firing, Daniel Boyd says "one day, inshallah, Alllah's going to put me back . . . I saw the 'deen', I saw the 'deen' . . . I love this round . . . [t]his is the best round in the world." [Ex. 33, pg. 1].  The metal ballast shot on June 10, 2009 was introduced into evidence by the Government . (Tr. 44-46, Ex. 48).  SA Sutton was asked to hold up the ballast and noted that

a bullet went through it. (Tr. 49)

SA Sutton also testified to various other matters that are not specifically mentioned in the summaries.  First, he noted that:

> on or about the 16th of February, 2007, . . .Anes Subasic paid $995 to attend a training school in Las Vegas, Nevada. The training school was: "Surviving Execution, Beheading Assassination Attempts and Escaping from Captivity. We were able to confirm his actual attendance. Also noted that on march 10, 2007, Subasic made online purchases of books entitled "Sniper Training" and he also inquired as to the availability and pricing of a bolt action .308 rifle and a Remington tactical long range weapon. He also ordered a sniper rifle scope, a sniper kill flashlight, and anti-reflection device, a sniper shade, a lens kit, and a mill dot master slide rule, all of which occurred online. On may 9 of 2007, he ordered .308 ammunition and 7.62-millimeter ammunition.

> (Tr. 45-46).

Furthermore, on January 10, 2009, the Boyds and a witness were together on a construction site when they observed a law enforcement helicopter flying overhead.  (Tr. 56).  Daniel Boyd asked the witness if "he could shoot."  (Tr. 56).   After the helicopter left, Daniel Boyd remarked that "he had something for them."  (Tr.  56).  He then pulled out an assault rifle with a holographic sight and noted that he had 150 rounds of armor piercing ammunition.  (Tr. 56).  The witness observed five 30-round magazines in the Boyd's truck.  (Tr. 56).  Zakariya Boyd also indicated that they had a 100 drum magazine for another weapon.  (Tr. 56).

Likewise, SA Sutton indicated that in August 2008, Daniel Boyd noticed a number of United States military "Humvees" parked at a nearby gas station.  Daniel Boyd stated to the witness that "he should take them out right now" and "they are over there killing our

brothers."(Tr. 55).

On June 15, 2008 Daniel Boyd told Hysen Sherifi that "we have a mission and its going to hurt some people." (Tr. 54). Sherifi later asks "if he did what the brothers did in New Jersey and if he died there, whether Allah would take him as a martyr?" (Tr. 54). Daniel Boyd answers this question, "God willing, yes, if it is the best you can do." (Tr. 54). SA Sutton testified that the mention of New Jersey is "a reference to the attempt on Fort Dix." (Tr. 54).

On June 19, 2008, Daniel Boyd and Sherifi are again conversing when Daniel Boyd indicates that "while in Afghanistan he would think how he could take America and that even now while he's driving, he thinks about the strategy required to take certain roads." (Tr. 54). They also discuss Sherifi's immigration issues, and ultimately Daniel Boyd advises that Sherifi must "make jihad" on the immigration officials. (Tr. 54).

Special agent Sutton testified that persons who know Defendant Hassan have been interviewed and they indicated that Hassan has made statements "that his international travel was planned to wage violent jihad." (Tr. 62). Sutton also testified that both Dylan Boyd and Zakariya Boyd are trained snipers. (Tr. 56). He further testified that Daniel Boyd and Dylan Boyd were carrying side arms at the time of their arrest.[4] (Tr. 57). During his arrest, Daniel Boyd reached for his side arm. (Tr. 61). Likewise, Dylan Boyd failed to comply with the instructions of his arresting officers. (Tr. 57).

_____

[4]Special agent Sutton's testified that each had a permit to carry concealed weapons.

10

The Government searched the Boyd residence pursuant to a search warrant issued by this court. SA Sutton detailed some of the items found during the search. Some of these items were photographed and the photographs entered into evidence as exhibits.

SA Sutton testified[5] that government exhibits four, five, and six are photographs of gas masks found at the Boyd residence. Government exhibit seven is a photograph of a number of items recovered from Daniel Boyd's truck including multiple 30 round magazines. Government exhibit three is a photograph of a manual of how law enforcement would respond to terrorism. Depicted in exhibit 11 is a pit dug beneath a deck at the Boyd's residence, while exhibit 13 showed a "lookout post" constructed near the entrance of the Boyd residence. (Tr. 66). Government exhibit 14 is a photograph of a flyer bearing the words "Join the Mujahideen." Government exhibits 15, 16, 17, 18, 35,36 and 37 are photographs of AK type assault rifles. Government exhibit 34 is a photograph of the 26 weapons recovered from the Boyds or at their residence.

