UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

_____
_____

UNITED STATES OF AMERICA, )
                          )
vs.                       )          5:09-CR-216-FL
                          )
                          )
DANIEL PATRICK BOYD,      )
HYSEN SHERIFI;            )
ANES SUBASIC;             )
ZAKARIYA BOYD,            )
DYLAN BOYD,               )
MOHAMMAD OMAR ALY HASSAN  )
ZIYAD YAGHI,              )
                          )
Defendants.               )
_____    )


STATUS CONFERENCE
JANUARY 13, 2011
BEFORE THE HONORABLE JAMES E. GATES
U. S. MAGISTRATE JUDGE



**APPEARANCES**:

**FOR THE GOVERNMENT**:

JOHN BOWLER
BARBARA D. KOCHER
U.S. ATTORNEY'S OFFICE
310 NEW BERN AVENUE
SUITE 800
RALEIGH, NORTH CAROLINA 27601

**FOR THE DEFENDANTS:**

| | |
|---|---|
| **DANIEL PATRICK BOYD:** | **HYSEN SHERIFI:** |

DEBRA C. GRAVES,              MR. ROBERT MCAFEE,
ROSEMARY GODWIN              MCAFEE LAW FIRM
FEDERAL PUBLIC DEFENDER      P. O. BOX 905
150 FAYETTEVILLE STREET MALL NEW BERN, NORTH CAROLINA 28563
RALEIGH, NORTH CAROLINA 27601


**ANES SUBASIC:**              **ZAKARIYA BOYD:**

PAUL K. SUN, JR.             MYRON T. HILL, JR.
ELLIS & WINTERS             BROWNING & HILL
P. O. BOX 33550             200 E. FOURTH STREET
RALEIGH, NORTH CAROLINA 27636  GREENVILLE, NORTH CAROLINA 27835


**DYLAN BOYD:**               **MOHAMMAD OMAR ALY HASSAN**

JOSEPH E. ZESZOTARSKI, JR.    R. DANIEL BOYCE
POYNER & SPRUILL            BOYCE & ISLEY, PLLC
P. O. BOX 10096             107 FAYETTEVILLE STREET
RALEIGH, NORTH CAROLINA 27605  SUITE 500
                            RALEIGH, NORTH CAROLINA 27601


**ZIYAD YAGHI:**

JAMES M. AYERS, II
AYERS & HAIDT, P.A.
P. O. BOX 1544
NEW BERN, NORTH CAROLINA 28563


J. DOUGLAS MCCULLOUGH
STUBBS & PERDUE, PA
310 CRAVEN STREET
NEW BERN, NORTH CAROLINA 28563


COURT REPORTER:  REBECCA L. CRUNK
STENOTYPE WITH COMPUTER AIDED TRANSCRIPTION

```
                          * * * * * * * *

     (The proceedings began at 10:10 a.m.)

     THE COURT:  Good morning, folks.

     Madam Clerk, would you please swear the interpreter.

     THE CLERK:  Please rise.

THEREUPON,

SPANISH INTERPRETER,

having been duly sworn, interpreted as follows:

     THE COURT:  Mr. Ayers, I want to welcome you to this case.

This is the first court proceeding that you've been able to

participate since your entry into the case.  You know, Mr. Sun

is a late arrival as well, so you're not alone in not coming to

this case at the outset, but the Court appreciates the service

of you as well as other -- the other counsel in this case.

     MR. SUN:  Thank you, Judge.

     THE COURT:  Now, let me begin by just reminding counsel of

an order that Judge Flanagan had entered back in December.  I

believe it's docket entry 678, and it -- in it, she directed or

reminded counsel of the need to file MOUs for those folks who

have dealt with sensitive information, I believe directed the

parties to file a list of all people who have had access to that

information.  My understanding is that some counsel have

complied with this directive and some have not.  If you all

could please check to make sure that if you have not yet

complied that you do so promptly.
```

1  The first order or the next order of business is to provide

2 Mr. Subasic, who is here with us today, an initial appearance

3 with respect to additional charges that have been brought

4 against him.

5  Mr. Subasic, sir, the Grand Jury returned a superseding

6 indictment, it's actually the second superseding indictment.  It

7 was filed in the Court on November 24th of 2010.  This

8 indictment includes additional charges against you and

9 specifically it adds two additional counts against you.

10  Under the preceding indictment, you have been charged in

11 Counts 1 and 2.  Count 1 charging a conspiracy to provide

12 material support to terrorists in violation of 18 USC, Section

13 2339(a).  And then Count 2, it charged you with conspiracy to

14 murder, kidnap, maim and injure persons in violation of Title 18

15 of United States Code, Section 956(a).  Those two counts are

16 carried over to the new indictment and the two additional counts

17 that have been added are Counts 12 and 13.

18  And, Mr. Sun, am I correct that Mr. Subasic has access to

19 the copy of this second superseding indictment.

20  MR. SUN:  Yes, sir, your Honor.

21  THE COURT:  Very good.  Thank you, sir.

22  Mr. Subasic, I'm going to review with you the additional

23 charges that are set out in these additional counts.  Count 12,

24 which appears on Page 20, charges a violation of Title 18 of the

25 United States Code, Section 1425(a), and it charges specifically

1  that on or about December 2nd of 2003 in this district and

2  elsewhere, you knowingly procured and attempted to procure,

3  contrary to law, naturalization; that is, in applying to become

4  a nationalized American citizen, you did respond, certify and

5  swear untruthfully on your formal application for

6  naturalization, form N-400, dated December 2 of 2003,

7  specifically in that you, in question 17, represented that you

8  had not ever been charged with committing any crime or offense,

9  whereas in truth and in fact, as you well knew, you had been

10  charged with committing crimes and offenses on at least ten

11  occasions prior to December 3 of 2003, again, an alleged

12  violation of Title 18 of United States Code, Section 1425(a).

13  Count 13 charges a violation of that same statute, 18 USC,

14  Section 1425(a), and specifically it alleges that on or about

15  December 2 of 2003 in this district and elsewhere, you knowingly

16  procured and attempted to procure, contrary to law,

17  naturalization, specifically in applying to become a

18  nationalized American citizen, you did respond, certify and

19  swear untruthfully on your formal application for

20  naturalization, form N-400, dated December 2, 2003, in answer to

21  question 23 represented that you had not given false or

22  misleading information to any U.S. government official while

23  applying for any immigration benefit or to prevent deportation,

24  exclusion or removal, whereas in truth and in fact, as you well

25  knew, you had made false statements in regard to your criminal

history on an I-590 registration for classification as a
refugee, which you filed on December 8 of 1997, wherein you
responded to question 15, "Have you ever been charged with a
violation of law?"  With the answer, "I have not."  And on an
I-485 application to register permanent residence or adjust
status, which you filed on August 24th, 1999 wherein you
responded "no" to question 1 of part 3 which asked if you had
ever been arrested, cited, charged, indicted, fined or
imprisoned for breaking or violating any law or ordinance
excluding traffic violations all prior to December 2 of 2003,
again, this an alleged violation of Title 18 of United States
Code, Section 1425(a).

    Mr. Bowler, sir, are you in a position to advise Mr.
Subasic, you or your colleague, Ms. Kocher, of the penalties he
faces on these charges?

    MR. BOWLER:  Your Honor, both counts carry a maximum of ten
years of confinement, $250,000 fine, three years supervised
release and, of course, the $100 special assessment.

    THE COURT:  Now, is that -- Mr. Bowler, you say not more
than ten years?

    MR. BOWLER:  Yes.  There are aggravated circumstances under
that statute which can produce a more serious cap, your Honor,
but that's not the specific charge in those two counts.

    THE COURT:  Am I correct that if the aggravating
circumstances are present, the penalty on each charge would go

up to 25 years, the maximum of 25 years imprisonment, a $250,000 fine, up to five years supervised release, not more than three year -- three years imprisonment upon revocation of supervised release and of course the $100 special assessment?

MR. BOWLER:  That's true.  That would be if those charged offenses proved -- turned out to indicate that they were committed in furtherance of an act of terrorism, your Honor.

THE COURT:  I see.  Okay.  Thank you.

Mr. Subasic, sir, let me remind you or indicate to you, sir, that you have all the rights with respect to these additional charges that you have with respect to the charges that were -- had already been brought against you, Counts 1 and 2.  Let me review some of these with you.

You have the right to remain silent.  Nobody can require you to answer any questions or make any statements about the charges facing you including these additional charges which we have reviewed here today.  This right can be waived.  If you waive the right to remain silent, then anything you say may be used against you.

Now, as with the Counts 1 and 2 of the indictment, so with these additional counts, at a later date, you will be asked to plead guilty or not guilty to the charges against you.  If you plead guilty, there will be no trial.  You will be admitted -- admitting that you committed the crimes charged.

On the other hand, if you plead not guilty, then there will

be a trial.  At trial, you have several important rights.  You have the right to counsel and to have one appointed if you cannot afford one.  You will be presumed innocent.  There will be no burden on you to prove anything.  The Government must prove you guilty beyond a reasonable doubt.  In addition, the Government must bring its witnesses to court.  You or your attorney are allowed to cross examine these witness, that is to ask them questions, and this right stems from your right to confront witnesses against you.

You also, of course, have the right to present evidence on your own behalf, and this includes the right to subpoena witnesses, that is, the right to have the court issue orders called subpoenas directing witnesses to come to trial so that they may testify on your behalf.

You, yourself, have a choice as to whether to testify or not to testify, and this right derives from your right to remain silent.  No adverse inference, that is no suggestion that you are guilty, is to be drawn from a decision by you not to testify.  And, of course, the Judge will so instruct the jury.

