UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

_____

_____

UNITED STATES OF AMERICA, )
                          )
vs.                       )          5:09-CR-216-FL
                          )
                          )
DANIEL PATRICK BOYD,      )
HYSEN SHERIFI,            )
ANES SUBASIC,             )
ZAKARIYA BOYD,            )
DYLAN BOYD,               )
MOHAMMAD OMAR ALY HASSAN, )
ZIYAD YAGHI,              )
                          )
Defendants.               )
_____)


STATUS CONFERENCE
NOVEMBER 16, 2010
BEFORE THE HONORABLE JAMES E. GATES
U. S. MAGISTRATE JUDGE




**APPEARANCES**:

**FOR THE GOVERNMENT**:

JOHN BOWLER
BARBARA D. KOCHER
U.S. ATTORNEY'S OFFICE
310 NEW BERN AVENUE
SUITE 800
RALEIGH, NORTH CAROLINA 27601

<u>**FOR THE DEFENDANTS:**</u>

| | |
|---|---|
| <u>**DANIEL PATRICK BOYD:**</u> | <u>**HYSEN SHERIFI:**</u> |

DEBRA C. GRAVES,            MR. ROBERT MCAFEE,
ROSEMARY GODWIN           MCAFEE LAW FIRM
FEDERAL PUBLIC DEFENDER    P. O. BOX 905
150 FAYETTEVILLE STREET MALL  NEW BERN, NC 28563
RALEIGH, NORTH CAROLINA 27601

<u>**ANES SUBASIC:**</u>              <u>**ZAKARIYA BOYD:**</u>

PAUL K. SUN, JR.            MYRON T. HILL, JR.
ELLIS & WINTERS             BROWNING & HILL
P. O. BOX 33550             200 E. FOURTH STREET
RALEIGH, NORTH CAROLINA 27636  GREENVILLE, NC 27835

<u>**DYLAN BOYD**</u>:              <u>**MOHAMMAD OMAR ALY HASSAN**</u>

JOSEPH E. ZESZOTARSKI, JR.   R. DANIEL BOYCE
POYNER & SPRUILL          BOYCE & ISLEY, PLLC
P. O. BOX 10096             107 FAYETTEVILLE STREET
RALEIGH, NORTH CAROLINA 27605  SUITE 500
                              RALEIGH, NC 27601

<u>**ZIYAD YAGHI**</u>:

JAMES M. AYERS, II
AYERS & HAIDT, P.A.
P. O. BOX 1544
NEW BERN, NORTH CAROLINA 28563


J. DOUGLAS MCCULLOUGH
STUBBS & PERDUE, PA
310 CRAVEN STREET
NEW BERN, NORTH CAROLINA 28563


COURT REPORTER: REBECCA L. CRUNK
STENOTYPE WITH COMPUTER AIDED TRANSCRIPTION

\*\*\*\*\*\*\*\*

1
2     (The proceedings began at 10:15 a.m.)
3     THE COURT:  Good morning, folks.  Madam Clerk, could you
4 please swear the interpreter?
5 THEREUPON,
6 BOSNIAN INTERPRETER,
7 having been duly sworn, interpreted as follows:
8     THE COURT:  Is it functioning properly?
9     THE CLERK:  Yes.
10    THE COURT:  Very good.  Well, good morning, again, folks.
11 I want to extend a special welcome to Mr. Paul Sun who is new to
12 the case.
13    MR. SUN:  Thank you, your Honor.
14    THE COURT:  Good to have you here this morning, Mr. Sun.
15 The Court does appreciate your willingness to serve in this
16 matter.
17    As has been our custom, what I would like to do this
18 morning is begin with a general session with counsel for both
19 sides present, then have a separate session, closed session,
20 with defense counsel and then have a similar session with
21 counsel for the Government.
22    Let me touch base first with the various liaisons that have
23 been appointed for the Court and see if there are any issues
24 related to the areas in which they are working.
25    Ms. Graves, any particular concerns with respect to

1    transcripts?

2        MS. GRAVES:  No, your Honor.  No concerns.  We have

3    provided all of the transcripts that we initially agreed to

4    provide for the group.

5        THE COURT:  Very good.  Are there any -- any issues

6    regarding transcription for counsel as a group?

7        The next deadline coming up with respect to transcription

8    is the December 1 deadline for the Government's proposed

9    transcripts of all remaining Government designated audio.

10       Mr. Bowler, is the Government on track?  I know last time

11   you indicated, I believe, the Government was on track.  Is that

12   still the case?

13       MR. BOWLER:  The answer would call for somewhat of a

14   detailed accounting if I could have just a minute on that, your

15   Honor.

16       THE COURT:  Certainly.

17       MR. BOWLER:  We've got three FBI agents.  We've got one

18   local FBI agent assigned full time to this.  We now have --

19   we've added two more Arabic linguist.  We had something of a

20   bottleneck.  I had two who were working very hard.  We needed

21   more manpower.  We brought two more in.  We also, U.S. Attorney

22   through the Department of Justice, distinct from the FBI, we

23   have a contract with two more court reporters to serve as

24   transcriptionists so we have a total of 10 personnel working

25   full time on it.

1    There have been some -- Transperfect entered into this

2  equation.  Our perception is their performance has been

3  considerably upgraded in terms of quality, and we understand

4  that has been brought to the Court's attention previously.  The

5  performance analysis, especially on the English portion, is much

6  better.  We have had to return to them, though, in recent weeks

7  in trying to meet this deadline.  I think it was about five

8  hours of work that needed to be redone by them and has been

9  redone, but we still have outstanding from Transperfect the

10  material relevant to this December 1st deadline approximately 30

11  hours of material which breaks down into approximately 4.4 hours

12  of priority 1 materials being prioritized in the first and

13  second priority, and about 26 hours of priority 2 materials.

14    At the pace we're going, we anticipate having all the

15  priority 1 material finished, and I forgot to add Transperfect

16  has promised to produce the rest by this Thursday.  Candidly,

17  we're a little skeptical that they're going to be able to make

18  that, but we'll contact them.

19    THE COURT:  So all 30 hours?

20    MR. BOWLER:  They'll have back to us.  At the moment we

21  don't have it to do our final processing, but they promised it

22  by Thursday, and we think they may be a little hopeful on that

23  estimate, but we should have it soon.

24    We think we're on course to have all the priority 1

25  completely done and fully half of priority 2 which would leave

1  us about a quarter of the materials we need some extra time as

2  it relates to Transperfect, the need for additional transcripts

3  we had to find, and additional personnel that we had to get

4  funded by the Department of Justice and now are on board.

