IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:09-CR-216-FL-3
5:09-CR-216-FL-7
5:09-CR-216-FL-8

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| ANES SUBASIC; ) | |
| MOHAMMAD OMAR ALY HASSAN; and ) | |
| ZIYAD YAGHI, ) | |
| ) | |
| Defendants. ) | |

This case comes before the court on the motions of defendants Mohammad Omar Aly Hassan (D.E. 1094), Ziyad Yaghi (D.E. 1155[1]), and Anes Subasic (D.E. 1212) (collectively "defendants") for an order compelling the government to produce all mental health and medical records of defendant Daniel Boyd ("Boyd") pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). The government filed a response (D.E. 1213[2]) in opposition to the motions.[3] In addition, defendant Hysen Sherifi filed a response supporting the motions (D.E. 1202), which is accompanied by correspondence between his counsel and the government relating to the subject matter of the motions. The motions were referred to the undersigned for review and decision pursuant to 28 U.S.C. § 636(b)(1)(A) and are ready for adjudication. (*See* Docket Entry dated 27 July 2011 after D.E. 1259 and Docket Entry dated 1

---

[1] The motions filed by Yaghi and Subasic are actually motions for leave to adopt the motion of Hassan (D.E. 1094). The court is treating these as motions to compel.

[2] The government's original response at D.E. 1210 was amended and refiled at D.E. 1213 to correct an inaccurate docket reference.

[3] The response relates expressly to the motions by Hassan and Yaghi, but because Subasic has adopted the motion of Hassan, the court is treating the response as applying to Subasic's motion as well.

Aug. 2011 after D.E. 1266). For the reasons discussed below, the motions will be denied without prejudice.

## BACKGROUND

Boyd entered a plea of guilty in this case on 9 February 2011 (*see* D.E. 799), pursuant to a plea agreement signed 14 January 2011 (D.E. 800), and has been debriefed by federal agents in connection with his plea. Agents' reports indicate that in the course of giving statements Boyd has taken up the persona of "Saifullah." (Hassan Mot. 4). The statements purportedly suggest that Boyd may have been unable, to some extent, to separate himself from this persona and that the need to maintain the persona resulted in "radicalization and more dangerous plans." (*Id.*). Defendants contend that these statements call into question Boyd's mental health and competence, and "cast light on his ability to perceive or accurate[ly] narrate perceptions in settings where he admitted he was role playing." (*Id*. 5).

The visitor logs of the Wake County Safety Center where Boyd is incarcerated show that Boyd has been visited by Dr. Jim Hilkey, a forensic psychologist and former Chief of Psychology at Federal Correctional Institution in Butner, North Carolina, and Dr. George Corvin, a forensic psychiatrist practicing in Raleigh, North Carolina. (Hassan Mot. 2). The visits (nine by Hilkey and four by Corvin), which also included Boyd's counsel on some occasions, occurred between 22 February 2010 and 1 April 2011, thereby falling both before and after Boyd's execution of the plea agreement in January 2011 and his entry of his plea in February 2011. (*Id*. 2). When a purpose for the visit is recorded on the log, it includes either "Psych," "Legal," or "Eval." (*Id*. 2-3).

Despite the government's representation that it had produced to defendants all materials subject to *Brady* and *Giglio*,[4] according to defendants it has not produced any mental health or medical records for Boyd, including specifically any records for Drs. Hilkey or Corvin.

In the correspondence Sherifi submitted with his response to the instant motions, his counsel specifically requested from the government "any records of any kind of psychological, psychiatric, or other mental health treatment of Daniel Boyd since the entry of his guilty plea on February 9, 2011." (Sherifi Resp. Ex. 1 (D.E. 1202-1) 2). The government responded to this request by stating that it "possesses no records showing treatment or diagnosis of Daniel Boyd for any medical or psychological illness, either before or after his plea." (*Id*. Ex. 2 (D.E. 1202-2) 1).

## DISCUSSION

### I.  THE PARTIES' ARGUMENTS

Defendants contend that the government has an obligation under *Brady* and *Giglio* to produce all mental health and medical records of Boyd on the grounds that the records will be important to their cross-examination and impeachment of Boyd at trial. Further, Sherifi asserts that even if such records are not in the government's possession, it has an affirmative duty to obtain them.

