IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. <u>5:09-CR-216-2-FL</u>
NO. <u>5:09-CR-216-3-FL</u>
NO. <u>5:09-CR-216-5-FL</u>
NO. <u>5:09-CR-216-7-FL</u>
NO. <u>5:09-CR-216-8-FL</u>

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | GOVERNMENT'S RESPONSE TO |
| | ) | DEFENDANTS' POST *DAUBERT* |
| HYSEN SHERIFI | ) | HEARING BRIEFS |
| MOHAMMAD OMAR ALY HASSAN, | ) | |
| ANES SUBASIC | ) | |
| DYLAN BOYD | ) | |
| ZIYAD YAGHI | ) | |

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, hereby responds in opposition to defendants' Post Hearing Briefs related to the 16 August 2011 <u>Daubert</u> hearing.[1]  In support of such opposition the Government shows unto the Court the following:

An educated jury is what the defendants' rightly fear; thus they seek to keep the jury ignorant of necessary information.  The charged conspiracies are difficult if not impossible to appreciate

---

[1] Defendant Sherifi's Supplemental Brief on the Admissibility of Testimony under Rule 702 as to Evan Kohlmann filed 25 August 2011 at D.E. 1351; Defendant Yaghi's Post Hearing Brief in Support of Motion to Exclude Testimony of Evan Kohlmann filed 26 August 2011 at D.E. 1358; Defendant Dylan Boyd's Supplemental Memorandum of Law in Support of Motion to Exclude Expert Witness filed 26 August 2011 at D.E. 1362; and Defendant Subasic's Post Hearing Brief in Support of Motion to Exclude Fake Expert Testimony of Evan Kohlmann filed 26 August 2011 at D.E. 1364.

1

without the context in which they arose. The understanding between and amongst these defendants is steeped within a twisted interpretation of the religion of Islam. To lack knowledge about this twisted interpretation and its adherents – commonly referred to as Islamic extremists or terrorists – is to lack the tools needed to fully comprehend the significance of the defendants' statements and actions. The defendants may not like what Mr. Kohlmann has to say or the conclusions drawn, but his qualifications and the relevancy of his testimony is manifest.

Through filings and the Daubert hearing, the Government described Evan Kohlmann's expected testimony and its applicability to the case at hand. Herein, to ensure no confusion exits, the Government will again explicitly set forth the projected scope of Mr. Kohlmann's testimony. Second, the Government will address the various objections raised within the defendants' filings.

## I. The Scope of Evan Kohlmann's Testimony.

Mr. Kohlmann's qualifications have been thoroughly presented, therefore the below is limited to the subject matter of his testimony. The Government stresses that Mr. Kohlmann's report is far more detailed than his testimony will be, but this certainly should not be something to hold against the Government.[2]

---

[2] The Government objected to providing such a detailed report (*See* D.E. 870) and only did so to ensure satisfaction of the Court's order(*See* D.E. 923 at p.9 "...the court anticipates that the required summary will be lengthy...").

**A. The Global Jihadist Movement.**

As previously set forth, Mr. Kohlmann will explain the Global Jihadist Movement. Similar to his testimony during the <u>Daubert</u> hearing, he will explain the roots of this movement and its outgrowth. This will include the ideological underpinnings (i.e., doctrine) that links many groups which go by different names yet have the same purpose. He will explain what this purpose is and how this movement intends to achieve it. Because these are extremist beliefs culled from the religion of Islam, it has naturally hijacked many terms from the religion of Islam. However, while these terms may mean one thing to the average Muslim, they mean something entirely different to the extremist. Within these concepts exists the unlawful justification that extremists utilize to convince themselves that their actions are not only right, but are obligatory as commandments from "Allah" (i.e., God). The Government's factual evidence will display defendants's conduct mirroring these beliefs; thus an understanding of the beliefs themselves is crucial to the jury in coming to an educated verdict.

