**<u>PUBLISHED</u>**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────────

**No. 12-4061**

─────────────────

UNITED STATES OF AMERICA,

               Plaintiff – Appellee,

       v.

MOHAMMAD OMAR ALY HASSAN,

               Defendant – Appellant.

─────────────────

**No. 12-4063**

─────────────────

UNITED STATES OF AMERICA,

               Plaintiff – Appellee,

       v.

ZIYAD YAGHI,

               Defendant – Appellant.

─────────────────

**No. 12-4067**

─────────────────

UNITED STATES OF AMERICA,

               Plaintiff – Appellee,

       v.

HYSEN SHERIFI,

Defendant – Appellant.

———————————

Appeals from the United States District Court for the Eastern District of North Carolina, at Raleigh.  Louise W. Flanagan, District Judge.  (5:09-cr-00216-FL-7; 5:09-cr-00216-FL-8; 5:09-cr-00216-FL-2)

———————————

Argued:  September 19, 2013        Decided:  February 4, 2014

———————————

Before WILKINSON and KING, Circuit Judges, and Samuel G. WILSON, United States District Judge for the Western District of Virginia, sitting by designation.

———————————

Affirmed by published opinion.  Judge King wrote the opinion, in which Judge Wilkinson and Judge Wilson joined.

———————————

**ARGUED:**  Robert Joseph Boyle, ROBERT J. BOYLE, ATTORNEY AT LAW, New York, New York; Robert Daniel Boyce, NEXSEN PRUET, Raleigh, North Carolina; John Clark Fischer, RANDOLPH & FISCHER, Winston-Salem, North Carolina, for Appellants.  Jason Michael Kellhofer, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.  **ON BRIEF:**  Kirsten E. Small, NEXSEN PRUET, PLLC, Raleigh, North Carolina, for Appellant Mohammad Omar Aly Hassan.  Thomas G. Walker, United States Attorney, Jennifer P. May-Parker, Kristine L. Fritz, Assistant United States Attorneys, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

———————————

2

KING, Circuit Judge:

The appellants in these consolidated proceedings, Mohammad Omar Aly Hassan, Ziyad Yaghi, and Hysen Sherifi, were tried jointly in the Eastern District of North Carolina and convicted of several offenses arising from terrorism activities. On appeal, the trio presents myriad challenges to their convictions and sentences. As explained below, we reject the appellants' various contentions of error and affirm.

I.

A.

On July 22, 2009, the federal grand jury in eastern North Carolina returned an indictment against the appellants and five others, alleging multiple terrorism conspiracies and related offenses. Bench warrants were issued for all eight defendants on July 23, 2009, and, four days later, seven were arrested. In September 2009, a superseding indictment was returned, followed on November 24, 2010, by the operative second superseding indictment (the "Indictment"). The Indictment alleged the following offenses that are particularly relevant to these appeals:

- Count One charged the eight defendants with conspiring to violate 18 U.S.C. § 2339A, that is, to provide material support and resources for violations of 18 U.S.C. § 956 (the "Count One conspiracy");

3

- Count Two charged the eight defendants with the conspiracy offense of violating 18 U.S.C. § 956(a), i.e., to commit outside the United States acts that would constitute murder, kidnapping, and maiming if committed within the United States (the "Count Two conspiracy");

- Counts Four and Eight charged conspiracy ringleader Daniel Boyd ("Boyd"), his son Zakariya, and appellant Hysen Sherifi with possessing firearms in furtherance of a crime of violence — particularly, the Count Two conspiracy — in contravention of 18 U.S.C. § 924(c); and

- Count Eleven charged Boyd and Sherifi with conspiring to kill members of the uniformed services of the United States in attacks on military personnel and installations in Virginia and elsewhere, in violation of 18 U.S.C. § 1117 (the "Count Eleven conspiracy").

None of the other charges in the Indictment were lodged against any of the appellants. Count Three charged Boyd with receiving a firearm and ammunition in interstate commerce, with knowledge that the offenses set forth in Counts One and Two would be committed therewith, in contravention of 18 U.S.C. § 924(b). Counts Five, Nine, and Ten charged Boyd (and in Count Five, Boyd's son Dylan) with knowingly selling firearms and ammunition to a felon, in violation of 18 U.S.C. §§ 922(d)(1) and 924. Counts Six and Seven charged Boyd with making false statements to the government by misrepresenting his plans to meet others — including appellants Mohammad Omar Aly Hassan and Ziyad Yaghi — when Boyd travelled to the Middle East in 2007, in

4

contravention of 18 U.S.C. § 1001(a)(2).  In Counts Twelve and Thirteen, defendant Anes Subasic was charged with knowingly making false statements to procure his naturalization as a citizen, in violation of 18 U.S.C. § 1425(a).

On February 9, 2011, Boyd pleaded guilty to the Count One and Count Two conspiracies, and, pursuant to his plea agreement with the government, Counts Three through Eleven were dismissed as to him.  Dylan and Zakariya Boyd each pleaded guilty to the Count One conspiracy, and, in exchange, the other charges against them were dismissed.  Boyd was sentenced to 216 months in prison, and his sons Dylan and Zakariya were sentenced to 84 months and 93 months, respectively.  Subasic was tried separately from the appellants, convicted of the four offenses alleged against him, and sentenced to 360 months.  As for the appellants, Hassan was convicted of the Count One conspiracy and sentenced to 180 months; Yaghi was convicted of the Count One and Count Two conspiracies and sentenced to 380 months; and Sherifi was convicted of the Count One, Count Two, and Count Eleven conspiracies, plus Counts Four and Eight, and he was sentenced to 540 months.[1]

---

[1] Although seven of the eight defendants were apprehended and successfully prosecuted, the eighth, Jude Kenan Mohammad, apparently remains at large.  Mohammad was charged solely with the Count One and Count Two conspiracies.  Other than Mohammad, each of the defendants was convicted of the Count One (Continued)

5

B.

The parties and the trial court were in substantial agreement on the essential elements of the offenses tried before the jury.[2] First, to obtain a conviction under 18 U.S.C. § 2339A for the Count One conspiracy, the government was required to prove as to each appellant: (1) that he entered into a conspiracy; (2) that the objective of the conspiracy was to provide material support or resources; and (3) that he then knew and intended that the provision of such material support or resources would be used in preparation for, or in carrying out, a violation of 18 U.S.C. § 956. See United States v. Chandia, 675 F.3d 329, 332 n.1 (4th Cir. 2012). "[M]aterial support or resources," as used in § 2339A, includes currency and other property, training, weapons, expert advice or assistance and personnel. See § 2339A(b)(1). To prove the Count Two conspiracy alleged under 18 U.S.C. § 956(a), the government was obliged to show as to each appellant: (1) that he entered into

_____

conspiracy. Boyd, Yaghi, Sherifi, and Subasic were convicted of the Count Two conspiracy. Hassan was acquitted of the Count Two conspiracy, and that charge was dismissed as to Zakariya and Dylan Boyd.

[2] At trial, there was debate over whether Count One required, as an essential element of the offense, the commission of an overt act. The trial court ruled that no overt act was necessary. On appeal, the appellants have abandoned any issue in that regard.

6

a conspiracy; (2) knowing and intending that the objective of the conspiracy was murder, kidnapping, or maiming outside the United States; (3) that the conspiracy was entered into within the United States; and (4) that a conspirator, not necessarily a defendant or an appellant, committed an overt act in furtherance of the conspiracy within the jurisdiction of the United States.[3]

The Indictment identified the purposes and objects of the Count One and Count Two conspiracies, which were generally to advance violent jihad, support and participate in terrorist activities outside the United States, and commit acts of murder, kidnapping, and maiming outside the United States. The manner

---

[3] Section 2339A of Title 18 criminalizes "provid[ing] material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [certain enumerated statutes]." 18 U.S.C. § 2339A(a). Importantly, one of the statutes listed in § 2339A(a) is 18 U.S.C. § 956. Section 956 provides, in pertinent part, that

> [w]hoever, within the jurisdiction of the United States, conspires with one or more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming if committed in the . . . United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, [be guilty of an offense against the United States].

18 U.S.C. § 956(a)(1). The appellants have not challenged the grand jury's decision to charge the Count One and Count Two conspiracies as separate offenses. As a result, we need not examine whether Counts One and Two were merged for any purpose.

7

and means by which the conspiratorial objects were to be accomplished by the defendants and their conspirators included the following:

- To prepare to become "mujahideen" and die "shahid" — that is, as martyrs in furtherance of violent jihad;

- To radicalize others, mostly young Muslims or converts to Islam, to believe in "fard'ayn," the idea that violent jihad is a personal obligation on the part of every good Muslim;

- To offer financing and training in weapons, and to assist in arranging overseas travel and contacts so that others could wage violent jihad;

- To raise money to support efforts in training and equipping personnel, and to disguise the destination of such monies from the donors; and

- To obtain assault weapons such as the AK-47, and to develop familiarity and skills with the weapons of choice used by mujahideen in Afghanistan and elsewhere.

Multiple overt acts were specifically alleged in the Indictment that relate to the Count One and Count Two conspiracies, including, inter alia:

- In late 2006, Yaghi travelled to Jordan to engage in violent jihad;

- In late 2006, Boyd purchased a Bushmaster carbine rifle and magazine;

- In early 2007, Boyd purchased a Ruger mini 14 long gun;

- In early 2007, Boyd purchased airline tickets to Israel from the United States for himself and his sons;

8

- In early 2007, plane tickets were purchased for Yaghi and Hassan to travel from the United States to Israel;

- In June 2007, Boyd, his son Zakariya, Yaghi, and Hassan departed Raleigh, North Carolina, for Israel. Having failed in their attempts to engage in violent jihad, the four men returned to the United States in late July 2007;

- Upon his arrival back in the United States, Boyd lied to federal agents by denying that he had intended to meet Hassan and Yaghi in Israel;

- In February 2008, Boyd solicited money to fund the travel of "brothers" overseas to engage in violent jihad;

- In June 2008, Boyd accepted $500 in cash from Sherifi to help fund violent jihad;

- In June 2008, Boyd showed Sherifi how to use a Kalashnikov AK-47;

- In June 2008, Sherifi departed North Carolina for Kosovo to engage in violent jihad;

- In November 2008, Boyd purchased a Mossburg rifle, a .357 revolver, and a Century Arms rifle;

- In early 2009, Boyd purchased an Ishmash SAGA .308 rifle, three Century Arms rifles, a Ruger 5.56 rifle, and a Smith & Wesson .223 rifle;

- In April 2009, Sherifi returned from Kosovo to the United States for the purpose of soliciting funds and personnel to support the mujahideen; and

- In June and July 2009, Boyd, Sherifi, and Zakariya Boyd trained in military tactics and the use of weapons in Caswell County, North Carolina.

With respect to the essential elements of Counts Four and

Eight — which were tried against Sherifi alone — the government

9

was required to establish:  (1) that Sherifi knowingly possessed a firearm on or about June 10, 2009, and again on or about July 7, 2009; and (2) that he did so to further the crime of violence alleged in Count Two.  See 18 U.S.C. § 924(c).[4]  Those charges arose from the weapons training sessions conducted by Boyd and others in 2009 in Caswell County.

Finally, to secure Sherifi's conviction under 18 U.S.C. § 1117 on the Count Eleven conspiracy, the government was required to demonstrate:  (1) that Sherifi entered into a conspiracy; (2) the object thereof was to kill or attempt to kill officers and employees of the executive branch of the federal government (here, members of the uniformed services), on account of — or while such officers and employees were engaged in — the performance of their official duties; and (3) that at least one overt act was committed in furtherance of the conspiracy.[5]  Count Eleven identified several overt acts,

---

[4] Pursuant to 18 U.S.C. § 924(c), a "crime of violence" is a felony offense that, "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  Section 956(a) of Title 18 — the Count Two conspiracy statute — falls within that definition.

[5] Section 1117 of Title 18 provides, in pertinent part, that "[i]f two or more persons conspire to violate [certain sections] of this title, and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be [guilty of an offense against the United States]."  Section 1114 is among the enumerated sections, and makes it a crime to "kill[] or (Continued)

10

including the following:  In June 2009, Sherifi's coconspirator Boyd conducted reconnaissance at the Quantico, Virginia Marine Corps Base; also in June 2009, Boyd reviewed maps of Quantico, intending the maps to be used to plan and coordinate an attack on the base; and, in July 2009, Boyd possessed weapons and ammunition that would be used at Quantico, asserting that they were for the base and to attack Americans.

C.

During the post-Indictment period leading to the trial, the appellants filed multiple pretrial motions in the district court, several of which sought to curtail the government's case. For example, the appellants challenged the government's expert witness and moved to exclude evidence obtained pursuant to the Foreign Intelligence Surveillance Act ("FISA").  The district court disposed of some of the appellants' evidentiary challenges prior to trial.  First, after conducting a Daubert hearing, the court authorized the trial testimony of the government's expert, Evan Kohlmann, subject to specified limitations.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).  Second, the court considered and rejected the appellants' challenges to the

_____

attempt[] to kill any officer or employee of the United States . . . while such officer or employee is engaged in or on account of the performance of official duties." 18 U.S.C. § 1114.

11

government's FISA-derived evidence.    After conducting an in
camera and ex parte review of relevant materials, the court
ruled that such evidence was admissible.    Finally, the court
considered several other evidentiary challenges, holding some of
them in abeyance pending the trial proceedings.

Before trial, the prosecution moved to preclude the
appellants from arguing to the jury that their alleged unlawful
conduct was protected by the First Amendment.    Although the
trial court agreed with the government "that there is no First
Amendment defense to the crimes with which [the appellants] are
charged," the court determined "that granting the government's
motion would go too far."    See United States v. Boyd, No. 5:09-
cr-00216, slip op. at 8-9 (E.D.N.C. July 12, 2011), ECF No.
1222.  The court further explained:

> While the government correctly points out that the
> First Amendment provides no constitutional right to
> actively support violent crime, the wording of the
> government's motion would suggest that defendants
> should not be allowed to mention the First Amendment
> at all at trial, a restriction that strikes the court
> as inappropriate.    As defendants note, it is the
> government's burden at trial to prove that defendants
> engaged in unlawful conduct.    Based on defendants'
> briefs, it seems that defendants intend to challenge
> exactly what "conduct" the government contends is
> unlawful.    This is a permissible argument to make.
> However, in making opening and closing arguments and
> in questioning witnesses, defendants may not invite
> jury nullification by suggesting that the First
> Amendment is a defense to the crimes charged.    Both
> sides may submit proposed jury instructions regarding
> the First Amendment, and such proposals will be
> considered by the court at the appropriate time.

Id. at 9 (footnotes omitted).

## II.

During the trial itself — which was conducted in New Bern over a three-week period in September and October of 2011 — the government presented approximately forty witnesses. Of those, about twenty-two were law enforcement officers, including FBI agents and employees. Other prosecution witnesses included expert Kohlmann, three informants, and three named coconspirators (Boyd and his sons Dylan and Zakariya), as well as former friends and associates of the defendants.[6] Of the three appellants, only Sherifi presented evidence. During his trial presentation, Sherifi called three witnesses, including himself.

## A.

Our description of the trial evidence is provided in the light most favorable to the government. See United States v. Burgos, 94 F.3d 849, 862-63 (4th Cir. 1996) (en banc). That evidence established a series of conspiratorial activities

---

[6] During the course of the terrorism investigation resulting in the Indictment and prosecution, the government collected the FISA-derived evidence, as well as other audio recordings, such as those made by informants wearing recording devices. The prosecution used computer records and a number of those recordings in evidence plus materials seized from social media and other internet sites.

