UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

-----------------------------------------------X
Ziyad Yaghi,
       *Petitioner,*                                            Case No: 5:09-cr-00216-FL

       v.

United States of America,
       *Respondent.*
-----------------------------------------------X

# EXPERT REPORT OF ARUN KUNDNANI

    I.     STATEMENT OF EXPERT QUALIFICATIONS

1. I have a Ph. D. in Applied Social Science from the London Metropolitan University, an M.A. in Philosophy and a B.A. in Philosophy, both from the University of Cambridge.

2. Presently, I am an adjunct Professor at New York University, Department of Media, Culture, and Communication, Steinhardt School of Culture, Education, and Human Development. I have taught courses as an adjunct Professor at Rutgers State University of New Jersey, John Jay College of Criminal Justice and Queens College. The course topics included: *Terrorism and International Relations*; *Middle East Media*; *Politics and Media; Media Criticism; and Religion & Media.*

3. I was a visiting Research Fellow at the Centre for Terrorism and Counterterrorism at Leiden University in the Netherlands. There I conducted researched and taught courses on *Terrorism and World Politics* and *Security and Hate Crimes*. The research included interviews of high-level national security officials, such as senior officers of the Algemene Inlichtingen en Veiligheidsdienst (AIVD), the Dutch Intelligence and Security Service.

4. During a research fellowship with the Open Society Foundations, I wrote on the issues of extremism and radicalization.

5. I have been consulted for my expertise on counter-terrorism policy by the United States State Department and the National Security Council.

6. I have been invited to participate on the CNN television news channel as an on-air analyst.

```
Exhibit 28
```

7. I testified before the United Kingdom Parliament regarding the Preventing Violent Extremism program.

8. I have written over 15 articles in peer-reviewed journals, including: *Dialectical Anthropology*, *European Journal of Cultural Studies*, *Race & Class*, and *Security and Human Rights*. Some of the titles include: *Imagining National Security: the CIA, Hollywood, and the War on Terror*; *Blind Spot? Security Narratives and Far-Right Violence*; *Radicalisation: the Journey of a Concept*; and *Wired for War: Military Technology and the Politics of Fear*.

9. I published two books: *The Muslims are Coming! Islamophobia, Extremism, and the Domestic War on Terror* (New York: Verso, 2014) and *The End of Tolerance: Racism in 21st Century Britain* (London: Pluto Press, 2007). Research for my most recent book was carried out in a number of locations in the US (Dallas, Dearborn, Detroit, Houston, Minneapolis-St. Paul, New York City, and Washington, DC) and the UK (Birmingham, Bolton, Bradford, Manchester, London, and Luton). In all, 160 interviews were carried out with FBI agents working on counter-terrorism, other law enforcement officials, policy-makers, government advisors, and Muslim activists, campaigners, and religious leaders, and a number of individuals labeled as extremists by the media or prosecutors.

10. My two books have been reviewed favorably in academic journals, including *Critical Criminology*, *Journal of Ethnic and Migration Studies*, *Ethnic and Racial Studies*, and *Translocations: Migration and Social Change*. Additionally, the books have been praised by leading scholars in the field, such as John Mueller (Professor of Political Science at Ohio State University), David Cole (Professor of Law at Georgetown University), Jeanne Theoharis (Distinguished Professor of Political Science, Brooklyn College), John Rex (Emeritus Professor of Ethnic Relations, Warwick University), Mark S. Hamm (Professor of Criminology at Indiana State University), and Aziz Huq (Professor of Law at University of Chicago).

II. NATURE AND BASIS OF EXPERT OPINION

11. I have been retained by counsel for the Petitioner, Ziyad Yaghi, to provide an expert opinion from the perspective of a social scientist on the testimony of Evan Kohlmann during the trial of Ziyad Yaghi.

12. I have reviewed the following material: Kohlmann Expert Report, Daubert Hearing, and Kohlmann Trial Testimony in United States v. Hassan, No. 5:09-CR-216-FL-7, 2012 U.S. Dist. LEXIS 5876 (E.D.N.C. Jan. 18, 2012); Expert Report submitted by Evan Kohlmann in United States v. Mehanna, No. 09-10017-GAO, 2011 U.S. Dist. LEXIS 93174 (D. Mass. Aug. 19, 2011); Kohlmann Expert Report and Daubert Hearing United States v.

