UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

-------------------------------------------------X
Ziyad Yaghi,
                *Petitioner*,                              Case No: 5:09-cr-00216-FL

     v.

United States of America,
                *Respondent*.
-------------------------------------------------X

## EXPERT REPORT OF LISA STAMPNITZKY

**I.**    **Expert Qualifications**

1. I received my Ph.D. in Sociology from the University of California, Berkeley, where I focused on cultural responses to and creation of "terrorism." I am currently a Lecturer (UK equivalent to Assistant Professor) in Politics at the University of Sheffield, and have also held appointments as Lecturer at Harvard and visiting research fellowships at Harvard, the University of Oxford, and the Ohio State University.

2. During my Ph.D. work at Berkeley I taught undergraduate courses on the Sociology of Knowledge and Expertise. While teaching at Harvard University I taught undergraduate courses on Culture and Politics in American Society, Contemporary Social and Political Theory, Classical Social and Political Theory, and a course focusing on the progression from September 11th to the "War on Terror."

3. During my time as a scholar I have published a number of books and articles on the subject of "terrorism," including *Disciplining Terror: How Experts Invented "Terrorism,"* published by the Cambridge University Press, and winner of numerous awards including the 2015 *Francesco Guicciardini Prize for Best Book in Historical International Relations*, presented by the International Studies Association. For this book alone I conducted approximately thirty interviews with terrorism experts and researchers in the field of "terrorism" studies. I have also published articles on terrorism expertise in peer reviewed journals including *Qualitative Sociology* and *Critique Internationale*.

DECLARATION OF LISA STAMPNITZKY

**Exhibit 29**

4. I have also contributed to scholarly books focused on sociology and terrorism studies, including "The Emergence of Terrorism Studies as a Field," Chapter 1 in *The Routledge Handbook of Critical Terrorism Studies*, "Sociology: Security and Insecurities," Chapter in *Security: Dialogue Across Disciplines* published by the Cambridge University Press, and "Problematic Knowledge: How "Terrorism" Resists Expertise," Chapter in *Security Expertise: Practices, Power, and Responsibility*.

5. I am currently a Lecturer at the University of Sheffield, where I teach an undergraduate course on Contemporary U.S. Foreign Policy, graduate courses on Human Rights, Philosophy and Methodology of Political Research. My U.S. Foreign Policy course, for example, focuses on the history of U.S. foreign policy, as well as modern challenges to the U.S. from other states, non-state actors, the international environment as a whole, and the U.S. "War on Terror" immediately after 9/11 and in Afghanistan and beyond.

6. In addition to authoring numerous books, textbook chapters, and articles, I frequently guest lecture at various symposia and universities. This includes lectures at York University, Columbia University, Boston College, Boston University, and Emory University to name but a few. Recent conference presentations include "How Torture Became Speakable (Again): Tracing the Shifting Meaning of 'Extraordinary' Practices in American Political Discourse" and "The Lawyers' War: States and Human Rights in a Transnational Field," for the American Sociological Association in Chicago, and "Unknown Knowns and Open Secrets: Towards a Sociology of Secrecy," for the Eastern Sociological Society in New York. These are but a few I have been invited to present in the year 2015.

## II. Nature and Basis of Expert Opinion

7. At the request of the Constitutional Law Center for Muslims in America, I have reviewed Kohlmann Expert Report, Daubert Hearing, and Kohlmann Trial Testimony in *United States v. Hassan*, No. 5:09-CR-216-FL-7; Expert Report submitted by Evan Kohlmann in *United States v. Mehanna*, No. 09-10017-GAO; Kohlmann Expert Report and Daubert Hearing *United States v. Osmakac*, Case No.8:12-CR-45-T-35AEP; Daubert Hearing and Trial Testimony in *United States v. Mohamud*, No. 3:10-CR-00475-KI; and an article

written by Kohlmann entitled, *Homegrown Terrorists – Theory and Cases in the War on Terror's Newest Front*.

8. Based on my training and expertise in the field of sociology and "terrorism" studies, I will render my observations and opinions associated with Evan Kohlmann's theories on "terrorism" and his analysis in this particular case.

### III. Analysis

9. "Compare and contrast" is not a recognized methodology for social science. "Compare and contrast" is a tool employed by social scientists, but is not a methodology for study. It begs the question what is being compared and contrasted, and against what standard and actual methodology? For some social scientists this may be a starting point, but it is not a recognized methodology for expert analysis. "Compare and contrast" does not explain how one selects the items to compare, on what basis they are compared, how one determines what facts to focus on in the comparison, how data was collected, or how that data is interpreted. [*See Yaghi Daubert p. 17*]

10. Mr. Kohlmann improperly uses the word "principles" to describe the tenets he believes are held by the actors in the cases he testifies regarding. "Principles" and "commonalities" are not interchangeable terms. One describes the fundamental beliefs or tenets of a person or group, the other simply common characteristics amongst members of same or different groups. For instance, generally Caucasian individuals have fairer skin than others, a commonality amongst the Caucasian group, but this is not a principle held by Caucasians as a whole. [*See Yaghi Daubert p. 35*]

11. Mr. Kohlmann only elucidates five of his six factors on homegrown terrorism during trial testimony, so my analysis will focus on the five mentioned during trial.

12. "Training materials" and "ammunition" are not equivalent terms.

