# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NORTH CAROLINA

-----------------------------------------------X

Ziyad Yaghi,

       *Petitioner,*                     Case No: 5:09-cr-00216-FL

    v.

United States of America,

       *Respondent.*

-----------------------------------------------X

## EXPERT REPORT OF DAVID MILLER

**Qualifications**

I am a Professor of Sociology at the University of Bath, UK and earned my PhD in Sociology in 1994. Sociology, generally, is the study of the organization, functioning, and classification of human societies. Relevant to this case, I have spent a portion of my career studying the sociology of expertise. My research in this area involves examining how expertise is created and how it is used in society in relation to a variety of issues including scientific expertise and specifically in relation to expertise in terrorism. I have studied the way in which terrorism and political violence have been portrayed, going back to my doctoral thesis (in 1994), which examined the conflict in Northern Ireland.[1] I have also, since that time, been interested in the way in which government and related institutions engage in public relations and propaganda activities. More recently, I undertook a study on the way in which academia and the press evaluated expertise in terrorism.[2] This study used citation data to examine which 'experts' were most highly cited in scholarly journals and compared this with those most highly cited in the global English language press. It found that the most highly cited academic experts featured rarely in the press and conversely that those described as 'experts' in the press were not among the most highly cited in the scholarly literature. In some cases this appeared to be because some of those cited in the press did not possess any real degree of expertise in the topics on which they were quoted, but simply were members of intelligence, military or policing agencies or were closely connected to them such as being involved in think tanks with close links of that type. The approach taken to expertise in this work and in other similar research is that of comparing and evaluating datasets against each other. This is important because it allows the comparison of the way in which differing domains (the press, academia, the courts, for example) treat 'expertise', while avoiding subjective judgements about individual levels of expertise. In 2012 I was awarded a 'Global Uncertainties Leadership

---

[1] Miller, David, *Don't Mention the War: Northern Ireland, Propaganda and the Media* London: Pluto, 1994.
[2] Miller D. and Mills, T., 'The Terror Experts and the Mainstream Media: The Expert Nexus and its Dominance in the News Media', *Critical Studies on Terrorism*, Volume 2, issue 3. December 2009, p. 414 – 437.

DECLARATION OF DAVID MILLER    `Exhibit 31`

Fellowship' which runs from January 2013 to January 2016.³  This is a prestigious competitive, peer reviewed, award from the Economic and Social Research Council, the main public social science funding agency in the UK. It was awarded to further develop my research on terrorism expertise, which I am currently completing.⁴ On issues of terrorism, political violence and conflict I have published five books, four reports and more than thirty articles and book chapters.

**Introduction**

Mr Kohlmann has no educational qualifications beyond an undergraduate degree in politics and a Juris Doctor from the University of Pennsylvania Law School.  He is not well respected and is closely connected to individuals and organisations described as constituting 'a small, tightly networked group of misinformation experts' who have been instrumental in the 'rise of Islamophobia'[1]  He has been severely criticised by leading figures in his purported field of expertise and moreover has been criticised by the High Court in England and Wales for distorting evidence through selective quotations.[2]

**Kohlmann's background and affiliations**

Mr Kohlmann states in his report that he began researching terrorism 'in approximately 1997'.  At that stage he was an undergraduate at the Georgetown University.  In February the following year, he began an internship at the think tank, the Investigative Project on Terrorism (IPT).  There, he says, he was responsible for tracking North African militant groups, and monitoring Islamist websites.  He subsequently completed his graduate studies and began studying law, but was encouraged by a former IPT colleague to return to IPT after the September 11th attacks.  He then worked at the IPT until 2004 whilst studying law, and has referred to himself as having been 'basically the deputy head of the organisation' at this time.[3]

The IPT is a not-for-profit organisation founded and run by former journalist Steve Emerson. Emerson claimed in 1995 that Islam 'sanctions genocide, planned genocide, as part of its religious doctrine'[4] and that year famously attributed the Oklahoma City Bombing (carried out by former US soldier Timothy McVeigh) to 'Middle Eastern Terrorists'.  In July 2011, Kohlmann would similarly attribute the attacks in Norway to Muslims, claiming that, 'Norway has had an increasing problem with these kind of asymmetric threats from al-Qaida and its Central Asian allies'.[5]  The actual perpetrator of the attack, the right-wing extremist Anders Breivik, cited Kohlmann's former boss, Steve Emerson, twice in an Islamophobic manifesto he wrote shortly before carrying out the attacks.[6]  In January 2015, Emerson appeared on Fox News to discuss Europe's Muslim population and claimed that Birmingham, England was an example of a 'totally Muslim [city] where non-Muslims just simply don't go in'.  After the claim attracted widespread publicity the British Prime Minister David Cameron reportedly described Emerson as 'a complete idiot'.[7]

