IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:09-CR-216-FL-8
No. 5:15-CV-523-FL

ZIYAD YAGHI,                        )
                                    )
            Petitioner,             )
                                    )       MEMORANDUM IN SUPPORT
      v.                            )       OF MOTION TO DISMISS OR,
                                    )       IN THE ALTERNATIVE, FOR
UNITED STATES OF AMERICA,           )       SUMMARY JUDGMENT
                                    )
            Respondent.             )

     Respondent, by and through the United States Attorney for

the Eastern District of North Carolina, hereby files this

memorandum in support of its motion to dismiss or, in the

alternative, for summary judgment.

BACKGROUND

     On October 13, 2011, a jury convicted Petitioner of

conspiracy to provide material support to terrorists, in

violation of 18 U.S.C. § 2339A (Count One) and conspiracy to

murder, kidnap, maim, and injure persons or damage property in a

foreign country, in violation of 18 U.S.C. § 956(a) (Count Two).

[D.E. 1508]. Petitioner was tried between September 19, 2011,

and October 12, 2011, when the jury began its deliberations.

[D.E. 1463, 1501].

     On January 13, 2012, the Court sentenced Petitioner to 180

months' imprisonment on Count One and 380 months' imprisonment

on Count Two, to run concurrently with each other. [D.E. 1644].
This sentence was consistent with the advisory guideline range
as to Count One and below the advisory guideline range of life
as to Count Two. [D.E. 2037 at 157]. Petitioner appealed his
judgment [D.E. 1678], and the United States Court of Appeals for
the Fourth Circuit affirmed in an opinion issued on February 4,
2014. United States v. Hassan, 742 F.3d 104 (4th Cir. 2014).
Petitioner was represented at trial and sentencing and on appeal
by James M. Ayers, II (hereinafter "Ayers" or "counsel").[1] On
October 6, 2014, the Supreme Court of the United States denied
certiorari. Yaghi v. United States, 135 S. Ct. 192 (2014)
(Mem.).

On or about October 2, 2015, Petitioner filed a motion
under 28 U.S.C. § 2255. [D.E. 2207]. Petitioner, through
counsel, subsequently filed a supplemental memorandum[2] that
alleges two sets of claims. [D.E. 2217]. First, Petitioner
alleges that counsel was constitutionally ineffective for four
reasons (discussed in detail in Argument Section I, infra).
[D.E. 2217 at 14-24]. Second, Petitioner argues that the

---

[1] Petitioner was represented by John D. McCullough from July 28,
2009 [D.E. 59] until December 21, 2010 [D.E. 688]. Ayers
entered a notice of appearance on behalf of Petitioner on
December 21, 2010. [D.E. 689].

[2] Petitioner's original motion under § 2255 largely mirrors the
claims raised in Petitioner's supplemental memorandum. Out of
an abundance of caution, those earlier claims are addressed in
Argument Section III, infra.

government failed to disclose material impeachment evidence regarding government witness Evan Kohlmann, in violation of Giglio v. United States, 405 U.S. 150 (1972). [D.E. 2217 at 24-26].

ARGUMENT

The Court should dismiss Petitioner's motion for failure to state a claim for which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss pursuant to Rule 12(b)(6), [Petitioner's] '[f]actual allegations must be enough to raise a right to relief above the speculative level,' thereby 'nudg[ing] their claims across the line from conceivable to plausible.'" Aziz v. Alcolac, Inc., 658 F.3d 388, 391 (4th Cir. 2011) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). As the Fourth Circuit has held, "'vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court.'" United States v. Dyess, 730 F.3d 354, 359 (4th Cir. 2013) (quoting United States v. Thomas, 221 F.3d 430, 437 (3d Cir. 2000)). Unless otherwise stated herein, Respondent assumes, solely for purposes of this Rule 12(b)(6) motion, the facts alleged in Petitioner's § 2255 motion. See Wolfe v. Johnson, 565 F.3d 140, 169 (4th Cir. 2009). "Under § 2255(b), [u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court must grant a prompt

3

hearing to determine the issues and make findings of fact and conclusions of law with respect thereto." United States v. Thomas, 627 F.3d 534, 539 (4th Cir. 2010) (internal quotation marks omitted).