Government exhibit 42, an FBI FD-302, lists by caliber, quantity, and type the ammunition found at the Boyd residence. The FBI seized 27,443 rounds of ammunition, including 80 tracer rounds. Government exhibit 40 is a photograph of the seized ammunition. Government exhibit 39 is a photograph of a label on a carton of .223 caliber armor piercing ammunition. SA Sutton described the box as being empty.

Government exhibit 19 is a photograph of a page entitled "Basic Chemistry 1.1"

---

[5]Unless otherwise noted, the information about the exhibits is based on the testimony of SA Sutton.

which lists, *inter alia,* reactants, propellants, and special ammunition.  Government exhibit 41 is a photograph of a box of 5.7x28 ammunition which special agent Sutton testified was a rifle caliber round which fit the handgun carried by Daniel Boyd.

Special agent Sutton testified that Government exhibit 47 is a copy of a document labeled "Text of Fatwah Urging Jihad against Americans."  The document states:

> . . .for over seven year the United States have been occupying the lands of Islam . . . All these crimes and sins committed by the Americans are a clear declaration of war on god, his messenger, and Muslims . . .*On that basis, and in compliance with God's order, we issue the following fatwa to all Muslims* . . .The ruling to kill the American and their allies–civilians and military–is an individual duty for every Muslim who can do it in any country in which it is possible to do it . . .
> (Govt. Ex. 47, italics in original)

Government exhibit 45 is a photograph Daniel Boyd and an individual in which can be seen an AK type assault rifle.  Government exhibit 46 is a photograph of Daniel Boyd  and another individual with two AK type assault riffles between them.  Government exhibit 43 is a photograph Daniel Boy on a laminated identification card.  Special agent Sutton read a translation of the Arabic appearing on the front and rear of the card.  Specifically, he testified:

> On the face, there is the word "monotheism", "jihad" and "power," but there's a question mark by that. The interpreter was not absolutely certain that that was the case. There's also words on there that says, "no God but God." "Muhammed is his messenger." it has a number listed there, 70071. It says, "country", which says "America." known by the name "Saifullah", which is a name utilized by Daniel Boyd, and date September 24, 1989,which is consistent with the time frame that Daniel Boyd told the FBI he had traveled to the region. . . on the back of the card it reads: "carrier of this card is allowed to get in the Ansar guest house alone. Carrier of this card must adhere to the

regulations of this hosting house. Return this card upon leaving the guest house." and then there's "type of blood," which is blank
(Tr. 16-17).

As discussed, *supra.*, the Defendants are charged with, *inter alia*, conspiracy to provide material support to terrorists and to murder, kidnap, maim and injure persons or damage property in a foreign country. The grand jury found probable cause to believe that these defendants committed these crimes and, moreover, the Court finds that the government's evidence as to all Defendants is strong. See, e.g., United States v. Reifsteck, 841 F.2d 701, 704 (6th Cir.1988). Portions of the cross examination of SA Sutton were designed to elicit testimony that several Defendants did not participate in all of the acts committed in furtherance of the conspiracy. These acts included: international travel; firearms or other military training; or possession of large sums of money. Because SA Sutton's testimony on cross examination indicated that not every Defendant participated in each of these acts, it is argued that these Defendants were not part of the conspiracy. This argument is without merit.

The evidence shows that the defendants knew the conspiracy's purpose and each took some action indicating their participation. United States v. Laughman, 618 F.2d 1067, 1075 (4th Cir.1980). A conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan. United States v. Reifsteck, 841 F.2d at 704. " 'Once the existence of a conspiracy is established, evidence establishing a connection of a defendant with the conspiracy, even though the connection is slight, is sufficient to convict him with knowing participation in the conspiracy.' " United States v.

Laughman, 618 F.2d at 1076 (quoting United States v. Dunn, 564 F.2d 348, 357 (9th Cir.1977)) (emphasis in original). This is because the acts of one conspirator in furtherance of the conspiracy are attributable to every conspirator. See Pinkerton v. United States, 328 U.S. 640 (1946). In short, "[t]he idea behind the Pinkerton doctrine is that the conspirators are each other's agents; and a principal is bound by the acts of his agents within the scope of the agency." United States v. Manzella, 791 F.2d 1263, 1267 (7th Cir.1986).