And needless to say, sir, you do have the right to trial by jury with respect to these additional charges as well as the charges that have previously been brought against you.

You also, of course, have the right to counsel in connection with these new charges against you.  And specifically with respect to these new charges as well as the others, you're

entitled under the constitution and the laws of the United
States to be represented by an attorney during any questioning
by the authorities and any line up and at all court proceedings.
You may consult with an attorney before questioning may occur at
any proceeding.  If you are unable to obtain counsel, then
counsel will be appointed.  Appointed counsel may not be free.
If you're found guilty, you may be required to repay part of the
entire cost of appointed counsel.  And, of course, counsel has
been appointed for you.  Your current counsel, of course, is
Mr. Paul Sun.

　　　Mr. Subasic, sir, have you heard everything I've said now
with respect to these new charges against you?

　　　MR. SUBASIC:  I do not understand two additional charges.
I don't know where they're coming from.  Are they reflecting
region of Bosnia and --

　　　THE COURT:  Ma'am, let me cut you off.  And, Mr. Sun, could
you confer with your counsel?  Mr. Subasic, I'm going to have
that question directed to Mr. Sun initially, and one reason for
that is, I don't want you to say anything in open court here
that could prejudice your case in any way.

　　　MR. SUBASIC:  I would like to say.  It doesn't matter what
it's going to be.

　　　THE COURT:  Well, I want you to confer with Mr. Sun, and
then we'll take it from there.

　　　MR. SUN:  May it please the Court, he did have a question.

Mr. Subasic does have a question about what's pleaded in the second superseding indictment, and I think he is prepared and he understands and would like to have what he asked the interpreter to ask you to go ahead and ask that.

THE COURT: Okay. Very good.

THE INTERPRETER: I'm going to -- I want to repeat what he said but now I have to interpret actually what Mr. Subasic said. His question was basically two additional charges wrote on him in regards to naturalization law, it says ten counts of crime and that when he stated I have not committed any crime in his I-form for the location to register permanent residence. He would like to have more information who brought these charges and who provide this information. He's asking, are they reflecting time in Bosnia from '91 to '95. There is no law and there was a board of operations, and he was, as a Muslim, tortured on the Serb territory under Mr. Carthage (ph) under the war crimes of '98, that he was tortured, and he was the victim of Serbian aggression, so if these people -- the Serbs are bringing charges against him, he definitely is denying any of these so he believes that it is something that could be put against him here in the United States.

THE COURT: Okay. Thank you.

INTERPRETER: You're welcome.

THE COURT: Mr. Subasic, I understand your question. You and your counsel can work together in fashioning discovery, that

1    is, questions to the Government to explore, get more information

2    about the facts that the Government is relying on in bringing

3    these charges against you.  You do have rights to attempt to

4    obtain more information along those lines which Mr. Sun can

5    explain to you.

6         The limited purpose of the proceeding here today is to make

7    sure that you are aware of what the Government is charging you

8    with.  So it's really, in a sense, that initial step to make

9    sure that you at least -- that you know what the accusations

10   are.  Down the line, there are processes and procedures that Mr.

11   Sun can review with you, and you've certainly been involved with

12   him in respect to the other charges, by which you can explore

13   the validity of these charges and develop evidence addressing

14   them.  But that second step of looking behind the charges and

15   trying to determine their validity and so forth, that's not our

16   issue for today.

17        So my concern today, and it sounds as if you do based on

18   your question, but I want to make sure that you understand these

19   additional two charges that have been brought against you.

20        MR. SUBASIC:  I have heard charge.

21        THE COURT:  And you believe you understand them, sir?  I

22   know you question their validity.

23        MR. SUBASIC:  It's just unbelievable for me, that's all,

24   very just unbelievable.

25        THE COURT:  Okay, sir.  And you understood the penalty, the

explanation of the penalty?

MR. SUBASIC: I had heard that, yes. That was clear.

THE COURT: Very good, sir. Thank you.

Well, I believe that concludes, then, the initial appearance of Mr. Subasic with respect to the additional charges against you. Mr. Sun, is there anything further in that regard you believe we need to cover today?

MR. SUN: Not directly, your Honor, but one thing I want to bring to the Court was whether it would be appropriate to have some scheduling dates with regard to the new charges. In the scheduling order, there were deadlines associated with the original charges, times by which things had to be done, and I'd like to speak to the Court here, or if we have our individual session, that might be a better time, about putting in deadlines in place now that there are some new charges to be dealt with.

THE COURT: The Court would certainly be willing to entertain any proposal that you may wish to offer. I think absent the change in the deadlines to accommodate concerns such as that the deadlines that are in place would apply. And I understand that -- I gather from what you're saying you have some concern whether those are really workable with respect to the additional charges.

MR. SUN: That's it in part, your Honor, but also in part because one of the deadlines have already passed. There was a deadline for a severance motion back in August. There would, I

1  think, be some time within which we could make that kind of a

2  motion with regard to the new charges or at least I'd like to

3  approach the Court on that subject.

4  THE COURT:  Well, certainly.  I think if you seek relief in

5  that regard, a motion is an appropriate means, but I'm certainly

6  happy to discuss it with you at the conference today.

7  MR. SUN:  Thank you, your Honor.

8  THE COURT:  Mr. Bowler, Ms. Kocher, anything further with

9  respect to the initial appearance of Mr. Subasic with respect to

10  the additional charges brought against him?

11  MR. BOWLER:  No.  I believe discovery has been out some

12  time and already done, but we certainly understand the request

13  by Mr. Sun.

14  THE COURT:  Very good.  Thank you, sir.

15  Mr. Yaghi, sir, I wanted you to be here today at the first

16  court proceeding involving Mr. Ayers.  It would give you a

17  definite opportunity to see him, and you may have seen him

18  otherwise, I believe you have, but that was one reason to have

19  you here.

20  I also wanted to express to you personally the high esteem

21  in which the Court holds Mr. Ayers.  Some care was taken in

22  selecting counsel for you, and I think you're going from one

23  very good lawyer to another very good lawyer, so I believe

24  you're in good hands with Mr. Ayers as you were with

25  Mr. McCullough who, as you now know, has returned to the Court

1  of Appeals as a judge in the State system.

2      Very good.  Let's turn now to the topics we typically

3  review at our -- in general session here.  And the first step is

4  always transcripts.  So, Ms. Graves, any update with respect to

5  the transcript situation?

6      MS. GRAVES:  Your Honor, I'm not aware of any problems

7  since our last conference so I think everything is going fine

8  with the role of completion of transcripts for the Court.

9      THE COURT:  Okay.  Very good.  Because I believe the

10  Government's met its obligations.  The Government's out of the

11  transcript business for the time being.

12      MS. KOCHER:  That's correct, your Honor, we're just

13  awaiting any proposed objections or changes at this point.

14      THE COURT:  Okay.  And then at the end of this month is the

15  deadline for defense objections or consents to the Government's

16  proposed changes to the Government designated -- designations of

17  the existing transcripts, and then, as well, on the same date,

18  defense designations and proposed changes -- their proposed

19  changes with respect to the existing transcripts.  And then the

20  end of next month, February, of course, is the deadline for the

21  defense proposed transcripts for all remaining defense

22  designated audio.

23      MS. GRAVES:  Your Honor, I would note that Mr. Sun raised

24  the question through email regarding the raising in the order

25  using the term "existing transcripts."  It has no relevance to

him since he hasn't been in this case throughout, and, frankly,
I was having trouble remembering myself exactly what the term
"existing transcripts" refers to with the two different
deadlines.  And I told him I believe the term "existing
transcripts" was referring to those transcripts that were
initially available and provided to the Government way back in
the beginning, but I could not recall exactly what disk numbers
those were referring to.  So it might be better to allow him to
just deal with the transcripts however he needs to instead of
relying on that phrase "existing transcripts" because it has no
relevance to him.

Do you understand what I'm saying?  He wasn't in the case
back when we were getting things in on a rolling basis.
Instead, he now has everything.  And so the use of the term
"existing transcripts" for him, you know, that doesn't really
make much sense for him.

THE COURT:  I understand.  Well, I'll be happy to hear from
him on that.  The term "existing transcripts" was used in one of
the orders early on, and it was a defined term in one of the
orders, and I can't give you the docket number for that off the
top of my head, but it was the defined term that in the context
at the time was an appropriate distinction to make.  It was
meaningful at the time, and I think served the parties well, but
at this -- towards the tail end of this process, I understand
the point you're making.

1    Mr. Sun, did you wish to be heard with respect to that?

2    MR. SUN:  Ms. Graves has stated the question that I made,

3  and I also talked with Ms. Kocher about that, too.  I understood

4  that that was a term of art.  I didn't appreciate that there was

5  an order that had defined it, but I did have, again, a question

6  distinguishing within the total weight what that -- what that

7  meant in terms of what was the January 31st deadline was

8  appropriate at that time.

9    MS. GRAVES:  I think that would apply to Mr. Ayers as well.

10    THE COURT:  Mr. Ayers, did you wish to be heard on that

11  issue at this time?

12    MR. AYERS:  No, your Honor.

13    THE COURT:  Well, I think, again, I come back to the point

14  with respect to all the parties, the deadlines that are in place

15  remain in place, and if a party seeks relief from those

16  deadlines, a motion is an appropriate vehicle so it can be fully

17  flushed out.  But, again, I'll be happy to discuss it on an

18  informal basis at the status conference today.

19    Anything further from any of the parties with respect to

20  transcripts?

21    ALL PARTIES:  (No response.)

22    THE COURT:  Mr. McAfee, are there any issues arisen that

23  you're aware of with respect to hard drives?