5  But we anticipate filing today a motion for an extension of

6  approximately two weeks.  One of the co-counsel suggested that

7  because of all the holidays that we might be better to make that

8  four weeks until the end of December or until approximately

9  Christmas time, but at the moment, we are anticipating what we

10  realistically need is two weeks, and then we have it all done.

11  THE COURT:  What volume of material do you anticipate you

12  need that extension for?  How many hours?

13  MR. BOWLER:  It would be about a quarter of the 30.

14  THE COURT:  A quarter of the 30, so about eight?

15  MR. BOWLER:  Yes, approximately, but as Ms. Knowlen (ph),

16  our person who orchestrated this effort, it's taking -- it's

17  still taking about seven hours of work to make final for one

18  hour of these transcripts.

19  THE COURT:  Okay.

20  MR. BOWLER:  Government always hates to come to the Court

21  saying we do need some more time, but we think the effort has

22  been really good faith on everybody's part here, and we think

23  we'll be substantially complete, but we're going to be moving

24  for two more weeks to have that final portion.

25  THE COURT:  Okay.  Well, the Court appreciates the

1  Government marshaling the resources to make its best effort to

2  meet the deadline.

3       Am I correct, Mr. Bowler, that the Government will produce

4  all that it has ready by the December 1 deadline even if there's

5  some additional material that may come after that deadline?

6       MR. BOWLER:  Yes, sir.  Thank you for asking that.  We

7  think there's really no practical slow down for processes, and

8  we think the defense will have everything they can swallow by

9  that set deadline.

10      THE COURT:  Okay.

11      MR. BOWLER:  It will take them a while to digest all that.

12      THE COURT:  Well, to some extent in one sense, at least,

13 what the Government produces is a springboard for the defense to

14 get to work and the more time the Government takes it, in a

15 sense, slows down defense counsel.  I realize they have

16 available the tapes as well and can act on their own, but I know

17 they have a particular interest in seeing what the Government's

18 producing.  So good.  That's a good approach that's being taken.

19      MR. BOWLER:  Thank you, sir.

20      THE COURT:  And I note that the -- there's the Government's

21 deadline on December 1 and then the next transcription deadline

22 is one for defendants at end of January, January 31st, for

23 defense objections or consent to the Government's proposed

24 changes to the Government designated existing transcripts, that

25 first group of transcripts.

1   Any sense at this point that there's going to be any

2   problem on the defense side in meeting that deadline?  I know

3   it's a ways off.

4   Well, good.  I see no defense counsel raising to state that

5   there is a problem, so that's good.

6   Mr. McAfee, any issues regarding computer issues?

7   MR. McAFEE:  No, your Honor.  Counsel doesn't have any

8   issues at this point.

9   THE COURT:  Very good.  I assume counsel share in that?

10  ALL COUNSEL:  (No response.)

11  THE COURT:  Very good.  Mr. Bowler, I assume there are no

12  issues on computer hard drives on the Government's side, but

13  I'll inquire nonetheless.

14  MR. BOWLER:  No, sir.

15  THE COURT:  Thank you, sir.

16  Mr. Hill, I know that the paper discovery has been silent

17  as far as any problems for a long time.  Nothing's surfaced, has

18  it?

19  MR. HILL:  No, your Honor.

20  THE COURT:  Good.  Very good.

21  Mr. McCullough, that takes us to international depositions.

22  MR. McCULLOUGH:  Yes, your Honor.  As you're aware, I

23  traveled to Amman, Jordan this past week, and I believe I took a

24  deposition, and it's my contention it's a valid deposition.  The

25  Government did not participate, and I'll be filing a motion

1    to -- with the Court to explain why I believe the deposition I

2    took was admissible for their lack of participation is, in fact,

3    a waiver due to Rule 15.  As you know, I had the motion pending

4    before the Court to compel them to attend by telephone.  The

5    Notice -- they filed a Notice updating you with the

6    conversations that took place --

7         THE COURT:  Yes.

8         MR. McCULLOUGH:  -- and everything.  The date and time was

9    never changed.  They didn't go to court to change the time, and

10   we never addressed the motion of whether they should be

11   compelled to attend by telephone.  They just said it was too

12   inconvenient for them to make travel arrangements, and they did

13   not want to participate by telephone so my reading of the rule

14   is them not having gone to court to have it changed, the

15   statement I took is a valid deposition, but I'll refrain from, I

16   think, further discussion about that because it will be the

17   subject of the motion once I have the transcript.

18        THE COURT:  And I know the Government's view of events

19   is -- are different based on the competency hearing with respect

20   to that motion.  I'm not trying to reargue that motion.  I was

21   interested in the status of that particular overseas excursion.

22        Mr. Bowler.

23        MR. BOWLER:  Our position is Mr. McCullough set an

24   artificial deadline that he wanted for his own purposes.  We

25   tried every way we could to alert Mr. McCullough that we didn't

have any control over this, and we weren't allowed because of

diplomatic protocol in a foreign country to proceed any

differently than we were.  Our suspicion is Mr. McCullough

thought that the Kingdom of Jordan was going to deny permission

for this deposition, which as we explained to the Court, we

would not be able to participate anyway, that he would go ahead

and do his interview and try to effect a deposition.  It's his

role as an advocate.

We made clear all along that we couldn't participate if

permission weren't granted.  Contrary to what we thought was

going to happen, they would get an informal statement to us on

or about the 10th that they thought they might get it approved.

It wasn't formal.  We couldn't act upon it until it's formal.

And then we immediately sent an email to Mr. McCullough,

called his office, called his cell phone.  We eventually got his

secretary to call and catch him at the airport where he and his

wife are preparing to depart for Jordan.  We explained exactly

what had happened and essentially projected the problem that we

couldn't move until we had a formal approval by the Kingdom of

Jordan, so he was going to get stuck over there without us being

there, and we made very clear we were not going to waive our

physical presence.

He was very open with myself and indicated essentially he

would go do the interview and if he had to come back, he had to

come back.  And in fact, they did get formal approval.  There's

a long chain of emails that followed while he was over there in
which we made our position crystal clear we didn't approve that.
After the formal approval came in, we were told, as
Mr. McCullough also told me in an e-mail once he got there or
shortly before he was leaving, that there were Jordanian
holidays over there which wouldn't permit the embassy to
participate in this until that -- and the holiday season
schedule. We were instructed, not offered a choice, but
instructed this could not be scheduled until after Thanksgiving.