In its response, the government again asserts that it does not have the records defendants seek. Further, while recognizing that it has an obligation to seek favorable evidence known to those acting on the government's behalf (*e.g.*, law enforcement agents), it contends that this obligation does not extend to third parties such as local psychiatrists engaged by a co-defendant. The government represents that it is "not aware of, did not arrange, and has no additional

---

[4] See the government's responses (D.E. 1165, 1188, 1195) to various defendants' motions (D.E. 1036, 1043, 1051, 1172, 1192) regarding its disclosure of *Brady* and *Giglio* material.

3

information regarding the visits between Hilkey and/or Corvin and Boyd" other than that which was presented in defendants' motions. (Gov.'s Resp. 2). While the government concedes that the records sought may be relevant for impeachment purposes, it asserts that the relevance of the records, alone, does not trigger its obligation under *Brady*.

## II. APPLICABLE LAW

It is well settled that prior to trial the government must produce any evidence that is "favorable to an accused . . . [if] the evidence is material either to guilt or to punishment." *Brady*, 373 U.S. at 87. "In addition to the general duty under *Brady v. Maryland* . . . to produce exculpatory evidence, the government is required to disclose all information which might arguably be used to impeach or discredit a government witness at trial." *United States v. Stroop*, 121 F.R.D. 269, 273 (E.D.N.C. 1988); *see also United States v. Smith*, 77 F.3d 511, 516 (D.C. Cir. 1996) ("Mental records can be material as impeachment evidence because they can cast doubt on the accuracy of a witness' testimony."); *United States v. Binder*, No. 5:01-CR-91-H, 2001 U.S. Dist. LEXIS 23000, at *2 (E.D.N.C. 3 Aug. 2001) (holding that criminal records of government witnesses as well as promises of leniency or other inducements to testify must be disclosed to defendant). As with *Brady* material, the Fourth Circuit has held that the government must disclose *Giglio* material in time for its effective use at trial. *See United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527, 532 (4th Cir. 1985)

The scope of the government's obligation under *Brady* and *Giglio* has been limited to materials in the government's possession or under its control.[5] *See United States v. Bender*, 304 F.3d 161, 163 (1st Cir. 2002) ("'[T]he rigors of *Brady* usually do not attach to material outside the federal government's control.'" (quoting *United States v. Sepulveda*, 15 F.3d 1161, 1179 (1st

---

[5] Similarly, under the criminal discovery rule, Rule 16, the government's obligation to produce records requested by a defendant is limited to records within "the government's possession, custody, or control." Fed. R. Crim. P. 16(a)(1)(E).

Cir. 1993)). "In order to comply with *Brady*, . . . 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf . . . , including the police.'" *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).

Further, the *Brady* rule "does not compel the disclosure of evidence available to the defendant from other sources, including diligent investigation by the defense." *Stockton v. Murray*, 41 F.3d 920, 927 (4th Cir. 1994); *see also United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990) ("[W]here the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine."). "Certainly, then, information that is not merely available to the defendant but is actually known by the defendant would fall outside of the *Brady* rule." *Fullwood v. Lee*, 290 F.3d 663, 686 (4th Cir. 2002).

## III. ANALYSIS

The court agrees with the government that it has no obligation under *Brady* or *Giglio* to attempt to obtain the records defendants seek. Among other reasons, those cases apply to material within the possession or control of the government, and the government has adequately demonstrated that it does not have either possession or control. Moreover, defendants are already aware of the evidence.

This determination does not, of course, foreclose other avenues by which defendants could conceivably obtain possession of the records they seek. Without attempting to address all such possibilities, the court notes that Rule 17 provides defendants in a criminal case certain rights to subpoena documents for trial.

Further, it is conceivable that at some point prior to trial the government will obtain the records at issue for its own use, whether as part of its routine trial preparation (including specifically the examination and cross-examination of Daniel Boyd) or otherwise. If the government does obtain the records and if they meet the requirements for disclosure under *Brady* or *Giglio*, the government will be obligated to produce them to defendants in accordance with those decisions. Defendants would have recourse to the court to enforce such obligations, if necessary.

## **CONCLUSION**

For the foregoing reasons, defendants' motions (D.E. 1094, 1155, 1212) are DENIED WITHOUT PREJUDICE.

SO ORDERED, this the 5th day of August 2011.

_____
James E. Gates
United States Magistrate Judge