**B. Home Grown Terrorism.**

Home Grown Terrorism is a result of the Global Jihad Movement. It is a tactically calculated result and may exist in the form of an individual or a group. Over the course of several years, Mr. Kohlmann has researched and reviewed a staggering amount of materials (e.g., dozens of terrorism trial transcripts, thousands

of audio/video/documentary items published by known terrorist groups) in addition to conducting his own personal interviews of a number of known terrorists. Through education and experience, he has learned and applied a well accepted methodology in the realm of social sciences. From these efforts, he has opined on the existence of commonalities present within home grown terrorism. This includes five separate factors - no single one being particularly indicative in Mr. Kohlmann's opinion. A combination however provides a valuable indication. It is of course neither technical or scientific in the traditional sense, which is to say there is no final indisputable objective answer. That is, a social science, by its very nature is not akin to concluding "four" based on the question of "what is two plus two?" Rather, the social sciences are a study of human behavior which after appropriate research and review allows the expert to extract certain commonalities that act as valuable indicators. Mr. Kohlmann has explained that a high indicator of a home grown terrorist network is one that is comprised of 1) Self-selecting schemes aimed at traveling abroad to a combat zone; 2) Training materials or stockpiling of guns and ammunition; 3) Radical sectarian ideology; 4) Subterfuge; 5) Collection & redistribution of propaganda.

**C.  Focus on Propaganda.**

Mr. Kohlmann is able to provide an explanation as to how the propaganda is used by the Global Jihadist Movement to further the

existence of its corrupt ideology, and specifically how this is often fundamental to home grown terrorism. In current times, this consists largely of use of the World Wide Web, i.e., the internet. This is a strategic action by the Global Jihadist Movement to increase its ranks with individuals who have never had any actual contact with a recognized terrorist group. By definition, home grown terrorism is "home grown" in the sense that it did not physically sprout from a foreign country. Therefore, to appreciate this, one must understand the types of propaganda utilized and the means by which it is dispersed. Mr. Kohlmann is able to inform a jury on this as well as provide specific information about a few of the propaganda materials found in this case. This propaganda embodies the underlying ideology and is thus a vehicle for further explaining the ideology of Islamic extremism. It is of course highly relevant to the defendants' state of mind. Mr. Kohlmann will apply his knowledge to assist the jury in understanding portions of the propaganda within the context of the Global Jihadist Movement.

**D.  Focus on Travel.**

As Mr. Kohlmann has explained, Home Grown Terrorism seeks to accomplish the goals of the Global Jihadist Movement. To do so, this often entails schemes to travel to what the Islamic Extremists consider war fronts. Mr. Kohlmann is able to explain where these locations are geographically, routes commonly utilized to enter

these areas, and why the extremists consider them battle fronts. Specific to this case, this will include countries such as Iraq, Afghanistan, Yemen, the Gaza strip, Bosnia-Herzegovina, Kosovo, Chechnya, and Somalia. The evidence will display that these are areas the defendants traveled to or discussed traveling to - which, in context is extremely relevant for the jury's consideration.

   **E.  Application to Facts of this Case.**

   Mr. Kohlmann will subsequently be questioned briefly regarding factual evidence from this case. He will provide context to certain propaganda documents, videos, and audio clips. However, as to any conclusions, he will simply testify to the significance of the evidence he personally reviewed. Although the exact phrasing may be different, the questions in this regard will substantively be: "Have you reviewed evidence related to the present case?", "Do you have an opinion about whether the evidence you have reviewed is consistent with the five commonalities existing within home grown terrorist groups?", and finally, "What is that opinion?". Based on Mr. Kohlmann's expert reports, his testimony during the <u>Daubert</u> hearing, and further conversation with him as to the legal limitations on his testimony, it is our understanding that Mr. Kohlmann will respond in substance: in his opinion, the evidence reviewed is consistent with the five commonalities previously set out and thus indicates the presence of a home grown terrorist group.