13

centering on Boyd, who, after pleading guilty to two of eleven charges, became the prosecution's chief trial witness.

### 1.

A citizen of the United States who converted to Islam as a child, Boyd had, as a young adult, spent time in Pakistan and Afghanistan in the 1980s and early 1990s. While living abroad, Boyd participated in the Afghan resistance against the Soviet occupation and received the nickname "Saifulla," which, in Arabic, means "Sword of God." Boyd later learned that he had been in a training camp operated or funded by the notorious al-Qaida leader Osama bin Laden. Boyd returned to the United States in the early 1990s, and, after another trip to Pakistan, settled with his family near Raleigh.

Boyd thereafter grew increasingly radicalized in his religious beliefs and, by 2004, began to espouse a violent ideology, including the view that the killing of non-Muslims was a "fard," or "fard'ayn," that is, a religious obligation imposed by Islam. As Boyd became more extreme, he disassociated himself from the Islamic community in the Raleigh area. Boyd then began to meet and discuss his violent religious views with others at his Raleigh home and at the Blackstone Halal Market, a grocery store he owned and operated for about a year in nearby Garner. The appellants met and talked with Boyd on numerous occasions during the course of the conspiratorial activities, during which

14

they often discussed violent jihad. Boyd explained that, to him, jihad required "doing something to fulfill [his] obligation in Islam," and was "suggestive of [men] actually involving [themselves] with going and physically helping with the resistance or fighting against . . . the NATO forces in Afghanistan or Iraq, or anyplace, really." J.A. 1549.[7] Boyd and the appellants "were at a point of agreement or a meeting of the minds" as to this ideology and understanding of violent jihad. Id. at 1549-50.

2.

a.

About 2005, the FBI initiated a criminal investigation into Boyd's activities. By mid-2006, the FBI had introduced its first informant, Abdullah Eddarkoui, into the Boyd investigation. In that capacity, Eddarkoui grew close to Boyd and his family, eventually interacting with Boyd on a daily basis. In 2007, the FBI introduced a second confidential informant, Alvin Harris, into its investigation. Harris obtained a job with another Boyd business, a construction company called Saxum Walls. Like informant Eddarkoui, Harris became a close friend of the Boyd family. Harris generally

---

[7] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in these appeals.

15

spent several days a week with Boyd. Boyd eventually helped Harris obtain a passport so that Harris could travel abroad to engage in violent jihad.

Appellant Yaghi met Boyd in 2006 when Yaghi, then eighteen years old, approached Boyd at an Islamic center in Durham. The two men initially spoke about Boyd's experiences in Afghanistan, after which Yaghi obtained Boyd's phone number. That same year, the FBI also opened an investigation into Yaghi, which was eventually merged into the Boyd investigation.

In the months that followed their first meeting in 2006, Boyd and Yaghi had several conversations, primarily at Islamic centers in the Raleigh area and in Boyd's home. The men discussed various topics, including Boyd's experiences overseas, plus his views on Islam and violent jihad. Yaghi also sought Boyd's advice about Jordan, because Yaghi wanted to travel in that country to visit relatives and study Islam. Yaghi explicitly asked Boyd where in Jordan he would find the "best brothers." J.A. 1548. This inquiry referred to Muslim men who were "going to pray" and maintain "the bonds of fellowship and Islam," and those who "understood [the] obligation of jihad" and could help Yaghi "gain access" to violent resistance movements. Id. at 1550-51. In response, Boyd told Yaghi about a mosque in Jordan where he could find the "best brothers."

16

In October 2006, Yaghi travelled to Jordan. Shortly before Yaghi left the United States, Boyd and several others — who understood and shared Boyd's violent and extremist ideology — met in a parking lot outside a Durham Islamic center to wish Yaghi well. Boyd described this as a "joyous send-off," during which Boyd and the others gave Yaghi gifts, including an Afghan blanket and a "traditional Pashtun hat." J.A. 1561-62. The men wished Yaghi well, sending him off with the valediction "may we meet again in heaven," which conveyed their hope that Yaghi would make his way to the battlefield, and, if he died, find his way to heaven. Id. at 1555, 1562. According to Boyd, the terms "battlefield" and "battlefront" were used to refer to locations where Muslims were then actively waging violent jihad against the "kuffar," including wars in Afghanistan, Iraq, Kosovo, Chechnya, Somalia, Palestine, and Kashmir. As Boyd and others explained to the jury, "kuffar" is a derogatory term, commonly used by violent Muslims to refer to non-Muslims. See id. at 989-90, 1399-1400, 1557. Boyd and his coconspirators shared the view that getting to the jihadist battlefield and fighting against the kuffar was a necessary and laudable aspiration.

While in Jordan in 2006, Yaghi remained in touch with Boyd by phone and email. In November 2006, Yaghi sent Boyd an email explaining that it was "getting more and more obvious that the true believer[s]" of Islam — such as Yaghi and Boyd — were

17

"under attack by the kuffar and by 'muslims.'" J.A. 4000. As Boyd explained, Yaghi's reference to "muslims" in that email meant those who claimed to be believers but who were not actually "true believers." Id. at 1556-57. Boyd recalled a "shared understanding amongst a lot of the rhetoric online and some of the people in the community" that those who shared his beliefs were "under attack . . . physically in the different battlefields," as well as "under attack ideologically from the . . . naysayers of our religion," who did not believe that Muslims had an obligation to defend those fighting on the jihadist battlefields. Id. at 1557.

Prior to his departure for Jordan, Yaghi told Boyd that he hoped to find a wife overseas. While abroad, Yaghi wrote Boyd that Yaghi was waiting to see how his "marriage" would go before planning to "make [his] next move," concluding by advising Boyd that they would "meet in a far better place than this earth." J.A. 4000. It was understood by Boyd and his associates that the phrases "getting married" and "finding a wife" were code for seeking to reach the battlefield to engage in violent jihad. Id. at 1592.[8] During some of their exchanges while Yaghi was

---

[8] Kohlmann, the prosecution's expert, explained to the jury that speaking in a coded manner is common in jihadist cells: "Frequently, in communications, individuals will talk about getting married as a euphemism for engaging in a violent extremist act, often a suicidal act, the idea being that you (Continued)

18

abroad, Boyd recalled Yaghi seeming "frustrated" that Boyd "wasn't able to fulfill any real helpful role for [Yaghi] to, you know, get inside somewhere to a battlefield." Id. at 1560-61.

While in the Middle East in 2006, Yaghi also posted numerous statements and copious information on Facebook concerning his adherence to the violent jihadist ideology. Yaghi consistently praised the teachings of Anwar al-Awlaki, an imam and cleric who was born in the United States and later became an al-Qaida militant in Yemen. Al-Awlaki was well known as an al-Qaida leader who espoused violent and radical jihadist views.[9] While overseas, Yaghi also kept in touch with appellant

---

will be married to the virgins of paradise after the act is completed." J.A. 379.

[9] Al-Awlaki grew to prominence in the United States during the late 1990s as a cleric and activist. Following the September 11, 2001 terrorist attacks, al-Awlaki came under suspicion for his associations with two of the 9/11 hijackers. Al-Awlaki was thereafter linked to other terrorist activities within the United States, often communicating with the perpetrators via email. In 2003, al-Awlaki departed this country for Yemen and never returned, eventually becoming an active high-ranking member of al-Qaida. Al-Awlaki published his extreme views — particularly that violent jihad against America was a binding obligation on Muslims — through speeches and writings, which were widely disseminated on the internet. As Kohlmann explained, al-Awlaki's teachings "have proven extraordinarily popular among extremists living in western countries," and have "regularly surfaced" in cases of "homegrown terrorists." J.A. 299. In 2011, al-Awlaki was killed by a drone strike in Yemen.

Hassan, who had been his good friend for some time. Yaghi and Hassan corresponded with one another largely through Facebook. In their Facebook postings, Hassan and Yaghi discussed the teachings of al-Awlaki and posted rap songs and poems about their animosity towards the non-Muslim kuffar. One of Yaghi's Facebook postings included the following:

> [F]eds tryed ta get at me but im quick wit the trickery thas how I stay slippery / kuffar get smoked like hickory / dickery dock i pull the glock so fast the clock dont have chance ta tock / or tick let the shots rip then I stop the shit / pop my wrists I don't give uck if cops exist / im above the law already explained how im quick on the draw / heard the battle in fallujahs ferocious / niggas runnin out of ammo but they stay strapped wit explosives / rpg 7s I aint worried if all them niggas die cuz inshallah they all going ta heaven[.]

J.A. 4395. Hassan also posted violent rhymes, including the following:

> I used to smoke tree / but I dont do that shit no more that shits far / only thing I smoke now is fuckin kuffar / getting high off their deaths / fuck buryin them, let the animals eat their flesh / leave their bones for weapons or for conditioning my shins[.]

Id. at 4388. Hassan and Yaghi actively promoted the violent views and teachings of al-Awlaki by providing literature and videos to others, both within and outside the conspiracies.

In 2007, after Yaghi returned to North Carolina from Jordan, he continued his friendship with Boyd. The two men met on a substantial number of occasions throughout 2007. Yaghi also introduced Hassan to Boyd and accompanied Hassan to Boyd's

20

home at least twice.[10]   During their visits with Boyd, the three men discussed the "obligation of jihad," which Boyd explained as the need "to go and actually defend against the specific wars in Iraq and Afghanistan that were taking place," and to fight in other wars that were "going on in the Muslim world," such as in Chechnya and Palestine.  J.A. 1653–64.

b.

In February 2007, Yaghi learned that Boyd would be travelling to Israel and Palestine with his sons.  Yaghi asked to accompany Boyd to the Middle East and asked if Hassan could join them as well.  Because the Boyds were taking a family trip, Boyd told Yaghi that he and Hassan could not travel with the Boyds.  Boyd agreed, however, to facilitate the purchase of plane tickets for Yaghi and Hassan to fly to Israel.  Yaghi and Hassan then gave Boyd money for their tickets, and Boyd arranged through a travel agency for a wire transfer of the necessary funds.  Boyd believed that Hassan and Yaghi wanted to travel overseas in an effort to "get to a battlefront somewhere."  J.A. 1587.  Boyd also told informant Eddarkoui that he had asked Yaghi and another boy (whom Boyd did not specifically identify) to "go somewhere overseas for jihad."  Id. at 780.  In the

---

[10] Although Hassan had been "peripherally known to the Boyd family during his teenage years," J.A. 3071, Hassan did not meet Boyd until 2007, when Hassan was approximately twenty years old.

21

months leading to their June 2007 trip, Hassan and Yaghi sought Boyd's advice about travelling in Israel and Palestine, and about the locations they should visit. Hassan and Yaghi also told Boyd that they hoped "to get married" and find wives while they sojourned in the Middle East. Id. at 1571.

Hassan and Yaghi discussed being familiar with firearms and assault weapons, as well as the need for training in their use, both with one another and with Boyd. Hassan and Yaghi knew that Boyd maintained a large stockpile of such weapons. Boyd had built his weapons arsenal over the years, and it included numerous assault rifles and handguns. The Boyd sons were also familiar with such weapons. Prior to 2006, for example, Dylan Boyd showed an AK-47 to a high school friend. Hassan and Yaghi discussed the need to obtain such weapons to use in implementing their beliefs in violent jihad. In early 2007, Hassan wrote on Yaghi's Facebook page, "[Y]o, theres an AK in Garner for sale — only 250 dollar . . . us 3 could get it for real." J.A. 4383. Hassan also posted a link to a YouTube video concerning the basics of shooting and marksmanship. In March 2007, Hassan purchased a small caliber rifle from a sporting goods store in North Carolina. Several months later, Hassan and Yaghi gave Boyd a car ride from a mosque in Durham where the three men had been attending religious services. During the ride, Hassan and

Yaghi showed Boyd the small rifle, explaining that they had purchased it for "training" and "target practice." Id. at 1796.

c.

Boyd and his son Zakariya departed for Israel on June 12, 2007, and Hassan and Yaghi left the very next day. Boyd and Zakariya were denied entry into Israel, however, and they instead went to Jordan via France. The Boyds toured Jordan, staying with a friend, and they concluded their Jordanian trip in the town of Salt, where they were joined by Dylan Boyd. Like the Boyds, Yaghi and Hassan were denied entry into Israel; they instead detoured to Jordan via Germany.

While abroad, Hassan and Yaghi repeatedly sought to contact Boyd by email and telephone. They received no responses from Boyd, however, notwithstanding that Boyd had email access during his travels. Hassan and Yaghi also attempted to reach Boyd by calling his home in North Carolina, but they were unable to make contact. Boyd later told the FBI that, as the trips were originally planned, he was to meet Hassan and Yaghi when they arrived in Israel and "hook them up" with persons who would assist their travels in Israel and Palestine. J.A. 1584. Hassan and Yaghi were to "go on their way from there," id., that is, they would ultimately find their way to the battlefield and participate in violent jihad.

23

While the four men were travelling in the Middle East, rumors circulated in Raleigh that Boyd had sent Hassan and Yaghi overseas to go to the battlefield — specifically to engage in violent jihad. Boyd learned that Aly Hassan, Hassan's father in North Carolina, was upset by those rumors. Boyd called the senior Hassan from Jordan, and the two men had a heated discussion about the younger Hassan's travel plans. Boyd told the senior Hassan that Boyd was not in touch with either Hassan or Yaghi, and he could not get a message to them.

d.

After Boyd and his sons, on the one hand, and Hassan and Yaghi, on the other, returned from their 2007 trips to the Middle East, Hassan and Yaghi remained close friends. Their contacts with Boyd, however, diminished substantially. Hassan and Yaghi neither emailed nor phoned Boyd, but they visited him at the Blackstone Halal Market in Garner on at least two occasions, in the fall of 2007 and again in the spring of 2008. During one of those visits, Yaghi introduced Boyd to defendant Jude Kenan Mohammad.

Mohammad had been raised in the United States, though his father was from Pakistan and still lived there. Boyd and Mohammad became good friends, often discussing such matters as Boyd's experiences fighting in Afghanistan, Mohammad's relatives in Pakistan, and their shared radical and violent religious

24

views.   Mohammad also spoke of the evils of westernized living.
In the fall of 2008, Mohammad talked of travelling to Pakistan
to "go back with his people," which Boyd "assumed was to
eventually try to get to the battlefield."   J.A. 1605-06.
Mohammad also stayed at the Boyd home when the Boyds were on
vacation.   While in Boyd's home, Mohammad reviewed Boyd's
materials on violent jihad and extremist Islamic ideology.
Mohammad passed along some of those jihadist materials to
others, including Yaghi.   His mother recalled dramatic changes
in Mohammad's behavior during 2008, after he began to espouse
Boyd's violent jihadist ideology.   In October 2008, Mohammad
went to Pakistan.   Following his departure, Mohammad's mother
confronted Yaghi — who had moved into Mohammad's apartment —
about the changes in her son.   Yaghi advised her that Mohammad
was "in the same place" that Yaghi had been "a year prior."   Id.
at 1904-05.   Boyd explained that being in the "same place"
metaphorically referred to Mohammad having the understanding and
beliefs that Yaghi espoused with respect to violent jihad.   Id.
at 1744.

e.