Osmakac, Case No.8:12-CR-45-T-35AEP; Daubert Hearing and Trial Testimony in United States v. Mohamud, No. 3:10-CR-00475-KI, 2012 U.S. Dist. LEXIS 151430 (D. Or. Oct. 22, 2012); and article by Kohlmann titled, Homegrown Terrorists – Theory and Cases in the War on Terror's Newest Front.

- A. **Lack of scholarly qualifications and experience**
    13. Mr. Kohlmann has no academic training or standing beyond an ordinary undergraduate degree, a certificate in Islamic Studies, and a Juris Doctorate from the University of Pennsylvania Law School in Philadelphia, Pennsylvania.[1] His background is not in academia or other forms of scholarly work, but in organizations like the Investigative Project, which have been widely criticized as producing propaganda rather than scholarly work.[2]

- B. **Factual error**
    14. There is a major factual error in Mr. Kohlmann's trial testimony. When questioned by the prosecution as to the definition of Hijrah, Kohlmann answers, "In the history of Islam, there is a very famous part of the history of Islam that involves the prophet of Islam, the prophet Mohammed, traveling from the Arabian Peninsula to the East Coast of Africa, fleeing his adversaries."[3]

    15. Mohammed's journey was to Medina in the Arabian Peninsula, not Africa. Mohammed's journey to Medina is a pivotal moment in Islamic history. Indeed, it is the date which Islamic calendars define as zero. As such, to make such an error calls into question his entire credibility as an expert witness. An equivalent error in relation to Christianity would be to think that Jesus was not crucified, but stoned to death.

- C. **Absence of appropriate methodology**
    16. Mr. Kohlmann's primary contribution is the administration of a large database of jihadist material. However, there is no reason to believe that he has used the data collected to develop a scholarly analysis of jihadist terrorism. In his media work and government work, he is primarily paid to supply data (such as video files to be broadcast on news programs), rather than scholarly analysis of that data.

---

[1] Ziyad Yaghi Trial Tr. (Sept. 27, 2011) at 181.

[2] *Fear Inc: The Roots of Islamophobia Network in the United States*, Center for American Progress, August 2011, available at: https://www.americanprogress.org/wp-content/uploads/issues/2011/08/pdf/islamophobia.pdf; Steve Emerson Profile available at: http://rightweb.irc-online.org/profile/Emerson_Steven; Bob Smietana, *Anti- Muslim crusaders make millions spreading fear, The Tennessean*, October 24, 2010, available at: http://archive.tennessean.com/article/20101024/NEWS01/10240374/Anti-Muslim-crusaders-make-millions-spreading-fear; Carmen Fishwick, *Fox News man is 'idiot' for Birmingham Muslim comments – David Cameron*, The Guardian, January 12, 2015 available at: http://www.theguardian.com/media/2015/jan/12/fox-news-expert-ridiculed-over-birmingham-is-totally-muslim-city-claims

[3] Ziyad Yaghi Trial Tr. (Sept. 27, 2011) at 202.

17. Beyond the collection of data, none of the normal requirements of scholarly investigation are present in his work. There is no stated methodology for how he has derived his five/six/seven factors, which he claims are associated with terrorism-related crime. Nor are the factors expressed in a consistent fashion on each occasion they appear.[4]

18. There is no effective conceptual or empirical analysis of the process he calls radicalization. The terms he uses are vague and lack definition in his work. For example, he uses the term "extremist" 27 times in the Expert Report he submitted for Ziyad Yaghi's case, but never defines it. An "extremist" is different from a "terrorist;" the latter is defined in US criminal law, but the former is not. If one wishes to use phrases such as "the classic profile of contemporary violent extremists"[5], one needs to offer an explicit definition. He also uses the terms "radicalization," "jihadi," "homegrown," and "radical Islam" without providing adequate definitions. The lack of definition indicates a low commitment to scholarly rigor and accuracy.

19. There is no engagement with leading scholars in the field. His description of the five/six/seven factors he believes are associated with homegrown jihadist terrorism has never, to my knowledge, been subjected to formal peer review or tested by the wider academic community through either publication by a university press, publication in a journal, or presentation at an academic conference.