13. There is no methodology presented to define the broad and ambiguous term "radical sectarian theology." Additionally, there is no methodology or definition of "terrorist propaganda," an idea that in my opinion is also in direct conflict with the fourth principle of communication concealment. [*See Yaghi Daubert p. 36*]

14. It is my belief that these "principles" are wholly insufficient and inaccurate to describe or identify terrorist groups. There is no rationale or method presented to identify why these principles, or factors rather, are relevant to this discussion, or why they were selected. Many of the factors are incomprehensibly vague or ill-defined so as to avoid methodological scrutiny. Finally, the factors are not discussed in relation to each other to indicate what makes this particular assemblage of qualities add up to a larger whole from which broad conclusions can be drawn. Ultimately, this analysis does not distinguish between correlation and causation, an absolutely necessary distinction to be made. [*See Yaghi Daubert p. 36*]

15. I do not believe that the characteristics, or commonalities, identifying "home-grown extremist networks" can accurately describe these networks. There is no evidence that the same or similar commonalities do not appear in other cases, generating false positives in individuals who display these "characteristics." Simply identifying a set of characteristics that are common to the population one labels "violent home grown extremists" is of no use unless one can also demonstrate that these characteristics are *not* present in those who are *not* "violent home-grown extremists." [*See Yaghi Trial p. 228*]

16. The adoption of a sectarian ideology does not indicate the existence of a "violent home-grown extremist network." An individual can adopt an ideology, but for a network to be present there must be a group-level phenomenon. [*See Yaghi Trial p. 299*]

17. I do not believe that the factors discussed during the trial are sufficient to indicate the existence of a "violent extremist network." Even if the data, which is absent, were to show that in every case of a violent extremist network all six out of six factors were present, it does not follow that those who display these factors are necessarily therefore violent extremists. Instead, at best one could say this is a list of symptoms that may suggest there is something to be concerned about when someone displays them, but there is no way to say it indicates that one can conclude that that person is *actually* planning to commit violence. [*See Yaghi Trial p. 230*]

18. I believe that these factors and their conclusions have been conducted by "selecting on the dependent variable," which is of considerable concern. One cannot just look at the population of individuals who do progress to violence, but must also select a comparison

group of individuals who do *not* progress to violence. There is no evidence in any testimony that such an analysis has been undergone. [*See Mohamud Case Opinion p. 6*]

19. These terms are all vague. There is no analysis as to what constitutes a terrorist organization, terrorist propaganda, extreme ideology, or extremist leader. Even if one were to fit in to some of Mr. Kohlmann's characteristics, there is no way to know whether or not one then fits in to the rhetoric of "terrorism."

20. In the Osmakac daubert hearing, Kohlmann puts forth evidence that the defendant Osmakac meets each of his five factors. I will not repeat here my prior criticism of the five factors themselves. I will only note further that, according to Kohlmann's own statement, Osmakac did not acquire "the immediate means to turn violent intent into action" (p36), and Osmakac did not have any "pre-existing connections to known extremist groups and/or accused terrorists" (p37). The case therefore rests on the argument that Osmakac has "the characteristics of a contemporary violent extremist" or "homegrown terrorist" (p37). I find it highly disturbing that the implication here is that "fitting a profile" has itself been criminalized.

21. As I have written, to treat "terrorist" as an identity which someone can inhabit, regardless of whether or not they have committed any acts of "terrorism" is a problematic and illogical development. Furthermore, on the basis of my research on terrorism experts, I would wager that it is much more accepted that "terrorism" should be treated as a tactic, and there is much more skepticism among academic terrorism experts as to the applicability of "terrorist" as a label to be applied to groups or individuals, apart from specific acts that those actors have undertaken.

22. In the Osmakac Daubert hearing, Kohlmann says that his work would be considered "Bayesian" (rendered in the transcript as "Basion", but I'm pretty sure this should be "Bayesian"). Because "There aren't enough people that become terrorists that actually do a statistical analysis and get reliable statistics". (p.44). However, this seems odd, because Bayesian analysis is also a type of statistical analysis--- it's just a different way of doing statistical analysis. Whereas what Kohlmann seems to be saying here is that there were not enough cases to do statistical analysis at all. (Which is fine--- I do primarily qualitative research myself. But to say that you're doing Bayesian analysis when you're

DECLARATION OF LISA STAMPNITZKY

Page 5 of 6

not doing statistical analysis at all is misleading--- just because you're doing qualitative research doesn't make it "Bayesian"). (And again, this is not to disparage qualitative research, it is to say that this is someone who doesn't seem to know what the terms he's using mean).

23. When the court in Osmakac asks Kohlmann about the control group in his studies, he states "the control group is -I'm looking at all the different people who I either have come across in terms of my work or we come across in terms of people that are using social networking forums related to terrorism. We look at these individuals and we see, does this person fit these characteristics..." Kohlmann's reply here indicates that he either doesn't know what a "control group" is or that he is purposefully misrepresenting its meaning. (p.47)

24. Kohlmann states, "I would never say, Your Honor, that just because those factors are present that means someone is definitely a homegrown extremist. What I say is is that because of the presence of these factors, these are indicative of someone who's been radicalized, but I don't ever state the actual conclusion that someone is definitely a radical terrorist because these factors are present." (p.59) Kohlmann here clearly states that the presence of these "factors" does not mean that someone is a "homegrown extremist".

_____
Lisa Stampnitzky, Declarant

Date: Jan 11 2016

DECLARATION OF LISA STAMPNITZKY

Page **6** of 6