Steve Emerson and his former colleagues not only have a questionable record as analysts, but Emerson himself has been accused of deliberately spreading misinformation.   On one occasion he presented Associated Press with a purported FBI dossier showing ties between American Muslim organisations and radical Islamist groups.[8]  The Associated Press reporters 'concluded [that] the dossier was created by Emerson and that [Emerson] had edited out all phrases, taken out anything that made it look like his.'[9]  The Center for American Progress

---

3 Global Uncertainties 'RCUK Global Uncertainties Leadership Fellows'
http://www.globaluncertainties.org.uk/about/Leadership-Fellows.aspx
4 Global Uncertainties, 'Understanding and explaining terrorism: expertise in practise'
http://www.globaluncertainties.org.uk/about/GU-fellows/Miller.aspx

DECLARATION OF DAVID MILLER

has identified Emerson and his IPT as part of 'a small, tightly networked group of misinformation experts' that 'peddle hate and fear of Muslims and Islam'.[10] Its research discovered that the IPT shares its major donors with all of the other major Islamophobic organisations it identified.[11]

In 2004, Kohlmann left the IPT, and law school, and set up his own terrorism research outfit, Globalterroralert.com. Globalterroralert.com was a one man operation Kohlmann ran out of his bedroom in a high rise apartment in New York. National Public Radio journalist Mary Louise Kelly met Kohlmann in his bedroom-office, and described how he worked at a desk two feet from his bed wearing 'what looks suspiciously like last night's pyjamas'.[12] Globalterroralert.com, operated until October 2007 when Kohlmann closed the site and redirected traffic to www1.nefafoundation.org, which he said would be publishing all his future work.[13]

The now defunct, NEFA Foundation, or Nine/Eleven Finding Answers Foundation, which hosted Kohlmann for around five years, was a not-for-profit organisation based in Charleston, South Carolina. It was set up in 2004 to '[expose] those responsible for planning, funding, and executing terrorist activities, with a particular emphasis on Islamic militant organizations'.[14] Kohlmann was paid as an investigator by NEFA in 2006 and 2007[15] and was listed as a 'Senior Investigator' on its website in 2012.[16] The NEFA Foundation was neither well respected, nor especially prominent. In February 2008, Daniel Byman, a leading terrorism expert, told the *Charleston City Paper* he had never heard of the organisation.[17]

The NEFA Foundation was reportedly privately funded[18] and whilst little is publicly known about its sources of income, IRS filings reveal that it has received grants from the Abstraction Fund and the William Rosenwald Family Fund.[19] Both these foundations are associated with Nina Rosenwald, a major donor to neoconservative, pro-Israel and Islamophobic organisations in the United States. A board member of the leading pro-Israel lobby group, the American Israel Public Affairs Committee (AIPAC), Rosenwald, according to a profile in *The Nation* magazine, is known for 'launching into anti-Arab anti-Palestinian tirades at public forums'.[20] The Center for American Progress identified the William Rosenwald Family Fund and the Anchorage Charitable Fund, which is run by Rosenwald's sister Elizabeth Varet, as key financial backers of Islamophobic organisations in the United States:

> Between 2001 and 2008, the Anchorage Charitable Fund and William Rosenwald Family Fund contributed $2,818,229 to Islamophobic organizations. Among the donations: $2,320,229.33 to the Middle East Forum; $437,000 to the Center for Security Policy; $25,000 to the Clarion Fund; $15,000 to the Counterterrorism & Security Education and Research Foundation; $11,000 to the David Horowitz Freedom Center; and $10,000 to the Investigative Project on Terrorism.[21]

The Center for American Progress has identified these groups as part of America's 'Islamophobia network' and claimed that its research 'frames Islam as an inherently violent and antagonistic religion'.[22] The Abstraction Fund has donated to these same groups. In the year it donated to NEFA, other grant recipients included the Center for Security Policy, the David Horowitz Freedom Center and the Middle East Forum. It also donated to Committee for Accuracy in Middle East Reporting in America (CAMERA), a pro-Israel media pressure group, the Central Fund of Israel, a New York based tax-exempt charity registered in 1979[23] which distributes funds to settlers in the Occupied Territories,[24] and the Zionist Organization of America, an organisation on the far right of American Zionism.