In the alternative, to the extent the Court considers and relies upon information outside of the files and records of the case, the Court should grant summary judgment in favor of Respondent. Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Industrial Co. Ltd. V. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)). "Moreover, 'the mere existence of some alleged factual dispute between the

4

parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact . . . . Factual disputes that are irrelevant or unnecessary will not be counted.'" <u>Cloaninger ex rel. Estate of Cloaninger v. McDevitt</u>, 555 F.3d 324, 332 (4th Cir. 2009) (quoting <u>Anderson</u>, 477 U.S. at 247-48).

I.  <u>Petitioner's Claims of Ineffective Assistance of Counsel</u>.

Petitioner's allegations in support of his claims of ineffective assistance of counsel must satisfy both prongs of <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).  Under the first prong of <u>Strickland</u>, Petitioner must show "that counsel's performance fell below an objective standard of reasonableness." <u>Sharpe v. Bell</u>, 593 F.3d 372, 382 (4th Cir. 2010) (internal quotation marks omitted).  "Judicial scrutiny of counsel's performance must be highly deferential, and a reviewing court must avoid the biases of hindsight." <u>Id.</u> (internal quotation marks and citation omitted).  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective <u>at the time</u>." <u>Strickland</u>, 466 U.S. at 689 (emphasis added).  Consequently, courts apply a "'strong presumption' that a trial counsel's strategy and tactics fall 'within the wide range of reasonable

professional assistance.'" United States v. Roane, 378 F.3d 382, 404 (4th Cir. 2004) (quoting Strickland, 466 U.S. at 689). Under the second prong of Strickland, Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Petitioner raises four claims of ineffective assistance of counsel. First, Petitioner challenges counsel's decision not to cross-examine the government's expert (Kohlmann) at trial and at the Daubert hearing. [D.E. 2217 at 16-18]. Second, Petitioner alleges that counsel was ineffective for failing to investigate and interview certain witnesses. [D.E. 2217 at 18-20]. Third, Petitioner alleges that counsel was ineffective for failing to review and use a recording of a conversation at Daniel Boyd's store. [D.E. 2217 at 20-21]. Fourth, Petitioner alleges that counsel was ineffective in failing to challenge Jude Mohammad's mother's credibility. [D.E. 2217 at 21-22].

Petitioner's first claim fails under Rule 12(b)(6) for lack of prejudice. For the reasons discussed in Argument Section II, infra, even assuming, for the sake of argument, that counsel could have completely impeached Kohlmann's testimony or prevented Kohlmann from testifying, Petitioner has not shown a reasonable probability of a different outcome.

6

In the alternative, the Court should grant summary judgment based on the first prong of _Strickland_. As shown in the attached declaration[3] of James M. Ayers II, Petitioner's counsel made a strategic decision not to engage Kohlmann during trial based on the outcome of the _Daubert_ hearing. [Exhibit A at 6, ¶ 15].[4] Specifically, counsel approached Kohlmann in the following manner:

> As a result of the _Daubert_ hearing and objections, the government's expert opinions were restricted and limited. Because of the restrictions and limitations, no questions were asked at trial. To ask questions, when the witness was prevented from commenting on the particular defendant, would have opened the door to additional testimony which was not otherwise allowed.

[Exhibit A at 6, ¶ 15].

Thus, counsel did not question Kohlmann due to sloth or inadequate preparation. Instead, once counsel felt that Kohlmann's testimony would be limited, counsel reasonably

---

[3] Counsel's document is captioned as a declaration and is made under penalty of perjury, consistent with 28 U.S.C. § 1746. It does not contain the specific language "that the foregoing is true and correct," 28 U.S.C. § 1746(2), but it is substantially in the form required by § 1746. If the Court desires, Respondent will submit an otherwise-identical declaration with the exact language in § 1746(2). The exhibits attached to counsel's declaration use counsel's exhibit stickers (typically captioned as "Defendant's Exhibit").

[4] Counsel's declaration and attached exhibits are filed as part of an appendix to the statement of material facts. Exhibit 1 to counsel's declaration is redacted to remove information not referenced in in Paragraph 13 of counsel's declaration.

elected not to risk allowing Kohlmann the opportunity to opine specifically regarding Petitioner (for example, regarding Petitioner's intent). Indeed, although the Court ruled that Kohlmann could not testify regarding the defendants' mental state and although the government instructed Kohlmann not to opine on the defendants' mental state, all of the defendants were diligent at trial to ensure that Kohlmann's testimony would not touch on that issue. [D.E. 2217-7 at 219-20].