SA Sutton testified that a rift developed between Defendants Sherifi and Yaghi as a result of their trip to Jordan. (Tr. 45,117). From this, counsel argue that their clients withdrew from the conspiracy. Again, this argument is without merit. Once a conspiracy is established, it is presumed to continue unless or until the defendant shows that it was terminated or he withdrew from it. Hyde v. United States, 225 U.S. 347, 369-70 (1912). A mere cessation of activity in furtherance of the conspiracy is insufficient. United States v. Goldberg, 401 F.2d 644, 648 (2nd Cir.1968), cert. denied, 393 U.S. 1099 (1969). The defendant must show affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach his co-conspirators. United States v. United States Gypsum Co., 438 U.S. 422, 464-65 (1978). The burden of proving withdrawal rests on the defendant. United States v. Gillen, 599 F.2d 541, 548 (3rd Cir.), cert. denied, 444 U.S. 866 (1979). Here, the evidence shows only that a rift developed between defendants Sherifi and Hassan and Daniel Boyd, not that they withdrew from the conspiracy.

Defendant Hassan submitted exhibits seven A-F. Defendant's exhibit A is the defendant's birth certificate. Exhibit B contains the defendant's Cary High School

14

Transcripts including documents from Al-Iman School. Defendant's exhibit C is the defendant's N.C. State University transcripts. Defendant's Exhibit D is the defendant's passport. Defendant's exhibit E contains several documents which detail the results of an investigation by Mr. Knudsen, Hassan's former attorney, into the facts surrounding Hassan's prior criminal activity. Counsel was informed at the time that the weight given to these documents–which are at odds with convictions that are based on guilty pleas–would be negligible.[6] Defendant's exhibit 7-F is the affidavit of Sonya-Yasmine Zaghloul, Hassan's fiancé. These exhibits have been carefully reviewed by the Court.

Finally, the Government also presented evidence against Defendants Hassan and Yaghi related to the issue of detention through the testimony of Raleigh police detective Mark Utley. (Tr. 140-152). On balance, this testimony indicated that Hassan was involved in several incidents involving assaultive and threatening behavior. This testimony also indicated that Defendant Yaghi has knowingly failed to appear for mandatory court appearances.

## Analysis

A defendant's right to bail is controlled by the Bail Reform Act of 1984 (18 U.S.C. §§ 3141, et seq.). Generally, a defendant must be released on bail on the least restrictive condition or combination of conditions that will reasonably assure the defendant's appearance and the safety of the community. See 18 U.S.C. § 3142(c)(B). Pursuant to l8 U.S.C. §

---

[6]In most circumstances and for most purposes in federal court, state court convictions can not be attacked, Defendant's exhibit seven falls short of demonstrating that these convictions come under the exception.

3142(e), however, if after a detention hearing a court determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community" the court must order the detention of the person before trial. If the government moves for detention on the basis of danger to the community, its burden of proof is by clear and convincing evidence. Id. at § 3142(f). Conversely, the government must prove a defendant is a risk of flight by a preponderance of the evidence.  United States v. Stewart, 19 Fed. Appx. 46, 48-49 (4th Cir. 2001).

The factors a court must consider in determining whether there are conditions of release that will reasonably assure the appearance of a defendant as required and the safety of any other person in the community are set forth in 18 U.S.C. § 3142(g).  That statute reads:

> (g) *Factors to be considered.*-The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning-(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a Federal crime of terrorism, ...; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including-(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be

designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.
18 U.S.C. § 3142(g).

These factors shall now be addressed in turn.

Each Defendant is charged in count one with conspiracy to provide material support to terrorists in violation of 18, U.S.C., § 2339A and in count two with conspiracy to murder, kidnap, maim and injure persons or damage property in a foreign country in violation of 18, U.S.C., § 956(a). Count one of the indictment authorizes a maximum term of imprisonment upon conviction of not more than 15 years. 18 U.S.C. § 2339A. A conviction on count two would subject the defendants to any term of years or life. 18 U.S.C. § 956(a). Several of the Defendants are also charged with other crimes in the remaining five counts of the indictment. Title 18 U.S.C. § 3142(g) specifically mentions that a factor the Court should consider is if the offense charged is a "federal crime of terrorism." This indicates that Congress viewed this charge as an especially serious offense. A "federal crime of terrorism" is defined in 18 U.S.C. § 2332b(g)(5). Section2332b(g)(5) defines a "federal crime of terrorism" as an offense "that is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is a violation of one of a number of other statutes, including 18 U.S.C. § 956(a), the statute the defendants are charged with conspiring to violate. Therefore, the nature and circumstances of the offenses charged favor detention.