24    MR. McAFEE:  No, your Honor.  I sent out the usual email to

25  defense counsel and have received no indication there has been

1    any problems.  I do have one issue to address to the Court with

2    my case, but we can do that later.

3          (Mr. McCullough entered the courtroom.)

4          THE COURT:  Okay.

5          Mr. McCullough, sir, how are you?

6          MR. McCULLOUGH:  I was in another court.  May I approach

7    and take a seat?

8          THE COURT:  Certainly.  Good to have you here.

9          Any other counsel wish to be heard at all with respect to

10   hard drives?

11         ALL PARTIES:  (No response.)

12         THE COURT:  Very good.

13         Mr. Hill, I think the paper discovery area has been normal

14   for a long time.  Does it remain so?

15         MR. HILL:  Yes, your Honor, that's correct.

16         THE COURT:  Any party wish to be heard with respect to

17   paper discovery at all?

18         ALL PARTIES:  (No response.)

19         THE COURT:  That gets us to international depositions.  The

20   deadline for filing motions for such depositions is coming up

21   the end of this month, and we are in the -- about to lose the

22   liaison that we appointed.

23         MR. McCULLOUGH:  I nominate my successor, your Honor.

24         THE COURT:  Well, we can add Mr. Ayers.  I don't know how

25   many international -- more international depositions we're going

1  to have to be dealing with.  We could -- I'm prepared to appoint

2  Mr. Ayers, but Mr. Boyce here has been the liaison for other

3  matters, and he hadn't been real busy.

4       MR. BOYCE:  Mr. Ayers is much more handsome.  I second it.

5       MR. McCULLOUGH:  I second and third it.

6       MR. BOYCE:  Your Honor, I'll work with Mr. Ayers.  The two

7  of us will talk about that.

8       THE COURT:  Okay.  That would be great.  Thank you.

9       Do any parties wish to be heard with respect to

10  international depositions?

11       ALL PARTIES:  (No response.)

12       THE COURT:  Very good.  We've had -- we have additional

13  deadlines.  The end of this month is a big deadline day, as you

14  know from the schedule that's been in place.  Motions regarding

15  general and sensitive but unclassified discovery are due as well

16  this month.

17       Do any parties know at this point whether they'll be filing

18  any such motions?  Mr. Zeszotarski, you anticipate --

19       MR. ZESZOTARSKI:  I think there will be a few, your Honor.

20       THE COURT:  Okay.  Folks, are there any other issues that

21  you believe can appropriately be taken up during our general

22  session here?

23       ALL PARTIES:  (No response.)

24       THE COURT:  Why don't we talk then about scheduling our

25  next conference, our next status conference.  Six weeks from

1 today would be the week of September 21st, I believe.  Excuse
2 me.  February, not September, February.  February 21st, and
3 Tuesday would be the 22nd.  I'd like to set it -- absent
4 objection, I'd like to set our next status conference for
5 Tuesday, February 22nd at 10:00 a.m.  Hearing no objection that
6 will be our setting.
7        Mr. McCullough, I'm going to ask you a question with
8 respect that relates to the pending motion regarding the
9 proceeding in Amman, Jordan, and I don't know whether you want
10 me -- it deals with the identity of the interpreter that was
11 used.  And I don't need to ask a name.  I'm interested in a --
12        MR. McCULLOUGH:  It was the person that I had originally
13 had attempted to depose?
14        THE COURT:  Yes.
15        MR. McCULLOUGH:  He was the interpreter for the deposition.
16        THE COURT:  So that's the uncle of the defendant.
17        MR. McCULLOUGH:  Yes, sir, of my client.
18        THE COURT:  Okay.  Very good.  Thank you, sir.  That was my
19 impression from reading the transcript, and I wanted --
20        MR. McCULLOUGH:  In fact, I had arranged for somebody else
21 to be the interpreter on that particular day, and he wanted to
22 be compensated in an exorbitant amount on the day of the actual
23 deposition, and so Mr. Yaghi stepped forward and acted as
24 interpreter, and I don't think there's any question that he was
25 sworn and agreed to interpret, and he lived here in this country

for a long time and knew English.

    THE COURT:  Okay.  Very good.  Well, I'm not trying to open up reargument of it --

    MR. McCULLOUGH:  Yes, sir.

    THE COURT:  -- but I appreciate you answering my question.

    Mr. Bowler, as I said, I'm not trying to reargue the motion, but I'll turn to you.  Do you have any comment or wish to be heard at all?  Again, I'm not trying to reargue this.

    MR. BOWLER:  I mean, we have various arguments we filed, your Honor.  We're not waiving any of those.  From our perspective needing to use the defendant's uncle as a translator for something they'll offer in court speaks to all the procedural issues which, in the Government's view, preceded that.

    THE COURT:  Okay.  Thank you, sir.

    Folks, what I'd like to do now is really turn the floor over to Jolie Skinner and Janet Callahan to provide information regarding some of the filing-related issues that have come up in the case that were the subject of Judge Flanagan's order on December 30.

    I want to remind counsel that I realize that in some of your offices you may have staff persons handling the filing, but the Court's looking to you to do it correctly, so if something's not done properly, the buck stops with the lawyer.

    So with that in mind, ladies.

MS. CALLAHAN: Hi, I'm Janet Callahan. I know most of the attorneys, and I know that you know me. I've been here longer than any of you have been here, most of you anyway.

And now, I was case manager for Judge Howard for too many years to speak of and courtroom deputy for him, but right now I'm trainer for case management in the district and the supervisor for the quality control of the electronic filing system.

And over here to my left is Jolie Skinner, and she is our operations manager for the district, and when we get through, if we have time, and if not, then you can call us in the clerk's office if you have any questions about what I have to talk about this morning.

The Court's asked me to speak this morning just to bring up the date on the quality control, and this just doesn't apply just to this docket, but dockets throughout the whole district, and it's not pointing fingers or pinpointing just in this case, but there are particular policies and procedures and rules and regulations that we need to follow.

And this is an important docket, and there's a lot of filings in this docket, so they've assigned me and Jolie as back up to audit the entries just to make sure that we have a clean and concise docket. And so I'm going to go over a few of the errors.

Before I did -- or before I do go over those, I know a lot

of you have been to seminars where I've had to speak at the
seminars, the CJ panel, and the Federal public defenders, and
you've heard some of these things over and over and over again,
and I apologize if you have, but the same errors and the same
things happen over and over, and that's why we have to have
these meetings.

     And I'll let you know that Judge Howard used to say all the
time in the courtroom when I was in there, if someone kept
saying the same thing over and over, and he would make the
statement, "We've plowed this field long enough, let's move on."
But in quality control, that doesn't apply because it's an
ongoing effort to keep the docket clean and concise so we have
to keep plowing the field over and over in quality control.

     And so I'll briefly cover some of the most common errors
that pertain to the electronic filing.  First, I'll cover the
memorandum and support.  Can all of you hear me?  I just want to
make sure that you can hear me.

     ALL PARTIES:  (No response.)

     MS. CALLAHAN:  The first error is no memorandum in support
of a motion.  All motions made other than in a hearing or trial
shall be filed with the supporting memorandum.  Now, I bulleted
these particular areas.  If you have a question in between, you
know, raise your hand, interrupt, if not, at the end of whenever
I get through, we can talk about it or if you need, to call the
clerk's office.

1   Next, the memorandum does not have a basis for filing the

2   document under seal.  The memorandum needs -- when you file a

3   motion to seal, your memorandum must state a basis for filing or

4   requesting this document be filed under seal.  The memorandum is

5   incorporated into the motion, but there's no reference of the

6   memorandum in the caption or the title or the docket entry.  I

7   mean, we may have a motion to continue, but -- and there's a

8   memorandum in support, but it doesn't state it on the docket,

9   and it may not even state it on the document itself, but we

10  need -- if your document states that it is a motion to compel

11  with the memorandum in support of that, then that needs to be

12  stated within the entry, the text on the document.  It all needs

13  to flow so it's an easier docket to identify.  Whenever the

14  court staff, chambers, our court users and our clerks and the

15  public go to the docket, it's hard to identify this document if

16  you don't describe it the same on the docket as you have the

17  document.

18      If there are issues as far as it goes with memorandums in

19  support, we're going to come back to the rules -- local rules

20  committee and we've discussed this this morning with the clerk

21  and -- yes, sir.

22      MR. BOYCE:  Is the preference for short motions that we put

23  in the caption motion and incorporate in memorandum of law --

24      MS. CALLAHAN:  Correct.

25      MR. BOYCE:  -- the preference?

1     MS. CALLAHAN: Yes. Thank you. Now I'll go over some

2    service errors that we're having problems with on the docket,

3    and it's not just this docket, it's throughout the whole

4    district, but we're being specific about this one today.

5     Documents filed with no certificate of service. A

6    certificate of service is required for all documents filed with

7    the Court. Certificate of service is incomplete, must state

8    specifically in your certificate of service, the name of the

9    document being served, the date it's served, the full name and

10    address if served by mail or the individual being served, and

11    the manner of service. If it's email, U.S. mail, whatever way

12    you're serving, that needs to be stated on the certificate of

13    service. It is not sufficient to state that service has been

14    made on all counsel of record or service has been made on

15    defense counsel or Government. We need a specific name or the

16    Court is requiring a specific name to appear on the certificate

17    of service. We're noticing that the certificate of service

18    incorrectly states that a public document was served by method

19    of CMECF. All public documents are served by CMECF. The minute

20    a public document is docketed, it goes out, electronic filing

21    goes out, a party receives the CMECF, therefore that language

22    does not need to be included in a certificate of service because

23    it's automatically done.