After somewhat series of exchanges between Mr. McCullough
and the Government, he seemed to have accepted this and he said
if he had to come back, it was all right. We learned this
morning that his position has changed on that. We can show the
Court those emails if the Court finds them pertinent, but we
have not waived our physical presence. We've done everything,
apprised him of every development along the way and, frankly, we
think Mr. McCullough is baldly gaming the system to try to get
an interview in in the form of to call it a deposition.

The original deadlines for foreign depositions were not
until the end of January. He set a date for reasons best known
unto himself for recent weeks and has just tried to essentially
jam it down the Government's throat when we had no ability to
meet his deadline because of our own protocols and whatnot and
which we made clear to him and candidly we thought he understood
and agreed to that, and this morning we learned that he had

1  changed his mind.  That'll be the substance of our response to
2  his motion.
3       THE COURT:  Okay.  Well, I guess I'll wait the filing of
4  that motion.
5       Are there any other issues, Mr. McCullough, regarding
6  international depositions that you're aware of?
7       MR. McCULLOUGH:  No, your Honor.  None of the other counsel
8  have indicated to me that they have any desire to take any other
9  foreign depositions, and so I'm not aware of any.  And based on
10 not only did I go to take depositions while I was there, I did
11 conduct some interviews.  The persons that I interviewed were
12 voluntary witnesses who would be willing to come to the United
13 States in at least one instance.
14      In the other instance, I don't believe that his testimony
15 would be as essential as the one that I did interview.
16 Therefore, I don't think he would qualify for a foreign
17 deposition under Rule 15.  If he shows up as a witness, it has
18 to be I think his testimony would be admissible, but there's
19 that extra threshold of Rule 15 depositions of how essential it
20 has to be, and I don't think it would amount to that being
21 admissible, so he's either going to have to travel to the United
22 States voluntarily or he would not be a witness if his health
23 doesn't permit it, would be my judgment as his counsel.
24      So the only foreign deposition I know of is the one that we
25 contend is valid, and we will move the Court to review it

because in our view under Rule 15 the date -- once notice has
been given, the party who is uncomfortable with that date has a
burden to go back to court and get the date changed.  And if
that had taken place, I would have been able to renew my motion
under Rule 30 of the Rules of Civil Procedure that they be
directed to participate by telephone.

Now, perhaps after I got my phone call from Mr. Bowler, I
should have tried to reopen our telephonic theory, that might
have been failed on my part.  I tried to be as transparent with
the Government and get them to voluntarily participate by phone,
which they were unwilling to do.

After I got back and had access to the rules, I realized
the rules put the burden on them to not just send a notice and
tell the Court about the difficulties they had and how
inconvenient it would be and how it was impossible to do in time
to actually file something.  The problem I have as an advocate
with Mr. Yaghi is that the rules seem to permit that deposition
to stand, then I have a duty to go forward and try and get it
admitted as it is.

THE COURT:  Okay.  I understand.

MR. McCULLOUGH:  If it's not admissible then we might have
to redo it.  If Mr. Bowler is correct, we may have to go back.

THE COURT:  Very good, sir.  I'll review your motion
assuming it's assigned to me when it's filed.  Just to check
with other counsel, no other issues regarding international

depositions at this time on behalf of any other counsel?

ALL COUNSEL:  (No response.)

THE COURT:  Very good.  I think that the experience we've had here with this particular deposition is a cautionary tale to other counsel if they, down the road, come to believe that they need an international deposition, there are unique uncertainties associated with them as we've seen that counsel pursuing expeditiously so as to minimize the uncertainties or to adequately address the uncertainties that are associated with them.

While we're talking about these international depositions, the issues come up in connection with them, and I might as well mention this just generally, and that is on motions to seal, the law really does require that there be a memorandum in support of a motion to seal.  I realize a lot of these motions to seal address the same issues.  If there's a memorandum that's already been filed that provides legal support for the motion to seal, it's fine with me, certainly, if it truly is applicable to simply reference that memorandum.

Of course, we all have word processors.  It's not that big a problem or inconvenience, I wouldn't think, just to print off another copy of it, make conforming changes and submit it, but the Court's in a position, unfortunately or not, of having to deny motions to seal that are unsupported by a memorandum.  The law really requires that there be a showing that they're valid,

and so if they are filed without a memorandum or incorporated by
reference one that gives clearly applicable, they'll be denied
but just a heads up to counsel.

Mr. Bowler, before we get off the issue of the
international depositions, you indicated that the Kingdom of
Jordan has given formal approval at this point, and I realize
it's Mr. McCullough's view that the ship has sailed and the
deposition has been taken, but if there is an update in that
regard, I think it would be helpful to have that reflected in
the court file.  I think the last update indicated that the
Government graciously filed was that there was an informal --
the informal approval that you had indicated.

MR. BOWLER:  Later that week I think it's termed in non
objection law.  With the Court's permission, we'll run through
that whole scenario in response to Mr. McCullough's motion.

THE COURT:  That would be fine.  That would be fine.  Thank
you.

Very good.  The next the next deadline dealing with
discovery generally is the motions deadline with respect to
general SBU discovery evidence at the end of January.  I believe
that applies to all the parties.  It's deadline number 7 on the
chart we're using, just remind counsel of that.

Let me also remind counsel with respect to the MOUs, the
memorandum of understanding, regarding SBU material, these are
provided for in the protective order and the amendment to it,

1  that is docket entry 188 and docket entry 202 relating to SBU

2  material, if I could just remind counsel, please do make sure

3  that those memorandum of understanding are signed and filed with

4  the court.  They do need to be filed in accordance with that

5  order and that should be done timely.

6      Mr. Boyce, I think you're the liaison for any issues other

7  than those specific topics.  Is there anything in your bailiwick

8  to report on?

9      MR. BOYCE:  Happy to report we have nothing to report.

10      THE COURT:  Okay.  Very good.  Is there anybody else who

11  appears to address in the general session, any other issues that

12  they're concerned about, problems they see down the road,

13  trouble meeting any upcoming deadlines, anything at all?

14      MR. HILL:  Your Honor, I've got an issue, but I need to

15  bring it up ex parte.

16      THE COURT:  Yes, sir.  That'd be fine.

17      Let me address the issue of our next conference.  If we

18  were to stay at eight weeks, I think that puts us a couple days

19  after Christmas which obviously isn't satisfactory.  I would --

20  I would suggest the possibility just to get over the holiday

21  season of scheduling our next conference for the week of January

22  10th.  Is that too far off?  We do have some deadlines.  Well,

23  we have the one deadline, the Government's production deadline,

24  then on the transcripts if the extension were allowed for that

25  two weeks then that would also be after any extension of that

deadline.  How does that strike counsel, the week of January
10th?