6

## II.  Rebuttal of Defense Arguments.

While each of the Defendants have filed a post-hearing brief, it appears the substantive arguments of each are more or less encapsulated within the filing by Defendant Yaghi at D.E. 1358. Although the Government's response tracks the format of Defendant Yaghi's filing, it is intended to apply to each defendant.

### A.  His Testimony is Relevant.

It requires a strong mind to be able to dismiss from memory the indictment, dismiss the thousands of documents in evidence, dismiss the hundreds of hours of audio and video, the many photographs, and the projected testimony of both sources and cooperating co-defendants.  But, to conclude that Mr. Kohlmann's testimony is not relevant would require such a mind.  The defendants are seeking a decision from this Court based on completely incorrect portrayal of the related evidence.  The notion that the facts of this case do not consist of the matters discussed by Mr. Kohlmann is simply inane.  The defense claims, "[Mr.] Kohlmann is nothing more than a summary fact witness." (D.E. at p.3).  Mr. Kohlmann is able to provide ADDITIONAL valuable background information related to the evidence ALREADY existing. Mr. Kohlmann's reports display that he is providing additional information to further describe the evidence in existence.[3]

---

[3]  Again, however, Mr, Kohlmann's report is more detailed than his testimony will be.  For example, while he provides much detail about the origins of certain video files or documents, the

For example, a fact that will be presented at trial is that defendant Yaghi has a Facebook account and on this account he sent a message to Defendant Hassan stating, "yo akhi jazakALLAHHukhairun for tell me about Anwar Al Awlaki niggas is good mashALLAH I been listening to his lectures for mad long asalamaualaikum." This apparently indicates association between Yaghi and Omar who are co-defendants, but on its face is of little more value. Of course, if "Anwar Al Awlaki" - whose lectures Yaghi has listened to for "mad long" - is a well known proponent of violence within the Global Jihadist Movement, then the value of this evidence is much more probative. Moreover, it is valuable to understand where and how these materials may be obtained. Mr. Kohlmann provides this context.[4] Further evidence will display that Yaghi and his co-defendants possessed a number of Al Awlaki lectures advocating the violence they are accused of conspiring to commit.

The defendants not only imply but directly assert that because they are not charged with assistance to a specific terrorist group, the Government should be precluded from mentioning any terrorist group. (See e.g., D.E. 1358 at p.3). The defendants are charged

---

specific creating source itself is generally not relevant unless known to the defendant; rather explanation of what the video portrays or explanation of what the document is referring to - if something generally unknown to someone other than an expert in this field - is what the jury should have for its consideration.

[4] *See* Mr. Kohlmann's Expert Report I at p.28 for a more thorough review related to this comment by Yaghi regarding Anwar Al Awlaki.

under Title 18 U.S. Code Section 2339A which does NOT require any contact or even intent to establish contact with any *specific* terrorist group. Perhaps the defense is confusing Section 2339A with Section 2339B, which does have such a requirement. Section 2339A, on the other hand, clearly exists for those individuals intent on providing material support towards the cause of terrorism as opposed to any specific group. Explanation regarding Homegrown Terrorism as a subset within the Global Jihadist Movement is of great assistance here. The very idea is for the ideology to result in action by those without any specific ties to a known terrorist group.[5] The defendants cannot and should not find shelter from prosecution because they were seeking to assist **any** terrorist group as opposed to a **specific** terrorist group.

Defendant Yaghi sarcastically claims that Mr. Kohlmann "manages to craft a report that uses the terms Al-Qaida, suicide bombings, Osama Bid Laden, terrorists, propaganda, Jihad and Mujahideen over and over again," and this "is a scare tactic and nothing more." (D.E. at p.4). Dozens of Islamic Extremist propaganda materials located on Yaghi's computer were additionally located on one or more of the computers owned by his co-defendants. In just one of these files, "39-Ways-to-Serve-and-Participate-in-Jihad," the terms such as "Jihad" and "Mujahideen" is used far more times than in Mr. Kohlmann's report and in a manner that proper

---

[5] *See e.g.*, Mr. Kohlmann's Expert Report I at p.4-5.

context displays as advocating unlawful violence. It is the evidence the defendants dislike, not Mr. Kohlmann.