Aside from the aforementioned encounters at the Blackstone
Halal Market, Boyd had little contact with either Hassan or
Yaghi after their return from the 2007 trip to the Middle East.
In January 2009, Yaghi and Hassan were arrested on unrelated

25

charges.[11]   While detained, Hassan asked his then paramour to
email al-Awlaki directly to seek advice on Hassan's behalf.
Hassan also asked her to remove from Facebook some of Hassan's
postings, messages, and videos, specifically those relating to
violent jihad.  In March 2009, Boyd contacted Yaghi, seeking to
ascertain what, if anything, Yaghi may have discussed with law
enforcement officers while he was in custody.   In that
conversation with Boyd, Yaghi denied being a snitch.  Otherwise,
Hassan and Yaghi failed to keep in touch with Boyd, and the
government has conceded that they were not part of Boyd's inner
circle after late 2007.

Although the defense lawyers for both Hassan and Yaghi
emphasized their clients' termination of communications with
Boyd, the evidence — viewed in the proper light — established a
"parallel set of initiatives" that the prosecution proved were
being carried on by Hassan and Yaghi in 2008 and 2009.  See
United States v. Boyd, No. 5:09-cr-00216, slip op. at 19
(E.D.N.C. Oct. 10, 2011), ECF No. 1494 ("Sufficiency Opinion
I").  As the district court explained, after his return from the
2007 trip to the Middle East, Yaghi gave a speech at the Islamic

---

[11] According to court records, Hassan, Yaghi, and another
man were charged with kidnapping and restraining a student at
North Carolina State University during a robbery.  Hassan
pleaded guilty to false imprisonment, and Yaghi pleaded guilty
to felonious restraint.

Association of Raleigh promoting jihad and the corresponding moral obligation to commit violence against non-Muslims. Hassan and Yaghi regularly communicated with one another through email and Facebook about jihadist ideology and continued to discuss and engage in weapons training. Hassan espoused increasingly violent and extremist jihadist views during that period, as demonstrated by his Facebook postings. The trial court emphasized that Hassan was highly proficient in using technology to disseminate his beliefs and in seeking to recruit others to his violent ideology. See id. at 25. Hassan also became progressively fervent in his support of al-Awlaki.

Hassan befriended an individual named Jamar Carter in late 2006 or early 2007, first meeting Carter at a UPS store where Carter worked near Raleigh. Hassan and Yaghi introduced Carter to the Islamic religion, and shared with Carter their beliefs in violent jihad and appreciation for the teachings of al-Awlaki. At one point, Hassan showed Carter videos depicting car bombings and expressed his view that such actions were permissible. Carter, having decided that his views of Islam varied dramatically from those of Hassan and Yaghi, eventually ceased associating with them.

Boyd's lack of contact with Hassan and Yaghi after 2007 was attributed by the prosecution to several factors, including Boyd's concern that Hassan and Yaghi talked too much and drew

27

unwanted attention to Boyd and his family. As the trial court observed, Boyd was questioned by FBI agents twice in the summer of 2007, once in July and again in August, and Boyd thus grew ever more concerned that he was under FBI surveillance. <u>See</u> Sufficiency Opinion I at 18. During his meetings with the FBI, the agents asked Boyd about his travels abroad and his contacts with Hassan and Yaghi. Boyd misled the FBI concerning the extent of his contacts with Hassan and Yaghi, initially failing to reveal that he had planned to meet Hassan and Yaghi in 2007 while they were travelling abroad in the Middle East.

### 3.

#### a.

In March 2008, a mutual friend introduced Boyd to appellant Sherifi, who was then about twenty-three years old. Sherifi and Boyd became close friends, and Sherifi often visited the Blackstone Halal Market where he and Boyd discussed their shared views advocating a violent jihadist ideology.[12] Boyd and Sherifi believed that dying "shahid" — as a martyr — was an important goal for a good Muslim. In the spring of 2008, Sherifi introduced Boyd to defendant Subasic.

---

[12] The Blackstone Halal Market closed in approximately mid-2008. Thereafter, several of the coconspirators met regularly in Boyd's home.

Sherifi, Boyd, Dylan, and Zakariya made regular efforts to raise money to support jihadist causes — that is, to fund their own travels or to send money to other "brothers" to further violent jihadist efforts overseas. In June of 2008, Sherifi gave Boyd $500 cash for the "sake of Allah." J.A. 1657. Boyd explained "that this money was to be used to either help get somebody over there to the battlefield or get it to the people who were already there fighting." Id. On July 21, 2009, shortly before his arrest, Sherifi received a $15,000 check from a man named Elbaytam, who lived in Raleigh and attended the same mosque as Sherifi. Elbaytam may have intended the funds for charity, consistent with the Muslim custom of "zakat," i.e., charitable giving based on accumulated wealth. Sherifi advised informant Eddarkoui, however, that the money would instead be used to support jihadist efforts. On July 23, 2009, Sherifi deposited $5,000 cash into his bank account.

Sherifi also spoke with Boyd about his desire to travel abroad to join in violent jihad. In June 2008, Sherifi told Boyd about the challenges that Sherifi faced in obtaining the necessary travel documents. Sherifi also speculated that when "there was Shari'ah" he could travel anywhere. J.A. 4035.[13]

---

[13] Shari'ah is a term used to generally describe the moral and religious rules of Islam, as well as its teachings.

Boyd suggested that if Sherifi could not travel, he should "make jihad" in the United States.  Id.  Sherifi promptly responded in the affirmative, intoning "Inshallah," or "God willing."  Id.

In July of 2008, Sherifi was finally able to travel, and he departed for Kosovo.  Sherifi advised some friends in Raleigh that he would be visiting family, while telling others that he was "looking for a way to go somewhere to make Jihad."  J.A. 765-66.  Boyd and Sherifi thereafter remained in close contact, continuing their discussions about violent jihad.  Boyd advised Sherifi about getting to the "battlefield" and finding others who adhered to his and Boyd's extremist Islamic views.  Boyd and Sherifi also discussed Sherifi's plans while he was abroad. Sherifi hoped ultimately to travel to Jerusalem, and he also considered travelling to Chechnya or Syria to aid in violent jihadist movements.  In January 2009, Sherifi wrote Boyd that he had obtained travel documents to a location that, though not his planned destination, was "a good place to seek the greatest pleasure of Allah."  Id. at 4011.  Sherifi also remained in contact with informant Eddarkoui, advising him of efforts to obtain weapons and participate in weapons training with like-minded persons in Kosovo.  In November of 2008, Sherifi wrote to Eddarkoui that "Allah ha[d] opened a way for [him]."  Id. at 4009.  Zakariya explained that opening or finding a way, in the context of violent jihad, meant that Allah had provided a "safe

30

route that you wouldn't get in trouble through to reach a current battlefield." Id. at 2468-69.

In January 2009, the FBI introduced a third confidential source into its investigation: Melvin Weeks, a Staff Sergeant in the United States Army at Camp Bondsteel, Kosovo. After meeting at a local mosque, Sherifi and Weeks soon became good friends. Sherifi, who believed that jihad meant "to fight physically with weapons against the enemies of Islam, wherever they are at and whoever they might be," J.A. 1947, thereafter began to discuss his violent jihadist beliefs with Weeks and made efforts to convert him. As Weeks explained, jihad, to Sherifi, was not "the jihad of the Prophet Mohammad," but rather "just murderous acts against innocent soldiers and civilians." Id. at 2018. Over the next few months, Sherifi provided Weeks with literature and videos, including a video of a beheading, coupled with the explanation that it was "[w]hat happens to the one who leaves the din," i.e., one who leaves the religion of Islam. Id. at 1973. Sherifi also introduced Weeks to the teachings of al-Awlaki, providing him with an al-Awlaki writing entitled "44 Ways to Support Jihad," in which the Imam explained how devoted "brothers" could assist violent jihadist causes by providing money and translating extremist texts, among other things. Weeks testified that Sherifi believed the "whole point of governance" was to impose Shari'ah law, and that Sherifi did

31

not respect any other form of government. Id. at 2001-02. According to Weeks, Sherifi viewed everyone who did not share Sherifi's beliefs in violent ideology to be an enemy of Islam, including "[e]verybody that America [or its allies were] fighting against." Id. at 1949.

While Sherifi was abroad in Kosovo, he also spent time with some like-minded individuals who agreed with Sherifi and advocated violent jihad. As a prime example of such contacts, Sherifi spoke with Bajram Asllani, also known as Abu Hatab, who was a native of Kosovo. Asllani, at the time of trial, was "wanted by the United States government" on "charges of material . . . support to terrorism and conspiracy to kill, maim and injure overseas." J.A. 2897. Asllani was also wanted in Serbia, where he had been tried and convicted in absentia for his involvement in a "conspiracy to blow up several buildings." Id. After Sherifi returned to the United States from Kosovo, he maintained contact with Asllani, speaking with him at least once using a video camera on a computer. According to Sherifi's own testimony, he spoke with Asllani several times and translated documents for him, though Sherifi claimed never to have met Asllani in person. Sherifi also wired Asllani money so that Asllani, who was still in Kosovo, could obtain travel documents.

b.

During the course of his conspiratorial activities, Boyd secured and maintained an extensive firearm and weapons arsenal, which he kept in and about his home and vehicles. Boyd and his sons generally carried firearms on their persons, and Boyd regularly purchased large quantities of ammunition. Zakariya explained that Boyd focused on obtaining armor-piercing ammunition as well as deadly hollow-point handgun ammunition. Beginning in 2008, Boyd voiced an interest in relocating his family overseas and talked about moving to Jordan. Boyd even began to sell his personal property, including some of his firearms, in preparation for such a move. Boyd was concerned that he would not be able to travel with his entire arsenal and, as a result, built a weapons bunker beneath his back porch and deck, where he planned to store some of the firearms. In July 2009, Boyd, Sherifi, and Harris spent several days working on the weapons bunker. The weapons bunker consisted of an entrenchment roughly six feet deep and was lined with sandbags for protection and stability.

c.

In May 2009, Sherifi returned to the United States from Kosovo, leaving his wife in that Balkan country. Sherifi told friends in Raleigh that he had returned to North Carolina to save money to buy a family farm in Kosovo. Sherifi advised

33

others that he planned for the farmland in Kosovo to be used by his jihadist "brothers" en route to the "battlefield."

That spring, Boyd and Sherifi discussed and developed a scheme to attack the Quantico Marine Corps Base in eastern Virginia. While abroad, Sherifi had identified Camp Bondsteel in Kosovo as a potential target for attack, because the "brothers" hated the presence of American soldiers in Kosovo. After returning to this country, Sherifi worked delivering medical supplies to various locations, including the Fort Bragg Army Post in North Carolina. Sherifi boasted to Boyd about how easy it was, as a delivery truck driver, to access such military facilities. Boyd and Sherifi then identified Quantico as a target, in part because Boyd was already familiar with Quantico, having lived there as a child. As a result, Boyd travelled to Quantico to get a closer look, supplementing his reconnaissance efforts with online research on Google and other websites. Following his visit to Quantico, Boyd reported to Sherifi that it was easy to access the base.

On several occasions, Boyd and Sherifi discussed their planned attack on Quantico, and, at least once talked about kidnapping a Marine officer, "a general or someone of high rank." J.A. 1697. Boyd proposed holding the officer for ransom, seeking in return the release of an Islamic scholar being imprisoned by the United States. As part of this scheme,

34

Boyd suggested cutting off the Marine's ring finger and "sen[ding] his finger with one of his rings" to Marine officials so that the Marines would "know it was him" and that he was Boyd's prisoner. Id.

d.

In the summer of 2009, Sherifi participated in two weapons training sessions in Caswell County, North Carolina. Those sessions involved Boyd and others, including informants Harris and Eddarkoui. The first session occurred on June 10, 2009, and the second was conducted about a month later, on July 7, 2009. The sessions took place on a rural property that Harris had obtained for weapons training, telling the group that it belonged to one of his relatives. The property was actually, however, under government control and FBI surveillance. Boyd organized the "practice" sessions with the "idea . . . that they would use this [training] in furtherance if they were to go to try and fight somewhere." J.A. 1820. During the sessions, Boyd instructed his trainees on military tactics and weapons skills, showing them how to use a variety of firearms. At the second session, Boyd taught the trainees more about military maneuvers. Boyd also had his trainees practice their firearms skills while he fired automatic weapons, so that they would become accustomed to using weapons while being subjected to the sound of gunfire.

35

Sherifi attended and participated in both training sessions, and he sought to recruit others to the second session.

On July 22, 2009, soon after the second training session, the initial indictment was returned in these proceedings. Boyd and his coconspirators had planned a third session for July 27, 2009, the very date on which they were arrested. After the arrests, the FBI seized Boyd's weapons arsenal from his home, together with various and sundry gas masks, computers, cell phones, and cash.[14] Fifteen of the firearms were loaded at the time of their seizure. A corresponding search of the North Carolina home of Sherifi's parents resulted in the seizure of packed suitcases and a money belt containing $10,000 in cash.

### B.

During the trial, the appellants raised a number of evidentiary objections and reiterated various First Amendment arguments, some related to the court's jury instructions. On October 7, 2011, at the close of the government's case, the appellants moved for judgments of acquittal. The trial court

---

[14] At the time of the initial indictment and during his ongoing conspiratorial activities, Boyd possessed more than forty weapons. Boyd's arsenal included assault weapons, sniper rifles, handguns, shotguns, and tens of thousands of rounds of ammunition. See J.A. 4274-79 (cataloging Boyd's arsenal). Boyd had at least ten assault weapons, including several Bushmasters and AK-47s; at least twenty rifles and shotguns; and more than a dozen handguns.

36

denied each of the acquittal requests, explaining that the evidence, viewed in the light most favorable to the prosecution, was sufficient for the jury to find each of the appellants guilty of the charged offenses. The appellants renewed their acquittal motions — again on sufficiency grounds — at the close of all the evidence, and then again after the jury returned its verdicts. The acquittal motions were all denied.

The prosecution's closing argument reiterated the key evidence linking each of the appellants to the charged conspiracies, focusing on the covert and secretive nature of the appellants' plans. The prosecution sought to underscore the violent tendencies of the appellants and their coconspirators, as evidenced by their fascination with weapons, postings on Facebook, and day-to-day communications with one another. The prosecutors also explained the government's view of the evidence, particularly Boyd's testimony, plus that of expert Kohlmann concerning home-grown terrorism cells. Conversely, the defense lawyers focused on what they characterized as the scattered and vague evidence supporting the conspiracy allegations, contending that the prosecution had failed to establish any concrete object thereof, resulting in a fatal deficiency in its case. Moreover, the defense lawyers attacked the credibility of Boyd and his sons, arguing that their potential to receive life sentences had been substantially

37

reduced by their testimony against the appellants. The defense also asserted that the FBI informants were not credible, emphasizing that all had been paid for their testimony. Finally, the lawyers stressed that, under the First Amendment, the appellants should not be convicted because the evidence against them consisted primarily of protected speech and, in any event, failed to prove the charged conspiracies.

On October 13, 2011, after the closing arguments and instructions, the jury deliberated and returned its separate verdicts. On January 13, 2012, the court sentenced each appellant, and it thereafter filed three sentencing opinions explaining the sentences imposed. These consolidated appeals followed. We possess jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).[15]

### III.

By their appeals, the appellants challenge their convictions in multiple respects. First, they contend that their convictions cannot stand because the trial court committed

---

[15] We are appreciative of the extensive efforts rendered in this case by our district court colleague, who patiently addressed the various issues presented. The record convincingly demonstrates her diligence, reflected in nearly a dozen written opinions, plus innumerable orders and oral rulings. We also commend defense counsel for ably and robustly representing the appellants.

reversible error in its First Amendment analysis. Second, the appellants pursue recognition of several evidentiary errors, seeking relief by way of a new trial. Finally, they maintain that their motions for judgments of acquittal were erroneously denied, in that the trial evidence was legally insufficient to sustain any of their convictions. We begin with the First Amendment, followed by other issues.