20. Mr. Kohlmann appears to have no interest in using his database for serious scholarship. A genuine scholar would want to use the database to ask quantitative questions, not just make vague assertions. For example, what proportion of terrorists had downloaded a

---

[4] In the Ziyad Yaghi case, Kohlmann's expert report, submitted in April 2011, contains 5 factors: "1)The Formulation of Self-Selecting Schemes Aimed at Traveling Abroad to Join Foreign Terrorist Organizations, and/or Achieving Imminent Acts of Physical Violence; 2)The Acquisition of Automatic Weapons and Sniper Rifles (Including Requisite Accessories Such As Sniper Scopes), Paramilitary Training Manuals, and the Establishment of Makeshift Training Camps; 3)The Adoption of a Hardline Sectarian Religious Perspective, Often Identified With the ―Salafi-Jihadi or ―Takfiri School (Evidenced by the Possession And/Or Distribution of Extremist Ideological Materials); 4) The Use of Coded Language and Attempts at Logistical Subterfuge (i.e. Attempts to Secret or Hide One's Activities); and, 5) The Deliberative Collection and Redistribution of Large Quantities of Terrorist Propaganda."

In the Tarek Mehanna case, Kohlmann's expert report, submitted in September 2011, contains 6 factors. He does **not** include factor #2 from the Ziyad Yaghi case, "The Acquisition of Automatic Weapons and Sniper Rifles" and adds the following two factors: "(1) Pre-Existing Connections to Known Extremist Groups and Convicted Terrorists and (2) The Browsing of Internet Websites Run by or on Behalf of International Terrorist Organizations."

Kohlmann's expert report in the Mohammed Osman Mohamud case has been sealed. During the 2012 trial, Kohlmann testified as to six factors, which were the same as those submitted in the Tarek Mehanna Expert Report. Again they did not include "The Acquisition of Automatic Weapons and Sniper Rifles".

In the Sami Osmakac case, Kohlmann's expert report, submitted February 2014, included only five factors. He does not include these two factors: (1) "Pre-Existing Connections to Known Extremist Groups and Convicted Terrorists" and (2) "The Acquisition of Automatic Weapons and Sniper Rifles".

[5] Kohlmann Expert Report Submitted in the Ziyad Yaghi Case, page 3.

given ideological text? One would then want to have another database of Muslims who were not involved in terrorism (a "control group") and see what proportion of them had downloaded the same text. The discrepancy between the two numbers would then enable a numerical assessment of how much of an indicator of terrorism possession of the downloaded text would be. You would then be able to make a statement like, "Someone who has document X is Y times more likely to become a terrorist than someone who does not have document X." Mr. Kohlmann never makes statements with that kind of precision. The reason is that, when forced to put numerical values on his claims, his data would not justify the exaggerated claims he wishes to make.

**D. Conceptual errors**

21. Mr. Kohlmann's factors use terms such as "hardline sectarian ideology," the "global jihadist movement," and a "fringe jihadi philosophy" without adequately defining these terms. Indeed he seems to use these terms interchangeably. For example, on page 19 of his Expert Report submitted in the case of Ziyad Yaghi, he talks about the defendants having adopted a "hardline sectarian ideology." On the following page, he describes their having a "fringe jihadi philosophy." It is apparent that, in his mind, these are one and the same but what defines them is never explained. In his testimony, he uses the phrase "Global Jihadist Movement" and explains this refers to a group of people who share a particular ideology.[6] But the word "movement" does not mean people who share an ideology; it means some level of organization that can carry out actions in support of an ideology. By failing to distinguish adequately between the adoption of an ideology and participation in a movement (which might involve joining a terrorist organization or a criminal conspiracy), Mr. Kohlmann blurs a distinction that is pivotal to determining guilt in cases such as this that sit on the line between free speech and criminal action.

22. Mr. Kohlmann writes as if participation in the online jihadist subculture or belief in a jihadist ideology is already to be involved in a criminal conspiracy. The reality is that thousands of people participate in this subculture through its online networks without ever committing a terrorism-related crime. Part of participation in this subculture is precisely to engage in a discussion of the meanings of terms like jihad and the complex debates about the particular contexts in which different kinds of violence may be considered legitimate. Mr. Kohlmann's account of this subculture lacks any apparent awareness of this complexity and his descriptions are vague and imprecise. Without an appreciation of this complexity, his interpretation of the intent behind the defendants' actions becomes questionable.

23. Mr. Kohlmann fails to properly distinguish between participation in the online jihadist subculture and belief in any particular ideology. He assumes without evidence that possession of an electronic document (or even a browser bookmark) amounts to belief.

---

[6] Ziyad Yaghi Trial Tr. (Sept. 27, 2011) at 196.