Whilst working for the NEFA Foundation, Kohlmann was also a contributor to Counterterrorism Blog, an outfit which ceased operations in March 2011, but described itself

as 'a unique, multi-expert blog dedicated to providing a one-stop gateway to the counterterrorism community'.[25] Counterterrorism Blog was founded by Andrew Cochran, a US lobbyist whose clients included Steve Emerson and the IPT.[26] The editor of the site was the former journalist Douglas Farah, who headed a company, IBI Consultants, which conducted paid investigative work for the NEFA Foundation and was also personally listed as a NEFA investigator.

In his report Kohlmann refers to himself as now being 'a senior partner at Flashpoint Global Partners, a New York-based security consulting firm.' It has been registered with the New York Department of State Division of Corporations since 1 February 2011 under the name Flashpoint Global Partners LCC, but is incorporated in Delaware. It appears to be officially registered there under the name Ej2 Communications Inc., which was incorporated on 12 February 2010. The registered address of the company is 111 East 14th Street in New York, an address which was used by Kohlmann in 2006[27] and was the registered address for his one-man consultancy, globalterroralert.com (indeed the domain globalterroralert.com currently redirects to the website of Flashpoint Global Partners). On the 'leadership' section of the website Kohlmann is listed along with two partners: Josh Devon and Josh Lefkowitz.[28] Lefkowitz is a former analyst at the Investigative Project and the NEFA Foundation. Josh Devon is also a former IPT analyst who founded the SITE Intelligence Group (formerly the SITE Institute) with another IPT alumni, the Israeli American Rita Katz.

**Mr Kohlmann's expertise**

Terrorism studies scholar Magnus Ranstorp cites Kohlmann as an example of 'charlatans' used as expert witnesses in legal proceedings, whose presence, he suggests, 'undermines severely the credibility of the proceedings and makes a mockery of the principle of scientific expertise.'[29] The former CIA analyst and terrorism expert, Philip Giraldi, has written:

> Within the intelligence community and at the Pentagon, Kohlmann, like many of his expert colleagues, is widely considered a phony who has somehow ingratiated himself with those who want an affable young media resource who will say just the right things when it comes to terrorism, keeping the public suitably alarmed while exuding a facile expertise.[30]

Marc Sageman, a former Operations Officer for the CIA, who is perhaps the most respected figure in the field of terrorism expertise, writes that 'Kohlmann and his work have very poor standing in both the academic and intelligence communities,' and describes him as 'a tireless self-promoter, who has published very few peer reviewed articles or books'.[31] He is scathing of Kohlmann's supposed expertise. He notes Kohlmann's lack of 'training in any of the social sciences' and the 'lack of integrity in his work',[32] but also goes as far as accusing him of 'the most egregious distortions of the evidence'.[33] A decade ago Sageman reviewed Kohlmann's book, *Al-Qaida's Jihad in Europe: the Afghan-Bosnian Network*, for the University of Pennsylvania Press. *Al-Qaida's Jihad in Europe* was published in 2004, and is Kohlmann's only book. According to Sageman it is 'based on erroneous propaganda… set[ting] the tone to his life's work.'[34] Sageman states, in an expert witness report, that he recommended rejecting the book in 2004, warning the publisher that Kohlmann 'has problems with reliability and one sided presentation of facts'. He described the book as 'sensationalistic', its claims as 'uncompelling', and described Kohlmann's handling of evidence as 'cavalier', noting his practice of 'using data supporting his point, and, worse, misinterpreting other, creating data to support his argument.'[35] Offering his opinion on an expert report produced by Kohlmann in April 2014, Sageman concluded that:

> Kohlmann cherry picks evidence in a very biased way, often out of context; intentionally ignores or deletes evidence contradictory to its claims; does not demonstrate general background or much familiarity for the Bosnian and Chechen Wars; conflates and misidentifies people; and occasionally fabricates evidence by misquoting people. Mr. Kohlmann's disregard of social science methodology compounds his lack of academic training and credentials. Throughout his report, Mr. Kohlmann conflates jihad and terrorism and confuses any sympathy for Muslim fighters defending Muslims against atrocities, like in Bosnia and Chechnya, with material support for terrorism.[36]

Kohlmann has previously been accused of bias and misleading interpretation of evidence. For example, Kohlmann submitted a report in the case of *R v AV*. The report, the High Court noted in *Secretary of State for the Home Department v AR and others*, was 'significantly undermined' by its 'selective quotation from an interview with a valuable source', which was 'sufficient to distort his views'. This, combined with its reliance on detainee reporting and 'the palpable hits secured by defence Counsel' in the case, led the 'prosecution to abandon reliance on any expression of opinion by Mr Kohlmann'.[37]

**Mr Kohlmann's expertise**

Mr Kohlmann claims to have identified 'the principle relevant factors as to whether a person or persons might fit the profile of a "homegrown" terrorist network'.[38] These 'principle relevant factors' are stated as follows:

- The Formulation of Self-Selecting Schemes Aimed at Traveling Abroad to Join Foreign Terrorist Organizations, and/or Achieving Imminent Acts of Physical Violence;
- The Acquisition of Automatic Weapons and Sniper Rifles (Including Requisite Accessories Such As Sniper Scopes), Paramilitary Training Manuals, and the Establishment of Makeshift Training Camps;
- The Adoption of a Hardline Sectarian Religious Perspective, Often Identified With the "Salafi-Jihadi" or "Takfiri" School (Evidenced by the Possession And/Or Distribution of Extremist Ideological Materials);
- The Use of Coded Language and Attempts at Logistical Subterfuge (i.e. Attempts to Secret or Hide One's Activities); and,
- The Deliberate Collection and Redistribution of Large Quantities of Terrorist Propaganda.[39]

Mr Kohlmann does not provide an account of how these 'principle relevant factors' have been identified and tested in his expert report. However, his methodology was discussed at length in *USA v. Osmakac*. During Daubert proceedings in that case, Mr Kohlmann was questioned by Judge Mary Scriven as to the scientific basis of his 'relevant factors' and as to whether his theory had been subject to peer review. Peer review is the process whereby scholarly work is reviewed anonymously by other scholars (peers) prior to publication and either rejected or published (often after certain revisions). Though demonstrating a clear understanding of the concept, Mr Kohlmann repeatedly implied in *USA v. Osmakac* that his work had been peer reviewed, when in fact it has not, and attempted to distinguish between 'peer review' and 'formal peer review', the former seemingly denoting any discussion or dissemination of his work. He claimed at one point that his 'peers would include a variety of individuals who are both in academia as well as, in some cases, nongovernmental agencies, as well as some independent individuals who I have worked and I do work with regularly'. Mr Kohlmann also claimed that his honours thesis was peer reviewed, and referred to an article in the *Annals for the American Academy of Social Political Sciences* as having been 'peer reviewed,

but not formally peer reviewed'. The *Annuls* has confirmed that it has no peer review process beyond review of issue proposals by the Editorial Advisory Board.[40] Mr Kohlmann has made similar misleading claims in previous cases. Under cross examination by Geoffrey Robertson QC in 2007, Mr Kohlmann claimed that 'every paper that I write is extensively peer reviewed by academics and by others around the world'.[41] And in *United States v. Paracha*, Mr Kohlmann testified that his 'written publications are submitted for comment and critique by academics and peers in his field before publication'.[42] In his expert report for the present case, Mr Kohlmann cites several court judgements to the effect that his work is or has been subject to peer review – a 'considerable amount', according to one judgement.

In fact, Mr Kohlmann has never published a sole authored peer reviewed journal. The bibliographic database Scopus presently contains three journal articles for Mr Kohlmann. The first is a 2006 article in *Foreign Affairs*, which although well respected, it is arguably a journalistic rather than academic publication. The second is the aforementioned article in the *Annals for the American Academy of Social Political Sciences*. The third is a co-authored article published in the quarterly *African Security*.