Petitioner's suggested avenues to attack Kohlmann (attacking the notion that there is a global jihadist movement or attacking Kohlmann's five factor test for home-grown terrorism [D.E. 2217 at 17]) would have, at best, created a battle of the experts at trial. See United States v. Dyess, 730 F.3d 354, 364 (4th Cir. 2013) ("Moreover, we give counsel wide latitude in determining which witnesses to call as part of their trial strategy."); Vinson v. True, 436 F.3d 412, 419 (4th Cir. 2006) ("On habeas review, a federal court generally credits plausible strategic judgments in the trial of a state case.") (internal quotation marks omitted).

Petitioner's argument that counsel should have challenged Kohlmann in a particular way at the Daubert hearing [D.E. 2217 at 18] likewise questions counsel's strategy. At the Daubert hearing, counsel asked Kohlmann, among other things, about his lack of training in statistics; his failure to collect samples

"of any groups of Muslims in specific before [he] drew any of [his] conclusions"; his failure to conduct "statistical studies as relates to marriage and jihad"; and his failure to interview people in Raleigh "with regard to Mr. Yaghi's contentions about getting married." [D.E. 2217-2 at 96-102]. Moreover, by the time counsel began cross-examining Kohlmann at the Daubert hearing, other defense counsel had questioned him on various matters. [D.E. 2217-2 at 41-96]. Thus, counsel's performance went well beyond the kind of "warm body" alleged in his motion, and Petitioner is simply challenging the strategic decisions made by counsel. [D.E. 2217 at 17]. As a result, the Court should defer to counsel's strategic choice in this matter and find in favor of Respondent as to the first Strickland prong.

Petitioner's second Strickland claim fails under Rule 12(b)(6) for lack of prejudice. As discussed below, the evidence offered against Petitioner was substantial. By contrast, the individuals whom Petitioner states counsel should have interviewed would not have undermined the weight of that evidence.

Petitioner alleges that counsel should have interviewed three witnesses (Adnan Al-Shishani, Ahmed Yaghi, and Mohammed Yaghi) who "would have confirmed that Mr. Yaghi was actively pursuing marriage." [D.E. 2217 at 19]. Petitioner also states that his step-father (Adnan Al-Shishani) also would have stated

that Petitioner was directed to the Shishan Mosque "to meet family members there" and that another witness (Walid Musafer Al-Shishani) would have stated that the Shishan Mosque "is a well-known landmark" in Zarqa. [D.E. 2217 at 19]. Even assuming, solely for the sake of a Rule 12(b)(6) motion, that these individuals would have testified consistent with their declarations, that testimony would merely have created a conflict with certain portions of Daniel Boyd's[5] testimony (such as his understanding as to Petitioner's motivations).

In any event, counsel at least touched on the marriage explanation during his opening and during the cross-examination of one witness. Counsel noted during his opening statement that Petitioner was trying to get married [D.E. 2217-6 at 130-31]. Likewise, Mike Greer, an FBI Special Agent, acknowledged on cross-examination by Petitioner's counsel that Petitioner had made internet searches with regard to finding a wife; that Petitioner had engaged in e-mail conversations about being married; and that Petitioner met people in Jordan in connection with getting married. [D.E. 2217-7 at 130-31].

Petitioner's claims also do not meaningfully challenge other incriminating aspects of the evidence against Petitioner. For example, Petitioner's motion does not specifically address the meaning of "best brothers." [D.E. 2217 at 18-20]. Daniel

---

[5] Unless otherwise noted herein, "Boyd" refers to Daniel Boyd.