Likewise, pursuant to 18 U.S.C. § 3142(e)(2)(B), the instant charges create a rebuttable presumption that no condition or combination of conditions will reasonably assure

the safety of any other person in the community. When a rebuttable presumption applies the defendant carries the burden of production to come forward with evidence to rebut the presumption. The defendant's obligation to come forward with evidence, however, does not shift the burden of persuasion to defendant. United States v. Blauvelt, 2008 WL 4755840 (D. Md. October 28, 2008). If a defendant meets his burden of production, the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the Court. United States v. Blankenhip, 2008 WL 1925137, * 3 (S.D.W.Wa. April 29, 2008)(*quoting* United States v. Mercedes, 254 F.3d 433, 436 (2nd Cir. 2001).

Here, none of the Defendants has presented evidence sufficient to rebut the statutory presumption that they should be detained.[7] Although Defendants Hassan, Subasic and Sherifi presented the testimony of potential third party custodians, their testimony was not sufficient to rebut the presumption of detention. For example, Defendant Subasic presented his father, Dragon Subasic, as a potential third-party custodian. Evidence at the hearing indicates that the Subasics shoplifted from a store in Cary, North Carolina, and that Dragon Subasic has a pending shoplifting charge. Regardless, because the condition of appointing a third-party custodian is insufficient to ensure Defendant Subasic's appearance or the safety of the community, the Court does not need to reach the issue of whether Dragon Subasic is a suitable third-party custodian. Likewise, in the case of Defendant Hassan, testimony

---

[7] As discussed, *supra.*, the exhibits presented by Defendant Hassan failed to rebut the presumption of detention. Although the presumption has not been rebutted by any Defendant, the undersigned will nonetheless analyze each relevant factor regarding detention.

indicates that he left the country without informing either his father (the proffered potential third party custodian, with whom he lived at the time) or his employer. (Tr. 113, 178). Finally, although the Government did not argue that a potential life sentence creates a risk of flight, logic and experience both counsel that it does. Thus, the first factor strongly weighs in favor of detention.

Likewise, the weight of the evidence against Defendants weighs in favor of detention. As detailed, *supra*., the Government's evidence in this matter is strong.

The history and characteristics of each Defendant also argues in favor of detention. Each defendant is legally in the United States. First, the Court takes judicial notice of the portions of each Defendants' history and characteristics that are a matter of public record. Much of this information is summarized in each Defendants' Pretrial Report.[8] Daniel Boyd, Zakariya Boyd, Dylan Boyd, Mohammad Hassan, and Ziyad Yaghi are citizens of the United States.[9] Hysen Sherifi is a legal resident of the United States. However, each Defendant has family or friends overseas and have traveled to foreign countries. (Tr. 73-74). Defendant Hassan was involved in several incidents involving assaultive and threatening behavior and Defendant Yaghi has knowingly failed to appear for mandatory court appearances. Furthermore Daniel Boyd reached for his side arm during his arrest, and Dylan Boyd did not

---

[8]  With regard to Defendant Subasic, the Pretrial Report indicates he has committed three prior offenses in Bosnia and Herzegovina. Two of these convictions occurred after Subasic relocated to the United States. Although the Government proffered that it "believed" that these crimes were prosecuted *in absentia,* the undersigned will not consider these convictions.

[9]Ziyad Yaghi is a naturalized citizen.

comply with the instructions of arresting officers. The members of this conspiracy had access to large quantities of cash. Indeed, Daniel Boyd even advised writing checks against a credit account with no intention of repaying the debt because "you need not worry to have to pay for it because you will have left the country and you will no longer be responsible for that." (Tr. 40).

Finally, the nature and seriousness of the danger to any person or the community that would be posed by the Defendants' release also weighs in favor of detention. Defendants are charged with, *inter alia*, conspiracy to murder, kidnap, maim and injure persons or damage property. In furtherance of this conspiracy, Defendants have stockpiled weapons, ammunition and cash. They have also undergone military training and attempted to recruit others. The threat Defendants pose to any person or the community is not mitigated by a third party custodian or any other proposed condition of release.

## Conclusion

After Defendants' detention hearing and for the reasons set forth *supra*., pursuant to 18 U.S.C. § 3142(e) this Court finds by clear and convincing evidence that no condition or combination of conditions will reasonably assure the appearance of Defendants and the safety of any other person and the community. Each of these Defendants is committed to the custody of the Attorney General or his designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. Defendants shall be afforded a reasonable opportunity for private consultation with defense counsel. On the order of a Court of the

United States or on request of an attorney for the Government, the person in charge of the corrections facility shall deliver Defendants to the United States Marshal for the purpose of an appearance in connection with a court proceeding.

DONE AND ORDERED in Chambers at Raleigh, North Carolina this 10th day of August, 2009.

_____
William A. Webb
U.S. Magistrate Judge