24     The certificate of service must reflect that all counsel in

25    the case have been served unless the filing is an ex parte or an

order to serve specific parties by the Court.  The certificate
of service incorrectly states that a sealed document was served
by CMCEF.  Criminal sealed documents can never be served through
CMCEF, through the electronic filing.  Opposing counsel received
an NEF but can't view the document.  Service must be made in
another manner such as an email, U.S. mail, fax, whatever way,
it has to be made in another manner, but you will not receive --
they would not be able to open up the document and view the
document, then you have to make service through other means.

Please note, service cannot be made by electronic
transmission unless the attorney has expressly consented in
writing to sent service to the opposing party or to the parties
within the case.

Now I'm going to go over just a few things on the sealing
errors.  The motion to seal must be filed under seal, and the
motion to seal must be a public docket entry of a public -- I
mean a public PDF.  The party may move the memorandum be filed
and sealed, but the motion to seal must be a public docket entry
and document the PDF.  All parties must file a public notice of
filing under seal in lieu of a motion to seal and does not
require the Court's approval when filing or referring to the
sensitive discovery material pursuant to the Court's order of
12-30-2010.  And I do not have that docket entry, but if you
could refer to that order.

Some proposed orders errors.  The proposed order is not

being attached to the motion. Whenever possible, please attach
the proposed order to the motion. The proposed order on a
motion to seal must not include the language that we request the
motion to be sealed. Both of these documents, the motion and
order, are public.

This is just a docket in request by the Court -- I mean by
the clerk's office. When docketing sealed motions or documents,
any type of document, please give us as much description as
possible in the corresponding text box. When you're making the
docket entry, you'll get a text box, and if you can put as much
information as possible without going to the guts of the body of
what you're requesting but just as descriptions because what's
happening is we're going back on the docket and the Court's
going on the docket and their staff, and everything on the
docket looks alike. It's a sealed document, sealed document,
but the sealed document -- and I realize that we've asked you to
be as generic as possible in this, but I've almost, in the
training classes, asked that you be -- I'll put the blame on
myself because in the training I said, be generic, be generic
whenever possible.

So we need a little bit of reference of the description of
the documents so when we're linking and referring back to the
other documents that it's referring to that it's easier to
detect because what's happening right now is we're having to
open up every single document if we do not have a link to that

other document. We're having to open them up and find them and
doing a lot of searching that if we had just some small
description then it wouldn't take near as long for chambers and
the Court to search for these documents, such as a sealed motion
to compel, that would be read, "Proposed sealed motion to
compel," added to compel in the text box. It's just that
simple. And with the massive amount of docket entries made, it
would be much easier to pinpoint these documents that we're
searching for if the parties would include this language.

Whenever necessary, link your filing to the motion or order
that is related. For example, a response to a motion or a
response to an order, link as much as possible because that
helps a lot, also. I may have said this before, and it is so --
and just like Judge Gates said just a few minutes ago, it is
left up to you to make sure this docket is right, great, but we
realize that all these attorneys and everybody's busy, and when
you do have staff in the office, and they have to be trained
properly, they have to understand what's going on, and we're
here in this office to make sure that they understand. And if
you're here and you're not the attorney that makes these docket
entries, it is just imperative that your staff is trained
properly, and if they feel uncomfortable and they feel -- if
they pause one second when they're making a docket entry, then
they need to stop and make a phone call to our office because
that's all it takes.

 1    I'm Janet Callahan.  My number is going to be on the

 2   handout, Jolie Skinner's number is on the handout, our

 3   operation's mana- -- our chief deputy, her number's on the

 4   handout that you're going to get, and we just want to make sure

 5   that -- I mean, if we -- there's so many times that one little

 6   phone call would have stopped a notice of deficiency, and

 7   believe me, that's the last thing that I want to send out or

 8   that I want to direct the persons on the team to send out, and

 9   as much as possible we'll confer with you and try to keep from

10   doing this.  It's not that we're doing it because we want to put

11   a notice of deficiency because believe me, we do not.  But

12   sometimes that's the only way we -- and if you have to refile

13   something, then we have to enter the notice of the deficiency.

14   But if it's something that we're trying to remind you of, like,

15   in the future, please do this or in the future, please do that,

16   then I'll send just a notice to the counsel.  It doesn't stand

17   out on the docket like a sore thumb, and it doesn't make it

18   as -- it doesn't come to notice to the Court, and what -- you

19   know, we don't want the Court to look at the document seeing

20   notice of deficiency when we could have put a notice to counsel,

21   just to send a note.  If I can make a phone call -- but when I

22   make a phone call, I make a note.  So I just need if any of you

23   have any questions now, I'll be glad to answer your questions,

24   Jolie will, if not, and you're ready to go forward, when you get

25   back to your offices, call me or have your staff call me and

1  please share these handouts with your staff.

2      THE COURT:  Any questions, folks?  These are the experts.

3      MS. CALLAHAN:  They'll call me.

4      MS. SKINNER:  Judge, can I pass these out?

5      THE COURT:  Sure.  Thank you.

6      MS. CALLAHAN:  Thank you so much.  Thank you for this time.

7      MS. SKINNER:  If you need any extras, we'll be glad to

8  email them to you.

9      THE COURT:  Thank you very much.

10      MS. CALLAHAN:  You're welcome.

11      THE COURT:  Ms. Callahan referenced Judge Flanagan's

12  December 30 order, I believe, document number 693.  We talked

13  earlier about what the term "existing transcripts" means.  It's

14  defined in the order that's at docket entry 287 at the bottom of

15  Page 2 running over to Page 3.  It refers to transcripts

16  received by the Office of the Federal Public Defender on or

17  before the date indicated in this order and this order was

18  entered on April 2nd of 2010.  And I believe at one point the

19  Federal Public Defender's Office was maintaining a list of

20  transcripts and the date of receipt from the transcription

21  company, so that puts the meat on the bones of what "existing

22  transcripts" means or has meant in the case, whatever its

23  current relevance is going to be as we discussed for the -- at

24  least some of the defendants.

25      Very good, folks.  I think that covers the matters that the

1    Court was interested in covering at our general -- general

2    session here.  What I'd like to do now is meet in closed session

3    with defense counsel as a whole, but as is our practice, if

4    Government's counsel could remain available because I would like

5    to meet with you later on.  Can we reach you at your offices?

6         MS. KOCHER:  We'll pass up cell phone numbers, your Honor.

7         THE COURT:  Okay.  Very good.  Thank you.

8         Ms. Kocher, Mr. Bowler, if I could ask you if you could

9    please leave at this time, and we'll let you know when we need

10   you to return.

11        MR. BOWLER:  We can take a hint, your Honor.

12        THE COURT:  And if I could ask security folks, we're going

13   to need to have those in the public gallery leave as well

14   because we need to speak in closed session with defense counsel.

15        MR. McCULLOUGH:  Judge, could I leave and come right back?

16   I left my coat in the other courtroom, and I'm afraid if they

17   get finished --

18        THE COURT:  You may, sir.  I just note to let the CSO that

19   you're about to return.

20        MR. BOYCE.  Your Honor, may I leave --

21        THE COURT:  Yes, sir.  We can probably take a five-minute

22   recess.

23        (Recess taken from 11:10 to 11:20.)

24        THE COURT:  I believe we're still awaiting Mr. Yaghi's

25   return so we can be at ease until he returns.

1     Very good, folks.  Mr. Yaghi has returned to the courtroom.
2   We are in closed session with defense counsel.  Before I inquire
3   of counsel as a group regarding the various areas of discovery
4   and case preparation generally, I just want to remind counsel
5   that as part of my preparation for these status conferences, I
6   do review the CJA vouchers, and we don't often discuss them, and
7   one reason we don't discuss them is -- well, let me put it this
8   way:  I'll discuss them if I think they indicate some issue,
9   some problem.  I don't intend to discuss them at this session
10  because I don't perceive the numbers any potential issues
11  presented, but that is an ongoing part of my preparation for
12  these status conferences, and I want just to remind you that it
13  is.
14     Let me inquire then to defense counsel as a group with
15  respect to these various areas of discovery any issues regarding
16  transcription, transcripts that we need to discuss in closed
17  session here.
18     ALL PARTIES:  (No response.)
19     THE COURT:  How about computer hard drives?  Mr. McAfee,
20  did you want to talk about that separately?
21     MR. McAFEE:  Yes, your Honor.
22     THE COURT:  That'd be fine.
23     For the group, any issues regarding computer hard drives?
24     ALL PARTIES:  (No response.)
25     THE COURT:  How about paper discovery?

1    ALL PARTIES:  (No response.)

2    THE COURT:  Anything with respect to international

3 depositions?  Mr. Ayers, sir.

4    MR. AYERS:  This is obviously -- depending on what the

5 Court's ruling is, at some point on the foreign issues, I may

6 very well have to file a motion to redo those or follow up, and

7 I don't think we need to cross that bridge today.

8    THE COURT:  I agree.

9    MR. AYERS:  I'll just file a motion to redo it if

10 necessary.

11    THE COURT:  Yes, sir.  Any issues with respect to experts?

12 Any other services that defense counsel are using?

13    ALL PARTIES:  (No response.)

14    THE COURT:  Any other issues for the group?  Any problems

15 that the group "as a whole" is having in case preparation,

16 anything the Court can help with?

17    ALL PARTIES:  (No response.)

18    THE COURT:  Well, good.  Mr. Ayers.

19    MR. AYERS:  Your Honor, I really have a -- obviously, the

20 logistics are coming in at this point, and I'm trying to come up

21 to speed, and I'll let you know in these other areas, but I do

22 have some budgeting issues.  I didn't know if I should just

23 speak to you directly in front of everybody or how you want to

24 handle that or if you want to do it as a group.  It doesn't

25 matter to me.