        Mr. Bowler, is that satisfactory?

        MR. BOWLER:  That's fine with the Government.

        THE COURT:  Is that inconvenient for any counsel?

        MR. HILL:  No, your Honor.

        MR. SUN:  No, your Honor.

        THE COURT:  Very good.  Why don't we set it, let's see
here, we seem to be doing these conferences on Tuesdays.  How
about Tuesday, January 11th at 10 a.m.?  Very good.  We'll set
the next conference for that date, and we'll, of course, give
formal notice of the location and order following this
conference today.  With that said, why don't we go into closed
session with the defendants.  Mr. Bowler and Ms. Kocher, will we
be able to reach you at your offices?

        MR. BOWLER:  Yes.  I'll write those numbers down.

        THE COURT:  Okay.  Very good.  Well, let's then -- we'll
take a brief recess while the courtroom is closed so we can go
into closed session with the defendants.

        (Recess taken from 10:42 to 10:48.)

        THE COURT:  Very good.  Well, it appears as though the
courtroom has been cleared of all persons except for court
personnel and counsel for the defendants.  Mr. Subasic, of
course, is here as well today.

        Let me run down the list again regarding the different

1  areas of discovery.  Are there any particular issues regarding

2  transcripts that defense counsel would like to discuss on an ex

3  parte basis?

4      MR. HILL:  I need to do that individually, your Honor.

5      THE COURT:  Okay.  That's fine, Mr. Hill, we'll do that.

6  Of course, all of you have the opportunity to meet with me

7  individually.  I do want to -- I'll meet individually with

8  Mr. Hill.  I do want to meet individually with Mr. Sun and Mr.

9  Wiles as well.  I know that, but that's certainly a privilege

10  any counsel may take advantage of it.  Sounds as if the quality

11  issues that have been concerned with Transperfect are

12  straightening themselves out which was the expectation and hope.

13  Is that everybody's experience?  Good.

14      Any issues with respect to computer regard hard drives.

15  Mr. McAfee, any?

16      MR. McAFEE:  No.  I got a copy.  The Government's ready to

17  deal with it.

18      THE COURT:  Okay.  And folks are generally satisfied with

19  the experts that they're using and their work is continuing at

20  pace?  I assume there are no issues for ex parte discussion

21  regarding paper discovery, Mr. Hill?

22      MR. HILL:  No, your Honor.

23      THE COURT:  Okay.  Very good.  Any ex parte issues

24  regarding international depositions?

25      MR. BOYCE:  Your Honor, I would advise the Court we are

looking at alternative methods.  We are still in that process,

and I should know by the end of this month hopefully if we will

be requesting any overseas depositions, but we have been using

alternative methods of gathering information.

THE COURT:  I see.  Okay.  Thank you, Mr. Boyce.

Are there any motions for defense experts that are

anticipated?  And I know there is one that the Court is

expecting and that is a motion by -- a motion for the additional

transcripts, additional transcription.  That's pursuant to Judge

Flanagan's September 22nd order docket entry 588.

MR. McAFEE:  Judge, that's the one with the $2,400 --

THE COURT:  Yes.

MR. McAFEE:  -- working unit.

THE COURT:  Yes.  And it requests -- there was a directive

in there, I'm sure you're all familiar with it, but it was a

directive that a budget, a collective budget be filed for

funding in excess of the statutory maximum and that that motion

be filed as soon as practical.  That motion, I believe, requires

authorization from the Chief Judge of the 4th circuit, so to get

it up to Judge Traxler and all to get it on his schedule may

take a bit longer, and the Court is concerned that that process

not slow you down in your work with the transcripts received.

If you haven't focused on that yet, and I'm not saying that you

haven't, but to the extent that you can, I would request that

you make that a priority so that that doesn't become an obstacle

1  in preparation for the trial.

2      Are there any other issues regarding motions for experts or

3  services of any kind that anybody's aware of?

4      MR. ZESZOTARSKI:  Your Honor, there might be a trial expert

5  witness in terms of testifying in this case and the public

6  defender's office is sharing one.  We're not there yet, but

7  we're working on it.

8      THE COURT:  Okay.  Well, good.  I'm glad you're working on

9  it.  I would ask that the liaisons -- and I'm sure you already

10  have, I imagine Mr. Wiles and Mr. Sun have reached out to you

11  already but just any assistance you can provide consistent with

12  your obligations to your own clients to help Mr. Sun get fully

13  up to speed to the extent he's not already, the Court would very

14  much appreciate that.

15      Are there any other issues to be discussed as a group here?

16  I do want to go over these individually with you, and obviously

17  some of this we talked about will be ex parte, but are there any

18  other issues for defense counsel as a group for us to discuss

19  this morning?

20      ALL COUNSEL:  (No response.)

21      THE COURT:  Very good.  Okay.  Well, why don't we then --

22  if I could just touch base with each of you, and I will reserve

23  time obviously to meet separately with a number of you.

24      Ms. Graves, Ms. Godwin, could you just update me on the

25  topics as listed in the order for the status conference, the

1 typical topics?  Is everything going on pace with respect to

2 review of the paper discovery?

3     MS. GODWIN:  Yes, your Honor.  We completed the paper

4 discovery and are actually reviewing it again so we've saturated

5 that pretty well.

6     THE COURT:  Very good.

7     MS. GODWIN:  Audio and video, we are reviewing that as we

8 go back through the discovery, putting it all together, and

9 we're making excellent progress on that and sharing with the

10 client.

11     THE COURT:  Oh, good.

12     MS. GODWIN:  The computer hard drives, we have our expert

13 in place, and we're working our way through that as well.

14     THE COURT:  And that seems to be going at a sufficient

15 pace.  It's right on schedule.

16     MS. GODWIN:  Yes, sir.

17     THE COURT:  Very good.

18     MS. GODWIN:  Regarding foreign depositions, that's a matter

19 that we are continuing to explore through other -- trying to get

20 that information through other means and will certainly be

21 cooperating with the other court appointed lawyers, and if it

22 becomes necessary for us to take foreign depositions.

23     We're on track.  We do have a plan for timely completion of

24 trial.

25     THE COURT:  Good.

1    MR. GODWIN:  And we're satisfied we're making progress as

2  we had planned, and we don't have any other with technology at

3  this time, and we don't have any other matters.