Defendant Yaghi goes on to claim that Mr. Kohlmann's reference to matters such as jihad "is specifically designed to inflame and frighten the jury into drawing a connection between the Defendant and the very sinister culture of terrorism that exists in some parts of the world." (D.E. at p.4). Amazingly, Defendant Yaghi's acknowledgment of this "sinister culture" is stated as if it is something completely foreign to him and his co-defendants. This "sinister culture" is evident from the propaganda contained in this case - the propaganda the defendants amassed and redistributed amongst themselves and others. As to Defendant Yaghi, he acknowledges as much on another facebook post, in which he states "Ziyad is watching mujahidin videos while feds are watchin him hahaha". What exactly are "mujahidin" and what type of videos could this refer to? Mr. Kohlmann is again able to provide context. Ziyad Yaghi later communicates to defendant Hassan, "yo I miss u like crazy nigga inshallah u will come very soon aight ALLAH has opened the doors for me and the true believers are the ones who are going to follow." Mr. Kohlmann's expertise on the jargon utilized by Islamic Extremists is valuable for a jury's consideration as "open the doors" and "true believers" are terms commonly utilized by such individuals and have very specific meaning within the Global Jihadist Movement. These are but a few

10

instances in Mr. Kohlmann's testimony will prove of great assistance to the jury. Similar examples exist for evidence related to each of the defendants.

Wholly separate from Mr. Kohlmann, the physical and testimonial evidence will display that the defendants possessed, condoned, and/or redistributed materials advocating violence in the name of Islamic Extremism. As a group, they possessed a massive amount of these materials. To be clear, these materials themselves explicitly refer to Al-Qaida and other various terrorist groups; explicitly either praise or are direct speeches by known terrorists such as Anwar Al-Alawki, Adam Ghadan, Usama Bin Laden, Abu Hamza al-Masri, and Abdullah al-Faisal al-Jamaiki; and these materials advocate and direct action such as suicide bombing, killing of civilians, and taking up arms again America - all under the rubric of Jihad as a holy obligation. For this reason, Defendant Yaghi's proclamation that mere mention of these topics in reference to the Defendants would "constitute plain error" is ludicrous. (D.E. 1358 at p.12). It is the evidence. It is axiomatic that the mountain of materials possessed by the defendants is relevant; ergo, information necessary to understand the significance of those materials is just as, if not more, relevant.

In a case where gang affiliation is relevant and at contest, the prosecution's evidence of a defendant wearing a red shirt and red bandana is seemingly irrelevant; however, an expert's

11

explanation that these are the colors and items commonly associated with and worn in a specific fashion by members of a certain gang brings to the forefront its relevancy, and is simply necessary for the jury's consideration.  The same applies to the jargon utilized by such a gang.  Here, the gang is simply much bigger as it operates on an international level and seeks members based on ideology as opposed to territory.  Of course membership in a gang or condoning an ideology is itself not a crime, but it is an extremely valuable factor for consideration when the crime is action consistent with that membership or ideology.

**B.    His Testimony is Not Precluded by The Fist Amendment.**

The First Amendment does not protect the Defendants from conspiring to commit violence.  The Government's case entails far more than a mere belief by the defendants but rather an implicit agreement to act upon those beliefs and overt actions taken in furtherance thereof.  Mr. Kohlmann's testimony certainly assists in explaining the beliefs held by the Defendants, but this is merely one piece of the case.  The possession of these materials is not criminal, it is however, very probative of the beliefs that make it more likely they would act upon the ideology espoused therein.  Defendant Yaghi exemplifies a ridiculously short-sighted outlook by proclaiming that Mr. Kohlmann "concludes that because you have the material on your computer, you must want to be a terrorist or part of a homegrown terrorist