### A.

The appellants contend that the trial court committed reversible error in its handling of the argument that their speech espousing violent jihad was protected by the First Amendment. Concomitantly, the appellants assert that they never agreed to take action in connection with their beliefs and expressions, and thus were prosecuted purely for their offensive discourse. Of course, their argument ignores that the jury found — as it was required to do in order to convict — that the appellants had, in fact, agreed to take action in furtherance of violent jihad.

### 1.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The Supreme Court has explained that, "as a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its

39

subject matter, or its content." United States v. Stevens, 559 U.S. 460, 468 (2010) (internal quotation marks omitted). Notwithstanding the foregoing, the First Amendment's protections are not absolute, and the Court has approved government "restrictions upon the content of speech in a few limited areas, . . . including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct." Id. (citations and internal quotation marks omitted). Moreover, the Court has been clear that prohibited conduct cannot "be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." Wisconsin v. Mitchell, 508 U.S. 476, 484 (1993) (internal quotation marks omitted).

The statutes underlying the appellants' various convictions serve, inter alia, to criminalize providing, and conspiring to provide, material support for terrorism, see 18 U.S.C. § 2339A; conspiring to murder, kidnap, or maim outside the United States, id. § 956(a); and conspiring to kill a federal officer or employee, id. § 1117. Often, those offenses involve speech. For example, the § 2339A convictions in United States v. Stewart were premised on evidence that the defendants provided material support — personnel — to a § 956(a) conspiracy by communicating to the conspirators the messages of "'spiritual' leader" Abdel Rahman that were intended to induce "criminal acts of violence." See 590 F.3d 93, 112-16 (2d Cir. 2009). The Second Circuit

40

rejected the defendants' First Amendment argument that, because "the government established only that they provided the underlying conspiracy with Abdel Rahman's 'pure speech,'" the defendants "did not provide 'personnel' within any constitutional interpretation of section 2339A." Id. at 115. In so doing, the Stewart court determined that the issue was one of protected speech, rather than pure speech, and that Rahman's "call to arms" was not protected. Id. The court explained that "[w]ords that instruct, solicit, or persuade others to commit crimes of violence violate the law and may be properly prosecuted." Id. (alteration and internal quotation marks omitted).

The appellants' First Amendment contention is somewhat different than that of the Stewart defendants. As the appellants would have it, their convictions unconstitutionally rest on their own protected speech, i.e., mere expressions of belief in violent jihad. The appellants invoke Holder v. Humanitarian Law Project, 130 S. Ct. 2705 (2010), wherein the Supreme Court recently entertained a First Amendment challenge to 18 U.S.C. § 2339B (making it a federal crime to knowingly provide material support or resources to "a foreign terrorist

organization" designated as such by the Secretary of State).[16]
The Humanitarian Law Project plaintiffs "claimed that they
wished to provide support for the humanitarian and political
activities of [foreign terrorist organizations in Turkey and Sri
Lanka] in the form of monetary contributions, other tangible
aid, legal training, and political advocacy, but that they could
not do so for fear of prosecution under § 2339B."  130 S. Ct. at
2714.   Although the Supreme Court concluded that, "in
prohibiting the particular forms of support that plaintiffs seek
to provide to foreign terrorist groups, § 2339B does not violate
the freedom of speech," id. at 2730, the Court emphasized "that
Congress has [not] banned [the plaintiffs'] pure political
speech," id. at 2722 (internal quotation marks omitted).   That
is,

> [u]nder the material-support statute, plaintiffs may
> say anything they wish on any topic.   They may speak
> and write freely about the [foreign terrorist
> organizations], the governments of Turkey and Sri

---

[16]   The Humanitarian Law Project decision concerned the
constitutionality of § 2339B, rather than § 2339A.   Section
2339A(a) prohibits the provision of "material support or
resources" while "knowing or intending that they are to be used
in preparation for, or in carrying out," violations of certain
terrorism statutes.   Meanwhile, § 2339B(a)(1) prohibits
"knowingly provid[ing] material support or resources" to an
organization that has been designated as a "foreign terrorist
organization" by the Secretary of State.   Thus, both § 2339A and
§ 2339B criminalize the provision of "material support," but
they have some different elements.   See United States v.
Chandia, 514 F.3d 365, 372 (4th Cir. 2008).

42

Lanka, human rights, and international law. They may
advocate before the United Nations. . . . The
statute does not prohibit independent advocacy or
expression of any kind. Section 2339B also does not
prevent plaintiffs from becoming members of the
[organizations] or impose any sanction on them for
doing so. Congress has not, therefore, sought to
suppress ideas or opinions in the form of "pure
political speech." Rather, Congress has prohibited
"material support," which most often does not take the
form of speech at all. And when it does, the statute
is carefully drawn to cover only a narrow category of
speech to, under the direction of, or in coordination
with foreign groups that the speaker knows to be
terrorist organizations.

Id. at 2722-23 (alteration and internal quotation marks
omitted); see also Stewart, 590 F.3d at 115 ("The government
does not deny that section 2339A may not be used to prosecute
mere advocacy or other protected speech, but contends that the
defendants were prosecuted for criminal actions that did not
amount to protected speech.").

The appellants rely on Humanitarian Law Project for the
proposition that they could not be convicted under § 2339A for
simply speaking, writing about, or even joining a terrorist
organization. That proposition, however, does not undermine any
of the appellants' convictions. Their convictions rest not only
on their agreement to join one another in a common terrorist
scheme, but also on a series of calculated overt acts in
furtherance of that scheme. For example, each of the appellants
travelled abroad seeking to reach locations considered to be
jihadist battlefields, with the hope and intent of engaging in

43

violent jihad.  To prepare themselves for jihad, the appellants trained with weapons and took instruction from Boyd.  Moreover, Sherifi and Yaghi endeavored to recruit others into the conspiracies:  Sherifi through explicit efforts to recruit Sergeant Weeks, and Yaghi by introducing Mohammad and Hassan to Boyd.

Furthermore, it was entirely consistent with the First Amendment to make "evidentiary use of [the appellants'] speech to establish the elements of [their] crime[s] or to prove motive or intent."  See Mitchell, 508 U.S. at 489.  Indeed, because "the essence of a conspiracy is an agreement to commit an unlawful act," United States v. Jimenez Recio, 537 U.S. 270, 274 (2003) (emphasis added) (internal quotation marks omitted), the supporting evidence may necessarily include a defendant's speech.  See United States v. Rahman, 189 F.3d 88, 117 (2d Cir. 1999) (including conspiracy in list of offenses that "are characteristically committed through speech").  Such is the case here, where the appellants engaged in extensive conversations with Boyd and others about the necessity of waging violent jihad and their shared goal of reaching the jihadist battlefield. Meanwhile, evidence such as Sherifi's discussions with Weeks about the religious obligation to engage in jihad, as well as Sherifi's statements to Eddarkoui about plans to recruit Weeks for violent jihad in Somalia, allowed the jury to attach

44

nefarious intent to what otherwise might have been considered innocent acts. As further examples, Hassan's and Yaghi's Facebook postings advocating violent jihad, as well as their conversations with Boyd to that effect, serve as compelling support for the jury's finding that Hassan and Yaghi travelled abroad with the hope of acting on their beliefs by engaging in jihad and fighting against the "kuffar."

As the Sixth Circuit explained with regard to another terrorism prosecution under 18 U.S.C. § 2339A, "[f]orming an agreement to engage in criminal activities — in contrast with simply talking about religious or political beliefs — is not protected speech." United States v. Amawi, 695 F.3d 457, 482 (6th Cir. 2012). In that case, "although the conspiracy was closely related to, and indeed proved by, many of the defendants' conversations about political and religious matters, the conviction was based on an agreement to cooperate in the commission [of] a crime, not simply to talk about it." Id. The Amawi analysis is readily applicable here. Put succinctly, the First Amendment was no bar to the government's use of the appellants' speech to demonstrate their participation in the charged conspiracies.

2.

In any event, the appellants contend that the jury was not fully instructed — and thus misled — on the scope of the First

45

Amendment's protections.    The trial court's First Amendment
instruction advised the jury as follows:

> I turn your attention now to the First Amendment to
> the United States Constitution, which establishes
> certain rights which accrue to each defendant.    The
> First Amendment provides, in part, that Congress shall
> make no law respecting an establishment of religion or
> prohibiting the free exercise thereof or abridging the
> freedom of speech or of the press or the right of the
> people to be peaceably assembled.    The right of
> freedom of speech and to engage in peaceful assembly
> extends to one's religion and one's politics.    Having
> instructed you concerning rights of each defendant
> pursuant to the First Amendment, I also instruct you
> that the First Amendment is not a defense to the
> crimes charged in the indictment.

J.A. 3567-68.    Although the appellants offered eleven other
First Amendment instructions, their appeal focuses on just three
of those proposals.    Specifically, they argue that their
proposed instructions 37, 40, and 45 were erroneously excluded
from the court's charge to the jury.[17]    Those proposed
instructions were as follows:

---

[17] The appellants also challenge on First Amendment grounds
the trial court's rejection of proposed instruction 28.    Rather
than pertaining to any protections accorded by the First
Amendment, however, that proposal reflects the appellants'
(incorrect) interpretation of the elements of the Count One
conspiracy.

The appellants have further suggested that the trial
court's charge was not just deficient but also incorrect,
because the court affirmatively instructed that the First
Amendment was not a defense to the crimes charged.    The
appellants failed to adequately address that claim in their
opening brief, however, and therefore have abandoned it.    See
Edwards v. City of Goldsboro, 178 F.3d 231, 241 n.6 (4th Cir.
(Continued)

46

Number 37: [Each appellant's] right to exercise religion guarantees his right to believe and profess whatever religious doctrine he desires.

Number 40: The First Amendment protects speech that encourages others to commit violence, unless the speech is capable of producing imminent lawless action. Speech that makes future violence more likely, such as advocating for illegal action at some indefinite time in the future, is protected. Thus, speech may not be punished just because it makes it more likely that someone will be harmed at some unknown time in the future.

Number 45: The First Amendment right to free speech protects the right of an individual or group to advocate the use of force or advocate for the violation of law so long as the speech is: 1) not directed to incite or produce imminent lawless action and 2) is not likely to incite or produce imminent lawless action. The First Amendment even protects an individual's right to praise groups or persons using terrorism as a means of achieving their ends. Advocacy is pure speech protected by the First Amendment.

See id. at 453–460.[18]

---

1999) ("Failure to comply with the specific dictates of [Federal Rule of Appellate Procedure 28(a)] with respect to a particular claim triggers abandonment of that claim on appeal.").

[18] Pursuant to Rule 30(d) of the Federal Rules of Criminal Procedure, "[a] party who objects to any portion of the instructions or to a failure to give a requested instruction" is required to "inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." A "failure to object in accordance with this rule" will, in most instances, preclude appellate review. See United States v. Ebersole, 411 F.3d 517, 526 (4th Cir. 2005). The appellants made arguments in favor of their proposed instructions — including numbers 37, 40, and 45 — prior to the court's charge to the jury. The record reveals, however, that the appellants only identified instructions 37, 47, and 48 in their post-charge objections. Nevertheless, the government does (Continued)

We review for abuse of discretion a trial court's decision to either give or refuse to give a proposed instruction.  See United States v. Lighty, 616 F.3d 321, 366 (4th Cir. 2010) (internal quotation marks omitted).  In assessing a claim of instructional error, "we do not view a single instruction in isolation; rather we consider whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law."  United States v. Passaro, 577 F.3d 207, 221 (4th Cir. 2009) (internal quotation marks omitted).  Thus, "[a] district court commits reversible error in refusing to provide a proffered jury instruction only when the instruction (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense."  Lighty, 616 F.3d at 366 (internal quotation marks omitted).

Even if the three rejected instructions correctly recite the legal principles espoused therein, the appellants nevertheless fail in two essential respects.  That is, they have

_____

not, however, raise any contention of waiver for failure of the appellants to properly object under Rule 30(d).  More importantly, we discern no error in the court's refusal of the three instructions at issue.

not shown (1) that their proposals were not substantially covered by the court's jury charge, or (2) that their proposals dealt with points so important that the court's failure to give them seriously impaired the appellants' ability to conduct their defenses. The court's First Amendment instruction substantially covered the appellants' right to freely exercise and express their religious beliefs, echoing proposed instruction 37. Proposals 40 and 45, encompassing the First Amendment protections extended to speech advocating violence, are of no import in this case. Put simply, the appellants were not prosecuted for inciting violence, cf., e.g., Stewart, 590 F.3d at 115, nor would the instructions have permitted any convictions on that ground. Accordingly, the court did not abuse its discretion by declining to give — in haec verba — proposed instruction 37, 40, or 45.[19]

---

[19] Additionally, Hassan raises the trial court's failure to instruct on the Second Amendment insofar as it "protects an individual right to possess a firearm unconnected with service in a militia, and to use that [weapon] for traditionally lawful purposes, such as self-defense within the home." See J.A. 463 (further specifying that mere possession of a firearm "does not in and of itself make a defendant guilty of a crime"). Notably, Hassan was neither charged with nor convicted of any offense involving his possession of a firearm, and he cannot show that the lack of a Second Amendment instruction prejudiced his defense.

49

B.

We turn now to the various evidentiary issues presented by the appellants. First, they assert that the trial court erred in admitting the opinion evidence of Evan Kohlmann, the government's expert witness. Next, Hassan and Yaghi maintain that the admission of their Facebook pages and certain videos was erroneous. Hassan and Yaghi also challenge selected evidence against them as being inadmissible lay opinion and improper hearsay. Finally, Yaghi contends that the court erred in admitting evidence that the prosecution obtained improperly pursuant to FISA court orders.

We assess challenges to a trial court's evidentiary rulings for abuse of discretion. See United States v. Hornsby, 666 F.3d 296, 307 (4th Cir. 2012). In reviewing an evidentiary ruling under that standard, "we will only overturn [a] ruling that is arbitrary and irrational." United States v. Cole, 631 F.3d 146, 153 (4th Cir. 2011) (internal quotation marks omitted). With those principles in mind, we address the various evidentiary challenges.

1.

The appellants first contend that the expert testimony of Evan Kohlmann was inadmissible under Federal Rule of Evidence 702 because it was irrelevant and failed to satisfy the foundational requirements established by the Supreme Court in

50

_Daubert v. Merrell Dow Pharmaceuticals, Inc._, 509 U.S. 579 (1993). The appellants also maintain that, even if Kohlmann's evidence was admissible under Rule 702, it was yet inadmissible under Rule 403 because its probative value was outweighed by the potential for unfair prejudice.

a.

As the Supreme Court has explained, Rule 702 "imposes a special obligation upon a trial judge to ensure that any and all scientific testimony is not only relevant, but reliable." _Kumho Tire Co., Ltd. v. Carmichael_, 526 U.S. 137, 147 (1999) (internal quotation marks omitted).[20] In _Daubert_, the Court identified five factors for use in evaluating the reliability of proposed expert testimony:

> (1) whether the particular scientific theory "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3)

---

[20] Pursuant to Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if the following requirements are satisfied:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

51

the "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community.