24. Mr. Kohlmann's account of particular jihadist groups and individuals is misleading. Examples:

– He describes Abdullah Azzam as someone who "very much believes in the concept of jihad"[7] without specifying which kind of jihad and in which context – it was exactly on these points that Azzam disagreed with bin Laden. Azzam favored launching armed insurgencies ("jihads") in specific national contexts, such as Kashmir, Palestine, and Chechnya, where he believed Muslims were engaged in struggles for self-determination against foreign occupiers. Bin Laden, on the other hand, favored a global insurgency against regimes in Muslim-majority countries as well as against the US and its allies.[8] There is no mention that Azzam worked with the CIA in the 1980s and that the books he wrote were to support an insurgency in Afghanistan that the US government was backing and funding.[9]

- He presents Anwar al-Awlaki as someone who was always a terrorist criminal and therefore ignores the transformation of his views in the mid-2000s from opponent of violence against the US to supporter of it. There is no mention that, prior to this transformation, Awlaki was hugely popular among young English-speaking Muslims because of his mainstream religious lectures.[10] Hence there is nothing inherently suspicious in possessing large numbers of his recordings. There is no evidence that Awlaki assisted in the recruitment or radicalization of Nidal Hasan, the perpetrator of the Fort Hood shootings, as was noted by the *William H. Webster Commission on the Federal Bureau of Investigation, Counterterrorism Intelligence, and the Events at Fort Hood, Texas, on November 5, 2009*.[11]

---

[7] Ziyad Yaghi Trial Tr. (Sept. 27, 2011) at 207.

[8] Mahmood Mamdani, *Good Muslim, Bad Muslim: America, the cold war and the roots of terror* (New York: Three Leaves Press, 2004).

[9] Jason Burke, *Frankenstein the CIA created*, The Guardian, January 17, 1999, available at: http://www.theguardian.com/world/1999/jan/17/yemen.islam; Chris Suellentrop, *Abdullah Azzam: The Godfather of Jihad*, Slate, April 16, 2002, available at: http://www.slate.com/articles/news_and_politics/assessment/2002/04/abdullah_azzam.html (Azzam visited the U.S. countless times during the 1980s advocating support of the Mujahideen in Afghanistan); Suzanne Goldenberg, *America's No 1 target: Osama bin Laden*, The Guardian, August 20, 1998, available at: http://www.theguardian.com/world/1998/aug/21/alqaida.terrorism

[10] *William H. Webster Commission on the Federal Bureau of Investigation, Counterterrorism Intelligence, and the Events at Fort Hood, Texas, on November 5, 2009*, page 37.

[11] *William H. Webster Commission on the Federal Bureau of Investigation, Counterterrorism Intelligence, and the Events at Fort Hood, Texas, on November 5, 2009*, pages 62–63.

- The account of the Islamic Thinkers Society (ITS) and al-Muhajiroun[12] organizations is misleading. ITS is a group that advocates jihadist ideology, but is not known to have organized any acts of terrorism. The claim that ITS "has regularly engaged in activities that are explicitly designed (and are quite likely) to incite violence"[13] is partial and lacks context. Al-Muhajiroun is proscribed as a terrorist organization in the United Kingdom under legislation that allows such proscription for the expression of jihadist ideology.[14] It publicly expresses verbal support for terrorism, but is not known to have organized any acts of terrorism.

_____   _____Jan 8, 2016_____
Arun Kundnani                                Date

---

[12] During trial when questioned by the prosecution about his research regarding homegrown terrorism, Mr. Kohlmann brings up the Al-Muhajiroun organization in the United Kingdom. "In the United Kingdom, I spent approximately two weeks with the Al-Muhajiroun extremist movement…they allowed me to sit and watch and come to their events and speak to their leaders and speak to their recruits, and others. So, yes, I've observed this [homegrown terrorism] directly." Ziyad Yaghi Trial Tr. (Sept. 27, 2011) at 228.

[13] Kohlmann Expert Report submitted in Ziyad Yaghi case, page 37.

[14] The list of terror groups and organizations proscribed in the UK is available at: https://www.gov.uk/government/publications/proscribed-terror-groups-or-organisations--2; The leading civil liberties organization in the UK, Liberty, notes that the Terrorism Act 2006, upon which these proscriptions are based, "criminalises 'encouragement of terrorism' which includes making statements that glorify terrorist acts, punishable by up to seven years imprisonment. It is an offence even if the person or group making the statement doesn't intend to encourage terrorism. As the definition of terrorism is so wide this could criminalise people speaking out against repressive regimes anywhere in the world." See: https://www.liberty-human-rights.org.uk/human-rights/free-speech-and-protest/speech-offences