None of these publications include any discussion of his 'principle relevant factors'. In *USA v. Osmakac*, Mr Kohlmann stated: 'These are certainly things that other experts and other colleagues of mine that I've discussed with that have indicated that they also believe are significant.' Mr Kohlmann, stated that the only place his 'factors' have published is his *Annals* article. Under repeated questioning, he was therefore forced to concede that the method he uses in this case has never been subject to peer review:

> So I think the answer to your question is is that the paper in which I presented these all together is the *Annals*. Now, I have certainly presented individual factors in peer reviewed journals, but I have never presented all the factors together in a formal peer reviewed journal.

In fact, even Mr Kohlmann's *Annals* article contains no reference to his 'principle relevant factors'. Neither does it give any account of his methodology. Indeed, despite purporting to examine 'theory and cases' of 'homegrown terrorists', the article has no theoretical content.[43] His more recent co-authored *Africa Security* paper, , 'Bringing Global Jihad to the Horn of Africa', makes no use of, or reference to Kohlmann's 'principle relevant factors', or indeed any of Mr Kohlmann's work.[44] In short, Mr Kohlmann's expertise has not been subject to any peer review process. More than that though, he has not been able to give a coherent account of his methods in cases in which he has testified. In the course of Daubert proceedings in *USA v. Osmakac*, Mr Kohlmann referred to his analysis several times as 'Bayesian':

> The way to do analysis in this -- these materials is a Bayesian analysis. It's taking a sample set of cases and then doing a comparative analysis and looking for the common threads that appear. It's not statistical...

> ...this is not a statistical study, it's not meant to be a statistical study. It's meant to be looking at individual factors that appear in cases and assessing their significance. But again, it's a Bayesian analysis, this is not a Fisherian analysis.

This shows Mr Kohlmann's basic ignorance of social scientific theory and methods. The difference between Bayesian and Fisherian (or frequentists) statistics is epistemological and is to do with different understandings of probability and different ways in which one might draw inferences from data. Mr Kohlmann describes his own approach as Bayesian, apparently believing that this justifies his inability to present any quantitative evidence in support of his methodology. But far from not being statistical, the Bayesian approach is a

DECLARATION OF DAVID MILLER

school within statistics. It is an approach based around Bayes's theorem, a mathematical tool describing the relationship between different probabilities.

Bayes's theorem is worth briefly considering, as ironically it illustrates a basic problem with Kohlmann's methods. A social scientist might want to examine, for example, the relationship between acts of terrorism and the 'Adoption of a Hardline Sectarian Religious Perspective' - one of Mr Kohlmann's 'factors'. Bayes's theorem can help conceptualise the relationship between these two factors. It is usually expressed as follows:

$$P(A|B) = P(B|A) P(A)/P(B)$$

Here **A** and **B** are particular outcomes and **P** is the probability of that outcome. In our example, let's say that **A** is an American committing an act of terrorism, and **B** is an American adopting a 'hardline sectarian religious perspective'. **P(A|B)** is what we are interested in. It is the probability of an American who has adopted a 'hardline sectarian religious perspective' committing an act of terrorism. **P(B|A)** is, inversely, the probability of an American who has committed an act of terrorism having adopted a 'hardline sectarian religious perspective'. **P(A)**, meanwhile, is the overall probability of an American committing an act of terrorism, and **P(B)** is the overall probability of an American adopting a 'hardline sectarian religious perspective'. Bayes's theorem points to the information which must be known in order to draw certain inferences and shows that the relationship between different probabilities is not as straightforward as is sometimes intuitively thought. In this case, even if it were true that the overwhelming majority of Americans who had committed an act of terrorism had previously adopted a 'hardline sectarian religious perspective', it does not follow that someone who has adopted a 'hardline sectarian religious perspective' will likely commit an act of terrorism. Not only that, Bayes's theorem proves that one cannot make any such logical inference.

Mr Kohlmann's misguided invocation of 'Bayesian analysis' it likely due to a widely read and discussed article on terrorism research authored by leading terrorism expert and former CIA analyst, Marc Sageman. In 'The Stagnation of Research on Terrorism', Sageman wrote:

> Aggressive FBI field offices identify many young men based on nonspecific indicators, set them up in sting operations, and arrest them. According to Bayesian probability models, the odds that these young men would ever have turned to violence are low. But it is difficult to teach lawyers and juries Bayesian probability...[45]

The relevant point here is that one cannot necessarily draw an inference on the likelihood of an individual committing an act of terrorism on the basis of characteristics observed amongst those who do. This is precisely what Mr Kohlmann seeks to do.