Boyd testified regarding Petitioner's attempt to find the "best brothers." [D.E. 2217-3 at 60]. Boyd further testified that he understood the term "best brothers" to mean "up to and including if I were to, you know, want to try to get somewhere and help with the resistance somewhere, where would be the best brothers to discuss this with and try to, you know, gain access." [D.E. 2217-3 at 62].[6]

Petitioner also has not meaningfully addressed Petitioner's second trip to the Middle East in 2007 and his motivations for that trip. [D.E. 2217 at 23]. Petitioner, in his statement of facts, offers two declarations (Saleh Hamdan and Naji Sarsour) to argue that it "is a common practice for members of [Petitioner's] community to go overseas to find wives, as [Petitioner] had hoped to do in 2006 and 2007." [D.E. 2217 at 10]. The declarations, however, simply state that the two individuals have traveled to the Holy Land and/or Jerusalem several times, that Sarsour found his wife in Palestine (Hamdan found his in Jordan), that Sarsour believed that there was "nothing out of the ordinary" in both of Petitioner's overseas trips, and that neither one knew of any plans or action to participate in something violent or illegal. [D.E. 2217-20,

---

[6] Some of the declarations in support of Petitioner's motion claim that the terms "best" or "good" brothers mean something more benign than what Daniel Boyd testified. [See, e.g., D.E. 2217-21 at 2, ¶ 11; D.E. 2217-20 at 1, ¶ 7]. Petitioner did not raise such an argument in his motion, however.

2217-21].   By  contrast,  Daniel  Boyd  testified  that,  in
discussing  with  Petitioner  and  Hassan  their  trip  to  the  Middle
East,  Petitioner  and  Hassan  showed  Boyd  a  weapon.  [D.E.  2217-3
at  88-89].   Boyd  took  the  weapon  and  Petitioner's  and  Hassan's
statement  that  they  were  using  the  weapon  for  training  to  mean
that  Petitioner  and  Hassan  were  training  and  preparing  for
possible  combat.   [D.E.  2217-3  at  89].   Although,  as  Petitioner
notes,  Hassan  was  acquitted  on  a  conspiracy  charge  "despite
[Hassan's]  presence  on  the  [Middle  East]  trip"  [D.E.  2217  at
23],  the  other  evidence  against  Petitioner,  in  connection  with
the  2007  trip,  supports  Petitioner's  conviction.   As  a  result,
Petitioner  has  not  sufficiently  alleged  facts  to  show  the
required  prejudice  under  Strickland.

     In  the  alternative,  the  Court  should  grant  summary  judgment
as  to  the  first  prong  of  Strickland.   Counsel's  declaration
indicates  that  counsel  spoke  with  several  members  of
Petitioner's  family  (including  Amad  Yaghi  and  Ali  Yaghi)  but
that  those  family  members  were  unhelpful.   [Exhibit  A  at  6,
¶  13;  see also  Exhibit  17  to  Exhibit  A  at  1].   Moreover,  counsel
sates  that  "Petitioner's  bride  claim  and  defense  were
compromised  by  certain  information  that  [he]  received  during
[his]  investigation  of  the  Jordan  trip."  [Exhibit  A  at  6,
¶  14].   Counsel  also  states  that  neither  Adnan  Al-Shishani  nor

Mohammed[7] Yaghi was suggested as a witness by Petitioner. [Exhibit 17 to Exhibit A at 1]. Counsel also states that Walid Musafer (apparently the Walid Musafer Al-Shishani referenced in Petitioner's motion)[8] was interviewed by the government. [Exhibit 17 to Exhibit A at 1]. It is not clear how, given such information, counsel's performance fell below an objective standard of reasonableness.

To place counsel's performance in a wider context, counsel investigated a defense based on searching for a bride, including deposing a foreign witness regarding the issue. [Exhibit A at 5-6, ¶¶ 9-11, 14]. At trial, counsel advised Petitioner not to present witnesses once three government witnesses (members of the Boyd family) "denied having entered into a specific conspiracy with Petitioner." [Exhibit A at 7, ¶ 16]. Counsel also reached the conclusion that, had Petitioner "moved forward with witnesses during Petitioner's case in chief, . . . Petitioner's defense of seeking a bride and simply visiting with family in Jordan would have been compromised in many ways." [Exhibit A at 8, ¶ 22]. These decisions—based on counsel's

---

[7] Counsel states that a "Mohammad Yaghi" was not suggested by Petitioner. [Exhibit 17 to Exhibit A at 1]. Based on the context of counsel's exhibit, this appears to be the same individual as the Mohammed Yaghi referenced in Petitioner's motion.