THE COURT:  Why don't we meet -- I'll meet with both you and Mr. McAfee individually, and that's -- just so you know, Mr. Ayers, that's a standard part --

MR. AYERS:  That's fine.

THE COURT:  -- of conferences so that's not unusual to be bringing that.

Well, I take it then from -- I take it then that, generally speaking, counsels on track, feels comfortable where they are in case preparation, nothing that the Court can help with at this point.  Okay.

Now, I would like to go around and just check in -- just give individual counsel now a chance to speak about their respective cases.  I'll do it with Mr. Ayers and Mr. McAfee in closed session, but let me turn to you, Ms. Graves, any --

MS. GODWIN:  I think this is my speaking turn.  I'm guessing that we're going to ask where we are in review of the discovery materials?

THE COURT:  Yes.

MS. GODWIN:  We are on track.

THE COURT:  Very good.  And that's across the board with respect to the paper, hard drive, the transcription and so forth.

MS. GODWIN:  We're comfortable with where we're at.  I think the only real challenge we're facing, and if necessary, we'll address that in a motion.  We have a lot of cross

references that the Government has provided their designations

against what we might designate separate from that because of

the amount of audio we have with our particular client.

THE COURT: Yes.

MS. GODWIN: And so if we have any trouble completing

everything by that deadline, we'll address that in a motion, but

that will be at the time.

THE COURT: Okay. Very good. Mr. Sun.

MR. SUN: Your Honor, I'm not sure what's appropriate in

the general session versus an individual session.

THE COURT: I'll be happy to meet with you separately.

MR. SUN: Thank you, your Honor.

THE COURT: Okay. Very good. Mr. Hill, sir.

MR. HILL: Your Honor, I'm hoping to have everything done

by January 31st. I had that problem with my paralegal, my

secretary legal --

THE COURT: Yes.

MR. HILL: -- not doing anything for two months,

October/November, but I've got my computer expert tech with the

paralegal end, and so as far as computer, the computer is on

stand still now, but Joe and I are comfortable with that. He's

not working on the computer. He's totally working on the

transcripts.

The only problem I've got is I've got a superior court

judge who doesn't like the Federal system, and he set a murder

case for me January 24th and that could cause a problem, quite frankly because my computer expert and paralegal has been working hard on the transcripts all of December and January, and we had planned to spend the next three weeks together and that might cause some motion to be filed, but I'm trying to get that murder case continued, your Honor.

The only other thing I see here is motion for foreign depositions.  At this point in time, I'm not planning on taking a foreign deposition, but I anticipate some classified material being dropped in our box, and once I review that classified material, I anticipate having to go take a foreign deposition.

THE COURT:  I see.  Okay.  Well, if the Court can assist with the scheduling conflict, obviously, if you seek relief from this Court with that respect at all.

MR. HILL:  You can't impeach a superior court judge, can you?

THE COURT:  No, I cannot.

MR. HILL:  Just asking, Judge.

THE COURT:  Mr. Zeszotarski, sir.

MR. ZESZOTARSKI:  Good morning, your Honor.  Likewise, I'm comfortable with where I am and working hard on all these deadlines for the 31st.  I feel very comfortable that three of the four will not be a problem.  Like Mr. Daniel Boyd's counsel as to the designation portion of things, it may be that I wind up, if I need to, filing a motion and producing some and asking

for an extension as to some more but working hard to get there.

THE COURT: Okay. Well, that's good because, you know, the schedule, there's not a lot of fat in this schedule. Enough said.

Mr. Boyce.

MR. BOYCE: Morning, your Honor. We're on schedule, working hard on some pretrial motions to be filed by the 31st. I echo what Mr. Hill said about the potential for subsequent -- well, after the deadline asking for international depositions if they drop either jinx materials or the classified discovery on us that we don't have. Nothing else right now.

THE COURT: Okay. Very good. Thank you.

Well, I think that takes us then to the Court meeting separately with Mr. McAfee, Mr. Sun and Mr. Ayers and Mr. McCullough. Have I left anybody out?

ALL PARTIES: (No response.)

THE COURT: Okay. Very good. Well, then why don't I excuse -- I'll just take them in the order that you're seated here. So why don't we start with you, Mr. -- well, actually, Mr. Sun, why don't we start with -- I'm going to reverse myself on this, Mr. McAfee. Mr. Sun and Mr. Ayers both have their clients here so why don't we begin with -- we'll begin with you, Mr. Sun, and then we'll take Mr. Ayers and come back to you, Mr. McAfee.

So if I could ask everybody to leave the courtroom except

for Mr. Sun and his client and the interpreter and of course

court person.

MS. GODWIN: Does that conclude us for the day?

THE COURT: Yes. It concludes those defense counsel who

are not meeting individually. Thank you for being here.

Yes, ma'am.

INTERPRETER: Mr. Subasic has told me right now that he

would like to speak English as much as he's able and then if he

does not understand, I can stay and help.

THE COURT: That's fine.

Mr. Sun, my general question I would have for you, sir, is

how are you finding the transition is going?

MR. SUN: We are actually making progress, your Honor.

What I wanted to raise and report to the Court, I've honestly

been a little surprised with the quality or the lack of setting

in the transcripts. That was not -- I certainly have seen some

interchanges in just reviewing the file, trying to get

transcripts in better shape and my impression was that was --

there was a substantial amount of progress that was made. What

I didn't appreciate was, even so, I guess, in my judgment the

quality of the transcripts is -- you know, varies from okay to

really not very good at all. And so relying on the transcripts

for much of anything is a bit of a dicey proposition. And so in

terms of organizing my thinking and focus for the case

preparation, the idea of relying on the transcripts, I've had to

1    downgrade that.  That is something that I can -- I can really
2    rely on, I think is the best way to put it.  So that --
3        THE COURT:  Let me --
4        MR. SUN:  Certainly.
5        THE COURT:  Let me ask you, Mr. Sun, does that include the
6    transcripts that the Government has produced?  I mean, I realize
7    there may be an interest in checking behind them.
8        MR. SUN:  Where they have designated, for example,
9    your Honor?
10       THE COURT:  Yes, sir.
11       MR. SUN:  In fact, yes.  We found in going through the
12   depositions to try to find corrections, for example, that there
13   are a varied number of things that we found and will put in a
14   counter designation, if you will, to seek corrections of what
15   the Government is correcting.  And so I think -- that was
16   honestly one of the first things that I noticed that when we --
17   when I looked at what the Government has designated, there's so
18   many changes that they propose that, I guess, is a commentary on
19   the quality of the original transcript, number one.
20       And then number two, as we've gone through that finding
21   occasions, regular occasions where we think there needs be
22   further corrections beyond -- beyond that, and so, again, I
23   think, honestly, it goes back to the original transcripts and
24   not anybody -- I'm not unique in this, obviously, not anybody
25   having a baseline, if you will, to work from that that is very

good, I guess is the right way.  So in -- in our focus that, in

terms of getting the work, we've been obviously deadline driven

and everybody is new that I've got working on this, myself

included, and we've gotten better.  I mean, everybody gets --

you're more able to recognize speakers, you're more able to

recognize words and phrases that you're -- as you're listening.

     And, I guess, again, the point that I wanted to relate to

the Court is we're not getting a lot of help, as much help as I

would have expected just sort or reviewing, reading through the

transcripts, I guess.  That's been a hindrance to our ongoing

efforts to complete all the work that we need to do.

     But in light of all that, you know, even as recently as

last week I put two more new people on this in light of, again,

recognizing that it takes people getting up to speed, but I

don't have enough currently people -- people currently who are

working on it to make sure that I can -- I can try to meet those

deadlines.  Frankly, the slower process that we have is in

dealing with what we're dealing with.

     So it'll be helpful if we'll go back and coordinate with

Ms. Graves in terms of making sure I understand exactly what are

the existing transcripts that are the substance of the January

31 deadline versus a later deadline.  And if I need to approach

the Court for relief, I'll obviously talk to Mr. Bowler and

Ms. Kocher before that, but I think generally that's where we

are.

1          THE COURT:  Okay.

2          MR. SUN:  So I think the thing that I wanted to, I guess,

3     just alert the Court to is, your Honor asked me at the last

4     status conference sort of where I was, and I think the thing

5     that's become most apparent to me is that relying on the

6     transcripts for much of anything is questionable.  It's a bit of

7     a dicey proposition so that engenders more work sort of from the

8     ground up.

9          THE COURT:  I understand what you're saying.  As I think

10    you know, the issues of transcript quality were (A) focus, if

11    not a major focus, if not the primary focus of the status

12    conferences that we had held in this case early on when we first

13    started holding them, and I know progress has been made, so I

14    understand, with respect to quality, and I'm sorry to hear

15    that -- that from what you're saying there's still some profound

16    issues, but I understand -- I understand the background.

17         MR. SUN:  Well, as I say, that was my -- just in reading

18    the file, my impression was that there had been substantial

19    progress made, and I'm sure that was the case, but the baseline

20    at the end of that that we're using, I guess, is sort of what --

21    at least in my judgment the way we found it at this point.

22         THE COURT:  I understand.  Okay.

23         And I think from what you said, Mr. Sun, it sounds as if

24    you're diligently addressing the issue.  Notwithstanding the

25    prior problems and existing problems with transcription, the

 1  deadlines are a fact of life for everybody.

 2      MR. SUN:  Sure.  I understand.

 3      THE COURT:  I know you're extremely sensitive to that.

 4      MR. SUN:  Understood.  And in that respect, I don't need to

 5  put him in front of the Court, but Mr. Subasic has been an

 6  extraordinary help.  He's been working very closely, including

 7  myself and my paralegal, and so we're able to make,

 8  collectively, good progress with all of that.