4    THE COURT:  Very good.  Thank you.  Mr. McAfee, sir.

5    MR. McAFEE:  Judge, as all the paper discovery has been

6  done, but we are just shy of halfway through the audio video

7  discovery.

8    THE COURT:  Right.

9    MR. McAFEE:  And in the last week in November, depending on

10  the trial venue in State court, there's not going to be any

11  depositions overseas.  I have two witnesses who will be

12  voluntary witnesses, if anything.  Another person who is a

13  family member of my client, I have the report he's been arrested

14  for a state crime there so I don't think I'm going to be taking

15  his deposition.

16    We're following the plan as about the things -- the

17  budgetary concerns.  December was slow, but in November and

18  going from October and November are going on a regular basis.  I

19  would note that the public defender's office got an offer to

20  extend the offer from the software called Case Mammal and the

21  time, which I actually took them up on their offer, it's sort of

22  a case management tool.  I don't know if it's going to be

23  something that's going to take the place of the trial record

24  that has all the bells and whistles, but it's a very useful

25  piece of software in a case like this where you have multiple

1 kinds of discovery together.

2     I was offered it at a great reduced rate and turned it to

3 be pretty good.  I haven't put it in place yet.

4     THE COURT:  Well, good.

5     MR. McAFEE:  I'm learning that the Court didn't even have

6 to provide it for us, but it is useful in with the other

7 matters.  There are no other issues at this time.

8     THE COURT:  Okay.  Very good.  Let me ask you about

9 September.  I know there were budgeting issues that you talked

10 about before, and I don't necessarily want to discuss them

11 openly here unless you're comfortable doing that, and you were

12 waiting for approvals from the Court for certain --

13     MR. McAFEE:  The attorney's fee and the legal assistant

14 budget has now been approved.

15     THE COURT:  And are you planning on submitting a CJ

16 advancement for September?

17     MR. McAFEE:  No.  The entries I had for September were just

18 for me, and they were on my October ledger.

19     THE COURT:  I see.  Okay.  Very good.  Thank you.

20     Mr. Hill, sir, I guess you want to meet privately, correct?

21     MR. HILL:  I can address in general everything but one

22 topic.  I've been through all the hard paper discovery and I've

23 been through it with my client.  Computer wise, Joe and I are

24 sharing a computer expert, and we're up to speed.  He's doing

25 what he's doing, and we're very satisfied with his services.

Depositions, as Rosemary said, will be a package deal.  We're

working on that.  Audio transcript is what I need to discuss

with you ex parte, and I have a plan to get it done.

THE COURT:  Okay.  Mr. Zeszotarski, sir.

MR. ZESZOTARSKI:  Your Honor, the majority of my time right

now, as you can see from the vouchers, are being spent mainly on

the audio and video side of things and in linking that together

with the paper which I think is what a lot of us are doing right

now.  And I feel like I'm making very good progress on that.

It's hard for me to gauge exactly how far along I am because I'm

kind of doing it in order of significance to my client rather

than regular order.

That being said, I think that I'm on schedule, and I'm

confident that I'm in a good position to be ready for trial.

THE COURT:  Is there -- is there a motion that you're going

to file with respect to paralegal fees?  Am I recalling that

correctly?

MR. ZESZOTARSKI:  I've already filed a motion and gotten

approval for paralegal.

THE COURT:  Okay.

MR. ZESZOTARSKI:  I just haven't submitted a voucher, yet.

THE COURT:  Okay.

MR. ZESZOTARSKI:  That's been an from an internal issue I'm

having to work through.  I'm sort of an island unto myself over

there.

1    THE COURT:  Well, good luck with that.

2    MR. ZESZOTARSKI:  Yeah.  Thank you.

3    THE COURT:  Yes, sir.  Mr. Boyce.

4    MR. BOYCE:  Yes, sir.  We have indexed the sensitive and

5    unclassified paper.  We have indexed the audio and video

6    unclassified and sensitive.  We have preliminarily reviewed all

7    the computers and don't really see a need to index that, but

8    we've reviewed that.  Obviously, we don't have any classified

9    materials of any relevance.  We still, on the record, want to

10   express our concern regarding the deadline for overseas

11   depositions and not having the general materials and classified

12   materials in time to schedule any depositions that still may be

13   problematic, so we may be making emergency motions or having to

14   deal with that sometime in 2011.

15   THE COURT:  So you're satisfied with your preparation in

16   all these various areas.  I know you elaborated on this in some

17   detail in the past with the chart and so forth, but you're

18   satisfied that your preparation is on track.

19   MR. BOYCE:  If Judge Flanagan wants to reconsider my

20   motion, we'll be ready any time she wants.

21   THE COURT:  Okay.  Very good.  Mr. McCullough.

22   MR. McCULLOUGH:  I second his motion on that since I also

23   had our motion to sever denied this past week.  It was

24   anticipated, I know that, but nonetheless, both Mr. Boyce and I

25   find ourselves in a relatively unique situation in regard to

transcripts and that type of thing is there's very little that
pertains to us at all, and so we have reviewed it because the
material might have an impact on our defendant just by the
cumulative effect of what's being discussed and that type of
thing, but it really isn't anything that we can make a motion
about because our people are not on it, therefore, we're not
aggrieved parties so we're just kind of monitoring, and we have
and my client has very diligently read virtually everything in
the case that's been reduced to paper or where he could review
it on the computer based on the protective order that we had in
place where you could leave the computer at the jail, and he did
have access to the disk and that type of thing, and that's been
very helpful because he's very curious, as I'm sure all the
defendants are, about the quality of the case involving him.

This past week was very productive from our standpoint.
Regardless of whether we have to go back and do it again or
whether we -- you know, after we've briefed it whether this
particular deposition stands, those parties would have an
opportunity to brief that issue, and it's predetermined, but
nonetheless it was a very productive week because I interviewed
other witnesses unless I wouldn't have gone, I just couldn't
have known the detail that they could provide and the
background.

I apologize for not having included a memorandum of law
regarding the sealing motion but on the last round of materials,

we'll be able to address that.  I think because we had addressed
it early on, it just got to be pro forma and set by, and we'll
address that and incorporate it for the reasons stated in
previous motions.  This relates to the same subject matter,
therefore, we'll come up with a short statement that satisfies
that requirement.

    THE COURT:  That'll be fine.  The Court's not trying to
make busy work for anybody.

    MR. McCULLOUGH:  It's just one of those things that came
out of the processor.  Maybe we should have been put a little
more meat on the bone.

    THE COURT:  Okay.  Well, I appreciate it then.