organization." (D.E. 1358). Certainly, if possession alone were a crime, Mr. Kohlmann himself - who has accumulated terabytes of such propaganda - would be the greatest of violaters. Mr. Kohlmann's testimony clearly details that the factors he laid out are not individually of great value in forming any reliable conclusion about the existence of a homegrown terrorist group. Rather, it is the conglomeration of these factors. Thus, for example, if the five commonalities were present for one individual, that would be indicative to Mr. Kohlmann of a homegrown terrorist - or what is often referred to in this field as a "lone wolf." Likewise, there could be a group of five individuals who each meet one of the five commonalities. Again, individually, the value of this information is minimal to Mr. Kohlmann in forming any opinion. Conversely, when these five individuals are linked together, it is another matter entirely as the five commonalities are now all present.

**C.    His Testimony Does Not Exceed His Expertise.**

In so many words, a majority of the defendants assert that Mr. Kohlmann cannot be an expert in the matter of Terrorism because he does not speak every language utilized by terrorists and therefore must rely on translations. (D.E. 1358 at p.17). Should this line of reasoning be accepted, there are hundreds of thousands of pastors and priests who despite a lifetime of study of the King James Bible would fail to qualify as an expert in

13

such matters for the mere fact that they lack fluency in the Hebrew language. As Mr. Kohlmann testified, his research includes review of materials in various foreign language and he takes extensive steps to ensure the reliability of his translations. The defendants again confuse what is more properly cross-examination for an issue of admissibility. The defendants are well represented and their counsel are well equipped to test Mr. Kohlmann's reliance on such translations. The defense additionally attacks Mr. Kohlmann for lacking credentials as a forensic computer specialist. (D.E. 1358 at p.9). If he were testifying as such, that may be worthy of consideration. Mr. Kohlmann's testimony regarding where propaganda related to the Global Jihadist Movement is generally located and how it may be obtained are based on personal experience - as described during the <u>Daubert</u> hearing.

**D. His Testimony is More Probative than Prejudicial.**

Mr. Kolhmann's testimony is highly relevant and is in fact necessary. As this Court has surely recognized from its own experience thus far, the terminology alone is subject to extreme debate. Mr. Kohlmann's expertise involves how Islamic Extremists use these terms to advance unlawful violence. Exposing those materials possessed by the defendants is highly prejudicial to the defendants. To be clear though, that is why it is valuable evidence; the higher the level of prejudice, the higher the

probative value.  The ONLY question is whether it is "unfairly" prejudicial and even if there is an element of "unfair" prejudice, that unfairness must "substantially" outweigh the probative value for the evidence to be precluded.  *See* Fed. R. Evid. 403.  In the present instance, there is absolutely no element of unfair prejudice.  The defendants are accused of committing crimes that are in direct line with the distorted ideology advocated by the multitude of documentary, audio, and video materials they possessed.  If anything, defendants' arguments are in reality against the evidence itself as opposed to Mr. Kohlmann's placing the evidence in context.

### E.   His Testimony is That of a Qualified Expert.

Defendant Yaghi's attacks in this regard are particularly shallow and unbecoming.[6]  While congruous with his filing on the whole in terms of continuing irrationality, it is nonetheless difficult to understand how he can continue to demean Mr. Kohlmann as a "self-described expert," despite the fact that multiple federal, state, and foreign courts have accepted him as an expert.  (D.E. 1358 at p.12).  Mr. Kolhmann need not describe himself as an expert, he has been accepted and legally described by multiple courts as an expert.  Interestingly, while the

---

[6]  To be fair, while defendant Sherifi joins in other areas of attack, he does not do so in this regard and recognizes, "There is no doubt [Mr. Kohlmann] has admirable educational credentials."  (D.E. 1351 at p.6).

defendants would completely disregard the opinions of other courts in concluding that Mr. Kohlmann is abundantly qualified as an expert in the area of Terrorism, they seek to heavily rely on a few of these same courts in the matter of the scope of his testimony. Besides the obvious inconsistency, the matter of scope is one that is completely fact specific to any given case whereas a determination of Mr. Kohlmann's qualifications - though far from dispositive to a separate case - is a determination that may rightly be considered by other courts due to its obviously broader applicability. The fact that Mr. Kohlmann has testified in multiple courts on multiple instances is valuable to this Court for a myriad of reasons, but perhaps most is that it one of the greatest forms of peer review. On many occasions, he has publicly declared his credentials, his education, his experiences, his methodology, and his opinions - all in a forum under which he is subject to not only comment by the community at large but he is subject to the most thorough form of testing known to law, cross-examination.