See United States v. Crisp, 324 F.3d 261, 265-66 (4th Cir. 2003) (quoting Daubert, 509 U.S. at 593-94). The Daubert test is flexible; "[r]ather than providing a definitive or exhaustive list, Daubert merely illustrates the types of factors that will bear on the inquiry." Id. at 266.

On April 30, 2010, the government alerted the appellants that it intended to call Kohlmann as an expert witness with respect to various aspects of Islamic extremism. Specifically, it was anticipated that Kohlmann would testify about the "meaning and context of various words and phrases used by the defendants which are commonly used by persons practicing extreme Islam"; the "structure and leadership of groups adhering to the principles of Islamic extremism"; and the "manner and means employed by extremist Islamic groups to recruit individuals and the process of radicalization which occurs within such groups." J.A. 204-07. The appellants sought to bar Kohlmann's testimony, asserting, inter alia, that the prosecution was unable to satisfy the Daubert test.

The trial court — after conducting a Daubert evidentiary hearing and allowing ample opportunity for cross-examination of Kohlmann — denied the pretrial exclusion motion by written

52

opinion.  See United States v. Boyd, No. 5:09-cr-00216 (E.D.N.C.
Sept. 16, 2011), ECF No. 1443 (the "Daubert Opinion").  The
court therein determined that Kohlmann's proposed testimony was
both reliable and relevant, thus satisfying Rule 702's
requirements.  To its credit, the court did not rule broadly
that all of Kohlmann's potential testimony was relevant.  The
court instead made clear that it would not "allow testimony on
all of the information included in Kohlmann's very lengthy
expert reports," id. at 6, explaining that "the government is on
notice that only expert testimony relevant to the case is
admissible and it should tailor its examination of Kohlmann
accordingly," id. at 11.  The trial court also noted that
questions about Kohlmann's credentials and opinions were "ideal
fodder for vigorous cross examination."  Id. at 8.

    The trial court did not abuse its discretion in deciding
that Kohlmann's proposed evidence satisfied Rule 702.  The court
heard and considered testimony about Kohlmann's credentials and
techniques and was convinced that he possessed "the requisite
knowledge, skill, experience, training, and education to testify
on various aspects of the trend of decentralized terrorism and
homegrown terrorism."  Daubert Opinion 7.  In so ruling, the
court gave particular attention to the Daubert factors,
including thorough assessments of whether Kohlmann's methods
were subject to peer review, his "consultation with others in

53

the field," and "whether or not his research findings [were] based in a sound methodology." Id. at 9.

The trial court's assessment of Kohlmann's credentials fulfilled its gatekeeping obligation under Daubert, and the court did not err in deciding that Kohlmann's testimony was reliable as well as relevant to the issues to be presented. Notably, we have previously approved of Kohlmann's expertise in terrorism matters, ruling that his testimony would "assist the trier of fact to understand the evidence or to determine a fact in issue." See United States v. Benkahla, 530 F.3d 300, 309 (4th Cir. 2008) (internal quotation marks omitted).[21] There, the trial evidence was also "complicated, touching by necessity on a wide variety of ideas, terms, people, and organizations connected to radical Islam." Id. at 309. We thus ruled that the trial court had not abused its discretion in deeming "lengthy testimony about various aspects of radical Islam . . . appropriate, and indeed necessary, for the jury to understand the evidence and determine the facts." Id. at 310 (internal quotation marks and punctuation omitted). That reasoning applies equally today, because the evidence in this case was

_____

[21] Our Benkahla analysis focused largely on the relevance of Kohlmann's testimony because, as Judge Wilkinson explained, Kohlmann's "qualifications were obviously substantial and the district court acted well within its discretion in determining that they were sufficient." See Benkahla, 530 F.3d at 309 n.2.

similarly complex, involving the testimony of multiple coconspirators and informants. The evidence in each case also involved terminology and concepts that were likely to be unfamiliar to jurors. In such settings, the relevance of expert testimony is quite evident.

b.

The appellants also challenge the trial court's failure to exclude Kohlmann's testimony under Rule 403, maintaining that its probative value was substantially outweighed by the risk of unfair prejudice.[22] We apply a "highly deferential" standard of review to such an issue, and a trial court's "decision to admit evidence over a Rule 403 objection will not be overturned except under the most extraordinary circumstances, where that discretion has been plainly abused." United States v. Udeozor, 515 F.3d 260, 265 (4th Cir. 2008) (internal quotation marks omitted). We have emphasized that relevant evidence should only be excluded under Rule 403 "when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and this risk is disproportionate to the probative value of the

---

[22] Pursuant to Rule 403, a trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury."

offered evidence." United States v. Siegel, 536 F.3d 306, 319 (4th Cir. 2008).

Here, the district court carefully balanced — both before and during trial — the relevance of Kohlmann's testimony against the potential prejudice arising therefrom. Although linking the appellants to extremist jihadist groups was undoubtedly prejudicial, it was not unfairly so. Indeed, the charges that were lodged against the appellants meant that the prosecution would necessarily seek to establish that link. See Benkahla, 530 F.3d at 310 (rejecting Rule 403 challenge to Kohlmann's testimony, despite potential prejudice, where relevance could not be doubted and trial judge could decide that probative value outweighed any prejudicial risk); United States v. Williams, 445 F.3d 724, 730 (4th Cir. 2006) (explaining that, though prejudicial, "as is all evidence tending to show a defendant's guilt," the challenged evidence was nevertheless admissible because the risk of unfair prejudice did not "substantially outweigh the probative value of the evidence" (emphasis added)). In these circumstances, the court did not abuse its discretion in overruling the appellants' Rule 403 objections.[23]

_____

[23] The appellants also assert that Kohlmann's testimony was irrelevant under Rules 401 and 402 because "[c]riminal behavior must be judged by the conduct of individual defendants applied to the particularized elements of the pertinent criminal statute, not the characteristics of any class of defendants 'as (Continued)

2.

Next, Hassan and Yaghi contend that several prosecution exhibits consisting of Facebook pages and the files embedded therein — including videos hosted on YouTube (and maintained by Google) — were not properly authenticated. Hassan also challenges, on hearsay and other grounds, two videos used against him by the prosecutors. First, he maintains that the court erred in admitting a physical training video that he had posted on a website called RossTraining.com. Second, Hassan claims that a video seized from his cell phone by the FBI was also erroneously admitted.

a.

The trial court ruled that the Facebook pages and YouTube videos were self-authenticating under Federal Rule of Evidence 902(11), and thus that they were admissible as business records. That the Facebook pages and YouTube videos were self-authenticating business records was not, however, the end of the trial court's inquiry. The court also required the government, pursuant to Rule 901, to prove that the Facebook pages were linked to Hassan and Yaghi.

---

a whole.'" Br. of Appellant Sherifi 16. To the extent that assertion constitutes a distinct relevancy challenge to Kohlmann's testimony, it is rejected.

57

Rule 902(11) authorizes the admission in evidence of records that satisfy the requirements of Rule 803(6)(A)-(C), "as shown by a certification of the custodian . . . that complies with a federal statute or a rule prescribed by the Supreme Court." Rule 803(6), in turn, provides that business records are admissible if they are accompanied by a certification of their custodian or other qualified person that satisfies three requirements: (A) that the records were "made at or near the time by — or from information transmitted by — someone with knowledge"; (B) that they were "kept in the course of a regularly conducted activity of a business"; and (C) that "making the record was a regular practice of that activity."[24] Turning to Rule 901, subdivision (a) thereof provides that, to "establish that evidence is authentic, the proponent need only present 'evidence sufficient to support a finding that the matter in question is what the proponent claims.'" See United States v. Vidacak, 553 F.3d 344, 349 (4th Cir. 2009) (quoting Fed. R. Evid. 901(a)). Importantly, "the burden to authenticate under Rule 901 is not high — only a prima facie showing is

---

[24] The current version of Rule 803(6), quoted above, was effective as of on December 1, 2011, several months after completion of the trial. The amendments to Rule 803 were not substantive, however, but were part of a restyling of the Rules of Evidence to make them more readily understandable and consistent.

58

required," and a "district court's role is to serve as gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic." Id.

Hassan's and Yaghi's Facebook pages were captured via "screenshots," taken at various points in time and displaying Hassan's and Yaghi's user profiles and postings. The screenshots of the Facebook pages also included photos and links to the YouTube videos. On the Facebook pages, Hassan and Yaghi had posted their personal biographical information, as well as quotations and listings of their interests. Each Facebook page also contained a section for postings from other users, on what is called a "wall." Meanwhile, the videos in question were retrieved from Google's server. In establishing the admissibility of those exhibits, the government presented the certifications of records custodians of Facebook and Google, verifying that the Facebook pages and YouTube videos had been maintained as business records in the course of regularly conducted business activities. According to those certifications, Facebook and Google create and retain such pages

59

and videos when (or soon after) their users post them through use of the Facebook or Google servers.[25]

After evaluating those submissions, the trial court ruled that the requirements of Rule 902(11) had been satisfied. The court then determined that the prosecution had satisfied its burden under Rule 901(a) by tracking the Facebook pages and Facebook accounts to Hassan's and Yaghi's mailing and email addresses via internet protocol addresses. In these circumstances, there was no abuse of discretion in the admissions of any of the Facebook pages and YouTube videos.

b.

Turning to the physical training video uploaded by Hassan to RossTraining.com, Hassan maintains that the trial court's refusal to admit his own related postings contravened the evidentiary "rule of completeness." The rule of completeness has its origins at common law, and is codified in Rule 106 of the Federal Rules of Evidence. Pursuant thereto, "[w]hen a writing or recorded statement or part thereof is introduced by a

---

[25] The appellants' contention that the Facebook and Google certifications are insufficient because they were made for litigation purposes several years after the postings occurred is entirely unpersuasive. It would make no sense to require a records custodian to contemporaneously execute an affidavit attesting to the accuracy of a business record each time one is created or maintained, when there is no pending litigation or need for such a certification.

party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." United States v. Moussaoui, 382 F.3d 453, 481 (4th Cir. 2004) (internal quotation marks omitted). As we have explained, a trial court, in applying the rule of completeness, may allow into the record "relevant portions of [otherwise] excluded testimony which clarify or explain the part already received," in order to "prevent a party from misleading the jury" by failing to introduce the entirety of the statement or document. See United States v. Bollin, 264 F.3d 391, 414 (4th Cir. 2001). Nevertheless, the rule of completeness does not "render admissible . . . evidence which is otherwise inadmissible under the hearsay rules." United States v. Lentz, 524 F.3d 501, 526 (4th Cir. 2008) (internal quotation marks omitted). Nor does the rule of completeness "require the admission of self-serving, exculpatory statements made by a party which are being sought for admission by that same party." Id.

The physical training video posted by Hassan on RossTraining.com depicted Hassan in a series of physical training workouts. It opened with a series of quotations on the video screen, such as "[t]here is no God but ALLAH and Muhammad is his Messenger," the "strong Muslim is better than the weak

61

Muslim," and "[l]et's please ALLAH and train hard." Trial Ex. 399; J.A. Vol. XIV. The training video concluded with the words "support our troops," which appeared on the screen above an Arabic phrase and an image of an assault rifle. Id. After Hassan had uploaded the training video to RossTraining.com, other users of the website posted various comments and questions, some of which were critical of Hassan. Hassan responded to them with postings of his own, including an apology for any controversy his training video had caused. Hassan then posted additional statements about his beliefs and his support of those troops fighting "for the truth." J.A. 2377. In one of those subsequent postings, Hassan said that he "do[es] not support terrorists." Id.[26] Hassan's defense lawyer thus sought to introduce into evidence — under the rule of completeness —

---

[26]   Hassan's assertion that he "do[es] not support terrorists" was part of a lengthier statement:

> The troops I support are the ones who fight for truth, whether he is Arab, American, Spanish, Europe, whatever, it doesn't matter as long as he fights for the truth. PS, I do not support terrorists.

J.A. 2377. In posting his apology, Hassan asserted:

> Islam is a religion of peace but when attacked we fight back strong. I will edit the video but will probably keep my religious beliefs . . . because part of my religious faith is to become strong and in healthy shape.

Id. at 2377–78.

the follow-up statements posted by Hassan.  The court, however, sustained the hearsay objection interposed by the prosecution and excluded those statements.

Hassan's excluded statements, though possibly exculpatory, do not fall within any hearsay exception that would authorize their admission into evidence.  Nor was the jury likely to have been confused or misled by their exclusion.  The court simply ruled that Hassan's follow-up postings on RossTraining.com could not be used to establish the truth of any matter asserted — specifically, to show that Hassan did not support terrorists. That ruling was not an abuse of the court's discretion.

c.

Hassan next challenges the prosecution's use against him of the video that the authorities had seized from his personal cell phone.  The cell phone video showed Hassan firing a rifle at an outdoor location near the Islamic Center in Raleigh.  Hassan maintains that the cell phone video was irrelevant to the prosecution's case because it was not created until early 2009, two years after he stopped having regular contact with Boyd. Hassan also contends that, even if relevant, the cell phone video was unduly prejudicial under Rule 403, because it shows Hassan using a firearm and thereby could have caused the jury to improperly associate Hassan with Boyd's weapons arsenal.

Because the cell phone video was relevant to Hassan's weapons training with Yaghi, it was also relevant to whether Hassan was yet involved — even in 2009 — in the ongoing Count One conspiracy. As for Hassan's claim of prejudice, "[t]he mere fact that the evidence will damage the defendant's case is not enough — the evidence must be _unfairly_ prejudicial, and the unfair prejudice must _substantially_ outweigh the probative value of the evidence." See _Williams_, 445 F.3d at 730. Put simply, the cell phone video of Hassan firing a rifle did not present a sufficient "danger of unfair prejudice" to warrant its exclusion under Rule 403. Indeed, at least one government witness admitted that there was no reason to believe that Hassan's mere possession or firing of the rifle was illegal. Moreover, there was no suggestion that Hassan or Yaghi had participated in the weapons training sessions of 2009 or in the creation and preservation of Boyd's weapons arsenal. In these circumstances, the trial court did not err in its ruling with respect to Hassan's cell phone video.

3.

Hassan and Yaghi next contend that three witnesses gave improper lay opinion evidence when they testified to their understandings of what Hassan and Yaghi meant by certain statements or on particular occasions. The following are challenged as erroneously admitted: (1) Boyd's understanding of

64

what Hassan and Yaghi meant in statements to Boyd during face-to-face conversations and in email exchanges; (2) Dylan Boyd's understanding of why Hassan and Yaghi wanted to accompany the Boyds on their 2007 trip to the Middle East; and (3) Jamar Carter's testimony regarding his understanding of Yaghi's use of the phrase "jihad."

Pursuant to Federal Rule of Evidence 701, a lay witness may testify to opinions when such evidence is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Rule 701 thus "allows testimony based on the person's reasoning and opinions about witnessed events." United States v. Offill, 666 F.3d 168, 177 (4th Cir. 2011). Lay witnesses are not entitled to opine broadly or generally; rather, "lay opinion testimony must be based on personal knowledge." United States v. Johnson, 617 F.3d 286, 292 (4th Cir. 2010). In contrast to Rule 702, which governs expert testimony, Rule 701 "permits lay testimony relating to a defendant's hypothetical mental state." Offill, 666 F.3d at 177. Applying those principles, we have ruled that testimony regarding a witness's understanding of what the defendant meant by certain statements is permissible lay testimony, so long as the witness's understanding is predicated

65

on his knowledge and participation in the conversation. <u>See,</u> <u>e.g.,</u> <u>United States v. Min</u>, 704 F.3d 314, 325 (4th Cir. 2013); <u>Offill</u>, 666 F.3d at 177-78.