Mr Kohlmann in fact readily concedes that he cannot offer any 'statistical determination' to support his 'seven factors' theory, and in addition to the claim that he uses Bayesian analysis, refers to his method as 'comparative analysis'.[46] He states that this 'basically involves taking a variety of different sources, identifying whether or not these sources are reliable and credible and then juxtaposing these sources against each other to pull out a common narrative.' This explanation is more suggestive of an historical method. Comparative analysis generally refers not to the assessment of multiple sources but multiple causal factors observable in different cases. Qualitative comparative analysis, for example, is a social scientific method developed to identify relevant causes associated with a particular event. Its adherents claim that it allows for the examination of complex causality in a relatively small number of cases not allowing for statistical inference. Such an approach would seem amenable to the analysis of cases of terrorism. But Mr Kohlmann's approach shows no

evidence of the sort of analytical rigour necessary as much for this sort of analysis as for a statistical approach, whether 'Bayesian' or 'Fisherian'. An adequate application of such a method would, for example, require a clear procedure for the selection of cases, including cases where the particular event was not observed. Without this methodological rigour, it is simply not possible to assess relevant causal factors without potentially confirming the rationale (conscious or not) for the selection of cases.

Mr Kohlmann admits that his theory about factors has 'crystallized' through his consultancy work for the Department of Justice and with the FBI, and states that his 'factors' are those 'that tend to surface in the evidence surrounding homegrown terrorism cases.'[47] This means not only that his theory has not been subject to peer review, but that it has been developed in the small number of cases in which his unscientific claims are expected to be useful in securing a prosecution. The evidential problem here is obvious. Mr Kohlmann is drawing (unsound) conclusions based on the confluence of factors in cases in which he is called to testify, the presence of which may as likely reflect the fact that Kohlmann being called as a expert, as the probability of the person in that case in fact being a 'violent extremist' or part of 'a "homegrown" terrorist network'.

Mr Kohlmann does claim a wider evidential basis for his theory, referring to 'large data sets' drawn especially from 'social networking forums related to terrorist organizations'.[48] However, he has presented no evidence to suggest that this data has been collected in a methodologically rigorous fashion or, assuming it has, that he is competent enough to draw any sound evidential conclusions from it. Indeed, what little we know about Mr Kohlmann's methods from his cross examination in terrorism cases suggests that his work is marred by the most rudimentary fallacies. To give just one example, in the Daubert proceedings in *USA v. Osmakac*, Mr Kohlmann states that 'almost everybody who's radicalized in this country is downloading terrorist propaganda'.[49] Not only is this an unsound basis on which to draw conclusions, for the reasons outlined above, but there is moreover no evidence that either 'radicalisation' or 'terrorist propaganda' have been clearly defined. Indeed elsewhere in the same proceedings Mr Kohlmann states: 'By radicalizing, I mean digesting propaganda from extremists'.[50] Radicalisation, then, is defined with reference to 'The Deliberative Collection and Redistribution of Large Quantities of Terrorist Propaganda', which is in turn used as evidence of radicalisation. This type of fallacious and tautological reasoning is regrettably endemic in Mr Kohlmann's work.

I, David Miller, declare under penalty of perjury under the laws of the state of North Carolina that the foregoing is true and correct.

Signed this 19th day of January, 2016.

_____

David Miller, Declarant

Strasbourg, France

DECLARATION OF DAVID MILLER

[1] Wajahat Ali et al, *Fear Inc.: The Roots of the Islamophobia Network in America*, Center for American Progress (August 2011), http://www.americanprogress.org/issues/2011/08/pdf/islamophobia.pdf

[2] *Secretary of State for the Home Department v AR and others* [2008] EWHC 2789. Available at: http://www.bailii.org/ew/cases/EWHC/Admin/2008/2789.html

[3] *R. v. F*, Cross Examination of Kohlmann by Geoffrey Robertson QC, 23 January 2007. http://powerbase.info/images/1/15/Kohlman_cross_robertson_qc.pdf