[8] In his declaration, Walid Musafer Al-Shishani that he was subpoenaed by the government but was not called to testify at trial. [D.E. 2217-19 at 2, ¶ 18].

diligent work in a voluminous and complicated case [see, e.g., Exhibit A at 2-5]-are classic strategic decisions and satisfy the first Strickland prong. Dyess, 730 F.3d at 364-65.

Petitioner's third claim centers[9] on the allegation that counsel should have used an audio recording to challenge Daniel Boyd's testimony that Petitioner introduced Jude Mohammad to Boyd. [D.E. 2217 at 20-21; D.E. 2217-3 at 112-13]. Assuming, for the sake of Rule 12(b)(6), that Petitioner has accurately translated and transcribed the relevant portions of the audio recording [D.E. 2217-12 at 3-8],[10] Petitioner has not shown a reasonable probability that the outcome of the trial would have differed. The transcript suggests that Boyd had seen Mohammad earlier at the "community center" when Mohammad was "younger." [D.E. 2217-12 at 4]. That is consistent with Boyd's testimony

---

[9] Although Petitioner alleges that counsel did not review the audio tape in question, Petitioner has not offered any sworn evidence in support of that allegation. By contrast, counsel has stated that he "had to review thousands of pages of discovery, audio tapes and transcripts. This review was accomplished as quickly as possible. During the review process [he] met with Petitioner regularly." [See Exhibit A at 1, ¶ 5]. As a result, the government denies that counsel failed to listen to the audio recording in question. Nevertheless, Petitioner's claim ultimately turns on whether Daniel Boyd should have been confronted with the transcript of the audio recording.

[10] If the Court determines that Petitioner has stated a claim for which relief can be granted as to his third Strickland claim, Respondent asks that the record be further developed (either through a hearing or through discovery) to determine the full and accurate content of the audio recording, whether counsel listened to that audio recording, and the extent to which not using the audio recording at trial was a strategic decision.

that he "saw [Mohammad] a couple times at the Islamic center" before he officially met Mohammad. [D.E. 2217-3 at 112]. Boyd originally testified that he officially met Mohammad through Mohammad's mother but later corrected his testimony to indicate that he first met Mohammad through Petitioner. [D.E. 2217-3 at 112-13]. As a result, it is not clear how using the transcript on that issue would have effectively impeached Boyd.

Petitioner's further argument that counsel could have used the transcript to impeach Boyd by showing that Petitioner's presence at the Blackstone Market with Mohammad was "purely coincidental" likewise is speculative. In any event, Hysen Sherifi, on cross-examination by counsel, stated that Petitioner came to the Blackstone Market in May of 2008 to wrestle Jasmin Smajic; that he stayed at the market for a brief period of time; that he did not discuss killing or maiming; and that he "did not have any discussions with anybody at that time." [D.E. 2217-9 at 100-02]. As a result, counsel was able to raise these points in a linear, concise manner through a witness rather than through an audio recording or transcript. The decision of how to raise a particular argument at trial is strategic in nature and is entitled to deference. Dyess, 730 F.3d at 364-65.

Additionally, for the reasons discussed infra, substantial evidence was introduced supporting Petitioner's conspiracy convictions, as the Fourth Circuit discussed. United States v.

Hassan, 742 F.3d 104, 140-42 (4th Cir. 2014). As Petitioner has not satisfied the second Strickland prong, his third Strickland claim fails pursuant to Rule 12(b)(6).

Petitioner's fourth Strickland claim fails to state a claim as to prejudice. In essence, Petitioner argues that counsel should have interviewed Amber Mohammad (Jude Mohammad's sister) and used information from that interview to argue that Jude Mohammad's mother "fabricat[ed Petitioner] as the reason her son had gone to Pakistan, rather than attribute his actions to her own conduct." [D.E. 2217 at 22]. Even assuming, for the sake of a motion to dismiss under Rule 12(b)(6), that counsel failed to interview Amber Mohammad and that Mohammad would have given information consistent with her declaration [D.E. 2217-16], the declaration itself does not claim that Jude Mohammad's mother had a motivation to lie about Petitioner specifically or any of the co-defendants generally. Instead, the declaration largely recounts Amber Mohammad's allegations that the mother mistreated Jude and his siblings. The declaration does not explain how such mistreatment would have led the mother to fabricate a story against Petitioner.