 9      THE COURT:  Good.

10      MR. SUN:  And he's really the one who, right as I got

11  involved, was able to say, look at this.  You can't really rely

12  on these transcripts.  Look at all these problems.  You know, he

13  identified particular things for me to listen to, compare to the

14  transcripts and say, look, these are still not -- you know, not

15  only are the baseline transcripts not very good, but even

16  ones -- I don't mean to demean the work that's been done, but

17  suffice to say with directed focus, it became clear to me even

18  sooner than it might have been just kind working through it on

19  my own because of, you know, the experience that Mr. Subasic had

20  and with his -- you know, with Mr. Wiles, obviously, before that

21  they were working through that as well.  But that's what I

22  wanted to --

23      THE COURT:  Good.  Well, I'm glad you did.

24      MR. SUN:  -- just by way of background.

25      THE COURT:  That's fine.  I'm glad you have a good working

relationship with Mr. Subasic as well. That's good.

MR. SUN: And in that light, I'm not sure yet whether I'll go through this by way of motion but just wanted to advise the Court.

Because of the security procedures that Mr. Subasic is subject to, the only time that he can -- and I'm sure that your Honor is aware of this, the only time that he can actually listen to the tapes is when either I or my paralegal go over there with the computer to listen to -- I made efforts to try to work out a different process so that he could have access to a computer himself. So far that has not been born fruit. If they don't, I think it will be -- I will approach the Court with that because I do think that's -- it's an essential part of, I think, Mr. Subasic's rights but also in the case preparation to give him maximum access to the ability to actually listen to the recorded evidence as well as just read it.

Again, that sort of goes back to my first point. He certainly had all of the transcripts, you know, going way, way back but relying on those to understand what's going on in this particular incident, whatever it is, is -- is, you know, a bit of a dicey proposition. So I'll continue to work on that front.

THE COURT: Good.

MR. SUN: And I won't raise it to the Court unless I need to but just wanted to advise the Court.

THE COURT: I'm sure you know from Mr. Wiles and looking at

1  the file that there had been discussions with the folks at the

2  facility previously about arrangements to --

3      MR. SUN:  Right.

4      THE COURT:  -- increase access so that's not a new issue

5  you're raising but really an ongoing one.

6      MR. SUN:  Right.  Well, I actually, not to bore the Court

7  or belabor the point, another issue came up because of the

8  volume of paper in the case that Mr. Subasic has, the

9  authorities actually asked me, you know, what -- could we do

10 something about all the papers feeling like it was, I don't

11 know, a hazard or something, and I said, I've got a perfect

12 solution.  Let us put those on a disk and let Mr. Subasic have

13 access to a computer, and that didn't --

14     So I did try a slightly different tact with the same result

15 so far, but, anyway, I was aware that that had been raised.  I'm

16 going to try, you know, my best to work it out, but if I can't,

17 it may be matter subject for the Court, but I just wanted to

18 relay to the Court.

19     THE COURT:  Okay.  That's fine.  Very good.

20     MR. SUN:  Your Honor, what I was just speaking to Mr.

21 Subasic about, he actually has some examples of where we found

22 in the Government designations occasions where we think there

23 would need to be corrections made.  If your Honor would hear him

24 speak to that, he would address that specifically, but, you

25 know, it's numerous in volume.  It's not like a word here and a

1  word there. It's frequent and at least from our perspective --

2  you know, some of them are -- not all of them are consequential

3  but many of them are, so that's again the --

4  MR. SUBASIC: And particularly they're bad, is not good for

5  my defense and every word looks bad for me. If the deadlines

6  are not extended, and I don't have time for this stuff and my

7  lawyer does not speak Arabic or Bosnian, I will not be able to

8  produce exculpatory evidence that shows my innocence.

9  THE COURT: I understand. Well, today is not the day to

10  get into the substance of the objections to the transcripts. In

11  the Court schedule, there is a time to bring those forward, and

12  if there's a need for more time to enable, Mr. Subasic, for you

13  and your lawyer to prepare those objections, there's a way to

14  request that at that time.

15  So the Court's aware that that's an issue. The Court --

16  I've told you in one of these prior conferences, Mr. Subasic, as

17  I've said today, that the Court is acutely aware that there have

18  been issues with respect to the quality of transcription, and

19  I'm not prejudging any particular objection by any means, but I

20  think all the parties in the case are aware that there have been

21  real issues in that regard.

22  MR. SUBASIC: If I can make just one point, Judge, and I'm

23  not going to try to take nobody's time now. My point is my

24  previous defense have not reviewed a great majority of our

25  material. I have reviewed SUV material plus out of 168 plus two

CDs for general reporting, I have reviewed only 20 percent.

Now, what I did, going through the transcript, the transcript I have done, I have pinpointed where I might think that speaks about me because Arabic is not translated, Bosnian barely, and I have plenty of documents shows where people speaks about me, where they call me Hibujy (ph), that they want to kill me and do all that stuff, that's not even transcribed in the hundreds of places.

I cannot even recognize my name. They call me Anes or Annasol (ph), so I have to guess that. And the thing is, if I do not have allowed to listen and review all that stuff, and I don't think so. Mr. Paul, he's trying real hard to fix what the previous lawyer has damaged to listen over 1,000 hours of recording to be able to find because he cannot rely whatsoever on transcript -- transcript to find any exculpatory evidence.

THE COURT: I understand. I understand, Mr. Subasic. That point has been made.

Have you considered an MP3 player, Mr. Sun? I don't know if that would be viewed differently from my perspective.

MR. SUN: I actually didn't think of that, but I'll ask if that would be --

THE COURT: That's just an idea. I don't know if that would be perceived differently.

Very good. Anything further, Mr. Sun?

MR. SUN: Nothing further, your Honor.

1       THE COURT:  I appreciate your comments, and I remand

2  Mr. Subasic to the custody of marshals.

3       THE CLERK:  Could you get Mr. Ayers?

4       THE COURT:  Thank you, Madam Interpreter.

5       INTERPRETER:  You're welcome.

6       MR. SUN:  Thank you, your Honor.

7       THE COURT:  Yes, sir.  And I think we'll need Mr. Yaghi.

8       Very good.  Mr. Yaghi, I alluded to this earlier, but as I

9  know your counsel, both your lawyers at the moment have

10 explained to you, the only reason there's a change of counsel in

11 your case is because of Mr. McCullough's election as a judge on

12 the State Court of Appeals.  That's the only reason.  There can

13 be different reasons in a case for changing lawyers, but that's

14 the only reason that applies in your case.

15      Mr. Ayers, I wanted to remind you, I'm going to ask you

16 about how the transition is going generally, but I want to -- I

17 just -- I want to remind you of the impending deadline Friday

18 for your submission of any revised CJA budget.  I know there

19 have been indications that may be a deadline that you're going

20 to need to have some wiggle room with, but if that's the case,

21 please file an appropriate motion.

22      MR. AYERS:  That's what I was going to ask the Court today

23 if I needed to do that, just do it orally.  I don't think I need

24 a bunch of time.  The problem is just to catalog all of this.

25 Of course, Mr. McCullough has done quite a bit of the work and I

followed through with that and just so I don't have to go back.
Unfortunately, when you switch representation and I think that
will take a couple more weeks to do a good estimate as compared
to just a high end, which I can do that tomorrow if that's what
I need to do.  It's not going to be as tailored as what we're
trying to accomplish between now to the trial.

THE COURT:  Well, I think the Court has an interest in
having a real number as opposed to just a rifle shot.

MR. AYERS:  That's what I was telling Mr. McCollough
yesterday, that would really be an estimate, and if there's a
motion that you'd like me to file.

THE COURT:  I prefer that you do it by written motion then
the record is clear.  I think it's just creates a cleaner record
if it's done by written motion.  So let me ask:  How is the
transition going, Mr. McCullough?

MR. McCULLOUGH:  If I may address this, your Honor.

THE COURT:  Yes, sir.

MR. McCULLOUGH:  Obviously, this particular race that I was
involved in from November the 2nd just sat dormant for a long
period of time.  From November 29th, they started counting the
ballots.  It was, I think, December 3rd a newspaper article
indicated that I had lost.  So up until that period of time we
really didn't have any reason to think that there was going to
be any change of counsel.  It was not until the following week
that I got informal word from the Board of Elections that I was

1   actually ahead in this race and would likely win it in the

2   director's opinion.  I was so stunned that I made him repeat it

3   a couple of times.

4       THE COURT:  Well, I know you said in open court here I

5   think at one status conference that you were 60,000 votes behind

6   and so be it.

7       MR. McCULLOUGH:  Yes, sir.  And that's exactly -- and what

8   had happened is, the news media is sometimes wrong, much to

9   their -- they'll never admit it, but the guy that wrote that

10  article just didn't count the votes right and that wasn't

11  accurate.  But nonetheless, it happened.  It was written over

12  the weekend.  The following week we didn't know.  The next day,

13  I get a call after we had that conference, said that I was

14  actually ahead.  Upon doing that, getting that call, I

15  immediately called Mr. McNamara of the Public Defender's Office

16  and alerted him to the fact that there would probably need to be

17  a change of counsel in this case and started planning even

18  before we got the Court's order permitting the change.

19      So I brought Mr. Ayers over to the office and Mr. McNamara

20  said that as soon as he got the Court's order, it's his

21  intention to appoint Mr. Ayers.  I brought him into the office

22  knowing that he was enumered (ph) which really facilitated our

23  logistics and kind of showed him the scope of the problem and

24  what was coming and then filed -- it was before Christmas and

25  before the Christmas holidays that we did get the Court's order

permitting me to participate and up until this hearing today and
for and through tomorrow, which is going to be my last day with
the law firm, and start the actual logistics of getting
everything to Mr. Ayers.