    MR. McCULLOUGH:  The only other issue that I would have,
and it's just there's no answer to it right now, and so I don't
know what -- but I don't -- I don't have any idea as to how the
election is going to come out.  November 29th --

    THE COURT:  I was going to ask you about that.

    MR. McCULLOUGH:  November 29th they start counting votes.
I am at this point about 90 something thousand votes behind, but
there's about 1.7 million votes that have to be counted two
times statewide to see how many number twos and number three
until leading contenders pick up, and there's about 575,000
Republican votes there who these are people who voted number one
for a different Republican other than myself so even though it's
bipartisan election, it goes backwards into it, and nobody knows

how the runoff process is going to be. I would say that if I
was elected, and I would have to move to withdraw, the counsel
that would come behind me would be in no worse position than
Mr. Sun is and probably better because my client has less direct
evidence involving him than Mr. Sun's client has so we would
work to make the transition as smooth as possible.

THE COURT: So are there any firm dates set?

MR. McCULLOUGH: I think they're going to start counting
the votes November 29th and have an answer by that week.

THE COURT: And that then subsequent after that then you'll
identify the leading two, correct?

MR. McCULLOUGH: Well, we're already identified, yes, sir.
The two leading contenders and everybody else is now out of it
so what they do process wise is on November 29th the counselors
of election will start hand counting the losers ballots for
their number two and number three selections and see how many of
those votes were for one of the two leading contenders and post
those numbers, just a vote for us, one or the other votes, and
at the end of that process the person who has the most overall
votes would be the winner of that election.

THE COURT: I see. So --

MR. McCULLOUGH: They would first go through all the number
twos, then they would add every one for Mr. Thigpin and every
one for myself for our vote totals. If either one of us has
less than 50 percent election vote -- but since he only has 20

percent and I only have 15 percent, it's very unlikely that counted twos would be enough to get anybody there.  So then they would count the threes and how many ever selected one or the other of us as their third choice would then be added to our totals, and he who has the most votes then wins.  And there's almost no way we can tell.

All I know is right now I'm 97,000 votes behind, and I'm planning on practicing law, but it may be that there's enough votes there for me to be the winner.  Some people seem to think I have an excellent chance because of all the high number of Republican votes that are in there, that I have a good chance of votes out of that group that he has from the other candidates so we have to wait and see.

THE COURT:  So we should know some definitive by the end of the month.

MR. McCULLOUGH:  By the end of the month, yes, sir, and maybe then we'll see.

THE COURT:  I understand, but in the meantime all is well as far as your case prep.

MR. McCULLOUGH:  All is well as far as our case preparation goes, and I would tell the Court that the amount that I budgeted for this trip was just about to the penny.  The court order was for $3,750 and the air fare was, like, 1,200 and something, the hotel bill was 1,200 and something and the per diem was, like, 900 and something so it comes out, like, 3,600 and some odd

1  dollars by the time you see what our voucher would be so that

2  prediction is what it would be now.

3       If we have to redo it, and they want to send two attorneys,

4  it's going to be about $10,000 or thereabouts for us to redo it

5  and that's not the -- the defendant because I think there's

6  enough room in the budget, my legal budget and theirs, for us to

7  redo it if necessary, but I'm certainly going to press for --

8  you know, for my client to have this be done.

9       THE COURT:  I see.  Okay.  I understand.  I understand.

10 Very good.  Mr. Boyce, let me add, I believe that your paralegal

11 budget that you submitted was approved by the 4th Circuit

12 yesterday so that approval ought to be reflected in an order

13 from this court pretty soon.

14      MR. BOYCE:  Thank you, Judge.

15      THE COURT:  Yes, sir.  Mr. Sun, is there anything that -- I

16 am interested in knowing the status of case preparation

17 generally.  I do want to meet with you and Mr. Wiles separately

18 to talk about the transition, but we can defer any discussion of

19 the status of your case until then if you care to.

20      MR. SUN:  That would be fine with us, your Honor.

21      THE COURT:  Okay.  Very good.  Very good.  Well, I think

22 that takes us through the agenda for the meeting with the

23 defendants as a group.  I would suggest now that I meet with

24 Mr. Sun and Mr. Wiles and Mr. Subasic separately and I know,

25 Mr. Hill, if you could just be on standby, I don't anticipate

1  taking too much time.  How might we reach you?  Will you just be

2  in the lobby, sir?

3      MR. HILL:  I'll be in the lobby or classified room.

4      THE COURT:  Okay.  Very good.  We'll track you down.  Let's

5  clear this courtroom except for the counsel for Mr. Subasic and

6  Mr. Subasic.  We'll be in a brief recess.

7      (Recess taken from 11:12 to 11:17.)

8      THE COURT:  We're now in closed session with counsel for

9  Mr. Subasic.  Mr. Subasic himself is present as well.

10  Gentlemen, I just -- I wanted to touch base with you partly to

11  just check in on the overall status of the case preparation and

12  also to discuss with you, really just check in with you about

13  the transition process that you're in the mist of right now.

14      Why don't we start out with just a check on the status of

15  the case preparation generally, and I'll be happy to hear from

16  either you, Mr. Sun or Mr. Wiles.

17      MR. WILES:  Let me just give a brief update of what I've

18  done since our last status conference.

19      THE COURT:  Okay.  Very good.

20      MR. WILES:  I kind of put things on a sort of -- sort of

21  kind of hold in terms of my preparation because I anticipate

22  what the Court ultimately did and didn't want to run into new

23  counsel's budget unnecessarily, but I did continue working on

24  reviewing audio and video surveillances, and I finished all the

25  audio and prioritized and began working on Mr. Subasic materials

1  and keeping notes so that they could be handed off to new

2  counsel if that's what came about.

3      There's not been any further work on my part on the

4  computer materials or on the paper discovery.  I have compiled

5  my notes on the prioritized audios into a spreadsheet that's

6  arranged chronologically that's been provided to new counsel,

7  and we were able to copy all of the -- our case files that are

8  in digital format to CD ROMs and flash drives to provide to

9  Mr. Sun, so I just got those are up and running.

10      So I've made myself available to him in every way I can,

11  and he's been really good.  He clearly knows what he's doing.

12  He's got great questions so I'm satisfied what he's doing toward

13  transition.

14      The Court's order to refer to a written transition plan,

15  I've never done one so I don't know exactly what to do, but what

16  I have done is I started the day or the day after your order

17  came out, and I prepared a memo outlining and describing

18  everything that I had in the file and how I was going to be

19  providing it to him, and we've been working on that.