The defense claims that experts "do not render opinions in Court where the evidence is not disclosed and is controlled by a single party," and that an expert is a de facto summary witness where "there is no question upon which to opine." (D.E. at 1358). It is this very type of excessive statement that exposes the defendants' overreaction to Mr. Kohlmann's testimony. In

truth, experts commonly testify on background materials in addition to providing a specific opinion.[7] This is not only acceptable, but common practice. The defendants seem to believe that Mr. Kohlmann's opinion is lacking because he was not provided every single piece of discovery or every single piece of evidence to be introduced by the Government. Besides the fact that this would have been counterproductive, the amount of data alone would have made it highly inefficient. If Mr. Kohlmann can not recall being provided a specific piece of evidence or in fact did not receive it, there exists an appropriate avenue for the defense to resolve: cross-examination. If the defense believes that Mr. Kohlmann's testimony is based on "cherry-picked" evidence, then they may present it to him and simply ask, "does this change your opinion?".

Mr. Kohlmann has testified that he was provided enough evidence to form an opinion. While the defendants raise a hue and cry over the fact that they are not as prominent a figure in Mr. Kohlmann's reports as others, this in no way means that his testimony is less relevant to them. First, the ONLY portion of Mr. Kohlmann's testimony that requires his awareness of the evidence obtained in this case is that portion in which he provides an opinion on the evidence (i.e., the above Section I,

_____

[7] Per Fed. R. Evid. 702, "a witness qualified as an expert...may testify thereto in the form of an opinion *or otherwise*." (Emphasis added).

17

E).  Simply put, Mr. Kohlmann's testimony as set forth above in
Section I, A-D, is relevant because of the evidence in this case.
This includes emails or online posts between and amongst the
defendants, audio capture of the defendants' conversations, video
recordings of the defendants' conversations, and various
materials possessed by the defendants - all of which Mr. Kohlmann
is able to greatly assist a jury in understanding even if he were
not referring to or aware of specific items of evidence.  The
Jury is able to utilize the knowledge provided by Mr. Kohlmann
and consider it for purposes of evaluating the peices of evidence
subsequently presented to them.  Second, the defendants have
continually failed to fully appreciate that they are charged with
conspiracy wherein the actions of one co-conspirator in
furtherance of the overall conspiracy is attributable to each.

     The uncouth attacks against Mr. Kohlmann's education are
recognizable as such.  (See D.E. 1358 at p.13-14).  Without
explanation, the defense derides Mr. Kohlmann as having not only
"inflated" his credentials but as having been "deceptive" as
"demonstrated at the Daubert hearing."  (Id.)  This allegation is
altogether unwarranted.  The "big deal" regarding Mr. Kohlmann's
background was sufficiently described during the Daubert hearing
and we need not rehash the matter.  The defense claims that Mr.
Kohlmann's testimony regarding his experiences with The
Investigative Project, the website globalterroralert.com, and the

Nine Eleven Finding Answers Foundation offers not even a "suggestion...that he received any additional academic training or experience...which would lead to reliable principles and methodology regarding matters of terrorism." (D.E. 1358 at p.15). In stark contrast, Mr. Kohlmann testified that these experiences provided him exactly that opportunity. Defendant Yaghi then does nothing short of shift into fifth gear as he races down superlative street. Disparaging remarks such as Mr. Kohlmann's "one and only book" do little to further the defense cause. Particularly, when the book is directly relevant to the topics in the case at hand, has been utilized as a textbook in a number of higher institutions of learning, and has received extensive peer review. The greatest attack on this issue that the defense can muster is that while cited by the final report of the Congressional 9/11 Commission, it was only in two string cites and related to historical propositions. (D.E. 1358 at p.16). Again, the defendants are welcome to attempt to establish before a jury any deficiency or weakness they believe to exist in Mr. Kohlmann's credentials and experience; however, in the field of international terrorism, these far surpass that which is necessary to qualify him as an expert.