Having evaluated the trial court's admission of the challenged lay opinion testimony, we are satisfied that none of its rulings constituted an abuse of discretion. In each instance, the lay testimony stemmed directly from the witness's conversations with Hassan and Yaghi, and was therefore based on that witness's perceptions. Furthermore, the testimony clearly assisted the jury in understanding the appellants' conversations and statements. Lay opinion testimony is particularly useful when, as here, the terms and concepts being discussed, such as "kuffar," "best brothers," finding "the battlefield," and "shahid," are likely to be unfamiliar to the jury. In particular, the government introduced a substantial amount of evidence relating to the coded and convoluted communications between the conspirators. In such circumstances, the witnesses were entitled, under Rule 701, to explain their understandings and impressions of Hassan's and Yaghi's statements and actions. As a result, the court's rulings with respect to the lay evidence were not an abuse of its discretion.

### 4.

Hassan and Yaghi next maintain that certain evidence admitted by the trial court constituted inadmissible hearsay.

66

Rule 801 of the Federal Rules of Evidence defines hearsay as any statement that a "declarant does not make while testifying at the current trial," and that is offered "in evidence to prove the truth of the matter asserted in the statement."

First, Hassan contends that Boyd's testimony regarding a conversation between Boyd and a shared acquaintance (the "mutual contact") of Hassan's father and Boyd constituted multi-level hearsay. Boyd explained that the "mutual contact" advised him that Hassan's father "believed both [Hassan and Yaghi] had travelled with [Boyd] to . . . try to get to a battlefield." J.A. 1760 (emphasis added). Hassan maintains that this statement was admitted to establish that he had, in fact, travelled with Boyd to the Middle East with the hope and intention of making it to the battlefield. The government contends to the contrary: that such testimony was not admitted for the truth of the matter asserted, but simply to establish Boyd's understanding of why Hassan's father was angry with Boyd, thus providing context for a phone call between the two men.

Boyd's testimony about his phone conversation with Hassan's father was not inadmissible hearsay. Assessed in the context of the other evidence, the prosecution elicited the testimony in order to show the basis for Boyd's belief that Hassan's father was angry with Boyd. As the prosecution demonstrated, Boyd's interactions with the elder Hassan, as well as Boyd's

67

understanding of rumors in the Raleigh Islamic community about the travel of Hassan and Yaghi to the Middle East in 2007, were relevant at trial, in that they offered a plausible explanation for the cessation of Boyd's relationship with Hassan and Yaghi.

Second, turning to a specific hearsay challenge interposed by Yaghi, he maintains that a police detective's testimony that law enforcement began to investigate Yaghi in 2006 after "receiv[ing] information from the Muslim community that [he] was traveling to Jordan . . . with the intent to participate in jihad in Iraq," J.A. 2256, constituted inadmissible hearsay. As with Boyd's testimony about the elder Hassan, the prosecution contends that the detective's testimony was simply used as relevant background, and to explain the origins of the Yaghi investigation. Because Yaghi did not object at trial to the detective's testimony concerning the origins of the investigation, we review Yaghi's hearsay challenge solely for plain error. See United States v. Smith, 441 F.3d 254, 262 (4th Cir. 2006).

Under plain error review, an appellate court may only correct an error when: "(1) there is an error; (2) the error is plain; (3) the error affects substantial rights; and (4) the court determines, after examining the particulars of the case, that the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" United States v.

68

Williamson, 706 F.3d 405, 411 (4th Cir. 2013) (quoting United States v. Olano, 507 U.S. 725, 732 (1993)). The plain error standard is thus a high bar that is difficult to clear. To establish that an error affected his substantial rights, an appellant must demonstrate that "the error actually affected the outcome of the proceedings." Id. (internal quotation marks omitted). Even if the first three prongs of plain error review have been satisfied, an appellant must convince the reviewing court that the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." Olano, 507 U.S. at 732.

Put simply, the trial court did not plainly err in admitting the detective's testimony. In context, his statement concerning the inception of the Yaghi investigation was presented as background to explain how the law enforcement officer became involved in the case. The detective's statement also supports the inference, however, that some members of the Muslim community of Raleigh believed that Yaghi had travelled abroad with the hope of engaging in jihad, and that some in the law enforcement community likewise thought that Yaghi had done so. Nevertheless, the government introduced a vast amount of other trial evidence to that effect. Thus, even if the detective's statements would have been subject to a hearsay

objection, the court's admission thereof would not satisfy either of the final two prongs of plain error review.

5.

On July 27, 2009, well before trial, the government gave notice that it intended to use evidence it had collected pursuant to FISA. The appellants moved to suppress the FISA evidence, or, alternatively, for disclosure of the FISA materials.[27] The district court, after an in camera and ex parte review of the FISA materials, denied the appellants' motion and explained its reasoning. See United States v. Boyd, No. 5:09-cr-00216 (E.D.N.C. June 22, 2011), ECF No. 1174 (the "FISA Opinion"). Yaghi challenges the rulings embodied in the FISA Opinion, asserting that the electronic surveillance orders were not supported by probable cause because, when the orders were issued in June 2007, there was no evidence that Yaghi was an agent of a foreign power, as required by FISA. Yaghi seeks disclosure of the FISA materials to support his contentions or, in the alternative, asks that we review those materials de novo to assess whether probable cause existed.

---

[27] The FISA applications, as well as the electronic surveillance orders issued by the FISA Court and any returns filed in connection with them, are collectively referred to as the "FISA materials."

70

FISA established a detailed framework whereby the executive branch "could conduct electronic surveillance for foreign intelligence purposes without violating the rights of citizens." United States v. Hammoud, 381 F.3d 316, 332 (4th Cir. 2004) (en banc), vacated on other grounds, 543 U.S. 1097 (2005).  Subject to certain exceptions not relevant here, "electronic surveillance of a foreign power or its agents may not be conducted unless the FISA Court authorizes it in advance," and "[e]ach application to the FISA Court must first be personally approved by the Attorney General."  United States v. Squillacote, 221 F.3d 542, 553 (4th Cir. 2000) (internal quotation marks omitted).  Where, as here, the target of electronic surveillance is a "United States person," the FISA Court

> may issue an order authorizing the surveillance only if the FISA judge concludes that there is probable cause to believe that the target of the surveillance is a foreign power or agent of a foreign power, that proposed minimization procedures are sufficient under the terms of the statute, that the certifications required by [50 U.S.C.] § 1804 have been made, and that the certifications are not clearly erroneous.

Id. (internal quotation marks omitted).[28]

---

[28] The FISA provisions, in pertinent part, define a "United States person" as "a citizen of the United States, [or] an alien lawfully admitted for permanent residence."  50 U.S.C. § 1801(i).  Yaghi, as a naturalized citizen of this country, is a United States person.

FISA identifies several requirements for the government's use of information obtained pursuant to a FISA order, as well as the essential procedures for challenging a prosecutor's use of such information. See 50 U.S.C. § 1806. Under those procedures, a defendant may move to suppress evidence that was "obtained or derived from such electronic surveillance," where the information was "unlawfully acquired" or "the surveillance was not made in conformity with an order of authorization or approval" under FISA. Id. § 1806(e). When faced with such a suppression motion, "if the Attorney General files an affidavit under oath that disclosure or an adversary hearing would harm the national security of the United States," id. § 1806(f), "the district court must review in camera and ex parte the FISA application and other materials necessary to rule," Squillacote, 221 F.3d at 553.

FISA provides that a district court may only divulge "portions of the application, order, or other materials relating to the surveillance . . . where such disclosure is necessary to make an accurate determination of the legality of the surveillance." 50 U.S.C. § 1806(f); see United States v. Rosen, 447 F. Supp. 2d 538, 546 (E.D. Va. 2006). We have emphasized that, where the documents "submitted by the government [are] sufficient" to "determine the legality of the surveillance," the

72

FISA materials should not be disclosed.  Squillacote, 221 F.3d at 554.

Because the Attorney General filed an appropriate affidavit in this case, in response to the appellants' motion to suppress, the district court conducted an in camera and ex parte review of the FISA materials and determined that there was probable cause to support the FISA orders.  The court then articulated and correctly applied the principles established by FISA and our precedent, reviewing the FISA materials "de novo with no deference accorded to the . . . probable cause determinations, but with a presumption of validity accorded to the certifications."  FISA Opinion 15.  Moreover, as the court recognized, because the statutory application was properly made and approved by a FISA judge, it carried a strong presumption of veracity and regularity.  Id. at 14-15; see United States v. Pelton, 835 F.2d 1067, 1076 (4th Cir. 1987).

We have conducted an independent review of the FISA materials and likewise conclude that the FISA applications demonstrated probable cause to believe that Yaghi was an agent of a foreign power when the FISA orders were issued.  Having conducted that review, we are satisfied that the materials submitted to the court by the government were sufficient to show

73

that the FISA surveillance was proper.  We therefore decline to order any further disclosure of the FISA materials.[29]

C.

Having resolved the appellants' evidentiary challenges that bear on admissibility, we turn to their principal contention on appeal:  that the evidence was insufficient to support their various convictions.  At the close of the prosecution's case-in-chief, at the conclusion of the trial evidence, and after the jury's return of its verdicts, the appellants challenged the sufficiency of the evidence.  The district court ruled that each of their challenges was without merit, as articulated in the court's opinions of October 10 and December 1, 2011.  See Sufficiency Opinion I; United States v. Boyd, No. 5:09-cr-00216 (E.D.N.C. Dec. 1, 2011), ECF No. 1558 ("Sufficiency Opinion II").

---

[29] We have heretofore reviewed de novo a district court's determination that a FISA application established probable cause.  Squillacote, 221 F.3d at 554; Hammoud, 381 F.3d at 331.  Some of our sister circuits, however, have utilized a more deferential standard of review.  See, e.g., United States v. El-Mezain, 664 F.3d 467, 567 (5th Cir. 2011) (conducting "independent in camera review" and applying abuse of discretion standard); United States v. Abu-Jihaad, 630 F.3d 102, 130 (2d Cir. 2010) (explaining that "FISA warrant applications are subject to minimal scrutiny by the courts, both upon initial presentation and subsequent challenge" (internal quotation marks omitted)).  We are satisfied that probable cause existed in this case under any of these standards.

We review de novo a trial court's denial of a motion for judgment of acquittal. See United States v. Osborne, 514 F.3d 377, 385 (4th Cir. 2008). Applying that standard, it is well settled that "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the [g]overnment, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942). As we have explained, "substantial evidence" is that which "a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Moye, 454 F.3d 390, 394 (4th Cir. 2006) (en banc) (internal quotation marks omitted). We examine "circumstantial as well as direct evidence," and remain mindful that "a conviction may rely entirely on circumstantial evidence." United States v. Bonner, 648 F.3d 209, 213 (4th Cir. 2011). In so doing, we accord deference to "the jury's resolution of all evidentiary conflicts and credibility determinations." Id. Simply put, "[a] defendant challenging the sufficiency of the evidence faces a heavy burden." Id. (internal quotation marks omitted).

After our independent and de novo review of the voluminous trial record, we are satisfied that the evidence presented was sufficient to sustain the appellants' various convictions. The evidence, though largely circumstantial, was nevertheless substantial. That evidence readily supports the determination

75

that a rational finder of fact could (and in fact did) deem the evidence adequate to support each conviction beyond a reasonable doubt.

### 1.

We turn first to Yaghi, who challenges the sufficiency of the evidence on the Count One and Count Two conspiracies, maintaining in particular that none of the evidence supports an inference that he agreed to participate therein. Yaghi emphasizes that Boyd and his sons denied under oath entering into any agreements with him, and he argues that it was not otherwise proved that he had entered into even a tacit conspiratorial agreement.

To convict Yaghi on Count One, the government was obliged to prove: (1) that he entered into a conspiracy; (2) that the objective thereof was to provide material support or resources; and (3) that he then knew and intended that such support or resources would be used in preparation for, or in carrying out, a separate conspiracy to murder, kidnap, or maim outside of the United States. See 18 U.S.C. § 2339A; United States v. Chandia, 514 F.3d 365, 372 (4th Cir. 2008).[30] With respect to the first

---

[30] Although the Indictment alleged a series of overt acts in furtherance of the Count One conspiracy, proof of the commission of an overt act in a § 2339A conspiracy is not required by statute. See 18 U.S.C. § 2339A; see also Stewart, 590 F.3d at 114-16 (setting out elements of § 2339A without including overt (Continued)

element, the government was obliged to prove a conspiracy — that
is, an agreement between two or more persons to engage in
illegal activity.  See United States v. Burgos, 94 F.3d 849,
857-58 (4th Cir. 1996) (en banc).[31]  Yaghi's involvement in such
a conspiracy was adequately demonstrated if the evidence showed
"a slight connection between [him] and the conspiracy."  United
States v. Kellam, 568 F.3d 125, 139 (4th Cir. 2009) (internal
quotation marks omitted).[32]  Furthermore, the "existence of a
tacit or mutual understanding is sufficient to establish a

---

act requirement); cf. supra note 2 (observing that appellants
asserted at trial that overt act was not required).  The Count
Two conspiracy, by contrast, requires proof that at least one
overt act in furtherance thereof was committed within the United
States.  See 18 U.S.C. § 956(a)(1).

[31]  The trial court instructed the jury on the law of
conspiracy, explaining that

> [i]f a defendant understands the unlawful nature of a
> plan or scheme and knowingly and intentionally joins
> in that plan or scheme on one occasion, that is
> sufficient to convict him for conspiracy, even though
> the defendant hadn't participated before and even
> though the defendant played only a minor part.

J.A. 3573-74.  The court also instructed that the prosecution
had no obligation to "prove that a conspiracy has a discrete,
identifiable organization structure."  Id. at 3573.

[32]  The conspiracy instructions emphasized that a defendant
can be a coconspirator "without knowing [the conspiracy's] full
scope or all of its members, and without taking part in the full
range of its activities."  J.A. 3573.  Moreover, the trial court
advised the jury that "[o]nce a defendant willfully joins in a
conspiracy," he "is presumed to continue in that conspiracy
unless and until he takes affirmative steps to withdraw."  Id.
at 3574.

conspiratorial agreement, and proof of such an agreement need not be direct — it may be inferred from circumstantial evidence." Id. (internal quotation marks omitted).[33]

On the second element of the Count One conspiracy, "material support or resources" is defined as "any property, tangible or intangible, or service," including "currency," "training," "expert advice or assistance," "weapons," or "personnel." 18 U.S.C. § 2339A(b)(1).[34] The third element required the government to establish that Yaghi acted "with the knowledge or intent" that such material support or resources would be used to commit a specific violent crime, in this instance a violation of 18 U.S.C. § 956. See Stewart, 590 F.3d at 113.

Turning to the Count Two conspiracy, the government was obliged to show that: (1) Yaghi entered into a conspiracy; (2) knowing and intending that the objective thereof was murder,

---

[33] The court explained to the jury that a conspiracy "may be proved wholly by circumstantial evidence," J.A. 3572, which can consist of "a defendant's relationship" with other conspirators and "the length of this association," as well as "the defendant's attitude and conduct, and the nature of the conspiracy," id. at 3573.