[4] Cited in John F. Sugg, 'Steven Emerson's Crusade', Extra!, January/February 1999. http://www.fair.org/index.php?page=1443

[5] Spencer Ackerman, 'Were Oslo's Terror Blasts Caused by Car Bombs?', Wired, 22 July 2011. http://www.wired.com/dangerroom/2011/07/were-oslos-terror-blasts-caused-by-car-bombs/

[6] Eli Clifton 'Anders Breivik Recommended Popular Anti-Muslim Documentary "Obsession" For "Further Study"' Think Progress Security, Jul 26, 2011 at 1:28 pm

[7] Matthew Holehouse, and Raf Sanchez, 'David Cameron: US terror "expert" Steve Emerson is a "complete idiot"', Telegraph, 12 Januarty 2015, http://www.telegraph.co.uk/news/uknews/terrorism-in-the-uk/11340399/David-Cameron-US-terror-expert-Steve-Emerson-is-a-complete-idiot.html

[8] Wajahat Ali et al, *Fear Inc.: The Roots of the Islamophobia Network in America*, Center for American Progress (August 2011), http://cdn.americanprogress.org/wp-content/uploads/issues/2011/08/pdf/islamophobia.pdf

[9] Wajahat Ali et al, *Fear Inc.: The Roots of the Islamophobia Network in America*, Center for American Progress (August 2011), http://cdn.americanprogress.org/wp-content/uploads/issues/2011/08/pdf/islamophobia.pdf

[10] Wajahat Ali et al (2001), *Fear Inc: The Roots of the Islamophobia Network in America*, Center for American Progress, August 2011. http://www.americanprogress.org/issues/2011/08/pdf/islamophobia.pdf

[11] Wajahat Ali et al, *Fear Inc.: The Roots of the Islamophobia Network in America*, Center for American Progress (August 2011), p.48. http://cdn.americanprogress.org/wp-content/uploads/issues/2011/08/pdf/islamophobia.pdf

[12] Mary Louise Kelly, 'All Things Considered', National Public Radio, 8 June 2006. http://www.npr.org/templates/story/story.php?storyId=5472132

[13] Globalterroralert.com, http://www.globalterroralert.com/ [Accessed 29 February 2008].

[14] Nine Eleven Finding Answers Foundation Inc, Form 990s for the Year Ending 31 January 2011, p.1.

[15] Nine Eleven Finding Answers Foundation Inc, Form 990s for the Years Ending 2006 and 2007.

[16] Internet Archive, NEFA Foundation > About Us, https://web.archive.org/web/20120706143639/http://www.nefafoundation.org/index.cfm?pageID=26

[17] Greg Hambrick, 'Charleston's Counter-Terrorism Unit', *Charleston City Paper*, 20 February 2008.

[18] Susan Schmidt, 'Imam From Va. Mosque Now Thought to Have Aided Al-Qaeda', *Washington Post*, 27 February 2008. Available at: http://www.washingtonpost.com/wp-dyn/content/article/2008/02/26/AR2008022603267_2.html

[19] Abstraction Fund, Form 990 for the calendar year 2009, Schedule A. William Rosenwald Family Fund, Inc., Form 990 for the calendar year 2009, Schedule A.

[20] Max Blumenthal, 'The Sugar Mama of Anti-Muslim Hate', *The Nation*, 13 June 2012. http://www.thenation.com/article/168374/sugar-mama-anti-muslim-hate

[21] Wajahat Ali et al, *Fear Inc.: The Roots of the Islamophobia Network in America*, Center for American Progress (August 2011), p.21. http://cdn.americanprogress.org/wp-content/uploads/issues/2011/08/pdf/islamophobia.pdf

[22] Wajahat Ali et al, *Fear Inc.: The Roots of the Islamophobia Network in America*, Center for American Progress (August 2011), http://www.americanprogress.org/issues/2011/08/pdf/islamophobia.pdf

[23] Central Fund of Israel Form 990 for the year ending 31 January 2012.

[24] Moshe Kohn, 'Caring', *Jerusalem Post*, 27 September 1989.

[25] Counterterrorism Blog, 'About'. http://counterterrorismblog.org/about/

DECLARATION OF DAVID MILLER

[26] See for example Public Policy Partnership Lobbying Report for Steven Emerson 2004, http://www.powerbase.info/images/a/ad/Steven_Emerson_Public_Policy_Partnership_Year_End_Report_2004.pdf

[27] Nine Eleven Finding Answers Foundation Inc, Form 990 2006, Schedule A, p.1.