Moreover, calling Amber Mohammad would have risked placing even greater attention on a witness who (1) offered "brief but emotional" testimony [D.E. 2217 at 22; see also D.E. 2217-10 at 132-37]; (2) testified about her son whom she had not seen since

he left for Pakistan in 2008; and (3) was having difficulty testifying [D.E. 2217-10 at 135, 136]. Counsel did attempt briefly to impeach the witness based on her statements to the FBI, thus showing that counsel was making an effort to impeach a potentially challenging witness. [D.E. 2217-10 at 137]. As a result, Petitioner has not shown a reasonable probability that, had counsel interviewed Amber Mohammad, that the outcome of this case or Petitioner's sentencing would have differed.

In the alternative, the Court should grant summary judgment based on the first _Strickland_ prong. As counsel stated in his declaration, "strategically it was not . . . necessary to berate Jude Mohamm[a]d's crying mother." [Exhibit A at 7-8, ¶ 20]. As argued previously, the Court should defer to this strategic trial decision.

In the alternative, if the Court determines that Petitioner has otherwise stated a claim as to the Amber Mohammad issue, the government asks for a hearing limited to whether counsel or his representative interviewed Mohammad. [See Exhibit 17 to Exhibit A at 1].

II. Petitioner's Giglio Claim.

Petitioner also raises a claim under the Due Process Clause through _Giglio v. United States_, 405 U.S. 150 (1972). [D.E. 2217 at 24-26]. Petitioner alleges that the government failed to produce evidence that could have been used to impeach

17

Kohlmann based on bias. In support of this claim, Petitioner has offered a declaration from counsel (Dratel) in another case who states that he has seen these materials (hereinafter the "Kohlmann Information"). [D.E. 2217-32].

"The Due Process Clause requires the prosecution to disclose upon request evidence that is favorable to the defense and material to guilt or punishment." United States v. Sterling, 724 F.3d 482, 511 (4th Cir. 2013); see also Local Criminal Rule 16.1. Evidence is favorable if it is exculpatory or may be used for impeachment. Sterling, 724 F.3d at 511 (citing Brady and Giglio). "A failure to disclose violates due process only if the evidence in question (1) is favorable to the defendant because it is either exculpatory or impeaching; (2) was suppressed by the government; and (3) is material in that its suppression prejudiced the defendant." Id.; see also Banks v. Dretke, 540 U.S. 668, 691 (2004).

The materiality prong is satisfied when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435 (1995). When evaluating the materiality of the government's use of false or misleading testimony, a court considers whether the false testimony "could affect the judgment of the jury." United States v. Bartko, 728 F.3d 327, 335 (4th Cir. 2013) (citing Giglio, 405 U.S. at 154).

18

Evidence of bias that is cumulative of already-presented evidence is immaterial. Bartko, 728 F.3d at 339. Additionally, in determining whether potential impeachment evidence is material, courts consider the importance of the witness and the potential value of the undisclosed information:

> "In general, evidence whose function is impeachment may be considered to be material where the witness in question supplied the only evidence linking the defendant to the crime." United States v. Avellino, 136 F.3d 249, 256 (2nd Cir. 1998). Likewise, we may find impeaching evidence to be "material where the witness supplied the only evidence of an essential element of the offense." Id. at 257. "This is especially true where the undisclosed matter would have provided the only significant basis for impeachment." Id.

Id.

Even assuming, solely for the sake of argument and solely for the purposes of Rule 12(b)(6), that the Kohlmann Information could thoroughly impeach Kohlmann's testimony, Petitioner cannot satisfy the materiality prong because it would not undermine the jury's confidence in the verdict. Kohlmann was not the kind of witness discussed in Bartko whose impeachment could be deemed material. Bartko, 728 F.3d at 339. Even if the Kohlmann Information resulted in Kohlmann's total impeachment or even prevented him from being allowed to testify as an expert, more than sufficient evidence was introduced at trial to support Petitioner's convictions. In rejecting the defendants'

challenge to the sufficiency of the evidence, the Fourth Circuit reviewed the "voluminous trial record" and concluded that the "evidence, though largely circumstantial, was nonetheless substantial" and "readily supports the determination that a rational finder of fact could (and in fact did) deem the evidence adequate to support each conviction beyond a reasonable doubt." United States v. Hassan, 742 F.3d 104, 140 (4th Cir. 2014).