He had some time between Christmas and New Year's to do
some reading.  I'll let him tell you how much he's gotten done,
but we got all the paper discovery in our offices in notebooks,
and those -- and I showed him the charts and various guides to
index that discovery as well as the CDs and the video and audio
recordings.

We also had printed out virtually every one of the newly --
the final versions of transcripts, when the transcripts would be
edited and finally be posted by the public defender.  We had
these numbered and matched to the CD.  So logistically I think
we did as much as we could to prepare him.

He and I have met with Mr. Yaghi personally at the Harnett
County Jail, was able to introduce them.  We went to -- I have
given him the material about the cultural expert that Mr. Boyce
and I have jointly hired, and last -- I think it was last
Friday, I was able to introduce him to the computer expert, and
we had a session on that.

He's also gotten, and I gave him -- previously given him
some of the work product that the computer expert had done for
us, and we had a chance to review some of that.  And tomorrow,
the investigator that I have been using to interview witnesses

that are local to the Raleigh and North Carolina area has an
appointment with us so that we can talk about the interviews
that have been done to date and where he might see some of the
others.

I think that we have looked at the budget for the cultural
expert and the investigator and the computer person and realized
that those budgets are probably going to be okay.  The only ones
where there may be changes would be perhaps in paralegal budget
and perhaps in his budget and how much of that he's going to
have to spend reviewing the prior discovery is probably the only
duplication of effort that there may be in the case.

But I hope that by the steps that we've taken, we will have
cut down on the amount of time.  It won't be as chaotic as it
was for us in the beginning.  And it took some of these sessions
and some things that the Government produced by way of
documentation to help us.

THE COURT:  Yes.

MR. McCULLOUGH:  Collectively, you will recall, we've had
that discussion of how much that helped us get through this
discovery.  Well, he started with that documentation in hand.

THE COURT:  Well, that's an advantage.

MR. McCULLOUGH:  We hope that will help him go through this
material a little more.  I had a motion to bring Mr. Yaghi to
the courtroom today solely so that he could hear and hear this
report again.  It's one thing to tell your client something in

the confines of the jail in the interview room.  It's another thing to know that we're reporting it to the Court that these steps had been taken because I want him to be comfortable, number one, that Mr. Ayers is a good attorney who is -- and is well thought of by the Court and colleagues, otherwise he wouldn't be appointed to a case of this magnitude, and that he's got the kind of experience to be able to handle a case of this magnitude competently.

THE COURT:  Well, and you're right on both scores there.

MR. McCULLOUGH:  And then to have me tell you of the steps we've done to make this transition as smooth and seamless as possible and get Mr. Ayers up to speed so that he knows that what we tell him is exactly what's being reported to the Court and that his competency is he is competent.

THE COURT:  Very good.  Well, thank you.  I appreciate the effort you've made, Mr. McCullough.  That kind of activity that you've describe is exactly what the Court had in mind that you would be doing during the transitional period.

MR. McCULLOUGH:  We'll be meeting at 10:30 in Mr. Ayers' office, and at 1:30, I'm taking the oath of office formally -- informally at my own office, and I'll be working with the other case after 1:30, but I might pack some things from my office the rest of the afternoon, but all the substantive work will be done by 1:30 and then 11:00 next Friday we'll have the ceremony.

THE COURT:  Well, thank you.  Congratulations.

1    MR. McCULLOUGH:  Thank you very much, your Honor.  It's a

2 very difficult period of time from August through November it's

3 very humbling to win a statewide election, and having done it

4 twice, I'm quite humble and hope to do a good job in the Court

5 of Appeals.

6    THE COURT:  I'm sure you will.  I understand.  Mr. Ayers,

7 did you wish to be heard?

8    MR. AYERS:  Judge, briefly, we spoke to some of the

9 logistics and deadlines that may be coming up.  I don't know if

10 I'm comfortable with those generally yet, but obviously if not,

11 I will file appropriate motion with the Court --

12    THE COURT:  Yes, please do.

13    MR. AYERS:  -- to address -- the reason I wanted to address

14 budgeting specifically is because I've seen the orders.  I know

15 the Court is aware of the size of the case --

16    THE COURT:  Yes.

17    MR. AYERS:  -- and budgeting is relatively new in much of

18 this case and others, and while there have been a few of them,

19 the same person doesn't seem to do them every time so creating

20 that wheel of -- and how to get your vouchers approved and

21 things of that nature also is a concern.  But what I would

22 expect is to file a motion asking for 15 to 20 days and to

23 mainly, because I'm trying to categorize all of the discovery in

24 this case.  Mr. McCullough's office has done a good job putting

25 it together to find it.  Unfortunately, I still have to learn

1   the case from beginning to end which is a lot easier when you

2   can find the things that you need so that step's been

3   accomplished, but I do want to make sure I present to the Court

4   a realistic budget as compared to one just assuming a worse case

5   scenario to the Court with counsel and experts and things of

6   that nature.  I think we've had a good a transition as you can.

7   Mr. Yaghi and I seem to get along well.  Mr. McCullough was of

8   assistance in meeting with the experts and the investigator

9   tomorrow.  And I then I think I've met basically everybody but

10  potential witnesses in the case.

11       THE COURT:  Good.

12       MR. AYERS:  We do have the issue of the deposition

13  overseas.  I would assume that I will renotice that if things

14  don't go well with the ruling but to do that now would be

15  premature.  I think we've got some additional time.

16       THE COURT:  Yes.

17       MR. AYERS:  The only thing I would ask is if this Court has

18  a preference on that motion for extension on budgeting.  I don't

19  expect it to be a very lengthy deal, just from the logistics

20  standpoint that I would ask for more time.  I don't anticipate a

21  long dissertation but that I may need some additional time to

22  try to get that together so I can get it out.

23       THE COURT:  I wouldn't -- I think -- I think the motion

24  would need to state the justification for the extension for good

25  cause, but that's not particularly showing --

MR. AYERS:  No.  And I received the budgets from
Mr. McCullough and some of the other counsel have been kind
enough, expecially Mr. --

THE COURT:  Good.

MR. AYERS:  -- to fill me in on how it's kind of
transpired.  Mr. Sun did have a bigger window to have to
present --

THE COURT:  I know he did.

MR. AYERS:  So I do want to make sure I address that before
the Court formally, and I'm not going to ask for a lot.
Reviewing the discovery in this case is going to be a chore.
It's a lot.

THE COURT:  There is a lot of material.

MR. AYERS:  And I don't mind doing it, it's just some
things I can depend on Mr. McCullough having done and some I
actually have to learn myself as counsel.  I do it often.  It's
just the problem with this case is it's much bigger than your
average case as a lawyer so I may need relief for some reason,
but I'll do the best I can to do it as fast as I can.  I'll
discuss that with Mr. Yaghi to go through all those things to
make sure that I put them in the appropriate basis and
perspective.

THE COURT:  Good.  Well, it sounds like you're on track.

MR. AYERS:  I believe so as best you can be.

THE COURT:  I understand.  Very good.  Well, I appreciate

1    your -- I appreciate your comments.

2        I wanted to take up an issue with just counsel separately

3    without Mr. Yaghi being present so why don't we -- at this time,

4    I'd like to excuse Mr. Yaghi, remand him to the custody of the

5    marshals.

6        THE CLERK:  He doesn't have to come back, right?

7        THE COURT:  No.

8        Mr. Ayers, I just wanted to just touch base with you about

9    your security clearance.  My understanding from Ms. Campbell is

10   that you'll have your briefing -- if you haven't had it yet,

11   you'll have it tomorrow, today or tomorrow.

12       MR. AYERS:  I believe this afternoon, unless something

13   happens, we're scheduled at 2:30, and we'll get that concluded.

14   I think the initial part is done, and I think the --

15       THE COURT:  Yes.

16       MR. AYERS:  -- the agent is coming by next week is what she

17   told me yesterday so it shouldn't take them too long to look at

18   it.

19       THE COURT:  No.  It worked out well.  I want to -- I

20   will -- I'll tell you, frankly, there was a little concern on my

21   part about the delay in your submission of your application and

22   for the security clearance.  The background on the security

23   clearance is that they -- as you may know from your experience,

24   sometimes they're done quickly, sometimes they're not done

25   quickly so our interest was in -- the Court's interest was in

getting that -- you getting your application in as quickly as possible to start the ball rolling, and it was particular concern to the Court here because Mr. McCollough had a hard deadline, but he was out of the case, and the Court didn't want to have a gap where Mr. Yaghi would be unrepresented with respect to unclassified material at any time. So that was the Court's concern.

But I bring that up not to scold you in any means. You did get it in and it worked out well, but just the general principle of it, a lot of the deadlines in this case, I mean, they have a history to them in the sense that a lot of thought has gone into setting them. It's a schedule that has fat built in, and the Court, obviously, entertained motions for extension, as it will with respect to the budget, but the deadlines are not real flexible in this case. I wanted to be sure that that message was made clear since you're a newcomer, Mr. Ayers.

MR. AYERS: I think I understand where everybody is. I don't know what happened with the application, but we got notice on the 28th on the Tuesday after and with the folks in Washington giving me information, oddly enough, about myself which I didn't know myself.

THE COURT: Well, I guess that's some reassurance that somebody has it.

MR. McCULLOUGH: And once he gets his security clearance, I can perhaps amend --

1    THE COURT:  Oh, he's got it as I understand it.  It's in

2  interim.

3    MR. McCULLOUGH:  Then they need to take him into the little

4  room that we have off the side here.  We have a safe in there,

5  and we have to change the combination on the safe.

6    THE COURT:  Ms. Campbell's going to get Mr. Ayers' briefing

7  today.