20      THE COURT:  Good.

21      MR. WILES:  I think we're pretty much complete on that

22  memo.

23      THE COURT:  And that was the Court's concern.  I didn't

24  want see a transition plan.  I just -- I anticipated this would

25  happen anyway but just to make sure some real thought went into

1  the most efficient way to pass off the case because it is a

2  large case.  It's complicated and I think to do it efficiency

3  would require some thought by you and, not surprisingly, you

4  have given it.

5      MR. WILES:  That's all I have to say, your Honor, unless

6  you have further questions of me.

7      THE COURT:  Not necessarily.  I was interested in -- your

8  comments are very helpful.  I was interested in if I know -- if

9  you continue to believe collectively that your case remains on

10 pace to be ready to meet the series of deadlines that are

11 upcoming and ultimately be ready for trial in the current dates

12 set by the Court.

13     MR. WILES:  I felt that way at the last status conference,

14 and I did, as we moved through this most recent process, I -- I

15 feel we've moved through the track.

16     THE COURT:  Okay.  Very good.  Mr. Sun.

17     MR. SUN:  May it please the Court, I just wanted to echo

18 and tell the Court, as I told Mr. Wiles, we were able to

19 actually upload, if that's the right term, right to a program

20 that we use all the material that is in his file electronically

21 so it did switch over seamlessly, and I've been pleased in my

22 ability to work through this.

23     I don't have the substantive knowledge, but I'm able to

24 appreciate the organization and the content in a general sense

25 to see what's there, and I can confirm to the Court that I feel

confident in that regard about being able to quickly grasp that
because of the work that's going into the case up to this point
and again, the ability, literally, to pick it up, if you will,
and move it from one law firm to another electronically in a way
that, frankly, it's amazing, I guess, but it works great.

And so I do feel confident. It's easier, I guess, for me
to look at some back end deadlines and think about those from
earlier deadlines and get precisely what would be involved with,
you know, the January 31st deadlines.

THE COURT: Right.

MR. SUN: I haven't reviewed the discovery enough to know
whether -- I haven't talked to my client about that. I
certainly know that Mr. Wiles has had that process going on, but
I can't honestly say to the Court that I've engaged in that to
an ability at this point, but nothing that's happened so far has
lead me to think that that won't be the case.

Mr. Wiles and I have met twice already, and he's great at
responding to e-mail so I'm confident we'll be able to make that
transition as soon as possible.

THE COURT: Good. That's excellent. And I believe,
Mr. Sun, you entered your appearance on November 5 which I think
would put the end of the 60-day transition period, if I
calculated correctly, January 4. Is that your understanding as
well?

MR. SUN: Yes.

1      THE COURT:  Okay.

2      MR. SUN:  And I have gone through -- if I can branch out a

3  little bit from discovery.

4      THE COURT:  Certainly.

5      MR. SUN:  I did have a meeting with the court security

6  officer yesterday.

7      THE COURT:  Yes.

8      MR. SUN:  And I have now filed the memorandum of --

9      THE COURT:  We saw that today.

10      MR. SUN:  And I'll get the personnel I want to help me with

11  the case, but we're making the appropriate progress on that as

12  well.

13      THE COURT:  That's excellent.  We were gratified to see

14  that.  The court security officer made a particular effort to

15  make sure that process went quickly.  The Court thanks her for

16  her efforts in that regard.  The transition process is subject,

17  as you know, really to two orders that were entered, one was the

18  order that I entered.  I think both orders are self-explanatory,

19  but since we're all here, I just wanted to ask if either you,

20  Mr. Sun, or you, Mr. Wiles, had any questions relating to either

21  of these orders.  My order is docket number 631 making the

22  substitution of counsel or ordering that that occur and then

23  Judge Flanagan's order on budgeting type issues was also

24  entered.  That's docket entry 652, I believe.

25      Any questions at all regarding those two orders or any

1  provisions of them?

2      MR. SUN:  No, your Honor.  Again, to reflect on the

3  assistance that Mr. Wiles provided, Judge Flanagan's order

4  referred back to a number of earlier orders that I did not have

5  access to but Mr. Wiles shot that over to me right away so I

6  don't have any questions in that regard.

7      THE COURT:  Okay.  Very good.

8      MR. WILES:  I think I'm on track with that, your Honor.

9      THE COURT:  Very good.  And I'm assuming from your comments

10  that you don't anticipate that you'll be able to make the

11  handoff and, Mr. Wiles, you'll be able to file your notice of

12  withdrawal within this 60-day period, by January 4th.

13      MR. SUN:  Yes, sir.

14      THE COURT:  Okay.  Very good.  Mr. Subasic.

15      MR. SUBASIC:  Yes, sir.

16      THE COURT:  Sir, I wanted to just make a couple of comments

17  to you, sir.  As you know you do have new counsel in the case,

18  and I urge you to make your best efforts to work cooperatively

19  with Mr. Sun.  The Court anticipates he'll do an excellent job

20  representing you.  As I think is implicit if not stated

21  expressly in the Court's order appointing new counsel for you,

22  the timing of your request and the other circumstances made it

23  possible for that substitution of counsel to be made and as the

24  case progresses, it's important to keep in mind that in no case

25  can counsel be substituted on a repeated basis.  It's too

disruptive to the case.  The case must move forward.  It

undermines the orderly administration of the case.

So I just -- I don't want to prejudge future circumstances

but just to emphasize the point that I'm confident you're going

to make your best efforts to work with Mr. Sun.  I have no doubt

about that, and I just urge you to do so because the

availability of another opportunity to substitute counsel under

the circumstances that may exist in the future, there are

other -- at that point down the road, there are other

considerations that may not make it possible for that to happen.

I just wanted to alert you to that.

Very good.  Gentlemen, is there anything further that we

could productively discuss today in closed session?

MR. SUN:  No.  Thank you, your Honor.

MR. WILES:  No.  Thank you, your Honor.

THE COURT:  Mr. Wiles, thank you for your efforts in this

transition process.  I certainly appreciate it, sir.  And I

believe that concludes the proceedings then involving

Mr. Subasic.  So I'll remand him to the custody of the

Department of Corrections, and Madam Interpreter, thank you for

your services.  And we'll take a brief recess and if we can

round up Mr. Hill for a private session.

(Recess taken from 11:29 to 11:30.)

THE COURT:  Mr. Hill, the floor is yours.

MR. HILL:  A quick summary, as you know, I'm a sole

practitioner down in Greenville and I've been that way my whole life and I've never had help. I do my own research, my own everything and when I got in this case and started moving along, I realized I needed paralegal help. I made the necessary motion and it was approved for, I think, $20,000 the first time around, and now I've got 50,000 I believe is where I'm at.