**F.    His Testimony Accurately Describes his Peer Review.**

With an entire two sentences worth of explanation, Defendant Yaghi declares that Mr. Kholmann lacks meaningful peer review.

As was established during the <u>Daubert</u> hearing, within the field of international terrorism, Mr. Kohlmann is constantly subject to various manners of peer review due to his many publications, on-air statements, conference speeches, and court testimony.

**G. His Testimony is Based on Sufficient Data.**

The defense has twisted the facts to meet its theory on this issue. (D.E. 1358 at p.17). Mr. Kohlmann's testimony explained that within social sciences it is generally impractle to utilize hard statistics given the innumerable factors often at play. He noted that this was true within the field of terrorism and that drawing certain conclusions is particularly impossible for homegrown terrorism as the number of instances of homegrown terrorism is less and thus naturally there is simply less data to pull from. Mr. Kohlmann's statements on this subject were much more narrow than that which defendant Yaghi asserts and they were made in response to specific questions by counsel for defendant Yaghi. The questions posed to Mr. Kohlmann along this line included whether there existed data regarding individuals who are not terrorist yet possess extremist materials or whether there was data regarding those who use the term "wedding" to mean an actual "wedding" as opposed to using the term as code for something sinister. Mr. Kohlmann responded that the research and study in this arena was not conducive to such statistics. This is hardly the equivalent to a lack of data for Mr. Kohlmann to

apply his methodology and form the opinions expressed regarding
home grown terrorism. Based on years of experience in the field
of terrorism and research specifically related to dozens of cases
of homegrown terrorism Mr. Kohlmann unequivocally stated he was
able to apply the accepted principles and methods in the area of
social sciences to form an opinion that there are five
commonalities existing within individuals or groups of home grown
terrorism (i.e., Islamic extremists pursing the ideology of the
Global Jihadist Movement despite no direct contact to a known
terrorist group).[8]

Moreover, in this case, Mr. Kohlmann's opinion is the result
of application of his theory regarding homegrown terrorism in
general to the facts he has been presented. Similar to the gang-
case hypothetical used above, the prosecution has every right to

---

[8] Defendant Sherifi asserts that in other instances Mr.
Kohlmann has utilized four commonalities "none of which are
common to this instance case." (D.E. 1351 at p.4). This is not
true; a review of attachment one and two of D.E. 1351 displays
that they are extremely similar and more importantly are not
dissimilar or inconsistent. Nor did he lay out the commonalities
within those exhibits in the same nature as he has done for this
case. The fact that over time he has refined and distilled his
research into a more specific organization does nothing to
detract from his qualifications, methodology, or application of
that methodology. Defendant Sherifi additionally attempts to
discredit Mr. Kohlmann as simply recycling his opinions. (Id. At
p.4-6). There are only so many ways a Doctor can say a leg is
broken and there are only so many ways an expert in terrorism can
describe that evidence is consistent with the existence of a
homegrown terrorist group. In this regard, the Defense would
likely attack any inconsistency for just that and apparently,
will also attack any consistency for just that.

ask that expert whether he observed a photo of the defendant wearing the items mentioned in a specific manner and what it indicates to him based on his experience. But, to claim that because he did not sufficiently test the validity of the photo itself he is therefore unable to provide an opinion is to misconstrue Fed. R. Evid. 702. Mr. Kohlmann's principles and methods were used to determine that there exists five commonalities. His opinion whether evidence presented to him is consistent with those five commonalities is only as valid as the evidence presented to him and the proper testing in that regard is cross-examination.