[34] The court further defined "training" as "instruction or teaching designed to impart a specific skill as opposed to general knowledge," J.A. 3574-75, and defined "personnel" as "one or more persons, which can include a defendant's own person," id. at 3575.

kidnapping, or maiming outside the United States; (3) the conspiracy was entered into within the United States; and (4) a conspirator committed an overt act in furtherance thereof within the jurisdiction of the United States.  See 18 U.S.C. § 956(a); United States v. Wharton, 320 F.3d 526, 538 (5th Cir. 2003).

After our de novo assessment of the evidentiary record, we, like the trial court, are satisfied that there was sufficient evidence to support each of Yaghi's conspiracy convictions. That evidence includes the following:

- In 2006, Yaghi sought out Boyd at an Islamic center in Durham to ask about Boyd's experiences in Afghanistan.  Yaghi and Boyd became friends, and Yaghi shared Boyd's beliefs in the necessity of violent jihad;

- In the fall of 2006, Yaghi travelled to Jordan, seeking to reach the battlefield.  Yaghi maintained contact with Boyd during the trip;

- Prior to and during his 2006 trip to Jordan, Yaghi discussed violent jihad with Boyd.  Before his departure, Yaghi asked Boyd how and where he could find the "best brothers," and mentioned "finding a wife."  Those terms were coded references for seeking others who shared Yaghi's beliefs in violent jihad and could help Yaghi make his way to the battlefield;

- After returning from his 2006 trip to Jordan, Yaghi brought Hassan to Boyd's home, thus recruiting another man to the terrorism conspiracies;

- Yaghi thereafter again sought Boyd's assistance in travelling to the Middle East, and Boyd purchased plane tickets for Yaghi and Hassan to fly to Israel in the summer of 2007;

79

- In 2007, as he prepared to travel to the Middle East with Hassan, Yaghi indicated a "readiness to join" Boyd in waging violent jihad;

- Yaghi flew to the Middle East with Hassan in 2007 with the hope of engaging in violent jihad. Yaghi and Hassan were denied entry into Israel and were unable to reach the battlefield.  The men thereafter returned to the United States;

- Yaghi and Hassan made unsuccessful efforts to contact Boyd while they were in the Middle East in 2007;

- Yaghi facilitated an introduction between Boyd and defendant Jude Kenan Mohammad in 2008. Coupled with Mohammad's subsequent departure for Pakistan and his "insistence" on finding "a way to the battlefield," this evidence shows that Yaghi recruited Mohammad into both conspiracies. See Sufficiency Opinion I at 17;[35]

- Yaghi posted messages on Facebook promoting his radical and violent jihadist beliefs.  Those postings continued after Yaghi's contacts with Boyd diminished, justifying the jury's finding that Yaghi and Hassan — independent of Boyd — continued to engage in initiatives in furtherance of the conspiracies; and

- In late 2007, Yaghi made a speech to an Islamic group in Raleigh, advocating that its members consider violent jihad.  From such statements, and from Yaghi's efforts to convert others to his beliefs in violent jihad, the jury was entitled to find Yaghi's continuing participation in the conspiracies.

---

[35] In referencing the opinions of the district court on the sufficiency issues, we do not accord any deference to the court's analysis; we quote those opinions only where we agree that they are supported by the record.

The trial evidence fully supports the jury's finding that Yaghi believed in violent jihad and acted on those beliefs in concert with coconspirators. Yaghi understood and acquiesced in the objectives of the Count One and Count Two conspiracies, i.e., providing material support and resources for, and committing acts of murder outside the United States. Moreover, numerous overt acts were undertaken in furtherance of each conspiracy, including Yaghi's 2007 trip to the Middle East and his efforts to recruit others into the conspiracies. The verdict against Yaghi must therefore be sustained.

2.

Sherifi challenges each of his five convictions, maintaining that, at best, the trial evidence reflected only his religious and political beliefs, and perhaps his approval of the misdeeds of others. In addition to proving that Sherifi's conduct fulfilled the elements of the Counts One and Two conspiracies, the government was required to satisfy the elements of the other charges lodged against Sherifi. With respect to Sherifi's fifth offense of conviction, the Count Eleven conspiracy, the government was obliged to show that Sherifi entered into a conspiracy to kill federal employees engaged in the performance of their official duties, and a conspirator committed an overt act in furtherance thereof. See 18 U.S.C. § 1117. As to Counts Four and Eight — the firearms

81

charges — the prosecution was required to "present evidence indicating that the possession of a firearm furthered, advanced, or helped forward a crime of violence." United States v. Khan, 461 F.3d 477, 489 (4th Cir. 2006) (internal quotation marks omitted). Count Four alleged that Sherifi possessed a firearm on June 10, 2009, in furtherance of the Count Two conspiracy, and Count Eight alleged that he possessed a firearm on July 7, 2009, also in furtherance of the Count Two conspiracy.

Substantial evidence supports each of Sherifi's five convictions, beginning with the following that relates to his involvement in the Count One and Count Two conspiracies:

- In 2008, Sherifi grew close to Boyd, visiting in Boyd's home and spending time with Boyd's family. In discussions with Boyd, Sherifi confirmed his adherence to the violent jihadist ideology he shared with Boyd, plus the need to act in accordance therewith;

- Sherifi openly advocated his disdain for the laws and government of the United States, believing Shari'ah to be the true law;

- In 2008, Sherifi travelled to Kosovo, advising associates in Raleigh that he was going there to be closer to the battlefield;

- Sherifi talked with Boyd and others in Raleigh about his efforts to join violent jihadist efforts abroad, as well as his attempts to radicalize and recruit Sergeant Weeks;

- While in Kosovo, Sherifi participated in firearms training with like-minded individuals. At one point, Sherifi was in contact with persons who

82

were considering Camp Bondsteel — where Weeks was stationed — as a target for jihad;

- Sherifi believed that jihad "was just murderous acts against innocent soldiers and civilians";

- After returning to the United States, Sherifi assisted Boyd in preparing a bunker under Boyd's home to conceal Boyd's weapons arsenal;

- Sherifi participated in Boyd's efforts to raise money to support violent jihadist causes, and gave Boyd $500 in cash to that end; and

- While back in the United States, Sherifi made efforts to raise funds to purchase "farmland in Kosovo from which to launch off to the battlefield" in Kosovo, Syria, and elsewhere. See Sufficiency Opinion I at 21.

The foregoing evidence readily satisfies the elements of the Count One and Count Two conspiracies as to Sherifi. Sherifi wilfully partook in those conspiracies, and sought to provide money and personnel to support violent jihadist causes, in this country and abroad. Even more so than Yaghi and Hassan, Sherifi advocated his extreme and violent beliefs to Boyd and other members of the conspiracy, demonstrating his intention to act on those beliefs. The evidentiary record shows that a multitude of overt acts were committed in furtherance of the conspiracies, including the weapons training sessions, the construction of Boyd's weapons bunker, travel abroad, and consistent efforts to join violent jihadist battlefields. The verdict against Sherifi on Counts One and Two must therefore be sustained.

The evidence supporting Sherifi's conviction on the Count Eleven conspiracy included the following:

- In June 2008, Sherifi expressed to Boyd his willingness to wage violent jihad in the United States if unable to do so abroad;

- While in Kosovo, Sherifi discussed the possibility of targeting the American military post at Camp Bondsteel for violent jihad;

- In 2009, Boyd shared his plans to attack the Marine Corps Base at Quantico with Sherifi, who readily agreed to participate;

- Sherifi told Boyd about his experiences delivering goods to Fort Bragg, explaining how a person could easily gain entry into an American military facility as a truck driver; and

- Boyd proposed kidnapping a Marine officer and took steps in connection with the Count Eleven plot, including touring Quantico and conducting research about the base.

As with the Count One and Count Two conspiracies, the evidence of Sherifi's agreement with Boyd to participate in an attack on Quantico is sufficient to support his Count Eleven conviction. Cf. In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 93, 113 (2d Cir. 2008) (deeming evidence sufficient to sustain § 1117 conviction). The evidence is more than adequate to support a rational fact-finder's determination that Sherifi knowingly joined Boyd in a plot to target Quantico for an attack, and that overt acts were committed in furtherance

84

thereof. Sherifi's conviction on the Count Eleven conspiracy must therefore also be sustained.

Turning to Sherifi's convictions on the firearms charges, those too must be upheld, given the prosecution's evidence that Sherifi participated in weapons training sessions in North Carolina on June 10 and July 7, 2009, where Boyd taught military tactics and weaponry skills in preparation for violent jihad. There was substantial evidence to support a finding that Sherifi, on both of those occasions, possessed and used at least one firearm for training purposes, in furtherance of the Count Two conspiracy. Sherifi's convictions on Counts Four and Eight are therefore also sustained.

3.

Hassan, who was convicted of the Count One conspiracy only, maintains that there was a dearth of evidence, testimonial or otherwise, showing that he entered into a conspiratorial agreement with anyone. Hassan emphasizes that he was not involved in any of the audio recordings introduced into evidence, and that the FBI informants neither interacted with Hassan nor heard Boyd mention him.

Reviewing the evidence de novo and acknowledging that the evidence against Hassan is not as overwhelming as that implicating the other appellants, there was nevertheless substantial evidence proving that Hassan was involved in the

85

Count One conspiracy.[36]   The evidentiary support for his conviction includes the following:

- Beginning in 2006 and continuing through mid-2007, Hassan maintained regular contact with Boyd, often meeting at the Blackstone Halal Market;

- In 2006 and 2007 Boyd was stockpiling weapons and surrounding himself with like-minded individuals called "good brothers."  Those brothers shared the view that the killing of non-Muslims was a prescribed obligation.  Yaghi and Hassan shared Boyd's beliefs in the necessity of violent jihad;

- Seeking a jihadist battlefield, Yaghi travelled to Jordan in the fall of 2006.  While there, Yaghi maintained contact with Hassan, all the while expressing the hope that Hassan would make it to the battlefield.  Hassan also "offered veiled encouragement to defendant Yaghi while he was on this expedition" overseas.  See Sufficiency Opinion I at 12;

- In early 2007, Yaghi and Hassan sought Boyd's assistance in obtaining plane tickets to travel to the Middle East;

- Before departing for the Middle East in 2007, Hassan and Yaghi sought Boyd's advice, including methods of overseas travel to avoid detection. Boyd had discussions with Hassan "about killing and maiming."  Id. at 13;

---

[36] That Hassan was acquitted of the Count Two conspiracy is not accorded any weight in our analysis.  Even if that verdict is inconsistent with the guilty verdict on Count One, a jury is permitted to return an inconsistent verdict if it sees fit to do so.  See United States v. Powell, 469 U.S. 57, 63 (1984).  The question before us relates solely to the Count One conspiracy and whether — viewed in the light most favorable to the prosecution — that charge was properly proven against Hassan.

- Hassan and Yaghi trained with weapons prior to their 2007 trip overseas as "part of their continued training" for violent jihad. Id. at 20.

- During a drive with Boyd in 2007, Hassan brandished a .22 caliber rifle, which Hassan and Yaghi said they had purchased for training and target practice;

- In 2007, exchanges between Yaghi and Boyd indicated that Boyd, who was experienced on the battlefield, validated the like-mindedness of Yaghi and Hassan. As the trial court related, a "readiness to join" Boyd "reasonably could be concluded" on Hassan's part. Id. at 12;

- Using plane tickets purchased through Boyd, Hassan travelled with Yaghi in 2007 to the Middle East, and sought to enter Israel and Palestine;

- Boyd advised his associates in Raleigh that he had asked Hassan and Yaghi to go overseas to engage in violent jihad;

- After arriving in the Middle East, Hassan and Yaghi sought on several occasions to contact Boyd;

- Following his return from the 2007 Middle East trip with Yaghi, Hassan's contacts with Boyd diminished substantially. Another set of initiatives was then undertaken by Yaghi and Hassan that, as the trial court explained, "subscribed to [tenets] of violent jihad espoused by Daniel Boyd." Id. at 19;

- Hassan's postings on Facebook and other social media confirmed his beliefs in violent jihad and demonstrated his desire to further the violent causes and ideology espoused by Boyd and others;

- The physical training video that Hassan posted on RossTraining.com showed his determination to train physically for violent jihad;

87

- Hassan showed Jamar Carter videos of car bombings and offered praise for the people fighting in such a manner. Hassan's view of jihad "deemed suicide bombings righteous." Id. at 19;

- Hassan's nefarious intentions were substantiated when, in January 2009, he "instructed his paramour to remove his postings on his Facebook page" as well as "postings on 'Muslim Gangsta For Life,'" which endorsed his radical ideology. Id. at 23;

- Hassan had ties to Anwar al-Awlaki and sought al-Awlaki's counsel in early 2009 on an important matter; and

- Hassan's connection to al-Awlaki, coupled with Kohlmann's explanation of al-Awlaki's far-reaching influence in the "development of home-grown terrorists," id. at 23-24, show that Hassan "endorsed, collected and distributed preachings [that] repeatedly called for Jihad against the United States." Id. at 25.

In these circumstances, there was substantial evidence proving that Hassan joined and agreed to participate in the Count One conspiracy and that, in fact, he participated in multiple overt acts in furtherance thereof. As a result, the trial evidence supports Hassan's conviction on the Count One conspiracy, and his contention to the contrary is rejected.

D.

Before turning to the various sentencing issues presented here, I will exercise a point of personal privilege with respect to the investigation and prosecution of this important case. The trial record reveals that the appellants strove to conceal their nefarious activities from outsiders uncommitted to violent

88

revolution around the world, habitually congregating in secret to discuss their plans and to reinforce, in the manner of zealots, each other's resolve. That the conspiracy was infiltrated and almost all of its cohorts arrested before they could bring their criminal schemes to fruition should in no way inspire the conclusion that the appellants have been prosecuted for merely harboring ideas, convicted of nothing more than an Orwellian "thoughtcrime."

To the contrary, the evidence reveals that the appellants are dangerous men who freely and frequently exercised their constitutional right to speak, to be sure, but who also demonstrated a steadfast propensity towards action. Before the appellants' actions could escalate to visit grievous harm upon the government, other countries, or innocent civilians, the FBI and its associates timely intervened. The laudable efforts of law enforcement and the prosecutors have ensured that, on this occasion at least, we will not be left to second-guess how a terrorist attack could have been prevented.

Absent the long reach of the federal conspiracy statutes, the government would have been forced to pursue the appellants with one hand tied behind its back. No such constraint served to hinder the investigation and prosecution of the appellants, however, and we are reminded once more that the charge of conspiring to commit a federal crime has yet to relinquish its

89

well-earned reputation as — in the words of Learned Hand — the "darling of the modern prosecutor's nursery." <u>Harrison v. United States</u>, 7 F.2d 259, 263 (2d Cir. 1925). Judge Hand's profound observation is as true now as it was nearly ninety years ago.

Over the course of the modern legal era, the pursuit of federal conspiracy convictions has doubtlessly been a boon to United States Attorneys. And it is eminently fair and reasonable to say that the implementing statutes — particularly those that dispense with the commission of an overt act as an element of the crime — sometimes paint with a broad brush. <u>Cf. Krulewitch v. United States</u>, 336 U.S. 440, 450 (1949) (Jackson, J., concurring) ("[T]he conspiracy doctrine will incriminate persons on the fringe of offending who would not be guilty of aiding and abetting or of becoming an accessory, for those charges only lie when an act which is a crime has actually been committed."). But our system of government and law reposes great and solemn trust in federal prosecutors to exercise their discretion as instruments of right and justice, and it is therefore "for prosecutors rather than courts to determine when to use a scatter gun to bring down the defendant." <u>Id.</u> at 452.