[28] Flashpoint Global Partners, About Us > Leadership. http://flashpoint-intel.com/about-us/leadership/

[29] Ranstorp, Magnus 2009. 'Mapping terrorism studies after 9/11: An academic field of old problems and new prospects.' In Richard Jackson, Marie Breen Smyth & Jeroen Gunning, eds. *Critical Terrorism Studies: A new research agenda*. London: Routledge, p.28.

[30] Philip Giraldi, 'Terrorism Experts On Parade', Antiwar.com, 28 July 2011. http://original.antiwar.com/giraldi/2011/07/27/terrorism-experts-on-parade/

[31] Redacted Expert Report of Marc Sageman in USA v. Babar Ahmad, 25 April 2014, p.22. Available from: http://www.sacc.org.uk/sacc/docs/sageman-%20expert-report-fully-redacted-4.pdf

[32] Redacted Expert Report of Marc Sageman in USA v. Babar Ahmad, 25 April 2014, p.22. Available from: http://www.sacc.org.uk/sacc/docs/sageman-%20expert-report-fully-redacted-4.pdf

[33] Redacted Expert Report of Marc Sageman in USA v. Babar Ahmad, 25 April 2014, p.74. Available from: http://www.sacc.org.uk/sacc/docs/sageman-%20expert-report-fully-redacted-4.pdf

[34] Redacted Expert Report of Marc Sageman in USA v. Babar Ahmad, 25 April 2014, p.24, ft.14. Available from: http://www.sacc.org.uk/sacc/docs/sageman-%20expert-report-fully-redacted-4.pdf

[35] Marc Sageman, email to Peter Agree, University of Pennsylvania Press, 10 June 2003, quoted in Redacted Expert Report of Marc Sageman in USA v. Babar Ahmad, 25 April 2014, p.22. Available from: http://www.sacc.org.uk/sacc/docs/sageman-%20expert-report-fully-redacted-4.pdf

[36] Redacted Expert Report of Marc Sageman in USA v. Babar Ahmad, 25 April 2014, p.88. Available from: http://www.sacc.org.uk/sacc/docs/sageman-%20expert-report-fully-redacted-4.pdf

[37] *Secretary of State for the Home Department v AR and others* [2008] EWHC 2789. Available at: http://www.bailii.org/ew/cases/EWHC/Admin/2008/2789.html

[38] Evan F. Kohlmann, Expert Report I – U.S. v. Daniel Patrick Boyd et al., April 2011.

[39] Evan F. Kohlmann, Expert Report I – U.S. v. Daniel Patrick Boyd et al., April 2011.

[40] Email from Dr. Phyllis Kaniss, Executive Director of the American Academy of Political and Social Science to David Miller, Tue, 19 Aug 2008 10:44:23 -0400.

[41] Cross Examination of Kohlmann by Geoffrey Robertson QC. 23 January 2007. http://powerbase.info/images/1/15/Kohlman_cross_robertson_qc.pdf

[42] United States v. Paracha (Southern District of New York, 2005)

[43] Evan F. Kohlmann, Homegrown' Terrorists: Theory and Cases in the War on Terror's Newest Front', The ANNALS of the American Academy of Political and Social Science, Vol. 618, No. 1, 95-109 (2008).

[44] Lorenzo Vidino, Raffaello Pantucci, and Evan Kohlmann. 'Bringing Global Jihad to the Horn of Africa: Al Shabaab, western fighters, and the sacralization of the Somali Conflict.' *African Security* 3.4 (2010): 216-238.

[45] Marc Sageman, 'The Stagnation of Research on Terrorism', *The Chronicle of Higher Education*, 30 April 2013.

[46] *USA v. Osmakac*, transcript of Daubert proceedings.

[47] *USA v. Osmakac*, transcript of Daubert proceedings.

[48] *USA v. Osmakac*, transcript of Daubert proceedings.

[49] *USA v. Osmakac*, transcript of Daubert proceedings.

[50] *USA v. Osmakac*, transcript of Daubert proceedings.

DECLARATION OF DAVID MILLER