The Court then summarized in detail evidence "sufficient [to] support each of Yaghi's conspiracy convictions." Hassan, 742 F.3d at 141. The summarized evidence deals with Petitioner's actions and interactions with his co-defendants. Id. Those actions included: meeting and becoming friends with Boyd and sharing "beliefs in the necessity of violent jihad"; traveling to Jordan in 2006, "seeking to reach the battlefield" and maintaining contact with Boyd; before departing to Jordan, asking Boyd where to find the "best brothers" and mentioning "finding a wife," which were "coded references for seeking others who shared Yaghi's beliefs in violent jihad and could help Yaghi make his way to the battlefield"; bringing Hassan to Boyd's home, "thus recruiting another man to the terrorism conspiracies"; flying in 2007 to the Middle East with Hassan with the "hope of engaging in violent jihad"; and

"facilitat[ing] an introduction between Boyd and defendant Jude Kenan Mohammad in 2008." Id.

After summarizing the evidence, the Court held:

> The trial evidence fully supports the jury's finding that Yaghi believed in violent jihad and acted on those beliefs in concert with coconspirators. Yaghi understood and acquiesced in the objectives of the Count One and Count Two conspiracies, i.e., providing material support and resources for, and committing acts of murder outside the United States. Moreover, numerous overt acts were undertaken in furtherance of each conspiracy, including Yaghi's 2007 trip to the Middle East and his efforts to recruit others into the conspiracies. The verdict against Yaghi must therefore be sustained.

Id. at 142. Thus, setting aside Kohlmann's testimony would not undermine or call into question Petitioner's guilty verdict on Counts One or Two.

Admittedly, in responding to the defendants' motions for acquittal at the closing of the government's evidence, the government discussed Kohlmann's testimony several times. [D.E. 1850 at 152-54, 156, 157, 169]. The government also discussed Kohlmann's testimony during its closing argument. [D.E. 2217-11 at 14-17, 26, 36, 37, 39, 63, 64, 81, 83]. Those discussions of Kohlmann's testimony, however, are best viewed as framing arguments regarding the nature of global jihad and homegrown terrorism, including the use of propaganda and code words and

notable individuals within those networks.[11]    As noted previously, the evidence on which the Fourth Circuit focused concerned Petitioner's actions and statements.  See also Hassan, 742 F.3d at 116-21 (summarizing evidence, in the light most favorable to the government, as it relates to Yaghi and Hassan).

Moreover, testimony from at least one other witness addressed the code words highlighted by the Fourth Circuit ("best brothers" and "finding a wife"). [D.E. 2217-7 at 229-30, 233-35].   Daniel Boyd testified directly regarding these specific coded phrases.   Boyd testified that he understood the term "best brothers" to mean "up to and including if I were to, you know, want to try to get somewhere and help with the resistance somewhere, where would be the best brothers to discuss this with and try to, you know, gain access." [D.E. 2217-3 at 62].   Boyd likewise testified that it was his understanding that Petitioner was in Jordan to find his way to a battlefront.  [D.E. 2217-3 at 63-64].   Boyd further testified that he understood Petitioner's discussion of "getting married" referred to the process of getting to a battlefield.  [D.E. 2217-3 at 104].   Additionally, Boyd testified how he assisted Petitioner and Hassan in obtaining tickets in an effort to travel to Palestine.

---

[11] Kohlmann also testified about and described various propaganda found on the defendants' media.  [D.E. 2217-7 at 235-72].

In the alternative, if the Court determines that Petitioner has adequately alleged facts to satisfy the materiality prong of Giglio, the government does not object to the Court's reviewing the Kohlmann Information _in camera_ to determine if it in fact contains undisclosed material impeachment information. Accordingly, the government is filing simultaneously a classified appendix containing a copy of the "Kohlmann Information" and a discussion[12] of that information should the Court elect to review it.

III. <u>The Claims Raised in Petitioner's Original § 2255 Motion</u>.

Out of an abundance of caution, Respondent addresses the claims raised in Petitioner's original § 2255 motion. [D.E. 2207]. Those claims fail under Rule 12(b)(6) for reasons discussed previously, because the Fourth Circuit already addressed them, or due to procedural default.