8    MR. McCULLOUGH:  So that'll be good.

9    THE COURT:  Yes, sir.  Very good.  Gentlemen, that's all

10  that I wanted to cover.  Thank you for being here.

11    MR. AYERS:  Is there anybody else you need?

12    THE COURT:  Mr. McAfee.

13    MR. McCULLOUGH:  And, your Honor, this is my final

14  appearance in Federal court.

15    THE COURT:  I'm glad we could be a part of it.  Best to you

16  on your renewed tenure on the Court of Appeals.

17    MR. McCULLOUGH:  Thank you very much, sir.

18    THE COURT:  I hope that's your coat, Mr. McAfee.

19    MR. McAFEE:  Yes.

20    THE COURT:  Very good.  What computer hard drives issues

21  are you concerned about?

22    MR. McAFEE:  Judge, it's actually an expert issue.

23    THE COURT:  I see.

24    MR. McAFEE:  You mentioned at the beginning of the hearing

25  the filing of MOUs.  I did that Monday, and I wanted to do it

earlier waiting to hear back from my expert.  My expert went off

the radar about five months ago.  He's in Wilmington and my

communication was by email.  That was all.  I found out that

Tuesday, after I filed the MOUs with my assistant, but I found

out Tuesday that he had been involved in a knock down drag out

domestic case in Wilmington, and he essentially sent his regrets

and so he's not going to be my expert anymore.

THE COURT:  Oh, goodness.

MR. McAFEE:  And he did not yet -- he did not see the

drive, the computer drive because what I was going to try to get

him to do was meet me in Jacksonville so I could lay out what I

needed to be done.  So he never saw it so I didn't have to file

an MOU for it and I put that in my notice for Judge Flanagan so

that she would be aware of it.  But I just wanted to make you

aware that I'm going to -- I'm searching for a new computer

expert now.

Because there's only really one computer out of this batch

of 23 that my client had access to or used or is on video using,

that's the one I'm obviously most concerned with, and it's not a

massive job for forensics to get to if they have the right

software.  So I don't think that's going to be a problem.  But

essentially my other expert was approved for a certain amount

already.  I don't think this expert will come even close to that

figure.  I've got someone I'm supposed to call in Raleigh in the

next day or two and see if they can take it, and if not, then we

knows -- know the expert that Mr. Hill and Mr. Zeszotarski are
using.

     THE COURT:  I see.

     MR. McAFEE:  So I've started making calls.

     THE COURT:  Well, good.  Did I understand you correctly
that he's been off the radar for five months?

     MR. McAFEE:  Yeah.  I mean, I've been calling, and he had
sent me notice through email saying, I have a couple of personal
things.  I'll call you back in a little while, and then I just
didn't pay any attention to it because that's really not -- in
the grand scheme of things, the computer stuff against my
client, in my mind, isn't going to carry as much weight as other
things are, conversations, actions.

     And so I just didn't think it was much of an issue until I
got the order from the Judge and I said, you know, I never got
him to sign it.  And so I pushed him, you know, and I said, get
back and I emailed him and then I kept hounding him, and he
happens to know the reason I know him is because he's friends
with an FBI agent that I know in Wilmington so I had to call the
FBI agent to get my own expert to call me.

     THE COURT:  Oh, goodness.

     MR. McAFEE:  But that's regardless, nothing changes.  But,
anyway, I'm going to fix that --

     THE COURT:  Okay.

     MR. McAFEE:  -- and I just wanted to make you aware of

that.  That's why you haven't seen any vouchers or anything
because he hasn't done it.

THE COURT:  Okay.  Well, I assume, it sounds if it was --
if it was -- if it didn't concern you that you weren't hearing
from him -- well, I'm sure it concerned you at some point, that
you weren't -- obviously weren't hearing from him for that
extended of period of time, I'm assuming that this isn't going
to disrupt your case preparation.

MR. McAFEE:  No.  I think I know -- I know what I wanted
off that drive --

THE COURT:  Okay.

MR. McAFEE:  -- and I've actually -- as you recall, I made
myself a working copy, and I've already done all --

THE COURT:  I understand.  If this had to happen, I'm glad
it happened to you.

MR. McAFEE:  I just need somebody else to tell me if I'm
right or wrong.  If I need, you know, to get together these
full-blown multipage reports, then I'll do that.

THE COURT:  I understand.

MR. McAFEE:  As far as the other discovery, Judge, all
paper discovery has gone through.  We're nearly done with the
audio.  My assistant was doing that.  I've spent my time doing
December and January, most of December and all of January's
transcripts, and I'm just trying to file through those and get
the designations to go through.  I have a list of some

objections and counter designations that I keep on these pads, and the Government's made a rather massive number of designations so there's very little of that, I think, we need to go through to designate.  I don't have any trouble, but a lot of the things that the Government doesn't designate tend to be ordinary conversations or innocuous conversations, and so I don't know if there's much evidentiary value to either side, but I've got to read through them all just to see if my client stands up and says something totally contrary to what is in there, in those conversations.

THE COURT:  I understand.

MR. McAFEE:  But last night it was a 76 page transcript and the Government designated four pages of it, and we know they've got a number of people working on that.

Foreign depositions, obviously with the Islany (ph), Ismael Islany was the other co-conspirator that was separate.  He was actually somebody I wanted to talk to over there.  He is -- he's off the chart now, and there may be a family member still that we're trying to get ahold of, my client's mother, that I may want him deposed, but he actually works for the military base there, and he has the ability to travel, easier to come, and he may come here voluntarily so I don't know yet, and I may make a motion simply to take him if I can get some contact information in the next two weeks.  And I told my client's family if I don't have anything by then, I'm not using him as a witness.

THE COURT: Okay. Very good.

MR. McAFEE: And everything else, we're moving forward. Actually, I told you about the software at this last status conference that had been offered to defense counsel CJ --

THE COURT: Yeah.

MR. McAFEE: I finally got it when I got it, but I got training on it actually yesterday, and it was about an hour-long training and it's a terrific piece of software, and for this kind of case, it's terrific because I make a list of issues which are the 13 counts of the indictment, you list the person's name in those counts, you list the dates in those counts, and the facts. You have a spreadsheet and start typing in facts. I took one hour yesterday, and after training did this, type in the facts of the indictment, and then all the players from the defense attorneys to all the witnesses, and it's by no way complete, but they all link to each other. And that's the power of this thing so I can say, show me every fact in which Irichirify (ph) is alleged to have participated in. A list of 12 facts eventually -- and now those are overt acts, eventually all the notes taken can be plugged into that so I can actually pull up a report. That's what it looks like.

THE COURT: Yeah.

MR. McAFEE: And it can be exported to Power Point, exported to Word. It's a pretty nifty piece of software, and it came along just in time.

1     THE COURT:  Sounds like a powerful tool.

2     MR. McAFEE:  And thankfully they offered it to CJ for one

3 third of the normal price.  If I can use it in this case one

4 more, it will pay for it.

5     THE COURT:  Do you know if other counsel are using it?

6     MR. McAFEE:  No.  Danny Boyce's paralegal called me to ask

7 me, and at that point I hadn't had the training.  I'm just sort

8 of playing with it right now, but they had one training in one

9 hour.  It's rather straightforward, but I don't think anybody

10 else has purchased it.

11     THE COURT:  But it's been offered to them?

12     MR. McAFEE:  It was offered -- it was a window of

13 opportunity back in October, and, in fact, they forwarded the

14 email and his company has just been purchased by Lexus so

15 they're trying to generate business.

16     THE COURT:  Oh, I see.  Interesting.  It sounds like a

17 powerful tool.

18     MR. McAFEE:  It will be.

19     THE COURT:  Very good.  Well, it sounds like everything is

20 on track other than getting a new computer expert.

21     MR. McAFEE:  Yeah.  And it shouldn't be that difficult.

22 I've only taken a day and gotten two leads so.

23     THE COURT:  Okay.  Very good.  Thank you, sir.

24     THE CLERK:  Do you want me to call the Government now?

25     THE COURT:  Yes.

1    MR. McAFEE:  Good day, Judge.

2    THE COURT:  You, too.  Thank you.

3    This is now the closed session with counsel for the

4    Government.  Mr. Bowler, Ms. Kocher I appreciate your coming

5    down.  I don't have any specific issues to take up with

6    Government counsel.  I do appreciate the Government meeting its

7    deadline with respect to the transcript.  The transcripts,

8    that's really an important milestone in the case.  It really is.

9    I know a lot of work went into that, and the Court appreciates

10    the effort that was behind all that.

11    But notwithstanding the fact that I don't really have

12    specific topics, I did want to give you an opportunity to bring

13    to the Court's attention any concerns that you may have.

14    MR. BOWLER:  We don't have anything worthy of bringing to

15    the Court's attention, your Honor.

16    THE COURT:  Okay.  Very good.  I guess we're at a point

17    where we can adjourn.  Thank you guys for coming in.

18    (The hearing was adjourned at 12:25 p.m.)

19

20

21

22

23

24

25

CERTIFICATE

THIS IS TO CERTIFY THAT THE FOREGOING TRANSCRIPT OF PROCEEDINGS TAKEN AT THE CRIMINAL SESSION OF UNITED STATES DISTRICT COURT IS A TRUE AND ACCURATE TRANSCRIPTION TO THE BEST OF MY ABILITY OF THE PROCEEDINGS TAKEN BY ME IN MACHINE SHORTHAND AND TRANSCRIBED BY COMPUTER UNDER MY SUPERVISION.

THIS THE 1ST DAY OF FEBRUARY, 2011.


/S/ REBECCA L. CRUNK

REBECCA L. CRUNK
COURT REPORTER