I've hired a litigation expert in the case, Lynette Norphilly (ph), in June, July and August. I think she worked about 560 hours a month. She did 40 hours a week, did a fabulous job and got me through all the videos. Now it's reduced down to my client. I think we spent three hours on all the evidence on video and so she reduced all that down to three hours, did a wonderful job.

When she took the job September 1st with the public defender, she knew another lady, Ms. Webb, who is a litigation expert, she thought she would be wonderful for the job. I've hired her. I've had some secretary problems myself when my secretary retired after 17 years and two jury trials this month so I sort of thought she was doing her thing, and I found out she billed out 15 hours last month. I got a letter from the judge, you may have seen it, because she had she had three and a half hour drive from Chapel Hill to Greenville from two hours and the mileage was 336 and it was 200. So I've got some problems with her and I am behind in the other transcripts. I see here today that there's 10 people working on the

1  Government's side of it, and I don't have anybody up to speed.

2      I talked to my computer expert, Camden, Camden is a new

3  graduate, very sharp, in Greenville.  He's literally a quarter

4  mile from my office.  He's got a stack of 10 or 20 people.  He

5  can review the audio tapes and can put the key words in and help

6  me out tremendously in getting -- looking at these transcripts

7  and whatever and if one person is busy, we've got another person

8  that can do it.  So what I'm asking the Court to do is to allow

9  me to use my paralegal expense of $50 an hour to hire my

10  computer company to help me get through it

11      THE COURT:  I see.

12      MR. HILL:  And if it gets crunch time, he can put five

13  people on it, and I just think that's the most efficient.  Right

14  now, I can't find a paralegal there.  They're hard to find.  The

15  good ones are working full time.

16      THE COURT:  I understand.

17      MR. HILL:  But that's all my request is.  When I submit my

18  voucher to submit it, I'll submit -- Silicon Solutions, Inc.

19  will be the one that I'll split my paralegal time through and

20  then Camden Stiles (ph) who I'll submit my computer time

21  through.  And I had a long discussion with him because I didn't

22  sleep well Saturday night so I was at his office Sunday morning

23  worried about it, and he and I had about a two-hour conversation

24  and, like I said, he's very sharp, and he's agreed to this.

25      THE COURT:  And you're confident that that work can be done

1  satisfactory by his company.

2      MR. HILL:  I am.  And I believe up to date, I billed

3  $28,000.  I think I can do that a lot less than the 28.  I think

4  it would be a lot less than that because of his computer skills

5  and be able to plug key words to pull up, and then I'll have

6  some funds left over to hire somebody to sit behind me at trial.

7      THE COURT:  Okay.

8      MR. HILL:  I don't see any negatives.  If I had a negative,

9  I'd tell you.

10      THE COURT:  No.  I understand what you're saying.  I'm

11  thinking about the best procedural way to present this.  You've

12  made an oral motion.  I'm thinking, Mr. Hill, it might ought to

13  be put on paper, and it doesn't sound like that would be an

14  extraordinary effort, and, of course, you've got the record

15  here, the justification for it.  I hate to put you to the extra

16  trouble, but I think it probably needs to be reflected in a

17  written motion.

18      MR. HILL:  I'll do that, your Honor.

19      THE COURT:  So that would enable Judge Flanagan to see that

20  in writing and help to facilitate the process, but I certainly

21  understand what you're saying.  It sounds like you've been

22  resourceful in trying to find a solution and getting resources.

23      MR. HILL:  I don't sleep at night.  I try to get where I

24  can, and I found out she had billed 15 hours for the whole month

25  of October.

1      THE COURT:  I'm sorry.  Okay.  Well, my suggestion on that
2  would be to get a motion in, and I'll certainly pass along the
3  gist of your comments here today to Judge Flanagan so she can be
4  on the lookout for that motion.
5      MR. HILL:  Very good.
6      THE COURT:  Very good.  Thank you, sir.  Very good.  I
7  think we need to meet with counsel for the Government.  Thank
8  you, Mr. Hill.
9      MR. HILL:  Thank you.
10      THE COURT:  We're now in a closed session with solely
11  counsel for the Government and court personnel.  Mr. Bowler and
12  Ms. Kocher, I appreciate your making the effort to come back
13  downstairs or upstairs depending on where your office is.
14      MR. BOWLER:  We're intimidated by your powers, your Honor.
15      THE COURT:  Well, I appreciate you mastered the effort to
16  come.  Nevertheless, are there any other issues that counsel for
17  the Government wishes to bring to the Court's attention
18  regarding case preparation or any other aspect of this case?
19      MR. BOWLER:  This is really -- this could necessarily be ex
20  partied just to give the Court, Mr. Kelhoffer (ph) is attempting
21  to collect some authorities in reference to this whole
22  deposition matter that the Court needs to meet on so we haven't
23  forgotten about having to supply that to the Court.
24      THE COURT:  Very good.  I appreciate that very much.
25      MR. BOWLER:  Nothing else.

1    THE COURT:  And your case preparation, I'm assuming, is on

2  track.

3    MR. BOWLER:  We think so.

4    THE COURT:  On current schedule.  And we talked about the

5  one deadline.  You don't foresee any other deadlines that you

6  see a problem with at this point?

7    MR. BOWLER:  We don't at this point, your Honor.

8    THE COURT:  That's fine.  We'll be seeing each other again

9  in January.  Very good.  Anything else that you wanted to bring

10  up at all, Ms. Kocher, Mr. Bowler?

11    MS. KOCHER:  No, sir.

12    THE COURT:  Very good.  Well, I guess that will conclude

13  our conference.  Again, thank you for coming down.  Very good.

14  We'll be in recess.

15    (Proceedings ended at 12:25 p.m.)

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE

2          THIS IS TO CERTIFY THAT THE FOREGOING TRANSCRIPT OF

3    PROCEEDINGS TAKEN AT THE CRIMINAL SESSION OF UNITED STATES

4    DISTRICT COURT IS A TRUE AND ACCURATE TRANSCRIPTION TO THE BEST

5    OF MY ABILITY OF THE PROCEEDINGS TAKEN BY ME IN MACHINE

6    SHORTHAND AND TRANSCRIBED BY COMPUTER UNDER MY SUPERVISION.

7          THIS THE 21ST DAY OF FEBRUARY, 2011.

8

9                              /S/ REBECCA L. CRUNK

10                             REBECCA L. CRUNK
                               COURT REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25