## CONCLUSION

The defendants' approach is taken directly from the oft quoted maxim, "If the facts are against you, argue the law. If the law is against you, argue the facts. If the law and facts are against you, pound the table and yell like hell."[9] While the present pounding is deafening, it is not persuasive. The Government has previously set forth the legal analysis supporting Mr. Kohlmann's testimony (see D.E. 1207). The testimony of Mr. Kohlmann is necessary to place the massive amount of evidence in this case in context. The requirements to establish Mr. Kohlmann as an expert under Fed. R. Evid. 702 are satisfied. While Mr.

---

[9] Generally attributed as quoted by an Illinois native in *The People, Yes* by Carl Sandburg (1936).

Kohlmann's first expert report is extensive, the scope of Mr. Kohlmann's testimony has been narrowly tailored and explicitly defined by Government in an unprecedented manner. During the Daubert hearing, the defense expended a great amount of time focusing on matters appropriate for cross-examination at trial as opposed to a true dispute regarding the admissibility of Mr. Kohlmann's testimony - the post hearing briefs do much of the same. There is no realistic fear of Mr. Kohlmann or the Government veering off track into unrelated matters and at this point can be both efficiently and fairly resolved as part of the adversarial process during trial. For these reasons, the Government respectfully requests that Mr. Kohlmann be permitted to testify as an expert in the field of international terrorism on the matters set forth above.

Respectfully submitted this 31<u>st</u> day of August, 2011.

GEORGE E. B. HOLDING
United States Attorney

<u>BY:/s/John S. Bowler</u>
JOHN S. BOWLER
BARBARA D. KOCHER
Assistant U.S. Attorneys
310 New Bern Avenue, Suite 800
Raleigh, NC 27601
Tel: 919-856-4530
Fax: 919-856-4487
Email: john.s.bowler@usdoj.gov
State Bar No. 18825
Email: barb.kocher@usdoj.gov
State Bar No.  16360

<u>/s/ Jason Kellhofer</u>
JASON KELLHOFER
Trial Attorney
U.S. Department of Justice
National Security Division
Counter-Terrorism Section
10th St. And Penn. Ave., N.W.
Room 1533
Washington, DC 20530
Tel: (202 353-7371
Fax: (202) 353-0778
Email: jason.kellhofer@usdoj.gov
OH Bar No.  0074736

24

<u>CERTIFICATE OF SERVICE</u>

        This is to certify that I have this 31st day of August, 2011, served a copy of the foregoing upon counsel for the defendants in this action by electronically filing the foregoing with the Clerk of Court, using the CM/ECF:

Rosemary Godwin
and Debra C. Graves
Federal Public Defender
150 Fayetteville St. Mall
Suite 450
Raleigh , NC 27601-2919

Robert J. McAfee
McAfee Law, P.A.
P. O. Box 905
New Bern , NC 28563

Paul Sun
P.O. Box 33550
Raleigh, NC 27636

Myron T. Hill , Jr.
Browning & Hill
200 E. Fourth St.
Greenville , NC 27835

R. Daniel Boyce
Nexsen Pruet, PLLC
4141 Parklake Ave., Suite 200
P. O. Box 30188
Raleigh, NC 27612

James M. Ayers, II
307 Metcalf Street
Post Office Box 1544
New Bern, North Carolina 28563

Joseph E. Zeszotarski, Jr.
Poyner & Spruill
PO Box 1801
Raleigh, NC 27602

and further, upon defendant Anes Subasic by placing a copy postage pre-paid in first class mail addressed to:  Anes Subasic, Public Safety Center, Attn: Wake County Jail, Post Office 2419, Raleigh, NC 27602.

                         /s/ John S. Bowler
                         BY: JOHN S. BOWLER
                         Assistant United States Attorney
                         Criminal Division
                         310 New Bern Avenue, Suite 800
                         Raleigh, NC 27601
                         Telephone: 919-856-4530
                         Fax: 919-856-4487
                         E-mail: john.s.bowler@usdoj.gov

25