Indeed, the societal utility of conspiracy prosecutions as a weapon against evildoers is manifest not merely in the substantive elements of the offense, but also in the procedural

90

mechanisms enabling its ready proof, even against those only marginally involved. See, e.g., Fed. R. Evid. 801(d)(1)(E) ("A statement . . . is not hearsay [that] was made by the party's coconspirator during and in furtherance of the conspiracy."). A person intending to only be "in for a penny," with the slightest connection to an established conspiracy, actually risks being "in for a pound." It is somewhat unique in this case that Boyd, the prosecution's star witness, was also the ringleader of the conspiracies. This was thus a top-down prosecution of conspiracy offenses, with Boyd and his sons — having departed the dock and ascended the witness stand — implicating others more peripherally involved. That fact matters not, however, in the context of the criminal culpability of these appellants. Put succinctly, the specter of federal criminal liability cannot help but serve as an intense deterrent to those who otherwise would be bent on violence.

We have faithfully applied the well-settled principles of conspiracy law in this case, both in letter and in spirit. In so doing, we have come to the ineluctable conclusion that the government legitimately and appropriately charged the appellants, and the convictions it thereby obtained are without infirmity.

91

IV.

Finally, having rejected all challenges to the appellants' convictions, we turn to their contentions concerning the sentences imposed by the district court. The court announced those sentences during a January 13, 2012 hearing, and thereafter filed a sentencing opinion as to each appellant. See United States v. Boyd, No. 5:09-cr-00216 (E.D.N.C. Jan. 18, 2012), ECF No. 1653 (the "Sherifi Sentencing Opinion"); United States v. Boyd, No. 5:09-cr-00216 (E.D.N.C. Jan. 18, 2012), ECF No. 1654 (the "Hassan Sentencing Opinion"); United States v. Boyd, No. 5:09-cr-00216 (E.D.N.C. Jan. 18, 2012), ECF No. 1655 (the "Yaghi Sentencing Opinion").

A.

Hassan, who was convicted of solely the Count One conspiracy, had a base offense level of 33 under the 2011 edition of the Sentencing Guidelines. Because the district court deemed Hassan to be subject to the enhancement for a "federal crime of terrorism" under Guidelines section 3A1.4 (the "terrorism enhancement"), his offense level increased by twelve levels to 45. The court then applied two additional enhancements to Hassan — a three-level adjustment for having selected victims on the basis of their religion, ethnicity, or national origin, see id. § 3A1.1(a) (the "hate crime enhancement"), and a two-level adjustment for attempting to

92

obstruct justice by asking his paramour to delete Facebook and other internet postings, see id. § 3C1.1 — resulting in a total offense level of 50. The court declined to grant Hassan's request for a four-level "minimal participant" reduction under Guidelines section 3B1.2. With the offense level of 50 and the terrorism enhancement's automatic criminal history category of VI, Hassan's advisory Guidelines range was life in prison. Nevertheless, § 2339A(a) of Title 18 provides for a maximum penalty of only fifteen years. Thus, Hassan's advisory range fell to 180 months (fifteen years), which was the very sentence imposed.

After applying both the terrorism enhancement and the hate crime enhancement to Yaghi, the sentencing court determined that his adjusted offense level was 48 and his criminal history category was VI. The resulting advisory Guidelines ranges were 180 months for the Count One conspiracy and life imprisonment for the Count Two conspiracy. The court sentenced Yaghi to 180 months on Count One and to a concurrent sentence of 380 months on Count Two, for an aggregate sentence of 380 months.

Sherifi, who was convicted of the Count One, Two, and Eleven conspiracies, plus the Count Four and Eight firearm offenses, received the terrorism enhancement, the hate crime enhancement, and a three-level enhancement for targeting government officers or employees as victims, see USSG

93

§ 3A1.2(a).  The court calculated Sherifi's advisory Guidelines ranges as follows:  180 months (the statutory maximum) on Count One; life in prison on Count Two; 60 months (consecutive to any other sentence) on Count Four; 300 months (consecutive to any other sentence) on Count Eight; and life in prison on Count Eleven.  Rather than a life sentence, the court imposed an aggregate sentence of 540 months.[37]

On appeal, each of the appellants challenges the sentencing court's application of the terrorism enhancement.  In addition, Hassan contends that the court erred in refusing to grant his request for a minimal participant reduction.  Meanwhile, Yaghi and Sherifi challenge the substantive reasonableness of their sentences.

B.

1.

The primary sentencing issue pursued by the appellants relates to the district court's application of the terrorism enhancement.  More specifically, each appellant contends that the court clearly erred in finding that he possessed the specific intent necessary for application of that enhancement.  In assessing whether a court committed procedural error by

---

[37] Sherifi was sentenced to concurrent 180-month terms on Counts One, Two, and Eleven; a consecutive 60-month term on Count Four; and a consecutive 300-month term on Count Eight.

94

improperly calculating the advisory Guidelines range, we review its "legal conclusions de novo and its factual findings for clear error." United States v. Lawing, 703 F.3d 229, 241 (4th Cir. 2012).

The terrorism enhancement has two components. The first bears upon a defendant's offense level: If the offense of conviction "is a felony that involved, or was intended to promote, a federal crime of terrorism," the applicable offense level increases by twelve levels or to a minimum of level 32. See USSG § 3A1.4(a). The second component of the terrorism enhancement results in a criminal history category of VI — the maximum under the Guidelines. Id. § 3A1.4(b). For purposes of the enhancement, the phrase "federal crime of terrorism" has the meaning specified in 18 U.S.C. § 2332b(g)(5). Id. § 3A1.4 cmt. n.1. Thus, a "federal crime of terrorism" is an offense that

> (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and

> (B) is a violation of [an enumerated statute].

18 U.S.C. § 2332b(g)(5). In this case, the statutes of conviction for Count One (18 U.S.C. § 2339A) and Count Two (18 U.S.C. § 956(a)) are among those enumerated in § 2332b(g)(5)(B) and, as a result, satisfy the second prong of the definition of a "federal crime of terrorism." Thus, only the first prong of the

definition — § 2332b(g)(5)(A)'s specific intent requirement — is implicated here.

As we explained in our series of _Chandia_ decisions, a court deciding whether to impose the terrorism enhancement must "resolve any factual disputes that it deems relevant to application of the enhancement," and then, if it finds the requisite intent, "should identify the evidence in the record that supports its determination." _United States v. Chandia_, 514 F.3d 365, 376 (4th Cir. 2008) ("_Chandia I_"); _see also_ _United States v. Chandia_, 395 F. App'x. 53, 56 (4th Cir. 2010) ("_Chandia II_") (unpublished); _United States v. Chandia_, 675 F.3d 329, 331 (4th Cir. 2012) ("_Chandia III_"). In his first appeal, we affirmed Chandia's convictions but vacated his sentence, remanding for fact finding as to whether he possessed the intent required for application of the terrorism enhancement. _See Chandia I_, 514 F.3d at 376. We also vacated and remanded in Chandia's second appeal, explaining that the sentencing court had "again concluded that Chandia deserved the terrorism enhancement . . . without resolving relevant factual disputes . . . and without explaining how the facts it did find related to Chandia's motive." _Chandia II_, 395 F. App'x. at 54. The court complied with our mandate in the subsequent resentencing proceedings, finally prompting our affirmance in Chandia's third appeal. _See Chandia III_, 675 F.3d at 331-32. Here, abiding by

96

our directives in Chandia I and Chandia II, the district court resolved the relevant factual disputes and identified, as to each appellant, the evidence that supported an individualized application of the terrorism enhancement. See Hassan Sentencing Opinion 8 n.5; Yaghi Sentencing Opinion 4 n.5; Sherifi Sentencing Opinion 3 n.5.[38]

Beginning with the sentencing court's determination that Hassan possessed the intent necessary for application of the terrorism enhancement, the issue is whether the court erred in ruling that Hassan's actions were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." See 18 U.S.C. § 2332b(g)(5)(A). The court found that Hassan had built relationships with Yaghi and Boyd "based on their shared view of Islam, including the goal of waging violent jihad in various parts of the world." Hassan Sentencing Opinion 8 n.5. The court explained that Hassan "became part of a loose group of conspirators whose goal was to kill non-Muslims, specifically

---

[38] Because the appellants' sentencing proceedings were conducted prior to the issuance of our Chandia III decision, the district court did not have the benefit of our ruling that "a preponderance of the evidence is the appropriate standard of proof for establishing the requisite intent for the terrorism enhancement." See 675 F.3d at 339. Being appropriately cautious, the court applied the more stringent "clear and convincing evidence" standard.

those they believed were living unjustly in Muslim lands." Id.
To further support its finding on specific intent, the court
turned to the record, identifying, in particular, the following:
that Hassan shared Boyd's view that jihad imposed an obligation
on Muslims of "physically helping with the resistance or
fighting against . . . the NATO forces in Afghanistan or Iraq,
or anyplace, really," J.A. 1549; Hassan's 2007 trip to the
Middle East with Yaghi, for the purpose of finding "those who
could assist him and defendant Yaghi to join the mujahideen,"
Hassan Sentencing Opinion 8 n.5; that Hassan and Yaghi, in
advance of their 2007 trip to the Middle East, "brandished a
firearm to Daniel Boyd in veiled reference to their shared
goals," id.; Hassan's role in advancing "jihadist propaganda
including the teachings of Anwar al-Awlaki," as well as Hassan's
efforts to create and disseminate "his own rhetoric" on the
internet, id.; and that Hassan was "trying to offer himself as a
fighter" and supporting terrorism and extremism by "attempting
to be a part of it on the battlefield, and supporting those who
would," J.A. 3794.   Premised on that evidence, the court
properly found that Hassan possessed "the motive and intent to
influence or affect the conduct of the government by
intimidation or coercion or retaliate against government
conduct." See id.

In its sentencing of Yaghi, the district court also conducted a detailed analysis, finding by clear and convincing evidence that he possessed the specific intent necessary for the terrorism enhancement. The court observed that Yaghi had initiated a corrupt relationship with Boyd when he "sought out" Boyd at an Islamic center in Durham "to learn more about . . . Boyd's time in Afghanistan and presumably to learn more about traveling abroad to commit violent jihad." Yaghi Sentencing Opinion 4 n.5. As further proof that Yaghi's conduct was calculated to influence or affect the conduct of government by intimidation or coercion, the court relied on his travels in 2006 and 2007 to the Middle East, each time seeking, in the court's words, "to engage in violent jihad." Id. The court determined that Yaghi's communications to Boyd, as well as his postings on Facebook, "evidence[d] his intent to wage violent jihad and acceptance of radical Islam." Id. Moreover, Yaghi's travels in the Middle East, his relationships with Boyd and Hassan, and his advocacy of violent jihad on the internet "through raps and other postings," convincingly demonstrated his intent to participate in conduct calculated to influence or affect government. Id. During Yaghi's sentencing hearing, the court observed that his conduct had gone "beyond words to actions," and that, despite Yaghi's "very limited resources, [he still went] back over and he trie[d] to go to Israel." J.A.

3901.   In these circumstances, application of the terrorism enhancement to Yaghi was supported by a preponderance of the evidence.

As with Hassan and Yaghi, the district court made detailed factual findings with respect to the application of the terrorism enhancement to Sherifi.   In assessing Sherifi's motives, the court found particular importance in his "return to the United States [from Kosovo] in 2009 with the intent to solicit funds and personnel" to support the mujahideen.   See J.A. 3853.   The court explained that Sherifi hoped "that he would be able to secure farmland from which to launch various challenges against military occupation or intervention."   Id. Like Hassan and Yaghi, Sherifi had developed a relationship with Boyd on the basis of their shared "goal of waging violent jihad."   Sherifi Sentencing Opinion 3 n.5.   Sherifi also developed relationships with coconspirator Subasic and the notorious Serbian terrorist Asllani.   The court credited each of those relationships, as well as Sherifi's participation in the firearms training conducted in Caswell County, his receipt of $15,000 to support the mujahideen, and his "efforts to convert [Sergeant] Weeks," as evidence of Sherifi's specific intent to intimidate, coerce, or retaliate against government.   See id. Those findings, which are not clearly erroneous, support the court's application of the terrorism enhancement to Sherifi.

100

2.

The only other sentencing challenge lodged by Hassan, who insists that he was the least culpable of the defendants, relates to the district court's refusal to award him a four-level minimal participant reduction under Guidelines section 3B1.2(a). We have evaluated Hassan's contention of error on that point, and we are satisfied that the court did not clearly err in denying Hassan's request. See United States v. Powell, 680 F.3d 350, 358 (4th Cir. 2012). In a conspiracy prosecution, a minimal participant reduction is not automatically awarded to the least culpable conspirator. To be entitled to the reduction, a defendant must show by a preponderance of the evidence that his role in the offense of conviction "makes him substantially less culpable than the average participant." See id. at 358-59 (internal quotation marks omitted). Although Hassan may have been less active than many of his coconspirators, he has failed to establish that he was a minimal participant. Thus, the court's ruling to that effect was not clearly erroneous, and is not to be disturbed.

3.

Turning to Yaghi and Sherifi's contentions that their sentences were substantively unreasonable, we review for abuse of discretion a challenge to the reasonableness of a sentence. See United States v. Susi, 674 F.3d 278, 282 (4th Cir. 2012).

101

If, as here, there is "no significant procedural error, then we consider the substantive reasonableness of the sentence imposed, taking into account the totality of the circumstances, including the extent of any variance from the Guidelines range." Id. (internal quotation marks omitted). As a general rule, "[w]e apply a presumption of reasonableness to a sentence within or below a properly calculated guidelines range." United States v. Yooho Weon, 722 F.3d 583, 590 (4th Cir. 2013).

Yaghi maintains that his aggregate sentence of 380 months is unreasonably harsh, and particularly so in light of his difficult childhood and his peaceful nature. Before sentencing Yaghi, the court considered the contents of his Presentence Report, resolved his objections thereto, and properly calculated his advisory Guidelines range. The court then carefully evaluated each of the 18 U.S.C. § 3553(a) factors. In so doing, the court weighed the nature and circumstances of Yaghi's offenses of conviction, the need for the sentence imposed, and his history and characteristics. The court emphasized the seriousness of Yaghi's conspiracy convictions and his "escalating contact with the state criminal justice system," explaining that such conduct showed his "disregard for liberty and property rights of others," and his readiness to "resort to force." See Yaghi Sentencing Opinion 8. In these circumstances, the court did not act unreasonably, nor did it

abuse its discretion. Yaghi's challenge to the substantive reasonableness of his aggregate sentence of 380 months is therefore rejected.

Finally, like Yaghi, Sherifi maintains that his aggregate sentence of 540 months is substantively unreasonable. Notably, Sherifi does not challenge the reasonableness of the consecutive sentence of 360 months imposed on his two firearms offenses —— Counts Four (60 months) and Eight (300 months). Rather, he contends that, because 360 months for those two convictions is adequate punishment and serves as a sufficient deterrent, the court should not have imposed any additional consecutive sentences on his conspiracy convictions. Prior to sentencing Sherifi, the court properly calculated the advisory Guidelines ranges for each of his offenses of conviction. Then, after assessing Sherifi's background and his role in the offenses, the court imposed sentences on the conspiracy offenses that were substantially below those authorized by statute and recommended by the Guidelines. In these circumstances, the court did not abuse its discretion in its sentencing of Sherifi, and we are unable to disturb its sentencing decisions on the basis of substantive unreasonableness.

V.

Pursuant to the foregoing, we reject the various contentions of error presented by the appellants and affirm the judgments of the district court.

AFFIRMED

104