First, Petitioner alleges ineffective assistance of counsel for reasons largely argued previously (for example, failing to interview witnesses to support Petitioner's stated reason for traveling to Jordan, failing to cross-examine Kohlmann, and failing to challenge Jude Mohammad's mother). [D.E. 2207 at 13-15]. Petitioner also claims that counsel should have objected to certain government statements and should have cross-examined

---

[12] A redacted unclassified version of the discussion of the Kohlmann Information is also being filed contemporaneously with the Court.

Musa and Ismail more effectively. [D.E. 13, 15]. Those decisions (when to object to government statements and how to cross-examine witnesses) are strategic decisions and are entitled to deference under Strickland. In the alternative, those claims fail to satisfy the prejudice prong of Strickland, due to the weight of the evidence against Petitioner discussed previously.

Second, Petitioner alleges that the government failed to provide certain information regarding Kohlmann that is referenced in the Dratel declaration. [D.E. 2207 at 5]. This appears to be the Giglio claim that is explored at greater length in Petitioner's supplemental filing and fails for the reasons discussed in Argument Section II, supra.

Third, Petitioner challenges the validity of Kohlmann's testimony. [D.E. 2207 at 6-7]. The defendants in this matter challenged the Court's decision allowing Kohlmann to testify as an expert, and the Fourth Circuit rejected those challenges. Hassan, 742 F.3d at 130-32. Absent a change in the law, petitioner cannot relitigate a claim on collateral review that was decided on direct review. See United States v. Roane, 378 F.3d 382, 396 n.7 (4th Cir. 2004) ("Because the Defendants have not pointed to any change in the law that warrants our reconsideration of these claims, we agree with the district court that they cannot relitigate these issues."); Boeckenhaupt

v. United States, 537 F.2d 1182, 1183 (4th Cir. 1976) (per curiam).

Fourth, Petitioner claims that he is actually innocent. [D.E. 2207]. To the extent Petitioner is challenging the adequacy of the evidence against him, the Fourth Circuit rejected a sufficiency of the evidence challenge on direct review. Hassan, 742 F.3d at 141-42. To the extent Petitioner is relying on the witnesses whose declarations he is using to support his ineffective assistance of counsel claim, those claims fail to undermine Petitioner's guilty verdicts for the reasons stated previously. That is, just as those declarations do not create a reasonable probability of a different outcome at trial, they would not undermine Petitioner's convictions in this case.

Fifth, Petitioner alleges that the government engaged in misconduct by "threaten[ing] witnesses if they cooperated with [Petitioner's] defense team." [D.E. 2207 at 16]. This claim is procedurally defaulted, as it was not raised on direct review. Bousley v. United States, 523 U.S. 614, 622 (1998). Petitioner's explanation for that procedural default is vague and does not satisfy the pleading requirements of Rule 12(b)(6). [D.E. 2207 at 16]. Furthermore, Petitioner's allegations as to this claim lack the specificity necessary to make it plausible. Aziz v. Alcolac, Inc., 658 F.3d 388, 391 (4th Cir. 2011).

25

<u>CONCLUSION</u>

For these reasons, Respondent respectfully asks the Court to dismiss Petitioner's motion or, in the alternative, grant summary judgment in Respondent's favor.

Respectfully submitted, this 12th day of May, 2016.

JOHN STUART BRUCE
Acting United States Attorney

By: <u>/s/ Seth M. Wood</u>
SETH M. WOOD
Attorney for Respondent
Assistant United States Attorney
Appellate Division
310 New Bern Avenue
Suite 800 Federal Building
Raleigh, NC 27601-1461
Telephone: (919) 856-4530
Facsimile: (919) 856-4821
Email: seth.wood@usdoj.gov
N.C. Bar # 48345
D.C. Bar # 491011

26

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has this the 12th day of May, 2016, been served upon counsel for Petitioner by CM/ECF filing system, as follows:

Charles Davidson Swift
Constitutional Law Center for Muslims in America

/s/ Seth M. Wood
SETH M. WOOD
Attorney for Respondent
Assistant United States Attorney
Appellate Division
310 New Bern Avenue
Suite 800 Federal Building
Raleigh, NC 27601-1461
Telephone: (919) 856-4530
Facsimile: (919) 856-4821
Email: seth.wood@usdoj.gov
N.C. Bar # 48345
D.C. Bar # 491011